**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW G. MCCABE, <br><br> *Plaintiff*, <br><br> v. <br><br> WILLIAM P. BARR, <br> in his official capacity as <br> ATTORNEY GENERAL OF THE <br> UNITED STATES, <br> U.S. Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530; <br><br> U.S. DEPARTMENT OF JUSTICE, <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530; <br><br> CHRISTOPHER A. WRAY, <br> in his official capacity as <br> DIRECTOR OF THE FEDERAL BUREAU OF <br> INVESTIGATION, <br> Federal Bureau of Investigation, <br> 935 Pennsylvania Avenue, NW <br> Washington, DC 20535; and <br><br> FEDERAL BUREAU OF INVESTIGATION, <br> 935 Pennsylvania Avenue, NW <br> Washington, DC 20535, <br><br> *Defendants*. | Civil Action No. 19-2399 |

**COMPLAINT**

Plaintiff Andrew G. McCabe, by and through his attorneys, hereby brings this Complaint against William P. Barr, acting in an official capacity as Attorney General of the United States; the U.S. Department of Justice ("DOJ"); the Federal Bureau of Investigation ("FBI"); and Christopher A. Wray, acting in an official capacity as Director of the FBI.  In support thereof, upon personal knowledge as well as information and belief, Plaintiff alleges the following:

## NATURE OF THE ACTION

1.      Plaintiff is the former Deputy Director of the FBI and a career civil servant.  He believes that the United States government remains "a government of laws, and not of men," *Marbury v. Madison*, 5 U.S. 137, 163 (1803), and has brought this case to remedy Defendants' unlawful retaliation for his refusal to pledge allegiance to a single man.

2.      Plaintiff served the FBI with fidelity, bravery, and integrity for more than 21 years, defending the United States against enemies both foreign and domestic.  Most recently, Plaintiff's work at the FBI included investigating whether the 2016 U.S. presidential campaign of then-Republican Party nominee Donald J. Trump ("Trump") was linked to the Russian government's efforts to interfere in the 2016 U.S. presidential election ("the Russia investigation").  Defendants responded to Plaintiff's two decades of unblemished and non-partisan public service with a politically motivated and retaliatory demotion in January 2018 and public firing in March 2018—on the very night of Plaintiff's long-planned retirement from the FBI.  Defendants' actions have harmed Plaintiff's reputation, professional standing, and dramatically reduced his retirement benefits.  Plaintiff asks this Court to find that his demotion was unlawful and his purported termination was either a legal nullity or, in the alternative, unlawful, and to award him any and all relief necessary for him to retire as he had originally planned:  as the Deputy Director of the FBI

and an agent in good standing, with sufficient time in service to enable him to receive his full earned law enforcement pension, healthcare insurance, and other retirement benefits.

3.    Trump, acting in an official capacity as President of the United States, is responsible and accountable for Defendants' actions.  Trump purposefully and intentionally caused the unlawful actions of Defendants and other Executive Branch subordinates that led to Plaintiff's demotion and purported termination.  It was Trump's unconstitutional plan and scheme to discredit and remove DOJ and FBI employees who were deemed to be his partisan opponents because they were not politically loyal to him.  Plaintiff's termination was a critical element of Trump's plan and scheme.  Defendants—as well as then-Attorney General ("AG") Jefferson Beauregard Sessions III ("Sessions"), Defendant Barr's predecessor—knowingly acted in furtherance of Trump's plan and scheme, with knowledge that they were implementing Trump's unconstitutional motivations for removing Plaintiff from the civil service.  Trump demanded Plaintiff's personal allegiance, he sought retaliation when Plaintiff refused to give it, and Sessions, Wray, and others served as Trump's personal enforcers rather than the nation's highest law enforcement officials, catering to Trump's unlawful whims instead of honoring their oaths to uphold the Constitution.  Were it not for Trump's plan and scheme and the complicity of Defendants and other Executive Branch subordinates, Plaintiff would have otherwise been permitted to retire as he had long planned.

4.    Since the 2016 U.S. presidential election, Trump's public statements reflect his false and unreasonable view that DOJ and FBI employees' work in support of the Russia investigation—including the work by Plaintiff, former FBI Director James B. Comey ("Comey"), and the members of Special Counsel Robert S. Mueller III's investigative team—is evidence of those employees' affiliation with Trump's partisan opponents in the Democratic Party.

5.      But even before Trump knew of Plaintiff's work on the Russia investigation, Trump had already repeatedly lied about Plaintiff, singling him out for his alleged but non-existent association with Trump's political opponents.  During the 2016 U.S. presidential campaign, Trump repeatedly and falsely attacked Plaintiff for his wife's political activity and alleged ties to Trump's election opponent, Hillary Rodham Clinton ("Clinton"), the Democratic presidential nominee, former U.S. Secretary of State, and wife of former President William J. Clinton.  After the election, Trump continued and amplified these false attacks after learning that Plaintiff did not vote for Trump in the 2016 U.S. presidential election.  Trump's repeated public and private statements are direct evidence of Trump's perception of Plaintiff's partisan affiliation, Trump's attribution of Plaintiff's wife's political activity to Plaintiff based solely upon their marriage, and Trump's constitutionally improper motives for removing Plaintiff from the career civil service.

6.      In 2017, Trump determined to have Plaintiff fired as soon as possible in order to deprive Plaintiff of his full retirement benefits.  Trump's decision was motivated by his unconstitutional desire to punish Plaintiff for his refusal to pledge partisan allegiance to Trump, for Trump's misperception of Plaintiff's partisan affiliation, and for Plaintiff's lawful exercise of his First Amendment-protected rights of expression and association.  Through public statements and private communications detailed herein, Trump repeatedly made his determination to fire Plaintiff known to DOJ and FBI officials, and Defendants knew that they were implementing Trump's unconstitutional motivations for removing Plaintiff from the civil service.

7.      In January 2018, Defendant Wray demoted Plaintiff from the role of Deputy Director of the FBI without meaningful explanation.  Wray rebuffed Plaintiff's request to explain the specific basis for the demotion, saying that Wray and Sessions had agreed not to discuss the

specific reason with Plaintiff.  In truth, the demotion was politically motivated and had no legal basis, because Wray and Sessions were bowing to Trump's illegitimate directions.

8.      In February and March 2018, because of and in direct response to Trump's requests, pressure, and influence, Defendants initiated and accelerated pretextual disciplinary proceedings in order to satisfy Trump's unlawful desire to remove Plaintiff before his announced retirement date.  If Defendants had followed standard procedures, they could not have fired Plaintiff before that date.  Therefore, Defendants subjected Plaintiff to expedited disciplinary proceedings, which they knew to be irregular, legally deficient, and non-compliant with statutory requirements and agency policies.  Plaintiff's termination was the intended, predetermined, unjustified, and vindictive result of these pretextual proceedings.

9.      Around 10 p.m. on Friday, March 16, 2018, Sessions announced to the press that he had terminated Plaintiff's employment with the FBI.  Plaintiff first learned of his "termination" from press reports.  This purported termination was a political maneuver with no legal basis.  At the time of Sessions' press announcement, Plaintiff had already retired, having already begun "terminal leave" two months earlier, and having completed his final week of service to the FBI earlier on March 16, 2018, at the 5 p.m. close of normal business hours.  But even if Plaintiff had not already retired, the issuance of a press announcement was not a legally valid or effective method for removing an employee from the federal civil service.  That announcement also stated that Sessions was terminating Plaintiff pursuant to DOJ Order 1202, but that Order actually deprived Sessions of any authority to terminate Plaintiff.  Regardless, Defendants treated Sessions' after-hours announcement as if it had legal effect, and they have caused the withholding of Plaintiff's full retirement benefits, including his law enforcement pension and health insurance.

10.     Defendants invoked pretextual reasons for terminating Plaintiff.  But for their acquiescence to Trump's improper and unlawful desires, they would never have asserted those pretextual reasons—nor would they have targeted Plaintiff for termination in the first place.  They also would have instead applied the procedures and policies regularly applicable to FBI employees in Plaintiff's circumstances, and would have let Plaintiff retire with the full benefits he had earned over two decades of loyal and honorable service to the United States.

11.     Plaintiff seeks to vindicate his rights and address the chilling effect of Defendants' message to career civil servants that they, like Plaintiff, are at risk for politically motivated termination.  Plaintiff hereby asks the Court to review Defendants' decisions to demote and terminate Plaintiff on the grounds that they violated the First Amendment, because those decisions were unlawfully based on Plaintiff's perceived partisan affiliation and taken in retaliation for his constitutionally protected conduct.  Plaintiff also asks the Court to review Defendants' termination decision on the grounds that it violated the Fifth Amendment's Due Process Clause, because it was undertaken without lawful authority and in violation of explicit procedural protections.

12.     Plaintiff seeks equitable relief in vindication of his constitutional rights; declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and *mandamus* relief under 28 U.S.C. § 1361.

13.     Plaintiff requests that the Court exercise its jurisdiction and authority to issue a declaratory judgment that Defendants' termination announcement was a legal nullity, that Plaintiff retired as Deputy Director of the FBI and an agent in good standing, and that Plaintiff is immediately entitled to his full law enforcement pension and all other benefits, privileges, and rights currently being withheld.  In the alternative, Plaintiff requests that the Court exercise its jurisdiction and authority to issue a declaratory judgment that Defendants' demotion and

termination of Plaintiff's employment were unlawful, and to order equitable relief that reverses Defendants' unlawful personnel actions; reinstates Plaintiff's employment as Deputy Director of the FBI so he can retire in good standing and in a manner that lets him collect his full law enforcement pension, health insurance, and other retirement benefits; and enjoins Defendants from interfering with Plaintiff's receipt of those benefits and from taking any further retaliatory actions. Plaintiff also requests that the Court provide all other relief, including writs of *mandamus*, that the Court deems appropriate.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States, and under 28 U.S.C. § 1361 because Plaintiff seeks writs of *mandamus* to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiff and required under law.

15. Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702, and by the fact that Defendants acted unconstitutionally and beyond statutory authority.

16. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

## PARTIES

17. Plaintiff Andrew G. McCabe is a citizen of the United States and resides in the Commonwealth of Virginia. He was employed by the FBI from 1996 until 2018.

18. Defendant William P. Barr, serving as Attorney General of the United States and the head of DOJ, has his office in the District of Columbia. He is sued only in an official capacity.

19. Defendant U.S. Department of Justice is an Executive department, 5 U.S.C. § 101, and an "agency" within the meaning of 5 U.S.C. § 701. DOJ's principal offices are in the District of Columbia.

20.     Defendant Christopher A. Wray, serving as FBI Director, has his office in the District of Columbia.  He is sued only in an official capacity.

21.     Defendant FBI is a subordinate component of the DOJ pursuant to 28 C.F.R. § 0.1. The FBI's principal offices are in the District of Columbia.

## FACTS

### A.    <u>Plaintiff's Career with the FBI</u>

22.     Plaintiff was employed by the FBI from July 1996, until March 2018.  During his over 21-year career with the FBI, Plaintiff served in several different positions, all with distinction.

23.     In 1996, Plaintiff joined the FBI as a special agent in the New York field office.

24.     Throughout his career with the FBI, Plaintiff made contributions toward a law enforcement retirement annuity.  After five years of FBI service, in June 2001, Plaintiff's property interest in his retirement annuity vested.

25.     In 2003, Plaintiff was promoted to the title of "supervisory special agent."

26.     In 2006, Plaintiff accepted a position at FBI Headquarters in Washington, D.C.

27.     In 2009, Plaintiff was promoted to the FBI Senior Executive Service ("SES"), comprised of the highest-ranking supervisors within the FBI.  At this time, Plaintiff's title in the SES remained "supervisory special agent."  By law, the SES "shall be administered" in a manner "free from improper political interference."  5 U.S.C. § 3131(13); *id.* § 3151(a)(1) (requiring that regulations establishing FBI SES shall meet § 3131's requirements).

28.     Plaintiff was never a political appointee and remained a career civil servant for the entirety of his FBI service.

29.     Effective February 1, 2016, Plaintiff was promoted to the role of Deputy Director, the FBI's second-in-command and the highest attainable career role in the FBI for a civil servant such as Plaintiff.

30.     In 2016, Plaintiff decided to retire from the FBI in March 2018, when he would reach retirement age, with sufficient years of service to receive his full law enforcement pension and other related benefits, including healthcare coverage.

31.     On May 9, 2017, Plaintiff became Acting Director of the FBI after Trump fired Director Comey.

32.     On May 13, 2017, Plaintiff notified then-AG Sessions and then-Deputy Attorney General ("DAG") Rod J. Rosenstein ("Rosenstein"), the second highest-ranking official at DOJ, of Plaintiff's intent to retire in March 2018.

33.     On August 2, 2017, Plaintiff resumed his role as Deputy Director after Defendant Wray was confirmed as the new Director of the FBI.

34.     On December 23, 2017, Plaintiff's plan to retire became public.

35.     Plaintiff held the position of Deputy Director until January 29, 2018.  At that time, he submitted notice of his forthcoming retirement in March 2018 and transitioned to non-duty, terminal leave status.  The same day, Defendant Wray named David L. Bowdich ("Bowdich") as Deputy Director.

36.     On or about February 15, 2018, Plaintiff notified the FBI that the first full day of his retirement would be Saturday, March 17, 2018.  (Plaintiff had previously notified the FBI that his retirement would commence on March 19, 2018, the day after his 50th birthday, but FBI human resources personnel later instructed him, consistent with federal regulations, that he would be deemed to reach the age of 50 and become eligible for full retirement benefits on March 17, 2018,

the day before his 50th birthday.)  Because this date would fall during a weekend, Plaintiff's last day of service was scheduled for Friday, March 16, 2018.

37.      On Friday, March 16, 2018, upon the close of regular business at 5 p.m., Plaintiff completed his service with the FBI and privately celebrated his retirement.  On this day, the FBI deducted a full day of leave from Plaintiff's accrued leave time account.

38.      On March 16, 2018, just before 10 p.m., Sessions issued a public statement announcing that he had terminated Plaintiff's employment with the FBI.

**B.      The 2016 U.S. Presidential Election**

39.      Throughout 2015, multiple individuals announced that they would seek the presidency of the United States.  Clinton did so in April 2015, declaring herself a candidate for the Democratic Party's presidential nomination.  Trump did so in June 2015, declaring himself a candidate for the Republican Party's presidential nomination.

40.      In July 2015, the FBI opened an investigation into whether Clinton had improperly stored or transmitted classified information on a private email server while conducting official business during her tenure as Secretary of State ("Clinton email investigation").  Plaintiff had no role in this investigation until he became FBI Deputy Director in February 2016.

41.      Trump and Clinton won and accepted their respective parties' presidential nominations during the summer of 2016.

42.      Throughout the 2016 U.S. presidential campaign and beyond, Trump falsely accused non-partisan government institutions and officials of supporting Clinton's candidacy, the Democratic Party, or both.

43.      Trump routinely made (and continues to make) these false accusations by publication     through     the     Internet     social     media     platform     Twitter,     available     at

http://www.twitter.com. Through Twitter, Trump could "tweet" (*i.e.*, publish) short statements (also known as "tweets"), which would then be publicly available on the Internet, even to readers without Twitter accounts. Trump's personal Twitter account uses the name "@realDonaldTrump" and his posts are available at https://twitter.com/realDonaldTrump. Trump also has access to the presidency's official Twitter account, which uses the name "@POTUS" and can be read at https://twitter.com/POTUS. Trump's tweets through both the @realDonaldTrump and @POTUS accounts, including those concerning Plaintiff, were—and continue to be—routinely republished and commented upon by the press and other individuals in print, on television, and on the Internet.

44. On or about July 31, 2016, the FBI began a counter-intelligence investigation into whether Trump campaign associates were linked to the Russian government's efforts to interfere in the 2016 U.S. presidential election. In May 2017, the Russia investigation was assigned to a Special Counsel, former FBI Director Robert S. Mueller III ("Mueller"). Over time, that investigation identified links, both alleged and proven, between individuals in Trump's presidential campaign and the Russian government and other Russian individuals and entities. *See generally* Special Counsel Robert S. Mueller III, REPORT ON THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION (Mar. 2019) ("Special Counsel Report"), *redacted version available at* https://www.justice.gov/storage/report.pdf, 2019 WL 1780145 (Vol. I), and 2019 WL 1780146 (Vol. II).[1]

---

[1] *E.g.*, Indictment at 1-3, *United States v. Netyksho, et al.*, No. 18-CR-215 (D.D.C. July 13, 2018) (charging 12 officers of the Russian Federation's military intelligence agency with cyber operations intended to interfere with the 2016 U.S. presidential election); Superseding Indictment at 1, 3, *United States v. Manafort*, No. 17-CR-201 (D.D.C. June 6, 2018) (alleging that Trump's 2016 presidential campaign chairman acted as an unregistered agent of Ukraine and the Party of Regions, "a pro-Russia political party in Ukraine"); Plea Agreement at 1, 4, *United States v. Gates*, No. 17-CR-201-2 (D.D.C. Feb. 23, 2018) (admitting to working as an employee of companies run by Manafort, including as an agent of the Party of Regions); Indictment at 2-3, *United States v.*

45.     On July 5, 2016, FBI Director Comey publicly announced the conclusion of the Clinton email investigation with the recommendation that the facts did not support bringing any criminal charges against Clinton.

46.     It was in this context in 2016 that Trump began to attack Plaintiff, then serving as FBI Deputy Director, and Plaintiff's wife, because Trump apparently perceived that Plaintiff was affiliated with Clinton and Democratic Party and would not be personally loyal to Trump.  As has been publicly reported, Trump values, needs, and seeks pledges of personal loyalty from government officials (as in the case of former FBI Director Comey) which are different from and contravene these officials' oaths to uphold the Constitution and laws of the United States.  Trump improperly expects political loyalty even from career civil servants, *i.e.*, government employees who are not politically appointed and cannot be dismissed for political reasons.

C.     **Trump Begins to Attack Plaintiff Because of His Perceived Partisan Affiliation**

47.     Plaintiff's wife, Dr. Jill McCabe, is a respected pediatric emergency physician.  In March 2015, Dr. McCabe announced her candidacy as a Democratic candidate for the Virginia state senate.  Ultimately, Dr. McCabe lost to the Republican incumbent in the Virginia election held on November 3, 2015.

48.     In 2015, Plaintiff was not involved in the Clinton email investigation, and he had not yet been promoted to Deputy Director of the FBI.

---

*Internet Research Agency, et al.*, No. 18-CR-032, (D.D.C. Feb. 16, 2018) (charging 13 Russian individuals and three Russian companies with conducting operations to defraud the United States and to interfere "with the U.S. political and electoral processes, including the presidential election of 2016"); Statement of the Offense at 1-3, *United States v. Flynn*, No. 17-CR-232 (D.D.C. Dec. 1, 2017) (pleading guilty to making false statements to FBI regarding Flynn's conversations with the Russian ambassador to the United States about U.S. sanctions); Statement of the Offense at 1-3, *United States v. Papadopoulos*, No. 17-CR-182 (D.D.C. Oct. 5, 2017) (Trump's National Security Advisory pleading guilty to making false statements to the FBI regarding his communications with foreign individuals tied to the Russian government).

49.     Before Dr. McCabe announced her candidacy, Plaintiff notified numerous FBI officials, including the FBI Deputy Director, FBI General Counsel, and FBI chief ethics officer, to seek their guidance in order to ensure that Plaintiff took any steps necessary to comply with government ethics obligations and avoid conflicts of interest.  None of the FBI officials expressed any concerns, and the FBI provided Plaintiff with specific guidelines he needed to observe with respect to Dr. McCabe's campaign.  Plaintiff followed those guidelines.

50.     In the summer of 2015, Plaintiff, Dr. McCabe, and their children attended a swim meet.  There, Plaintiff posed for a family photograph in which each family member wore a campaign T-shirt reading: "DR. JILL MCCABE FOR STATE SENATE."  That family photograph was later posted to an Internet social media page for Dr. McCabe's campaign.  Plaintiff's appearance in this family photograph, which did not identify him as an FBI employee, was not inconsistent with the ethics guidance he received.

51.     During the 2015 Virginia election campaign, the "Common Good VA" political action committee affiliated with then-Governor Terence R. McAuliffe ("McAuliffe") made contributions to numerous Democratic Party campaigns for Virginia state office, as part of an effort to gain Democratic majorities in the state legislature, including donations of over $250,000 to each of five state senate campaigns.  During the 2015 election campaign, one state senate campaign received $803,500 from Common Good VA, another received $781,500, and Dr. McCabe's campaign received $467,500.  McAuliffe was a Democrat and, in 2008, had served as the co-chair of then-Senator Clinton's first presidential campaign.

52.     Plaintiff had no knowledge of Common Good VA's contribution to Dr. McCabe's campaign until late October 2016.

12

53.     Beginning in 2016, Trump—then the Republican candidate for president—began to assert falsely that Clinton and/or McAuliffe had given money to Plaintiff and/or Dr. McCabe in order to influence Plaintiff's decisions about the Clinton email investigation.  Specifically, Trump falsely stated or implied that (a) Plaintiff oversaw the Clinton email investigation during Dr. McCabe's 2015 Virginia state senate race, which he did not; (b) Plaintiff decided to end that investigation, which he did not; and (c) the investigation was ended because of political contributions received by Dr. McCabe, which it was not.  Trump also falsely stated the amounts contributed by Common Good VA to Dr. McCabe's campaign.

54.     For example, according to press reports, on October 24, 2016, Trump falsely stated at a campaign rally that:

> [O]ne of the closest people to Hillary Clinton […] gave more than $675,000 to the campaign of the spouse, the wife of the top FBI official, who helped oversee the investigation into Mrs. Clinton's illegal email server.  So the man that was investigating her from the FBI, his wife runs for office and they give her more than $675,000 to run.[…]  And it's unbelievable how Hillary Clinton got away with the email lie, the email scam, the email corruption, but now at least we have a pretty good idea.

55.     The next day, Trump further falsely stated during an interview with Fox News:

> Terry McAuliffe, they gave to the FBI person at the high level, who was doing the investigation, who was in charge of the investigation. They gave his wife $675,000.  Now you think of that.  Now, that's Clinton giving the money because that's how close they are.  So Clinton gave the FBI agent, who was—top person, who's the top person in charge of her email case, which is a disgrace that she got off of that.[…]  She gave money at a huge clip, $675,000, to the wife of the FBI agent who was in charge of her investigation.

56.     Even after the election, Trump has continued to make these and other false statements about Plaintiff and his wife.  *See infra* ¶¶ 95, 101-102, 104, 133-147.

57.     Trump's statements quoted in this Complaint, as well as others, attributed Dr. McCabe's political activities to Plaintiff because of their marriage.  Trump's statements also

13

reflected his perception that Plaintiff was affiliated with Clinton and the Democratic Party and was, therefore, Trump's partisan opponent and not a Trump loyalist.

**D.**       **Even After the Election, Trump's Attacks Continued**

58.     Despite losing the popular vote to Clinton by approximately 2.87 million votes, Trump won the 2016 U.S. presidential election by winning the vote of the Electoral College.

59.     On January 6, 2017, the Office of the Director of National Intelligence released a declassified intelligence report that stated: "Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the U.S. presidential election," in part to help Trump's chances in that election. The report also stated that "[i]n July 2015, Russian intelligence gained access to Democratic National Committee (DNC) [computer] networks and maintained that access until at least June 2016" and released material acquired from the DNC computer networks to third parties. Similarly, Special Counsel Mueller later reported in March 2019 that there were "numerous links between the Russian government and the Trump Campaign," that "the Russian government perceived it would benefit from a Trump presidency and worked to secure that outcome," and that the Trump campaign "expected it would benefit electorally from information stolen and released through Russian efforts." Special Counsel Report, Vol. I, at 1-2.

60.     Trump was inaugurated on January 20, 2017. Given his loss of the popular vote and his campaign's acceptance of Russian assistance during the presidential election, Trump entered office with reason to believe that he was already in political jeopardy and with a motive to protect himself, regardless of legal requirements and constraints.

61.     After his inauguration, Trump's public statements continued to reflect his fear of the Russia investigation, his criticism of it as a partisan effort by his Democratic opponents, and his desire to remove from government anyone whom he deemed to be his partisan opponent.

62.     Once in office, Trump began to purge the DOJ and FBI of officials whom he perceived as his partisan opponents rather than Trump loyalists, and as affiliated with the Democrats because of their support for the Russia investigation.

63.     Trump's purge targeted Plaintiff in particular because Trump had already decided during the 2016 U.S. presidential campaign that Plaintiff was his partisan enemy by virtue of Plaintiff's marriage to Dr. McCabe.  However, even if Trump had accurately perceived Plaintiff's partisan affiliation, Plaintiff's political thoughts, beliefs, and affiliations were irrelevant to his job qualifications because Plaintiff was never a political appointee, and party affiliation has never been a requirement for the effective performance of Plaintiff's positions.

64.     In fact, partisan activity or affiliation with the President's political party has never been relevant even to the FBI *Director's* qualifications or effectiveness.  For example, Democratic Presidents Obama, Clinton, and Carter each chose a Republican to serve as FBI Director. Additionally, DOJ and FBI policy has, for at least the last 40 years, restricted contact between the FBI Director and the President—restrictions that Trump has ignored and repeatedly violated.

65.     Nevertheless, Trump intended to press Plaintiff for a pledge of political loyalty and to have Plaintiff removed from government after Plaintiff refused.

66.     Trump implemented his desire to remove Plaintiff from government by pressuring Sessions and other subordinate DOJ and FBI officials, including Deputy Attorney General Rod J. Rosenstein ("Rosenstein") and DOJ Inspector General Michael E. Horowitz ("Horowitz"), such as by threatening to terminate Sessions and Rosenstein, and by accusing Sessions, Rosenstein, and Horowitz of disloyalty and/or bias.  Trump routinely made such threats and accusations against subordinate officials in order to induce their compliance with Trump's desires, including but not limited to his desire for Plaintiff's accelerated and unlawful termination.  Trump's use of threats

and accusations to cause his subordinates to act is memorialized in his tweets and other public documents, including the Special Counsel Report.

67.     In January, February, and March 2017 conversations with then-FBI Director Comey, Trump repeatedly emphasized his perception that Plaintiff was affiliated with Clinton and the Democratic Party, and he repeatedly asked Comey about Plaintiff's personal loyalty to Trump.

68.     On January 27, 2017, Trump had dinner with Comey in the White House.  During that dinner, Trump repeatedly told Comey that he needs and expects loyalty.  Trump later asked Comey whether Plaintiff had a problem with Trump, explaining: "I was pretty rough on him and his wife during the campaign."  Comey explained that Plaintiff was a true professional and had no problem with Trump.  Nonetheless, Trump later asked again whether Plaintiff "was going to be okay," and Comey reaffirmed Plaintiff's ability and professionalism.  However, because Trump cared only about Plaintiff's perceived partisan affiliation and loyalty to Trump, Comey's responses about Plaintiff did not satisfy Trump.

69.     On February 8, 2017, Comey met with Trump's then-chief of staff, Reince Priebus ("Priebus") at the White House.  After their meeting, Priebus took Comey to the Oval Office to meet Trump.  Priebus remained in the room with Trump and Comey.  Trump again asked Comey whether Plaintiff had a problem with Trump, because Trump had criticized Plaintiff during the 2016 presidential campaign.  During this conversation, Trump summarized his prior attacks on Plaintiff as asserting that "the number 2 guy at the FBI took a million dollars from the Clintons."  Comey again assured Trump that Plaintiff was a professional.  Trump then asked Comey whether Plaintiff had ever mentioned to Comey anything about Trump's campaign attacks on Plaintiff.  Comey said that Plaintiff had "never" done so, repeated that Plaintiff was a true professional, and assured Trump that he would come to value Plaintiff.  Comey added that Plaintiff put political

considerations aside and did his job well.  Comey then said that he was sure that if Plaintiff had to do things over again, Plaintiff would have urged his wife not to run for office.

70.     On February 9, 2017, Sessions was sworn in as the Attorney General. Subsequently, in Plaintiff's presence, Sessions expressed support for discriminatory considerations in FBI personnel decisions.

71.     On February 10, 2017, around 4:30 p.m., Plaintiff briefed the staff of Vice President Michael R. Pence ("Pence") on counterintelligence matters.  After that meeting, then-White House Counsel Donald F. McGahn ("McGahn") asked Plaintiff to meet him in the West Wing.  Plaintiff went to McGahn's office but was then redirected to Pence's office, where Plaintiff met with Pence, McGahn, Priebus, and two others.  Afterward, around 9 p.m. that night, Plaintiff was informed that White House officials were questioning Plaintiff's commitment to the Trump administration.

72.     On February 15, 2017, Trump, through Priebus, asked Plaintiff to have the FBI publicly refute a recent news story that was unfavorable to Trump.  When Plaintiff refused on FBI policy grounds, Priebus said that Plaintiff and the FBI were "not being good partners" to Trump.

73.     On March 2, 2017, Sessions recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  Sessions stated that the then-acting Deputy Attorney General "shall act as and perform the functions of the Attorney General with respect to any matters from which" Sessions recused himself "to the extent they exist."

74.     On March 6, 2017, Plaintiff was informed that White House officials were looking for ways to fire FBI Director Comey, and that these officials did not understand why Comey had not yet removed Plaintiff from his position as Deputy Director of the FBI.

75.     On March 20, 2017, Director Comey publicly confirmed the existence of the FBI's investigation of links between the Russian government and the Trump campaign.

76.     On March 30, 2017, Trump called Comey.   Trump complained that the Russia investigation was creating a "cloud" over Trump, and said that he wanted Comey to "lift the cloud."   As their conversation ended, Trump added that he had not raised the topic of "the McCabe thing," because Comey had said Plaintiff was an honorable man.   Trump then stated again Governor McAuliffe was close to the Clintons and had given money to Plaintiff.

77.     On April 26, 2017, Rosenstein was sworn in as Deputy Attorney General. Rosenstein served as Acting Attorney General on the Russia investigation in light of Sessions' recusal from all matters related to the 2016 U.S. presidential campaigns.

78.     On or about May 8, 2017, Trump decided to fire FBI Director Comey.   That evening, Trump summoned Rosenstein to the White House.   In the Oval Office, Rosenstein met with Trump, Pence, Sessions, McGahn, and others.   Rosenstein was told that Trump was going to fire Comey, and was given a draft letter that Trump had written to Comey, informing Comey of the termination decision.   This draft letter reflected Trump's belief that Comey wrongly declined to prosecute Clinton for her use of a private email server, and his belief that Plaintiff was affiliated with Secretary Clinton and the Democratic Party.   The draft stated that one of Trump's primary reasons for firing Comey was that Comey breached the public trust by letting Plaintiff oversee the Clinton email investigation in 2016.   The draft letter then falsely stated that Plaintiff's wife, Dr. McCabe, had received "$700,000" in campaign contributions from a "Clinton surrogate," and that this same "Clinton supporter" encouraged Dr. McCabe to run for the Virginia state senate "soon after Clinton's server was exposed."

79.     At the May 8, 2017 Oval Office meeting, Rosenstein and McGahn told Trump that he should not use this draft letter to dismiss Comey.  In response, Trump then ordered Rosenstein to write a memorandum justifying Comey's firing.

80.     On May 9, 2017, Trump fired Comey.  Trump publicly released Rosenstein's justifying memorandum and a letter from Sessions, accompanied by a one-page letter from Trump stating that he had accepted the recommendations by Sessions and Rosenstein to fire Comey.  Unlike Trump's draft letter, these documents did not reference Plaintiff.

81.     On May 9, 2017, at approximately 5:30 p.m., Plaintiff learned that Comey had been fired and that, as a result, Plaintiff had become Acting Director of the FBI.

82.     On May 9, 2017, at approximately 6 p.m., Plaintiff was asked to meet Trump at the White House.  Plaintiff arrived at this meeting at approximately 6:30 p.m.  Plaintiff had never met Trump before this.  Present at the meeting were Plaintiff, Trump, Pence, Priebus, McGahn, and another individual.

83.     During the meeting, Trump asked if Plaintiff disagreed with Comey's decisions to close the 2016 Clinton email investigation without prosecution and if Plaintiff was part of a supposed internal FBI "resistance" to Comey's leadership.  Based on Trump's tone of voice and body language, Plaintiff understood these questions to be Trump's attempts to assess Plaintiff's loyalty to Trump.  Plaintiff responded that he worked very closely with Comey and participated in Comey's July 2016 investigative decisions.  Trump stated that Plaintiff made a "mistake" in letting Dr. McCabe run for the Virginia state senate in 2015.

84.     On May 10, 2017, at approximately 10 a.m., Plaintiff was in his office and received a telephone call from Trump.  Other people were present in the room with Plaintiff during this call.  Trump discussed with Plaintiff the possibility of visiting FBI headquarters.  Trump falsely stated

19

that he had received "hundreds" of messages from FBI employees supporting Trump's decision to fire Comey.  Trump also opined that most FBI personnel likely voted for him in the 2016 U.S. presidential election.  Trump then commented on Dr. McCabe's 2015 Virginia state senate campaign, saying that it must have been "tough" to "be a loser."  Trump also asked Plaintiff to come to the White House at 2 p.m. that day.  After completing the call with Trump, Plaintiff relayed the contents of the call to the people in the room with him.

85.     On May 10, 2017, at approximately 2 p.m., Plaintiff met with Trump in the Oval Office.  Priebus, McGahn, and McGahn's chief of staff, Annie Donaldson ("Donaldson"), were also present.  Donaldson took notes of this meeting.  During the meeting, Trump stated that FBI personnel loved and supported him, and that at least 80 percent of FBI personnel voted for him.  Trump then asked Plaintiff how he voted in the 2016 U.S. presidential election.  No superior had ever asked Plaintiff about his voting history in his entire career as a public servant.  Based on Trump's tone of voice and body language, Plaintiff understood the question as a threat to his employment, notwithstanding his civil service protections, and responded by saying that he "always played it right down the middle."  Trump was visibly displeased by Plaintiff's answer.

86.     On May 13, 2017, Plaintiff met with Sessions and Rosenstein and was ostensibly interviewed for the position of FBI Director.  During the meeting, one of Sessions' aides brought in a smartphone showing the 2015 swim meet photograph of Plaintiff, Dr. McCabe and their children wearing Dr. McCabe's campaign T-shirts.  Republicans  had found the photograph on the Internet and circulated it, falsely stating that Plaintiff was wearing it while campaigning for Dr. McCabe.  Plaintiff explained that the photograph was being mischaracterized.  At the end of the meeting, Plaintiff also revealed to Sessions and Rosenstein that he would become eligible for retirement in March 2018, and that he had long intended to retire from public service at that time

20

and begin work in the private sector.  Plaintiff advised Sessions and Rosenstein that, consistent with past practice, the interests of the FBI would best be served by appointing a Director from outside the agency.

87.     On May 16, 2017, Plaintiff met with Rosenstein and others.  In this meeting, Rosenstein stated that he feared being fired by Trump.  Rosenstein also stated that Plaintiff had a "political problem" and referenced Dr. McCabe's 2015 Virginia state senate campaign. Rosenstein also informed Plaintiff that in Trump's unsent draft letter firing Comey (*see supra* ¶ 78), Trump cited Comey's decision to let Plaintiff remain as FBI Deputy Director as a reason for Comey's firing.  Rosenstein also criticized Plaintiff for the 2015 family photograph of Plaintiff, Dr. McCabe, and their children wearing Dr. McCabe's campaign T-shirts.  Plaintiff again explained that he wore this T-shirt at his children's swim meet and did not violate the ethics guidance he received from the FBI.

88.     During their May 16, 2017 meeting, Rosenstein also informed Plaintiff that Trump was considering a number of people for permanent FBI Director.  Rosenstein told Plaintiff that although Trump would interview Plaintiff for the position, this would not be a "real interview."

89.     On May 17, 2017, Rosenstein—in his capacity as Acting AG for the Russia investigation—appointed former FBI Director Mueller as Special Counsel to oversee the Russia investigation and related matters.

90.     Also on May 17, 2017, Plaintiff met with Trump, Sessions, Priebus, and McGahn in the Oval Office, ostensibly to interview for the position of FBI Director.  Trump returned to the topic of the 2016 U.S. presidential election.  During that discussion, Plaintiff told Trump that Plaintiff considered himself a lifelong Republican and had always voted for the Republican

candidate for president, except in the 2016 general election, when he did not cast a vote for president.

91.     On May 21, 2017, Plaintiff met with Rosenstein and others.  Rosenstein had called the meeting for supposed "coordination and logistics issues."  However, once Plaintiff arrived at the meeting, no such issues were discussed.  Instead, the subject of the meeting focused on Dr. McCabe's 2015 Virginia state senate campaign.  Rosenstein stated that although he believed that Plaintiff had no conflicts with the Russia investigation, Plaintiff should nonetheless consider recusing himself from that investigation because of Dr. McCabe's 2015 campaign.  Rosenstein suggested that the 2015 photograph showing Plaintiff, Dr. McCabe, and their children wearing Dr. McCabe's campaign T-shirts created a "credibility issue" that could cause unspecified others to complain about Plaintiff's involvement in the Russia investigation.  Plaintiff repeated what he explained to Rosenstein and Sessions a week earlier (*see supra* ¶ 86): this photograph did not show Plaintiff playing a role in or attending events for Dr. McCabe's campaign, and instead simply showed that Plaintiff attended a swim meet with his children.  Plaintiff understood Rosenstein's concern about unspecified third parties' complaints to include the only officials who outranked Rosenstein in the DOJ chain of command: Trump and Sessions.  Plaintiff also explained that he had a memorandum from the FBI's chief ethics officer stating that there was no basis to find that Plaintiff had any conflict (or the appearance of one) warranting his recusal from the Russia investigation.  Plaintiff then suggested that Rosenstein should consider recusing himself from the Russia investigation, given Rosenstein's own potential conflict as a likely witness in that investigation.  In response, Rosenstein did not state or even suggest that he had an ethics opinion supporting his continued work on the Russia investigation.

E.     **Trump Calls for Plaintiff's Termination**

92.     Because Trump perceived Plaintiff to be affiliated with Clinton and the Democratic Party, and because Plaintiff did not vote for Trump and rebuffed Trump's requests to express partisan support for Trump, Trump decided to have Plaintiff removed from government.

93.     Around July 19, 2017, a White House official told a member of Plaintiff's staff that Plaintiff should not attend an upcoming July 21, 2017 White House briefing.  The White House official also said that "they" (*i.e.*, unnamed individuals in the White House) had decided to get rid of Plaintiff as soon as a new FBI Director was in place.

94.     At the end of the July 21, 2017 White House briefing, Trump stated that as soon as Defendant Wray was sworn in as the new FBI Director, Trump was going to get rid of Plaintiff.

95.     The following week—and just two months after Plaintiff confirmed to Trump that he did not vote for Trump in the 2016 U.S. presidential election—Trump tweeted two statements that falsely stated or implied that Plaintiff oversaw the Clinton email investigation during Dr. McCabe's 2015 campaign and that Plaintiff solicited and received campaign contributions from Clinton:

>       (a)     July 25, 2017, at 6:21 a.m.: "Problem is that the acting head of the FBI & the person in charge of the Hillary investigation, Andrew McCabe, got $700,000 from H for wife!"

>       (b)     July 26, 2017, at 9:48 a.m. and 9:52 a.m.: "Why didn't A.G. Sessions replace Acting FBI Director Andrew McCabe, a Comey friend who was in charge of Clinton investigation but got...." "...big dollars ($700,000) for his wife's political run from Hillary Clinton and her representatives.  Drain the Swamp!"

Since his 2016 presidential campaign, Trump and his subordinates have repeatedly used the phrase "Drain the Swamp" to refer to removing government officials from office.

96.     These tweets and other communications by Trump made clear to Sessions, his subordinates, and others that Trump wanted to remove Plaintiff from the FBI, and they began formulating plans to achieve that goal.

97.     On Friday, July 28, 2017, Plaintiff was contacted by a DOJ Assistant Inspector General ("Assistant IG") who summoned Plaintiff to talk to him urgently and immediately.  Based on a public announcement by the DOJ's Office of Inspector General ("OIG") earlier that year, Plaintiff knew that Inspector General ("IG") Horowitz was investigating, among other matters, Plaintiff's involvement with the Clinton email investigation.  Based on that awareness, Plaintiff told the Assistant IG that he did not want to be interviewed for an investigation in which he was a subject, without his lawyer present.  The Assistant IG said the meeting would not be such an interview, but rather an opportunity to bring something urgent to Plaintiff's attention.  Later that same day, Plaintiff met with the Assistant IG and other OIG personnel, as requested.  The OIG personnel displayed and questioned Plaintiff about multiple text messages between FBI employees Peter Strzok and Lisa Page, and then, based on the text messages, asked whether Plaintiff had authorized Page to speak to a *Wall Street Journal* reporter about the Clinton email investigation in late October 2016.  At no time did Plaintiff respond to these questions, or any other questions from anyone in the DOJ or FBI, with any intentionally false or misleading statements.

98.     On Tuesday, August 1, 2017, Plaintiff contacted the Assistant IG and stated that he recalled authorizing Lisa Page to speak to the *Wall Street Journal*.  Plaintiff also recommended that the OIG speak to Michael Kortan, the FBI Assistant Director for Public Affairs, who might have information about this issue.

99.     On August 2, 2017, Defendant Wray was sworn in as the new FBI Director, and Plaintiff resumed his responsibilities as Deputy Director.  On or about this date, Sessions, acting at Trump's urging, asked Defendant Wray to fire Plaintiff.  Wray refused on the basis that he would not allow personnel decisions at the FBI to be politicized.  Wray suggested that he would resign if Sessions continued to apply such pressure.

100.    In December 2017, Trump met with DAG Rosenstein and asked Rosenstein if he was "on my team," *i.e.*, Trump's "team."  "Of course, we're all on your team, Mr. President," Rosenstein responded.

101.    On December 2, 2017, Trump publicly demanded that Defendant Wray fire Plaintiff, based on Trump's perception of Plaintiff's political affiliation, by retweeting another Twitter user's statement: "Wray needs to clean house.  Now we know the politicization even worse than McCabe's ties to McAuliffe/Clinton. [. . .]"

102.    The next day, December 3, 2017, Trump tweeted about a different FBI employee but also referenced Plaintiff: "Clinton money going to wife of another FBI agent in charge."

103.    In late December 2017, because of pressure from Trump, White House personnel, and/or DOJ, IG Horowitz and other OIG officials decided to accelerate the completion of part of the investigation into events surrounding the 2016 election: specifically, their assessment of Plaintiff's actions regarding *Wall Street Journal* articles published in October 2016.  Because of this pressure, Horowitz and other OIG officials also decided to issue a separate report about Plaintiff's actions, ultimately dated February 2018 ("OIG Report"), in order to ensure that Plaintiff could be terminated before his planned retirement.  On December 20, 2017, Horowitz notified Defendant Wray and then-Associate Deputy Director David Bowdich of these decisions.

104.    On December 23, 2017, the press reported what Plaintiff had disclosed to Sessions seven months earlier: that Plaintiff planned to retire in March 2018 once he became eligible to receive his full law enforcement pension.  That same day, at 3:27 p.m., Trump repeated his prior false statements and innuendo and reaffirmed his perception of Plaintiff's partisan identity with the following tweet: "How can FBI Deputy Director Andrew McCabe, the man in charge, along with leakin' James Comey, of the Phony Hillary Clinton investigation (including her 33,000 illegally deleted emails) be given $700,000 for wife's campaign by Clinton Puppets during investigation?"  Three minutes later, at 3:30 p.m., Trump tweeted: "FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits.  90 days to go?!!!"  Plaintiff understood this tweet as a threat by Trump.  Trump's phrase "racing the clock" broadcast to the public and to Defendants that Trump wanted to terminate Plaintiff before he could retire with full benefits.

**F.    Defendant Wray Removes Plaintiff from the Position of Deputy Director**

105.    On January 28, 2018, Defendant Wray informed Plaintiff that Plaintiff could not remain in the role of Deputy Director because of the OIG investigation.  When Plaintiff asked Wray to explain his specific concerns about Plaintiff, Wray refused, saying that he had promised Sessions that he would not discuss specifics with Plaintiff.  Wray told Plaintiff he had two options for his demotion: (1) Plaintiff could transition to a lesser role of his own choosing if he falsely announced to the FBI that he had stepped down voluntarily; or (2) if Plaintiff refused to announce that his resignation was voluntary, Wray would reassign Plaintiff to a lesser role of Wray's choosing.

106.    On January 29, 2018, Plaintiff told Defendant Wray that he would not lie to the FBI workforce about the circumstances of his departure, and that he would be taking terminal leave until he became eligible to retire.  That same day, Wray promoted David Bowdich to the role of

26

FBI Deputy Director.  This reflected that Wray had followed through on this threat to demote Plaintiff involuntarily.

107.    On January 29, 2018, Plaintiff sent an email to all FBI personnel, announcing "with great sadness" the commencement of his terminal leave and forthcoming retirement:

> It has been my privilege and honor to work with you all for the last 21 years.  I am continually amazed by your dedication, your professionalism and your compassion.  You have the greatest mission on earth – protecting the American people and upholding the constitution.  And you accomplish it in a million different ways around the world every day.  Please always remember that the key to those successes is an unflagging focus on integrity.  You are the greatest workforce on earth because you speak up, you tell the truth and you do the right thing.
>
> Thank you for your service, your support and your friendship.

108.    As of January 29, 2018, Plaintiff no longer served in a duty status, and he relinquished all access to FBI offices, networks, and workstations.  However, Plaintiff remained an FBI employee for the purpose of establishing eligibility for his retirement annuity and continuance of health benefits for himself and his family.

109.    After Wray removed Plaintiff from the position of FBI Deputy Director, the policies and procedures applicable to that position no longer applied to Plaintiff.

## G.    Plaintiff's Retirement and His Retaliatory "Termination"

110.    On February 28, 2018, at 6:34 a.m., Trump tweeted a criticism of IG Horowitz, stating that he was "an Obama guy" who was "already late with [his] reports on Comey etc."  That same day, IG Horowitz's February 2018 Report was submitted to the FBI's Office of Professional Responsibility ("OPR"), headed by Candice M. Will ("Will"), for her review and proposal of potential discipline.

111.    The OIG Report was titled "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe."  Its investigative conclusions are

incorrect, partly because the Report relies on material mischaracterizations and omissions, including the Report's failure to reference any testimony by exculpatory witnesses such as Michael Kortan.  Candice Will reviewed the OIG Report and began preparing a notice from OPR proposing Plaintiff's termination.

112.    In March and April 2018, Trump repeatedly criticized the DOJ, the FBI, and others by stating that they were "slow walking" their activities in order to thwart his various political goals.

113.    On March 5, 2018, Deputy Director Bowdich asked to speak with Will by telephone.  After Bowdich and Will spoke, Will followed up with Bowdich via an email bearing the subject "DD Bowdich," meaning "Deputy Director Bowdich."  Will's email stated that she had assured DAG Rosenstein both that OPR soon planned to propose its response to the February 2018 OIG Report and that OPR was "not slow walking" this response.

114.    Will's March 5, 2018 email to Bowdich also falsely stated that OPR would make the investigative file available to Plaintiff in accordance with "standard" and "established" procedures.  In fact, contrary to DOJ and FBI procedures, Defendants worked to accelerate Plaintiff's termination proceedings and constrain his review and consideration of the evidence against him.

115.    On March 7, 2018, Will issued a recommendation that Plaintiff be terminated, based solely on her review of the February 2018 OIG Report.  Will conducted no independent investigation before issuing her notice and instead relied exclusively on the facts collected by the OIG and reflected in the OIG Report.

116.    Attached to Will's March 7, 2018 recommendation was a handwritten note that she addressed to "Director Wray and Deputy Director Bowdich."  (*See* Exhibit A hereto.)  Will's note

reflected her awareness of Defendants' desire to terminate Plaintiff before his announced retirement date, because she stated: "It seems unlikely that [the proposed termination] will reach final resolution before Mr. McCabe's March 18 retirement date, but that is up to the DAG." No law or policy made Plaintiff's retirement date relevant to the OIG investigation or to OPR's review of the February 2018 OIG Report. Nor is there any law or policy pursuant to which Plaintiff's removal was a decision for DAG Rosenstein's consideration, because Plaintiff was no longer FBI Deputy Director.

117. By letter to Plaintiff dated Thursday, March 8, 2018, Associate DAG Scott N. Schools ("Schools") stated that he had received Will's notice of proposed removal and would make a final decision on that proposal in accordance with DOJ Order 1202 (dated November 26, 2013). DOJ Order 1202 was the DOJ policy governing the removal of FBI senior executives. DOJ issued this order pursuant to 5 U.S.C. § 3151(a), which requires DOJ to establish by regulation a personnel system for FBI senior executives, including provisions for removal that are consistent with other sections of the U.S. Code such as 5 U.S.C. §§ 3592 and 7543(a)-(c). Under DOJ Order 1202, because Plaintiff remained a senior executive but was no longer Deputy Director, any decision to remove him would have to be made by Defendant Wray rather than by DAG Rosenstein or AG Sessions.

118. Schools' March 8, 2018 letter further stated that Plaintiff had to submit his written reply to Schools by the "close of business" on Thursday, March 15, 2018. The letter also made clear that Plaintiff and his counsel would not have access to the necessary case files until Friday, March 9, only six calendar days before Plaintiff's oral hearing and March 15 written submission deadline. By imposing this accelerated timeline, Schools further implemented the message conveyed by Trump's "racing the clock" tweet.

119.    On the morning of Friday, March 9, 2018, Schools admitted that the personnel involved in Plaintiff's disciplinary proceedings were not following any established agency practices and procedures.  Specifically, Schools told Plaintiff's counsel on a telephone call: "We're making it up as we go along."

120.    Plaintiff and his counsel were given hardly any time to review key pieces of essential evidence.  For example, Plaintiff and his counsel had requested to review the OIG interview transcripts of Michael Kortan, whom Plaintiff had previously suggested that the OIG contact for more information about Lisa Page's authorization to speak to the *Wall Street Journal* (*see supra* ¶ 98).  It was not until Wednesday, March 14, 2018—less than 24 hours before Plaintiff's presentation to Schools—that Schools permitted Plaintiff to review Kortan's transcripts, which proved to be favorable to Plaintiff.  The decision to withhold key exculpatory evidence from Plaintiff until the eve of his termination hearing further impaired Plaintiff's exercise of his procedural rights.

121.    On Wednesday, March 14, 2018, Plaintiff's counsel requested that the hearing and written submission deadlines be postponed, because counsel was "simply unable to properly prepare for both the oral presentation and written presentation that are necessary to adequately represent Mr. McCabe."  The record consisted of over 1,000 pages of materials, and Plaintiff and his counsel had been given only four business days to review the materials, prepare for a hearing with Schools, and draft a written response.  Plaintiff's counsel stated: "Any government employee deserves fairness, and both the appearance and reality of due process, and Mr. McCabe certainly does.  We believe that rushing into the hearing with you tomorrow, without adequate time to prepare, is unfair and inappropriate."

122.    Despite counsel's pleas, Schools flatly rejected the request to postpone the oral hearing, without any explanation about why Plaintiff and his counsel could not be given more time to review the record.  Schools' only concession was to extend Plaintiff's deadline for providing his written submission to 12 p.m. on Friday, March 16, 2018.

123.    On Thursday, March 15, 2018, Plaintiff and counsel met with Schools to present Plaintiff's case in opposition to termination. The hearing was a sham because Schools served merely to rubber-stamp the predetermined decision to fire Plaintiff.

124.    On Friday, March 16, 2018, at 12 p.m., Plaintiff provided his written submission to Schools.

125.    On Friday, March 16, 2018, at 5:00 p.m. Plaintiff fulfilled his final week of service with the FBI and retired from the agency.  The FBI charged Plaintiff's accrued leave account for a full week of leave time, confirming that the FBI deemed Plaintiff to have been employed for the entire week preceding his retirement.

126.    On Friday, March 16, 2018, around 10:00 p.m. and several hours after Plaintiff retired, Sessions issued a statement to the media announcing that Plaintiff was fired "[p]ursuant to [DOJ] Order 1202."  Sessions did not send this statement to Plaintiff.  Instead, around that time, Schools emailed Plaintiff what Schools characterized as "the Attorney General's Final Decision regarding the FBI's proposed removal of Mr. McCabe."  Schools' email did not state that Plaintiff would, in fact, be terminated, nor did it provide the effective date of such termination.  The email attached a letter dated March 16, 2018, written by Schools and addressed to Sessions, which recommended that Plaintiff be terminated.  The last page of the letter contained the following "decision" from Sessions, which merely stated that Sessions decided that Plaintiff "should be

removed" from the FBI and civil service, and did not state when this recommendation should become effective.

127.    On March 16, 2018, around 10:30 p.m., Plaintiff learned from media reports that Sessions had announced Plaintiff's termination "effective immediately."  The effective date of Sessions' announcement surprised Plaintiff, because Defendants had not communicated this information to him before reporting it to the media.

128.    When Plaintiff learned of his "termination" from the media, he had not yet seen the email from Schools.  Even after reviewing Schools' email, Plaintiff continued to wait for a notice of termination consistent with FBI policy and practice.

129.    Normally, for the termination of FBI employees, a packet of information is prepared with detailed instructions about how a termination must be implemented.  Termination decisions are not effective until (1) a supervisor notifies the employee of the termination and its specific effective date, and (2) the supervisor hands the employee a physical document explaining this information.  Plaintiff was aware of these FBI policies and procedures because he had implemented them in his various FBI supervisory roles.  To this day, Plaintiff has not received notice of his termination consistent with these policies and procedures.

130.    Following Plaintiff's supposed "termination," Defendants caused the FBI to falsely record Plaintiff's date of separation as March 16, 2018, one day earlier than the date set forth on Plaintiff's notice of retirement and application for retirement benefits.  This discrepancy has materially altered and diminished the benefits to which Plaintiff is entitled by, among other things, eliminating the benefits Plaintiff would have otherwise received beginning at age 50.

131.    On or about March 21, 2018, Defendant Wray was interviewed by the press about Plaintiff's termination.  When asked about how the timing of Plaintiff's termination suggested

improper motives, Wray did not deny the existence of improper motives and never stated that Plaintiff was lawfully terminated. Instead, Wray stated: "I want to be careful about what I can say about the process." He further stated that he was committed to "making sure" that the FBI's "process" for nonpartisan personnel decisions "is followed." However, Wray's "careful" language, stated in the present tense, did not cover personnel decisions made *before* the interview, such as Plaintiff's termination. In any event, Defendants disregarded any FBI "process" referenced by Wray, because Defendants allowed AG Sessions to terminate Plaintiff instead of leaving that decision to FBI Director Wray as required by DOJ Order 1202.

132. On April 11, 2018, an FBI official informed Plaintiff in writing that the FBI Office of General Counsel ("OGC") had concluded that Plaintiff's termination "was not due to gross misconduct." For the purposes of this factual finding, administrative authorities defined "gross misconduct" as a flagrant and extreme violation of a law or rule, including offenses punishable as felonies and some lesser offenses. The FBI OGC's finding that Plaintiff's supposed termination "was not due to gross misconduct" contradicted the pretextual rationale given by Defendants.

**H.    Trump's Subsequent Statements**

133. Since Defendants' unlawful purported termination of Plaintiff's employment, Trump has publicly celebrated those efforts and encouraged retaliation against Plaintiff for his perceived political affiliation with Clinton and the Democratic Party.

134. On March 17, 2018 at 12:08 a.m.—just two hours after Sessions' statement about firing Plaintiff—Trump tweeted:

> Andrew McCabe FIRED, a great day for the hard working men and women of the FBI - A great day for Democracy. Sanctimonious James Comey was his boss and made McCabe look like a choirboy. He knew all about the lies and corruption going on at the highest levels of the FBI!

135.    Later that same day, at 1:34 p.m., Trump again tweeted a statement explicitly linking Plaintiff's termination to Plaintiff's perceived partisan affiliation and marriage to Dr. McCabe:

> The Fake News is beside themselves that McCabe was caught, called out and fired.  How many hundreds of thousands of dollars was given to wife's campaign by Crooked H friend, Terry M, who was also under investigation?  How many lies?  How many leaks?  Comey knew it all, and much more!

136.    A month later, on April 15, 2018, Trump tweeted that Comey's new book failed to address "McCabe's $700,000."

137.    A month later, on May 18, 2018, Trump falsely tweeted: "Why isn't disgraced FBI official Andrew McCabe being investigated for the $700,000 Crooked Hillary Democrats in Virginia, led by Clinton best friend Terry M (under FBI investigation that they killed) gave to McCabe's wife in her run for office?  Then dropped case on Clinton!"

138.    Just over a month later, on June 28, 2018, Trump falsely tweeted that Plaintiff and former Director Comey "took their orders from you know who," in a reference to Trump's partisan opponents (whether Clinton or the Democratic Party generally).

139.    On August 11, 2018, Trump tweeted his perception that "McCabe['s] wife took big campaign dollars from Hillary people....."

140.    Eight days later, on August 19, 2018, Trump falsely tweeted: "No Collusion and No Obstruction, except by Crooked Hillary and the Democrats.  All of the resignations and corruption, yet heavily conflicted Bob Mueller refuses to even look in that direction.  What about the Brennan, Comey, McCabe, Strzok lies to Congress, or Crooked's Emails!"

141.    Five days later, on August 24, 2018, Trump tweeted his perception that Plaintiff was part of his partisan opposition, by asking Sessions to "look into all of the corruption on the 'other side' including [. . .] McCabe [. . . .]"

142.    Three months later, on November 15, 2018, Trump tweeted an attack on Plaintiff as being "on the other side," *i.e.*, as part of a "gang of Democrat thugs."

143.    On February 19, 2019, Trump falsely tweeted: "I never said anything bad about Andrew McCabe's wife other than she (they) should not have taken large amounts of campaign money from a Crooked Hillary source when Clinton was under investigation by the FBI. I never called his wife a loser to him (another McCabe made up lie)!"

144.    On March 27, 2019, Trump falsely stated on a television program that Plaintiff "was running the FBI and running all sorts of cases, and his wife got hundreds of thousands of dollars from essentially Clinton's, from Clinton's closest friend. And then he rules so favorably. I mean, he tries to say that he wasn't involved. […] I don't believe that. But, you know, she got all those good rulings."

145.    On May 23, 2019, Trump publicly threatened McCabe with execution by falsely accusing him of treason.

146.    On July 13, 2019, Trump falsely tweeted: "Andy McCabe is a major sleazebag. Among many other things, he took massive amounts of money from Crooked Hillary reps, for wife's campaign, while Hillary was under 'investigation' by FBI!"

147.    Trump's false attacks on Plaintiff are consistent with Trump's other public attacks on DOJ and FBI personnel (including those involved with the Special Counsel's investigation) as supposedly affiliated with Clinton and the Democratic Party, regardless of their actual party registration.

## COUNT ONE

**Plaintiff's Termination Was a Legal Nullity or, Alternatively, Was *Ultra Vires* Agency Action in Violation of the Fifth Amendment's Due Process Clause.**

148.    The Paragraphs above are incorporated and reasserted as if fully set forth herein.

149.    Sessions' public announcement of Plaintiff's termination was not a valid termination action.  Alternatively, Plaintiff's termination, as set forth above, was *ultra vires* agency action that violated the Fifth Amendment's Due Process Clause.

150.    Under applicable federal law, policy, and practice, a career civil servant who completes his or her work obligations for both weeks of a federal pay period is deemed to have been employed for the full pay period, and is therefore entitled to payment and service credit for the entire pay period.  A termination that becomes effective after the pay period's close of business does not diminish the employee's pay or service credit for that pay period.

151.    Plaintiff completed all employment obligations for his final pay period at 5 p.m. on Friday, March 16, 2018.  At that time, Plaintiff had no further work obligations, was deemed employed for the full pay period, and retired.  Although Defendants claim to have fired Plaintiff, their attempt to do so was ineffective because it was made around 10 p.m. on Friday, March 16, 2018—well after the close of regular business for the pay period and well after Plaintiff was deemed retired.

152.    Even if Plaintiff had not been deemed retired by 10 p.m. on Friday, March 16, 2018, Defendants failed to terminate him at that time.  To remove Plaintiff from the career civil service, Defendants were required to specify in writing the reasons for its decision, state an effective date for removal, and deliver this information to Plaintiff on or before the effective date of the action. This did not occur.  And although Defendants sent an email to Plaintiff around the time of Sessions' announcement—10 p.m. on Friday night—this email was not a valid removal action either.  The

email stated only that Sessions believed that Plaintiff "should be" removed.  It did not contain an effective date and therefore had no effect.

153.    Additionally, Sessions publicly announced that he had terminated Plaintiff "[p]ursuant to [DOJ] Order 1202," but that Order did not give Sessions the authority to terminate employees in Plaintiff's position.  DOJ Order 1202, promulgated pursuant to 5 U.S.C. § 3151, provides that the FBI Director alone has authority to terminate career FBI senior executives, except that the Attorney General and Deputy Attorney General retain authority to remove those who serve in certain enumerated "key positions."  After Defendant Wray removed Plaintiff from the role of Deputy Director in January 2018 and replaced him with Bowdich, Plaintiff remained a career FBI senior executive but did not serve in any of the "key positions" listed in DOJ Order 1202. Defendant Wray, as FBI Director, did not authorize Plaintiff's termination and in fact previously refused Sessions' request to terminate Plaintiff.  Accordingly, Plaintiff was not, in fact, terminated before his retirement.

154.    Even if DOJ Order 1202 could have been interpreted to grant Sessions authority to terminate Plaintiff, DOJ Order 1202 is invalid because it was promulgated through an invalid summary procedure, does not comport with statutory and constitutional requirements, and otherwise did not apply to Plaintiff.

155.    Additionally, Sessions lacked any authority to terminate Plaintiff due to conflicts of interest and recusals, including Sessions' March 2017 recusal from "investigations of any matters related in any way to the campaigns for President of the United States."  Defendants' pretextual basis for Plaintiff's termination arose from the OIG investigation of Plaintiff's actions related to the 2016 U.S. presidential campaign, specifically his actions regarding campaign-related articles published in October 2016 by the *Wall Street Journal*.  Sessions' recusal, on its face,

37

extended to the OIG investigation.  Sessions' recusal was therefore a "disability" under 28 U.S.C. § 508(a), meaning that he lacked legal qualification to participate in Plaintiff's termination.  As a result, Sessions had no authority to terminate Plaintiff.

156.    By falsely treating Sessions' March 16, 2018 termination announcement as if it had legal effect, and alternatively through their *ultra vires* actions, Defendants have harmed Plaintiff by denying him due process, damaging his reputation, depriving him of his rightful status as an FBI retiree in good standing with the agency, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full vested pension and related benefits.

## COUNT TWO

### Plaintiff Was Terminated Through Sham and Accelerated Proceedings That Ignored Statutory Procedures and Agency Policies, in Violation of the Fifth Amendment's Due Process Clause.

157.    The Paragraphs above are incorporated and reasserted as if fully set forth herein.

158.    Defendants further violated the Fifth Amendment by ignoring applicable statutory and agency processes in order to accelerate Plaintiff's termination, thereby depriving him of his property interest in his employment and full vested pension and related benefits, including health insurance, without due process of law.

159.    Plaintiff was entitled to a meaningful opportunity to evaluate and respond to the allegations against him before being terminated.  Defendants deprived Plaintiff of that meaningful opportunity when implementing Trump's directive that Plaintiff suffer the loss of his full retirement benefits.  Defendants knew this directive to be unlawful and malicious, and they knew that implementing it would require circumventing agency procedures.  Nevertheless, Defendants artificially accelerated Plaintiff's disciplinary proceedings in order to terminate him before his intended retirement date, which Defendants had known about since at least May 2017.

160.    By statute, Plaintiff was entitled to a minimum of 30 days' notice before his termination could become final.  Under 5 U.S.C. § 3151(a)(5)(D), FBI SES employees may be removed or suspended only in a manner consistent with the provisions of 5 U.S.C. § 7543(a)-(c). Section 7543(b)(1) provides that an employee facing action for misconduct is "entitled to . . . at least 30 days' advance written notice" of a proposed removal action, "unless there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed, stating specific reasons for the proposed action[.]"

161.    In addition, regardless of the nature of cause for termination, an FBI SES employee in Plaintiff's position is entitled to "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer" to the proposed notice of termination.  5 U.S.C. § 7543(b)(2).

162.    Plaintiff received less than seven days to evaluate the evidentiary record upon which his removal was based and to prepare for an oral hearing and written submission.  In fact, Plaintiff received only six calendar days to review a voluminous record of over 1,000 pages, while simultaneously preparing for his oral hearing and written submission.  Plaintiff therefore did not receive a meaningful opportunity to evaluate and respond to the allegations against him, in violation of DOJ Order 1202, 5 U.S.C. §§ 3151(a) and 7543 and the Due Process Clause.

163.    Additionally, Plaintiff received less than the statutory minimum of 30 days' notice before his "termination" became final, in violation of 5 U.S.C. §§ 3151(a) and 7543 and the Due Process Clause.  Plaintiff received the proposed notice of termination on March 8, 2018, and Sessions announced Plaintiff's termination eight days later, on March 16, 2018.  OPR's proposed notice of termination did not identify "reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed," 5 U.S.C. § 7543(b)(1),

as required to shortcut the statutorily mandated 30 days' notice period.  Nor could OPR have identified any such reasonable cause, given the FBI Office of General Counsel's April 2018 determination that Plaintiff's separation from the agency was not due to "gross misconduct."

164.    The sham hearing that Plaintiff received also violated constitutional and statutory requirements of due process.  Defendants had already determined Plaintiff's fate, and the agency decision-maker served merely to rubber-stamp Defendants' (and Trump's) desired outcome. Plaintiff therefore never had a neutral, informed, and independent decision-maker address his case. In truth and in fact, the sole decision-maker concerning Plaintiff's termination was Trump, whose decision was made and finalized before Defendants ever commenced their pretextual termination process.

165.    By accelerating the termination process in order to deny Plaintiff the ability to choose to retire as planned, Defendants also violated the FBI's longstanding administrative policies and practices.  Those policies explicitly contemplate that an employee subject to a personnel inquiry might instead submit his or her resignation rather than see the inquiry continue. These policies permit supervisory officials to discuss the possibility of resignation with the employee, and they provide that duress, deception, intimidation, or anything similar will not be tolerated and must not be used to influence the employee's decision.  These policies further provide that the employee under review must not be denied adequate time, if requested, to decide between resigning or seeing the inquiry continued.  Defendants accelerated Plaintiff's termination process in order to moot these policies, and thereby also violated them.

166.    Defendants' deficient termination proceedings also deprived Plaintiff of his constitutionally protected liberty interest in his reputation, in violation of the Fifth Amendment. Before, during, and after his unlawful purported termination, Trump and Defendants repeatedly

charged Plaintiff with dishonest and other unprofessional behavior, by publishing their allegations in their official capacities and through official channels, for review by the public at large.  As a result, Plaintiff's unblemished reputation has been stigmatized with false charges including dishonesty, his prospects for future employment with the DOJ and FBI have been foreclosed, and his prospects for other future public and private employment in law enforcement and related professions have been hampered.

167.    Any provision of agency regulation or policy that might purport to authorize the procedure followed in connection with Plaintiff's termination would be unlawful.

168.    Any statute that may purport to authorize the procedure followed in connection with Plaintiff's termination would be unconstitutional.

169.    Defendants' unlawful action harmed Plaintiff by denying him due process, damaging his reputation, depriving him of his rightful status as an FBI retiree in good standing with the agency, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full vested pension and related benefits.

## COUNT THREE

### Plaintiff's Demotion and Termination Were Based on His Perceived Partisan Affiliation, In Violation of the First Amendment.

170.    The Paragraphs above are incorporated and reasserted as if fully set forth herein.

171.    Defendants' actions, as set forth above, constitute improper acts of political patronage, in violation of the First Amendment to the United States Constitution.  Plaintiff's demotion and accelerated termination were unlawful because they were based on a perception of Plaintiff as Trump's partisan opponent and not a Trump loyalist.

172.    "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." *Rutan*

*v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980)); *accord O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates."). The only exception is if "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518.

173. A terminated federal employee may obtain reinstatement upon a showing that he or she was terminated on the basis of unlawful political patronage, *i.e.*, because of a belief—even an incorrect belief—"that the employee had supported a particular candidate" or otherwise "engaged in protected political activity." *See Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1416, 1418 (2016). It is sufficient for the employee to show that he was terminated because he was "not affiliated with or sponsored by" the dominant political party or its leaders. *See Branti*, 445 U.S. at 517 (quoting *Elrod*, 427 U.S. at 362).

174. As set forth above, Defendants demoted and terminated Plaintiff on an improperly accelerated schedule because of Trump's perception that Plaintiff was affiliated with Clinton and the Democratic Party, and not affiliated with or sponsored by Trump. This perception was based on, among other things, Plaintiff's involvement in the Russia investigation, his wife's political activity, his response to Trump's question about his voting history (*i.e.*, that Plaintiff did not vote for Trump in the 2016 U.S. presidential election), and his refusal to pledge or demonstrate personal loyalty to Trump.

175. Through public statements, private conversations, and other means, Trump communicated to DOJ and FBI decisionmakers at all levels that Plaintiff should be fired before he

could retire with full benefits.  Trump also made known that his desire to fire Plaintiff rested on his perception that Plaintiff was a Democrat and that Plaintiff had failed to support him politically.

176.    Partisan affiliation and political support for Trump were never legal or appropriate requirements for the effective performance of Plaintiff's role as an FBI supervisory special agent or Deputy Director.

177.    Defendants implied that Plaintiff's job would be secure if only he would pledge and demonstrate his loyalty to Trump.  Defendants thus made Plaintiff's employment subject to an unconstitutional condition.

178.    Defendants' proffered reasons for Plaintiff's demotion and accelerated termination were merely pretext for the true, political basis for his demotion and ultimate removal.  Trump's subordinates who participated in the decision to investigate, demote, and remove Plaintiff (including Sessions, Rosenstein, Schools, Horowitz, Defendant Wray, Bowdich, Will, and others) knew that the process was driven and accelerated by political considerations and Trump's malicious directive to deprive Plaintiff of his full retirement benefits.

179.    Defendants implemented Trump's directive despite their knowledge that it was politically motivated, that there was no lawful basis to demote and terminate Plaintiff, and that the accelerated timeline for Plaintiff's termination deprived him of due process.  The initiation and timing of the investigation, demotion, and termination decisions were all substantially motivated by, and would not have been made but for, Plaintiff's perceived partisan affiliation.

180.    Defendants' unconstitutional actions harmed Plaintiff by infringing upon the exercise of his constitutional rights, damaging his reputation, depriving him of his rightful status as an FBI retiree in good standing with the agency, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full vested pension and related benefits.

**COUNT FOUR**

**Plaintiff Was Demoted and Terminated in Retaliation for His Political Expression and Intimate Association, in Violation of the First Amendment.**

181.    The Paragraphs above are incorporated and reasserted as if fully set forth herein.

182.    Defendants additionally or alternatively violated the First Amendment by demoting Plaintiff, terminating him, and accelerating his termination in order to deprive him of his full vested pension and related benefits, because of (a) his refusal to pledge personal loyalty to Trump, (b) his decision not to vote for Trump in the 2016 U.S. presidential election (which he only revealed in response to Trump's improper inquiry about it), (c) his wearing of a T-shirt in 2015, in a family setting outside the workplace, in support of Dr. McCabe's Virginia state senate campaign, and (d) his marriage to Dr. McCabe and the improper attribution of her political activity to him. Plaintiff undertook these expressive acts as a citizen on matters of public concern, and his marriage to Dr. McCabe is constitutionally protected association.

183.    There is no governmental interest in demoting or terminating any career civil servant because of his or her (a) refusal to pledge personal loyalty to a public official, (b) voting history, (c) decision to wear a spouse's campaign T-shirt outside the workplace, or (d) spouse's political activity.

184.    As set forth above, Defendants' disapproval of Plaintiff's political expression and association with Dr. McCabe was a substantial motivating factor in prompting his demotion, his termination, and the acceleration of that termination decision.

185.    Had Plaintiff pledged his personal loyalty to Trump, voted for Trump in the 2016 election (or falsely told Trump that he had), not worn a T-shirt supporting Dr. McCabe's campaign, and not been married to Dr. McCabe, Defendants would not have reached the decisions to demote

him and terminate him, nor would they have proceeded on the accelerated schedule that deprived him of his full vested pension and related benefits.

186.    Defendants implemented Trump's directive despite their knowledge that it was politically motivated and that the accelerated timeline deprived Plaintiff of due process.  The initiation and timing of the investigation, demotion, and termination decisions were all substantially motivated by, and would not have been made but for, Plaintiff's First Amendment expression and association.

187.    Defendants' unconstitutional actions harmed Plaintiff by infringing upon the exercise of his constitutional rights, damaging his reputation, depriving him of his rightful status as an FBI retiree in good standing with the agency, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full vested pension and related benefits.

## COUNT FIVE

### *Mandamus*

188.    The Paragraphs above are incorporated and reasserted as if fully set forth herein.

189.    The provisions of 28 U.S.C. § 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of *mandamus* against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

190.    Defendants' actions, as set forth above, constitute an unlawful refusal to recognize that Plaintiff retired or, in the alternative, Defendants' actions constituted unlawful personnel actions.

191.    Plaintiff has a clear right to be recognized as having retired from the FBI as the Deputy Director and as an agent in good standing, or, in the alternative, to be reinstated as Deputy Director of the FBI so that he may retire and receive his vested pension and related benefits.

192.     Defendants have a clear non-discretionary duty to deem Plaintiff as having retired as Deputy Director rather than having been terminated or, alternatively, to rescind Plaintiff's unlawful demotion and termination.

193.     If no other remedy is available through which Plaintiff can be properly recognized as retired and through which the unlawful demotion and termination orders may be rescinded, then Plaintiff is entitled to relief in the nature of *mandamus* compelling Defendants to recognize Plaintiff as retired from the role of Deputy Director in good standing with the FBI or, alternatively, to rescind the unlawful demotion and termination orders.

## REQUEST FOR RELIEF

194.     WHEREFORE, Plaintiff requests that this Court:

(a)     declare that Plaintiff's termination was a legal nullity because he had already retired as Deputy Director by the time the termination order was issued, or, in the alternative, that Defendants violated Plaintiff's constitutional rights by demoting him and terminating his employment;

(b)     reinstate Plaintiff's employment as Deputy Director of the FBI, retroactive to the date of his termination and extended through Plaintiff's originally planned retirement date of March 17, 2018 (or any other date needed for Plaintiff to retire as the Deputy Director of the FBI and an agent in good standing, with sufficient time in service that allows him to receive his full earned law enforcement pension, healthcare insurance, and other retirement benefits);

(c)     expunge Plaintiff's personnel file of all records related to Defendants' unconstitutional demotion and termination decisions;

(d)     order Defendants to process and pay Plaintiff's full vested pension and provide his related benefits, retroactive to March 17, 2018;

(e)      enjoin Defendants from further retaliation and other violations of Plaintiff's rights;

(f)      issue writs of *mandamus* as appropriate;

(g)      award Plaintiff his costs and reasonable attorneys' fees incurred in this action; and

(h)      award other relief as the Court deems just.

August 8, 2019                    Respectfully submitted,

                                   /s/ Murad Hussain
                                  Howard N. Cayne (D.C. Bar. No. 331306)
                                  Murad Hussain (D.C. Bar. No. 999278)
                                  Owen Dunn (D.C. Bar. No. 1044290)
                                  Ryan D. White (D.C. Bar No. 1655918)
                                  ARNOLD & PORTER KAYE SCHOLER LLP
                                  601 Massachusetts Avenue, NW
                                  Washington, DC  20001-3743
                                  Telephone: (202) 942-5000
                                  Fax: (202) 942-5999

                                  *Attorneys for Plaintiff Andrew G. McCabe*