**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANDREW G. MCCABE., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-CV-2399-RDM |
| | ) |
| WILLIAM P. BARR, in his official capacity | ) |
| as Attorney General of the United States, *et* | ) |
| *al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendants hereby move to dismiss, in part, Plaintiff's complaint, under Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6), and seek summary judgment as to the remainder of the

complaint, under Federal Rule of Civil Procedure 56, as described, and for the reasons contained,

in the accompanying memorandum.


Dated: November 1, 2019                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           CHRISTOPHER R. HALL
                                           Assistant Branch Director

                                           */s/ Justin M. Sandberg*
                                           JUSTIN M. SANDBERG
                                           Senior Trial Counsel
                                           KYLA M. SNOW
                                           Trial Attorney
                                           U.S. Dep't of Justice, Civil Div., Federal Programs
                                           Branch
                                           1100 L Street, NW
                                           Washington, D.C.  20001

Phone:  (202) 514-5838
Fax: (202) 616-8460
Justin.Sandberg@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANDREW G. MCCABE., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-CV-2399-RDM |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, in his official capacity | ) | |
| as Attorney General of the United States, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

ARGUMENT ......................................................................................................... 10

I.    The CSRA Precludes McCabe's Statutory and Regulatory Claims ................................. 10

II.   Plaintiff's Constitutional Due Process Claims Lack Merit ......................................... 14

    A.    Plaintiff Has No Property Interest in His Former Job or Its Benefits ..................... 15

    B.    Plaintiff Has Waived His Bias Allegations ............................................... 17

    C.    Plaintiff Has Not Stated a Plausible Claim of Bias ....................................... 19

    D.    Plaintiff Had Ample Time to Respond to the Notice of Proposed Removal ........... 23

III.  Plaintiff's Removal Did Not Violate the First Amendment ............................................. 26

CONCLUSION ....................................................................................................... 31

## TABLE OF AUTHORTIES

### Cases

*Abhe & Svoboda, Inc. v. Chao*,
    508 F.3d 1052 (D.C. Cir. 2007) ......................................................................... 19

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ............................................................................................ 15

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Service*,
    707 F.2d 548 (D.C. Cir. 1983) ......................................................................... 16

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ......................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 19, 20, 23

*Ass'n of Nat. Advertisers, Inc. v. FTC*,
    627 F.2d 1151 (D.C. Cir. 1979) ....................................................................... 21

*Bloch v. Powell*,
    227 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003) ............. 17

*Cayuga Nation v. Bernhardt*,
    374 F. Supp. 3d 1 (D.D.C. 2019) ..................................................................... 18

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984) ........................................................................... 27

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) ......................................................................................... 23

*Crosby-Bey v. Dist. of Columbia*,
    786 F.2d 1182 (D.C. Cir. 1986) ....................................................................... 15

*Dave v. D.C. Metro. Police Dep't*,
    926 F. Supp. 2d 247 (D.D.C. 2013) ................................................................. 16

*De Llano v. Berglund*,
    282 F.3d 1031 (8th Cir. 2002) ......................................................................... 28

*Doe v. U.S. Dep't of Justice*,
    753 F.2d 1092 (D.C.Cir.1985) ......................................................................... 16

*Douglas v. Veterans Admin.*,
  5 M.S.P.R. 280 (1981) ................................................................................................ 2

*Duffy v. Selsky*,
  No. 95-cv-0474, 1996 WL 407225 (S.D.N.Y. July 18, 1996) ................................... 15

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................................... 26

*Filebark v. U.S. Dep't of Transp.*,
  555 F.3d 1009 (D.C. Cir. 2009) ........................................................................... 13, 14

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ............................................................................... 12, 14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477, (2010) .................................................................................................. 22

*Gardner v. United States*,
  No. CIV A. 96-1467, 1999 WL 164412 (D.D.C. Jan. 29, 1999), *aff'd*, 213 F.3d 735 (D.C.
  Cir. 2000) ................................................................................................................... 14

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ...................................................................... 10, 13, 14

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
  560 F.3d 495 (D.C. Cir. 2009) ........................................................................... 12, 14

*Holmes v. Poskanzer*,
  342 F. App'x 651 (2d Cir. 2009) ............................................................................... 22

*Johnson v. George*,
  No. 05-cv-157-MPT, 2007 WL 1697276 (D. Del. June 12, 2007), *aff'd*, 299 F. App'x 139
  (3d Cir. 2008) ............................................................................................................ 24

*Lamb v. Holder*,
  82 F. Supp. 3d 416 (D.D.C. 2015) ....................................................................... 13, 16

*Louisiana Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.*,
  958 F.2d 1101 (D.C. Cir. 1992) ................................................................................. 24

*Mack v. United States*,
  814 F.2d 120 (2d Cir.1987) ........................................................................................ 16

*Marcus v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*,
  548 F.2d 1044 (D.C. Cir. 1976) ................................................................................. 18

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.*,
  83 F. Supp. 2d 135 (D.D.C. 1999), *aff'd in part*, *vacated in part*, 264 F.3d 52 (D.C. Cir. 2001) .................................................................................................. 24, 25, 26

*Morrissey v. Brewer*,
  408 U.S. 471 (1972) .................................................................................. 23, 25

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ........................................................................................ 27

*Painter v. FBI*,
  694 F.2d 255 (11th Cir. 1982) ........................................................................ 16

*Pharaon v. Bd. of Governors of Fed. Reserve Sys.*,
  135 F.3d 148 (D.C. Cir. 1998) ................................................................... 18, 20

*Slovinec v. Georgetown Univ.*,
  268 F. Supp. 3d 55 (D.D.C. 2017), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018)............................................................................................................... 19

*Spagnola v. Mathis*,
  859 F.2d 223 (D.C. Cir. 1988) ........................................................................ 13

*Strumsky v. Washington Post Co.*,
  842 F. Supp. 2d 215 (D.D.C. 2012) ................................................................ 19

*Thompson v. Dist. of Columbia*,
  530 F.3d 914 (D.C. Cir. 2008) ........................................................................ 15

*Thompson v. Shock*,
  852 F.3d 786 (8th Cir. 2017).......................................................................... 26

*Throckmorton v. Nat'l Transp. Safety Bd.*,
  963 F.2d 441 (D.C. Cir. 1992) ........................................................................ 20

*Twist v. Meese*,
  854 F.2d 1421 (D.C. Cir. 1988) ...................................................................... 14

*United States v. Fausto*,
  484 U.S. 439 (1988) .............................................................................. *passim*

*Vill. of Bensenville v. Fed. Aviation Admin.*,
  457 F.3d 52 (D.C. Cir. 2006) ..................................................................... 18, 19

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959) ............................................................................ 13

*Wilburn v. Robinson*,
   480 F.3d 1140 (D.C. Cir. 2007) ............................................... 27, 29, 30

*Williams v. Johnson*,
   701 F. Supp. 2d 1 (D.D.C. 2010) ........................................................ 27

*Withrow v. Larkin*,
   421 U.S. 35 (1975) ............................................................................. 21

## Statutes

5 U.S.C. APP. 3 § 2 .................................................................................... 5

5 U.S.C. § 2301 ........................................................................................ 11

5 U.S.C. § 2302 ........................................................................................ 13

5 U.S.C. § 4301 ........................................................................................ 11

5 U.S.C. § 7501 ........................................................................................ 11

5 U.S.C. § 7511 .............................................................................. 11, 12, 16

5 U.S.C. § 7513 ........................................................................................ 11

5 U.S.C. § 7703 ........................................................................................ 11

5 U.S.C. § 8412(d)(2) ............................................................................... 16

5 U.S.C. § 8905(b) ................................................................................... 17

## Constitutional Law

U.S. CONST. art. II, § 2, cl. 2………………………………………………..22

## Regulation

8 C.F.R. § 0.29e(d)..................................................................................... 1

## Other Authorities

Andrew G. McCabe, *The Threat: How the FBI Protects America in the Age of Terror and Trump* (2019),
   https://www.amazon.com/Threat-Protects-America-Terror-Trump-ebook/dp/B07HFMYQPG
   ...................................................................................................... 17

Statement, Department of Justice, Office of Public Affairs, *Attorney General Jeff Sessions Announces Bradley Weinsheimer to Replace Departing Associate Deputy Attorney General Scott Schools* (July 3, 2018),
   https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-announces-bradley-weinsheimer-replace-departing-associate ................................................................................................... 7

FBI, About FBI, Leadership & Structure, Director Christopher Wray,
   https://www.fbi.gov/about/leadership-and-structure ........................................................... 6–7

FBI, Nat'l Press Release, "FBI Director Names Candice M. Will as Assistant Director for Office of Professional Responsibility" (Aug. 11, 2004)
   https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-director-names-candice-m.-will-as-assistant-director-for-office-of-professional-responsibility ........................................... 5

U.S. Department of Justice, Office of Inspector General, "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe" (Feb. 2018),
   https://oig.justice.gov/reports/2018/o20180413.pdf ......................................................... 1–2, 5

## INTRODUCTION

The Federal Bureau of Investigation's motto is "Fidelity, Bravery, Integrity."  The men and women of the FBI take those words—and the ideals behind them—very seriously.  As explained by former Assistant FBI Director Candice Will, then-head of the FBI's Office of Professional Responsibility, "our integrity is our brand.  Without it, we are nothing."  Letter from Will to Andrew McCabe ("FBI Rec.") at 15 (Mar. 7, 2018) (attached as Ex. 1).  Because of its institutional devotion to these principles, if the FBI finds that one of its Special Agents lacked candor under oath, the standard penalty is removal.  *Id.* at 14.

Andrew G. McCabe was one of those Special Agents.  Indeed, prior to his March 2018 removal, Mr. McCabe was not just any Special Agent:  He was the Deputy Director of the FBI, the second-highest-ranking official in the Bureau.  And he did not get that job by accident.  He earned it, through a long record of distinguished service to the Bureau and to the United States.  But in the FBI, a lofty position does not lessen the need to abide by the ideals memorialized in its motto.  To the contrary, the Deputy Director must lead first by example.  Again, to quote former Assistant Director Will, "the Deputy Director . . . [is] the second-highest position in the FBI," and the person holding that job is "expected to comport [him]self with the utmost integrity."  *Id.* at 15.

Mr. McCabe's actions here fell short of that bar.  After a lengthy investigation, the Department's Inspector General found, as detailed in a 34½-page report, that Plaintiff had repeatedly lacked candor under oath (and not under oath, too) in interviews with its investigators and with agents from the FBI's Inspection Division.  (The Inspector General also found that Plaintiff had improperly authorized the confirmation of an ongoing investigation to the press.)  Following standard practice—and the applicable regulation, 8 C.F.R. § 0.29e(d)—the Inspector General then transmitted his report to the FBI for "such action as it deem[ed] appropriate."  U.S. Department of Justice, Office of Inspector General, "A Report of Investigation of Certain

Allegations Relating to Former FBI Deputy Director Andrew McCabe," ("OIG Rpt.") (Feb. 2018), https://oig.justice.gov/reports/2018/o20180413.pdf.   Assistant Director Will, a career official, agreed almost entirely with the Inspector General's findings, departing only on the question of whether one of Mr. McCabe's interviews was under oath.  FBI Rec. at 1, 12–15.

The next question—one outside the scope of the Inspector General's mandate and thus left unaddressed by his report—was what the consequence of these findings should be for Plaintiff. The obvious answer lay in the words of the motto and the ethos of the Bureau:  Removal from the FBI for conduct "incompatible with the FBI's Core Values."  FBI Rec. at 15.  And based on her careful review and consideration of the Inspector General's report, FBI Offense Codes, and the *Douglas* factors,[1] removal is what Assistant Director Will recommended.

Because Plaintiff was the Bureau's second-highest-ranking official, Assistant Director Will did not have the last word in the matter.  The Attorney General is the final decision maker for top-ranking Bureau officials like Plaintiff.  But the Attorney General would receive another recommendation first.  This one would come from Associate Deputy Attorney General (ADAG) Scott Schools, who was the highest-ranking career official in the Department of Justice.

Mr. McCabe was given seven days to provide oral and written responses to the notice of proposed removal to ADAG Schools.  That response period was a departure from the 30-day response period more frequently provided for a proposed removal.  But FBI policy governing the removal of Senior Executive Service (SES) employees provides that "if there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment can be imposed, the advance notice may be curtailed to as little as seven days."  FBI SES Policy at 16

---

[1] The *Douglas* factors, derived from the Merit Systems Protection Board's decision in *Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 305–06 (1981), are used to determine the appropriate penalty for employee misconduct.

(attached as Ex. 2).  Given the Inspector General's findings that Mr. McCabe lacked candor under

oath, findings which Assistant Director Will seconded after her independent assessment, there was

reasonable cause to believe that Mr. McCabe had committed a crime for which a sentence could

be imposed—and, therefore, a sound basis for affording Mr. McCabe seven days to respond.

No matter:  Mr. McCabe's responses were extensive and sophisticated.  Mr. McCabe

testified at an oral hearing before ADAG Schools and, through his legal team, presented four hours

of factual and legal arguments against his proposed removal.  The next day, Mr. McCabe's lawyers

submitted an 11-page, single-spaced response to the notice of proposed removal.  Ultimately, after

considering the record, including Mr. McCabe's extensive responses, ADAG Schools found what

the Inspector General and Assistant Director Will had earlier found:  That Plaintiff had lacked

candor, both under oath and not, and had improperly revealed the existence of an ongoing

investigation to the press.  ADAG Schools also recommended that Plaintiff be removed from the

FBI.  The Attorney General adopted ADAG Schools' recommendation, removing Plaintiff from

the FBI and the Civil Service.

Mr. McCabe has now filed this suit challenging his dismissal.  He raises more than a dozen

claims, but none of them finds its mark.  In many of his claims, Plaintiff asserts that Defendants—

the Attorney General and FBI Director in their official capacities, the Department of Justice, and

the FBI—violated statutes and regulations in the course of his removal.  But the Civil Service

Reform Act (CSRA) precludes Plaintiff from bringing such claims.  The CSRA creates a

comprehensive and, more importantly for these purposes, exclusive remedial scheme.  This

comprehensive remedial scheme leaves no room for the hodge-podge of statutory and regulatory

claims brought by Plaintiff.

Plaintiff also raises constitutional claims for equitable relief under the Fifth Amendment's Due Process Clause and the First Amendment.  The CSRA does not preclude these claims, but they fail nonetheless.  He makes two due process claims:  1) the Attorney General was a biased decision maker; and 2) Plaintiff did not have adequate time to prepare a response to the notice of proposed removal.  Plaintiff waived his claim about the Attorney General's alleged bias by not raising it at the administrative level.  And regardless, the claim lacks merit, as it rests on an improper effort to impute alleged bias from the President to others, including the Attorney General. His other due process claim fares no better:  Plaintiff knew the bases of his removal for weeks, and he and his legal team had ample time to respond to the notice of proposed removal, which ran no more than 15 pages.  Finally, there is Plaintiff's First Amendment claim, which is essentially that he was fired for being perceived as a Democrat.  But as stated above and explained below, the Attorney General decided to remove Plaintiff due to his lack of candor, irrespective of Plaintiff's perceived political affiliation.

Accordingly, the Court should dismiss certain of Plaintiff's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and enter summary judgment in favor of Defendants as to the rest.

## BACKGROUND

In 2016, someone at the FBI confirmed the existence of an ongoing criminal investigation to a reporter, in contravention of standard FBI practice.  OIG Rpt. at 1.  The question was who. The FBI tried to find out, including by interviewing the Bureau's then-Deputy Director—now the Plaintiff—Mr. McCabe.  *See id.* at 1.  Eventually, agents in the FBI's Inspection Division came to suspect that Mr. McCabe had authorized the revelation to the reporter and had not been forthcoming about having done so.  *Id.*  Because of his high position in the organization, though, moving the investigation out of the FBI made sense.  Thus, the Department of Justice's Office of

4

Inspector General (OIG, IG, or Inspector General), which was created by statute as an "independent and objective unit[]" for conducting "investigations," 5 U.S.C. APP. 3 § 2, took over. It conducted an investigation, which included conducting multiple interviews of Plaintiff. *Id.* at 2. In February 2018, the Inspector General issued a report entitled, "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe," Feb. 2018, https://oig.justice.gov/reports/2018/o20180413.pdf.

The Inspector General concluded that Plaintiff had in fact authorized the relevant disclosure and had lacked candor relating to that conduct on four occasions, in violation of FBI rules. OIG Rpt. at 2. To start, the IG determined that Plaintiff lacked candor when speaking with then-FBI Director James Comey about who had authorized the disclosure to the reporter. *Id.* Moreover, the IG concluded that Plaintiff had lacked candor on three occasions while under oath— once while being questioned by agents from the FBI's Inspection Division and twice while being questioned by the OIG. *Id.* The IG also concluded that Plaintiff's decision to confirm the on-going investigation violated FBI rules. *Id.* Before finalizing its report, the OIG shared a draft with Plaintiff and his counsel, Mar. 15, 2018 Tr. of Hearing in the Matter of Andrew McCabe ("Oral Resp. Tr."), at 165:6–8 (attached as Ex. 3), and Plaintiff submitted a response. The OIG considered the arguments offered by Plaintiff in his response. *See, e.g.*, OIG Rpt. at 23 n.8, 25 n.10, & 26 n.11. Ultimately, OIG "issu[ed] [the] report to the FBI for such action as it deem[ed] appropriate," *id.* at 2.

The ball was then in the FBI's court. The career head of the FBI Office of Professional Responsibility (OPR) at the time, Assistant Director Candice Will,[2] took the lead under standard

---

[2]   *See*   https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-director-names-candice-m.-will-as-assistant-director-for-office-of-professional-responsibility (Aug. 11, 2014).

Bureau practice.  After her independent review of the OIG's report and the underlying evidence, she determined that it was not clear whether Plaintiff was under oath when he spoke with the Inspection Division Agents, but otherwise agreed with the IG's findings that Plaintiff had lacked candor and had improperly disclosed the existence of an FBI Investigation.  FBI Rec. at 1.  After concluding that Plaintiff had engaged in misconduct, she turned to the consideration of an appropriate penalty, taking into account factors such as consistency with FBI precedent, the FBI's guidelines for punishment, and aggravating and mitigating circumstances.  *Id.* at 14–15.  In light of these considerations, including that dismissal is the standard penalty for lacking candor under oath and that Plaintiff was the Deputy Director at the time, Assistant Director Will recommended that Plaintiff be "dismissed from the rolls of the FBI."  *Id.* at 17.  She reasoned, in part, as follows: "I find that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand.  Without it, we are nothing. As the Deputy Director, you held the second-highest position in the FBI and are expected to comport yourself with the utmost integrity.  Despite this, you repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division."  *Id.* at 15.

While the head of OPR can issue final decisions with regard to lower-ranking FBI employees, as to the Deputy Director, she could issue only a recommendation.  Under DOJ Order 1202, which was signed by former Attorney General Eric Holder, the Deputy Director of the FBI can be removed only by the Attorney General.  DOJ Order 1202, at 14 (Nov. 26, 2013) (attached to Ex. 4, Letter from Schools to McCabe) (specifying that individuals in "[k]ey SES [p]ositions" can be removed only by the Attorney General, and defining key positions to include "[a]ll career SES officials who are deputy Component Heads in Components with a single deputy position"); *see* FIB,  About   FBI,   Leadership   &   Structure,   Director   Christopher   Wray,

https://www.fbi.gov/about/leadership-and-structure (listing a single Deputy Director position for FBI).

Accordingly, Assistant Director Will forwarded her 15-page recommendation (along with the largely redundant 17-page report of investigation) to the Office of the Deputy Attorney General.  ADAG Scott Schools, then the highest-ranking career official in the Department of Justice (he has since left the Department), served as the point person.  *See* Statement, Department of Justice, Office of Public Affairs, *Attorney General Jeff Sessions Announces Bradley Weinsheimer to Replace Departing Associate Deputy Attorney General Scott Schools* (July 3, 2018),       https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-announces-bradley-weinsheimer-replace-departing-associate.  ADAG Schools sent Plaintiff a letter informing him of the procedures that the Department would follow in reviewing this matter and of his rights to "review the material relied upon to support the proposal," "to reply to this notice orally, in writing, or both," "to submit any affidavits or other documentary evidence [he] wish[ed] in support of [his] reply," and to have his "attorneys assist [him] in preparing and presenting [the] reply."  Letter from Schools to McCabe ("Schools Letter") at 1 (Mar. 8, 2018) (attached as Ex. 4).[3]  Attached to the letter was DOJ Order 1202, which, as explained above, specified that the Deputy Director of the FBI can be removed only by the Attorney General.  DOJ Order 1202, at 14.  The letter also stated that any decision to remove Mr. McCabe would be effective no earlier than March 16, 2018.  Schools Letter at 1.

Consistent with FBI policy governing the removal of SES employees, the Department of Justice furnished Mr. McCabe with a week to respond to the notice of proposed removal.  Under

---

[3] The letter from ADAG Schools stated that Plaintiff's written response was due March 15, 2018, but that deadline was extended until noon on March 16, 2018.  Compl. ¶ 122.

FBI policy, if a proposed removal is based on misconduct, then the employee is presumptively afforded 30 days to respond to the proposal. FBI SES Policy at 16. But there is an exception to this rule. "[I]f there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment can be imposed, the advance notice may be curtailed to as little as seven days." *Id.* The Inspector General's finding that Mr. McCabe had lacked candor under oath provided "reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment can be imposed."

Plaintiff availed himself of the opportunity to provide both an oral and written reply. On March 15, 2018, Plaintiff and two of his attorneys provided his oral reply to ADAG Schools and another career Department of Justice attorney from the Justice Management Division, the administrative arm of the Department. *See generally* Oral Resp. Tr. The hearing lasted more than four hours. *See id.* at 1, 201. During the hearing, Plaintiff answered questions from his lawyers and from ADAG Schools, and his lawyers presented arguments. *See generally id.* At the end of the hearing, ADAG Schools reminded Plaintiff's counsel that the Attorney General would make the decision of whether or not to remove Plaintiff. *Id.* at 198–200. The next day, Plaintiff, through his legal team, submitted an 11-page, single-spaced letter responding to the notice of proposed removal. Letter from Bromwich to Schools ("Resp. Letter") (March 16, 2018) (attached as Ex. 5). In neither response, oral or written, did Plaintiff raise any concerns about the propriety of the Attorney General's involvement in the decision making process.

After "hav[ing] reviewed the entire record and carefully considered Mr. McCabe's oral and written responses," ADAG Schools recommended that the Attorney General "sustain the charge[s] that Mr. McCabe lacked candor under oath in the July 28, 2017 OIG interview," lacked candor under oath in the November 29, 2017 OIG interview, lacked candor during the May 9, 2017

interview with the Inspection Division Agents, and authorized the disclosure of an on-going FBI investigation in contravention of FBI policy. Memo. from ADAG Schools to the Attorney General ("ADAG Rec."), at 1–6 (Mar. 16, 2018) (attached as Ex. 6). ADAG Schools did not endorse all of the FBI's recommendations, however, as he concluded that the evidence did not support the conclusion that Plaintiff lacked candor in a meeting with the FBI Director because "[a]lthough the preponderant evidence supports a finding that Mr. McCabe did not tell Mr. Comey that he authorized the disclosure, the testimony is insufficient to support a finding that Mr. McCabe denied being the source." *Id.* at 5.

Having made these recommended findings, ADAG Schools recommended, as Assistant Director Will had, that Plaintiff be "dismissed from the rolls of the FBI." *Id.* at 6. He based his recommendation primarily on the fact that the "standard penalty for lack of candor under oath is dismissal" and that "[t]he substantiated findings of lack of candor under oath are compounded by the finding of lack of candor not under oath, and the unauthorized disclosure finding." *Id.* ADAG Schools recognized that "McCabe ha[d] had a distinguished career in the FBI" but noted, "as Ms. Will [had] observed, [that] he was the second highest-ranking official in the FBI, and he [wa]s expected to handle himself with utmost integrity." *Id.*

The Attorney General adopted the recommendation of ADAG Schools (and by extension that of Assistant Director Will) that Mr. McCabe be removed. He wrote: "For the reasons stated in the foregoing recommendation, I have decided that Andrew G. McCabe should be removed from the Federal Bureau of Investigation and from the civil service." *Id.*

In August 2019, Plaintiff filed his complaint. It includes five counts, but over a dozen claims. Compl. ¶¶ 148–93. It names as defendants the Attorney General and the Director of the FBI, in their official capacities, as well as the Department of the Justice and the FBI. *Id.* ¶¶ 18–

21.  According to Plaintiff, these Defendants violated various statutes and regulations, the Due Process Clause of the Constitution, and the First Amendment in the course of removing him from the FBI and the Civil Service.  *Id.* ¶¶ 148–93.

## ARGUMENT

Plaintiff's complaint raises (i) statutory and regulatory claims; (ii) due process claims; and (iii) First Amendment claims.  None of them withstands scrutiny.  The statutory and regulatory claims are precluded by the CSRA:  It creates an exclusive remedial scheme for the sort of non-constitutional employment-related grievances made by Plaintiff, but (with exceptions inapplicable here) it precludes FBI employees from obtaining relief.  The due process claims fare no better, as they run aground on the lack of a protected property interest, waiver, and Plaintiff's failure to articulate an actionable claim.  Finally, Plaintiff's First Amendment claims, which are premised on the assertion that Mr. McCabe was fired for his perceived political affiliation, come up short:  The Attorney General adopted the recommendations of two high-ranking Department of Justice officials that Mr. McCabe be removed due to his lack of candor under oath.

## I.    The CSRA Precludes McCabe's Statutory and Regulatory Claims

The first two counts of the Complaint contain an assortment of claims, among them claims that Defendants violated various statutes and regulations in the course of removing Plaintiff from the FBI and the Civil Service.  *See* Compl. ¶¶ 148–69.  For example, Plaintiff alleges that his removal was ineffective because it occurred after 5:00 p.m. on a Friday, *id.* ¶ 151; was based on a decision that used the incorrect verb tense, *id.* ¶ 152; and was made by the Attorney General, rather than a lower-ranking Department of Justice official, *id.* ¶ 153.  These claims lack merit, as do the rest of the statutory and regulatory claims.  But the Court need not reach their merits because the CSRA precludes judicial review of such claims.  *See United States v. Fausto*, 484 U.S. 439, 447 (1988); *Graham v. Ashcroft*, 358 F.3d 931, 935–36 (D.C. Cir. 2004).

In enacting the CSRA in 1978, Congress comprehensively reformed the relationship between the federal government and its employees.  It "replace[d] the haphazard arrangements for administrative and judicial review of personnel action[s]" that were "part of the 'outdated patchwork of statutes and rules built up over almost a century.'"  *Fausto*, 484 U.S. at 444 (quoting S. Rep. No. 95-969, at 3 (1978)).   Before the CSRA, there were multiple sources of authority (statutes, executive orders, and regulations) governing employment matters, with various courts around the country giving their own gloss to each.  *See id.* at 444–45.  Unsurprisingly, there was "dissatisfaction with the wide variations in the kinds of decisions issued on the same or similar matters."  *Id*. at 445 (cleaned up) (citation omitted).  The CSRA brought order to this chaos.  It established an "integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."  *Id.*

As part of this integrated scheme, the CSRA channels judicial review of most covered claims through the Merit Systems Protection Board, and from there on to the U.S. Court of Appeals for the Federal Circuit.  5 U.S.C. § 7703.  It also establishes, among other things, a reticulated remedial structure for claims involving:  (i) personnel actions based on unacceptable performance, 5 U.S.C. § 4301 *et seq*. ("Chapter 43"), (ii) certain personnel actions taken in alleged violation of the merit system principles, 5 U.S.C. § 2301 *et seq.* ("Chapter 23"), and (iii) certain defined major personnel actions based on misconduct, 5 U.S.C. § 7501 *et seq.*  ("Chapter 75").  *See Fausto*, 484 U.S. at 445–47.  For example, Chapter 75 establishes that an "employee" (as that term is defined at 5 U.S.C. § 7511) may be removed "only for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a), and that an employee is entitled to certain procedural protections in the event that his or her employing agency proposes removal, *id.* § 7513(b)–(d).

Crucially, the CSRA is not only comprehensive, but exclusive.  In other words, with regard to remedies for non-constitutional employment-related claims, with a few inapplicable exceptions, "what you get under the CSRA is what you get."  *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).  The scheme's exclusivity helps to ensure the uniformity that motivated the enactment of the CSRA.  *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).  Moreover, the CSRA excludes certain categories of employees from the remedies that would otherwise be available to them under Chapters 23, 43, and 75.  The category of employees carved out of all or part of the CSRA includes those employed by the FBI.  Most relevant for purposes of this case, Chapter 75 of the CSRA—regarding challenges to misconduct-based personnel actions—does not apply to FBI personnel:  "This subchapter does not apply to an employee . . . whose position is within the . . . the Federal Bureau of Investigation . . . unless subsection (a)(1)(B) of this section or section 1005(a) of title 39 is the basis for this subchapter's applicability."[4]  5 U.S.C. § 7511(b)(8).

Plaintiff was dismissed from the FBI for conduct-based reasons.  So, given the general inapplicability of Chapter 75 of the CSRA to FBI personnel, he has no avenue to challenge his removal under that statutory scheme.  And, because the CSRA is not only comprehensive, but exclusive, Plaintiff has no other avenue for raising his statutory and regulatory claims:  "[T]he exclusion of particular employees . . . from the CSRA [i]s not an invitation to those employees to sue under other statutes but a 'manifestation of a considered congressional judgment that they

---

[4] So far as applicable to the FBI, the exception to the exception in Chapter 75 is for those FBI employees who are "preference eligible"—certain military veterans or their family members.  In other words, for example, certain veterans who work for the FBI are covered by Chapter 75, whereas the Bureau's employees who don't fall within this exception to the exception are not.  None of the allegations in the complaint indicate that Plaintiff possesses the qualifying military experience necessary to fall within the band of covered FBI employees.

should not have statutory entitlement to review.'" *Filebark v. U.S. Dep't of Transp.*, 555 F.3d

1009, 1013 (D.C. Cir. 2009) (quoting *Fausto*, 484 U.S. at 448–49). Another court in this district

reached just this conclusion with respect to a challenge brought by another former FBI employee

removed for alleged misconduct. *Lamb v. Holder*, 82 F. Supp. 3d 416, 421 (D.D.C. 2015)

(explaining that a former FBI employee "is excluded from the CSRA provisions regarding

termination, and therefore his termination is not subject to judicial review").[5]

Indeed, the D.C. Circuit has previously ruled that the CSRA precludes the very kinds of

claims raised by Plaintiff here. Plaintiff's claims that Defendants violated their own regulations

in taking an adverse personnel action are known as *Vitarelli* claims. *See Vitarelli v. Seaton*, 359

U.S. 535, 539–40 (1959). In *Graham,* 358 F.3d at 935, the D.C. Circuit held, in a suit brought by

an FBI agent, that the CSRA precluded review of *Vitarelli* claims: "[I]t is clear that judicial review

of Graham's personnel claims under *Vitarelli* is precluded by the CSRA." As for Plaintiff's

statutory claims, while they do not identify a cause of action, the APA is the most likely candidate,

but the D.C. Circuit has "long held that federal employees may not use the Administrative

Procedure Act to challenge agency employment actions." *Filebark*, 555 F.3d at 1010. In short,

nothing in the nature of Plaintiff's specific claims takes them outside the ambit of the CSRA's

preclusive effects.

A 2009 D.C. Circuit decision well summarizes the state of the law and, by extension, the

reasons for dismissing Plaintiff's statutory and regulatory claims based on the preclusive effects

of the CSRA:

---

[5] The CSRA does not preclude judicial review of claims under certain anti-discrimination statutes, such as Title VII of the Civil Rights Act, *see* 5 U.S.C. § 2302, and the D.C. Circuit has never "suggest[ed] that [it] precludes the exercise of federal jurisdiction over the constitutional claims of federal employees and job applicants altogether," *Spagnola v. Mathis*, 859 F.2d 223, 229–30 (D.C. Cir. 1988).

> As our Court has emphasized, the CSRA is comprehensive and
> exclusive. . . . We have emphasized, moreover, that the CSRA is the
> exclusive avenue for suit even if the plaintiff cannot prevail in a
> claim under the CSRA.  As we have explained, Congress designed
> the CSRA's remedial scheme with care, "intentionally providing—
> and intentionally not providing—particular forums and procedures
> for particular kinds of claims."  *Filebark*, 555 F.3d at 1010.
> Allowing employees to end-run the CSRA would undermine
> Congress's efforts to foster a "unitary and consistent Executive
> Branch position on matters involving personnel action." *Fausto*,
> 484 U.S. at 449, 108 S.Ct. 668; *see also Graham*, 358 F.3d at 934.
> Therefore, we have told federal employees, "what you get under the
> CSRA is what you get." *Fornaro*, 416 F.3d at 67.

*Grosdidier*, 560 F.3d at 497.  Accordingly, the Court should dismiss Plaintiff's statutory and

regulatory claims, which are found in Counts I and II of the Complaint, for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See, e.g.*, *Gardner v. United States*,

No. CIV A. 96-1467, 1999 WL 164412, at *7 (D.D.C. Jan. 29, 1999), *aff'd*, 213 F.3d 735 (D.C.

Cir. 2000) (dismissing claims under Rule 12(b)(1) on the basis of CSRA preclusion).

## II.    Plaintiff's Constitutional Due Process Claims Lack Merit

Plaintiff received notice of the bases of his proposed removal and both provided a written

response and participated in an oral hearing before the Department of Justice's then top career

official, ADAG Scott Schools.  *See generally Twist v. Meese*, 854 F.2d 1421, 1428 (D.C. Cir.

1988) ("[G]iven the fact that Twist received advance notice, an on-the-record hearing, and an

opportunity to submit a written answer to the charges against him, even if Twist had a property

right to his continued employment, which we have held he does not, he has received all the process

to which he would be due.").  All the while, Plaintiff was assisted by lawyers from two well-

regarded law firms.  But the outcome of this process obviously was not what Mr. McCabe sought,

as former Attorney General Sessions adopted ADAG Schools' recommendation that Plaintiff be

removed from the FBI and the Civil Service.  (ADAG Schools' recommendation tracked that of

the career head of the FBI's Office of Professional Responsibility, Assistant FBI Director Candice Will.)  He thus contends that he was denied due process.

Plaintiff raises two constitutional due process claims.  First, Plaintiff alleges that former Attorney General Sessions was biased.  Second, he contends that he lacked adequate time to prepare a response to the notice of proposed removal.[6]  Plaintiff contends that these alleged due process violations "depriv[ed] him of his property interest in his employment and full vested pension and related benefits," Compl. ¶ 158, and "deprived [him] of his constitutionally protected liberty interest in his reputation," *id.* ¶ 166.  These claims should be dismissed or, in the alternative, the Court should enter summary judgment in favor of Defendants.

### A.  Plaintiff Has No Property Interest in His Former Job or Its Benefits

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted).  Plaintiff has not been deprived of a protected property interest.  An employee has a property interest in a government job only if, under the law, "he did not serve in his job at his employer's 'will,' but he could be removed only 'for cause.'"  *Thompson v. Dist. of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) (citation omitted).  But Plaintiff did not enjoy for-cause removal protections:  Chapter 75 of the CSRA provides for-cause removal protections for many if not most federal employees, 5 U.S.C. §§ 7511, 7513, but, with a few exceptions inapplicable to Plaintiff, it excludes FBI employees, 5

---

[6] Plaintiff's complaint may also suggest that the alleged violations of an agency's regulations constitute a per se due process violation.  *See* Compl. ¶ 158.  This argument is meritless.  *E.g.*, *Crosby-Bey v. Dist. of Columbia*, 786 F.2d 1182, 1186 (D.C. Cir. 1986).  Similarly meritless is the suggestion*, see* Compl. ¶158, that any alleged statutory violations constitute a per se due process violation.  *See Duffy v. Selsky*, No. 95-cv-0474, 1996 WL 407225, at *8 (S.D.N.Y. July 18, 1996).

U.S.C. § 7511(b)(8).  Indeed, numerous courts—including one in this district—have held that FBI personnel lack a protected property interest in their jobs.  *See, e.g.*, *Lamb*, 82 F. Supp. 3d at 424–25; *Mack v. United States*, 814 F.2d 120, 123 (2d Cir.1987); *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982).  Thus, as a non-preference-eligible FBI employee, Plaintiff was excluded from the CSRA's for-cause protections and, by extension, any viable argument that he has a property interest in his former job.  Absent a protected property interest in his job, Plaintiff cannot seek reinstatement as a remedy for any alleged due process violations.  *See Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985); *Dave v. D.C. Metro. Police Dep't*, 926 F. Supp. 2d 247, 249 n.1 (D.D.C. 2013).

Plaintiff's argument that he has a property interest in the employment benefits of his former job fares no better.  By statute, a federal law enforcement officer is "entitled to a[] [retirement] annuity" immediately "after becoming 50 years of age and completing 20 years of service as a law enforcement officer," unless "remov[ed] for cause on charges of misconduct or delinquency."  5 U.S.C. § 8412(d)(2); *see* Compl. ¶ 36 (indicating that Plaintiff is basing his pension-entitlement claim on § 8412(d)(2)).  But Mr. McCabe did not satisfy the requirements for entitlement to this law-enforcement officer annuity because he was not employed as a law enforcement officer "after becoming 50 years of age and completing 20 years of service."  Thus, he has no protected property interest in the annuity.  D.C. Circuit precedent squarely supports this conclusion.  In a similar context, the D.C. Circuit held that "a *retiree* who *meets [age, service, or disability] requirements* acquires an interest protected by the due process clause in benefits at the level provided by the law in effect at the time he or she becomes eligible."  *Am. Postal Workers Union, AFL-CIO* v. *U.S. Postal Service*, 707 F.2d 548, 554 (D.C. Cir. 1983) (emphasis added); *see also id.* ("Potential retirees have no protected property interest in any particular level of retirement benefits."

(emphasis omitted)).  Accordingly, as Mr. McCabe did not meet the age and service requirement for a law-enforcement officer annuity at the time he left federal service, he did not acquire a protected property interest in it.  *See also Bloch v. Powell*, 227 F. Supp. 2d 25, 38 (D.D.C. 2002), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003) ("[P]laintiff was not qualified for annuity and therefore had no cognizable property rights to such an annuity in the first place.").  Since Mr. McCabe has no property interest in the annuity, it follows that he does not have a property interest in the continued receipt of his medical benefits, either.  5 U.S.C. § 8905(b) (stating that "[a]n annuitant" who meets certain requirements "may continue his enrollment" in a health benefits plan).

Plaintiff is thus left with the assertion that he has a protected liberty interest in his reputation that has been affected by Defendants' actions.  But statements about Plaintiff's misconduct rest on a solid foundation, as demonstrated by the IG's report.  *See Aref v. Lynch*, 833 F.3d 242, 258 n.11 (D.C. Cir. 2016) ("Most important here, the reputation-tarnishing statement must be *false*."); *see generally* OIG Rpt.  And Defendant has not been sidelined by his removal:  He has published a book[7]; joined CNN as on on-air contributor; and secured the services of a speaker's bureau that also represents, among others, former Speaker of the House Paul Ryan, Pulitzer-Prize winning reporter Bob Woodward, and former Senate Majority leader George Mitchell, *see* https://www.leadingauthorities.com/speakers. That said, the Court need not determine whether Plaintiff's liberty-interest allegations are persuasive because his claims otherwise fail.

### B.  Plaintiff Has Waived His Bias Allegations

Plaintiff waived the allegation that former Attorney General Sessions was biased by not raising it at the administrative level.  D.C. Circuit precedent is clear:  "[C]laims of bias must be

---

[7] Andrew G. McCabe, *The Threat: How the FBI Protects America in the Age of Terror and Trump* (2019), https://www.amazon.com/Threat-Protects-America-Terror-Trump-ebook/dp/B07HFMYQPG.

raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist." *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 73 (D.C. Cir. 2006) (deeming waived claims of bias that were not raised before the agency); *Pharaon v. Bd. of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C. Cir. 1998) (same); *Marcus v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*, 548 F.2d 1044, 1051 (D.C. Cir. 1976) (same). There is a straightforward reason why "[i]t will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor": "A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process." *Marcus*, 548 F.2d at 1051; *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 20 (D.D.C. 2019) ("This requirement prevents parties from sitting on potential claims of disqualification and raising those claims only in the case of an unfavorable outcome."). In short, a plaintiff must raise claims of bias at the administrative level to enable the agency to cure any bias or otherwise address claims of bias, rather than sitting on his hands and raising such claims only if he gets an unfavorable decision from the agency.

During the administrative proceedings prior to his dismissal, Plaintiff did not level any allegations of bias against the former Attorney General. He was given notice of the Attorney General's role, at the latest, on March 8, 2018, when ADAG Schools furnished him with a copy of DOJ Order 1202. *See* DOJ Order 1202, at 14. And Plaintiff's counsel were reminded of the Attorney General's role at the oral hearing. *See generally* Oral Resp. Tr. at 198:20–200:19; *see also id.* at 198:20–199:2 ("Mr. Schools: The process is that I do my thing and make . . . effectively [what will] be a recommendation to the [A]ttorney [G]eneral. And he either endorses or changes it."). At the time of the administrative proceedings, Plaintiff (and his counsel) thus possessed the information on which he now bases his bias allegations. *See* Compl. ¶ 164. Yet Plaintiff did not

18

raise any allegations of bias at the oral hearing or in his written response.  *See* Oral Resp. Tr.; Resp. Letter.[8]

Thus, Plaintiff did not raise his claims of bias "as soon as practicable."  *Vill. of Bensenville*, 457 F.3d at 73.  Instead, he brought them only after learning that the Agency's decision, which was based on the recommendations of two senior career officials, did not go in his favor.  His bias claims have thus been waived.[9]

## C.  Plaintiff Has Not Stated a Plausible Claim of Bias

In any case, Plaintiff has not pleaded a plausible claim that former Attorney General Sessions harbored any bias against him.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The heart of Plaintiff's bias allegation against the former Attorney General is that "Defendants had

---

[8] The transcript of the oral hearing and the response letter from Plaintiff's counsel to ADAG Schools were incorporated into the complaint by reference.  *See* Compl. ¶¶ 118, 123, 124; *Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018); *Strumsky v. Washington Post Co.*, 842 F.Supp.2d 215, 217–18 (D.D.C. 2012).  Accordingly, the Court can rely on them under Rule 12(b)(6).  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).  The same is true of the Attorney General's Decision (including the recommendation by ADAG Schools), the FBI's recommendation, and the FBI's SES policy.  *See* Compl. ¶¶ 115, 126, 160-61.  In the alternative, the Court can enter judgment in Defendants' favor under Rule 56.

[9] Plaintiff asserts that he was demoted from the position of Deputy Director in January 2018, *see, e.g.*, Compl.¶ 7, and, therefore, that the Attorney General should not have been the decision maker. *See* Compl. ¶ 117.  This assertion is incorrect.  Plaintiff was not demoted from the Deputy Director position prior to his removal.  In his written response to the notice of proposed removal, Plaintiff's counsel referred to Mr. McCabe as the "FBI Deputy Director." Resp. Letter at 1.  Moreover, Plaintiff's counsel implicitly acknowledged that Plaintiff had *not* been demoted when he stated during the hearing with ADAG Schools that, "if it's a suspension for more than 30 days or a termination[,] that goes to [the Attorney General]."  Oral Resp. Tr. at 199:13–14.  That would be true only if—as was the case—Mr. McCabe was still the Deputy Director.  *See* DOJ Order 1202 at 14.  Finally, the FBI's and ADAG Schools' recommendations regarding Plaintiff's removal refer to him as the Deputy Director of the FBI.  *E.g.*, OPR, Report of Investigation at 1 (Mar. 6, 2018) (attached as Ex. 1) ("McCabe . . . is an ES-0 *Deputy Director*." (emphasis added)); ADAG Rec. at 1 ("Purpose:  To provide a recommendation regarding the proposed removal of FBI *Deputy Director* Andrew G. McCabe) (emphasis added).  Since Plaintiff was the Deputy Director of the FBI at the time of his removal, under DOJ Order 1202, the Attorney General was the appropriate decision maker.  DOJ Order 1202, at 14.

already determined Plaintiff's fate, and the agency decision-maker served merely to rubber-stamp Defendants' (and Trump's) desired outcome." Compl. ¶ 164. But, under *Iqbal*, this is just the sort of conclusory allegation that the Court need not—indeed, cannot—credit. 556 U.S. at 680–81 (concluding that allegations "that Ashcroft was the 'principal architect' of this invidious policy . . . and that Mueller was 'instrumental' in adopting and executing it" are "conclusory and not entitled to be assumed true" (citation omitted)). Crucially, Plaintiff does not allege that former Attorney General Sessions made any statements, publicly or privately, indicating that he had an unalterably closed mind with respect to the McCabe employment matter. *See Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 445 (D.C. Cir. 1992) (explaining that the test for bias under the Due Process clause is whether the agency decision maker has "a fixed opinion—a closed mind on the merits of the case so as to disqualify him for prejudice" (citation omitted)); *Pharaon v. Bd. of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C. Cir. 1998) (same). Plaintiff does allege that former Attorney General Sessions asked FBI Director Wray to remove him (*i.e.*, Plaintiff) in August 2017. Compl. ¶ 99. Assuming that this request was made (as is appropriate in a motion to dismiss under Rule 12(b)(6)), it does not plausibly suggest that former Attorney General Sessions had a "closed mind" in March 2018. The former Attorney General's alleged request to Director Wray was made in August 2017, seven months prior to Mr. McCabe's removal. During those seven months, the Attorney General had the power to remove Plaintiff, *see* DOJ Order 1202, at 14, but did not so. This demonstrates that, whatever concerns the Attorney General allegedly had about Plaintiff's continued employment with the FBI, he remained open-minded about the matter. In any case, the alleged expression of an opinion about whether Plaintiff should be removed in August 2017 for one reason fails to plausibly suggest that the Attorney General lacked an open mind in March 2018 with respect to whether a different rationale justified

Plaintiff's removal.   Indeed, courts have held that, under the Due Process Clause, a judge is permitted to decide a case even when he has previously expressed a view on the very policy question raised in the case.   *See Ass'n of Nat. Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1171 n.51 (D.C. Cir. 1979) ("Even judges are free to decide cases involving policy questions on which they previously have expressed a view.").   Similarly, Plaintiff does not make any allegations regarding actions taken by the former Attorney General that indicate he was biased.

Instead, Plaintiff's claim that the former Attorney General was biased is premised exclusively on two points:   1) the Attorney General dismissed Plaintiff; and 2) the President made statements about Plaintiff indicating that his removal was (or would be) warranted.   Plaintiff's dismissal does not itself indicate bias, however.   The Inspector General concluded that Plaintiff had lacked candor on four occasions, including three times while under oath.   OIG Rpt. at 2.   Based on the Inspector General's investigation and careful consideration of the *Douglas* factors and the FBI's offense code, the long-serving career official in charge of the FBI's Office of Professional Responsibility, Assistant Director Will, recommended that Plaintiff be removed from the FBI and the Civil Service.   And the highest-ranking career official at the Department of Justice did the same.   Thus, Plaintiff's dismissal was the rational culmination of a process based on the conclusions and recommendations of the Inspector General and two high-ranking career officials—not support for an allegation of bias.

Nor do the President's statements about Plaintiff support plausible allegations of bias against the former Attorney General.   Imputing any perceived bias of the President to the former Attorney General is inconsistent with the "presumption of honesty and integrity" that is enjoyed by those "serving as adjudicators."   *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).   And there is no indication of any facts that might overcome that presumption.   Simple conjecture by Plaintiff

21

certainly cannot do so.  *See, e.g., Holmes v. Poskanzer*, 342 F. App'x 651, 653 (2d Cir. 2009) ("Here, the Plaintiffs have not alleged any facts to support actual bias, conflict of interest, or prior involvement by any of the Defendants who participated in the disciplinary hearing process, and thus, their bald assertion that Appellees Paul Zuckerman and Jonathan Raskin were not impartial is insufficient to state a claim.").  Moreover, crediting Plaintiff's theory, which seems to be that all political officials in the Department should be presumed to be biased because of the President's statements, would lead to an absurd result—namely, all politically appointed officials would be cut out of the process of deciding whether to remove a high government official, the Deputy Director of the FBI.  But in our constitutional system, the removal of high government officials is entrusted to executive "Officers," who are politically appointed officials like the Attorney General. *See* U.S. CONST. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone . . . or in the Heads of Departments."); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509, (2010) ("Under the traditional default rule, removal is incident to the power of appointment.").  There is a good reason for that.  Such Officers are often most answerable to the people:  "Our Constitution was adopted to enable the people to govern themselves, through their elected leaders." *Free Enterprise Fund*, 561 U.S. at 499 (holding unconstitutional a statute that interposed two levels of tenure protection between the President and members of a government board).   Plaintiff's theory should be rejected on that basis as well.  And besides, the outcome would have been the same even if politically appointed officials had been removed from the process, as Assistant Director Will and ADAG Schools, both high-ranking career officials—the latter being the highest-ranking career official in the Department of Justice—concluded that Mr. McCabe should be removed.

In sum, Plaintiff's claim of bias against former Attorney General Sessions "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).   Dismissal, or the entry of summary judgment in favor of Defendants, is warranted.

### D.  Plaintiff Had Ample Time to Respond to the Notice of Proposed Removal

Plaintiff alleges that he "did not receive a meaningful opportunity to evaluate and respond to the allegations against him, in violation of . . . the Due Process Clause," because he had less than seven days to prepare a response to the notice of proposed removal. *See, e.g*., Compl. ¶ 162; *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The essential requirements of due process . . . are notice and an opportunity to respond.").  Not so:  Plaintiff, aided by multiple lawyers, had ample time to respond to the 15-page notice of proposed removal, which centered on conclusions that he had first seen weeks earlier, when he reviewed a draft of the Inspector General's Report.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Plaintiff received all of the process that the situation demanded.   As an initial matter, Plaintiff learned of the conclusions underlying the notice of proposed removal weeks before the notice was delivered to him.   The bases for Plaintiffs proposed removal—his lack of candor in interviews on October 31, 2016, May 9, 2017, July 28, 2017, and November 29, 2017—were discussed at length in the Inspector General's Report. *Compare* OIG Rpt. at 27–32, *with* FBI Rec. at 12–14; *see also* ADAG Rec. at 1 (notice of proposed removal was "consistent with the conclusions of the Inspector General"); Compl. ¶ 115 (noting that the proposed removal decision relied on the OIG Report).  A draft of the Inspector General's Report was first made available to Plaintiff on February 21, 2018, Oral.

Resp. Tr. at 165:6–8.  Thus, Plaintiff was aware of the conclusions that undergirded the removal

decision 22 days before his March 15 oral response to the notice of proposed removal, and 23 days

before he submitted his written response to the notice of proposed removal on March 16.  *See* Oral

Resp. Tr. at 1; Resp. Letter at 1.  Courts consider notice of related proceedings in evaluating

whether, as a matter of law, a plaintiff was afforded adequate response time.  *See, e.g.*, *Louisiana*

*Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.*, 958 F.2d 1101, 1114 (D.C. Cir. 1992)

(evaluating process provided in light of earlier proceedings regarding the same issue); *Johnson v.*

*George*, No. 05-cv-157-MPT, 2007 WL 1697276, at *8 (D. Del. June 12, 2007), *aff'd*, 299 F.

App'x 139 (3d Cir. 2008) (noting that "[t]wo and a half months prior to the hearing, Johnson

received the Santora Report which outlined the allegations of financial abuse which were the basis

for her dismissal").

Moreover, the notice of proposed removal spanned only 15 substantive pages.  *See*

*generally* FBI Rec.  Responding to a 15-page document in a week might be a burdensome task for

a team of experienced attorneys, but that task is not constitutionally problematic, especially when

the facts and conclusions have been known to the respondent for weeks.  Indeed, another court in

this District found that a plaintiff who had less than two weeks to respond to a 159-page document

had been afforded an adequate opportunity to respond under the Due Process Clause:

> After being served with the Special Committee's 159–page final
> Report on December 4, Judge McBryde enjoyed less than two weeks
> to prepare his response thereto in time for the Judicial Council to
> consider it in advance of the meeting. . . . Nonetheless, . . . Judge
> McBryde managed to prepare several extensive responses. The
> Court cannot say that this interval, abbreviated as it may have
> seemed to Judge McBryde, deprived Judge McBryde of notice so as
> to violate his due process rights.

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial*

*Conference of the U.S.*, 83 F. Supp. 2d 135, 168 (D.D.C. 1999), *aff'd in part*, *vacated in part*, 264

F.3d 52 (D.C. Cir. 2001).   Just as in *McBryde*, Plaintiff here prepared "extensive responses." Specifically, Plaintiff provided testimony and (through his lawyers) argument in an oral hearing that lasted about 4 hours.   *See* Oral Resp. Tr. at 1, 202.   And he supplemented his oral hearing testimony and argument with an 11-page, single-spaced written response to the notice of proposed removal.

As a corollary to his allegation that seven (days) is not enough, Plaintiff alleges that it was improper for the Department to consider his looming retirement date when establishing the timeframe for resolving his notice of proposed removal.   *See, e.g.*, Compl. ¶ 116.   But why is that? No statute, regulation, or policy requires the FBI or Department of Justice to allow employees suspected of serious wrongdoing to retire before the FBI or the Department can evaluate their conduct.   Nor does the Constitution:   Due Process is flexible, meaning it accounts for the circumstances at hand, *see Morrissey*, 408 U.S. at 481, and one of the relevant circumstances in this case was Mr. McCabe's imminent retirement date.   Ignoring an impending retirement date in situations like this one would hamper the ability of the FBI and the Department of Justice to punish serious misconduct by its most senior employees, thereby incentivizing bad behavior by employees nearing the end of their careers.   Whatever else due process requires, it does not require that.

And lest he claim otherwise, Mr. McCabe could not have been surprised by the fact that the Department gave him seven days to respond to the notice of proposed removal.   As noted earlier, FBI policy states that "if there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment can be imposed, the advance notice may be curtailed to as little as seven days."   FBI SES Policy at 16.   As a long-time SES employee, Compl. ¶ 27, and the Deputy Director of the FBI, Mr. McCabe was undoubtedly aware of this fact (or should have been), and he certainly recognized (or should have), that the Inspector General's conclusions

25

would trigger this provision.  Also, as already noted, Mr. McCabe had a head start, having been aware of the OIG's conclusions for weeks by the time the seven-day clock started ticking.

In short, Plaintiff received due process.  He knew of the conclusions on which his removal notice was based for weeks.  The notice of proposed removal ran only 15 pages.  Plaintiff, aided by multiple attorneys, put on hours of testimony and submitted a lengthy written response to the notice.  He was heard.  And just as in *McBryde*, the "interval, abbreviated as it may have seemed to [Plaintiff]" did not deprive him of his due process rights.  83 F. Supp. 2d at 168.

## III.    <u>Plaintiff's Removal Did Not Violate the First Amendment</u>

Finally, Plaintiff alleges that he was removed on an accelerated schedule based on the perception that he was a partisan opponent of the President's, in violation of his First Amendment right to free association and political expression.  Compl. ¶¶ 171, 174, 182.  Specifically, Plaintiff alleges that he was unlawfully removed because of: "(a) his refusal to pledge personal loyalty to [the President], (b) his decision not to vote for [the President] in the 2016 U.S. presidential election . . . (c) his wearing of a T-shirt in 2015 . . . in support of Dr. McCabe's Virginia state senate campaign, and (d) his marriage to Dr. McCabe and the improper attribution of her political activity to him."  Compl. ¶ 182.

Generally speaking, the First Amendment protects government employees from adverse employment action on the basis of political belief or association.  *Elrod v. Burns*, 427 U.S. 347, 360 (1976).  To prevail on his First Amendment claim,[10] Plaintiff must prove that political

---

[10] Plaintiff purports to bring two First Amendment claims—one based on political expression and one based on political association, Compl. ¶¶ 170–87—but in fact his allegations are properly categorized only as political-association claims.  *See, e.g.*, *Thompson v. Shock*, 852 F.3d 786, 792–93 (8th Cir. 2017) (applying the political-affiliation, rather than political expression, line of cases to an employee who was removed after he campaigned for an opposing candidate "by attending fundraisers, placing campaign signs in his yard, and wearing a campaign T-shirt").  Regardless,

association "was a 'substantial' or 'motivating' factor" behind his removal. *Clark v. Library of Cong.*, 750 F.2d 89, 101–02 (D.C. Cir. 1984) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If he does so, then the burden shifts to the government to show, by a preponderance of the evidence, "that it would have reached the same decision" irrespective of Plaintiff's political affiliation. *Mt. Healthy*, 429 U.S. at 287; *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007); *Williams v. Johnson*, 701 F. Supp. 2d 1, 18 (D.D.C. 2010) (stating that a defendant may prevail on summary judgment if it can demonstrate that that it "would have taken the same action even in the absence of any protected activity"). Plaintiff must then be able to refute that showing by proving that the government's justifications for his removal were pretextual. *Wilburn*, 480 F.3d at 1140.

That, Plaintiff cannot do. The documents charting the course of the Attorney General's removal decision establish that the but-for cause behind Plaintiff's removal was his lack of candor.[11] In other words, the government would have reached the same decision regardless of what any official believed about Plaintiff's political affiliation.

Recall that the Inspector General and two high-ranking Department of Justice career officials determined that Plaintiff lacked candor on three separate occasions. The OIG's February 2018 Report lays out in meticulous detail the factual predicate for the lack-of-candor findings, which stemmed from Plaintiff's statements to the OIG and the FBI's Inspection Division over the course of several months. *See generally* OIG Rpt. Assistant Director Will conducted a separate

---

because the *Mt. Healthy* test applies to either claim, *see Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C. Cir. 1984), whether this is a free speech or free association claim does not change the result here: Plaintiff's removal was based on lack-of-candor findings rather than any protected activity.

[11] Again, even though Plaintiff alleges that Defendants unlawfully demoted Plaintiff as well, Plaintiff was, in fact, not demoted. *See supra*, note 9.

review of the OIG's findings, found that "the allegations [were] substantiated," and thus recommended—in keeping "with precedent" and the FBI's "Penalty Guidelines"—that Plaintiff be removed from the FBI.  FBI Rec. at 1, 15.  And after considering Plaintiff's oral and written response to Assistant Director Will's recommendation, ADAG Schools recommended that the Attorney General concur in the proposal to remove Plaintiff from his position because of his lack of candor.  ADAG Rec. at 6.  In his recommendation, ADAG Schools emphasized that Plaintiff's lack of candor under oath was "compounded" by his lack of candor not under oath and his revelation of an ongoing investigation.  *Id.*  Finally, "[f]or the reasons stated" by ADAG School's recommendation—that is, because of Mr. McCabe's lack of candor and his revelation of an ongoing investigation—the Attorney General ordered Mr. McCabe removed.  *Id.* at 6.  Neither the recommendations nor the Attorney General's order offer politically motivated reasons for Plaintiff's removal.  Plaintiff's First Amendment claim therefore cannot survive summary judgment.  *See De Llano v. Berglund*, 282 F.3d 1031, 1037 (8th Cir. 2002) ("The dismissal notice given to [the plaintiff] outlines a number of reasons for his termination and those reasons were substantiated in two separate hearings.  Not one of the reasons stated for his termination related to [protected First Amendment activity].").

Indeed, given the independent lack-of-candor determinations, Plaintiff's removal was quite unremarkable.  As Assistant Director Will explained in her letter recommending removal, "all FBI employees know that lacking candor under oath results in dismissal."  FBI Rec. at 15; *see also id.* at 14 (stating that dismissal is the standard penalty for lack of candor under oath).  ADAG Schools affirmed, too, that "the standard penalty for lack of candor under oath is dismissal."  ADAG Rec. at 6.  Plaintiff does not—and cannot—allege that removal is not the standard penalty.  The Attorney General's removal decision was thus a routine application of standard FBI protocol.

28

Of course, that Plaintiff occupied the second-highest position at the FBI did not make the FBI's standard removal penalty any less applicable to him.  Rather, in the Department's view, it made his lack of candor all the more egregious.  To be sure, both Assistant Director Will and ADAG Schools acknowledged Mr. McCabe's "distinguished career in the FBI," ADAG Rec. at 6, and his "truly outstanding performance record," FBI Rec. at 15.  As Plaintiff himself asserts, it was his distinguished service that elevated him to the position of Deputy Director, which is "the FBI's second-in-command and the highest attainable career role in the FBI for a civil servant such as" himself.  Compl. ¶ 29.  But the importance of Plaintiff's senior leadership role ultimately weighed against him in the Department's analysis of the proper sanction:  As the "second highest-ranking official in the FBI," ADAG Schools explained, Mr. McCabe was "expected to handle himself with utmost integrity."  ADAG Rec. at 6; FBI Rec. at 15.  And as Assistant Director Will put it, "integrity is our brand.  Without it, we are nothing."  FBI Rec. at 15.  The serious and "substantiated" findings that Mr. McCabe lacked candor—both under oath and not under oath—thus provided ample justification for his removal from the FBI and the Civil Service.  Indeed, given standard FBI protocol, removal was the natural, and expected, result of such findings. Plaintiff now attempts to use the First Amendment as a shield against that unwanted consequence. But because the Attorney General "would have reached the same decision" irrespective of Plaintiff's perceived political affiliation, Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.[12]  *Wilburn*, 480 F.3d at 1149.

In attempts to undermine the propriety of his removal, Plaintiff suggests that every Department decision maker knew that the OIG investigation and the removal process were a sham,

---

[12] The timing of Plaintiff's removal does not change the outcome here—if Plaintiff's removal did not run afoul of the First Amendment, then neither did the pace at which the removal decision was made.

driven only by political concerns.  Compl. ¶¶ 178–79.  But the facts do not bear out that position.
Plaintiff insinuates, for instance, that the OIG—an independent investigative agency—initiated its
investigation into Plaintiff because of political pressure from the President.  *Id.* ¶¶ 97, 103, 178–
79.  The OIG did not act at the President's, or even its own, behest, however; the OIG opened its
investigation upon a referral from the FBI's Inspection Division because of growing concerns over
Plaintiff's forthrightness.  OIG Rpt. at 1.    And the Inspection Division began its investigation in
May 2017 because they were concerned about "someone at the FBI leaking the Deputy Director's
private conversations to the media."  OIG Rpt. at 15.   Plaintiff also contends that he was
investigated and removed despite there being "no lawful basis" for doing so, Compl. ¶ 179, thereby
implying that the OIG's findings were falsified.  Yet the OIG's detailed, nearly 35-page report lays
out all the verifiable evidence it considered to reach its conclusions.  *See generally* OIG Rpt.  And
two career officials in the Department of Justice—Assistant Director Will and ADAG Schools—
reviewed those same findings and found they were substantiated.  *See generally* FBI Rec.; ADAG
Rec.  ADAG Schools did so after the benefit of a four-hour oral hearing and Plaintiff's written
response to the initial removal recommendation.  *See generally* Oral Resp. Tr.  And both officials
carefully considered, accepted, and rejected the OIG's findings to the extent they found those
findings supported by the evidence.  *See* FBI Rec. at 1 n.1; ADAG Rec. at 5.  Plaintiff simply
cannot show that any Department officials worked in concert to manufacture an investigation and
initiate a removal proceeding as pretext to remove him for politically motivated reasons.  Because
Plaintiff cannot rebut the evidence that he would have been removed regardless of his perceived
political affiliation, Defendants are entitled to summary judgment in their favor under Rule 56.
*Wilburn*, 480 F.3d at 1149.

## CONCLUSION

For the above stated reasons, the Court should dismiss certain claims in Plaintiff's complaint and enter judgment in favor of Defendants as to the rest.

Dated: November 1, 2019                          Respectfully submitted,

                                                 JOSEPH H. HUNT
                                                 Assistant Attorney General

                                                 CHRISTOPHER R. HALL
                                                 Assistant Branch Director

                                                 */s/ Justin M. Sandberg*
                                                 JUSTIN M. SANDBERG
                                                 Senior Trial Counsel
                                                 KYLA M. SNOW (Ohio Bar No. 96662)
                                                 Trial Attorney
                                                 U.S. Dep't of Justice, Civil Div., Federal Programs Branch
                                                 1100 L Street, NW
                                                 Washington, D.C.  20001
                                                 Phone:  (202) 514-5838
                                                 Fax: (202) 616-8460
                                                 Justin.Sandberg@usdoj.gov

                                                 *Counsel for Defendants*

31

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ANDREW G. MCCABE., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-CV-2399-RDM |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

As required by Local Civil Rule 7(h)(1), and in support for their Motion for Summary Judgment, Defendants hereby submit the following statement of material facts as to which there is no genuine issue.

1. Andrew G. McCabe ("Plaintiff" or "Mr. McCabe") became a Federal Bureau of Investigation ("FBI") employee in 1996.  Compl. ¶ 23.

2. Plaintiff became a member of the FBI Senior Executive Service ("SES"), *see* 5 U.S.C. § 3151, in 2009.  Compl. ¶ 27.

3. On February 1, 2016, Plaintiff became the FBI's Deputy Director.  Compl. ¶ 29.

4. In May 2017, the FBI's Inspection Division ("INSD") began investigating whether information published in an October 30, 2016 *Wall Street Journal* article "was an unauthorized leak and, if so, who was the source of the leak."  U.S. Department of Justice, Office of Inspector General, "A Report of Investigation of Certain Allegations Relating to

Former FBI Deputy Director Andrew McCabe" ("OIG Rpt."), at 1, 14 (Feb. 2018), https://oig.justice.gov/reports/2018/o20180413.pdf.

5.  Pursuant to that investigation, Inspection Division Agents interviewed Plaintiff. *Id.* at 2, 15.

6.  Inspection Division Agents became concerned that Plaintiff may have lacked candor when questioned about his role in the disclosure to the Wall Street Journal. *Id.* at 1, 21.

7.  In August 2017, the Inspection Division referred the investigation to the Department of Justice's Office of the Inspector General ("OIG"). *Id.* at 1, 21.

8.  The OIG interviewed Plaintiff, under oath, on two separate occasions. OIG Rpt. at 2, 18, 24.

9.  In February 2018, the OIG issued a report entitled, "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe," Feb. 2018, https://oig.justice.gov/reports/2018/o20180413.pdf.

10. The OIG Report was released publicly on April 13, 2018. *See* https://oig.justice.gov/reports/all.htm.

11. The OIG Report concluded that Plaintiff had lacked candor on four occasions, in violation of FBI rules: once when speaking with then-FBI Director James Comey on October 31, 2016; once while being questioned, under oath, by Inspection Division Agents on May 9, 2017; and twice while being questioned, under oath, by OIG on July 28, 2017 and November 29, 2017. OIG Rpt. at 2, 22, 27, 29, 31, 35.

12. The OIG also concluded that Plaintiff authorized the disclosure of information to the *Wall Street Journal* in violation of the FBI's and the Department of Justice's media policy. *Id.* at 2, 32, 35.

13. Before finalizing its report, the OIG shared a draft with Plaintiff and his counsel.  Oral Resp. Tr. at 165 ln. 6-8.

14. Plaintiff, through counsel, submitted a written response to the OIG Report.  *See* OIG Rpt. at 23 n.8.

15. The OIG responded to arguments offered by Plaintiff in his response.  *See, e.g.*, *id.* at 23 n.8, 25 n.10, and 26 n.11.

16. The OIG "issu[ed] [its] report to the FBI for such action as it deem[ed] appropriate."  OIG Rpt. 2, 35.

17. The then-career head of the FBI Office of Professional Responsibility, Assistant Director Candice Will,[1] reviewed the OIG Report on behalf of the FBI.  Letter from Will to Andrew McCabe ("FBI Rec.") at 15 (March 7, 2018)  (attached as Ex. 1).

18. Assistant Director Will determined that it was not clear whether Plaintiff was under oath when he spoke with the Inspection Division Agents, but otherwise agreed with the OIG's findings that Plaintiff had lacked candor under oath and not under oath and had improperly disclosed the existence of an FBI Investigation.  FBI Rec. at 1, 12-14.When considering an appropriate penalty for Plaintiff's conduct, Assistant Director Will explained that she took several factors into account, including consistency with FBI precedent, the FBI's guidelines for punishment, and aggravating and mitigating circumstances.  *Id.* at 14-15.

19. As Assistant Director Will noted, dismissal is the FBI's standard penalty for lacking candor under oath.  *Id.* at 14.

---

[1]  *See*  https://archives.fbi.gov/archives/news/pressrel/press-releases/fbi-director-names-candice-m.-will-as-assistant-director-for-office-of-professional-responsibility.

3

20. Ultimately, Assistant Director Will recommended that Plaintiff be "dismissed from the rolls of the FBI." *Id.* at 15.

21. In making her recommendation, Assistant Director Will stated, in part, as follows: "I find that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand. Without it, we are nothing. As the Deputy Director, you held the second-highest position in the FBI and are expected to comport yourself with the utmost integrity. Despite this, you repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division." *Id.*

22. After her review, Assistant Director Will informed Plaintiff via letter, on March 7, 2018, of her conclusions and recommendation that he be removed from the FBI. *Id.* at 1.

23. The report of investigation accompanying the recommendation letter states that Andrew McCabe is an "ES-0 Deputy Director." OPR, Report of Investigation at 1 (Mar. 6, 2018) (attached as Ex. 1).

24. DOJ Order 1202 was signed by then-Attorney General Eric Holder. DOJ Order 1202, at 1 (Nov. 26, 2013) (attached to Exhibit 4, Letter from Schools to McCabe).

25. DOJ Order 1202 states that the Deputy Director of the FBI can be removed only by the Attorney General. *Id.* at 14 (specifying that individuals in "[k]ey SES [p]ositions" can be removed only by the Attorney General, and defining key positions to include "[a]ll career SES officials who are deputy Component Heads in Components with a single deputy position"); *see* About FBI, Leadership & Structure, Director Christopher Wray, https://www.fbi.gov/about/leadership-and-structure (listing a single Deputy Director position for FBI).

4

26. Assistant Director Will forwarded her 15-page recommendation (along with the 17-page report of investigation) to the Office of the Deputy Attorney General.  Compl., Ex. A.

27. Associate Deputy Attorney General (ADAG) Scott Schools was then the highest ranking career official in the Department of Justice. *See* Statement, Department of Justice, Office of Public Affairs, *Attorney General Jeff Sessions Announces Bradley Weinsheimer to Replace Departing Associate Deputy Attorney General Scott Schools*, July 3, 2018, https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-announces-bradley-weinsheimer-replace-departing-associate.

28. On March 8, 2018, after receiving Assistant Director Will's recommendation, ADAG Schools sent Plaintiff a letter informing him of the procedures that the Department would follow in reviewing the matter and of the rights he possessed related to this review.  Letter from Schools to McCabe ("Schools Letter") (Mar. 8, 2018) (Attached as Ex. 4).

29. Attached to ADAG Schools' letter was a copy of DOJ Order 1202.  DOJ Order 1202, at 14.

30. ADAG Schools' letter also stated that any decision to remove Mr. McCabe would be effective no earlier than March 16, 2018.  Schools Letter at 1.

31. The Department of Justice furnished Mr. McCabe with a week to submit oral and written responses to the notice of proposed removal.[2]  *Id.*

32. On March 15, 2018, Plaintiff and two of his attorneys provided Plaintiff's oral reply to ADAG Schools and another career Department of Justice attorney.  Mar. 15, 2018 Tr. of Hearing in the Matter of Andrew McCabe ("Oral Resp. Tr.") (attached as Ex. 3).

---

[2] The letter from ADAG Schools stated that Plaintiff's written response was due March 15, 2018, but that deadline was extended until noon on March 16, 2018.  Compl. ¶ 122.

33. The hearing lasted more than four hours.  *See id.* at 1, 201.

34. During the hearing, Plaintiff answered questions from his lawyers and from ADAG Schools, and his lawyers presented argument.  *See generally* Oral Resp. Tr.

35. At the end of the hearing, ADAG Schools told Plaintiffs' counsel that the Attorney General would make the decision of whether or not to remove Plaintiff.  *Id.* at 198–200.

36. At the hearing, Plaintiff's counsel stated, "if it's a suspension for more than 30 days or a termination that goes to him."  Oral Resp. Tr. at 199:13–14.

37. The reference to "him" at line 14 of page 199 of the Oral Response Transcript is a reference to the Attorney General.  Oral Resp. Tr. at 198–99.

38. The next day, Plaintiff, through counsel, submitted an eleven-page, single-spaced letter responding to the notice of proposed removal.  Letter from Bromwich to Schools ("Resp. Letter") (March 16, 2018) (attached as Ex. 5).

39. The letter submitted by Plaintiff's counsel refers to Plaintiff as the Deputy Director of the FBI.  *Id.* at 1.

40. In neither his oral nor written response did Plaintiff raise concerns with the Attorney General's involvement in the decision-making process.  *See* Oral Resp. Tr.; Response Letter.

41. ADAG Schools issued a written recommendation to the Attorney General.  Memo. from ADAG Schools to the Attorney General ("ADAG Rec."), at 1–6 (Mar. 16, 2018) (attached as Ex. 6).

42. ADAG Schools' recommendation states that its purpose is to "provide a recommendation regarding the proposed removal of FBI Deputy Director Andrew G. McCabe."  *Id.* at 1.

43. In his written recommendation, ADAG Schools recommended that the Attorney General "sustain the charge[s] that Mr. McCabe [(i)] lacked candor" under oath in his interview with OIG, (ii) lacked candor not under oath in his interview with Inspection Division Agents, and (ii) authorized the disclosure of an on-going FBI investigation in contravention of FBI policy. *Id.* at 1–6.

44. ADAG Schools concluded that the OIG's finding that Plaintiff lacked candor in his conversation with former FBI Director James Comey was not supported by a preponderance of the evidence. *Id.* at 5.

45. ADAG Schools recommended that Plaintiff be "dismissed from the rolls of the FBI." *Id.* at 6.

46. ADAG Schools based his dismissal recommendation, in part, on the fact that the "standard penalty for lack of candor under oath is dismissal." *Id.*

47.  ADAG Schools also stated that "[t]he substantiated findings of lack of candor under oath are compounded by the finding of lack of candor not under oath, and the unauthorized disclosure finding." *Id.*

48. ADAG Schools noted, "as Ms. Will [had] observed," that Mr. McCabe "was the second highest-ranking official in the FBI, and he [wa]s expected to handle himself with utmost integrity." *Id.*

49. On March 16, 2018, the Attorney General adopted the recommendation of ADAG Schools that Mr. McCabe be removed.  Compl. ¶ 38; ADAG Rec. at 6.

50. The Attorney General wrote: "For the reasons stated in the foregoing recommendation, I have decided that Andrew G. McCabe should be removed from the Federal Bureau of Investigation and from the civil service." *Id.*

51. Mr. McCabe's removal was effective on March 16, 2018.  *Id.*

Dated: November 1, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Justin M. Sandberg*
JUSTIN M. SANDBERG
Senior Trial Counsel
KYLA M. SNOW (Attorney Bar No. 96662)
Trial Attorney
U.S. Dep't of Justice, Civil Div., Federal Programs
Branch
1100 L Street, NW
Washington, D.C.  20001
Phone:  (202) 514-5838
Fax: (202) 616-8460
Justin.Sandberg@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW G. MCCABE., | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

Case No. 1:19-CV-2399-RDM

**[PROPOSED] ORDER**

The Court, having considered Defendants' Motion to Dismiss and for Summary Judgment, hereby **GRANTS** the motion.

IT IS SO **ORDERED**, this _____ day of _____, 2019.


_____
HON.  RANDOLPH D. MOSS
United States District Judge

EXHIBIT 1



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

March 7, 2018

PERSONAL

Mr. Andrew G. McCabe
(P-1)

Dear Mr. McCabe:

I have completed my review of an administrative inquiry, investigated by the Department of Justice, Office of Inspector General (OIG), regarding allegations that you: (1) lacked candor in an interview with the OIG on July 28, 2017, and in a second interview with the OIG on November 29, 2017, in violation of FBI Offense Code 2.6 (Lack of Candor – Under Oath); (2) lacked candor when discussing a October 30, 2016 *Wall Street Journal* article with the FBI Director, and in an interview with FBI's Inspection Division on May 9, 2017,[1] in violation of Offense Code 2.5 (Lack of Candor – No Oath); and (3) disclosed, without authorization, an FBI investigation, in violation of Offense Code 4.10 (Unauthorized Disclosure – Sensitive Information).[2]  Based on a preponderance of the evidence, I conclude the allegations are substantiated.  Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I propose dismissing you from the rolls of the FBI.[3]

## DISCUSSION

### October 23, 2016 *Wall Street Journal* Article

On October 23, 2016, the *Wall Street Journal* (WSJ) published an online article written by Reporter which stated that the Virginia Democratic Party and a political action committee (PAC) run by the Virginia Governor donated nearly $675,000 to your wife's unsuccessful 2015

---

[1] The OIG found that you lacked candor under oath when you spoke to Inspection on May 9, 2017.  However, it is unclear from the case file whether you were under oath at the time you spoke with investigators about the article in question.  Accordingly, I find the May 9 interview is more appropriately considered not under oath.

[2] This administrative inquiry was opened after January 1, 2017, and thus will be analyzed under the FBI's 2017 Offense Codes and Penalty Guidelines.

[3] Pursuant to the Deputy Attorney General's Memorandum dated May 27, 2008, to the Director of the FBI, the Justice Department has retained final decision-making authority over adverse actions impacting the Deputy Director of the FBI.

state senate campaign.[4] The article described the Governor's close connection to Bill and Hillary Clinton, and noted that you were an FBI official "who later helped oversee Investigation #1."[5]

The WSJ article resulted in significant public discussion as to whether your subsequent oversight of Investigation #1 was appropriate given your wife's connection to the Governor and the Virginia Democratic Party. Your Special Counsel told the OIG, "[s]o that article comes out on Sunday. And it is like an enormous fire storm. It is hugely, you know, it's not only all over the news, but there's just a lot of swirl and churn associated with that fact coming out."[6] According to the OIG's investigation, a Senator immediately called for your recusal. On October 27, 2016, in a meeting on Investigation #1, the FBI General Counsel (GC) suggested that you, present by telephone, not be present for the discussion on Investigation #1. The GC acknowledged that the question of whether you should recuse yourself had not yet been settled, but out of an abundance of caution, the GC felt you should not be in the meeting. The Director agreed and you ended your call into the meeting.[7]

On October 24, 2016, Reporter emailed the Assistant Director, Office of Public Affairs, to ask additional questions for a follow-up story he was working on.[8] In that email, Reporter asked about your involvement in Investigation #2, among other things.[9] Specifically, Reporter's email said that he was told that:

> in the summer, McCabe himself gave some instruction as to how to proceed with the [Investigation #2] probe, given that it was the height of election season and

---

[4] The print edition of the article was published on October 24, 2016.

[5] The article acknowledged that you played no role in your wife's 2015 state senate campaign and that you were promoted to FBI Deputy Director, with oversight of Investigation #1, months after your wife's defeat. You did not have an oversight role in Investigation #1 when your wife was running for office.

The FBI Director told the OIG that he first learned of the issue regarding your wife and her connection to the Governor when you emailed the Director on October 21, 2016, two days before the article was released, stating, "[The Office of Public Affairs (OPA)] informed me that [Reporter] at WSJ is putting together an article claiming I had a conflict of interest on [Investigation #1] as a result of [your wife's] campaign connections to Governor []. I'll work with [OPA] to provide some basic facts to pushback." On October 23, 2016, you emailed the Director and wrote, "Not too much in the update. The only additional notable news is that [OPA] and I spent a good part of the day trying to shape the Wall Street Journal's story on my alleged conflict...," which you noted was to be released online.

[6] Special Counsel OIG interview, 9/7/2017, pg. 253.

[7] In your 12/4/2017 interview with the OIG, you stated that you dropped out of the call because the GC brought up the need to discuss classified information and you were on an open line. You denied that you were asked to leave the meeting due to the possibility of recusal or a conflict of interest.

[8] Assistant Director has since retired from the FBI.

[9] Investigation #2 was a separate and distinct investigation from Investigation #1. Although Investigation #1 was publicly acknowledged by the FBI, Investigation #2 was not. When the Director was asked during Congressional testimony whether the FBI was involved in Investigation #2, he declined to answer.

ɩ

the FBI did not want to make a lot of overt moves that could be seen as going
after [] or drawing attention to the probe.

Reporter's email asked Assistant Director if this was accurate and if there was anything else
Reporter should know.

You were notified that Reporter was working on a follow-up story that would cover your
oversight of Investigation #2 in the face of Reporter's earlier article that the gave significant
campaign contributions to your wife. Special Counsel stated that you both believed that
narrative being developed by the WSJ was inaccurate and you authorized Special Counsel to
speak to Reporter "to fix this story and give a complete picture."[10] Special Counsel stated,
"Andy [McCabe] directs me to work with [Assistant Director] on a follow-up story with
[Reporter]...So I am a source on background with [Reporter] at Andy [McCabe] and [Assistant
Director's] direction in order to try to correct the inaccurate sort of representations in that
article."[11] Special Counsel advised that this was the first time she had communicated with the
media in her official capacity at the FBI.

Special Counsel and Assistant Director were scheduled to speak with Reporter for the
first time on October 27, 2016, in "receive mode," to hear what Reporter's story intended to
address. Special Counsel and Assistant Director would then discuss an appropriate response and
speak to Reporter a second time. You were on personal travel from Thursday, October 27 –
Sunday, October 30, 2016. Despite this, you maintained close contact with your Special Counsel
regarding her and Assistant Director's progress with Reporter. According to text messages, on
October 27, 2016, at 12:06 pm, you texted Special Counsel, "Are you with wsj now." Special
Counsel texted back that she was "going there now" and would call you "immediately after re
call with [Reporter]." A little over an hour later, Special Counsel texted you asking if you were
free to talk. Telephone records show that you and Special Counsel spoke by telephone at 2:54
p.m. for approximately 51 minutes. According to Special Counsel, she briefed you on her
conversation with Reporter and a purported "stand down" order that you had issued to agents
working on Investigation #2. You and Special Counsel discussed the inaccurate and
inflammatory nature of Reporter's information. According to Special Counsel, you cited your
August 12, 2016 phone call with the DOJ Principal Associate Deputy Attorney General
(PADAG) in which PADAG expressed anger at you that the FBI had not shut down
Investigation #2 based on PADAG's misunderstanding of the situation. In that call, you pushed
back against PADAG and told him that the FBI would continue to take appropriate and logical
investigative steps in Investigation #2. You then asked if PADAG was telling you "to shut down
a validly predicated investigation," which PADAG said he was not. According to Special
Counsel, you wanted to provide an account of your conversation with PADAG to rebut the false
"stand down" scenario that had been shared with the WSJ. Special Counsel's notes of her
conversation with you on October 27 include a notation "Fri. Aug 12 with [PADAG]" to remind
her to discuss the telephone call with Reporter.

---

[10] Special Counsel OIG interview, 9/7/2017, pg. 280.

[11] Special Counsel OIG interview, 9/7/2017, pg. 272.

Text messages and phone records show that immediately before Special Counsel and Assistant Director spoke with Reporter for the second time on October 27, 2016, you called Special Counsel and you spoke for six minutes. Special Counsel and Assistant Director than spoke to Reporter from 4:45 p.m. to 5:21 p.m. According to Special Counsel's contemporaneous notes and testimony to the OIG, in this call to Reporter she responded to claims regarding FBI leadership's handling of Investigation #2 and provided the account of the August 12 phone call between you and PADAG. Later that evening, Special Counsel texted you, "We're done. He's going to look at this story again and we'll circle back with him in the morning."

On October 28, 2016, Special Counsel and Assistant Director spoke to Reporter a third time. He gave them a preview of his revised story, which now included a report on the PADAG phone call. After this call ended, Special Counsel texted you, "Just got off with [Reporter]. Give me a call here." You called Special Counsel and you spoke for 23 minutes.

**October 30, 2016 *Wall Street Journal* Article**

On October 30, 2016, Reporter's follow-up article was published online.[12] The article mentioned the Director's stunning disclosure two days earlier, on Friday, October 28, that the FBI was taking another look at Hillary Clinton's emails days before the presidential election and discussed tension inside the FBI and DOJ on how best to proceed. The article again mentioned the Governor's campaign contributions to your wife's failed state senate campaign in 2015 and discussed your efforts to refocus Investigation #2.[13] The article reported that agents had been told to "[s]tand down" on Investigation #2 and that "the order had come from the deputy director – Mr. McCabe," but also that "[o]thers familiar with the matter deny Mr. McCabe or any other senior FBI official gave such a stand-down instruction." The article described the August 12 conversation between you and PADAG (the latter identified only as a "senior Justice Department official"), stating:

> According to a person familiar with the probes, on Aug. 12, a senior Justice Department official called Mr. McCabe to voice his displeasure at finding that New York FBI agents were still openly pursuing the [Investigation #2] probe during the election season. Mr. McCabe said agents still had the authority to pursue the issue as long as they didn't use overt methods requiring Justice Department approvals.

> The Justice Department official was "very pissed off," according to one person close to McCabe, and pressed him to explain why the FBI was still chasing a matter the department considered dormant…

---

[12] The print edition of the article was published on October 31, 2016.

[13] This represented the first public acknowledgment that the FBI had opened a criminal investigation into Investigation #2. The Director had previously declined to answer questions about the existence of an investigation of Investigation #2.

"Are you telling me that I need to shut down a validly predicated investigation?" Mr. McCabe asked, according to people familiar with the conversation. After a pause, the official replied "Of course not," these people said.

## Meeting with the Director on October 31, 2016

The following day, Monday morning, October 31, 2016, the Director held a staff meeting, attended by you and Special Counsel, among others. During the meeting, according to Special Counsel's contemporaneous notes, the Director said, "Need to figure out how to get our folks to understand why leaks hurt our organization." In his statement to the OIG, the Director advised that he remembered reading the October 30, 2016 WSJ article and thinking, "what the hell[,]" "I was very concerned about it for a number of reasons[,]" "this was going to poison our relationship with the Department of Justice."[14] The Director went on to say that his second reaction was, "what are we doing talking about what we're doing in an investigation…"[15] He considered it a disclosure of sensitive FBI information. The Director stated, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[16] When questioned further by the OIG whether you told him that you authorized the disclosure, the Director stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[17] When asked again if you told him that you authorized Special Counsel to speak to the WSJ, the Director stated that you said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it…"[18] The Director stated that he did not suspect that you were the source of the disclosure based on what you told him the morning after the article came out.

The Director told the OIG it is "very unlikely" "in fact approaching zero" that he would have authorized disclosure of the PADAG telephone call if asked ahead of time. The Director stated that part of the reason for declining to disclose that information is that it explicitly confirms the existence of a criminal investigation.[19] The Director advised that when he disclosed the existence of Investigation #3 to Congress, he did so reading from a script that was carefully drafted and considered. He stated that disclosing a criminal investigation anonymously sourced in a newspaper is not something the FBI would do. Regarding the October 30, 2016 WSJ article, the Director stated, "I did not authorize this. I would not have authorized this."[20] The Director

---

[14] Director OIG interview, 11/16/2017, pgs. 301-302.

[15] Director OIG interview, 11/16/2017, pg. 302.

[16] Director OIG interview, 11/16/2017, pgs. 304-305.

[17] Director OIG interview, 11/16/2017, pg. 305.

[18] Director OIG interview, 11/16/2017, pgs. 314-315.

[19] Director OIG interview, 11/16/2017, pg. 310.

[20] Director OIG interview, 11/16/2017, pg. 311.

further stated that as the Director of the FBI, significant disclosures about investigations would always go through him because he is responsible for how the FBI interacts with the world. The Director stated that if the Deputy Director wanted to disclose information regarding an ongoing investigation, he would expect the Deputy Director to check with him first.

## Inspection Division Interview on May 9, 2017

The FBI Inspection Division was tasked with investigating various media leaks. One of the leaks pertained to an article published by Circa News reporting that you had made derogatory comments about the former National Security Advisor and the President during a private FBI executives meeting. On May 9, 2017, Section Chief (SC) and Supervisory Special Agent (SSA) #1 interviewed you in your office concerning the leaks.[21] SC and SSA #1 (and SSA #2) had previously interviewed you in April 2017, following which SSA #1 had prepared and emailed to you a signed, sworn statement for your review, editing (if necessary), and signature. This May meeting was to go over the previously emailed statement about the Circa article and to ask you about the October 30 WSJ article. SC advised that they met with you in the privacy of your office.

After going over changes to the previously emailed statement, SC showed you a copy of the October 30 WSJ article, and directed your attention to the first three paragraphs on the last page which discussed the PADAG conversation. SSA #1 stated, "we paused and let him read, read the article. I mean, he read the article, not just that piece. I think he refreshed his memory and flipped through the article."[22] You initialed the article to acknowledge that you read it.

According to SSA #1, you indicated the WSJ article was "somewhat familiar" because you recalled reading it when it came out in October 2016.[23] SSA #1 stated that you said you did not know who leaked the information, "[You] didn't authorize it. [You] didn't direct anybody to give it out."[24] SSA #1 recalls asking you who you thought could have disclosed the information about your private telephone conversation because it seemed likely that only a few people would have been present during the phone call. According to SSA #1, you said you could not recall how many people were present or how many people you told the story to because you had related the story many times. At this point in time, SSA #1 considered you the victim of the leak.[25]

---

[21] May 9, 2017, is the same day that the Director was fired and you became Acting Director of the FBI. This occurred after your meeting with Inspection.

[22] SSA #1 OIG interview, 10/5/2017, pg. 26.

[23] SSA #1 OIG interview, 10/5/2017, pg. 26.

[24] SSA #1 OIG interview, 10/5/2017, pg. 29.

[25] SSA #1 took contemporaneous notes throughout your interview.

SC's account of the May 9 interview of you is consistent with SSA #1's. She stated that you read the article and although she could not remember what you said verbatim, "the overarching issue, or take-away from it was that [you] did not grant anyone permission to divulge the information to the media. That [you] personally hadn't shared the information. And [you] hadn't granted anyone else permission to. And that [you] did consider it a media leak[.]"[26]

On May 12, 2017, SSA #1 sent you an email attaching a revised version of your signed, sworn statement, "You will note that your requested changes have been made, and we added a short paragraph, in parenthesis beginning on page 10, relative to your recollection of circumstances pertaining to the [October 30] Wall Street Journal article we reviewed with you." The paragraph read:

> On 05/09/2017, SC [] and SSA [#1] provided me with a photocopy of a Wall Street Journal article, dated 10/30/2016, and requested I evaluate and assess the content of the first three paragraphs appearing on the last page for accuracy. My assessment of the referenced portion of the article is that it is basically an accurate depiction of an actual telephonic interaction I had with a Department of Justice (DOJ) Executive. Since this event, I have shared the circumstances of this interaction with numerous FBI Senior Executives, and other FBI personnel. I do not know the identity of the source of the information contained in the article. I gave no one authority to share any information relative to my interaction with the DOJ Executive with any member of the media. *I initialed the photocopy of the article, which is attached to my statement as Exhibit #5.*

(Emphasis in original.) SC stated that there was no doubt in her mind that you told her that you did not authorize the disclosure to the WSJ and that you did not know who had disclosed the information to the WSJ. SC stated that she stands by what is contained in your draft statement.[27] The statement is consistent with contemporaneous notes taken by SSA #1 during the interview.

When you failed to sign and return the statement to Inspection, it was emailed it to you again by Inspection on June 23, 2017.

## OIG Interview on July 28, 2017

On July 28, 2017, the OIG interviewed you under oath regarding a separate matter. The OIG told you that it would not be covering issues related to your recusal in a different investigation. The OIG showed you certain text messages exchanged between your Special Counsel and Counterintelligence Deputy Assistant Director (DAD).[28]

---

[26] SC OIG interview, 12/20/2017, pg. 14.

[27] SC OIG interview, 12/20/2017, pg. 40.

[28] Special Counsel has since been reassigned to the Office of General Counsel. DAD has since been reassigned to the Human Resources Division.

The OIG referred you to the October 30, 2016 WSJ article written by Reporter and told you there was information in the Special Counsel/DAD texts also on October 30, 2016, indicating Special Counsel had spoken to the press.  The OIG showed you a text in which DAD forwarded a *Washington Post* article that was critical of the FBI to Special Counsel, and DAD wrote, "This is all [PADAG]."  Special Counsel responded, "Yeah, I saw it.  Makes me feel WAY less bad about throwing him under the bus in the forthcoming [Investigation #2] article."

The OIG told you it believed Special Counsel's October 30 text related to the WSJ's article later that same day revealing Investigation #2 and the PADAG telephone conversation.  You responded, "I don't know what she's referring to."[29]  You then stated the OIG's questions exceeded the scope of the OIG's current investigation for which it was questioning you, and that you did not want to "get into discussing the article" with the OIG.  The OIG asked, "Was she ever authorized to speak to reporters in this time period, was [Special Counsel]?"  You responded, "Not that I'm aware of."[30]  You went on to say, "I was not even in town during those days.  So I can't tell you where she was or what she was doing."[31]

**Your Phone Call to OIG on August 1, 2017**

Four days later, on August 1, 2017, you called the Assistant Inspector General to provide additional information about matters discussed during your July 28 OIG interview.  The Assistant Inspector General memorialized the phone conversation in an email, which reads in relevant part:

> First, he [McCabe] stated that he believes that [Special Counsel] may have been authorized by him to work with [Assistant Director] (Public Affairs) and to speak with the WSJ for the late October article.  He said he had worked with [Special Counsel] on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies.  At the time the second article was being prepared, McCabe was out of town visiting his son in CT.  He believes he may have authorized [Special Counsel] to work with [Assistant Director] and speak to [] (the WSJ reporter) because she had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues.

**Inspection Division Interview of Special Counsel on August 7, 2017**

On August 7, 2017, Special Counsel was interviewed by SC and SSA #2.  The investigating agents showed Special Counsel the October 30 WSJ article and she acknowledged that she was familiar with it.  Special Counsel told SC and SSA #2 that you told her to work with Assistant Director to speak with Reporter "on background" and provide him with information to help shape his next article.  She advised that she spoke to Reporter by telephone on October 27

---

[29] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[30] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[31] Andrew McCabe OIG interview, 7/28/2017, pg. 32.

and 28, 2016. Special Counsel signed a sworn statement to this effect on August 15, 2017. Special Counsel was also interviewed by the OIG on September 7 and October 26, 2017, in which she gave the same account.

**Inspection Division Interview on August 18, 2017**

After learning from Special Counsel that you authorized her to speak to Reporter, SSA #2 and SSA #1 re-interviewed you on August 18, 2017. SSA #1 showed you the earlier draft statement that Inspection prepared for you to sign (you never did) and the October 30 WSJ article again. SSA #1 stated that he asked you, "I want to ask you about this article because we're, we're having conflicting information. And so I need to know from you, did you authorize this article? Were you aware of it? Did you authorize it?"[32] SSA #1 advised that you read the article and said, "yep. Yep I did."[33] SSA #1 was taken aback and stated that he told you, "sir, you understand that we put a lot of work into this based on what you've told us. I mean, and I even said, long nights and weekends working on this, trying to find out who amongst your ranks of trusted people would, would do something like that." According to SSA #1, you "kind of just looked down, kind of nodded, and said, yeah, I'm sorry."[34] You apologized and told SSA #1 and SSA #2 that "there was a lot going on then."

SSA #1 reported the new information to his supervisors in the Inspection Division and recommended they turn the matter over to the OIG. The Assistant Director, Inspection Division, agreed and referred the matter to the OIG. The OIG formally accepted the referral on August 31, 2017.

**OIG Interview on November 29, 2017**

**Authorization**

On November 29, 2017, the OIG interviewed you under oath again, this time focusing on the WSJ disclosure. During the interview, you told the OIG that you authorized Assistant Director and Special Counsel to speak to Reporter to try to correct what you perceived as "incredibly damaging inaccuracies" in his story.[35] You described the first WSJ article as "creat[ing] a false narrative that I had been exercising my judgment in a political way. And this article continued in that direction, which I thought was incredibly damaging for us as an organization."[36] You stated that you thought having Assistant Director and Special Counsel

---

[32] SSA #1 OIG interview, 10/5/2017, pg. 45.

[33] SSA #1 OIG interview, 10/5/2017, pg. 46.

[34] SSA #1 OIG interview, 10/5/2017, pgs. 47-48.

[35] Andrew McCabe OIG interview, 11/29/2017, pg. 20.

[36] Andrew McCabe OIG interview, 11/29/2017, pg. 58.

speak to Reporter "was the right thing to do" and that you "felt very confident doing it."[37]  When asked what sparked your recollection of authorizing Assistant Director and Special Counsel, you denied speaking to Special Counsel or Assistant Director about the matter, and simply stated that you thought a lot about it.

**FBI Director**

The OIG asked you if, prior to authorizing Special Counsel and Assistant Director to speak to Reporter, you discussed the matter with the Director.  You stated that you did not remember discussing it with the Director beforehand, but did recall discussing the article with the Director in person on Monday, October 31, the day after the article was published:

> [W]e talked about the article.  I asked him his thoughts about it.  He thought it was, you know, he had the same impression as I did that it was really kind of a one-sided narrative supported by a lot of spurious information.  But he thought that it was good that we at least had gotten the, the, you know, the information, that they at least presented information that indicated that, no, that's not who we are.  That we are, that we're independent and doing our job.  We discussed the fact that the Department was likely to be pretty angry, and specifically [PADAG] was, was unhappy about that the fact that this may, that this made its way into the paper.

The OIG asked you, "are you telling him at this time, hey boss, I authorized [Assistant Director] and [Special Counsel] to disclose the account of the August 12th call?"  You stated, "Yes.  He knew that."  The OIG repeated, "You told him that?"  You stated, "Yes."  The OIG asked you for the Director's reaction.  You stated, "He did not react negatively, just kind of accepted it."  The OIG continued to question you and asked, "Did he have any reaction to the fact that by disclosing the account of the August 12th call, even though it's not a direct quote attributed to you.  It essentially is in substance confirming the existence of [Investigation #2].  Did he have any reaction to that?"  You replied, "He did not."[38]

You further claimed that the fact that Assistant Director and Special Counsel spoke to Reporter was not a secret and that people generally knew you authorized the disclosure because it was your private conversation with PADAG that was disclosed.[39]

---

[37] Andrew McCabe OIG interview, 11/29/2017, pg. 62.

[38] Andrew McCabe OIG interview, 11/29/2017, pgs. 94-96.

[39] Andrew McCabe OIG interview, 11/29/2017, pg. 106.

### Interviews with Inspection Division

The OIG also questioned you about your interviews with Inspection. You incorrectly recalled being interviewed by SC, SSA #1, and SSA #2 on May 9, 2017.[40] You advised that as SSA #2 and SSA #1 were walking out of your office, SC "kind of grabbed [you] by the arm" to ask you something.[41] You advised that SC then showed you the October 30 WSJ article. You told her that you knew about the article. You stated that you do not recall reading the WSJ article when SC handed it to you.[42] You stated:

> I remember being like kind of confused about why she was even bringing it up because it had nothing to do with what I had asked them to, to investigate, so I was trying to kind of connect the two and understand what the relevance was. And she asked me a question or two about it. And that was it. It was a very quick exchange.[43]

You stated that you later received the draft statement from Inspection "that reflected [the interview] in a way that I thought was inaccurate."[44]

You were asked whether you believed you told SC, SSA #2, and SSA #1 that you gave authorization for the WSJ disclosure, and that their recollections to the contrary are wrong. You stated, "I'm telling you that I don't know exactly what we discussed in that May 9th meeting. But to be perfectly honest, May 9th, prior to Director []'s firing and learning of that from the AG later that evening, everything that happened prior to that moment is a little bit distant for me."[45]

You stated that you raised the issue of the inaccurate statement with SC in a later meeting and told her that you authorized Special Counsel and Assistant Director to speak to Reporter. You said that SC seemed surprised and you suggested that she coordinate with the OIG. You stated that you did not attempt to correct the statement when you received the drafts by email. You stated that you were the Acting Director at the time and were focused on that. You stated that once you got back to your Deputy Director role, you worked to resolve the outstanding issues with Inspection. You told the OIG that you did not remember when you actually looked at the draft statement but that it could have been months later.

---

[40] You repeatedly told the OIG that all three Inspection Division investigators, SC, SSA #1, and SSA #2, were present. In fact, only two investigators were present during the interviews on May 9 (SC and SSA #1) and August 18 (SSA #1 and SSA #2). However, all three were present when they first interviewed you in April 2017.

[41] Andrew McCabe OIG interview, 11/29/2017, pg. 142.

[42] Andrew McCabe OIG interview, 11/29/2017, pg. 145.

[43] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[44] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[45] Andrew McCabe OIG interview, 11/29/2017, pg. 157.

## ANALYSIS

### A. Lack of Candor – Under Oath

According to FBI Offense Code 2.6, employees are prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

#### 1. Interview with OIG on July 28, 2017

During your July 28, 2017 interview under oath with the OIG, after being shown Special Counsel's October 30 text concerning having thrown PADAG "under the bus" in a forthcoming article, you falsely stated that you were not aware that Special Counsel was authorized to speak to reporters at that time. You also falsely stated that because you were out of town, you did not know where Special Counsel was or what she was doing at that time. In fact, as you later admitted, you did authorize Special Counsel to speak to Reporter for the October 30 WSJ article, and you were aware of what she was doing because you stayed in constant contact with her through texts and phone calls. Although you did not know you were going to be questioned about the WSJ article before sitting down with the OIG on July 28, the interview was voluntary and you had the opportunity to end it at any time. Instead, you provided false information.

#### 2. Interview with OIG on November 29, 2017

I further find that you lacked candor under oath during your November 29, 2017 OIG interview when you falsely told the OIG that: (a) you told the Director on October 31, 2016, that you had authorized the disclosure to the WSJ and that the Director agreed it was a "good" idea; and (b) you did not deny to the Inspection agents on May 9 that you had authorized the disclosure to the WSJ.

As discussed below, I credit the Director's recollection of his conversation with you regarding the WSJ article on October 31, the gist of which was that you had not authorized the leak the prior day and did not know who was behind it. Accordingly, I find your statement to the OIG that you told the Director you authorized the disclosure to the WSJ and that the Director agreed it was a "good" idea is false.

Also, as discussed below, the testimony of SC and SSA #1, SSA #1's contemporaneous notes of the interview, and the draft statement prepared shortly thereafter show that you denied authorizing the disclosure in your interview with Inspection on May 9. Your statement to the contrary is false.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 2.6 is substantiated.

## B. Lack of Candor – No Oath

According to FBI Offense Code 2.5, employees are prohibited from "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

### 1. Meeting with the Director on October 31, 2016

You lacked candor in your conversation with the Director on October 31, 2016, when you discussed the October 30 WSJ article. The Director told the OIG, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[46] When questioned further as to whether you told the Director that you authorized the disclosure, the Director stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[47] Again, the Director later stated when asked if you told him about authorizing Special Counsel to speak to the WSJ, you said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it..."[48] The Director stated that he did not suspect that you were the source of the disclosure based on what you told him the morning after the article came out. Although it appears that the Director never directly asked you if you authorized, or made the disclosure, your overall statements to the Director were deceptive. You owed it to the Director, your immediate supervisor and the Director of the FBI, to be forthcoming and transparent in your discussions with the Director about any matter, much less one of such significance.

The Director was concerned about leaks in general and this disclosure in particular because he was concerned it would poison the FBI's relationship with DOJ. Therefore, I do not credit your account that you told the Director that you authorized the disclosure and that the Director "did not react negatively, just kind of accepted it." Additionally, your failure to be forthright with the Director is consistent with your behavior in denying authorizing the disclosure up until you were confronted with Special Counsel's texts by the OIG on July 28, 2017. I therefore credit the Director's account.

### 2. Interview with INSD on May 9, 2017

SC and SSA #1 both stated that you told them on May 9, 2017, that you did not know who authorized the disclosure of the PADAG call to the WSJ. SC stated that there was no doubt

---

[46] Director OIG interview, 11/16/2017, pgs. 304-305.

[47] Director OIG interview, 11/16/2017, pg. 305.

[48] Director OIG interview, 11/16/2017, pgs. 314-315.

in her mind that you told her that you did not authorize the disclosure to the WSJ and that you did not know who disclosed the information to the WSJ. SSA #1 stated that you told him, "[you] didn't know who gave it out. [You] didn't authorize it. [You] didn't direct anybody to give it out." SSA #1 noted that you took time to read the WSJ article and initialed it, indicating that you reviewed it. You had an opportunity to refresh your recollection of the article at issue and still gave a false answer. SC and SSA #1's accounts are consistent with each other and are corroborated by SSA #1's contemporaneous notes of the interview and the draft statement that SSA #1 prepared for your signature shortly after the interview. I credit their account of their May 9 interview and find that you lacked candor in your May 9 interview with Inspection.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 2.5 is substantiated.

## C. Unauthorized Disclosure

According to FBI Offense Code 4.10, without authorization, employees are prohibited from "disclosing or attempting to disclose the FBI's, or another agency's, sensitive material."

There is a general prohibition on disclosing information about an ongoing criminal investigation. Investigation #2 was especially sensitive, having, as it did, a connection to a presidential campaign. The Director declined to confirm the existence of Investigation #2 in his testimony to Congress in July 2016. When questioned by the OIG, the Director stated that nobody in the FBI was authorized to publically confirm Investigation #2. The Director considered the information contained in the October 30 WSJ article to be a disclosure of sensitive FBI information. The Director advised that the default rule is that the FBI does not discuss open investigations but would consider whether the public interest requires it. Your decision to confirm the existence of Investigation #2 through an anonymously sourced quote, recounting the content of a phone call with a DOJ Executive, was not within the public interest exception.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 4.10 is substantiated.

## PENALTY DETERMINATION

In proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

The investigation establishes you violated FBI Offense Code 2.6 (Lack of Candor – Under Oath). The standard penalty is dismissal. This Offense Code does not include a mitigated or aggravated range.

The investigation establishes you violated FBI Offense Code 2.5 (Lack of Candor – No Oath). The standard penalty is a 14-day suspension. Mitigating factors warrant a letter of

Mr. Andrew G. McCabe

censure to a ten-day suspension, and aggravating factors warrant a 20-day suspension to dismissal.

The investigation establishes you violated FBI Offense Code 4.10 (Unauthorized Disclosure - Sensitive Information). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

I have considered all mitigating factors supported by the record, including, but not limited to, your 21 years of remarkable FBI service and your truly outstanding performance record. At the time of the misconduct, you were facing unprecedented and unimaginable pressure and challenges. Notwithstanding all relevant and significantly mitigating factors, however, I find that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand. Without it, we are nothing. As the Deputy Director, you held the second-highest position in the FBI and are expected to comport yourself with the utmost integrity. Despite this, you repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division. Your lack of candor is incompatible with the FBI's Core Values. Based on the circumstances of this case, I propose dismissing you for your 2.6, 2.5, and 4.10 offenses.

## CONCLUSION

In sum, I propose dismissing you from the rolls of the FBI. The Deputy Attorney General will make the final decision in this matter. [49]

Sincerely yours,

Candice M. Will
Assistant Director
Office of Professional Responsibility

---

[49] You are admonished not to discuss this matter with anyone other than OPR, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from DOJ OIG or FBI OPR. In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

Mr. Andrew G. McCabe

Michael R. Bromwich
Senior Counsel
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, N.W. Suite 411L
Washington, D.C. 20006

Eric B. Bruce, Esq.
Kobre & Kim LLP
1919 M Street, N.W.
Washington, D.C. 20036

√ 1- Deputy Attorney General, Department of Justice
1 - Office of the Inspector General, Department of Justice
1 - Director, FBI
1 - Deputy Director, FBI
1 - OIG, DOJ
1 - AD, OPR
263X-HQ-xxxxxx
1 - Tickler Copy, OPR
Based on OPR ROI, dated 03/06/2018
CMW (P) (9)

16

**OFFICE OF PROFESSIONAL RESPONSIBILITY (OPR)**
**REPORT OF INVESTIGATION**
**File Number 263x-HQ-xxxxxx**
**Adjudication Unit II, (P)**
**03/06/2018**

RE: ANDREW G. MCCABE
DEPUTY DIRECTOR
DIRECTOR'S OFFICE

## PREDICATION

This administrative inquiry, investigated by the Department of Justice, Office of Inspector General (OIG), was predicated on the allegations that Deputy Director Andrew G. McCabe: (1) lacked candor in an interview with the OIG on July 28, 2017, and in a second interview with the OIG on November 29, 2017, in violation of FBI Offense Code 2.6 (Lack of Candor – Under Oath); (2) lacked candor when discussing a October 30, 2016 *Wall Street Journal* article with FBI Director James Comey, and in an interview with FBI's Inspection Division on May 9, 2017,[1] in violation of Offense Code 2.5 (Lack of Candor – No Oath); and (3) disclosed, without authorization, the FBI's investigation into the Clinton Foundation, in violation of Offense Code 4.10 (Unauthorized Disclosure – Sensitive Information).[2] Based on a preponderance of the evidence, OPR concludes the allegations are substantiated. Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, OPR recommends to the Deputy Attorney General that McCabe be dismissed from the rolls of the FBI.[3]

## PERSONNEL HISTORY

McCabe, EOD: 07/07/1996, is an ES-0 Deputy Director. McCabe was rated "Outstanding" in his 2014-2017 Performance Appraisal Reports. BPMS shows he has received a Commendation (1999), a Quality-Step Increase (2003), a Special Act/Achievement Award (1999), two Cash Awards (2009 (2x)), and five SES Performance Awards (2010, 2011, 2012, 2014, and 2016). He is not a preference-eligible veteran, and he has been the subject of one prior administrative inquiry. In OPR Case #1999-0041, McCabe was issued an oral reprimand for losing a building pass.

---

[1] The OIG found that McCabe lacked candor under oath when he spoke to Inspection on May 9, 2017. However, it is unclear from the case file whether McCabe was under oath at the time he spoke with investigators about the article in question. Accordingly, OPR finds the May 9 interview is more appropriately considered not under oath.

[2] This administrative inquiry was opened after January 1, 2017, and thus will be analyzed under the FBI's 2017 Offense Codes and Penalty Guidelines.

[3] Pursuant to the Deputy Attorney General's Memorandum dated May 27, 2008, to the Director of the FBI, the Justice Department has retained final decision-making authority over adverse actions impacting the Deputy Director of the FBI.

## DISCUSSION

The reader is referred to OPR investigative file 263x-HQ-xxxxxxx for a complete account of all the facts and circumstances regarding this matter.

### October 23, 2016 *Wall Street Journal* Article

On October 23, 2016, the *Wall Street Journal* (WSJ) published an online article written by ▮▮(P)▮▮ which stated that the Virginia Democratic Party and a political action committee (PAC) run by Virginia Governor Terry McAuliffe donated nearly $675,000 to McCabe's wife's unsuccessful 2015 state senate campaign.[4] The article described McAuliffe's close connection to Bill and Hillary Clinton, and noted that McCabe was an FBI official "who later helped oversee the investigation into Mrs. Clinton's email use."[5]

The WSJ article resulted in significant public discussion as to whether McCabe's subsequent oversight of the Clinton Email investigation was appropriate given his wife's connection to McAuliffe and the Virginia Democratic Party. McCabe's Special Counsel, ▮(P)▮ ▮▮ told the OIG, "[s]o that article comes out on Sunday. And it is like an enormous fire storm. It is hugely, you know, it's not only all over the news, but there's just a lot of swirl and churn associated with that fact coming out."[6] According to the OIG's investigation, Senator Charles Grassley immediately called for McCabe's recusal. On October 27, 2016, in a meeting on the Clinton Email investigation, the FBI General Counsel (GC) suggested that McCabe, who was present by telephone, not be present for the discussion on the Clinton Email investigation. The GC acknowledged that the question of whether McCabe should recuse himself had not yet been settled, but out of an abundance of caution, the GC felt McCabe should not be in the meeting. Director Comey agreed and McCabe ended his call into the meeting.[7]

---

[4] The print edition of the article was published on October 24, 2016.

[5] The article acknowledged that McCabe played no role in his wife's 2015 state senate campaign and that he was promoted to FBI Deputy Director, with oversight of the Clinton Email investigation, months after his wife's defeat. McCabe did not have an oversight role in the Clinton Email investigation when his wife was running for office.

Then FBI Director James Comey told the OIG that he first learned of the issue regarding McCabe's wife and her connection to McAuliffe when McCabe emailed the Director on October 21, 2016, two days before the article was released, stating, "[The Office of Public Affairs (OPA)] informed me that ▮▮(P)▮▮ at WSJ is putting together an article claiming I had a conflict of interest on [the Clinton Email investigation] as a result of Jill's campaign connections to Governor McAuliffe. I'll work with [OPA] to provide some basic facts to pushback." On October 23, 2016, McCabe emailed Comey, "Not too much in the update. The only additional notable news is that [OPA] and I spent a good part of the day trying to shape the Wall Street Journal's story on my alleged conflict...," which McCabe noted was to be released online.

[6] ▮(P)▮ OIG interview, 9/7/17, pg. 253.

[7] In his 12/4/2017 interview with the OIG, McCabe stated that he dropped out of the call because the GC brought up the need to discuss classified information and McCabe was on an open line. McCabe denied that he was asked to leave the meeting due to the possibility of recusal or a conflict of interest.

On October 24, 2016,  (P)  emailed Assistant Director Michael Kortan, Office of Public Affairs, to ask additional questions for a follow-up story he was working on.[8]  In that email,  (P)  asked about McCabe's involvement in the Clinton Foundation investigation, among other things.[9]  Specifically,  (P)  email said that he was told that:

> in the summer, McCabe himself gave some instruction as to how to proceed with the Clinton Foundation probe, given that it was the height of election season and the FBI did not want to make a lot of overt moves that could be seen as going after [Clinton] or drawing attention to the probe.

 (P)  email asked Kortan if this was accurate and if there was anything else  (P)  should know.

McCabe was notified that  (P)  was working on a follow-up story that would cover McCabe's oversight of the Clinton Foundation investigation in the face of  (P)  earlier article that McAuliffe gave significant campaign contributions to McCabe's wife.  (P)  stated that she and McCabe believed that narrative being developed by the WSJ was inaccurate and McCabe authorized  (P)  to speak to  (P)  "to fix this story and give a complete picture."[10]  (P)  stated, "Andy [McCabe] directs me to work with Mike [Kortan] on a follow-up story with  (P)   (P)  …So I am a source on background with  (P)  at Andy [McCabe] and Mike's [Kortan] direction in order to try to correct the inaccurate sort of representations in that article."[11]  (P)  advised that this was the first time she had communicated with the media in her official capacity at the FBI.

 (P)  and Kortan were scheduled to speak with  (P)  for the first time on October 27, 2016, in "receive mode," to hear what  (P)  story intended to address.  (P)  and Kortan would then discuss an appropriate response and speak to  (P)  a second time. McCabe was on personal travel from Thursday, October 27 – Sunday, October 30, 2016. Despite this, he maintained close contact with his Special Counsel regarding her and Kortan's progress with  (P)   According to text messages, on October 27, 2016, at 12:06 pm, McCabe texted  (P)  "Are you with wsj now."  (P)  texted back that she was "going there now" and would call him "immediately after re call with  (P)   A little over an hour later,  (P)  texted McCabe asking if he was free to talk. Telephone records show that McCabe and  (P)  spoke by telephone at 2:54 p.m. for approximately 51 minutes. According to  (P)  she briefed McCabe on her conversation with  (P)  and a purported "stand down" order that McCabe had issued to agents working on the Clinton Foundation investigation.  (P)  and McCabe discussed the inaccurate and inflammatory nature of  (P)  information. According to  (P)  McCabe cited his August 12,

---

[8] Kortan has since retired from the FBI.

[9] The Clinton Foundation investigation was a separate and distinct investigation from the Clinton Email investigation. Although the Clinton Email investigation was publicly acknowledged by the FBI, the Clinton Foundation investigation was not. When Director Comey was asked during Congressional testimony whether the FBI was investigating the Clinton Foundation, he declined to answer.

[10]  (P)  OIG interview, 9/7/17, pg. 280.

[11]  (P)  OIG interview, 9/7/17, pg. 272.

2016 phone call with DOJ Principal Associate Deputy Attorney General (PADAG) Matthew Axelrod in which Axelrod expressed anger at McCabe that the FBI had not shut down the Clinton Foundation investigation based on Axelrod's misunderstanding of the situation. In that call, McCabe pushed back against Axelrod and told him that the FBI would continue to take appropriate and logical investigative steps in the Clinton Foundation investigation. McCabe then asked if Axelrod was telling McCabe "to shut down a validly predicated investigation," which Axelrod said he was not. According to (P) McCabe wanted to provide an account of his conversation with Axelrod to rebut the false "stand down" scenario that had been shared with the WSJ. (P) notes of her conversation with McCabe on October 27 include a notation "Fri. Aug 12 with [PADAG]" to remind her to discuss the telephone call with (P)

Text messages and phone records show that immediately before (P) and Kortan spoke with (P) for the second time on October 27, 2016, McCabe called (P) and they spoke for six minutes. (P) and Kortan than spoke to (P) from 4:45 p.m. to 5:21 p.m. According to (P) contemporaneous notes and testimony to the OIG, in this call to (P) she responded to claims regarding FBI leadership's handling of the Clinton Foundation investigation and provided the account of the August 12 phone call between McCabe and Axelrod. Later that evening, (P) texted McCabe, "We're done. He's going to look at this story again and we'll circle back with him in the morning."

On October 28, 2016, (P) and Kortan spoke to (P) a third time. He gave them a preview of his revised story, which now included a report on the McCabe-Axelrod phone call. After this call ended, (P) texted McCabe, "Just got off with (P) Give me a call here." McCabe called (P) and they spoke for 23 minutes.

### October 30, 2016 *Wall Street Journal* Article

On October 30, 2016, (P) follow-up article was published online.[12] The article mentioned Comey's stunning disclosure two days earlier, on Friday, October 28, that the FBI was taking another look at Hillary Clinton's emails days before the presidential election and discussed tension inside the FBI and DOJ on how best to proceed. The article again mentioned McAuliffe's campaign contributions to McCabe's wife's failed state senate campaign in 2015 and discussed McCabe's efforts to refocus "the Clinton Foundation probe[.]"[13] The article reported that agents had been told to "[s]tand down" on the Clinton Foundation investigation and that "the order had come from the deputy director – Mr. McCabe," but also that "[o]thers familiar with the matter deny Mr. McCabe or any other senior FBI official gave such a stand-down instruction." The article described the August 12 conversation between McCabe and Axelrod (the latter identified only as a "senior Justice Department official"), stating:

> According to a person familiar with the probes, on Aug. 12, a senior Justice Department official called Mr. McCabe to voice his displeasure at finding that

---

[12] The print edition of the article was published on October 31, 2016.

[13] This represented the first public acknowledgment that the FBI had opened a criminal investigation into the Clinton Foundation. Director Comey had previously declined to answer questions about the existence of an investigation of the Clinton Foundation.

New York FBI agents were still openly pursuing the Clinton Foundation probe during the election season. Mr. McCabe said agents still had the authority to pursue the issue as long as they didn't use overt methods requiring Justice Department approvals.

The Justice Department official was "very pissed off," according to one person close to McCabe, and pressed him to explain why the FBI was still chasing a matter the department considered dormant... ·

"Are you telling me that I need to shut down a validly predicated investigation?" Mr. McCabe asked, according to people familiar with the conversation. After a pause, the official replied "Of course not," these people said.

## Meeting with Director Comey on October 31, 2016

The following day, Monday morning, October 31, 2016, Comey held a staff meeting, attended by (P) and McCabe, among others. During the meeting, according to (P) contemporaneous notes, Comey said, "Need to figure out how to get our folks to understand why leaks hurt our organization." In his statement to the OIG, Comey advised that he remembered reading the October 30, 2016 WSJ article and thinking, "what the hell[,]" "I was very concerned about it for a number of reasons[,]" "this was going to poison our relationship with the Department of Justice."[14] Comey went on to say that his second reaction was, "what are we doing talking about what we're doing in an investigation..."[15] He considered it a disclosure of sensitive FBI information. Comey stated, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[16] When questioned further by the OIG whether McCabe told Comey that McCabe authorized the disclosure, Comey stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[17] When asked again if McCabe told Comey that McCabe authorized (P) to speak to the WSJ, Comey stated that McCabe said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it..."[18] Comey stated that he did not suspect that McCabe was the source of the disclosure based on what McCabe told him the morning after the article came out.

Comey told the OIG it is "very unlikely" "in fact approaching zero" that he would have authorized disclosure of the Axelrod telephone call if asked ahead of time. Comey stated that part of the reason for declining to disclose that information is that it explicitly confirms the

---

[14] James Comey OIG interview, 11/16/2017, pgs. 301-302.

[15] James Comey OIG interview, 11/16/2017, pg. 302.

[16] James Comey OIG interview, 11/16/2017, pgs. 304-305.

[17] James Comey OIG interview, 11/16/2017, pg. 305.

[18] James Comey OIG interview, 11/16/2017, pgs. 314-315.

existence of a criminal investigation.[19] Comey advised that when he disclosed the existence of
the Russia investigation to Congress, he did so reading from a script that was carefully drafted
and considered. He stated that disclosing a criminal investigation anonymously sourced in a
newspaper is not something the FBI would do. Regarding the October 30, 2016 WSJ article,
Comey stated, "I did not authorize this. I would not have authorized this."[20] Comey further
stated that as the Director of the FBI, significant disclosures about investigations would always
go through him because he is responsible for how the FBI interacts with the world. Comey
stated that if the Deputy Director wanted to disclose information regarding an ongoing
investigation, he would expect the Deputy Director to check with him first.

### Inspection Division Interview of McCabe on May 9, 2017

The FBI Inspection Division was tasked with investigating various media leaks. One of
the leaks pertained to an article written by     (P)     and published by Circa News reporting
that McCabe had made derogatory comments about former National Security Advisor Michael
Flynn and President Trump during a private FBI executives meeting. On May 9, 2017, Section
Chief (SC) Voviette Morgan and Supervisory Special Agent (SSA)     (P)     interviewed
McCabe in his office concerning the leaks.[21] Morgan and   (P)   (and SSA     (P)  
had previously interviewed McCabe in April 2017, following which   (P)   had prepared and
emailed to McCabe a signed, sworn statement for McCabe's review, editing (if necessary), and
signature. This May meeting was to go over the previously emailed statement about the  (P) 
      article and to ask McCabe about the October 30 WSJ article. Morgan advised that they
met with McCabe in the privacy of his office.

After going over changes to the previously emailed statement, Morgan showed McCabe a
copy of the October 30 WSJ article, and directed his attention to the first three paragraphs on the
last page which discussed the McCabe-Axelrod conversation.   (P)   stated, "we paused and let
him read, read the article. I mean, he read the article, not just that piece. I think he refreshed his
memory and flipped through the article."[22] McCabe initialed the article to acknowledge that he
read it.

According to   (P)   McCabe indicated the WSJ article was "somewhat familiar"
because he recalled reading it when it came out in October 2016.[23]   (P)   stated that McCabe
said he did not know who leaked the information, "He didn't authorize it. He didn't direct
anybody to give it out."[24]   (P)   recalls asking McCabe who he thought could have disclosed

---

[19] James Comey OIG interview, 11/16/2017, pg. 310.

[20] James Comey OIG interview, 11/16/2017, pg. 311.

[21] May 9, 2017, is the same day that Director Comey was fired and McCabe became Acting Director of the FBI.
This occurred after McCabe's meeting with Inspection.

[22]    (P)    OIG interview, 10/5/2017, pg. 26.

[23]    (P)    OIG interview, 10/5/2017, pg. 26.

[24]    (P)    OIG interview, 10/5/2017, pg. 29.

the information about his private telephone conversation because it seemed likely that only a few people would have been present during the phone call. According to   (P)   McCabe said he could not recall how many people were present or how many people he told the story to because he had related the story many times. At this point in time,   (P)   considered McCabe the victim of the leak.[25]

Morgan's account of the May 9 interview of McCabe is consistent with   (P)   She stated that McCabe read the article and although she could not remember what he said verbatim, "the overarching issue, or take-away from it was that he did not grant anyone permission to divulge the information to the media. That he personally hadn't shared the information. And he hadn't granted anyone else permission to. And that he did consider it a media leak[.]"[26]

On May 12, 2017,   (P)   sent McCabe an email attaching a revised version of his signed, sworn statement, "You will note that your requested changes have been made, and we added a short paragraph, in parenthesis beginning on Page 10, relative to your recollection of circumstances pertaining to the [October 30] Wall Street Journal article we reviewed with you." The paragraph read:

On 05/09/2017, SC Morgan and SSA   (P)   provided me with a photocopy of a Wall Street Journal article, dated 10/30/2016, and requested I evaluate and assess the content of the first three paragraphs appearing on the last page for accuracy. My assessment of the referenced portion of the article is that it is basically an accurate depiction of an actual telephonic interaction I had with a Department of Justice (DOJ) Executive. Since this event, I have shared the circumstances of this interaction with numerous FBI Senior Executives, and other FBI personnel. I do not know the identity of the source of the information contained in the article. I gave no one authority to share any information relative to my interaction with the DOJ Executive with any member of the media. *I initialed the photocopy of the article, which is attached to my statement as Exhibit #5.*

(Emphasis in original.) Morgan stated that there was no doubt in her mind that McCabe told her that he did not authorize the disclosure to the WSJ and that he did not know who had disclosed the information to the WSJ. Morgan stated that she stands by what is contained in McCabe's draft statement.[27] The statement is consistent with contemporaneous notes taken by   (P)   during the interview.

When McCabe failed to sign and return the statement to Inspection, it was emailed to him again by Inspection on June 23, 2017.

---

[25]   (P)   took contemporaneous notes throughout the interview of McCabe.

[26] Voviette Morgan OIG interview, 12/20/2017, pg. 14.

[27] Voviette Morgan OIG interview, 12/20/2017, pg. 40.

**OIG Interview of McCabe on July 28, 2017**

On July 28, 2017, the OIG interviewed McCabe under oath regarding a separate matter. The OIG told McCabe that it would not be covering issues related to McCabe's recusal in the McAuliffe investigation. The OIG showed McCabe certain text messages exchanged between McCabe's Special Counsel    (P)    and Counterintelligence Deputy Assistant Director (DAD)    (P)    [28]

The OIG referred McCabe to the October 30, 2016 WSJ article written by    (P)    and told McCabe there was information in the    (P)    texts also on October 30, 2016, indicating    (P)    had spoken to the press. The OIG showed McCabe a text in which    (P)    forwarded a *Washington Post* article that was critical of the FBI to    (P)    and    (P)    wrote, "This is all [Axelrod]."    (P)    responded, "Yeah, I saw it. Makes me feel WAY less bad about throwing him under the bus in the forthcoming CF article."

The OIG told McCabe it believed    (P)    October 30 text related to the WSJ's article later that same day revealing the Clinton Foundation investigation and the McCabe-Axelrod telephone conversation. McCabe responded, "I don't know what she's referring to."[29] McCabe then stated the OIG's questions exceeded the scope of the OIG's current investigation for which it was questioning him, and that he did not want to "get into discussing the article" with the OIG. The OIG asked, "Was she ever authorized to speak to reporters in this time period, was    (P)    McCabe responded, "Not that I'm aware of."[30] McCabe went on to say, "I was not even in town during those days. So I can't tell you where she was or what she was doing."[31]

**McCabe Phone Call to OIG on August 1, 2017**

Four days later, on August 1, 2017, McCabe called Assistant Inspector General    (P)    to provide additional information about matters discussed during McCabe's July 28 OIG interview.    (P)    memorialized the phone conversation in an email, which reads in relevant part:

First, he [McCabe] stated that he believes that    (P)    may have been authorized by him to work with AD Michael Kortan (Public Affairs) and to speak with the WSJ for the late October article. He said he had worked with    (P)    on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies. At the time the second article was being prepared, McCabe was out of town visiting his son in CT. He believes he may have authorized    (P)    to work with Kortan and speak to    (P)    (the WSJ reporter) because she

---

[28]    (P)    has since been reassigned to the Office of General Counsel.    (P)    has since been reassigned to the Human Resources Division.

[29] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[30] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[31] Andrew McCabe OIG interview, 7/28/2017, pg. 32.

had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues.

**Inspection Division Interview of** (P) **on August 7, 2017**

On August 7, 2017, (P) was interviewed by SC Morgan and SSA (P)   The investigating agents showed (P) the October 30 WSJ article and she acknowledged that she was familiar with it. (P) told Morgan and (P) that McCabe told her to work with Kortan to speak with (P) "on background" and provide him with information to help shape his next article. She advised that she spoke to (P) by telephone on October 27 and 28, 2016. (P) signed a sworn statement to this effect on August 15, 2017. (P) was also interviewed by the OIG on September 7 and October 26, 2017, in which she gave the same account.

**Inspection Division Interview of McCabe on August 18, 2017**

After learning from (P) that McCabe authorized (P) to speak to (P) (P) and (P) re-interviewed McCabe on August 18, 2017. (P) showed McCabe the earlier draft statement that Inspection prepared for McCabe to sign (he never did) and the October 30 WSJ article again. (P) stated that he asked McCabe, "I want to ask you about this article because we're, we're having conflicting information. And so I need to know from you, did you authorize this article? Were you aware of it? Did you authorize it?"[32] (P) advised that McCabe read the article and said, "yep. Yep I did."[33] (P) was taken aback and stated that he told McCabe, "sir, you understand that we put a lot of work into this based on what you've told us. I mean, and I even said, long nights and weekends working on this, trying to find out who amongst your ranks of trusted people would, would do something like that." According to (P) McCabe "kind of just looked down, kind of nodded, and said, yeah, I'm sorry."[34] McCabe apologized and told (P) and (P) that "there was a lot going on then."

(P) reported the new information to his supervisors in the Inspection Division and recommended they turn the matter over to the OIG. Nancy McNamara, Assistant Director, Inspection Division, agreed and referred the matter to the OIG. The OIG formally accepted the referral on August 31, 2017.

**OIG Interview of McCabe on November 29, 2017**

**Authorization**

On November 29, 2017, the OIG interviewed McCabe under oath again, this time focusing on the WSJ disclosure. During the interview, McCabe told the OIG that he authorized Kortan and (P) to speak to (P) to try to correct what McCabe perceived as "incredibly

---

[32]   (P)   OIG interview, 10/5/2017, pg. 45.

[33]   (P)   OIG interview, 10/5/2017, pg. 46.

[34]   (P)   OIG interview, 10/5/2017, pgs. 47–48.

9

damaging inaccuracies" in his story.[35]  McCabe described the first WSJ article as "creat[ing] a false narrative that I had been exercising my judgment in a political way.  And this article continued in that direction, which I thought was incredibly damaging for us as an organization."[36]  McCabe stated that he thought having Kortan and (P) speak to (P) "was the right thing to do" and that he "felt very confident doing it."[37]  When asked what sparked his recollection of authorizing Kortan and (P) McCabe denied speaking to (P) or Kortan about the matter, and simply stated that he thought a lot about it.

### Director Comey

The OIG asked McCabe if, prior to authorizing (P) and Kortan to speak to (P) he discussed the matter with Comey.  McCabe stated that he did not remember discussing it with Comey beforehand, but did recall discussing the article with Comey in person on Monday, October 31, the day after the article was published:

> [W]e talked about the article.  I asked him his thoughts about it.  He thought it was, you know, he had the same impression as I did that it was really kind of a one-sided narrative supported by a lot of spurious information.  But he thought that it was good that we at least had gotten the, the, you know, the information, that they at least presented information that indicated that, no, that's not who we are.  That we are, that we're independent and doing our job.  We discussed the fact that the Department was likely to be pretty angry, and specifically Matt Axelrod was, was unhappy about that the fact that this may, that this made its way into the paper.

The OIG asked McCabe, "are you telling him at this time, hey boss, I authorized Kortan and (P) to disclose the account of the August 12th call?"  McCabe stated, "Yes.  He knew that." The OIG repeated, "You told him that?"  McCabe stated, "Yes."  The OIG asked McCabe for Comey's reaction.  McCabe stated, "He did not react negatively, just kind of accepted it."  The OIG continued to question McCabe and asked, "Did he have any reaction to the fact that by disclosing the account of the August 12th call, even though it's not a direct quote attributed to you.  It essentially is in substance confirming the existence of the Clinton Foundation investigation.  Did he have any reaction to that?"  McCabe replied, "He did not."[38]

McCabe further claimed that the fact that Kortan and (P) spoke to (P) was not a secret and that people generally knew McCabe authorized the disclosure because it was his private conversation with Axelrod that was disclosed.[39]

---

[35] Andrew McCabe OIG interview, 11/29/2017, pg. 20.

[36] Andrew McCabe OIG interview, 11/29/2017, pg. 58.

[37] Andrew McCabe OIG interview, 11/29/2017, pg. 62.

[38] Andrew McCabe OIG interview, 11/29/2017, pgs. 94-96.

[39] Andrew McCabe OIG interview, 11/29/2017, pg. 106.

**Interviews with Inspection Division**

The OIG also questioned McCabe about his interviews with Inspection.  McCabe incorrectly recalled being interviewed by Morgan, (P)  and (P)  on May 9, 2017.[40]  He advised that as (P)  and (P)  were walking out of his office, Morgan "kind of grabbed [him] by the arm" to ask him something.[41]  He advised that Morgan then showed him the October 30 WSJ article.  He told her that he knew about the article.  McCabe stated that he does not recall reading the WSJ article when Morgan handed it to him.[42]  McCabe stated:

> I remember being like kind of confused about why she was even bringing it up because it had nothing to do with what I had asked them to, to investigate, so I was trying to kind of connect the two and understand what the relevance was. And she asked me a question or two about it.  And that was it.  It was a very quick exchange.[43]

McCabe stated that he later received the draft statement from Inspection "that reflected [the interview] in a way that I thought was inaccurate."[44]

McCabe was asked whether he believed he told Morgan, (P)  and (P)  that he gave authorization for the WSJ disclosure, and that their recollections to the contrary are wrong. McCabe stated, "I'm telling you that I don't know exactly what we discussed in that May 9th meeting.  But to be perfectly honest, May 9th, prior to Director Comey's firing and learning of that from the AG later that evening, everything that happened prior to that moment is a little bit distant for me."[45]

McCabe stated that he raised the issue of the inaccurate statement with Morgan in a later meeting and told her that he authorized (P)  and Kortan to speak to (P)   McCabe said that Morgan seemed surprised and he suggested that she coordinate with the OIG.  McCabe stated that he did not attempt to correct the statement when he received the drafts by email.  He stated that he was the Acting Director at the time and was focused on that.  He stated that once he got back to his Deputy Director role, he worked to resolve the outstanding issues with Inspection. McCabe told the OIG that he did not remember when he actually looked at the draft statement but that it could have been months later.

---

[40] McCabe repeatedly told the OIG that all three Inspection Division investigators, Morgan, (P)  and (P) were present.  In fact, only two investigators were present during the interviews on May 9 (Morgan and (P)  and August 18 ( (P)  and (P)   However, all three were present when they first interviewed McCabe in April 2017.

[41] Andrew McCabe OIG interview, 11/29/2017, pg. 142.

[42] Andrew McCabe OIG interview, 11/29/2017, pg. 145.

[43] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[44] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[45] Andrew McCabe OIG interview, 11/29/2017, pg. 157.

11

## ANALYSIS

### A. Lack of Candor – Under Oath

According to FBI Offense Code 2.6, employees are prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

#### 1. Interview with OIG on July 28, 2017

During his July 28, 2017 interview under oath with the OIG, after being shown (P) October 30 text concerning having thrown Axelrod "under the bus" in a forthcoming article, McCabe falsely stated that he was not aware that (P) was authorized to speak to reporters at that time. He also falsely stated that because he was out of town, he did not know where (P) was or what she was doing at that time. In fact, as McCabe later admitted, he did authorize (P) to speak to (P) for the October 30 WSJ article, and he was aware of what she was doing because he stayed in constant contact with her through texts and phone calls. Although McCabe did not know he was going to be questioned about the WSJ article before sitting down with the OIG on July 28, the interview was voluntary and he had the opportunity to end it at any time. Instead, McCabe provided false information.

#### 2. Interview with OIG on November 29, 2017

OPR further finds that McCabe lacked candor under oath during his November 29, 2017 OIG interview when he falsely told the OIG that: (a) he told Comey on October 31, 2016, that he (McCabe) had authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea; and (b) he did not deny to the Inspection agents on May 9 that he had authorized the disclosure to the WSJ.

As discussed below, OPR credits Comey's recollection of his conversation with McCabe regarding the WSJ article on October 31, the gist of which was that McCabe had not authorized the leak the prior day and did not know who was behind it. Accordingly, OPR finds McCabe's statement to the OIG that he (McCabe) told Comey he authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea is false.

Also, as discussed below, the testimony of Morgan and (P) contemporaneous notes of the interview, and the draft statement prepared shortly thereafter show that McCabe denied authorizing the disclosure in his interview with Inspection on May 9. His statement to the contrary is false.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 2.6 is substantiated.

## B. Lack of Candor – No Oath

According to FBI Offense Code 2.5, employees are prohibited from "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

### 1. Meeting with Director Comey on October 31, 2016

McCabe lacked candor in his conversation with Director Comey on October 31, 2016, when they discussed the October 30 WSJ article. Comey told the OIG, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[46] When questioned further as to whether McCabe told Comey that he (McCabe) authorized the disclosure, Comey stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[47] Again, Comey later stated when asked if McCabe told him about authorizing (P) to speak to the WSJ, McCabe said, "something like can you believe this crap? But I took from whatever communication we had that he wasn't involved in it…"[48] Comey stated that he did not suspect that McCabe was the source of the disclosure based on what McCabe told him the morning after the article came out. Although it appears that Comey never directly asked McCabe if he authorized, or made the disclosure, McCabe's overall statements to Comey were deceptive. McCabe owed it to Comey, his immediate supervisor and the Director of the FBI, to be forthcoming and transparent in his discussions with Comey about any matter, much less one of such significance.

Comey was concerned about leaks in general and this disclosure in particular because he was concerned it would poison the FBI's relationship with DOJ. Therefore, OPR does not credit McCabe's account that he told Comey that he authorized the disclosure and that Comey "did not react negatively, just kind of accepted it." Additionally, McCabe's failure to be forthright with Comey is consistent with his behavior in denying authorizing the disclosure up until he was confronted with (P) texts by the OIG on July 28, 2017. OPR therefore credits Comey's account.

### 2. Interview with INSD on May 9, 2017

Morgan and (P) both stated that McCabe told them on May 9, 2017, that he did not know who authorized the disclosure of the McCabe-Axelrod call to the WSJ. Morgan stated that

---

[46] James Comey OIG interview, 11/16/2017, pgs. 304-305.

[47] James Comey OIG interview, 11/16/2017, pg. 305.

[48] James Comey OIG interview, 11/16/2017, pgs. 314-315.

there was no doubt in her mind that McCabe told her that he did not authorize the disclosure to the WSJ and that he did not know who disclosed the information to the WSJ.  (P)  stated that McCabe told him, "[h]e didn't know who gave it out. He didn't authorize it. He didn't direct anybody to give it out."  (P)  noted that McCabe took time to read the WSJ article and initialed it, indicating that he reviewed it. McCabe had an opportunity to refresh his recollection of the article at issue and still gave a false answer. Morgan and  (P)  accounts are consistent with each other and are corroborated by  (P)  contemporaneous notes of the interview and the draft statement that  (P)  prepared for McCabe's signature shortly after the interview. OPR credits their account of their May 9 interview and finds that McCabe lacked candor in his May 9 interview with Inspection.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 2.5 is substantiated.

## C. Unauthorized Disclosure

According to FBI Offense Code 4.10, without authorization, employees are prohibited from "disclosing or attempting to disclose the FBI's, or another agency's, sensitive material."

There is a general prohibition on disclosing information about an ongoing criminal investigation. The Clinton Foundation investigation was especially sensitive, having, as it did, a connection to a presidential campaign. Comey declined to confirm the existence of the Clinton Foundation investigation in his testimony to Congress in July 2016. When questioned by the OIG, Comey stated that nobody in the FBI was authorized to publically confirm the Clinton Foundation investigation. Comey considered the information contained in the October 30 WSJ article to be a disclosure of sensitive FBI information. Comey advised that the default rule is that the FBI does not discuss open investigations but would consider whether the public interest requires it. McCabe's decision to confirm the existence of the Clinton Foundation investigation through an anonymously sourced quote, recounting the content of a phone call with a DOJ Executive, was not within the public interest exception.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 4.10 is substantiated.

## *DOUGLAS* FACTORS

## 1. The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.

McCabe's offenses are extremely serious and directly related to his position and responsibilities as an FBI executive. All FBI employees are expected to tell the truth and demonstrate the utmost integrity at all times. His misconduct was intentional, and while it was a one-time disclosure, McCabe repeatedly failed to be fully forthright about whether he authorized the disclosure.

14

**2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.**

McCabe is the Deputy Director of the FBI. Several Assistant Directors and other component heads reported directly to him. His role was extremely prominent as he was second-in-command of the FBI, heading the daily operations of the Bureau. McCabe interacted with the highest levels of the government and a wide array of other government and private entities and individuals.

**3. The employee's past disciplinary record.**

McCabe has one prior administrative inquiry. In OPR Case #1999-0041, McCabe was issued an oral reprimand for losing a building pass.

**4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability.**

McCabe has 21 years of FBI service. He was rated "Outstanding" in his 2014-2017 Performance Appraisal Reports. BPMS shows he has received a Commendation (1999), a Quality-Step Increase (2003), a Special Act/Achievement Award (1999), two Cash Awards (2009 (2x)), and five SES Performance Awards (2010, 2011, 2012, 2014, and 2016).

**5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties.**

McCabe's offenses have severely impacted his ability to perform at a satisfactory level. OPR finds that McCabe cannot satisfactorily perform his assigned duties when he has irrevocably broken the trust the FBI placed in him.

**6. Consistency of the penalty with those imposed on other employees for the same or similar offense.**

As courts have often concluded, "[a]n agency need not exercise its discretion identically in every case. A penalty that is within the authority of the agency is not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases and mere unevenness in the application of the sanction does not render its application in a particular case unwarranted in law." *Villela v. Dep't of the Air Force*, 727 F.2d 1574, 1577 (Fed. Cir. 1984); see *Schoemer v. Dep't of the Army*, 81 MSPB 363, 367 (1999) (stating "the Board has consistently found that allegations of disparate penalties provide no basis for reversal or mitigation where the punishment is appropriate to the seriousness of an employee's offense"). OPR must ascertain the appropriate penalty for misconduct in every substantiated case. Precedent is a helpful resource. Thus, OPR reviewed the 444 cases under Offense Codes 2.6, 2.5, and 4.10 (as of March 6, 2018), which reflect penalties ranging from oral reprimand to summary dismissal. After reviewing the 444 precedent cases, OPR concludes the recommended

penalty is consistent with those imposed upon other employees for the same or similar offenses.[49]

**7. Consistency of the penalty with any applicable agency table of penalties.**

The recommended sanction is consistent with the FBI's Penalty Guidelines.

**8. The notoriety of the offense or its impact upon the reputation of the agency.**

When the notoriety of the offenses becomes known, it will, without question, significantly damage the reputation of the FBI.

**9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.**

McCabe is aware of the FBI's standards of conduct and the obligation to tell the truth at all times.

**10. Potential for employee's rehabilitation.**

OPR finds that McCabe's offenses demonstrates he has failed to act with integrity at all times and has broken the FBI's trust in him

**11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.**

From October 2016 through August 2017, McCabe, as both Deputy Director and then as Acting Director, was under intense, even unimaginable, scrutiny dealing with a variety of highly sensitive matters that generated a significant amount of controversy.

**12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.**

OPR does not believe that alternative sanctions are appropriate in this matter.

## PENALTY DETERMINATION

When determining an appropriate penalty, OPR considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

---

[49] The discussion above is designed to document that OPR has considered the applicable precedent. It does not, and is not intended to, convey the full extent of OPR's analysis of these precedents. OPR has carefully reviewed and weighed every precedent serialized into the investigative file. OPR's penalty determination is driven primarily by the facts of the case before it, including applicable mitigators and aggravators, with precedent review serving to promote general consistency and uniformity.

The investigation establishes McCabe violated FBI Offense Code 2.6 (Lack of Candor – Under Oath). The standard penalty is dismissal. This Offense Code does not include a mitigated or aggravated range.

The investigation establishes McCabe violated FBI Offense Code 2.5 (Lack of Candor – No Oath). The standard penalty is a 14-day suspension. Mitigating factors warrant a letter of censure to a ten-day suspension, and aggravating factors warrant a 20-day suspension to dismissal.

The investigation establishes McCabe violated FBI Offense Code 4.10 (Unauthorized Disclosure - Sensitive Information). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

OPR has considered all mitigating factors supported by the record, including, but not limited to, McCabe's 21 years of remarkable FBI service and his truly outstanding performance record. At the time of the misconduct, McCabe was facing unprecedented and unimaginable pressure and challenges. Notwithstanding all relevant and significantly mitigating factors, however, OPR finds that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand. Without it, we are nothing. As the Deputy Director, McCabe held the second-highest position in the FBI and is expected to comport himself with the utmost integrity. Despite this, McCabe repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division. McCabe's lack of candor is incompatible with the FBI's Core Values. Based on the circumstances in this case, OPR concludes that McCabe should be dismissed from the rolls of the FBI for his violations of FBI Offense Codes 2.6, 2.5, and 4.10.

## CONCLUSION

Based on a preponderance of the evidence, OPR concludes McCabe violated FBI Offense Codes 2.6, 2.5, and 4.10. Based on the circumstances of this case, OPR recommends to the Deputy Attorney General that McCabe be dismissed from the rolls of the FBI for his 2.6, 2.5, and 4.10 offenses.

1 – Deputy Attorney General, Department of Justice
1 – Director, FBI
1 – Deputy Director, FBI
1 – OIG, DOJ
1 – AD, OPR
1 – 263X-HQ-xxxxxxx
1 – Tickler Copy, OPR

17

# EXHIBIT 2

## TABLE OF CONTENTS

Subject                                                                      Page

I.  GENERAL PROVISIONS

    A.  POLICY    ........................................ 1
    B.  DEFINITIONS...................................... 2

II.  RESPONSIBILITIES AND AUTHORITIES

    A.  THE ATTORNEY GENERAL............................. 4
    B.  THE DEPUTY ATTORNEY GENERAL...................... 4
    C.  THE DIRECTOR OF THE FBI.......................... 4
    D.  THE SES BOARD................................... 4
    E.  THE PERFORMANCE REVIEW BOARD(PRB)              4
    F.  THE ADMINISTRATIVE SERVICES DIVISION..          4

III.  ADMINISTRATION

    A.  THE SES BOARD                                  5
    B.  THE PERFORMANCE REVIEW BOARD . . .             6

IV.  STAFFING

    A.  MERIT PRINCIPLES                               7
    B.  CAREER APPOINTMENTS                            7
    C.  LIMITED TERM/LIMITED EMERGENCY APPOINTMENTS    8
    D.  REINSTATEMENT                                  9

V.  REMOVAL AND ADVERSE ACTION

    A.  GENERAL                                        10
    B.  ACTIONS TAKEN DURING PROBATIONARY PERIOD       10
    C.  ACTIONS TAKEN AFTER COMPLETION OF
         PROBATIONARY PERIOD                           11
    D.  ACTIONS TAKEN AGAINST
         LIMITED TERM/EMERGENCY APPOINTEES             15
    E.  GUARANTEED PLACEMENT OUTSIDE THE SES           15
    F.  GUARANTEED ANNUITY                             17

VI.  PERFORMANCE APPRAISAL

    A.  GENERAL INFORMATION                            18
    B.  PERFORMANCE APPRAISAL FOR THE SES              28

C.   ACTIONS BASED ON LESS THAN FS PERFORMANCE         38
D.   ESTABLISHMENT OF DOJ PERFORMANCE REVIEW BOARDS    42

(Revised 11/2004)

VII. PAY FOR THE SENIOR EXECUTIVE SERVICE

A.   SALARY LEVELS                                     26
B.   SETTING INDIVIDUAL PAY RATES                      26
C.   AWARDS                                            27
D.   LIMITATION ON SALARY                              29

VIII.  EXECUTIVE DEVELOPMENT

A.   EXECUTIVE DEVELOPMENT PROGRAM                     30
B.   SABBATICALS                                       30

IX. MISCELLANEOUS PROVISIONS

A.   TRAVEL EXPENSES                                   32
B.   ANNUAL LEAVE                                      32
C.   LAST MOVE HOME EXPENSES                           32
D.   FURLOUGHS                                         32
E.   TRAINING                                          34
F.   REPORTS AND EVALUATION                            34
G.   EXTENSION BEYOND MANDATORY RETIREMENT. . . . . . . 34
H.   RECORDS. . . . . . . . . . . . . . . . . . . . . . 34

## CHAPTER I.  GENERAL PROVISIONS

A.     POLICY.  Public Law 100-325 authorized the Attorney
       General to establish a Senior Executive Service (SES) for
       the FBI to include designated managerial and supervisory
       positions.  It is the policy of the FBI to administer its
       SES so as to:

       ● provide for a compensation system, including salaries,
benefits, and incentives, and for other conditions of
employment, designed to attract and retain highly competent
senior executives;

       ● ensure that compensation, retention, and tenure are
contingent on executive success which is measured on the basis
of individual and organizational performance (including such

factors as improvements in efficiency, productivity, quality of
work or service; cost efficiency, and timeliness of performance
and success in meeting equal employment opportunity goals);

• assure that senior executives are accountable and
responsible for the effectiveness and productivity of employees
under them;

• recognize exceptional accomplishment;

• enable the head of an agency to reassign senior
executives to best accomplish the agency's mission;

• provide for severance pay, early retirement, and
replacement assistance for senior executives who are removed
from the Senior Executive Service for nondisciplinary reasons;

• protect senior executives from arbitrary or capricious
actions;

• provide for program continuity and policy advocacy in
the management of public programs;

• maintain a merit personnel system free of prohibited
personnel practices;

• ensure accountability for honest, economical, and
efficient Government;

• ensure compliance with all applicable civil service
laws, rules, and regulations, including those related to equal
employment opportunity, political activity, and conflicts of
interest;

• provide for the initial and continuing systematic
development of highly competent senior executives;

• provide for an executive system which is guided by the
public interest and free from improper political interference;
and,

• appoint career executives to fill Senior Executive
Service positions to the extent practicable, consistent with the
effective and efficient implementation of agency policies and

responsibilities.

B.   <u>DEFINITIONS</u>.  Throughout the remainder of this policy
     statement, all references to "SES" indicate the FBI SES,
     unless otherwise specified.  The provisions of this policy
     do not supersede the jurisdiction of the Office of
     Attorney Personnel Management, Department of Justice
     (DOJ), in matters pertaining to those employees serving in
     FBI SES non-Agent attorney positions, unless a delegation
     of authority otherwise exists.

     1.   <u>SES Position</u> is any managerial or supervisory
          position classified above GS 15 of the General
          Schedule or in level IV or V of the Executive
          Schedule, or an equivalent position, which is not
          required to be filled by Presidential appointment
          with the advice and consent of the Senate and which
          involves:

          a.  Directing the work of an organizational unit;

          b.  Being held accountable for the success of one or
          more specific programs or projects;

          c.  Monitoring progress toward organizational goals
          and making appropriate adjustments to such goals;

          d.  Supervising the work of employees other than
          personal assistants; or

          e.  Otherwise exercising important policy making,
          policy determining, or other executive functions.

     2.   <u>Senior Executive</u> is a member of the SES.

     3.   <u>Key Executive</u> is the term used throughout this policy
          to refer to individuals who occupy:

          a. the positions of Executive Assistant Director,
          Assistant Director, Assistant Director in Charge, or
          General Counsel, and

          b. positions which report to the Director,

- 3 -

4.   <u>A Limited Emergency Appointment</u> may be made to meet a bona fide, unanticipated, urgent need.  The appointment may not exceed 18 consecutive months and is nonrenewable.

5.   <u>A Limited Term Appointment</u> may be made to a position the duties of which will expire at the end of a specified period or to a position that special circumstances require to be filled on a rotating basis.  The appointment may not exceed five years and is nonrenewable.

6.   <u>SES Limited Appointment Allocation</u>.  Limited term and limited emergency appointments are included in the total FBI SES allocation.  The total number of limited emergency and limited term appointees may not exceed 5% of the FBI total allocation.

CHAPTER II.   RESPONSIBILITIES AND AUTHORITIES

A.   THE ATTORNEY GENERAL has final authority over the SES in
that he/she may issue governing regulations and shall from
time to time issue guidance to the Director regarding
aspects of the SES.   The Attorney General is solely
responsible for nominating FBI executives for Presidential
Rank Award recognition.

B.   THE DEPUTY ATTORNEY GENERAL provides overall supervision
and direction to the FBI SES and has final approval
authority for many personnel matters involving executives,
e.g., salary adjustment and bonus decisions.

C.   THE DIRECTOR OF THE FBI is authorized by the Deputy
Attorney General to manage the FBI SES in accordance with
5 U.S.C. §3151, to include taking final action in matters
pertaining to employment, direction, and general
administration of personnel, including appointment,
assignment, training, promotion, demotion, compensation,
leave, classification, and separation. [The Attorney
General and Deputy Attorney General reserve final approval
authority for matters pertaining to key executives and key
executive positions.]

D.   THE SES BOARD consists of high ranking executives selected
by the Director to provide recommendations and/or final
decisions in a vast array of matters impacting the use of
executive resources.   The SES Board shall, as appropriate,
establish sundry other boards and committees as necessary
to facilitate the administration and operation of the SES.

E.   THE PERFORMANCE REVIEW BOARD (PRB) evaluates the initial
appraisal of senior executives for compliance and
sufficiency.   In the event an employee responds to one or
more negative ratings, the PRB will review the response
and addend a recommendation to sustain or adjust the
appraisal for consideration of the final approving
official.   The PRB may also evaluate bonus recommendations
based on the content of the appraisal.

F.   THE ADMINISTRATIVE SERVICES DIVISION (ASD) provides policy
support to the SES Board and furnishes an executive

secretary to the PRB and all subsidiary boards.  ASD works closely with the Justice Management Division, DOJ to interpret and implement laws and regulations impacting the FBI SES.

CHAPTER III.   ADMINISTRATION

The SES Board and the PRB provide recommendations on personnel management matters required for the continuous operation of the SES, e.g., selection, promotion, evaluation of performance, recommendation for recognition, succession planning, etc.  Additional boards and committees, such as those necessary for the initial rating of the Special Agents in Charge of the various field offices, will be formed and staffed as necessary to ensure the efficient accomplishment of internal goals and objectives.

A.    THE SES BOARD.

1.    Membership.  The SES Board will consist of high ranking executives selected by the Director.  Members will be recused from voting on matters involving themselves or their prior decisions and as otherwise required by the Board Chair based on conflicts or other appropriate bases.

2.    Functions.  Under delegation of authority from the Director, the SES Board provides management oversight and is responsible for conducting the following functions:

a.  Executive personnel planning, including determination of numbers of SES positions needed, development of executive staffing plans, forecasting of executive requirements, determination of executive development program objectives.

b.  Preparing recommendations regarding the staffing of executive positions, including selections, promotions, reassignments and details.

c.  Executive development, including selection of candidates for programs to develop executive qualifications, the planning and conduct of such programs for the continuing development of senior executives, and evaluation of performance during developmental assignments.

- 7 -

d.  Position management, including proper use of SES and other positions, and redistribution of functions to maximize the effectiveness of agency executives.

e.  Pay management, through recommendations to the Director on staffing, promotion, and demotion matters, as well as recruitment, relocation and retention pay incentives available to the SES.

f.  Development of policy on discipline and removal of executives for cause.

g.  Development of policy on removal from the SES based on performance and alternatives to removal for use in appropriate cases.

h.  Development of policy on performance appraisal and recognition.

i.  Incorporation of DOJ and FBI equal employment opportunity policies into executive personnel plans and activities.

j.  Establishment of boards and committees to facilitate the administration and operation of the SES, to include review and evaluation of the reports and recommendations from such boards/committees, assuring that DOJ requirements are met where applicable.

k.  Such other matters as are approved, implicitly or explicitly, by the Director and not prohibited by DOJ or other policy or law.

B.  THE PERFORMANCE REVIEW BOARD (PRB).

DOJ guidance will be provided on an annual basis to establish PRBs in each component.  Please see chapter VI for further information.

Chapter IV.  STAFFING

A.   MERIT PRINCIPLES.  The SES Board will ensure that merit
     principles, executive qualifications, selection criteria,
     and equal employment opportunity objectives are considered
     in selection matters under their purview.  The SES Board
     will review the executive qualifications of each candidate
     meeting selection guidelines, including all current FBI
     SES members and qualified employees outside the FBI SES
     population.

B.   CAREER APPOINTMENTS to the SES are normally made from
     within the career ranks of the FBI, to include both
     Special Agent and non-Agent personnel, considering
     demonstrated executive experiences and, where relevant,
     successful participation in the Career Development
     Program.  Sufficient flexibility exists to allow for the
     appointment of non-FBI career employees whose special or
     unique qualifications indicate a likelihood of executive
     success.

     1.   Probationary Period.  An individual who receives an
          SES career appointment must serve a 1-year
          probationary period.

     2.   Reassignment.  SES members may be reassigned to meet
          mission needs, better use or enhance their executive
          qualifications, or provide developmental
          opportunities.

          a.  Authority:  The Director may reassign SES members
          from one position to another.  The Director, based on
          recommendation from the SES Board, determines that
the       SES member being proposed for reassignment meets the
     technical qualification requirements of the position
     to which being reassigned.  When reassigning key
     executives,, the Director will seek concurrence from
     the Deputy Attorney General prior to the action being
     made final.

          b.  Notice Requirements:  The SES member must be
          provided with written notice in advance of any
          reassignment/transfer.

- 9 -

(1)   Non-geographic reassignments:  The appointee must receive a written notice at least 15 days in advance of the effective date of the reassignment.  An appropriate management official will generally consult with the appointee before the written notice is delivered.

(2)   Geographic reassignments (i.e., to another commuting area): Management will consult with and consider an executive's input prior to making a final reassignment decision. Following a decision, the executive is given a written notice at least 60 days in advance of the effective date of any reassignment.  This written notice must contain the reasons for the reassignment.  The advance written notice may be waived with the written consent of the executive being reassigned.

(3)   Voluntary reassignment:  An SES member may request a reassignment if he/she meets all technical qualification requirements.  Such a request must be in writing signed by the SES member and the documentation should be preserved.  The written request will preclude necessity for the advance notice described above.

C.     LIMITED TERM/LIMITED EMERGENCY APPOINTMENTS to SES are made in consideration of demonstrated special qualifications and/or experience which uniquely qualify the individual to serve either on an emergency basis for a specified, limited period, or in a position the duties of which will expire within a specified period of time or which must be filled on a rotating basis.  The Director must approve all limited appointments and seek the concurrence of the Deputy Attorney General where the appointment is to a key executive position.

Reassignment:

      a.   A limited term appointee may be reassigned to another SES position provided that the duties of such a position terminate within five years or less. Under no circumstances may a limited term appointee serve in one or more such positions in the FBI for more than five years.

      b.   A limited emergency appointee may be reassigned to another SES position in the FBI which is established to meet a bona fide, unanticipated, urgent need, except that the limited emergency appointee may not serve in one or more such positions in the FBI for more than 18 consecutive months.

      c.   Neither a limited term nor a limited emergency appointee may be appointed to or continue to hold a position under such an appointment if within the preceding 72 months the individual has served more than 60 months in the aggregate under any combination of such appointments.

D.     <u>REINSTATEMENT</u> of a former FBI SES career appointee to any SES position for which the appointee is qualified <u>may</u> occur if the following conditions are met.

    1.   The appointee has successfully completed, or was not required to complete, a one-year SES probationary period; and

    2.   The appointee left SES for reasons other than misconduct, neglect of duty, malfeasance, failure to accept a directed reassignment or to accompany a position in a transfer of function, or less than fully successful executive performance; or

    3.   The employee was appointed by the President to any civil service position outside SES, left that position for reasons other than misconduct, neglect of duty, malfeasance, and applies for reinstatement within 90 days after separation from the Presidential appointment; and

    4.   The Deputy Attorney General must approve reinstatement to a key executive position.

- 11 -

Reemployed annuitants in the SES serve at the discretion of the Director.  Final administrative action regarding reemployed annuitants in key executive positions is subject to review by the Deputy Attorney General.

CHAPTER V.   REMOVAL AND ADVERSE ACTION

A.    GENERAL.  A career appointee may be removed from the SES
      for a variety of reasons, including less than fully
      successful performance, misconduct, conditions arising
      before appointment, and reduction in force (RIF).  Final
      approval for adverse actions involving key executives will
      be at the discretion of the Deputy Attorney General.  The
      Director is the final approval authority for all other FBI
      senior executives.

      Unless a career appointee is removed for less than Fully
           Successful executive performance pursuant to the
      appraisal process described in Chapter VI, he/she may not
      be involuntarily removed from the SES within 120 days
      after the appointment of a new Director.  A removal action
      based on performance is not subject to the 120-day
      moratorium if the action is based on a final rating given
      before the appointment of the Director.  Procedural
      entitlements and placement of the appointee are dependent
      upon the basis for the removal action.


B.    ACTIONS TAKEN DURING PROBATIONARY PERIOD.

      1.    Performance-based removal.  The removal for
            unsatisfactory performance of a career appointee who
            has not completed the probationary period need not be
            based on a final rating of record.  Regardless of
            whether a rating has been issued, a probationary
            executive being removed for performance must be
            notified in writing of the effective date of the
            action.  This notice must, at a minimum:

            a.   State the agency's conclusions as to the
            inadequacies of the executive's performance;

            b.   State whether the appointee has placement rights
            and, if so, identify the position to which he/she
            will be assigned (see paragraph E of this chapter
            regarding placement rights); and

            c.   Show the effective date of the action.

- 13 -

2.   <u>Adverse action</u>.  An employee being removed or
     suspended for misconduct, neglect of duty,
     malfeasance, or failure to accept a directed
     reassignment or to accompany a position in a transfer
     of function, must be notified in writing before the
     effective date of the action.  This notice must, at a
     minimum:

     a.  State the basis for the action (including the
     act(s) of misconduct, neglect of duty, or malfeasance
     if those factors are involved); and

     b.  Show the effective date of the action.

          However, if the employee was a preference
     eligible employee immediately prior to his/her
     appointment, the provisions in 5 CFR Part 752,
     Subpart F apply.

3.   <u>Removal based on conditions arising before
     appointment</u>.  When action to remove is based in whole
     or in part on conditions arising before the
     appointment, and the probationary employee was not a
     preference eligible employee immediately before
     appointment, the following procedures apply:

     a.  The agency shall give the employee an advance
     written notice stating the specific reasons for the
     proposed removal;

     b.  The employee must be provided a minimum of seven
     days to reply; and

     c.  A written decision, showing the reasons for the
     action and the effective date, must be given to the
     employee at or before the time the action will be
     made effective.

          However, if the employee was a preference
     eligible employee immediately prior to his/her
     appointment, the provisions in 5 CFR Part 752,
     Subpart F apply.

4.   <u>Removal based on RIF</u>.  The same procedures apply to

- 14 -

probationary and non-probationary employees during a RIF.  See C.3., below.

C. <u>ACTIONS TAKEN AFTER COMPLETION OF PROBATIONARY PERIOD</u>.

1. <u>Removal for Performance</u>.  A career appointee may be removed from SES and assigned to a GS 15 position within the FBI at any time for less than fully successful executive performance based on a minimum of 120 days in the SES position and in accordance with the provisions of Chapter VI.  A career appointee who has completed the one year probationary period, but who is removed from the SES for executive performance, is guaranteed placement in a GS 15 position (see paragraph E of this chapter).  Any career appointee being removed for performance reasons will receive a written notice at least 30 calendar days before the effective date of removal which will include:

a.  The reason for the removal, including reference to the final rating(s) upon which the decision was based;

b.  The appointee's right to be placed in a position outside the SES, and information regarding the position to which the employee will be reassigned, if such decision has been made.  If that decision has not been made, the employee may be advised of the proposed assignment in a supplementary notice issued at least 10 days in advance of the effective date of the action;

c.  The appointee's right, if any, to a discontinued service retirement; and

d.  The appointee's right to request a reconsideration of the proposed action by the Director.  Such a request must be made at least 15 days prior to the effective date of the action.  For key executives, the response to a proposed action will be considered by the Director and ultimately the Deputy Attorney General who serves as the final approval authority.  For all other executives the

- 15 -

Director will serve as the final approval authority.
A removal for performance is <u>not</u> appealable to the
Merit Systems Protection Board.

2.   <u>Adverse Actions (Disciplinary Removal/Suspension)</u>.
Action may be taken against a member of the SES for
misconduct, neglect of duty, malfeasance, or failure
to accept a directed reassignment or to accompany a
position in a transfer of function.  This action may
include removal from the civil service or suspension
for more than 14 days.  Suspension in the SES may
include indefinite suspension where additional
investigation is necessary to resolve serious
disciplinary proceedings such as allegations of
criminal activity, revocation of security clearance,
or disruptive behavior which may have underlying
medical causes.

The Office of Professional Responsibility is the
entity within the FBI charged with processing adverse
actions for review by the Director.

a.  Entitlements.  Any career SES employee who has
completed the one-year probationary period, and any
probationary or limited term/limited emergency
appointee who was a preference eligible employee
immediately prior to appointment to the SES, against
whom such adverse action is taken, is entitled to:

(1)  At least 30 days advance written notice
stating specific reasons for proposed actions.
However, if there is reasonable cause to believe
the employee has committed a crime for which a
sentence of imprisonment can be imposed, the
advance notice may be curtailed to as little as
seven days.

(2)  A reasonable time, but not less than seven
days, to answer orally and in writing and to
furnish affidavits and other documentary
evidence in support of the answer;

(3)  Be represented by an attorney or other
representative; and

- 16 -

(4)   A written decision of final action and specific reasons therefor at the earliest practicable date.

(4)   If the employee wishes the FBI to consider any medical condition that may have affected the basis for the adverse action, he/she will be permitted to furnish medical documentation of the condition.

b.   Special circumstances.   If during the required 30 day advance notice period the employee's presence in the work place may pose a threat to the employee or others, result in loss of or damage to Government property, or otherwise jeopardize legitimate Government business, the following actions may be taken:

(1)   The employee may be assigned to duties where he/she is no longer a threat to safety, the FBI's mission or Government property;

(2)   The employee may be placed on leave with his/her consent;

(3)   The employee may be carried on appropriate leave if he/she is voluntarily absent for reasons not originating with the FBI;

(4)   The notice period may be curtailed, and the employee placed in a nonduty status with pay, where the FBI has reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment may be imposed; or

(5)   If none of the above alternatives are available, the employee may be placed in a paid nonduty status during all or part of the notice period.

c.   Documentation.   The notice of proposed adverse action will inform the employee of his/her right to

- 17 -

review the material that is relied on to support the
reasons for the action(s).  The FBI will not use
material that cannot be disclosed to that employee,
his/her representative, or designated physician to
support the reasons provided in the notice.

    d.  Determination.  In arriving at its written
decision, the FBI will consider only the reasons
specified in the notice of proposed action and will
consider the reply of the employee or his/her
representative as well as any medical documentation
which has been submitted.  Written notice of the
decision will be delivered at or before the time the
adverse action will be effective.  The Director has
final approval authority regarding removals and
adverse actions for the majority of SES employees,
excepting only those who are key executives for which
final approval authority resides with the Deputy
Attorney General.

3.  Removal as a result of RIF.  A RIF can take place in
the SES based upon elimination or modification of
positions due to a reorganization, lack of funds or
curtailment of work, or other factors.  Retention in
the SES will be based upon procedures consistent with
Title 5 U.S.C. §3595(a).

    An employee who is removed from the SES as the
result of a RIF will be reduced to a GS 15 and placed
in a non-SES position within the FBI.  The reduced
employee will be entitled to guaranteed placement in
accordance with paragraph E of this chapter, if he/she
has completed any required probationary period.  After
receiving the specific notice of a RIF decision, an
employee may appeal that decision in writing to the
Director.

D.  ACTIONS TAKEN AGAINST LIMITED TERM/EMERGENCY APPOINTEES.

1.  Limited term and limited emergency appointees may be
removed or suspended from the SES at any time at the
discretion of the Director, or Deputy Attorney
General for action(s) involving key executives.  All

such appointees must be given at least a one day written notice and have no rights to an administrative hearing or appeal.  Such employees do not have reinstatement or pay retention rights.  The notice provided shall, at a minimum,

 a.  State the basis for the action (including the act(s) of misconduct, neglect of duty, or malfeasance if those factors are involved); and

b.  Show the effective date of the action.

2.  Removal for disciplinary reasons of limited term and emergency appointees who held preference eligible status immediately prior to entering the SES and completed at least one year of continuous service in the FBI must be in accordance with the provisions in 5 CFR Part 752, Subpart F.

E.  <u>GUARANTEED PLACEMENT OUTSIDE THE SES</u>.

1.  <u>Coverage</u>.  The following information applies to career appointees, other than reemployed annuitants, who are removed from the SES for any of the following conditions:

a.  Removal during the probationary period for other than misconduct, neglect of duty, malfeasance, or other disciplinary reasons;

b.  Removal for less than Fully Successful performance if the appointee has completed or was not required to serve an SES probationary period; or

c.  Removal as a result of a RIF if the appointee has completed or was not required to serve a probationary period.

2.  <u>Placement</u>.  Any position to which a career appointee under 1.b.c.d. is placed must be a continuing position at no less than GS 15 for which he/she meets qualifications requirements.  No career appointee may be placed in a non-SES position which would cause the

separation or reduction in grade of any other employee.

An employee who has not completed the FBI SES probationary period is entitled to be placed in a position of tenure equivalent to the FBI appointment held at the time of entry into the SES, unless the FBI does not have a position of equivalent tenure for which the appointee meets the qualifications requirements or if the appointee is willing to accept a position having different tenure.

Employees who do not complete the FBI SES probationary period and did not hold an FBI career appointment for which they completed a probationary period prior to entering the FBI SES have no placement rights.

3.  Pay.  Any career SES appointee placed in a GS 15 position, as a result of other than an adverse action, is entitled to receive *basic pay* at the highest rate of:

a.  The basic pay rate in effect for the non-SES position in which placed;

b.  The basic payable salary in effect for the position held by the appointee before entering SES; or

c.  The basic pay rate in effect for the SES career appointee immediately before placement in the non-SES civil service position.

[Note:  While basic pay is preserved, other components           of salary, to include locality and availability pay, will be limited by the pay caps applicable for the General Schedule.]

SES appointees subject to guaranteed placement prior to completing the FBI SES probationary period will receive the highest previous rate for the position to which they are returned.

4.  Disciplinary removal.  An appointee removed for

- 20 -

disciplinary reasons has no entitlement to placement in a position outside the SES, and may not be moved directly from an SES position to a non-SES position. Following the removal action, however, a separate action may be taken to appoint the individual to a position outside the SES for which he/she is eligible.  In such case, all requirements, including suitability requirements, pertinent to the new appointment must be met.

F.   <u>GUARANTEED ANNUITY</u>.  A member of the SES who is removed from SES for less than fully successful executive performance may request a discontinued service annuity if the employee has completed 25 years of service or is at least 50 years of age and has completed 20 years of service.

CHAPTER VI.   PERFORMANCE APPRAISAL

This chapter incorporates the DOJ Performance Management System Plan covering all senior executives.

DEPARTMENT OF JUSTICE
PERFORMANCE MANAGEMENT SYSTEM PLAN
FOR SENIOR EXECUTIVE SERVICE EMPLOYEES

SECTION 1

GENERAL INFORMATION

1.   <u>PURPOSE</u>.  This framework establishes the Department of Justice (DOJ or Department) Performance Management System (PMS) for Senior Executive Service (SES) employees[1] throughout the Department and also includes the Federal Bureau of Investigation and the Drug Enforcement Administration.

2.   <u>SCOPE</u>.  This model plan provides general guidelines for component heads to use in developing performance management plans for their organizations.  Component heads may adopt this plan or develop their own to tailor their PMS and approach for managing SES performance to fit their unique and changing mission, operational needs, and organizational climates.  Component performance plans must be consistent with law and regulation as listed in paragraph 4 of this plan.

3.   <u>POLICY</u>.  The Department recognizes the importance of integrating its performance appraisal, pay, and incentive award programs into the management of its human resources to promote efficient and effective attainment of its mission, program objectives, and strategic planning initiatives.  The Department's PMS for SES members is a management tool to motivate high levels of achievement, and for holding senior executives accountable for their individual and organizational performance by:

a.   Expecting excellence in senior executive performance;

---

[1] SES employees are those covered by 5 U.S.C. chapter 31, subchapter II.

    b.    Linking performance management with the results-oriented goals of the Government Performance and Results Act (GPRA) of 1993;

    c.    Setting and communicating individual and organizational goals and expectations;

    d.    Systematically appraising senior executive performance using measures that balance organizational results with customer, employee, or other perspectives; and

    e.    Using performance results as a basis for pay, awards, development, retention, removal, and other personnel decisions.

4. <u>AUTHORITIES</u>.  The PMS is established in accordance with the following authorities:

a.    <u>Performance Appraisal</u> - 5 U.S.C. chapter 43, subchapter II (Performance Appraisal in the Senior Executive Service); 5 CFR Part 430, Subpart C (Managing Senior Executive Performance).

b.    <u>Superior Accomplishment Awards</u> - 5 U.S.C. chapter 45 (Incentive Awards); 5 CFR Part 451, Subpart A (Agency Awards).

c.    <u>Records of Employee Performance</u> - 5 CFR Part 293, Subpart D (Employee Performance File System Records).

5. <u>RESPONSIBILITIES</u>.

    a.    The Attorney General (AG) responsibilities:

        (1)    Managing the SES and assessing the performance for individual SES members.  Setting and adjusting SES rates of pay for individual senior executives.  The AG has delegated certain responsibilities as appropriate.

    b.    The Deputy Attorney General (DAG) responsibilities:

        (1)    Directs that the annual assessment of the Department's performance be conducted, issues performance evaluation guidelines, certifies that the results of the appraisal process make meaningful distinctions, and assures pay

adjustments and levels of pay accurately reflect and recognize performance and/or contribution to the Department's performance.

(2) Approving performance appraisals for noncareer and key career executives except for SES members in the Office of the Inspector General (OIG);

(3) Approving Superior Accomplishment Awards (Special Act or Service) for all noncareer and career executives except for SES members in the OIG; and

(4) Approving bonus recommendations for all career executives except for SES members in the OIG.

(5) Serving as Chair of the Department's executive Performance Review Board (PRB) established under 5 CFR 430.310.

b. Assistant Attorney General for Administration (AAG/A) responsibilities:

(1) Providing assessment of the component's or Department's performance overall as well as each of its major program and functional areas, such as reports of the Department's Government Performance and Results Act (GPRA) goals and other program performance measures and indicators, and evaluation measures and indicators, and evaluation guidelines based, in part, upon those assessments to senior employee rating and reviewing officials and PRB members.

(6) Certifying that (1)the senior employee appraisal process makes meaningful distinctions based on relative performance; (2)the results of that process take into account as appropriate the Department's assessment of its performance against program performance measures; and (3)pay adjustments, cash awards, and levels of pay accurately reflect and recognize both individual and organizational performance.

c. Authorized Department Official, (i.e., Component Head) with the exception of the Office of the Inspector General (OIG) responsibilities:

(1)     Setting and adjusting SES rates of pay for individual senior executives within the scope of the Department's Delegation of Authority.

(2)     Appointing SES members within their respective organizations to serve on PRBs;

(3)     Approving performance appraisals for all career SES members within their respective organizations except for certain key career executives[2]; and

(3)     Approving performance based reassignments for all career SES members within their respective organizations except for certain key career executives.

d. The Inspector General responsibilities:

(1)     Appointing SES members to serve on the OIG PRB;

(2)     Approving performance appraisals for all career executives in the OIG;

(3)     Approving Superior Accomplishment Awards (Special Act or Service) for all career executives in the OIG; and

(4)     Approving bonus recommendations for all career executives in the OIG.

6.   DEFINITIONS

---

Key career executive positions at the FBI include:

a. the positions of Executive Assistant Director, Assistant Director, Assistant Director in Charge, or General Counsel, and

b. positions which report to the Director.

a.      <u>Annual Summary Rating</u>.  The overall rating level that an appointing authority assigns at the end of the appraisal period after considering a Performance Review Board's recommendations.  This is the official rating.

b.      <u>Appointing Authority</u>.  The Attorney General, Department component heads, or other Department official with authority to make appointments in the SES.

c.      <u>Authorized Department Official</u>. The Attorney General or an official who is authorized to act for the Attorney General in the matter concerned.  The Department's Inspector General is the Authorized Department Official for senior executive positions in the Office of the Inspector General consistent with the requirements in section 3(a) of the Inspector General Act of 1978.

d.      <u>Award or Superior Accomplishment Award</u>.  A monetary or non-monetary award for a special contribution resulting in tangible benefits or savings and/or intangible benefits to the government.

e.      <u>Balanced Measures</u>.  An approach to performance measurement that balances organizational results with the perspectives of distinct groups, including customers and employees.

f.      <u>Component</u>.  An Office, Board, Division, or Bureau, i.e., the first major subdivision of the Department that is separately organized and clearly distinguished from other components in work functions and operation.

g.      <u>Component Head</u>.  The official who directs the administration and operations of each Office, Board, Division, and Bureau of the Department of Justice.  However, for the purposes of this plan, the component head for the United States Attorneys and United States Trustees shall be the Director of the Executive Office for United States Attorneys and the Director of the Executive Office for United States Trustees, respectively.

h.      <u>Critical Element</u>.  A key component of an executive's work consisting of one or more duties and responsibilities that contributes to organizational goals and results and is so important that unsatisfactory performance of the element would make the executive's overall job performance unsatisfactory.

i.        <u>Higher Level Review Official</u>.  The official who is responsible for providing a higher level review of an SES member's initial appraisal. (Typically the second level supervisor)  Note:  The reviewer must hold a higher level position than the rating official, but not necessarily be in the same organization.

j.        <u>Intangible Benefits</u>.  Benefits to the Government which cannot be measured in terms of dollar savings.

k.        <u>Initial Summary Rating</u>.  The overall rating level the supervisor derives from appraising the senior executive's performance during the appraisal period and forwards to the Performance Review Board.

l.        <u>Interim Rating</u>.  An interim rating is issued to appraise employee performance during details, or during assignment to any Department PMS position in which the employee served for the minimum appraisal period during the annual appraisal cycle.  The weight given to interim ratings in deriving the employee's annual summary rating should be proportionate to their share of the appraisal cycle.

m.        <u>Minimum Appraisal Period</u>.  The minimum amount of time in which an employee must have served in a position under written performance elements and requirements in order for an appraisal to be rendered concerning such performance.  The Department's minimum appraisal period is 90 days. Component heads may establish longer minimum appraisal periods.

n.        <u>Nonmonetary Award</u>.  A medal, certificate, plaque, citation, badge, or other similar item that is given to honor an individual.

o.        <u>Performance</u>.  The accomplishment of the work described in the senior executive's performance plan.

p.        <u>Performance Appraisal</u>.  The review and evaluation of a senior executive's performance against performance elements and requirements.

q.        <u>Performance Award</u>.  Performance awards, commonly called "bonuses," recognize and reward excellence of career SES appointees or a former career SES appointee who has elected to retain bonus eligibility under 5 U.S.C. § 3392(c).  Specific due dates and instructions for recommending executives for bonuses will be issued by the Deputy Attorney General for each appraisal cycle.

r.        <u>Performance Management System</u>.  The framework of
policies and practices established under 5 U.S.C. chapter 43,
subchapter II and 5 CFR Part 430, Subpart C, for planning,
monitoring, developing, evaluating, and rewarding both
individual and organizational performance and for using
resulting performance information in making personnel
decisions.

s.        <u>Performance Requirement</u>.  A statement of the
performance expected for a critical element or other element.
A performance requirement may include, but is not limited to,
factors such as quality, quantity, timeliness, and manner of
performance.

t.        <u>Performance Review Board</u>.  Performance Review Boards
are established under the provisions of 5 U.S.C.
        § 4314(c) and shall review and evaluate the initial
        summary rating of a senior executive's performance by
        his/her supervisor, along with any response by the senior
        executive or higher level review determination (if
        appropriate), and make recommendations to the appointing
        authority relative to the performance of the senior
        executive.  The appointing authority shall issue
        appraisals/ratings only after considering the
        recommendations of a Performance Review Board.  The
        Performance Review Board must also make recommendations
        concerning individual performance awards (bonuses) to the
        Deputy Attorney General.

u.        <u>Progress Review</u>.  The review of the senior
executive's progress in meeting the performance requirements.
A progress review is not a performance rating.  Regulations
require at least one progress review midway through the
appraisal period.

v.        <u>Rating Levels</u>.  The plan describes five rating
levels:  Outstanding, Excellent, Fully Successful, Minimally
Satisfactory, and Unsatisfactory.

w.        <u>Rating Official</u>.  The individual who is responsible
for communicating to the employee the elements of his or her
position, establishing performance requirements for those
elements, appraising performance, and assigning the initial
performance rating.  Normally this is the employee's immediate
supervisor.

x.       <u>Relative Performance</u>.  The performance of a senior employee with respect to the performance of other senior employees, including their contribution to Department performance, where appropriate, as determined by the application of a certified appraisal system.

y.       <u>Senior Executive Performance Work Plan</u>.  The written summary of work the senior executive is expected to accomplish during the appraisal period and the requirements against which performance will be evaluated.  The plan addresses all critical elements and any other performance elements established for the senior executive.

z.       <u>Senior Executive Resources Board</u>.  The Senior Executive Resources Board (SERB) provides overall management and control of the Department's SES.  The members of the SERB are the Deputy Attorney General, Associate Attorney General, and Assistant Attorney General for Administration.  The Assistant Director for Leadership Effectiveness, Personnel Staff, Justice Management Division serves as the Executive Secretary for the SERB.  Additional members may be added at the direction of the Attorney General.

aa.      <u>Special Act or Service</u>.  A contribution or accomplishment in the public interest which is:  (l) a nonrecurring contribution either within or outside of job responsibilities, (2) a scientific achievement, or (3) an act of heroism.

bb.      <u>Strategic Planning Initiatives</u>.  Department or component strategic plans, annual performance plans, organizational workplans, and other related initiatives.

7.  <u>TRAINING</u>.  Component heads are required to make effective use of available resources (e.g., technology, learning, information, etc.) to maximize SES employee performance.  It is essential that training and information on the PMS be provided to SES employees and their managers and supervisors to assure effective administration of the PMS.  Topics covered should include the Department's PMS for SES members, performance appraisal, and pay incentive programs (i.e., pay for performance and superior accomplishment awards).

8.  <u>CERTIFICATION CRITERIA</u>.  The plan incorporates the following criteria designed to guide the Department in the strategic use of the performance appraisal system to support and attain the Department's mission, goals, and objectives.

a.    <u>Alignment</u> - performance expectations for individual senior employees are linked to or derived from, the Department's mission, strategic goals, program/policy objectives, and/or annual performance plans.

b.    <u>Consultation</u> - Performance expectations are based on senior employee involvement and input that are communicated at the beginning of the appraisal period and appropriate times thereafter.

c.    <u>Results</u> - Performance expectations for senior employees apply to their respective areas of responsibility; reflect expected Department or Component performance; clearly describe performance that is measurable, demonstrable, or observable; and focus on tangible outputs, outcomes, milestones or other deliverables;

d.    <u>Balance</u> - Performance expectations for senior employees  include appropriate measures or indicators of results; customer/stakeholder feedback; quality, quantity, timeliness, and cost effectiveness, as applicable; and competencies or behaviors that contribute to and are necessary to distinguish outstanding performance;

e.    <u>Assessment and Guidelines</u> - The Attorney General, or the AAG/A, provides assessment of the performance overall as well as each of its major program and functional areas, such as reports of the Department's GPRA goals and other program performance measures and indicators, and evaluation measures and indicators, and evaluation guidelines based, in part, upon those assessments to senior employee rating and reviewing officials and PRB members.  These assessments and guidelines are provided at the conclusion of the appraisal period but before individual senior employee performance ratings are recommended, so that they may serve as a basis for individual performance evaluations as appropriate.

f.    <u>Oversight</u>  - Rigorous oversight of the appraisal process is provided by the Attorney General or AAG/A who certifies that:

(1)    The senior employee appraisal process makes meaningful distinctions based on relative performance;

(2)    The results of that process take into account, as appropriate, the Department's assessment of its performance against program performance measures; and

(3)   Pay adjustments, cash awards, and levels of pay based on the results of the appraisal process accurately reflect and recognize individual performance and/or contribution to the Department's performance.

The assessment may be any official or formal organizational assessment done for the purpose of determining how well the Department and its individual components have performed during the appraisal period.

2.      Accountability - Senior employee ratings (as well as subordinates' ratings for those with supervisory responsibilities) that appropriately reflect the employee's performance expectations and are clearly linked to organizational mission, GPRA strategic goals, or other program or policy objectives.

3.      Performance Differentiation - The Department is using a five-level rating system for senior employees which includes a rating level that reflects outstanding performance.  The appraisal process results in meaningful distinctions in relative performance based on senior employees' actual performance against rigorous performance expectations and their relative contributions to Department performance.

4.      Pay Differentiation - Individual pay rates and pay adjustments, as well as their overall distribution, reflect meaningful distinctions among executives based on their relative contribution to Department's performance; The Department's highest performing senior employees must receive the largest pay adjustments and/or highest pay levels (including both basic pay and performance awards), particularly above the rate for Level III of the Executive Schedule.

9.   PROGRAM EVALUATION.

a.      Reports on the Department's PMS activities will be provided to the Executive Secretary of the Department's SERB by the component heads.  These reports will be used to monitor performance management activities such as rating distributions, award payouts, regulatory compliance, etc.

b.      PRBs will be responsible for providing recommendations to the appropriate appointing authority on the SES performance management system.

c.      Based on this data, recommendations or required corrective actions will be developed as appropriate for implementation in the organization.

SECTION 2

PERFORMANCE APPRAISAL FOR THE SENIOR EXECUTIVE SERVICE

10.  <u>PERFORMANCE APPRAISAL PREMISES AND PRINCIPLES</u>.  The
Department has adopted the following set of premises and
principles to guide performance management within the SES.

a.       The Department of Justice workforce is comprised of
dedicated, hardworking public servants who strive to deliver
value to the American taxpayer.

b.       The Department will pursue a workforce that is fully
    representative of the diversity of the American people.

c.       The Department will pursue a workforce that is
engaged and involved in designing a results-oriented,
performance-based, and customer-focused system that delivers
value.

d.       Department of Justice federal leaders and managers
create a climate for excellence by communicating their vision,
values, and expectations clearly, and by:

    (1)       creating an environment in which every employee
        may excel, regardless of race, color, religion, sex,
        age, national origin, disability, sexual preference,
        or parental status, and which is free of sexual
        harassment;

    (2)       creating an environment for continual learning;

    (3)       working in partnership with employees to ensure
        they reach their full potential;

    (4)       recognizing and rewarding excellence with
        financial incentives and non-financial incentives,
        such as increased flexibility to do jobs, more
        meaningful work, and achieving a sense of
        accomplishment; and

    (2)       taking timely action to both reward and
        correct performance appropriately, ensuring that
        excellence is the standard for all.

e.       Individuals are personally responsible for being
results-oriented, performance-based, and customer-focused.

f.          Leaders, managers, and employees have a mutual obligation
to provide value and excellence.  This requires each individual
to be continually challenged to perform their best.  Taking
action to improve the performance of each individual and
providing fair and accurate appraisals is imperative to
achieving our mission.

g.          The Department of Justice is committed to pursuing
effective performance management.

11.  <u>PERFORMANCE APPRAISAL PERIOD</u>.

a.          The performance appraisal period for senior
executives is July 1 - June 30 of the following year, unless
advanced or delayed by appropriate authority.

b.          If a senior executive fails to complete the
established minimum appraisal period because of reassignments,
change in supervisor, or other legitimate management reasons,
his/her appraisal period should be extended for the minimum
appraisal period at which time a rating of record should be
prepared.

c.          The established performance appraisal period may be
terminated at any time after the minimum appraisal period is
completed, if there is adequate basis on which to appraise and
rate the senior executive's performance.

d.          An appraisal or rating of an SES career appointee may
not be made within 120 days after the beginning of a new
Presidential Administration.

<u>PERFORMANCE WORK PLANS</u>.

a.          Each senior executive must have a performance work
plan (PWP) that describes the individual and organizational
expectations for the appraisal period and sets the requirements
against which performance will be evaluated.
b.          Rating officials must develop PWPs in consultation
with senior executives and communicate (in writing) the plans
to the executives on or before the beginning of the appraisal
period.

c.          The PWP for career and noncareer SES members will be
                              -34-
written in a standard/generic format with at least three
critical elements to ensure alignment with Departmental goals.

a.          Elements must reflect individual and organizational performance.  They can be either capsulized aspects of the most important duties and responsibilities associated with the SES position or specific projects or tasks which can be logically inferred from the duties and responsibilities cited in the employee's position description.  Accomplishment of organizational objectives MUST be included in PWPs by incorporating objectives, goals, program plans, work plans, or by other similar means that account for program results.

b.          Before or at the outset of the rating period (usually within 30 days) or, in the case of an executive entering a new position, as soon as possible (but no later than 30 days) after entry into the position, a PWP must be either developed or reviewed for continued appropriateness and the elements and performance requirements covered by the PWP communicated to the executive.

c.          Final authority for establishing the elements and requirements rests with the rating official.  However, the PWP can be modified, as appropriate, at any time during the appraisal period to reflect changing priorities or shifts in workload.  Component guidance may require a second level review of SES PWPs.

12.   <u>PERFORMANCE REQUIREMENTS</u>.

a.          Like critical elements, performance requirements must be consistent with the goals and performance expectations in the Department's strategic planning initiatives.

b.          Performance requirements MUST be written at the Fully Successful level.  They may also be written at additional levels consistent with component level guidance.  These requirements are the standards against which the senior executive's performance will be appraised.

c.          The absence of a written performance requirement at a given level does not preclude the assignment of a rating at that level.

13.   <u>REVIEW OF PERFORMANCE WORK PLANS</u>.

-35-

a.          A higher level review of all SES ratings to ensure
appropriate levels of quality and difficulty of performance
requirements within each SES PWP and in SES PWPs across the
component is encouraged, but not required.

b.          The SERB will ensure that the review process across the
Department is fairly managed.  These reviews may be made during
the appraisal process or at such other times as deemed
appropriate.

14.  PROGRESS REVIEWS.

a.          Component heads and supervisors must monitor each
senior executive's performance during the appraisal period and
provide ongoing, timely, and honest feedback to the senior
executive on progress in accomplishing the performance elements
and requirements described in the performance plan to sustain
and reinforce expected performance.

b.          A progress review shall be held for each SES member
at least once during the appraisal period.  At a minimum,
senior executives must be informed about how well they are
performing including their level of performance by comparison
with the elements and performance requirements established for
their positions.

c.          Supervisors must provide advice and assistance to
senior executives on how to improve their performance.

d.          If either the rating official or the executive feels
that modifications to previously established elements or
performance requirements are warranted because of unforeseen
shifts in workload or changes in priorities, he/she must be
prepared to discuss possible alternatives.  If the rating
official feels that performance in one or more of the
established elements is lacking, he/she should discuss possible
corrective actions as well as the ramifications of unimproved
performance.  The progress review should not be viewed solely
as a discussion of performance weaknesses or deficiencies, but
also serve as a forum for encouraging employees whose
performance is Fully Successful or Excellent to strive for even
greater achievement.

e.        If modifications in either elements or requirements are warranted, they must be discussed and recorded during the review process.  At the end of the review session, both the rating official and the executive should share a common understanding of where the employee stands in relationship to his/her PWP, what is expected of the employee through the remainder of the rating period, and what actions, if any will be initiated as a result of performance to date.  The executive and the rating official each sign and keep a copy of the PWP, acknowledging that the progress review was conducted and reflecting any modifications in the elements or requirements.

15.  APPRAISING PERFORMANCE.

a.        If an SES member has served in his/her current position under written performance elements and requirements for the established minimum appraisal period when the performance appraisal cycle ends (June 30 of each year), and there is adequate basis on which to rate the senior executive, the employee must be rated as soon as practical after the end of the appraisal period on the appropriate performance appraisal record.

b.        Each executive must be appraised on each element of the PWP, unless the employee has had insufficient opportunity to demonstrate performance on the element.  On the rating date or as soon as possible thereafter, the rating official should be prepared to compare the overall achievements of the employee with respect to each element and performance requirement based on personal knowledge and a summary of accomplishments provided by the rated executive.

c.        The rating official should then briefly summarize in narrative fashion the achievements of the executive against each performance requirement established for the elements. Rating officials have the option of summarizing in a narrative fashion the achievements of the executive against the performance requirements established for the job elements, or to provide narrative comments only for rating levels to be assigned that are not described in the executive's PWP.

d.        Appraisals of senior executive performance must be based on both individual and organizational performance, taking into account such factors as:

-37-

(1)          Results achieved in accordance with the goals of the Government Performance and Results Act of 1993;

(2)            Customer satisfaction;

(1)          Employee perspectives;

(2)          The effectiveness, productivity, and performance quality of the employees for whom the senior executive is responsible; and

(3)          Meeting equal employment opportunity, and diversity goals and complying with the merit system principles set forth under section 2301 of title 5, United States Code.

e.       The supervisor will assign individual element ratings as follows:

(1)          <u>Outstanding</u>. Performance on an individual critical element of the job which clearly demonstrates a level of achievement which exceeds to an exceptional degree the performance requirements for Fully Successful. Performance at this level so exceeds what is normally required of the job that it is deserving of special recognition.

(2)            <u>Excellent</u>. Performance on an individual critical element which markedly exceeds the performance requirements for Fully Successful.

(1)          <u>Fully Successful</u>. Performance on an individual critical element of the job which completely meets, or exceeds to a limited degree, the performance requirements for Fully Successful established at the beginning of, or modified during, the rating period.

(2)          <u>Minimally Satisfactory</u>. Performance on an individual critical element of the job which just falls short of the performance requirements for Fully Successful. Performance at this level shows significant deficiencies that require correction.

-38-

(3)      <u>Unsatisfactory</u>.  Performance on an individual critical element of the job which is substantially below the performance requirements for Fully Successful.  Usually the employee's performance will show serious deficiencies in terms of quantity, quality, timeliness of work, or manner of performance.

16.  <u>INITIAL SUMMARY RATING</u>.

a.      The supervisor must develop an initial summary rating of the senior executive's performance, in writing, and share that rating with the senior executive.

b.      The supervisor will assign an initial summary rating level as follows:

(1)  <u>Outstanding</u>.  A majority of the critical elements must be rated Outstanding; no critical element may be rated less than Excellent.

(2)  <u>Excellent</u>.  A majority of the critical elements must be rated Excellent or higher and no critical element may be rated less than Fully Successful.

(3)  <u>Fully Successful</u>.  A majority of the critical elements must be rated Fully Successful or higher; no more than one critical element may be rated Minimally Satisfactory.

(4)  <u>Minimally Satisfactory</u>.  More than one critical element must be rated Minimally Satisfactory and no critical element may be rated Unsatisfactory.

(5)  <u>Unsatisfactory</u>.  Performance in one or more critical elements must be rated Unsatisfactory.

17.  <u>RIGHT TO RESPOND IN WRITING AND REQUEST HIGHER LEVEL REVIEW</u>.

a.      Senior executives in the Department are entitled to one higher level review, unless the component provides for more than one review level.

b.        At the time of rating, the rating official shall advise the senior executive of his or her right to respond in writing to any aspect of the rating and to have that rating (along with the written response, if any) reviewed at a higher executive level, i.e., higher organizational level.

c.        If the senior executive chooses to exercise his or her right to respond or seek higher level review, such response must be made to the rating official within 7 calendar days.

18.  HIGHER LEVEL REVIEW.

a.        After any initial discussions are completed and the written response, if any, to the initial summary rating is received, the rating official will, upon request of the executive, forward the completed rating form to the appropriate reviewing official (normally the next higher official in the supervisory chain) for the higher level review.

b.        The higher level official cannot change the supervisor's initial summary rating, but may recommend a different rating to the PRB and the appropriate appointing authority.

c.        Both the executive and the rating official must be given copies of the reviewer's findings and recommendations.

d.        After the higher level review is completed, the appraisal package (the rating and accompanying documentation, including the higher level review's comments and recommendation, if any) will be forwarded to a PRB for review.

19.  PERFORMANCE REVIEW BOARD REVIEW.

a.        The PRB must review the rating and comments from the senior executive and the higher level official, if any, and make recommendations to the appropriate appointing authority.

b.        The PRB will consider the material forwarded and make a written recommendation to the appropriate appointing authority regarding the annual summary rating to be assigned as well as any related matters such as performance pay, basic pay rate adjustments, performance awards, reassignments, and

-40-

removals. (See Appendix 1 for the Establishment and Functions of the Department of Justice SES PRBs.)

20.  ANNUAL SUMMARY RATING.

a.       The appropriate appointing authority will make the final decision in writing regarding the annual summary rating to be assigned and related personnel recommendations after considering any PRB recommendations.

b.       The annual summary rating approved by the appropriate appointing authority is final and becomes the executive's official rating.  Senior executive performance appraisals and ratings are not appealable.

c.       One copy of the approved rating form must be provided to the employee; another copy may be retained by the rating official; and a third copy will be forwarded to the servicing personnel office for retention in the Official Personnel File (OPF) or Employee Performance File (EPF).

d.       Personnel actions resulting from the annual summary rating must be promptly initiated by the rating official.


21.  DETAILS AND JOB CHANGES.

a.       Position Changes Within the Department.  When an executive occupies two or more positions in the Department during the appraisal cycle (in which the executive served under written elements and performance requirements for the minimum appraisal period) an interim rating must be prepared.  This interim rating, along with the PWP upon which it was based, must be forwarded to the new supervisor for inclusion in the rating of record due at the end of the appraisal cycle.  The weight given to this interim rating should generally be proportionate to its share of the appraisal period.  When such interim ratings are used to develop a rating of record, both the interim ratings and the PWPs upon which they are based must be attached to the final annual summary rating.

b.       Temporary Assignments Within the Department.  If the senior executive is detailed or temporarily reassigned WITHIN the Department and if the assignment is expected to last the

-41-

minimum appraisal period or longer, written critical elements
and performance requirements MUST be provided to the employee
and an interim rating must be prepared based on the performance
during the assignment.  The weight given to this interim rating
in preparing the rating of record should generally be
proportionate to its share of the appraisal period.

c.      Temporary Assignments Outside the Department.  If the
employee is temporarily assigned OUTSIDE the Department,
reasonable efforts must be made to obtain appraisal information
from the outside organization which will be considered in
deriving the employee's next summary rating.  Accordingly:

> (1)   If the employee has served in the Department for the
> minimum appraisal period, the employee must be rated.
> The rating of record shall take into account
> appraisal information obtained from the borrowing
> organization; or

> (2)   If the employee has not served IN the Department for
> the minimum appraisal period, but has served for the
> minimum appraisal period in a position OUTSIDE the
> Department, reasonable efforts must be made to
> prepare a rating of record using appraisal
> information obtained from the borrowing organization.

d.      Transfers From Other Agencies.  If an employee
transfers from another agency into the Department during the
appraisal cycle, any interim or summary rating(s) which are
forwarded from the losing agency (and which encompass periods
of time included in the Department's appraisal cycle) MUST be
considered in deriving the rating of record.  Weight given to
these ratings should be proportionate to their share of the
appraisal cycle.

e.      Transfers To Other Agencies.  If an executive
transfers to a new agency at any time during the appraisal
period, a summary (interim) rating must be prepared by the
employee's supervisor and provided to the gaining agency.

22.  PROCESSING AND RETENTION OF PERFORMANCE RATINGS.

a.        Control dates established by Departmental guidance must be adhered to in order to ensure the proper review of ratings by PRBs.

b.        All performance related records must be maintained in either the OPF or EPF for no less than 5 years from the date the rating is issued.

c.        The performance appraisals for the most recent 5 years and the most recent PWP and interim rating will be forwarded as part of the OPF to a gaining agency upon an employee's transfer. (Note: The FBI is exempt from the requirement to release performance plans and appraisals.)

23.   <u>VALIDITY OF RATINGS</u>.

a.        Each final annual summary rating issued within a component of the Department (or other agency which is subject to the performance appraisal requirements of 5 U.S.C. chapter 43, subchapter II) supersedes the previous one and is considered to be the valid rating of record.

b.        When a new SES employee enters on duty with the Department at any time during the appraisal period, the most recent annual summary rating rendered in the former agency will be recognized as the official rating of record until it is superseded by a rating of record issued under this plan.

SECTION 3

ACTIONS BASED ON LESS THAN FULLY SUCCESSFUL PERFORMANCE

24.  GENERAL.

a.       5 CFR § 430.306(a) requires that supervisors must advise and assist employees in improving their performance.

b.       Any SES member receiving an Unsatisfactory rating shall be reassigned or transferred within the SES or removed from the SES.  However, any SES member who receives two Unsatisfactory ratings within any period of 5 consecutive years shall be removed from the SES.

c.       A Minimally Satisfactory rating permits a year's period to show improvement.  However, any SES member who receives two less than Fully Successful ratings within 3 consecutive years shall be removed from the SES.

d.       When an employee's performance falls below Fully Successful (whether or not a formal appraisal has been given), good personnel practice suggests that this determination should trigger prompt action on the part of the supervisor to bring the employee's performance up to an acceptable level or, if warranted in the case when an employee is Unsatisfactory, to begin steps leading to the placement of the employee in a job he or she can successfully perform.  Exactly what steps should be taken depends on the circumstances of the case.

e.       Formal training, on-the-job training, counseling, and closer supervision are common approaches to below par performance problems.  An organization has no justification, however, for continuing to retain an employee whose performance is Unsatisfactory after attempts to improve the employee's performance or place him or her in another position fail.

25.  PROCEDURES.  Since performance appraisal is a continuous process, the following procedures shall be followed at any time during the year after the minimum appraisal period has been completed when a supervisor concludes that the employee's performance in one or more critical elements is below Fully Successful.

-44-

a.  <u>Discussion</u>.  There must be a discussion between the
    supervisor and the employee for the purpose of:

    (1)    Advising the employee of specific shortcomings
    between observed performance in the critical
    element(s) under scrutiny and the performance
    requirements associated with the particular
    element(s); and

    (2)    Providing the employee with a full opportunity
    to explain the observed deficiencies.

b.      <u>Determine Appropriate Action</u>.

    (1)    If the supervisor feels that the matter has been
    resolved to his or her satisfaction during the course
    of the discussion, the supervisor need not take
    further formal action at this point.

    (2)    If the supervisor of the senior executive feels
    that further action is necessary, he or she shall
    complete an appraisal and record his or her
    assessments on the rating form.  The supervisor shall
    advise the senior executive of his or her right to
    respond in writing within 7 calendar days and of the
    action he or she is recommending with respect to the
    proposed Minimally Satisfactory or Unsatisfactory
    rating.  The supervisor should also advise the senior
    executive of the review levels required before the
    rating and proposed action become final, i.e., a
    possible review by a higher level official, the PRB,
    and, ultimately, the Deputy Attorney General or
    component head as appropriate.  The senior executive
    should also be advised that the rating and proposed
    action do not become final until the Deputy Attorney
    General's/component head's decision is made.

    (3)    If a first-time rating of Minimally Satisfactory
    is approved by the Deputy Attorney General/component
    head, it does not carry with it any legally mandated
    personnel action.  However, as a practical matter,
    such a rating should carry with it a recommendation
    reflecting the marginal performance it represents.
    Recommended actions that the rating official may wish
    to consider include:  (1) a reduction in SES pay

(limited by OPM regulation to one level within a 12-month period); (2) additional training designed to correct the deficient performance; or (3) reassignment to another SES position.

(4)        A career appointee may be reassigned to another SES position only if the appointee receives at least 15 days advance written notice for a reassignment within the commuting area and at least 60 days advance written notice for a reassignment outside the commuting area.  The appointee may voluntarily waive the above notices.  Such waivers must be in writing.

(5)        If the Unsatisfactory rating is approved by the Deputy Attorney General/component head, the senior executive must be reassigned to a different position within the SES or removed from the SES in accordance with the provisions of 5 CFR Part 359, Subpart E.

(i)        A career appointee may be removed from the SES at any time prior to the completion of the probationary period required under 5 U.S.C. § 3393.  However, a career appointee who has completed the probationary period and whose removal from the SES for less than Fully Successful executive performance is contemplated is entitled, to a 30-day advance written notice of such action (see 5 CFR § 359.502).  In addition, upon request, the career appointee shall be granted an informal hearing before an official designated by the Merit Systems Protection Board at least 15 days before the effective date of the removal.  At this time, the career appointee may appear and present arguments.  Such hearing shall not give the career appointee the right to initiate an action under 5 U.S.C. § 7701 (formal appellate procedure) nor need the removal action be delayed as a result of the granting of such hearing.  A career appointee who is removed from the SES for less than Fully Successful performance is entitled to be placed in a civil service position (other than an SES position) in accordance with the provisions of

-46-

5 U.S.C. § 3594.

(i)        The removal of an SES career appointee for performance reasons is subject to the
120-day moratorium, except for a removal based on an unsatisfactory rating given before the appointment of a new agency head or noncareer supervisor that initiated the action.  This includes an optional removal based on one unsatisfactory rating, a mandatory removal based on two unsatisfactory ratings in 5 years, and a mandatory removal based on two less than fully successful ratings in 3 years when the second rating is an unsatisfactory rating.

(6)        SES noncareer and limited appointees may be reassigned or removed from the SES at any time.  Such SES members are not entitled to the procedures described in subparagraphs (b)(5) i-ii above.  Regulations require that noncareer and limited appointees receive notice in writing before the effective date of a removal (See 5 CFR Part 359, Subpart I.).

APPENDIX TO DOJ SES PMS PLAN

ESTABLISHMENT AND FUNCTIONS OF
THE DEPARTMENT OF JUSTICE
SES PERFORMANCE REVIEW BOARDS

1.   <u>GENERAL</u>.  Under the provisions of 5 U.S.C. § 4314(c), each
agency is required to establish one or more SES Performance
Review Boards (PRBs) which shall review and evaluate the
initial appraisal of a senior executive's performance by
his/her supervisor, along with any response by the senior
executive or higher level review determination (if
appropriate), and make recommendations to the appointing
authority relative to the performance of the senior executive.
The appointing authority shall issue appraisals/ratings only
after considering the recommendations of a PRB.

2.   <u>ESTABLISHMENT OF BOARDS</u>.  Component heads will jointly
establish one or more PRBs to review ratings and bonus
recommendations of the executives within their appointing
authority.  There will be a sufficient number of PRBs
established to review, evaluate, and make recommendations with
respect to the individual performance of the senior executives
in the component.

3.   <u>MEMBERSHIP</u>.

a.       Each PRB is composed of three or more members.  The
size of the PRB will depend upon the number of actions to be
reviewed.

b.       The Department establishes a standing PRB member list
comprised from Department career SES appointees  Each year, the
Assistant Attorney General for Administration shall provide
updates to the list of new Department SES members that are
eligible to serve on standing PRBs.  A PRB member's name will
be published in the Federal Register before their service
begins.  Those individuals on the list can serve until they
have left the SES.  Executives from Federal Bureau of
Investigation and the Drug Enforcement Administration are
exempt from publishing their executive's names for security
reasons, but can serve as members on any Department of Justice
PRB.

-48-

c.       The components have flexibility in determining who from the list will serve on their PRB(s)(including the chairperson).

d.       Members of PRBs are appointed in such a manner as to assure consistency, stability, and objectivity in reviewing performance appraisals.

e.       Members of each PRB shall:

   (1)   Be career SES members (or equivalent);

   (2)   Have current Fully Successful performance ratings or above;

   (3)   Consistently apply Department appraisal systems effectively in their respective organizations; and

   (4)   Possess a thorough knowledge and understanding of the performance appraisal system and other pertinent aspects of the SES.

f.       Appointees will not serve on the PRB reviewing the actions of their own organizations.  Accordingly, the supervisory official who made or reviewed the initial appraisal of an executive may not act as a member of the PRB considering the appraisal of that subordinate executive.  In addition, a subordinate to an executive whose performance appraisal is under review may not act as a member of the PRB with respect to his or her superior.  No senior executive may review his/her own rating.  A member of a PRB in conflict with the above will remove himself or herself from action or consideration by the PRB and such action/consideration will be accomplished by other PRB members.

4.   FUNCTIONS.

a.       Each PRB shall review and evaluate the initial appraisal and rating by the rating official of the senior executive, the senior executive's written response (if any), and the written comments of the reviewing official (if such written comments were made), and any accompanying recommendations for awards, bonuses, proposed corrective

-49-

actions, or the like.  In its consideration of a case, a PRB may call witnesses if it feels added clarification is needed. Each PRB shall consider equity and consistency among the ratings of executives as well as the accuracy, fairness, and effectiveness of individual ratings.  A primary goal of the review is to ensure that final ratings above the Fully Successful are awarded only to senior executives whose performance fully justifies them.  A PRB may review any aspect of the appraisal process, including the critical elements and performance requirements set for a senior executive prior to or as adjusted (modified) during the performance appraisal period.

b.          PRB recommendations shall be in writing and shall be submitted under signature of the PRB chairperson, along with the proposed rating and accompanying documentation, to the appropriate appointing authority.  Where the PRB does not concur with the initial appraisal or rating, or the record shows employee or reviewing official disagreement with the rating official's actions, the PRB's recommendations shall be supported by a written justification.  No appraisal or rating is final until the appropriate appointing authority takes final action.  As has been indicated earlier, a PRB is also responsible for reviewing or making recommendations to the appointing authority concerning individual performance actions such as bonuses for career SES appointees or pay increases for career and noncareer SES appointees.

CHAPTER VII.  PAY FOR THE SENIOR EXECUTIVE SERVICE

A.    SALARY LEVELS for the SES are established as a function of
      personal qualifications, individual and organizational
      performance, and the duties and responsibilities of the
      position held by the senior executive, and DOJ guidance.  The
      SES pay band has a floor equal to 120% of GS 15, step-1, and a
      ceiling of Executive Level II.  During periods when the DOJ
      pay-for-performance system is not certified by the Office of
      Personnel Management and Office of Management and Budget, the
      payband will be limited to Executive Level III.  Decisions
      affecting pay levels for those members in key executive
      positions must be confirmed by the Deputy Attorney General
      prior to being made final.

B.    SETTING INDIVIDUAL PAY RATES.

      1.    Initial Salary Level.  The Director will establish an
            initial salary which reflects up to a 10% increase over
            pre-SES salary.  In instances where a greater increase is
            warranted, the Director may seek a waiver from the Deputy
            Attorney General.

      2.    Pay Adjustments.  The DOJ will conduct a salary review of
            all senior executives on at least an annual basis.
            Recommendations for merit based salary increases will be
            provided by the Director.

            a.    Lowering a senior executive's pay.  A senior
                  executive's pay may be lowered as the result of poor
                  performance or conduct.

            b.    Pay Computation.  To compute the hourly rate of an
                  SES  employee, divide the annual rate by 2,087 (5 CFR
                  534.404).

            c.    Premium Pay.  SES members are excluded from all forms
                  of premium pay, including overtime, Sunday and
                  holiday pay rates, night, standby, irregular and
                  hazardous duty differential, and compensatory time
                  off (5 U.S.C 5541(2)(xvii).

C.    AWARDS.

1.  <u>Presidential Ranks</u>.  SES career appointees may be awarded one of two Presidential ranks for sustained superior performance, Distinguished Rank or Meritorious Rank.  The Director will receive recommendations for candidates for these ranks from the Deputy Director and other high ranking heads of offices and divisions.  The recommendations take into account an individual's performance over a period of three years in the SES.  The Director will forward recommendations to the Attorney General who will make final nominations to the President.

The President may award to any SES career appointee nominated by the Attorney General the rank of:

    a.  Distinguished Executive for sustained extraordinary accomplishment, or

    b.  Meritorious Executive for sustained accomplishment.

An SES appointee who receives a rank of either Distinguished or Meritorious Executive shall not be entitled to receive that same award during the following four years.  A Distinguished rank award winner cannot receive a performance award in the same calendar year.

A career SES member awarded a Distinguished or Meritorious rank will receive a monetary award consistent with the appropriate rank (5 U.S.C. §4507), currently 20% of basic pay for Meritorious and 35% of basic pay for Distinguished.  A Distinguished rank may be awarded to no more than one percent of the total number of SES members.  A Meritorious rank may be awarded to no more than five percent of the total number of SES members.

2.  <u>Performance Awards (Bonuses)</u> may be paid to a limited number of executives who demonstrate exceptional performance in attaining organizational goals. Eligibility for performance bonuses is determined during the annual performance appraisal process.  All career SES members rated at least Fully Successful in all critical elements may be recommended by the Director to the Deputy Attorney General for a performance award of between five and 20 percent of the senior executive's basic pay. Funding for performance awards granted in any fiscal year

is based on three to ten percent of the aggregate salary of career appointees as of the end of the preceding fiscal year.  A career SES member may receive only one such award for performance in a single year.

3.   <u>Incentive Awards</u>.  Incentive awards, including time-off, significant accomplishment, and on-the-spot awards recognize contributions resulting in tangible or intangible benefits or savings.  These awards are designed to improve government efficiency, economy and effectiveness by motivating and rewarding employees for efforts which benefit the government.  Senior executives are normally exempt from monetary Incentive Awards in lieu of their eligibility to receive performance awards as described in item #2, above.  Executives remain eligible for recognition under the Suggestion, Director's Awards, and Attorney General's Awards Programs.

a.   Basis.  Awards may be based on contributions such as suggestions, inventions, or special acts or service in the public interest connected with or related to official employment.

b.   Form of recognition.  An incentive award may be either monetary or non-monetary.  A non-monetary award could be in the form of a medal, certificate, plaque, citation, badge, or other similar item that has an award or honor connotation.

c.   Approval.  Recommendations for executive Incentive Awards must be submitted in writing to the SES Board.  Such recommendation must clearly identify the unusual nature of the accomplishment and why the achievement qualifies for recognition outside of the performance award process.  In addition to approval by the SES Board, final concurrence/approval of the Director and the Department of Justice is also required.

D.   <u>LIMITATION ON SALARY</u>.  The aggregate amount of pay that a member of the SES may receive during any calendar year may not exceed the salary limitation described in 5 U.S.C. §5307.  Included in the determination of aggregate pay are:  base pay; locality adjustment; recruitment and relocation bonuses; retention allowance; performance awards and rank awards.  Any

-53-

excess amount (excluding retention pay) will be paid in a lump
sum amount at the start of the next calendar year.  Monies
received from bonuses, rank or performance awards are not
included in computing an SES member's retirement pay.

CHAPTER VIII.   EXECUTIVE DEVELOPMENT

A.   <u>EXECUTIVE DEVELOPMENT PROGRAM</u>.  Employees will be provided progressive developmental opportunities prior to, and following, entry into the SES.  The Director will ensure that funding and staffing, sufficient to support this policy, are available.

    1.   <u>Program Management</u>.  Overall management of the SES development program will be provided by the SES Board.

    2.   <u>Monitoring</u>.  The SES Board will have responsibility for establishing an executive development program.  The program for SES incumbents will encompass developmental experiences which, through continuing short-term opportunities and periodic involvement in more extended programs, will:

        a.  Help meet organizational needs for managerial improvements and increased productivity;

        b.  Help the individual keep up to date in professional, technical, managerial, social, and political areas;

        c.  Meet the need for intellectual and personal growth; and

        d.  Include provisions for executive sabbaticals for carefully selected members.  Members of SES will be responsible for continuing to develop their executive knowledge, skills, and abilities and for fostering the development of their subordinates.

B.   <u>SABBATICALS</u>.  A sabbatical may be granted to any career appointee in the SES by the Director/Deputy Attorney General.  Sabbaticals are granted to permit a career appointee to engage in study or uncompensated work experience which will contribute to the individual's development and effectiveness.  A sabbatical may not exceed 11 months nor may it result in the loss of, or reduction in, pay or leave to which the career appointee is otherwise entitled.  The Director or designee may authorize travel expenses and per diem allowances if these are deemed essential for the study or experience.

1.   Eligibility.  A sabbatical may not be granted to any career appointee:

   a.   More than once in any ten year period;

   b.   Unless the appointee has completed seven years of service:

      (1)  In one or more positions in the SES;

      (2)  In one or more positions in the civil service, the level of duties and responsibilities of which are equivalent to those of SES positions; or

      (3)  In any combination of such positions except that not less than two of the seven years of service must be in SES; and

   c.   If the appointee is eligible for voluntary retirement with a right to an immediate annuity.

2.   Service Agreement.  The career appointee accepting a sabbatical must agree to serve in the civil service upon the completion of the sabbatical for a period of two consecutive years.  If the career appointee fails to meet this agreement (except for sufficient reason as determined by the Director/Deputy Attorney General or designee who granted the sabbatical), the appointee shall be liable to the United States for all expenses, including salary, of the sabbatical.

3.   Employment Provisions.  While an individual is on a sabbatical:

   a.   The individual continues to receive his or her SES salary;

   b.   The individual continues to earn leave and is charged for any leave taken; and

   c.   The individual remains subject to the SES performance appraisal system, but should be evaluated against standards appropriate to activities involved in the

-56-

sabbatical.  It would not be appropriate to award a bonus
for performance during the sabbatical.

CHAPTER IX.  MISCELLANEOUS PROVISIONS

A.    TRAVEL EXPENSES of SES candidates may be paid by the FBI
      pursuant to the applicable provisions of the MAOP if these
      expenses are incurred incident to pre-employment interviews
      requested by the FBI.

B.    ANNUAL LEAVE accrued by individuals after entry into the SES is
      subject to a limit of 720 hours in accordance with Title 5
      U.S.C., Section 6304 as amended by Public Law 103-356,
      10/13/94.  Any employee who became a member of the FBI SES
      prior to 10/13/94 may be entitled to an adjusted annual leave
      ceiling and should contact the PRAU or the Employee Benefits
      Unit.

           Effective October 31, 2004, the Workforce Flexibility Act
      of 2004 provides that all members of the FBI SES will accrue
      eight hours of annual leave per pay period regardless of their
      total number of years of federal service.

           When an employee moves into an SES appointment, any
           annual leave at the time of the move in excess of the
           employee's maximum accumulation level (normally 240 hours)
      is subject to forfeiture if not used by the beginning of the
      leave year immediately following entry into the SES, unless
      restored under conditions provided by 5 U.S.C. Section 6304(a)-
      (d).  The annual leave which is not subject to forfeiture and
      the annual leave which accrues while serving in the SES are
      carried forward into subsequent leave years up to the limit of
      720 hours.  Once the 720 hour limit is reached, any additional
      annual leave accrued must be used by the end of the leave year
      in which accumulated or forfeited, unless restored under
      conditions provided by 5 U.S.C., Section 6304(a)-(d).

           If an individual moves from an SES appointment to a non-
      SES appointment, any annual leave in excess of that which
      otherwise would be permitted remains to the individual's
      credit.  Subsequently, if the individual uses more annual leave
      in a leave year than earned, the balance carried forward will
      become the new leave ceiling if it is still above the maximum
      limit permitted for the position.

-58-

C.   <u>LAST MOVE HOME EXPENSES</u>.  Individuals transferred to accept a position in the SES or SES members who are transferred in the interest of the Government from one official station to another for permanent duty during or after five years preceding retirement eligibility are authorized travel, transportation and moving benefits as provided in 5 U.S.C. Sec 5724(a)(3).

D.   <u>FURLOUGHS</u>.

   1.   <u>Definition</u>.  "Furlough" means placing a career appointee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reason.

   2.   <u>Short furloughs</u>.

        a.  A short furlough is one that will last for 30 consecutive calendar days or less (or for 22 workdays or less if the furlough does not cover consecutive days) within a 12-month period beginning on the first day of the furlough.

        b.  Competitive procedures are not required in selecting the SES appointees to be furloughed for short periods. Selections will be made for sound management reasons.

   3.   <u>Long furloughs</u>.

        a.  A long furlough is one that will last for more than 30 consecutive calendar days (or for more than 22 workdays if the furlough does not cover consecutive days) within a 12-month period beginning on the first day of the furlough. The furlough may not exceed one year.

        b.  An SES appointee may be furloughed for more than 30 days only when the FBI intends to recall the appointee to a duty status with pay within one year from the beginning of the furlough.  A furlough shall not be used when the executive will have to be separated through a RIF action when the furlough terminates.

        c.  Competitive procedures, developed for competition for job retention under a RIF, will be used in selecting SES career appointees for long furloughs of more than 30 days.

4.   <u>Notice requirements</u>.

a.   The career appointee will be given written notice at least 30 calendar days before the effective date of the start of the furlough.   The notice will include the following information:

(1)   The reasons for the decision to take the furlough action.

(2)   The expected duration and the effective dates of the furlough.

(3)   The basis for selecting the appointee for furlough when some, but not all, SES appointees in a given organizational unit are being furloughed.

(4)   The place where the appointee may inspect the regulations and records pertinent to the action.

5.   <u>Appeal Rights</u>.   An employee may appeal a furlough decision by writing to the Director within 20 days of the effective date of the furlough.

E.   <u>TRAINING</u>.   Career appointees will be informed of the goals and objectives of the FBI SES.   Additional training opportunities may be recommended by an executive's immediate superiors, the SES Board, or self initiated by the executive with approval of an immediate superior.

F.   <u>REPORTS AND EVALUATION</u>.   The FBI will report to the Department of Justice such information, and take such corrective action, as the Attorney General may direct as a result of his/her oversight responsibilities.

G.   <u>EXTENSION BEYOND MANDATORY RETIREMENT</u>.   The Attorney General has delegated to the Director of the FBI, the authority to grant exceptions to mandatory retirement for FBI law enforcement members of the SES.   These exceptions may be granted to a limited number of individuals -- no more than 20 individuals at any given time -- whose continued service would be in the public interest and promote the mission of the FBI.

-60-

Any SES member who is a Special Agent and desires to extend his/her Bureau Service, must:

1.    Approximately 18 months prior to mandatory retire-ment, make known their intentions in a memorandum to the Director.  The memorandum must specify to what age or date the requestor desires to continue service, not to exceed age 60.  Any employee considering this option is encouraged to discuss this matter fully with the Director.

2.    The Director may furnish the senior executive's request along with his/her observations to the SES Board.

3.    The SES Board will review all pertinent information and provide the Director with a recommendation at which time the Director will serve as the final authority         for approving/denying the request.

H.    RECORDS.  Unless otherwise instructed by FBIHQ, all performance related documentation including, but not limited to, information maintained in any performance file or folder other than the employee's official FBIHQ or Field Office Personnel File must be maintained for a period of one calendar year beyond the date the associated summary/initial/final rating is issued.

# EXHIBIT 3

**DELETION CODES**

G.      THE LAW ENFORCEMENT PRIVILEGE - THE DISCLOSURE OF THIS INFORMATION
        COULD CAUSE HARM TO, IMPEDE, IMPAIR, OR HINDER AN INVESTIGATION AND/OR
        AN INVESTIGATIVE INTEREST OF THE FBI.

P.      THE PRIVACY ACT OF 1974, 5 U.S.C. § 552a

P-1     INFORMATION, THE DISCLOSURE OF WHICH WOULD BE AN UNWARRANTED
        INVASION OF PERSONAL PRIVACY.

S.      PERSONAL IDENTIFYING INFORMATION RELATED TO LAW ENFORCEMENT
        PERSONNEL AND THEIR FAMILY MEMBERS, THE DISCLOSURE OF WHICH IS
        ROUTINELY GUARDED FOR SECURITY REASONS.

**Page 1**

```
 1                IN RE ANDREW G. MCCABE

 2                    ORAL RESPONSE

 3

 4

 5       Hearing in the Matter of Andrew G. McCabe

 6                   Washington, DC,

 7               Thursday, March 15, 2018

 8                     1:15 p.m.

 9

10

11    Job No: J1641144

12    Pages: 1-202

13    Reported by:      (P)

14

15

16

17

18

19

20

21
```

**Page 2**

```
 1    ORAL ARGUMENT IN THE MATTER OF Andrew G. McCabe

 2    Held at the Law Offices of:

 3

 4        THE UNITED STATES DEPARTMENT OF JUSTICE

 5        U.S. DEPARTMENT OF JUSTICE

 6        950 Pennsylvania Avenue, NW

 7        Room 4133

 8        Washington, DC 20530

 9        (202) 514-3452

10

11

12        Pursuant to Notice, before      (P)     , a

13    Professional Reporter and Notary Public in and for the

14    District of Columbia.

15

16

17

18

19

20

21
```

**Page 3**

```
 1    APPEARANCES:

 2        ON BEHALF OF THE U.S. DEPARTMENT OF JUSTICE:

 3        ARTHUR E. GARY, ESQUIRE and

 4        SCOTT N. SCHOOLS, ESQUIRE

 5        United States Department of Justice, Office

 6        Justice Management Division

 7        145 N Street, NE

 8        Suite 8E.500

 9        Washington, DC 20530

10        Telephone: (202)514-3452

11        E-mail: arthur.gary@usdoj.gov

12

13        ON BEHALF OF THE ANDREW G. MCCABE:

14        MICHAEL R BROMWICH, ESQUIRE and

15        ERIC B. BRUCE, ESQUIRE

16        Robbins, Russell, Englert, Orseck,

17        Untereiner & SAUBER LLP

18        1919 M Street, NW

19        Washington, DC 20036

20        Telephone: (202) 775-4521

21        E-mail: mbromwich@robbinsrussell.com
```

**Page 4**

```
 1                    CONTENTS

 2    ORAL STATEMENT OF Andrew G. McCabe        Page

 3        By Mr. Bromwich                         5

 4        By Mr. Schools

 5

 6

 7

 8

 9    Exhibits                                 Page

10    (No exhibits marked)

11

12

13

14

15

16

17

18

19

20

21
```



Page 13

1   So when I graduated, they were under the
2   hiring freeze. So I went into private practice for
3   three years first in Camden, New Jersey, and then in
4   Newark, New Jersey. I was trying to cover both of the
5   worst cities in New Jersey in the span of two jobs.
6       And then, of course, in 1996 I got my letter
7   to go to Quantico. Summer of '96.
8       So after Quantico, first office of
9   assignment was New York City where I did organized
10  crime.work. I was on the Russian organized crime
11  squad as street agent for seven years, and then I
12  became the supervisor of that squad. I was promoted
13  as a stationary supervisor for the next three years. I
14  was in -- so I spent the first half of my career
15  essentially doing criminal work in New York.
16      In 2006, I had been on the desk for
17  three years. The five-and-out policy has been kind of
18  -- was being fairly strictly enforced. I was still
19  only about halfway through my career, so I knew that
20  at some point I would have to come down to
21  headquarters. So I convinced my wonderful wife, who

Page 14

1   is a physician -- she was in a private practice, a
2   pediatrician in Westchester County -- to kind of walk
3   away from her practice, and we took a transfer down to
4   headquarters to do counterterrorism work.
5       I had not ever worked CT except for, of
6   course, 911 when everybody in New York worked CT. But
7   I felt like, if I was coming to headquarters, I had
8   done -- I had had such a great criminal experience in
9   the field that it was time to learn something
10  different.
11      So I came down as a unit chief. I was
12  assigned out at (S) as -- in the counterterrorism
13  division doing ITOS-1, International Terrorism
14  Operations Section 1. I worked for Mike Hunbach
15  there. And after a few months he asked me to put in
16  for the assistant section chief job, which I did. And
17  then I stayed there at ITOS-1 for about two years as
18  the assistant section chief.
19      In 2008 -- forwards the end of 2008, I went
20  over to the Washington field office as an ASAC as CT
21  there. And then a year later Director Mueller asked

Page 15

1   me to come back to headquarters to serve as the first
2   director of the High-Value Detainee Interrogation
3   Group.
4       So it was the very beginning of the Obama
5   administration, and they had with an executive order
6   made some changes in the way that we were going to
7   approach issues around interrogating terrorists and
8   suspected terrorists, mostly internationally but also
9   here in the United States.
10      So he called for the creation of this group
11  and asked Director Mueller to stand it up and kind of
12  build it and run it and, you know, pay for it, take
13  care of care and feeding and that sort of thing. And
14  so Director Mueller asked me to do that.
15      So I did that for two years. Built the HIG
16  into what it is now. And then at the end of that
17  time, I actually tried to go back to the Washington
18  field officer as an SAC. And Jim McJunkin, who was
19  also a former boss of mine, was the ADIC at the time.
20  He was the assistant director in charge, ADIC, at the
21  Washington field office. I felt pretty confident of

Page 16

1   my chances of getting back to work for Jim.
2       And, actually, the day before the career
3   board, Mark Giuliano, who is the assistant director of
4   the counterterrorism division, he asked me to put that
5   aside and come back to the CT Division as a deputy
6   assistant director.
7       So I did that.
8       I served in that position for a year, when
9   the assistant director at the time, a man named Ralph
10  Bolter, B-O-L-T-E-R, retired and Director Mueller
11  asked me to serve as assistant director for CT. I did
12  that for a year.
13      And then Stephanie Douglas, D-O-U-G-L-A-S,
14  who was the executive assistant director for national
15  security, she retired and director -- then new
16  Director Comey asked me to serve as the EAD for
17  national security.
18      So that was in 2013. I did that for a year.
19      And then in the fall of 2014, then Deputy
20  Director Mark Giuliano, G-I-U-L-I-A-N-O, asked me
21  to -- if I would be interested in going back to the

Page 17

1   Washington field office. There had been a lot of
2   tours at headquarters, and I was very much looking
3   forward to getting back to the field. And he asked if
4   I would be interested in serving as the assistant
5   director in charge of the Washington field office,
6   which I did in -- towards the end of 2014.
7       MR. SCHOOLS: I can't ever keep this
8   straight. The ADIC is the WFO boss there?
9       THE WITNESS: Yes.
10      So New York, WFO, and Los Angeles all have
11  ADICs. And as ADIC at WFO you have five SACs that
12  report to you. One SAC for each division.
13  Essentially you've got a CT, CD, criminal, admin, and
14  intelligence.
15      So I went over very happy to go back to WFO
16  after a long time away, and that's where I was
17  essentially when things started in the beginning of
18  2015.
19      MR. BROMWICH: Why don't you walk us through
20  just your other promotions, and then we'll go back to
21  the events of your wife's campaign.

Page 18

1       THE WITNESS: Okay. So I stayed at WFO
2   until September of 2015. And at that time Mark, who
3   was still Deputy Director, Kevin Perkins, who was the
4   ADD was leaving to go back to the SAC at Baltimore,
5   and so Mark asked me to come back and serve in the ADD
6   role with the intention of having me kind of work
7   closely with him knowing that he was going to retire.
8       (Off-the-record discussion.)
9       THE WITNESS: In any case, Mark asked me to
10  come back to be the ADD, and he and Director Comey had
11  discussed that Mark was likely going to retire in the
12  beginning of 2016, and that I would then be well
13  positioned to follow Mark as deputy director. And
14  that's, in fact, what happened.
15      In February of 2016, Mark retired and
16  Director Comey asked me to serve as deputy director.
17      MR. SCHOOLS: The ADD is the number three?
18      THE WITNESS: Yes.
19  BY MR. BROMWICH:
20      Q. So you mentioned a moment ago your wife's
21  run for office in Virginia. And, obviously, articles

Page 19

1   about that serve as kind of the core of the events
2   that flow from that and were the subject of the
3   investigation.
4       So could you tell Mr. Schools and Mr. Gary
5   sort of how that came about?
6       A. Sure.
7       So just to go back a little bit. So -- and
8   these are facts that we did not know at the time, but
9   we have come to know them now.
10      Q. The background for her running for office?
11      A. That's right. And I say "we", I mean my
12  wife Jill and I. We've now kind of pieced this
13  together.
14      But in any case, in February of 2014, Jill
15  is a pediatrician. When we came to -- we moved here
16  back in 2006, we live out in Louden County, and she
17  decided -- because I promised her we would only be
18  here for 18 months. I did not live up to that
19  promise.
20      She took a job in the ER of our local
21  hospital, because thinking we might not be here for

Page 20

1   very long. So she still works there. She run the
2   pediatric ER in Louden Innova Hospital, and she has a
3   number of other responsibilities, but that's her main
4   job.
5       So, in any case, she was at the hospital on
6   this day in 2014 when, you know, unknown to her and
7   not having anything to do with her, then Governor
8   McAuliffe, who had made expanding Medicaid in the
9   state of Virginia one of his kind of principle issues.
10  So he was doing a tour of, like, local hospitals to
11  draw attention to that issue. He came to her hospital
12  and did some -- you know, looked around and saw the
13  ER, what have you.
14      At some point during that visit a reporter
15  for the Washington Post just happened to see my wife
16  there working. He asked her, "What are your thoughts
17  on expanding -- do you think it's important to expand
18  Medicaid coverage?"
19      Jill is not a political person. Was not
20  involved or interested or any even following politics
21  in any meaningful way, but she is a healthcare

Case 1:19-cv-02399-RDM   Document 23-4   Filed 11/01/19   Page 6 of 51

# ANDREW G. MCCABE
## IN RE ANDREW G. MCCABE ORAL RESPONSE

March 15, 2018
21–24

**Page 21**

1  provider. And, so, medical, you know, insurance
2  coverage for children, specifically in families is
3  very important to her. An issue she feels deeply
4  about.
5      So she answered the question, and the next
6  day in the article about McAuliffe's visit to the
7  hospital it included a quote from her as a physician
8  who worked at the hospital.
9      Q. On the Medicaid issue?
10     A. Right. She said something about how
11 important it was that children have access to medical
12 attention and having Medicaid helped that. And I
13 don't know if you follow Virginia politics, but it's
14 been a combative issue in Virginia that they did not
15 expand Medicaid in the way that other states did, I
16 guess, under Obamacare. So that's where that comes
17 from.
18     So she thought it was funny that she had
19 been quoted in the paper. We had no idea at the time
20 what it would lead to.
21     So a year later, in the beginning of 2015,

**Page 22**

1  thinking about the 2015 elections, state elections,
2  the -- the Governor and his team decided to try to
3  turn the balance in the state senate. They would
4  target five state senate races around Virginia, and
5  one of them was going to be our district, which is
6  District 13.
7      They also decided that their best candidate
8  in District 13 would be someone who was supportive of
9  Medicaid expansion. And, so, should -- that person
10 should be a doctor and would preferably be a female.
11     They had no idea who would fill that, you
12 know, that set of requirements.
13     Ralph Northam was given the kind of tasking
14 to find someone to fit that billing. He passed it on
15 to his chief of staff, whose name I cannot remember.
16     He had no idea who he was looking for. He
17 spoke to some people in the medical society of
18 Virginia, which my wife was not even a member of.
19 They didn't know my wife, but one of them did remember
20 this article that had appeared a year before and said
21 there was a doctor who was quoted in this article in

**Page 23**

1  Louden County, in that area. So they went back,
2  looked up the article and realized it was her, and
3  Northam's -- he was lieutenant governor at the time.
4  His chief of staff called Jill at the end of
5  February 2015 out of the blue.
6      We were stunned and didn't really take it
7  seriously at first but thereafter she had a number of
8  contact from other people, local, you know, state
9  level politicians who tried to convince her to run.
10     So that's how they found her.
11     As I said, she was not -- she was almost
12 exclusively motivated by the healthcare issue. That
13 was what she believed in. She voted for Democrats in
14 the past, for Republicans in the past. She does not
15 consider herself to be a partisan or even, like, a
16 politically, you know, focused person in any way.
17     So she decided to do it. Well -- we started
18 the process of trying to decide should she do it,
19 could she do it, how would it affect her career, our
20 family, her schedules, all that kind of stuff.
21     In about the second week of March, we -- she

**Page 24**

1  and I both -- she had been asked by a Virginia state
2  politician -- I think maybe Don McEachin or somebody
3  else, if she would come down to Richmond to meet other
4  state senators and delegates on a Saturday morning.
5      And so we were working through this thing
6  together trying to figure out if she should do it and
7  if she could do it. So we both went down to meet at
8  this -- they were having some prearranged conference
9  where a bunch of them would be, and so we went down
10 there to meet some people. When we got there, they
11 told us that Governor McAuliffe would like to talk to
12 her. So they took us over to the governor's residence
13 in Richmond where we met with McAuliffe.
14     Q. Had you ever met him before?
15     A. No, I had never.
16     Q. Had she ever met with before?
17     A. No, she hadn't.
18     Q. All right.
19     A. We met with him for 45 minutes to an hour,
20 and then we went back to the conference where he gave
21 a speech. And then we got in our car and left.



800.211.DEPO (3376)
EsquireSolutions.com

Page 25

1 A few days later -- well, after that, I
2 really dug into the issue on the work side with the
3 Bureau to try to figure out if there were reasons that
4 we shouldn't get involved in this, to include finding
5 out how the director felt about it.
6        Do you want me to through that?
7    Q. Yes.
8    A. Yes.
9        So, that Monday I talked to Mark Giuliano,
10 who was the deputy director. He was supportive of the
11 idea and recommended that I kind of pulse the director
12 on it and see what this thoughts were.
13       I talked to my lawyer at the Washington
14 field office who was a -- still is -- a woman named
15    (P)    . I spoke to Jim Baker and Pat Kelly.
16 And I talked to Chuck Rosenberg and laid the whole
17 thing out for him. Chuck Rosenberg was the director
18 -- Director Comey's chief of staff at the time, and he
19 said that he would have a conversation with the
20 director about it and let me know.
21       He got back to me a few hours later and said

Page 26

1 the director has no problem with it, it's fine, thinks
2 it's great, you know, good for her sort of thing.
3        So the next thing I met with Pat Kelly, Jim
4 Baker,    (P)   , and I -- we all met in Pat
5 Kelly's office to talk about the conflict issues,
6 Hatch Act, all the things that I should be thinking
7 about to insure that her political activity had no
8 impact on what I was doing at the FBI.
9        So Pat gave me some guidance on both the
10 Hatch Act, which was -- it was kind of two buckets.
11 There was Hatch Act on the one side, which is, like,
12 things I should be careful about during the campaign,
13 and on the other side was conflict of interest issues.
14 And most of those wouldn't really come into effect
15 until after she was elected if, in fact, she was
16 elected. That's how Pat explained it to me. But we
17 kind of walked through what some of those things were.
18       So, as a result of those meetings, I made a
19 couple of decisions. One, I decided and communicated
20 to Jill and anybody else that I would have no role in
21 the campaign, even though the Hatch Act permits the

Page 27

1 spouse of a candidate to do some things. It's very
2 specific, right? It's like you can put a sticker on
3 your car, but you can't drive the car into the
4 government parking lot.
5        You can go to an event, but you can't stand
6 in the receiving line. Things like that.
7        Rather than try to navigate those
8 intricacies I just said I won't do anything. I won't
9 attend an event, I won't, you know, knock on doors,
10 encourage people to vote. Certainly not raise money,
11 anything like that.
12       So that was the first thing.
13       Secondly on more of the kind of conflict of
14 interest side, I was concerned about kind of the
15 appearance of cases that -- one case in particular at
16 the Washington field office    (G)
17           I was concerned about that case. And any
18 other kind of Virginia state political corruption
19 cases that might create an appearance of a problem
20 there.
21       So I did two things. One, I had been

Page 28

1 speaking to Adam Lee, who at that time and still to
2 this day is the Special Agent in Charge or SAC of the
3 Richmond field office.
4        So I called Adam and I talked to him about
5                     (G)
6
7        So rather than just kind of recusing myself
8 from it, I had the case moved to a different field
9 office.
10       Which he was perfectly happy to do.
11       And then I set up a system with my lawyer at
12 WFO,  (P) , whereby she and the SAC for criminal
13 division at WFO would basically review all the
14 Virginia cases, determine what I should or should not
15 be recused from, and that they would kind of triage
16 all incoming political corruption cases to determine
17 whether or not I should be included or recused from
18 those cases, and then to kind of communicate that down
19 to the criminal folks who were working them.
20       And so that's how we did it. Essentially I
21 was out of anything involving Virginia state politics.



Page 29
1 Those things were all handled by the SAC for the
2 criminal division and the appropriate, you know,
3 people at headquarters.
4       So that's kind of the – that's how it
5 started.
6       And she ran and then lost in the first week
7 of November of 2015.  She lost her election.  I had
8 gone back to headquarters a few weeks prior to that as
9 the ADD where, as you know, Scott, I was doing the
10 role previously held by Dave Bowders, the kind of
11 beans and bullets, you know, admin facilities, all
12 that stuff.
13      Q.  And all the way up through the election, the
14 safeguards and prophylactics and things that you
15 wouldn't get involved in, that remained the same?
16 That didn't change?
17      A.  That's right.
18      Q.  From the time you made those decisions and
19 announced those decision up through the election?
20      A.  That's right.  That's right.
21      I later learned – and this is much later –

Page 31
1 attacks, mass shootings, you know, you name it.  And
2 at that time what we refer to as the mid-year review
3 – and that was the code name for the investigation.
4 We called it mid year, but it was the investigation of
5 Hillary Clinton's use of a private e-mail server and
6 specifically whether or not she had -- she had stored
7 or had classified material on that private server.
8       And so, that case was worked differently
9 than many other cases.  We thought about it as what
10 historically is referred to as a Headquarter's
11 Special.  So it wasn't assigned to a field office.
12 The investigative work was done by a small team at
13 headquarters.
14      A lot of different reasons for that, a lot
15 of precedent for doing that.  In very sensitive,
16 high-profile cases we've done that for many, many
17 years.
18      MR. SCHOOLS:  That happened before you
19 became deputy director.
20      THE WITNESS:  That's right.  I didn't have
21 anything to do with those decisions.

Page 30
1 that after I left WFO they moved the case back.  But I
2 didn't even know it happened.
3      Q.  You said before in walking us through the
4 chronology of your promotions in the FBI, that you
5 were promoted to deputy director in February of 2016?
6      A.  That's right.
7      Q.  And that was three months after the election
8 was over.
9      At that time, did you assume supervisory
10 responsibilities or some supervisory responsibilities
11 over the Clinton e-mail investigation?
12      A.  I did.  I did.
13      Q.  Why don't you describe what those were?
14      A.  So as the deputy director, you are
15 responsible for all investigative and intelligence
16 collection activity in the FBI.
17      Obviously, I don't know, a hundred thousand
18 open cases at any given time.  You're down in the
19 weeds on all of them or even the majority of them, but
20 there are a few that are of such importance they come
21 to your attention on a regular basis.  Terrorist

Page 32
1      By the time I got there in February, there
2 was already a small team in place that had been
3 working the mid-year case since, I want to say, July
4 of 2015.  I think they opened it in July of 2015.
5 BY MR. BROMWICH:
6      Q.  The ADD wouldn't have had any role in that?
7      A.  Not really.  Not really.  I mean, in the
8 meetings that I -- Dave Bowditch, B-O-W-D-I-T-C-H, was
9 present at many of the meetings.  He was present,
10 especially more towards the end for some of the, like,
11 leadership meetings on mid-year.  But, you know,
12 technically, the counterintelligence division was
13 working it and they reported up to the EAD for
14 national security, which for most of that time was
15 Michael Steinbach, S-T-E-I-N-B-A-C-H.  And Mike
16 reported to me, directly to me as deputy director.
17      So we met on the mid-year case.  We had like
18 an official update with the director at least once a
19 week.
20      I met with members of the team and members
21 of my staff who were involved in it all the time.  I



Page 33

1 mean, as issues would come up, they would come into my
2 office and we would talk about things.
3      You know I wasn't calling the shots on who
4 gets interviewed when and what questions get asked,
5 but I was more in kind of a top level supervisory and
6 oversight role. So when they were having particular
7 problems and issues, they would come to me and discuss
8 them, things like that.
9      Q. Can you back up to one part of your wife's
10 campaign pain?
11      She apparently got a sizable contribution
12 from a political action committee that — either
13 controlled or had some involvement. I don't know if
14 it was one contribution from two PACs or one
15 contribution from one PAC or what it was.
16      A. Yes.
17      Q. What did you know about that and when did
18 you know it?     .
19      A. I did not know about that when it happened.
20      I learned of those two contributions in
21 October of 2016 when the first Wall Street Journal

Page 34

1 article came out.
2      I did — obviously I knew that McAuliffe had
3 encouraged her to run. I knew that McAuliffe had
4 appeared at two or three events during the course of
5 her campaign, so I knew he was supporting her. I
6 mean, that was clear. But I had no knowledge of the
7 finances or how much money he had contributed or
8 anything like that. I was intentionally staying out
9 of all that.
10      Q. I know the campaign was over, because the
11 election was in November of 2015, but did you guys do
12 any additional sort of ethical — ethics analysis
13 regarding any conflicts that may have lingered from
14 your wife's campaign when you became deputy director?
15      A. Not just kind of as a prophylactic matter
16 when I became deputy director. We had — I'm sure
17 we'll get into this -- a lot of conversations around
18 those issues in October of 2016 in the wake of these
19 articles that ultimately led to my decision to recuse,
20 which was a little bit fraught with kind of — a lot
21 of conversations between me and Jim Baker and the

Page 35

1 director.
2      During that period, Jim Baker talked to --
3 he told me he talked to Pat Kelly about it.
4      Q. Pat Kelly's position was what?
5      A. He was the assistant director of office of
6 ethics.
7      He was the chief ethics, you know, officer
8 of the bureau.
9      I didn't talk to Pat Kelly at that time, but
10 Baker did.
11      I later went back to Kelly. As other issues
12 came up with other press reports and things like that,
13 I later went back and talked to Kelly about the whole
14 thing, soup to nuts, and he actually provided me with
15 his official ethics opinion, documented opinion.
16      I think that came — I think that happened
17 when we were -- we had moved on. Mid year was over
18 and we were working the Russia case. And some article
19 claimed that I should recuse from the Russia case
20 because of my wife's campaign.
21      So at that time I had Pat Kelly do, like, a

Page 36

1 full write up, and he concluded that I should not
2 recuse from the Russia case. And he also concluded
3 that there was actually no reason for me to have
4 recused from the mid-year case.
5      Q. When was that analysis done just in point of
6 time?
7      A. That's in April of 2017.
8      Q. Okay.
9      A. Don't quote me on that date, but that's my
10 best recollection.
11      MR. SCHOOLS: I'm sure we'll get into those
12 sort of October events more granularly at some point,
13 but if I recall correctly from what I've read before
14 the October 23rd, 2016, article your wife had gotten a
15 call from a      (P)
16      MR. BROMWICH: Yeah, we'll get into all of
17 that. We're about to get there.
18      MR. SCHOOLS: I'll shut up and let you.
19      MR. BROMWICH: No, no, not at all.
20 BY MR. BROWICH:
21      Q. Just a couple of other points.

Page 37

1   So you mentioned your involvement in the
2   mid-year investigation, the Clinton e-mail
3   investigation, and you said that started when you
4   became deputy director in February of 2016?
5   A.   That's right.
6   Q.   From the time that you became deputy
7   director in February until the time of Director
8   Comey's announcement on July 5th, was there any other
9   investigation that you spent more time dealing with
10  than that one?
11  A.   No.
12  Q.   So you were very involved in that?
13  A.   I was very involved in it. It was obviously
14  a very important investigation. It took a lot of our
15  time. There were other things that happened in there,
16  like the Pulse Nightclub shooting, which I spent
17  probably four days nonstop trying to sort through.
18  Other things like that would periodically come on and
19  off the radar, but over -- in an overarching way, that
20  is the one that really dogged us.
21  Q.   And you were involved in discussions with

Page 38

1   Director Comey that led up to his announcement?
2   A.   Yes. Yes, I was.
3   Q.   So let's turn, as Scott suggested, to the
4   Wall Street Journal's stories in October of 2016.
5        How did the fact that (P) then
6   of the Wall Street Journal, was in the process of
7   gathering information and reporting a story that dealt
8   with your wife's campaign?
9   A.   Yes.
10       So my independent recollection, my best
11  recollection of learning about it, was when (P)
12  called my wife. We were in the car together, and that
13  was on Sunday.
14  Q.   Had she ever spoken to him before?
15  A.   No. No.
16  Q.   Had you ever ever spoken to him before?
17  A.   No. Neither of us. We had never spoken to
18  him.
19       I have now seen an e-mail from the previous
20  Friday, so that would be the --
21  Q.   21st?

Page 39

1   A.   -- 21st. And it's an e-mail, I think,
2   between myself and the director in which I refer to
3   that -- the Wall Street Journal is asking questions
4   and seems to want to do an article about my wife's
5   campaign. Something like that.
6        So likely Mike Kortan told me about that
7   exchange on or about that Friday. But, nevertheless,
8   my independent recollection was I'm in the car with
9   Jill, my daughter is in the back seat. We're on our
10  way to an event, and her cell phone rings. And (P)
11       -- it's (P) calling. She didn't
12  take the call. I think he left a message, a
13  voicemail. And we were just both kind of taken aback
14  that he would even call.
15       So as a result of that call, I immediately
16  called Mike Kortan, and I told him to reach out to
17  (P) and to find out what, you know, where
18  were they going with this thing and to start kind of
19  getting a sense from (P) as to what they're writing
20  and making sure we could correct things that were
21  wrong, that sort of thing.

Page 40

1   Q.   Before we get further into that, what was
2   your understanding at that time as to what your
3   authority was as deputy director to direct people in
4   the FBI or to yourself --
5   A.   Right.
6   Q.   -- share information about an investigation?
7   A.   Miller understanding at that time -- and
8   still is today -- because this has not changed under
9   the new policy, is that at deputy director, I was one
10  of maybe three people in the FBI that had the
11  independent authority to interact with the media,
12  share information with the media, or authorize others
13  to share information with the media. That was my
14  understanding.
15  Q.   Including up to and confirming the existence
16  of an investigation?
17  A.   Yes. Whatever -- I had had kind of blanket
18  authority to make those decisions about what we -- how
19  we would interact and what we would share.
20  Q.   Did you also have that authority as ADD?
21  A.   As ADD?



Page 41

1  Q.  Yes.
2  A.  Well, I never --
3  Q.  If you did you never exercised it?
4  A.  I didn't know that I did.  I never exercised
5  it.  But I now know because we have done a pretty
6  thorough review of what the policy used to be and
7  we've recently done an update to the policy.  The new
8  policy is not different from the old one in that
9  respect.  It is the director, the deputy director, and
10  the ADD who have that authority.
11  Q.  So when you say "independent authority",
12  does that mean, for example, that the ADD does not
13  need to check with you before interacting with the
14  media?  And similarly, you wouldn't have to go to the
15  director to directly or direct others to interact with
16  the media?
17  A.  That is the case.  And it is -- however,
18  there is a presumption that the ADD essentially has
19  that authority, so that he can perform that role if
20  he's covering for the deputy or the director.
21      That's why it's written into the policy that

Page 42

1  way.
2  Q.  So, in practice, it's really the two of you,
3  the director and the deputy director?
4  A.  Yes.  And really, day-to-day practice, it's
5  the deputy.  I handled those questions all the time.  I
6  mean, Mike Kortan was a direct report to me.  So Mike
7  and I would talk every day, morning, and then again in
8  the afternoon at least, and if necessary more in the
9  middle.  And he would let me know, like, "Here's who
10  called today.  Here is what they're asking about.
11  Here's the stories that are in progress.  How do you
12  want me to handle X, Y, and Z?"
13      And it is a constant flow of requests and
14  inquiries, the vast majority of which we say "No
15  comment."  We don't provide any information or engage.
16      But many we do engage in some way.
17      Sometimes it is merely saying, you know,
18  "Hey, you're off base.  You have your facts wrong."
19      Other times it's sharing information on
20  background.
21      Other times it's finding the right person to

Page 43

1  be interviewed and then actually providing that person
2  for an interview, either on background or on the
3  record.
4      Sometimes it's a full blown on the record.  I
5  mean, there is a very wide array of possible ways you
6  could handle those inquiries and they come in
7  constantly.
8  Q.  So it sounds like a not insignificant amount
9  of your time was spent dealing with press inquiries?
10  A.  That's --
11  Q.  Kortan was a direct report to you, so you
12  were dealing with a steady stream of these issues?
13  A.  That's right.
14  Q.  So let's get back to the narrative of
15  October of 2016.
16      MR. SCHOOLS:  A couple questions on the
17  authority.
18      You, I think, in response to one of
19  Mr. Bromwich's questions indicated that your authority
20  to interact with the press would have included the
21  authority to confirm the existence of an

Page 44

1  investigation.  I think that's what you said.
2      THE WITNESS:  That was my understanding at
3  the time.  That I had that kind of independent
4  authority.
5      MR. SCHOOLS:  Did you -- maybe you didn't
6  think about it at the time.  If you didn't, that's
7  fine.  But you can envision situations where there is
8  an investigation that the FBI is involved in, like the
9  Pulse Nightclub shooting, where you guys are going to
10  be on scene and confirming that you're on scene and
11  you're doing things to ensure the public that you're
12  doing what the public expects you to do.
13  A.  Right.
14  Q.  A different situation would be where you're
15  in ongoing investigation of sorts and the department
16  of justice is involved, their lawyers are
17  participating.  Do you draw any distinction between
18  those two type of scenarios and the scope of your
19  authority to confirm an investigation?
20  A.  I don't know if I drew that kind of
21  distinction in terms of the scope of my authority.



Case 1:19-cv-02399-RDM   Document 23-4   Filed 11/01/19   Page 12 of 51

Page 45

1    I'm very familiar with our practice. Under
2    most circumstances we don't confirm the existence of
3    investigations.
4            Some where it's undeniable, like the ones
5    you've cited, you know, there is really no -- our mere
6    presence or showing up at a press conference or
7    something like that is a confirmation.
8    BY MR. BROMWICH:
9        Q.  To reassure the public?
10       A.  To reassure the public.
11           So, you know -- but there are many
12   investigation where, you know, we wouldn't do that.
13           So I'm aware of that distinction, and I was
14   always careful about it.
15           I've also had the experience of working on
16   cases where we maybe would have preferred that they
17   not be exposed to the public, but by virtue of the
18   fact that they've been reported on and referred by --
19   talked about by other people, whether on the hill or
20   other people around town, like the denying the
21   existence of something becomes a bit of a fiction at

Page 46

1    some point because things become -- even though they
2    are not officially acknowledged by the department or
3    the bureau, the fact that we're doing X has been so
4    widely discussed by maybe people involved in it or
5    witnesses or what have you, it becomes -- it becomes
6    hard to maintain that position.
7        Q.  I don't necessarily don't know of all the
8    instances in which that may have occurred, but of the
9    two I know most recently I think there were
10   discussions with the department of justice prior to
11   the bureau's confirming the existence of the
12   investigation even though there had been a lot of
13   public chatter about it.
14           So I think you guys did that on Clinton, and
15   I know you did it on Russia.
16       A.  You're absolutely right about those two.
17           And I think in any case where we would make
18   a public kind of on-the-record confirmation, I can't
19   fathom doing that without coordinating it. All this
20   stuff, ideal circumstances would be closely
21   coordinated, so I don't deny that at all.

Page 47

1        Q.  Can you recall any other instances in which
2    you personally were involved in confirming the
3    existence of an investigation that had not been
4    publicly confirmed by the FBI?
5        A.  Sure.
6            And specifically in that kind of providing
7    background information, correcting, shaping a story,
8    the one that comes to mind most clearly to me is the
9    story that was kind of a long-term thing in the
10   making. And I can't remember. I think it was a
11   Washington Post story about                (P-1)
12                           (G)                  The
13   Post became aware of it. I don't know how. And did
14   this kind of big expose-type story on it.
15           We had a number of people. Kortan worked on
16   that, kept me apprised of it. We made a lot of
17   decisions about providing people to be interviewed off
18   the record to try to shape that story. And all of
19   that was implicitly acknowledging the existence of a
20   case.
21           All done with -- you know, with knowledge of

Page 48

1    and frequent reporting, knowledge -- and the director
2    was aware of that. Others were aware of it. It was
3    discussed at meetings. So, I mean, that's one example
4    where -- that I can think of off the top of my head.
5            There are certainly others more recently. I
6    have had to interact with -- I had to interact with
7    the editor of the New York Times over the holidays at
8    the Director Ray's request to try to get them to not
9    publish a story that would identify -- specifically
10   identify basically the source of some information we
11   had received. And in an effort to try to protect that
12   source, I had to have this conversation with the
13   editor. And that conversation certainly
14   acknowledgedly implicitly the existence of the
15   investigation and the identity of the source.
16           So those kinds of exchanges happen. That's
17   part of -- you know, it's part of being responsible
18   for having to kind of try to manage the reputation and
19   the, you know, the public image of the organization.
20       Q.  Is there anything else on that?
21           So let's turn back to this initial contact,

Page 49
1    (P)    of the Wall Street Journal leaves a
2  voicemail on Jill's phone you think, and then you
3  begin to engage with, I think you said, Michael
4  Kortan. So pick up the narrative there.
5       What do you recall happening next?
6       A. So we were out the whole day, so it was kind
7  of one of those Sundays where you are on the e-mail
8  all day.
9       Series of interactions between myself, Mike
10 Kortan, Mike Kortan to    (P)    back and forth
11 with questions. It's hard for Kortan, because he
12 didn't know the details of my wife's campaign, so I
13 did send him one long e-mail that laid out some of
14 that.
15      That e-mail has been produced in multiple
16 FOIA requests, so it's one that gets referred to
17 often.
18      So, yeah, we went back and forth all day. I
19 at some point talked to or at least put the director
20 on notice that we were doing this, working to kind of
21 try to mitigate the damage of the story.

Page 50
1       And ultimately, he ran the story that night.
2  I think it posted online that Sunday night, and it was
3  in the paper on Monday morning. So that's the one
4  that I kind of think of as the first Wall Street
5  Journal story.
6       Q. And do you remember in general terms what
7  topics were addressed in the story?
8       A. It talked about what you just referred to,
9  Scott. The fact that -- so, as Governor McAuliffe was
10 the head of the Virginia State Democratic Party and
11 the State Democratic Party had contributed some
12 amount -- maybe $200,000 -- don't hold me to the
13 numbers -- to my wife's campaign, I think in the form
14 of like mailing support or something like that. And
15 the -- and then McAuliffe also had a PAC that he
16 controlled, and that PAC contributed, I want to say
17 generally, maybe another $400,000 to her campaign in
18 the last, maybe, week or two of her campaign to help
19 with whatever they were doing in that end of the
20 campaign and stuff.
21      So he reported that.

Page 51
1       And then kind of made this allegations that
2  my -- because my wife was supported by the governor,
3  the governor is a friend of Hillary Clinton, and I was
4  supervising the Clinton investigation, therefore, you
5  know, my involvement in the case was politically
6  biased and affecting my decisions. Not in those
7  words, but that was the basic theme of the story.
8       MR. SCHOOLS: Just to follow my earlier
9  question, the fact of those contributions, was that
10 not known by you until you saw the article or was that
11 part of the conversations that you may have had with
12 Kortan or he was giving feedback from  (P)  about
13 what the article was going to say? When did you know
14 about that?
15      THE WITNESS: I did not know about those
16 contributions until  (P)  told Kortan that he was
17 putting that in his article.
18 BY MR. BROMWICH:
19      Q. So you knew it before the article
20 appeared --
21      A. Before the article appeared.

Page 52
1       Q. -- but certainly before it from  (P)
2  through Kortan?
3       A. Hours before, right. So I did not know
4  about that until that exchange.
5       Q. So walk us through sort of the immediate
6  aftermath.
7       So the article gets posted online that
8  Sunday afternoon or evening. It's in the printed
9  version of the paper on Monday, the 24th. And then at
10 some point you learn that  (P)  is continuing to
11 work the story or angles of the story.
12      Tell us about that.
13      A. Well, it's important to, I mean, put it in a
14 little bit of context.
15      This was, like, in the middle of a storm of
16 articles that were coming out that were really rough
17 on the department and the bureau. And most of which
18 were based to some great degree on information that
19 was coming out of the FBI or the department in an
20 unauthorized fashion.
21      So not in the way that I have been talking



Page 53

1 about, but rather just people who were speaking
2 unauthorized off the record out of turn.
3       There was -- I think in the days around
4 that, there was an article about a reorganization in
5 the Eric Garner case in New York, which angered the AG
6 greatly at the time.
7       There was another article that came out,
8 like, I think within 24 hours of the Wall Street
9 Journal article about my wife's claim.
10      There was another article that came out that
11 cited to a private, like, one-on-one meeting that the
12 AG had had with Director Comey, like, that Monday
13 morning, the 31st. Which was inexplicable.
14   Q. The 31st or the 24th?
15   A. I'm sorry. That was the 31st. That was a
16 few days --
17   Q. Right.
18   A. -- in any case.
19   Q. General point.
20   A. A lot of articles coming out at that time.
21      So, in that week at some point (P) makes

Page 54

1 it known to Kortan that he's going to write a
2 follow-up article which will repeat most of the
3 allegations from the first article but will also
4 include these new allegations that he's getting from
5 people inside the FBI that I had made a decision to
6 try to kill the Clinton Foundation case, you know, in
7 an effort to, I don't know, whatever, help Hillary
8 Clinton or something like that.
9   Q. And just to back up a step, what was your --
10 what had been your involvement in the Clinton
11 Foundation case, which I gather was something that was
12 worked by multiple field offices at one point?
13   A. It was.
14      So I had really no involvement in it
15 whatsoever when I was at the Washington field office.
16      I knew that Washington field had an
17 investigation of (P-1), (G)
18
19
20      That was really all I knew about that. That
21 was the case that I moved out of WFO when I was there.

Page 55

1 So when I later found out that WFO had a stake in the
2 Clinton Foundation matter, I didn't -- I was surprised
3 by that.
4       But nevertheless, my involvement in the
5 Clinton Foundation case up until that point had really
6 only been in talking to people here at DOJ, and most
7 of that was conversations with Matt Axelrod,
8 A-X-E-L-R-O-D.
9       There had been some back and forth between
10 the criminal division of the bureau and the public
11 integrity section here about whether that case would
12 kind of continue moving forward. They had had a
13 meeting here in which PIN, public integrity section --
14 is that right?
15      MR. SCHOOLS: That's an acronym PIN.
16      THE WITNESS: They later came back to the
17 bureau and said, "We don't think there is enough to
18 keep moving. We're not going to support it with
19 process," and things like that.
20      So there was this back and forth.
21      There was also frustration on the part of

Page 56

1 the field level, primarily in New York, where New York
2 wanted to keep investigating. And they were getting
3 positive signals like that from their -- from the U.S.
4 attorney in the Eastern District at the time.
5       But DOJ main was kind of relying on the PIN
6 position to say this shouldn't be moving forward. So
7 there was this, like, tension between our field and
8 the U.S. attorney's office and DOJ main.
9       So Matt and I would have conversations about
10 that periodically back and forth.
11      So that was kind of really my role in it.
12      I did have one meeting in which I brought
13 the heads of those offices together and instructed
14 them -- like, this is after the PIN decision. So,
15 like, pursuing it, like, coming back to DOJ and
16 arguing again for, like, search warrants and stuff
17 like that did not seem to be a good idea, particularly
18 as we were getting close to the election.
19      That was the word that I was getting from
20 Matt and others here.
21      But, on the field side, they had information



Page 57

1  to work with. They had bank records that they had
2  seized in Los Angeles. They had a couple of
3  cooperators that they had recruited.
4        There was some historical Title 3 intercepts
5  of people that they thought were relevant.
6        So, basically, we kind of sorted it out as
7  to who would do what. And New York was basically
8  told, they have the cooperator and the T3. So the
9  agreement on this meeting was that New York would
10 continue moving forward with what they had, like,
11 tried to develop more information that we could then
12 after the election sit down with PIN again and say,
13 "Okay, here's what we've developed." And that Little
14 Rock would support that effort. And that the
15 Washington field would continue doing their thing with
16        but have to coordinate with New York just to
17 try to organize the cats, as it were, having four
18 field offices shooting at the same target.
19        So there was that. And then really my last
20 interaction was this phone call that's now -- now
21 infamous phone call between Mr. Axelrod and I where we

Page 58

1  really kind of -- Matt, I guess, had discovered that I
2  had given this direction to the field to continue
3  working with what they had. He was very frustrated by
4  that. He felt that that was contrary to the
5  conversations that he and I had had previously.
6        He called me in the middle of August. I was
7  actually at home at the time, because I was traveling
8  overseas for some other meeting. And he caught me,
9  like, right before I went to the airport. And we had
10 this very heated conversation in which I felt that
11 Matt was really pushing me inappropriately to try to
12 shut down these cases. And I basically kind of called
13 him out on it and said, "Look, is this what you're
14 telling me? Are you telling me to close down cases
15 that we have that are viable cases that are going
16 forward?" And at that point he said, "No, no, no."
17 So that was that.
18    Q.  So fast forward now to the week of October
19 24th. You find out, just to bring us back where we
20 were, that  (P)  is planning to write a follow-up
21 story.

Page 59

1     A.  Right.
2     Q.  And that part of it is going to be about the
3  Clinton Foundation investigation.
4     A.  Right.
5     Q.  So take it from there.
6     A.  So the story is, really, I think, very
7  damaging. It's going to basically say that, you know,
8  DOJ is trying to politically, you know, kill these
9  cases for politics and that the FBI is vulnerable to
10 that kind of pressure. You know, we're not doing --
11 our own people are mad, because we're kind of caving
12 to this pressure and we're not being the independent
13 kind of investigators that we should be.
14        And it's very -- I feel like it's going to
15 be very damaging to the bureau. Externally,
16 certainly. But even internally. Like, the fact that
17 people have this so wildly wrong is concerning to me
18 at that time.
19    Q.  And part of it -- correct me if I'm wrong --
20 is that he says that he's going to write that there
21 was some sort of directive from you to stand down?

Page 60

1     A.  Right. That I have issued the kill order or
2  something, the stand down order on these cases.
3        So at this point, I leave town on
4  October 27th, that is Thursday of that week. And Mike
5  Kortan is sent to have this kind of exchange with
6     (P)    that day or the next day.
7        Because I am gone, I tell   (P)   who is
8  at that time counselor -- like, counsel to the deputy
9  director. I tell her to work with Kortan on this.
10 Sit with him when he talks to, you know,  (P)  to
11 try to kind of figure this thing out.
12        We have -- so, I leave town. I have to go
13 up to Connecticut to my son's school. And (P) and
14 Mike kind of keep in touch with me on the phone as
15 they have the series of conversations with  (P) .
16        It's in those conversations where we're
17 trying to think, like, how can we show that this is
18 not, in fact, what happened? We didn't cave to
19 political pressure. We're doing our job in the way
20 that we should. We've pushed back appropriately. And
21 to me, this conversation between Axelrod is an example

(P-1), (G)



Page 61

1  of that.

2       So we talk about that, and I tell them to

3  share that with        (P)

4       Q.  And so this is their series of text

5  messages, phone calls, and so forth in which you're

6  dealing with  (P)  and Kortan on this issue?

7       A.  That's right.  Probably (P)  calls me, but I

8  think the two of them are together.  They may have

9  even been on speakerphone.  But it's a back and forth

10  that takes place from, like, the 27th to the 28th.

11       Q.  So you realize that the call was, obviously,

12  a sensitive one.  What was your purpose in authorizing

13  them to share it?

14       A.  Yeah, I just felt like -- you know, I felt

15  like the story was really going to be damaging to the

16  bureau.  And I knew that there would be consequences

17  to revealing the phone call.  It was a conversation

18  that I had -- I had already told people about

19  internally but obviously never shared publicly.

20       I had talked about it with the then EAD over

21  the criminal division and other people, likely the

Page 62

1  director and others.  Not in the context of the

2  article, but just after I had that exchange with Matt,

3  I was taken aback by it and told people about it.

4       So the idea to share it publicly, I mean it

5  was -- you know, I felt like it was necessary to try

6  to stop this, I guess, greater harm to the reputation

7  of the organization.

8       The Clinton Foundation case was something

9  that not only had been widely reported on, books had

10  been written about it, numerous articles written about

11  it.  Many people from within the organization were

12  already confirming it.  I know it's different.

13  They're not the deputy director, but there was a lot

14  of information in the article sourced to people in the

15  bureau or DOJ.

16       So it was being talked about in that article

17  one way or the other.

18       So that's kind of how I thought about it at

19  the time.

20       Q.  So at some point, you get from Kortan either

21  an e-mail or a draft of the story, which includes the

Page 63

1  account of the phone call; is that right?

2       A.  I'm not sure I ever got that.

3       Q.  Okay.

4       A.  I'm not sure I ever got that.

5       Q.  So did you know that  (P)  was going to

6  include that anecdote in this story before the story

7  came out?

8       A.  I just knew the result of their

9  conversations with him.

10       Q.  Um-um.

11       A.  And I can't remember whether (P) or Mike

12  told me that he told that them he would put it in, but

13  I think that was my assumption.

14       Q.  So that story appears online on Sunday, the

15  30th?

16       A.  That's right.

17       Q.  And then it appears in the print version on

18  October 31st.

19       MR. SCHOOLS:  Can I back up?

20       MR. BROMWICH:  Yes.

21       MR. SCHOOLS:  Ask you about the decision to

Page 64

1  authorize the disclosure of that.

2       You had to know that that was going to send

3  Matt Axelrod off the edge; right?

4       THE WITNESS:  Yes, I knew he would not be

5  happy about it.

6       MR. SCHOOLS:  And, so, when the context we

7  were talking about earlier with respect to your

8  authorization to release information --

9       THE WITNESS:  Yes.

10       MR. SCHOOLS:  -- sort of what I was talking

11  about earlier was the distinction between sort of

12  uniquely FBI information --

13       THE WITNESS:  Right.

14       MR. SCHOOLS:  -- and the bigger DOJ

15  information.  This is sort of a bigger DOJ

16  conversation because, at least, it's evil going to in

17  part disclose what someone over here said and not just

18  what was going on from the bureau.  Do you see any

19  distinction in that type of information with respect

20  to what you were authorized?

21       THE WITNESS:  I thought it was.



Page 65

1   I don't think I thought of it that way at
2   the time. Honestly, I didn't think of it even really
3   as, like, talking about a case because, in my mind, we
4   weren't discussing, like, the case, the evidence, the
5   strategy, the plan, whatever.
6       This was really more about, like, an
7   argument I had with another individual.
8       MR. SCHOOLS: So I know **(P)**
9   assessments are not necessarily your assessments or
10  not even your assessment. She has a text message in
11  which she says about that article "I feel a lot less
12  bad about throwing Matt under the bus."
13      So her assessment of what she achieved by
14  talking to **(P)** was to throw Matt under the
15  bus.
16      Was that your assessment? Did you feel that
17  way?
18      THE WITNESS: No. That was the one thing
19  that -- one of the things that crossed my mind that
20  was, you know, regretful or unfortunate. Like, Matt
21  and I talked probably multiple times a day every

Page 66

1   single day. And we didn't -- all those conversations
2   weren't always, like, happy times. I mean, we knocked
3   heads over quite a few things, but we had a lot of
4   really important work to do. So that bothered me.
5   Like, I didn't want to -- I didn't want to destroy my
6   relationship with Matt, but I didn't think it would do
7   that.
8       And he was frustrated the next day. There
9   is no question about that.
10      I called him. I saw him in the morning
11  meeting and then I called him later that day, I think,
12  and just we kind of talked through it.
13      You know, then we, you know, were able to
14  get past it.
15      MR. SCHOOLS: The way that always happens
16  when we hear or you across the street speak to
17  reporters and authorize them to attribute this story
18  to something other than a named individual over
19  here --
20      THE WITNESS: Right.
21      MR. SCHOOLS: -- is that it sometimes looks

Page 67

1   like a leak. So **(P)** and Mike are authorized to talk
2   to **(P)** Barrett on background. I can't remember how
3   that specific piece of it was sourced, but I think it
4   might have been a source close to McCabe or an FBI
5   official or something like that, which to the casual
6   reader probably looks like a leak. Even though this
7   isn't a leak, it's an authorized disclosure because
8   you've authorized it.
9       THE WITNESS: Right.
10      MR. SCHOOLS: So how in the universe of the
11  things that are going on at that time where you've got
12  lots of leaks about the Clinton Foundation that you're
13  contemporaneously frustrated with, because you're
14  talking to Sweeney about it. Walk me through the
15  process of how an on background disclosure of a
16  specific communication like that doesn't further the
17  problem you're trying to solve?
18      THE WITNESS: Yes.
19      I can certainly see how it would seem that
20  way. And now, being, you know, through this process
21  more familiar with kind of how Bill and Paul saw it at

Page 68

1   the time, I can understand their perspective on that.
2       But I can only tell you that I saw it
3   different. Like, my authorization of including that
4   fact in the article was something that I felt like I
5   had to do to combat the other 20 things that someone
6   from the FBI had in an unauthorized way already put
7   into the article.
8       I felt like I was in this situation because
9   I was trying to kind of mitigate the damage that we
10  were sustaining from unauthorized leaks.
11      So that's one thing.
12      I also felt like, you know, whether I, as
13  the deputy director, decide to share something on
14  background, that was the authority that I had to make
15  that decision.
16      There isn't anyone in the New York field
17  office to include Sweeney or the Washington field
18  office who was in a position to do that.
19      And so, at that time I felt like, you
20  know -- so when I look back on those conversations I
21  had with Paul and with Bill, which were very much at



Page 69

1  the blessing and at the direction of the director,
2  because we were talking about this stuff a lot. Yeah,
3  we were trying to kind of close off those — that
4  activity. We were trying to shut that out. We
5  actually took all kind of steps to try to figure out
6  who's talking to these reporters.
7      The way that -- to answer your question, the
8  way that the conversation was related in this article
9  could look like another leak. I mean, I guess that's
10  true. I didn't think of it that way at the time. I
11  thought of it differently because I had the authority
12  to make those decision and really nobody else that I
13  was aware of did.
14      MR. SCHOOLS: Did you ever contemplate
15  making sort of attributable representations to (P)
16  (P) to address the concerns that were raised by
17  the unauthorized leaks?
18      THE WITNESS: I don't remember -- I don't
19  remember considering doing that.
20      It's hard for me to say why we didn't.
21  BY MR. BROMWICH:

Page 70

1  Q. Well, is it fair to say that you more often
2  provide information on background than on an
3  attributed basis?
4  A. Yes. This is -- right. This is, like,
5  normal course of business. This one -- and, in
6  fact -- this one is particularly that way because this
7  whole exchange for me began a week earlier. It
8  started on that Sunday, the 23rd.
9      So this was just like a process that had
10  been going on for a week.
11      And this is where we ended up with it. And
12  I guess in some ways that's an escalation but, yes,
13  this is -- this is how we had interacted with the
14  media on countless articles in the past.
15      So that's how I thought about doing it this
16  way, I guess.
17  Q. You had a conversation with Matt after the
18  fact in which he expressed his frustration about, you
19  know, it's hard for us to work together if our private
20  conversations are going to end up in the newspaper.
21  His characterization of that call is that you

Page 71

1  apologized.
2  Q. I don't think you told him -- I don't think
3  you've said you told him and he didn't say you told
4  him that you had authorized it.
5  A. I didn't. I don't remember telling him
6  that.
7  Q. Why not?
8  A. I didn't think about telling him that. I
9  kind of felt like -- I don't know. I guess I didn't
10  think it was necessary.
11  Q. Is it fair to say based on your conversation
12  with him that -- did you feel like he was assessing
13  that the information had leaked as opposed to it being
14  an authorized disclosure?
15  A. Boy, I don't know. I mean, I don't remember
16  thinking about it that way at the time, so it would be
17  wrong for me to go back.
18  Q. Okay.
19  A. I mean, it was really about -- it was one in
20  a series of conversations that he and I had had about
21  information that had shown up in the paper, in which

Page 72

1  we would be frustrated because we thought things came
2  from here.
3      They would be frustrated because they
4  thought things were coming from us. I mean, you know
5  how that takes place all the time.
6      And Matt -- I just remembered Matt saying,
7  you know, like, basically this isn't going to work if
8  our conversations are showing up. And I was, "Okay,
9  agreed." You're right sort of thing.
10  Q. And did you -- or did he communicate to you
11  or did you ever have any concern about the impact of
12  the disclosure being sort of to defend the FBI, but to
13  portray DOJ in a negative light?
14  A. Did I think about that?
15  Q. Were you protecting the FBI at the expense
16  of the department is my question?
17  A. I might have been, but I was -- I felt like,
18  under the circumstances, it was appropriate. I felt
19  like the exchange that we had had was an actual,
20  truthful representation of, like, how these
21  conversations were taking place.



Page 73

1 And Matt was pressuring me to stop these
2 cases, and I had made the decision not to.
3 And, like, even in our conversation, he
4 didn't dispute that. So did it make the department --
5 did it shine a negative light on the department? I
6 guess it did for that issue.
7 But I didn't think that that was like -- it
8 wasn't unfair.
9 MR. SCHOOLS: It was accurate?
10 THE WITNESS: It was accurate.
11 BY MR. BROMWICH:
12 Q. So the article gets published the 30th,
13 31st.
14 Just to put this in a slightly broader
15 context, a few days earlier, on October 28th, Director
16 Comey had issued his letter announcing the reopening
17 of the Clinton e-mail investigation as a result of
18 additional work that had been done by the FBI in
19 connection with the Weiner laptop?
20 A. Yes.
21 Q. Were you sort of involved in aspects of

Page 74

1 that? And was that sort of occupying significant part
2 of your time and energy in the weeks between the two
3 Wall Street Journal articles?
4 MR. SCHOOLS: Can we do this? I feel like
5 we are moving to another topic, and I need to take a
6 five-minute break.
7 MR. BROMWICH: Fine.
8 MR. SCHOOLS: Be right back.
9 (Whereupon, a recess ensued.)
10 BY MR. BROMWICH:
11 Q. So, again, we talked about the two Wall
12 Street Journal stories, and I started to ask you about
13 your involvement in the decision leading up to
14 Director Comey's letter on October 28th reopening the
15 Clinton e-mail investigation.
16 A. Right. So, to try to tighten this up a
17 little bit -- so in that same week that it came to my
18 attention that we had basically not -- we needed to
19 make decisions about what we were going to do with the
20 material on the Anthony Weiner laptop.
21 And so I called for, you know, the usual

Page 75

1 updates, get people to let me know what's going on
2 since I had last heard about the issue, which was
3 maybe three weeks earlier.
4 So based on those conversations, I told the
5 director -- I thought I had told him that Wednesday
6 night before I left the office for the week, but I
7 have recently seen an e-mail that I sent to him at
8 about 5:00 o'clock on Thursday morning. Basically I
9 told him that, you know, an issue had come up that the
10 team needed to make some decisions on and he really
11 needed to weigh in on those decisions.
12 So that was what provoked the meeting with
13 the director and the rest of the team at 11:00 o'clock
14 that Thursday morning. And I called into it from --
15 from travel. I was on the road.
16 I called in, but was very quickly dropped
17 off the call. But that was the meeting that started
18 their thinking about and deciding how to handle the
19 congressional notification and the laptop and all that
20 stuff.
21 So I wasn't actually a part of those

Page 76

1 decisions, but that's kind of what happened.
2 So that Monday, when we got back into the
3 office, that 31st, I mean, that was really the thing
4 that everyone was focused on.
5 Q. So I'm going to talk about the meeting on
6 the 31st because, as you know, Director Comey's
7 recollection of discussions he had with you on that
8 date are a focal point for some of the charges in the
9 proposal.
10 A. Right.
11 Q. Before we talk about that, I want to show
12 you --
13 MR. BROMWICH: Scott, I don't know how you
14 want to handle documents as exhibits. We are not
15 going to use very many, but do you want me to just
16 refer to them and read them or do you want to have
17 them marked?
18 MR. SCHOOLS: I don't think you need to mark
19 them. If you can just refer to them and describe them
20 sufficiently so that we can identify them later.
21 MR. BRUCE: I have extra copies, so this is

Page 77

1  what we'll be talking about.

2  BY MR. BROMWICH:

3      Q.  So this is tab number two.  This is a very

4  short string of e-mails.

5      The first one, the one on the bottom is from

6  you to Director Comey with copies to James Rybicki and

7  David Bowditch.  The time is 9:59 p.m., again, on the

8  21st, which would have been before the first story.

9      And I want to direct your attention to the

10  second paragraph.  And I'll just read it to you.  "In

11  the more bad news category Mike K" -- is that a

12  reference to Mike Kortan?

13      A.  It is.

14      Q.  -- "informed me that  (P)  at the

15  Wall Street Journal is putting together an article

16  claiming that I had a conflict of interest on MIR" --

17  is that an abbreviation for mid-year?

18      A.  Yes.

19      Q.  -- "as a result of Jill's campaign

20  connections to Governor McAuliffe.  I will work with

21  Mike to provide some basic facts to push back.  And as

Page 78

1  always, will keep you advised."

2      And the response that you get within

3  15 minutes or so from the Director is "Outstanding.

4  Don't sweat it."

5      And then next one, at tab four, is an e-mail

6  from you to Director Comey on October 23rd,

7  9:00 o'clock in the evening.  And it says "Not too

8  much in the update.  The only additional notable news

9  is that Mike K and I spent a good part of the day

10  trying to shape the Wall Street Journal story on my

11  alleged conflict.  Looks like they may try to release

12  it online tonight.  The reporter also called Jill for

13  comments, so we're working that as well."

14      So this was -- tell me if I'm characterizing

15  this incorrectly -- an attempt by you to keep Director

16  Comey in the loop on the work that you were doing to

17  shape and correct the stories that  (P)  was

18  working on at the time?

19      A.  That's right.

20      Q.  And this is in advance of the first story?

21      A.  That's correct.

Page 79

1      Q.  So let's move to the 31st.

2      A.  Um-um.

3      Q.  And I'm going to first frame for you what

4  Director Comey has said about his interaction, his

5  statements and interactions, with you on the issue of

6  this second story.

7      He is cited at having said that what was in

8  the paper that day, including the account of the

9  discussion between you and Axelrod was going

10  to "poison our relationship with DOJ.  That he said he

11  must have had some conversation with you about it,

12  that he likely told me the opposite of the fact that

13  you had authorized the sharing of information." He

14  said further that "he" -- you -- "gave me the

15  impression that he didn't know what was going on."

16      What's your recollection of what your

17  exchange was, your discussion was, with Director Comey

18  on October 31st either in a larger group or just the

19  two of you?

20      A.  Yes.

21      Yes.  It's not that.  It is not -- I don't

Page 80

1  believe that accurately represents what or really

2  represents at all our exchange.

3      I completely understand why Director Comey

4  may not have a clear recollection, because I think it

5  was far from the most important thing on his mind on

6  that day.

7      My recollection is clearer than his.  I

8  remember that we had the normal kind of -- I think it

9  was probably 7:45 deputy director briefing followed by

10  the 8:15 director's briefing.  So that would be mine

11  at 7:45 with my kind of larger team, and then a

12  smaller bunch of us going and meeting with the

13  director.  I think we did them at 8:15.  We've changed

14  the times a bunch, so I might be off on the times.

15      And then we would meet until about 9:45.  We

16  kind of go around the room.  People would update what

17  they had.  And then, typically, the group would leave

18  and then some collection of usually myself, the chief

19  of staff, who with is James Rybicki, R-Y-B-I-C-K-I,

20  and the ADD, who was David Bowditch would stick

21  around.



Page 81

1    I don't remember if the two of them were
2    present for this exchange, but I do remember that day
3    after the director's briefing the director and I
4    staying to talk before we went downstairs to meet with
5    DOJ. Because back in those days, the morning briefs
6    with DOJ were in our building in SIOC.
7        I remember us talking very briefly about the  ·
8    article, because it wasn't the main point of what I
9    had stayed to talk to him about.
10       And so over a minute or two we discussed the
11   article. I remember talking to him about the fact,
12   which he already knew, that I had had Mike and (P)
13   working with  (P)  on the article. And that would
14   have included discussing the fact that we had provided
15   information about the conversation with Axelrod.
16       I remember the director being still
17   frustrated by the article. But, you know, I think
18   somehow thinking that it was -- well, at least it
19   included information that, you know, tried to balance
20   it sort of. We didn't have a long conversation about
21   it.

Page 82

1        Like I said, I had really stuck around
2    because I wanted to talk to him about -- we were
3    having a bunch of side conversations about my recusal
4    from the mid year case and whether I would do that and
5    how that would affect the case.
6        So that was really what I wanted to talk to
7    him about.
8        We didn't end up having an in-depth
9    conversation about that then, but we did talk about it
10   somewhat.
11       So that was really the point of our
12   interaction.
13       But there was this brief comments by the
14   both of us on the article.
15   Q.  And what do you remember, as best you can
16   recall, what you said and what he said?
17   A.  I can't tell you exactly the words that I
18   used or his exact response, but I do remember talking
19   to him about the fact that, you know, essentially we
20   tried to improve the article as much as we could. I
21   had Mike and (P) kind of interacting with  (P)  all

Page 83

1    weekend and we provided the information that we
2    provided, but it still included, you know, 25 other
3    facts that were leaked from who knows where. And over
4    all the article was damaging. Had some balance that
5    it would not have had but for the fact that we tried
6    to shape it. But overall it was just another article
7    that was causing us problems.
8        MR. SCHOOLS: Can you -- Director Comey's
9    testimony is, I think, on its face sort of this is
10   what I think happened.
11       THE WITNESS: Right.
12       MR. SCHOOLS: Or kind of alters back and
13   forth between what did happen and what he thinks
14   happened, but he did give what he thought his reaction
15   would be.
16       MR. BROMWICH: Would be.
17       MR. SCHOOLS: To the article and what he
18   would have said or what he thought about the fact of
19   the disclosure about the Axelrod conversation.
20       THE WITNESS: Right.
21       MR. SCHOOLS: That's sort of on its face is

Page 84

1    what we might expect him to think, but I realize that
2    at it's at a time in the relationship between your FBI
3    and the department was perhaps suboptimal.
4        THE WITNESS: Totally fair.
5        MR. SCHOOLS: Can you help put that whole
6    time frame in context with respect to the relationship
7    between the Bureau and the DOJ that in a context it
8    might suggest that what Director Comey later said
9    about what he thought his reaction would be, was not
10   what his reaction actually was. That's a very long
11   question.
12       MR. BROMWICH: I think we understand your
13   point.
14       THE WITNESS: So, just kind of off the top
15   and referring to the way he characterized what his
16   reaction would have been, that was not his reaction on
17   that morning.
18       So that's the first thing.
19       So to go a little bit broader to answer your
20   question, yes, the relationship between us was under
21   enormous stress for many reasons.



Page 85
1    Even prior to his announcement on July 5th
2  of the end of the Clinton case, things had gotten very
3  strained between us in terms of the DOJ's oversight,
4  but not really, of the Clinton investigation and how
5  that was handled, exacerbated more by, you know, the
6  infamous tarmac incident.
7        It was just -- yeah, those morning meetings
8  were rough. We would frequently talk about, like, how
9  awkward things were between us and even between others
10 on the same side of the table.
11       So there was a lot of tension in those rooms
12 at the time.
13       We would, you know, so it was -- things were
14 under great strain.
15       To be perfectly clear, though, this article
16 did not stand out in that crowd of issues that were
17 putting strain on our relationship.
18       As I've said, it was one of a number of
19 articles that even came out within that one-week
20 period.
21       So, like, the idea that, like, we would

Page 86
1  reconvene on that Monday morning and this would be the
2  biggest topic of concern was just not accurate.
3        I think he was very focused on -- I didn't
4  know the details of this then. I've now learned a
5  little bit of it from just kind of reporting stuff,
6  but I guess there were a lot of heated phone calls
7  between the DAG and the director and other folks here,
8  Axelrod included, and other people at FBI over the
9  course of that weekend regarding the notification to
10 Congress.
11       So things were -- you know, were really
12 inflamed as a result of the congressional notification
13 that had taken place.
14       So the idea that, like, this article was
15 going to poison the relationship would have been,
16 like, you know, poisoning the ocean. It was just a
17 much bigger, broader kind of, you know, bucket of
18 tension that we were dealing with.
19       MR. SCHOOLS: My understanding just from
20 having heard about it after the fact, because I wasn't
21 here yet, that Matt Axelrod was engaging with Jim

Page 87
1  Rybicki about the October 28th letter. And I assume
2  that ordinarily -- or I don't assume -- would
3  ordinarily those engagement have been with you, but
4  they were with Jim because you were out of town or
5  recused or whatever the status was at that time? Do
6  you know any of that?
7        A.  I do know that Axelrod and Rybicki had a lot
8  of heated back and forth over that weekend. Why it
9  was the two of them and not me is an interesting
10 question.
11       Like, normally, Axelrod would have just
12 called me wherever I was. We had a lot of
13 conversations when I was on vacation or at home or
14 whatever. So I don't know the answer. I don't know
15 if, like, Rybicki or someone else had told the -- had
16 told DOJ that, okay, Andy is not part of this
17 conversation. Or Andy's recused or thinking of
18 recusing whatever. I don't know the answer to that.
19       In my mind, I was not recused yet. So I got
20 kind of unceremoniously dropped from that phone call.
21 And then after I had a conversation with the director,

Page 88
1  in which he said to me, "I don't need you for this
2  decision. I've already decided what I'm going to do,
3  and I don't need you to weigh into this. So it is
4  just easier to do it myself. So don't worry about it
5  and we'll talk about it when you get back" sort of
6  thing. And I had a couple back and forth during the
7  weekend with  and with Jim, and I made it clear to
8  them -- I knew that people were thinking that I might
9  should recuse and I made it clear to them that I
10 didn't want to make any decisions about that until I
11 got back and had an opportunity to sit and talk with
12 Jim and talk to Jim Baker.
13       So, in my mind, I hadn't recused yet. But,
14 of course, we had all those conversations on the 31st
15 and the 1st, and then I issued the recusal memo on the
16 2nd.
17       MR. SCHOOLS: Which does bring up a
18 question. I realize the recusal timeline is pretty
19 tricky, but there is that e-mail from Sweeney. I
20 think it's dated the 30th or 31st. It reflects a
21 conversation he had with you on October the 26th in

ESQUIRE
DEPOSITION SOLUTIONS

Page 89

1  which you told him you were going to recuse or going
2  to or had recused?
3       THE WITNESS: Yeah, I don't remember that
4  the same way as he does.
5       We had a conversation, and I think I said to
6  him I was thinking about it or we were talking about
7  it or something. It had come up in the wake of Wall
8  Street Journal 1.
9       But, in fact, he didn't really -- my
10 recollection we didn't have the kind of nuts and
11 bolts, should I or shouldn't I conversation until I
12 got back from that trip to Connecticut.
13      But I did not communicate that to anyone
14 else.
15      Bill and I were on this somewhat strange
16 call with the AG that week. I think it was that week.
17 Where she convened a bunch of us to basically express
18 her frustration with leaks. And it didn't have
19 anything to do with the Wall Street Journal articles.
20 It was, I think, really more of a reaction to the Eric
21 Garner article. That's the best of my recollection.

Page 90

1  And it may have been in the wake of that call that
2  Bill and I talked about it. But I don't -- I hadn't,
3  in my mind, made a decision about that until the
4  following week when Jim finally sat down with me --
5  Jim Comey -- and said, "I agree with your analysis.
6  There is no conflict here. But I think just because
7  as a result of the article, for appearance sake, you
8  should probably recuse."
9       I didn't agree with him then. I don't
10 really agree with him to this day, but he asked me to
11 do it, so I did it.
12      MR. SCHOOLS: What did you know about the
13 conversations that Axelrod was having with anybody at
14 the bureau in advance of the October 28th letter going
15 out?
16      THE WITNESS: Really nothing. I mean, I had
17 a couple of conversations that -- I had a few phone
18 calls with Jim Baker, but we did not discuss, like,
19 the substance of the meetings. And we certainly
20 didn't discuss, like, the substance of phone calls
21 with DOJ.

Page 91

1       Because Baker was the guy that actually kind
2  of pushed me off the phone call. So he was, like,
3  being very careful.
4       So, yeah, those are things that I only know,
5  like, kind can of learned later.
6  BY MR. BROMWICH:
7  Q.  Just one other question focusing on the
8  October 31st meeting and Director Comey's memory of
9  it. He said at one point in his testimony that
10 "Significant disclosure would always go through me
11 because I'm responsible for how the FBI interacts with
12 the world."
13      What's your reaction to that?
14 A.  I think that's an overstatement. I think I
15 know what he's referring to.
16      I think we had conversations -- well, I say
17 "we." I didn't, because I wasn't there then. But
18 they had these sorts of conversations, as I now know,
19 around the idea of do we disclose to the public the
20 existence of the mid year case.
21      We did have those same sorts of

Page 92

1  conversations in anticipation of his congressional
2  testimony about what he would say and what he would
3  acknowledge and what he wouldn't acknowledge about the
4  Russia investigation.
5       And I think that's probably what he -- my
6  guess. I can't read his mind, but that's probably
7  what he's thinking of with that response.
8       My experience was in matters like this where
9  we were sharing information, not necessarily the
10 existence of an investigation but information with the
11 media on this kind of day-to-day basis that I've
12 described, he was not involved in those decisions.
13      Those are things that Mike Kortan and I
14 would transact upon. We would -- Mike would
15 frequently report the results of those interactions
16 with Jim, but he didn't play an active role in, like,
17 determining what facts would be shared or anything
18 like that.
19      MR. BROMWICH: Scott, I'm going to move on
20 to something else unless you have any --
21      MR. SCHOOLS: All right.



Page 93

1  BY MR. BROMWICH:
2      Q.  So let's move several months forward in time
3  to April of 2017.
4      A.  Um-um.
5      Q.  And at some point you meet with
6  investigators from the inspections division?
7      A.  Yes.
8      Q.  And they focus with you on a leaks related
9  matter, which has been characterized as a leaks
10 investigation and focusing on an article that appeared
11 in Circa.
12     A.  Yes.
13     Q.  Do you recall that?
14     A.  Yes.  It was actually based on questions
15 that we had gotten.  Once again, the reporter called
16 with questions, because they were anticipating writing
17 a story.  It was in this case   (P)    , who was
18 with Circa News.  I had never even heard of it before
19 then, or her.  And she asked Mike Kortan three or four
20 questions that she claimed to have from several
21 sources.  And they referred to a meeting that I had

Page 94

1  had with my leadership team and she alleged or
2  somebody alleged that I had made, like, defamatory
3  statements about Mike Flynn.
4      The facts -- not the statements themselves,
5  but the facts around the allegations actually very
6  closely mirrored an actual conversation that we had
7  had in one of my meetings, and so that caused me great
8  concern.
9      And, so, based on that concern, I called the
10 inspection division and essentially referred the
11 matter for investigation because I thought some --
12 it's possible even, unlikely, but possible that
13 someone from one of my very small kind of leadership
14 meetings had shared information or maybe talked to
15 someone who had or what have you.
16     So that was how that started.
17     Q.  And the article focused on supposedly
18 defamatory statements you had made both about or
19 others in the meeting had made about Mike Flynn and
20 about the President; is that right?
21     A.  That's right.

Page 95

1      It started out -- it talked about we had
2  received a request from the White House to connect
3  with them with, I think, major city chiefs or the
4  major county sheriffs who were having some sort of a
5  meeting here in D.C., and they wanted the President to
6  appear at the meeting.  Like, the White House wanted
7  the President to appear to give a speech there.  So
8  they asked us to, like, negotiate that for them.
9      And that was an actual conversation that we
10 had.  And in the real conversation, I had said, "Okay.
11 Go ahead and do that.  Connect them, but then step out
12 of it."  Like, we shouldn't be negotiating the terms
13 of the President's appearance somewhere.  That's
14 something for the White House to do.  But if they need
15 a point of contact with either of those associations,
16 certainly we could help them and connect them with the
17 right people.
18     That was a real conversation.  In the
19 question she said that we were talking about this
20 White House request to connect them with the
21 associations.  And I said, No, you know, and, like --

Page 96

1  you know, use profanity in describing both Mike Flynn
2  and the President and that, you know, we're out to get
3  them.  And it said, like, we went around and
4  celebrated when Mike Flynn got fired and everybody was
5  slapping high fives at my meeting.  Just ridiculous.
6  Nonsense, that obviously never happened.  But it was
7  because it so closely mirrored an actual conversation
8  we had that caused me concern.
9      Q.  So you had the interview with them?
10     A.  Yes.
11     Q.  And then at some point you get a draft
12 signed sworn statement?
13     A.  Yes.
14     Q.  And this is focusing solely on the Circa
15 issue; is that right?
16     A.  Yes.
17     Q.  And then at some point they re-interview
18 you.  And that's on May 9th.
19     Do you recall the events with respect to the
20 draft signed sworn statement or any contacts between
21 inspections investigators and your office and how that



Page 97

1  follow-up meeting comes to be?
2    A.  How the follow-up meeting comes to be?
3    Q.  The May 9th meeting, yeah.
4    A.  I think it was because I had looked at --
5  there may have actually been two meetings before
6  May 9th. I don't remember that very clearly. It was
7  definitely one where I laid out for them my basic
8  concerns.
9        Then they interviewed me and prepared the
10 draft signed sworn statement. And, again, I don't
11 know if that took place over the course of one or two
12 meetings.
13       Nevertheless, I get the draft. I take a
14 look at it. I think I made some corrections on it.
15 And it's to discuss those corrections that we meet on
16 May 9th.
17       And I can't remember whether I asked them to
18 come back and meet on May 9th or they called the
19 office and said, "Hey, does he want to meet?" I can't
20 remember. But it was, I think, essentially to discuss
21 this signed sworn statement.

Page 98

1    Q.  What is your recollection however the
2  meeting get set up, whether it was initiated by you or
3  initiated by them, what do you recall about the
4  meeting you had with them and the discussion you had
5  with the inspections investigators?
6    A.  I don't have a great recollection of the
7  meeting. It happened during a particularly busy time
8  on a day that then was, like, completely eclipsed by
9  the firing of Director Comey, which I learned about,
10 maybe, an hour or two after that. So I don't have a
11 clear recollection.
12       I know -- I think it was some combination of
13 the same people that I had met with before. Likely
14 all three. Voviette Morgan, V-O-V-I-E-T-T-E, and the
15 last name Morgan.    (P)    M-O-L-N-A-R. And
16        (P)            I think it was the three
17 of them.
18       We talked about the statement. We talked
19 about kind of -- you know, kind of a case update,
20 another investigative update. Not all the details of
21 what they were doing, but the basics of, like, what

Page 99

1  are you finding?
2    Q.  In that particular case in the Circa matter
3  or more broadly --
4    A.  This is all about the Circa matter.
5        And then, best of my recollection, it was
6  only at the end of the meeting where they brought up
7  the Wall Street Journal article.
8    Q.  What do you recall about that? Do you
9  remember -- what kind of details do you recall about
10 that discussion?
11   A.  I don't remember much about it.
12       I do remember at one point having a kind of
13 private pull-aside conversation with Voviette Morgan.
14 And I remember that because she kind of -- they were
15 leaving my office and the other two had kind of walked
16 out into the hallway and Voviette kind of pulled me
17 aside, put her hand on my arm and we had this very,
18 like, close conversation, which is a little bit
19 awkward. And so I remember that happened.
20       And, originally, I thought that that
21 happened in the May 9th meeting. In retrospect, I

Page 100

1  cannot be perfectly clear whether that was the May 9th
2  meeting or one of the prior meetings.
3        So I just don't know. But I do know that at
4  some point they kind of out of the blue brought up the
5  Wall Street Journal article out, which I was surprised
6  to see. And they asked me, you know, a couple of
7  questions about it. I remember it.
8    Q.  What do you remember telling them about the
9  article?
10   A.  To the best of my recollection, is they
11 asked me if I knew, like, who was the source for the
12 article. And I guess I told them I don't know.
13   Q.  Why did you tell them you didn't know?
14   A.  You know, I don't -- I don't have -- I'm not
15 sure whether I was maybe -- I was thinking that they
16 were talking about the source for, like, all of the
17 information in the article, which I don't know.
18   Q.  Um-um.
19   A.  Whether they had actually kind of drawn a
20 bead upon the conversation with Axelrod. I just don't
21 remember.

**Page 101**

1     I mean, I now know that they walked away
2 from that exchange with a different understanding than
3 I had. I know that both because of the signed sworn
4 statement -- the edited signed sworn statement that I
5 got from them after that meeting. And of course from
6 what was included in the report.
7     I just can't sit here and explain to you
8 with perfect clarity exactly what we discussed and
9 what pieces of the article we focussed on. I just
10 don't remember. It's something that, you know, it
11 happened in the middle of the course of events that I
12 think really kind of occupied most of my thoughts and
13 my recollection from that time.
14     But in any case, I did get the signed sworn
15 statement sometime after. And when I read that, I
16 realized that they had the wrong impression about my
17 authorization to Korton and (P) .
18     So that's why I didn't sign it. And,
19 ultimately, you know, several weeks later asked them
20 to come back to discuss it again because it was not
21 right.

**Page 102**

1     Q. Let me ask you a couple of direct questions
2 about that.
3     A. Yes.
4     Q. Did you at that time have a motive or a
5 reason for wanting to conceal the fact that you had
6 authorized Kortan and (P) to share the Axelrod
7 conversation with (P)
8     A. No. Absolutely not. Absolutely not.
9     In my mind, there wasn't and there still
10 isn't anything secret about my authorization to (P)
11 and Kortan.
12     Q. Did you ever tell (P) not to share the
13 fact that you had authorized her to share information
14 with (P)
15     A. No.
16     Q. Did you ever have any similar conversation
17 with Mike Kortan?
18     A. Absolutely not. Absolutely not.
19     And I don't know to this day who else they
20 might have shared the fact that they talked to (P)
21 with.

**Page 103**

1     You know, I don't know the mechanics of how
2 and where they talked to him or who set up that call.
3 I'm sure there are -- there may be people that they
4 talked to about it. I don't know. It would not have
5 concerned me. I did not see it as something that
6 needed to be hidden. And certainly not something to,
7 you know, conceal from the inspection division.
8 Although, to be quite honest, I don't -- I didn't
9 really understand their interest in it.
10     Q. Sort of off topic?
11     A. I remember thinking when they brought it
12 out, I was, like, what's this all about sort of thing.
13 It was off what I asked them to look at.
14     Q. Did -- at any time did either (P) or Kortan
15 initiate a conversation with you in which you got the
16 impression that they thought you wanted this
17 disclosure of the Axelrod conversation to be kept a
18 secret?
19     A. No. Absolutely not.
20     MR. BROMWICH: Scott, I don't know if you
21 have any questions on that. If not, I'll move on.

**Page 104**

1     MR. SCHOOLS: I don't think so. I may go
2 back to this. Not right now.
3 BY MR. BROMWICH:
4     Q. So you've adverted to the fact that May 9th
5 was a pretty significant day, and I think you
6 mentioned that a couple of hours -- within a couple of
7 hours after you had this meeting with the inspections
8 investigators, your world kind of turned upside down.
9     Describe in -- try briefly how you learned
10 about Director Comey having been fired by the
11 President and events that immediately followed that.
12     A. Okay.
13     So, that day, I don't know what time I met
14 with the inspectors. It must have been maybe 2:00 or
15 3:00 or something like that. It was in the afternoon.
16     My closeout meeting was at 5:00. So it
17 would have been my EADs and a couple of ADs meet in my
18 conference room at 5:00.
19     We were just getting started and one of the
20 gals came in with -- the secretaries came in and said,
21 "The attorney general would like to speak to you."



Page 105

1    So I excused myself from the meeting,
2  immediately went out, and said, "What line is he on?"
3  And they said, "No. He wants to see you in person.
4  He's not on the phone."
5    Which I thought that can't be good.
6    So I grabbed my coat and told my security
7  person, and we walked over here.
8    Had to wait. He was busy. Had to wait
9  maybe 10, 15 minutes before I went into his office.
10  And it was myself and Attorney General Sessions and
11  the DAG Rod Rosenstein. So it was the DAG and the AG
12  and I think Jim Crowell was there as well.
13    Q.  Who is he?
14    A.  Was he the acting packing pay DAG at the
15  time?
16    MR. SCHOOLS:  Um-um.  C-R-O-W-E-L-L.
17    THE WITNESS:  That's right. And I walked in
18  and they said, "I don't know if you've heard, but we
19  had to fire the director." I said, "No, I had not
20  heard that."
21    I was surprised.

Page 106

1    And that's what kind of set in motion really
2  a very tough couple of weeks.
3  BY MR. BROMWICH:
4    Q.  How long did you meet with the attorney
5  general and the others?
6    A.  Not long. 10 minutes, something like that.
7  And he told me that he needed me to serve as acting
8  director, and that it might not be for long because
9  they were thinking about putting in an interim
10  director in between that day and whenever a permanent
11  director would be selected.
12    I think I asked him a question about sending
13  a message to my work force, and the DAG told me not to
14  do that. Not do anything until we heard -- until we
15  heard more.
16    And that was it. Pretty much. I left.
17  Went back across the street. In fact, the DAG told me
18  to don't say anything to anyone until you hear more
19  from us basically.
20    And I said okay. So we went back across the
21  street kind of, like, "Oh, my God, what do I do now?"

Page 107

1  But by the time I got there, it was on the news. So
2  it was widely known. That leadership team was still
3  there. We immediately jumped into trying to figure
4  out how to run the bureau without the director from
5  that point forward.
6    We pulled every SAC back into their field
7  office. We had visits with them that night. We step
8  up a communications plan. They needed very specific
9  guidance on how to handle their personnel, media
10  questions, and all kinds of stuff like that.
11    Yeah, it was just a crazy time.
12    I also got asked to go down to the White
13  House that night to talk to the President. I had
14  never met him before.
15    Q.  Is that after the meeting you just
16  described?
17    A.  Yes.
18    Q.  So about what time?
19    A.  I think I met with the President at 7:00.
20  And we actually had the SAC -- I met with my
21  leadership team, then met with the President, then

Page 108

1  came back for the teleconference with the SACs.
2    And it ended up leaving late that night with
3  the detail, first time with a 24-hour security detail.
4  I think there were television cameras in my front yard
5  when I got home.
6    Q.  How long was your meeting with the
7  President?
8    A.  It was probably a half hour.
9    Q.  In general terms, what did you talk about?
10    A.  It was a strange conversation. We talked
11  about all kinds of things.
12    He asked me if I was part of the resistance,
13  whether or not I supported the director. Is it true
14  that people didn't like the director and that people
15  were frustrated with him.
16    These are all questions that he asked me and
17  of course I answered him in different ways.
18    He talked to me about what he characterized
19  as that mistake that I had made, which I asked him to
20  clarify. And he made clear that he was talking about
21  my wife and her run for office.



Page 109

1  All kinds of things like that.

2  Q.  Was there an issue that arose about whether

3  Director Comey was going to be able to take a

4  government plane?

5  A.  That was the following morning.

6  Q.  All right.

7  A.  The President called me in my office, and he

8  was very frustrated about the fact that the director

9  had taken the FBI plane to return to Virginia. And I

10  explained to him that it was, you know, the

11  appropriate thing to do and that I fully approved it.

12  And he had -- although he was not the director, he

13  still had a security detail because the assessment was

14  there were threats to him, and we would reevaluate

15  that assessment.  But for the time being, you know, he

16  needed transportation back to Virginia and that was

17  the right way to do it.  And he disagreed with that.

18      Then he asked me to come back that afternoon

19  for a conversation about whether or not he should

20  appear at the Hoover Building that week, the President

21  should.  Which I did.  I went back that week and --

Page 110

1  Q.  That day you mean?

2  A.  That day.  And I think that was the last

3  time I saw him that week.

4  Q.  He did not go the Hoover Building?

5  A.  He decided to do it on -- I think they were

6  going to do it on Thursday or Friday.  I can't

7  remember which day, and then ultimately they canceled.

8  Q.  So you've described what happened on May 9th

9  after meeting with the inspections investigators?

10  A.  Yes.

11  Q.  And, again, your responsibilities had

12  changed and increased dramatically --

13  A.  Right.

14  Q.  -- that afternoon and early evening of the

15  9th.

16      Part of the narrative that's related to the

17  proposal is that a redrafted, signed sworn statement

18  gets sent to you on the 12th.

19  A.  Yes.

20  Q.  So three days later and two and a half to

21  three days after you becoming acting director.  Do you

Page 111

1  remember receiving it?

2  A.  I remember getting it.  I don't think --

3  when I initially got it, I'm not even sure I even

4  opened the attachment.

5      At some point weeks -- I think weeks later I

6  did look at the attachment, but I kind of pushed it

7  aside and said, "I don't need to worry with this right

8  now.  I have so many other things to do."

9      I was very, very concerned about our Russia

10  investigation and what would happen to it.

11  Q.  What do you mean?

12  A.  Well, I was concerned about whether or not

13  our investigation was on a sound enough footing that

14  it would continue.  Whether or not I was serving as

15  acting director.  I didn't know if an interim director

16  would come in or what would happen to me if one did.

17  I expected that that might happen at any moment.  I

18  didn't know the answer to that, and I wanted to make

19  sure that our case was on solid ground.

20      So I had a series of conversations with the

21  DAG over the course of several days in which I

Page 112

1  advocated strongly for the appointment of a special

2  counsel.  So that was another thing.  That was the

3  thing that was really taking up the most of my

4  attention at that time.

5      So, in that context, you know, reviewing for

6  the second time the inspection division's signed sworn

7  statement that the Mike Flynn leak was not -- was not

8  high on my list of priorities.  So I kind of put it

9  aside until I had more bandwidth to focus on it.

10  Q.  Let's move forward to late July of 2017.

11      You're still the acting director.  I believe

12  you remained the acting director until either

13  August 1st or August 2nd when Director Wray was

14  confirmed; is that right?

15  A.  That sounds about right.

16  Q.  So you were contacted by the inspector

17  general's office; is that right?

18  A.  That is correct.

19  Q.  Describe what you recall about the initial

20  contact and then the events that followed that.

21  A.  It was a Friday, and I received a phone call



Page 113

1 or a message from the IG's office from (P) ,
2 and I don't remember if I took the call directly from
3 him or if he had called and I had to call back. But
4 in any case, we get on the phone and he explained to
5 me that they needed me to come over and sit down and
6 talk to them that day.
7         And I asked him what it was about. He said
8 he couldn't tell me, but that it was very important
9 and that I absolutely had to do it that day. And it
10 was something of utmost importance that they had to
11 kind of share with me and talk about.
12    Q. Um-um.
13    A. And so, I said, Okay. I'm not sure I can do
14 that, and I wanted to contact my counsel, my attorney.
15    Q. You were represented by counsel at the time?
16    A. I had an attorney at that time, yeah.
17 Because I knew I was under investigation by the IG as
18 per their announcement in January of '17.
19         So I contacted my -- it took me some time to
20 get in touch with my lawyer because he was actually
21 out of the country at the time. And so, he was unable

Page 114

1 to appear with me. I had not been interviewed by the
2 IG about the investigation that I was a part of up
3 until that point, and I figured that I would have more
4 time to kind of prepare for that. You know, I would
5 get more notice of it.
6         I certainly didn't expect our initial
7 engagement to be, like, hey, you have got to get over
8 here immediately.
9         So, I called Dan back. That's my
10 recollection. I called him back and said that I would
11 come over, but I was concerned about doing so because
12 my attorney was not available.
13         He said that that was fine. I explained to
14 him I did not want to talk about anything that had to
15 do with matters, you know, connected to their
16 investigation of me. He said that was fine. Come
17 over. He had to talk to me about some other things.
18         So I did that.
19    Q. You went across the street. And what
20 happens there?
21    A. Come across the street, just me and my

Page 115

1 security guy. He waited outside. I came into a
2 conference room. It was not this one, but one like
3 it. And it was (P) and two other attorneys
4 from from the IG's office who I did not know. I don't
5 remember their names.
6         And I made it, you know -- they thanked me
7 for coming over, and I made it very clear, like, you
8 know, fine. You know, happy to oblige, but I am
9 concerned about being here because I know that you're
10 investigating me and I'm not prepared to be
11 interviewed, and I don't have my lawyer. He's not
12 available to be here and so I don't want to talk about
13 anything that is connected to, you know, matters
14 that's your investigating -- could be investigating me
15 about.
16         They said that's no problem, you know, it's
17 a voluntary interview and that they wouldn't ask me
18 those questions. That it was something else that they
19 wanted to talk to me about.
20    Q. So what happens next?
21    A. So I agreed to talk to them, and they put it

Page 116

1 on the record or they started recording. And they
2 proceeded to explain to me that they had a massive
3 quantity of text messages between (P) and (P)
4 (P) which they thought were very -- they thought they
5 were really concerned about these messages, and that
6 they might be, you know, indicative of some sort of
7 political bias. And so, anyway, we started talking
8 about the texts.
9    Q. Did they show you some of those texts that
10 (P) texts that had had caused them concern and
11 then started causing you concern?
12    A. They showed me a lot of them. I'm sure it
13 was a small percentage of the total, since the total
14 was in the tens of thousands.
15    Q. That's what they said, it was in the tens of
16 thousands?
17    A. I think the number they told me was 70,000
18 or more.
19    Q. Okay.
20    A. But they had pulled out a whole stack of
21 ones that they were particularly concerned about. So



**Page 117**
1 we started to go through those. And they were asking
2 me questions like -- like did we ever talk about
3 Watergate or something like that. Like, I guess
4 questions that were keying off of substance of
5 different texts. They would ask me a question like
6 that, and then they would show me a text in which --
7 and I'm just using this as an example -- in which
8 (P) made some Watergate reference. Like,
9 what did that mean?
10       Anyway, we went over a lot of those that way
11 for a while. They were very concerning to me.
12       They asked me how they felt -- not how they
13 felt. But they asked me what did I think of the
14 texts, how did I feel about them, and things like
15 that.
16       So I told them that they concerned me
17 greatly.
18    Q. Based on what they had just shown you?
19    A. Just upon what they said and what they ·
20 seemed to suggest. Like, but I also said, look, if
21 you're asking me am I concerned that (P)

**Page 118**
1 were their decision and their participation in the mid
2 year case influenced by their personal politics, my
3 answer was, no, I never saw that. I never saw any
4 language like they had used in the texts. I never at
5 no time in working very closely with them did I ever
6 develop the sense that they were, you know, steering
7 things based on their politics.
8       But nevertheless, the texts themselves are
9 really inflammatory and, you know, concerned me.
10 That's what I told them.
11    Q. Then at some point they show you the text
12 message that has language that's from (P) to
13 (P) that uses the phrase "throwing the PADAG under
14 the bus."
15    A. Yes.
16    Q. What do you recall about that?
17    A. I remember that they showed me a text. I
18 think there was one at the same time -- maybe it's
19 that's one or another one in that same time period in
20 which -- I thought there was a mention specifically of
21 (P) or WSJ.

**Page 119**
1    Q. I don't have it in front of me. Let me
2 just quote to you just so we're focused.
3       This is from FBI OPR's summary of what
4 happened during that interview.
5    A. Okay.
6    Q. "The OIG told you he believed special
7 counsel's October 30th text related to the Wall Street
8 Journal's article later that same day revealing
9 investigation number two," which is the Clinton
10 e-mail, the Clinton Foundation investigation. "And
11 the PADAG telephone conversation. You responded, 'I
12 don't know what she's referring to.' You then stated
13 the OIG's questions exceed the scope of the OIG's
14 current investigation for which it was questioning you
15 and that you did not want to 'get into discussing the
16 article with the OIG.' The OIG then asked, "Was she
17 ever authorized to speak to reporters in this time
18 period? Was she?" You responded, "Not that I'm aware
19 of." You went on to say, "I was not even in town
20 during those days, so I can't tell you where she was
21 or what she was doing."

**Page 120**
1    A. Yes.
2    Q. So walk us through what you were thinking --
3    A. Right.
4    Q. -- and why you said what you said.
5    A. So they had asked me a lot of questions
6 about -- almost every text ended with the question
7 "What are they talking about here? What did she mean
8 by this?" And I was being very careful to make it
9 clear that I didn't know. I was not a party to those
10 conversations. And I didn't feel comfortable going
11 back after the fact and saying what was in her head or
12 (P) head.
13       So when they brought up the throwing him
14 under the bus comment, like that was my initial
15 reaction was, like, I can't sit here today in July,
16 whatever it was, and tell you what these two people
17 meant when they had a private conversation back in
18 October.
19       Then I think that my recollection is that
20 (P) or someone -- I think it was (P) -- brought out
21 the actual Wall Street Journal article from the 30th



Page 121

1 and asked something to the effect of, "Is this what

2 they're talking about?" And he kind of, like, you

3 know, drew my attention to that article specifically.

4 And that's where I said, Hey, now we're kind

5 of getting -- you're asking me questions about, you

6 know, whatever I said about --

7 Q. Crossing the strings?

8 A. Yeah. I didn't think we were going into

9 that area. It started to feel like I was being

10 examined about, you know, something other than being

11 notified about their texts, if that make sense.

12 Q. Um-um.

13 A. And, yes. So I was really trying to just,

14 like, stop the questioning in the way that I had told

15 them I didn't want to be questioned.

16 So I tried to kind of parry the question off

17 in and awkward and ineffective way. I probably should

18 have just said, "Hey, I'm not going to answer that."

19 But that's what I was thinking. I was kind

20 of processing a million things at once, and that's the

21 answer I gave him.

Page 122

1 Q. So you complete that interview with the OIG

2 on July 28th?

3 A. Yes.

4 Q. And you go back across the street. And what

5 do you do?

6 A. Well, I mean, I was really not focused on

7 the Wall Street Journal article. Certainly not

8 initially. I was greatly concerned about what was I

9 going to do with (P) . I felt like at

10 least (P) continued involvement on the team -- he

11 was assigned as the kind of FBI lead on the special

12 counsel team, and I thought that the texts could, you

13 know, by shining a negative light on (P) could

14 undermine the work of the team, the special counsel

15 team essentially. And I felt like I could not take

16 the chance of negatively impacting what the special

17 counsel's team was trying to do.

18 So I convened my kind of group of leaders,

19 Dave Bowditch, who had also, I learned, had spoken to

20 the OIG earlier in the day. So he was aware of the

21 texts.

Page 123

1 Q. You didn't know that when you went over?

2 A. No, I don't think I did.

3 But, in any case, he was aware of it.

4 Also Carl Ghattas, G-H-A-T-T-A-S. I think

5 Bill Priestap, P-R-I-E-S-T-A-P.

6 Because the special counsel kind of

7 supervision of that team was being done by Ghattas and

8 Priestap.

9 And Jim Baker I talked to as well. I think

10 it was just the four of them and myself in the

11 director's office. And we kind of talked about, like,

12 what do we do? What's the right thing here? We

13 didn't want the, like, penalize (P) We didn't want

14 to rush to judgment. We didn't want to take, you

15 know, unfair kind of, you know, negative action

16 against (P) but at the same time we felt like he's

17 in a very sensitive spot.

18 So we figured out that we had an equivalent

19 position that we could put him in. He was a deputy

20 assistant director. There was an open deputy

21 assistant director position or there was one

Page 124

1 somewhere. It was not where we would want to put him.

2 He felt like it would be better to put him in a

3 nonoperational role at least until the investigation

4 of this was concluded.

5 So we made some other moves essentially and

6 we created and empty spot for him in the human

7 resources division.

8 Q. How about for (P)

9 A. (P) had already left the special

10 counsel's team a couple of weeks earlier, and had

11 returned to the headquarters where she was still

12 assigned to the deputy director's office.

13 At that time I was not working with the

14 deputy director's office. I had moved into the

15 director's office and was working with the director's

16 office staff. I had handed over the deputy director's

17 role kind of to Dave Bowditch. And so (P) was back

18 at headquarters, but I was not interacting with her on

19 a regular basis.

20 Q. Did you talk to her at all in the immediate

21 aftermath of your July 28th OIG interview about what

Page 125
1 you had seen?
2     A. I did. I talked to her that night very
3 briefly, because we were going to reassign her as
4 well, essentially out of the deputy director's office
5 back to the general counsel's office.
6          And, so, I simply told her that I had had a
7 conversation with the IG, and they had shared with me
8 information that was very damaging, and that as a
9 result of that I had to -- I was moving her
10 essentially out of the deputy director's staff and
11 back to Office of General Counsel.
12    Q. Did you specifically mention that they had
13 shown you text messages between her and (P)
14    A. I don't believe I talked to her about any of
15 the details of it.
16    Q. Did you mention to her that they had shown
17 you this reference to PADAG and throwing PADAG under
18 the bus?
19    A. No. Absolutely not. Absolutely not.
20    Q. The record is that you contacted the OIG a
21 couple of business days later.

Page 126
1     A. Yes.
2     Q. On August 1st.
3          First, tell us what caused you to make that
4 recontact?
5     A. I was a little bit unsettled by -- I was
6 thinking back about it, thinking about the whole
7 exchange and trying to process, you know, not only,
8 like, what's happening with the special counsel's
9 team, how do we make that's not undermined, but
10 these two people whose lives are really going to be --
11 two people who I know well and think highly of who
12 apparently had exercised incredibly poor judgement and
13 had, as a result really -- you know, trying to assess
14 the damage of what would come of this to the bureau,
15 to the investigation, but also to them on a personal
16 level. I felt terrible about it. You know, they were
17 both really shaken up by the text message, the
18 existence of the messages and everything that would
19 come of that.
20          And so just in rethinking about all the
21 stuff that night, maybe the next day, I felt like my

Page 127
1 exchange with (P) over the article -- I was concerned
2 that I had left him with the wrong impression. And
3 specifically that, like, they would now think that
4 (P) had not been authorized and would, like, kind of
5 add that to their investigative focus on her. And I
6 wanted to make perfectly clear with them, you know, my
7 recollection of how that had happened, the fact that
8 she and Mike had been authorized about that exchange.
9     Q. Had you before they interviewed on the 28th
10 and then you went through this process of thinking
11 about it and you were in contact with them on the 1st,
12 had you had occasion to think much about the October
13 31st Wall Street Journal article and focus in
14 particular on the PADAG quote? I mean, you were doing
15 a lot of other things.
16     A. No. No, it was not a matter that -- you
17 know, I was surprised when the inspection division
18 folks brought it up in May. Hadn't thought about it
19 probably then since, like, the previous October. Yes,
20 I was just not -- it wasn't really relevant to  ·
21 anything that I was doing at the time.

Page 128
1 ·   Q. So what do you recall about the August 1st
2 call that you make to the IG's office?
3          MR. SCHOOLS: Can I follow up on July before
4 we get to that?
5          MR. BROMWICH: Yes.
6          MR. SCHOOLS: I will have to grab the
7 transcript if we need to to be precise, but you
8 mentioned earlier that you understood you were under
9 investigation by the IG at that time?
10          THE WITNESS: Yes.
11          MR. SCHOOLS: What did you understand you
12 were under investigation for?
13          THE WITNESS: I wasn't laser clear on that.
14 I knew that recusal was an issue. I knew that
15 unauthorized -- well, I mean, my interaction with the
16 media. I don't remember how that's phrased in the
17 January announcement was on that list of things.
18          And then, of course, the very general kind
19 of, you know, the catch-all category of, like, I think
20 it's FBI decisionmaking around the Hillary Clinton
21 investigation, which certainly could include me on a



Page 129
1 number of areas of investigation.
2       MR. SCHOOLS: I actually do want to go grab
3 that transcript so, I will be right back.
4       (Whereupon, a recess ensued.)
5       MR. SCHOOLS: Back on the record.
6       So, when your interview with them -- show
7 you the article from the Wall Street Journal dated
8 October 30th, ask you some questions about text
9 messages around that same time frame, their questions
10 start of concludes with a description of the text that
11 says, and (P) responds, "Yeah, I saw it. Make me
12 feel way less bad about throwing hill under the bus in
13 forth coming CF article." He says, "Which we're not
14 sure what that relates to. Perhaps Clinton
15 Foundation. Do you happen to know?" And you said, "I
16 don't know what she's referring to." And
17          says, "Or perhaps a code name." And you
18 said, "Not one that I recall. But this thing is like
19 right in the middle of the allegations about me, so I
20 don't really want to get into discussing this article
21 with you."

Page 130
1       And that's what I wanted to ask you about.
2       THE WITNESS: Okay.
3       MR. SCHOOLS: When you said, "this thing is,
4 like, right in the middle of the allegations about
5 me," what were you thinking at that point with respect
6 to the article and sort of where you were and what was
7 going on in that interview?
8       THE WITNESS: I think I was thinking a lot
9 of things, Scott. I think, like, I was trying to be
10 careful about not presuming what they were talking
11 about or what they weren't talking about. I never
12 heard "CF" used as a code name. It's not an official
13 code name that I'm familiar with.
14       Could it be Clinton Foundation? Sure. It
15 could.
16       And that, to me, puts me in that kind of
17 catch-all bucket of all things Clinton saying that I
18 know the IG is looking at.
19       And, so, that's part of it.
20       And that was my way of telling them, like,
21 hey, I'm not really comfortable kind of talking about

Page 131
1 this.
2       MR. SCHOOLS: Did it clue in to you at that
3 point that they were looking at this article as a
4 potential leak? You had mentioned earlier that one of
5 the things you understood was they were looking at was
6 leaks.
7       Did this start to feel like a leak
8 investigation in the middle of this kind of --
9       THE WITNESS: I didn't know.
10       MR. SCHOOLS: -- meeting?
11       THE WITNESS: I didn't know at that moment.
12 I think that's kind of how I started thinking about it
13 after the fact, which is why it was important to me
14 that they knew that that was not the case, at least
15 not with respect to (P)
16       Like, I think of that article as having a
17 ton of other leaks in it, but not any that I'm aware
18 that (P) was involved in.
19       MR. SCHOOLS: And then you've said this
20 already, but I want to just kind of run through it
21 again. You made the comment that you were out of town

Page 132
1 and you didn't know what (P) was up to during
2 that time.
3       THE WITNESS: Yes. I think if you read the
4 exchange leading up to that --
5       MR. SCHOOLS: So there is a question that
6 starts -- so, here, I mean, I can show you there is
7 not much content from what you already read. This is
8 October 27th "still on with (P) And this is
9 around the time of the, you know, the Comey, Comey
10 letter to Congress is the following day about the
11 Weiner matter. You say, "Yeah."          says, "And
12 things like that." "So there is another one in the
13 same period, the next day, that you know is still on
14 with (P) , but not any other context with it just
15 those." You say, "I -- not that I'm aware of. Okay?"
16 And then you say, "And, again, I'm not even -- I don't
17 feel comfortable getting into this with you guys
18 but" --          says, "Um-hum." And you said, "I
19 was not even in town during those days, so I can't
20 tell you where she was or what she was doing."
21       THE WITNESS: Yeah, so in my mind, they're



Page 133
1  asking me, like, this day, what did she mean with this
2  text? What did the following day? There's all these
3  things going on in the background.
4         I was -- again, my focus is, like, I don't
5  want to -- I don't want to assume that I know what
6  she's taking about, what CF means. I'm not a party to
7  those conversations, so I don't -- that's not -- I
8  didn't think that was an appropriate thing for me to
9  do.
10        So that comment is, like, basically me
11 saying I'm not -- again, I'm not thinking about the
12 authorization. I'm saying, like,      (P)     are
13 texting during that time. I'm not there. I'm not in
14 those conversations. I can't sit here and tell you
15 where she was and what she was doing every minute of
16 the day.
17        That's how much I'm thinking about that. It
18 was, like, an offhand comment to explain to them,
19 like, you can't hold me responsible for the things
20 that's    (P)    and    (P)    are saying in text
21 messages. I can't be a -- I can't actually tell you

Page 134
1  what was in their minds.
2         MR. SCHOOLS: So it's based on fairly clear
3  recollection you have about the events of that
4  weekend, at least as it pertains to the Wall Street
5  Journal article --
6         THE WITNESS: Yes.
7         MR. SCHOOLS: -- that statement is sort of
8  demonstratively false.
9         THE WITNESS: I don't know where she was or
10 what she was doing.
11        MR. SCHOOLS: I mean, I appreciate the
12 context of it. I wanted to make sure that you have
13 had every opportunity to say, "Look, this is the
14 atmosphere. They were questioning me about things
15 that" --
16        THE WITNESS: Yes.
17        MR. SCHOOLS: -- "I wasn't anticipating they
18 were questioning me about."
19        THE WITNESS: That's basically, Scott, what
20 I told the IG in the interview. Clearly, I misspoke.
21 And I was confused, anxious about being there without

Page 135
1  an attorney. Questions are kind of going all over the
2  place. I felt like they were asking me to basically
3  explain what these other two people meant in their
4  texts, and I was trying to kind of, like, defend
5  against the questions. I wasn't at all, at all,
6  thinking about, like, oh, gosh, I shouldn't tell them
7  that I authorized this disclosure.
8         And, in fact, that's why I called them
9  Monday or Tuesday the next week and said, "Look, just
10 to be clear, I don't know" -- and this is my
11 recollection of that conversation. "I don't know,
12 And still cannot tell you what the two of them were
13 talking about. I can't be responsible for their
14 private conversations. But I can tell you that I did
15 authorize her and Mike Kortan to talk to the Wall
16 Street Journal about that article." And I think I
17 also clarified something else with him about -- I
18 think he had asked me something about had I seen her
19 socially or something like that. And I remembered
20 something else that another occasion or something that
21 I hadn't told him about in the prior interview, so I

Page 136
1  corrected that as well.
2         MR. SCHOOLS: So listen to this question.
3  You mentioned that your counsel was out of town. I
4  don't know if maybe that wasn't the time, but were you
5  able to talk with your lawyer? I don't want to know
6  what was said, but between the July 28th interview and
7  the August 1st call to OIG?
8         THE WITNESS: No, no.
9         MR. SCHOOLS: Okay.
10 BY MR. BROMWICH:
11        Q. So moving then to the --
12        A. I should have waited for you to object. It
13 wasn't planned.
14        Q. All right.
15        So, again, going back to the August 1 call,
16 you thought about it?
17        A. Yes.
18        Q. It's sort of careening around in your head.
19 I think this is a paraphrase of you, but you want to
20 correct any misimpression.
21        A. Correct. I think they told me to do that.



Page 137

1    Q.   Sorry?
2    A.   I think they told me to do that at the
3    interview.  Like, they normally do.  Like, if you
4    think of something differently after the fact, just
5    call us up and let us know.  That's how I thought
6    about it.
7         Q.   You called that part in.  What do you recall
8    saying?  He wrote a memo to the file, which you may
9    have seen by now, but what do you recall telling him?
10        A.   I recall telling him that there were two
11   things that I had realized after the fact that I
12   wanted to make sure that they had correct.  And I
13   think one of them was this -- had to do -- not
14   particularly relevant, but it had to do with some
15   other question that he had asked me about times I had
16   seen her or something like that.  And then I brought
17   up the article and said, you know, "Just to be clear,
18   I don't want to have given you the wrong -- a
19   misimpression or the wrong impression."  An, again, I
20   tried to be very clear about, like, I'm not changing
21   my answer in terms of being able to shed light on what

Page 138

1    she and (P) were talking about.  I felt very strongly
2    that that's not my role to be, like, interpreting
3    their comments.
4           But, you know, in context, just so you know,
5    that I had authorized she and Mike Kortan to talk to
6    the Wall Street Journal.
7         Q.   Now, he -- there is a memo that he writes,
8    an e-mail that he writes summarizing the conversation.
9    And the language that he uses to describe what you
10   said is a little odd, at least that was my reaction.
11   He says you told him that (P) may have been
12   authorized by you to work with Kortan.  And the second
13   time that you may have authorized her to work with
14   Kortan and speak to the Wall Street Journal reporter,
15   because she previously worked with you on issues
16   raised by your wife's campaign.
17          Were you that equivocal about it, that you
18   may have authorized it?  Or do you recall it
19   differently?
20        A.   No, I recall it very differently.  I mean,
21   like, I would not have called him back to be equivocal

Page 139

1    about -- if I didn't want to clearly indicate to him
2    what my recollection was, i wouldn't have called him.
3         So I don't remember it that way at all.
4         MR. BROMWICH:  I'm going to move on to
5    something else unless you have any additional
6    questions about either the July 28th or the follow-up
7    call.
8         MR. SCHOOLS:  I don't.
9         MR. BROMWICH:  Okay.
10   BY MR. BROMWICH:
11        Q.   Let's move on to a couple of weeks after
12   that.  Just into the second half of August.
13          And I want to ask you about another meeting
14   you had with people from the inspections division.
15        A.   Okay.
16        Q.   How do you recall that that meeting came
17   about?
18        A.   That meeting came about because -- okay.  So
19   we had done this very outward and intentional kind of
20   shift of responsibilities, right, when the director
21   got fired.  So not in that very first week, but maybe

Page 140

1    in the second week.  I announced it to the field and
2    everything that I would be moving into his office,
3    taking on his role, you know, because it was important
4    to me that the bureau knew it had a director during
5    that time, or an acting director.
6         And, so, part of that was taking on his
7    calendar and his responsibilities and doing the
8    speeches he had committed to and all that stuff.
9         So, like, I had basically taken all my
10   deputy director stuff and put it aside for that
11   period, and that was my thinking around the signed
12   sworn statement.
13          So now it's August.  I'm back.  I had
14   physically moved back into my old office, and I sit
15   down and I going through those things that I've kind
16   of neglected over the last three months.  One of them
17   is the signed sworn statement.
18          I take a look at that.  I had already read
19   it.  At some point I had read the attachment and
20   realized it was inaccurate, but I knew that I needed
21   to reengage with the inspection team to get it

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 141

1 corrected.

2    And so I told my secretary to reach out to

3 inspection and get them on the calendar to come in and

4 talk about the statement again.

5    Q. So what do you recall happening next?

6    A. I remember that we reconvened in my office.

7 I remember that (P) was there. I don't remember

8 whether Voviette and/or (P) were there. I just

9 don't have -- like I said, over the course of those

10 meetings I conflate them a bit in my mind.

11    We met, and I said, I need to talk to you

12 about the signed sworn statement and also some other

13 stuff. And we just immediately got into talking about

14 the statement. And I told them that the piece that --

15 it was essentially very similar to the first edition

16 of the signed sworn statement, except it included a

17 paragraph or two on the very end about the Wall Street

18 Journal article, which was inaccurate and I explained

19 that to them. Yeah.

20    Q. What do you recall about their reaction?

21    A. (P) was kind of surprised.

Page 142

1    Q. (P)

2    A. (P) yes. And he was, like, "Oh, well."

3 And he made a point of saying a couple of times,

4 "Well, like, you have the authority to do that, so

5 that's fine."

6    And I said, "Yeah, I know that." And he's

7 like that's perfectly -- you know, he said that a

8 couple of times, which I thought was odd.

9    And he might have said something else, like,

10 well, you know, kind of we wasted time on that. We

11 wasted some time on that. If we had known that, then

12 we wouldn't have. I was, like, Well, that's why when

13 I saw it, I told you that that's not accurate.

14    Q. Um-um. He even said something like you hung

15 your head and you said "I'm sorry."

16    Do you remember anything like that?

17    A. No, no. I remember sitting in my conference

18 table and (P) was sitting to my right. I can't

19 remember if both of the other -- of the two ladies

20 were sitting on me left or just one of them or

21 whatever. But, yeah. No, it was a very kind of -- it

Page 143

1 was, like, right off the top of the bat at the

2 meeting. And, like I said, (P) was surprised, but he

3 kind of went into this soliloquy about, like, what my

4 authority was to authorize disclosures to the media,

5 which I thought was strange. And that was it.

6    I certainly did not have any intention of

7 apologizing to them for anything. There was not -- no

8 need for that.

9    Like I said, I saw it as simply correcting a

10 misimpression that they had. Which, again, like,

11 that's their process. I'd been through this before

12 and done other signed sworn statements. They send you

13 a draft, you may changes, you get together and you

14 talk about it. They send you another one, you correct

15 it, you get together, and eventually you get to the

16 final product. And that's how I saw this signed sworn

17 statement as a part of that process. I was simply

18 correcting something they had put in there in error.

19 And it wasn't finalized yet. I had never signed it,

20 but it was -- you know, we were getting to that, I

21 guess.

Page 144

1    Q. You --

2    A. I also told them that they were -- that I

3 had learned that the IG was now investigating the

4 Flynn comment allegation, and that that was surprising

5 to me.

6    Q. This is the Circa thing we talked about

7 before?

8    A. Yes. And did they know that? And I said,

9 "Look, you guys should kind of, you know, get with the

10 IG and figure out, like, who's doing what. Because it

11 didn't make sense to continue doing it if the IG was

12 already going to do it."

13    And they were very incensed by that. They

14 were not aware of that. And they seemed to be, you

15 know, mad about the fact that there was kind of two

16 horses going down the same road.

17    Q. Now, at some point. I believe it was

18 October, you were given a notification by the IG's

19 office that you were the subject of an investigation

20 into areas --

21    A. Yes.

Page 145

1  Q. -- that you had not been a subject in
2  before.
3      What do you recall about that?
4      A. Dave Bowditch gave that to me. Sometime in
5  October. And, honestly, like, my initial impression
6  was I didn't -- I wasn't sure that it was anything
7  different. Like, I almost thought, like, Well, maybe
8  this is just them coming back and giving me, like, the
9  official notice after the fact of what had been
10  started in January or something. I didn't really
11  understand, like, how this was different than what
12  they had said publicly in January.
13      And, again, I wasn't clear on exactly, like,
14  what I was the subject of at that point.
15      So then I e-mailed ___(P)___ and asked in
16  some form, like, is this, you know -- I can't remember
17  what I said in the e-mail. I'm sure somebody has it.
18  But I asked for a clarification as to what I was the
19  subject of.
20      Q. And did he clarify? How did he respond to
21  your e-mail?

Page 146

1      A. He did. He said that I was the subject of
2  everything that they had announced in January and also
3  this now. And I remember thinking that was odd,
4  because there were all kinds of restrictions in the
5  FBI on the OPR side about how you have to notice
6  someone at the beginning of an investigation and all
7  that stuff. And he was basically saying that the
8  public announcement in January was my official notice
9  of that stuff. And I just thought that that was
10  strange that that could serve as a notice.
11      But in any case, he sent me an e-mail and he
12  tried to clarify that.
13      Q. Am I right that you fully cooperated with
14  the IG's office in terms of making yourself available
15  for multiple interviews --
16      A. Absolutely.
17      Q. -- in November and early December?
18      A. We did them over the course of, I think,
19  two days in November and then another day in December.
20  Probably for a total of, I don't know, 24, 25,
21  26 hours, something like that.

Page 147

1      Q. And did you tell them the truth to the best
2  of your ability and recollection throughout those
3  interviews?
4      A. I did. I did, yes.
5      Q. So just a final couple of questions.
6      I've asked these before.
7      Did you have any motive to conceal the fact
8  that you had authorized sharing information with the
9  Wall Street Journal about your discussions with Matt
10  Axelrod?
11      A. Absolutely not, no. It is my understanding
12  that I had the authority to do that, and I was -- it
13  was not something that was secret or concealed.
14      Q. Did you ever speak to ___(P)___ and
15  discourage her from disclosing the fact that she had
16  been authorized to speak with the Wall Street Journal?
17      A. No.
18      Q. Did you ever have any similar conversations
19  with Michael Kortan?
20      A. I did not.
21      MR. BROMWICH: I don't have anything else

Page 148

1  here.
2      Do you have anything?
3      MR. BRUCE: No.
4  BY MR. SCHOOLS:
5      Q. I want to go back to the week of the 24th
6  and just talk a little bit about the recusal
7  timelines.
8      A. Okay.
9      Q. I'm trying to figure out what discussions
10  were happening and when.
11      So, the October 23rd article comes out, I
12  guess, Sunday afternoon?
13      A. Yes.
14      Q. It disclosed the McAuliffe contributions
15  about which you were aware -- only became aware just
16  prior to the publication of the article?
17      A. That's right.
18      Q. And then it's in the newspaper on the 24th.
19      Did that article prompt discussions about
20  recusal from Clinton e-mail or Clinton Foundation?
21  And if so, at what point did they start?



800.211.DEPO (3376)
EsquireSolutions.com

Page 149
1 A. I don't remember having any, like, really
2 serious conversations with the director or with Jim
3 Baker about recusal simply in the wake of that first
4 Wall Street Journal article.
5 I know Sweeney has this recollection of me
6 making that comment to him in a phone call. He's not
7 someone I would have, like, gone to for advice on that
8 or even included in the discussion.
9 Is it possible that (P) and I talked
10 about it after that? It's certainly possible. But my
11 recollection is (P) felt generally about the recusal
12 the same way that I did, which is that there really
13 was no conflict. There was nothing explicitly calling
14 for it. And that if I did recuse at that point, we
15 ran the risk of creating all kind of havoc and
16 criticism of our work on the case up until that point,
17 which of course we were getting criticized for for
18 many other reasons. But I felt like it would create
19 this misimpression that it would undermine, like, all
20 the decisions I had made leading up to that point.
21 Right?

Page 150
1 So if I should have recused then for
2 something that happened back in 2015, then I shouldn't
3 have been involved in -- it would kind of create this,
4 like, cloud hanging over my involvement in the case
5 which I didn't think was fair.
6 So in a normal situation where you might be
7 inclined to just err on the side of caution and say,
8 Well, the recusal is not really called for, but it is
9 possible that, for appearance sake, err on the side of
10 caution and recuse. I felt like if we did that here,
11 because of the unique circumstances of this case and
12 the timing of the recusal, that we would hurt the
13 public perception of our work more than we would help
14 it, if that makes sense.
15 And I know that (P) felt that way about it.
16 I don't know if she and I discussed it in that much
17 detail during that week, but we definitely did in the
18 wake of those -- of that weekend.
19 Q. In Director Comey's testimony, I think in
20 reference to that article, he makes a comment that
21 suggested to me when I read it, that he was unaware of

Page 151
1 all those facts. But he was aware of the campaign and
2 that Jill had run for office and lost. And McAuliffe
3 piece would have been new to everybody at that point.
4 A. Well, here's what I think he's referring --
5 again, I shouldn't be thinking what other people are
6 thinking.
7 He absolutely knew about about the campaign.
8 His recollection about that now, I don't
9 know. But he absolutely knew about it. I talked to
10 him about it. Well, through Chuck Rosenberg got his
11 approval before she ran. He and I would discuss it in
12 a kind of offhand way periodically.
13 But on another occasion, he and my wife
14 talked about it for an extended period of time, half
15 hour, maybe even an hour.
16 We were together on a trip in -- I think it
17 was either June or July of 2016. We went to the Five
18 Eyes Intel Conference, which that year was in Jackson
19 Hole. And I remember there was one event that I got
20 kind of pre-dinner kind of cocktail party where Jim
21 and Jill sat on a couch and he asked her, like, a ton

Page 152
1 of questions about it. Like, what was it like raising
2 money? What was it like asking -- having to call
3 people up? What was it like knocking on -- just the
4 whole kind of, like, really granular questions about
5 the campaign.
6 Did he know the exact amount that McAuliffe
7 had contributed to her campaign? I don't know. Maybe
8 that took him by surprise that week, as it did me.
9 But did he know that she ran? Absolutely.
10 Did he know that McAuliffe supported her?
11 It's unfathomable to me that she would not have
12 included that detail. That's why she ran. Right?
13 They recruited her to run. It was, like, part of the
14 story, and they spent a lot of time, at least on that
15 occasion, talking about that story.
16 Q. The conversation, the phone call on the
17 27th -- let me back up.
18 A. Um-um.
19 Q. So you had been made aware of the e-mails on
20 the Weiner laptop. I think you said earlier maybe
21 three weeks before --



Page 153

1   A. That's right.
2   Q. -- you had actually brought it to the
3   attention of the director?
4   A. Well, no. I mean, yes, I learned of it
5   maybe first week in October, in a phone call from Phil
6   Sweeney, who I think had just learned about it
7   himself. I think he was on his way to New York to
8   start as ADIC in New York. And he called me and told
9   me about this thing, the laptop. I had never heard of
10  it before.
11      As a result of that conversation, I, I think
12  immediately, called Bill Priestap, P-R-I-E-S-T-A-P,
13  and told him you need to get the midyear team or
14  somebody from it up to New York, have them sit with
15  the investigators and figure this thing out. I don't
16  know what they have, whether it's relevant to us.
17  Maybe it's materials we have already seen. We have no
18  idea, but you need to get somebody on this.
19      Then I didn't really hear anything else
20  about it for two weeks, three weeks, whatever that is.
21      During that time, I traveled to Hawaii for

Page 154

1   an Intel conference with Asian partners. We then went
2   to San Diego for the SAC conference. There was a lot
3   going on.
4       I come back. It's that first -- that last
5   week in October. So, like, what is that? The 24th?
6   Of that week.
7       And as near as I can recall -- okay, so
8   before I get to that, when the laptop thing initially
9   came up, I definitely mentioned it to Jim. It may not
10  have been in a e-mail. It may have been in a
11  face-to-face, like, close out type situation, but I
12  mentioned to Jim, like, Hey, this thing in New York
13  has come up. Anthony Weiner, it looks like, you know,
14  he has got e-mails on his laptop that might have been
15  midyear. We don't know what it is.
16      Not in an alarmist way at all. It's
17  basically like, "Hey, we have this thing. We're
18  looking into it. I'll get back to you."
19      So now fast forward. It's the last week in
20  October. I think it was the end of a -- I can't say
21  this for sure, but I'm pretty -- I don't know if it

Page 155

1   was the end of a morning meeting with DOJ or it was
2   just some other exchange I was having with, I think,
3   Toscos said to me, like, what's going on? Did you
4   hear about that Anthony Weiner laptop?
5       And when he first mentioned it to me, I
6   didn't even kind of remember. He said, "Yeah,
7   Weiner's got this laptop." So he jarred my memory and
8   I said, "Yeah, let me find out. I haven't heard about
9   that. Let me get back to you."
10      I then, you know, came back and talked to
11  Priestap or whoever it would have been and said, "Hey,
12  I need to know where we are with this thing? What's
13  going on? We're running out of time here," or
14  whatever.
15      I think I had a conversation with Mary
16  McCord about it as well, maybe a phone call.
17      Q. A phone call the week of the 24th?
18      A. That's all the week of the 24th. And it is
19  that afternoon, Wednesday, the 26th, I think when I
20  finally kind of get the information from the
21  counterintelligence division. And it is based on that

Page 156

1   that I say we need to get this in front of Comey,
2   like, tomorrow.
3       I knew that I wouldn't be here. I wanted to
4   be obviously in on the conversation, but I would have
5   to dial in from traveling.
6       So I thought that I talked to him again
7   about it that night, but I've recently seen an e-mail
8   that I sent to him, that looks like I actually sent
9   him an e-mail very early the next mourning and said,
10  basically, you have to get this on your calendar
11  today.
12      Q. Did he have any recollection, if you
13  remember, when you said you need to get this on your
14  calendar today, what it was about? You said you ahd
15  mentioned the e-mails on the Weiner laptop to him
16  maybe three weeks before?
17      A. Yes.
18      Q. What I'm trying to get at is in the first
19  three or four days of the week of the 24th, the
20  Clinton e-mail investigation, but for that, was
21  closed?

Page 157

1 A. That's right.

2 Q. So I was just trying to figure out would

3 there be any reason to have conversations about

4 recusal on Clinton's e-mails until this issue came up

5 on the morning of the 27th like you're saying?

6 A. Not really. What we were doing then was,

7 like, responding to FOIA requests.

8 Q. How about Clinton Foundation matters?

9 A. Not at all.

10 Q. Okay.

11 A. Not at all.

12 Q. Was there anything that was particularly --

13 there was leaks going on. I guess that article on the

14 24th would have generated discussions about the

15 Clinton Foundation case?

16 A. Yes.

17 Q. Did that start -- did that article result in

18 conversations about recusal from that matter?

19 A. No. Not that I can recall.

20 Q. So then on the 27th, when that phone call

21 occurs, your recollection about why you got off the

Page 158

1 call and sort of everybody else's recollection was a

2 little different. You weren't in the room, and maybe

3 that's the reason for that. But they all recall it

4 was Andy might be recused, we need to get him off the

5 call.

6 Do you recall there being some

7 classification questions?

8 A. I don't remember Baker saying -- I remember

9 Baker brought it up. Like, hold on, before we go any

10 further, should we really have Andy on this call?

11 Something like that. And my recollection is he said

12 it might include classified. I can't sit here and

13 tell you that he didn't say recusal. I don't remember

14 him saying recusal. He might have, but I don't have a

15 perfect recollection of everything he said.

16 I think it was likely. And from having read

17 some of these materials, it seems like there was

18 probably some conversation about it maybe after I got

19 off the call, but obviously I wasn't there for that.

20 Q. So the reason I'm asking is some people

21 might speculate that, look, you have these

Page 159

1 conversations on the 27th about the impact of the

2 article that came out on the 24th and the information

3 in it, and that it may be pragmatic at least for you

4 to recuse from Clinton e-mails and Clinton Foundation

5 and that, given those discussions, that you would have

6 had no business communicating or authorizing

7 communications with the Wall Street Journal about that

8 matter.

9 A. I see.

10 Q. Because of the recusal type question. And

11 to think that because of that sequence of events, that

12 might provide a motive for you to not want to disclose

13 that you were involved in that, because the director

14 may have thought, hey, he was supposed to be recused

15 from that and we had the conversation. What is he

16 doing authorizing communication with the Wall Street

17 Journal about it.

18 So I've not heard anybody say that, those

19 kind of facts sort of are all in the mix together

20 there and I just wanted to give you a chance to talk

21 about it.

Page 160

1 A. Sure. Yeah, I mean, I never considered that

2 before. And I've been asked about it.

3 I guess the best thing I can tell you is I

4 did not -- I had not engaged in any, as I said,

5 serious conversations about recusal like leading up to

6 that. It was only really the issue came up that

7 weekend, I guess without me present. And then it

8 really hit the ground running when I got in on the

9 31st.

10 And pointedly, I would say, like, I did talk

11 to Jim Comey after their meeting. And I talked to jim

12 Comey several times that weekend.

13 We exchanged a couple of e-mails. We had at

14 least one phone call on Sunday night. And in none of

15 those calls did Jim Comey say anything to me, like,

16 you need to recuse.

17 Q. I think it's reported -- maybe even by you

18 -- that in the conversation you had on the 27th, he

19 made a comment, like, "I know what I'm going to do" or

20 "I don't need your input on this question."

21 A. That's exactly what he said. Like, he said,



800.211.DEPO (3376)
EsquireSolutions.com

Page 161

1  I've already decided what I'm going to do, so I don't
2  need you to -- I don't need you to weigh in on this
3  decision.
4        He did not say you can't or you shouldn't or
5  I'm considering you to be recused or anything like
6  that.
7        And even -- I'll be honest with you, it was
8  a little bit strange. I really wanted to talk to him
9  about recusal on Monday morning, and that's why I
10 stuck around for kind of the after with him, after the
11 morning meeting. And he really kind of dodged the
12 issue, to be perfectly honest.
13       And I brought it up and he was, like, "Well,
14 you guys should talk about that. Kind of talk to
15 Baker and see what you think." That's sort of thing.
16 It was very kind of, like, noncommittal and, like,
17 didn't want to -- you know, clearly didn't want to get
18 into a long conversation about it. And we didn't have
19 a lot of time, because we had to get downstairs to the
20 meeting, but I remember thinking that at the time.
21       And then I had this series of conversations

Page 162

1  with Jim Baker. And it was clear to me that, like,
2  Jim Baker and Jim Comey were talking about it, and
3  then, like, Jim Baker would come talk to me. And so
4  it was only over the course of those conversations
5  that I realized that, like, I don't know. Maybe I
6  started thinking maybe Jim Comey wasn't comfortable
7  talking to me about it or something.
8        And, in fact, even at one point Jim and I
9  were -- Jim Baker and I were arguing kind of the legal
10 question over the course of those conversations on
11 that Monday and early on Tuesday. I wanted to resolve
12 it with the director on Monday. I did not get a
13 chance to talk to him to resolve it that day, and so
14 it all rolls into Tuesday. And at some point Baker
15 said to me, like, kind of like, he wants you to
16 recuse. Like, he's not going to tell you that, but
17 that's what he wants.
18       And, so, then I said, "Well, I need to hear
19 it from him." And I got time on his calendar. He and
20 I had a one-on-one in his office. He was sitting on
21 the couch, I was sitting in the chair. And I laid out

Page 163

1  for him why I thought it was a bad idea. And he said
2  basically, you know, you make a good point, and you're
3  right. I think your legal analysis is right, but in
4  light of all the tension generated by these articles,
5  I think just in light of that it's better that, you
6  know, you recuse.
7        So it was -- I guess that's a really long
8  way of saying over the course of all those
9  interactions, it wasn't until he and I met, sat down
10 in his office on Tuesday, that he actually said to me
11 "you should be recused" or "you should recuse
12 yourself."
13       So, yeah, I was not -- I would never have
14 been up until that point concerned about, like, not
15 letting him know that I had authorized the disclosure
16 of the article, because, oh, I should have been
17 recused and that's not something I should have done.
18    Q.  I don't have a list of the witnesses with
19 me, but are there any witnesses who are -- that you
20 know of that have been interviewed in connection with
21 this matter that you have a poor relationship with

Page 164

1  that you think would have any reason to sort of
2  testify negatively against you?
3    A.  Well, no.
4    Q.  Okay.
5    A.  I mean, not that I can think of.
6    Q.  Okay.
7    A.  You never really know I guess.
8        MR. BROMWICH:  Until they testify against
9  you.
10       THE WITNESS:  I think other than Jim Comey,
11 all of them reported to me at some point. Maybe at
12 multiple points over the last 12 years. So, like,
13 could there be something there? I guess. But not
14 that I'm aware of.
15       MR. SCHOOLS:  That's all I have.
16       MR. BROMWICH:  Can he now go down to your
17 office and we'll continue and we'll come get you when
18 we're done.
19       (Witness excused from the room.)
20       MR. BROMWICH:  Okay. Do you want us to talk
21 about -- want to do that at the end or now?



Page 165

1 MR. SCHOOLS: About the process?

2 MR. BROMWICH: Yeah. Well, both. Why we

3 needed more time and about the process. Want to do

4 that now?

5 MR. SCHOOLS: Yes.

6 MR. BROMWICH: So just to give you the

7 entire chronology, on February 21st, the OIG's draft

8 report was made available for review.

9 On February 23rd, Eric and your colleague —

10 MR. BRUCE: No, just me.

11 MR. BROMWICH: — made an oral presentation

12 to the OIG.

13 MR. BRUCE: Oh, I did have a colleague with

14 me on that day.

15 MR. BROMWICH: So we were given -- Eric was

16 given -- I wasn't even in the case until the 22nd.

17 But very harried time table to review the report,

18 respond to the report in person and provide a written

19 submission.

20 All together from the time that it was first

21 made available, February 21st, to the time the written

Page 166

1 submission was due was February 26th, I actually asked

2 for an extension of that, because I had just gotten

3 into the case.

4 Horowitz said he couldn't do that or he

5 wouldn't do that, they were on a very tight time

6 table.

7 Then we understand that the revised OIG

8 report -- and at that time we had no idea whether any

9 revisions had been made or what revisions had been

10 made -- were transmitted to FBI OPR on February 28th.

11 On March 6th, Candace Will transmitted

12 nondisclosure agreements to Eric and me and Andy. She

13 was actually going to have it hand delivered to Andy's

14 house. Andy was not here. And let me talk about that

15 briefly.

16 Andy had scheduled a year ago, rather had

17 planned a year ago, to take a family vacation around

18 now.

19 And in early January, they had actually

20 scheduled and ticketed it. So well before any of this

21 time table was known.

Page 167

1 And so, I think I've told you, Scott, that

2 he was away and had been away for a number of days

3 before we had knowledge of when the IG report was

4 going to be transmitted to OPR and what the subsequent

5 steps were going to be.

6 MR. SCHOOLS: When did he leave? Do you

7 know?

8 MR. BROMWICH: I don't recall. I think it

9 was -- I don't know. We should check with him.

10 MR. SCHOOLS: Okay.

11 MR. BROMWICH: But my recollection is it was

12 the weekend of the 27th or so. I'm not a hundred

13 percent sure about that.

14 Then the administrative file was made

15 available to Eric and me last Friday. As you know,

16 it's a large file. I don't know if that binder

17 contains the entire file. I don't think so. Because

18 there are four volumes.

19 MR. SCHOOLS: A fourth of it.

20 MR. BROMWICH: Yeah. Four volumes and

21 Candace, again, has been extremely cooperative and

Page 168

1 helpful through all this, made it available to us

2 starting last Friday.

3 So we spent some time Friday, Monday, and at

4 the end of the day I told Candace that I didn't see

5 how we were going to be able to get through all of

6 this stuff given the volume.

7 Then I think at that point she made some

8 contact with you. She made some contact with the IG's

9 office, and we were given the entire file on Monday

10 afternoon.

11 You know, in going through that file we had

12 to make a number of requests for additional

13 information. Some of which actually we found to be

14 quite relevant and helpful. Important stuff comes to

15 mind, somebody e-mails involving Kortan and Rybicki

16 have been quite helpful. And then, you know, really

17 this week we had to through a combination of trying to

18 complete our review of the administrative file,

19 working with Andy, who returned Tuesday night, and

20 getting ready for this session.

21 So I have never seen as quick a turnaround

Page 169

1  time as the IG had here. It's been 19 years since I
2  have been in that job, but I don't ever recall putting
3  that kind of pressure on anyone to respond to a very
4  significant report that could affect somebody's future
5  in that kind of a time frame. And similarly, I've had
6  many less experience with FBI OPRs process, so I don't
7  now that compares. But its been a very rushed process
8  from our point of view.
9       And so, it was not just for the sake of it
10 that we asked for additional time. I think we could
11 have made very good use of the additional time. And I
12 think it's really hampered our ability to do as good a
13 job as we would have liked to have done. And for him
14 to, frankly, have been prepared. Ideally, he would
15 have been able to review the entire file and spot
16 checked various factual matters that we could have
17 then gone back and tried to corroborate or whatever,
18 and he hasn't been able to do that.
19      MR. SCHOOLS: Are there any people that you
20 wanted to speak with or interview or contact that you
21 were unable to reach?

Page 170

1       MR. BROMWICH: To be honest with you, we
2  haven't had the time to do that. In other
3  circumstances we would have to reach out to a whole list
4  of people, including virtually all of the witnesses
5  whose transcripts have been given to us. I mean,
6  that's just part of decent lawyering in representing
7  our client.
8       I don't know. There may well be people
9  beyond that list that we would have wanted to talk to.
10 Certainly, we would have wanted to talk to virtually
11 all of them.
12      Eric, I don't know if you have anything to
13 add?
14      MR. BRUCE: Well, I think that summarizes
15 it.
16      And we asked for information from OIG before
17 we had to give the oral presentation and the written
18 presentation, and the response was "We have our
19 process and you're not entitled to anything."
20      And if that's the process, that's the
21 process. But that, coupled with the timing, made it

Page 171

1  extremely difficult to respond in a meaningful way.
2       And it was essentially Michael, who I have
3  known and liked for 18 years, saying, you know, kind
4  of put in your response and then we'll address it.
5  You know, but without giving us a chance to really be
6  able to dig in and do it in a meaningful way.
7       MR. BROMWICH: So Eric is going to handle
8  his piece of it.
9       MR. SCHOOLS: All right.
10      MR. BRUCE: You know, I can sort of go
11 through it any way you want, Scott. There are
12 particular pieces that are more important to you than
13 others. We wanted to be helpful and field any
14 questions to the best of our ability, or I can just go
15 through it.
16      I mean, I think that the most important
17 charges are the under oath charges, obviously, so if
18 you don't have any preference, I'll probably start
19 with those.
20      MR. SCHOOLS: I agree with that as a
21 priority.

Page 172

1       MR. BRUCE: Yeah. Okay. So, look, part of
2  it is -- and, again, we thank you for your time. We
3  wanted you to hear it from Andy. We find him
4  incredibly credible, and we hope you will too.
5       He's been put in difficult situation after
6  difficult situation by anyone's standards. And as he
7  acknowledged, his memory is not perfect, but he's done
8  the best he can. And in our view, he's not a liar and
9  not a perjurer. And we think there's a lot of gaps
10 and inconsistencies in both the OIG conclusions and
11 the OPR conclusions.
12      The OPR conclusions, really, just being
13 paper conclusions. In other words, they didn't have a
14 chance to judge his credibility. But we think it's
15 important that both of you did.
16      So, going through the under oath
17 conclusions, the -- they relate to the November 29th
18 interview, obviously. And two aspects to it, which
19 are then sort of incorporated into the not-under-oath
20 allegations.
21      So for the November 29th interview, OPR



Page 173
1  focuses on whether Andy told Jim Comey on or about
2  October 31st that he had authorized the disclosure of
3  the PADAG call. And, secondly, whether he had denied
4  to the INST investigators on May 9th that he had
5  authorized that.
6          So with respect to the Comey issue first --
7  it sounds like you've gone through the transcript in
8  detail, which we think is -- again, we're grateful,
9  but we think it's helpful also. And what we have done
10  in the binder I gave you, if you could turn to tab 1?
11          Because what we've done, Scott and Art, is
12  gone through it closely as well. And we think the OIG
13  report is unfair in the sense that it concludes -- and
14  it reads like Jim has some specific recollection of
15  this conversation when his testimony is equivocal all
16  over the place with respect to whether he remembers
17  anything.
18          He definitely testifies about an impression
19  he's left with in his mind. But if you look at the
20  actual testimony, just even like the first one is
21  maybe one of the best examples. He's testifying about

Page 174
1  his recollection of conversations with Andy and he
2  says, "I'm really worried (P) went off the
3  reservation or something here. I'm making this up
4  because I don't have a clear recollection, but I must
5  have had some conversation with Andy about it where I
6  took from him that he didn't do and -- he didn't do
7  and didn't authorize it." And we have page numbers
8  and cites for you.
9          Then he goes on to say, "This is what I
10  think what happened, this is what I think it is. I
11  think I asked if something could be done. He likely
12  told me the opposite. He definitely didn't tell me he
13  authorized, and I think gave me the impression he
14  didn't know what was going on."
15          So just a ton of equivocation from Jim in a
16  way that we submit to you in this kind of he said, he
17  said battle of credibility, the OIG and you should not
18  find that Andy's lying under oath about his
19  recollection. It's just not strong enough. I mean,
20  in this context.
21          And I think the OIG report, it's great that,

Page 175
1  as I said, you read the testimony. The OIG report, I
2  think, cherry picks it in a way that makes it sound a
3  lot stronger than it is.
4          Look, as to Jim, I think it's understandable
5  that he may not have a great recollection of this,
6  given all of the events we have just talked about, his
7  decision to write the letter to Congress, the
8  expedited of the Weiner laptop, that -- as Andy just
9  testified, this is maybe a minute or two between the
10  two men as to Andy conveying to him what had happened
11  and Jim trying to process a million things at once.
12          As Michael just referenced and as we've
13  seen, we think even the limited amount of
14  investigation we have been able to do has helped
15  corroborate Andy's version.
16          So -- and I won't go through all of these,
17  but they are there for you to review.
18          But we looked at the second -- if you go to
19  tab 2, we looked at this e-mail with Andy. Pretty
20  clear Andy's keeping the director updated on what he's
21  doing with (P) working on background.

Page 176
1  Says, "I will work with Mike to provide some basic
2  facts to push back. As always keep you advised."
3          You know, recollections are a funny thing,
4  because if you go to tab 3 for a minute, in -- this is
5  Jim Comey's OIG interview. Okay. They showed him the
6  e-mail we just looked at. And                    says,
7  "Behind tab 25, there is an October 21st e-mail from
8  Andy McCabe to you, Jim Rybicki, Dave Bowditch that
9  says, "In the more bad new category, Mike K. informed
10  me that (P) of the Wall Street Journal is
11  putting together an articles claiming I had a conflict
12  of interest on midyear as a result of Jill's campaign.
13  Connections to Governor McAuliffe. I'll work with
14  Mike to provide some basic facts to push back."
15          And then she asked, "And, if you want
16  to jump in with any questions, please feel free." And
17  then they ask him, "What was your reaction to this
18  e-mail?" And Jim says, "What is this?'
19                    Yeah." And Jim, "Yeah, that was my
20  reaction. It was -- I'm quite certain, one never
21  knows, but I think this was the first time I learned

Page 177

1  about any issue related to. And I had no idea that
2  Andy had gone to ethics counsel, Pat Kelly, and all
3  that had gone on before. I think this is -- first,
4  I'm highly confident this is the first time that I
5  learn about this." "Okay. And what is your
6  reaction?" I mean, I think you said earlier that you
7  were concerned. What's your reaction to this e-mail?"
8           Answer by Jim Comey. "What's going on?
9  What are they going to say?" Meaning to the Wall
10  Street Journal reporters. "What is this about?
11  What's the story with McAuliffe? I mean, I have a
12  million questions."
13           Okay? That's Jim's recollection of what he
14  thought at the time. But if you go back to the actual
15  e-mail, if you go back to tab 2, all he says to Andy
16  is "Outstanding. Don't sweat it."
17           So he may have a stronger recollection than
18  he had a reaction at the time. Again, putting in
19  context, this is an extremely difficult time for
20  everyone.
21           The other articles we think are helpful

Page 178

1  also. If you go to tab 4, we looked at that together.
2           Again, on the 23rd, Andy is again keeping
3  him updated. Rybicki, Bowditch, others. "The only
4  additional notable news is that Mike K. and I spent a
5  good part of the day trying to shape the Wall Street
6  Journal story on my alleged conflict. That can only
7  be background information. Looks like they may try to
8  release it online tonight. The reporter also called
9  Jill for a comment, so we're working on that as well."
10  No reaction that we know of from Jim Comey
11  saying, you know, you shouldn't be doing any of this.
12           We talked about -- if you go to tab 5, we
13  talked about the e-mail. Now moving to the second
14  Wall Street Journal article, we talked about the
15  e-mail that      (P)      sends to Mike Kortan with
16  the reference to the PADAG call. The story will go
17  into a long discussion of the internal conversations
18  that have been going on, around, have more color from
19  the August 12th McCabe-Axelrod call. "Though at
20  present I'm disinclined to name Axelrod." And that
21  gets forwarded to Rybicki obviously.

Page 179

1           We believe these e-mails are, you know, very
2  good corroboration that Jim is in the loop on these
3  things and that there is certainly no reason to hide
4  any of this from Jim Comey.
5           We're also putting together, what is being
6  worked on now, a timeline of some additional calls,
7  Scott, between Andy and Jim around this time period
8  that shows that they were in touch. Including about
9  an hour after the -- after the article posted to the
10  Internet.                                      ˙
11           So, you know, we'll put that in a letter as
12  well.
13           But, again, you know, kind of shows, we
14  think, Andy keeping Jim updated all throughout. And,
15  again, no reason to hide anything.
16           OIG doesn't mention these e-mails or the
17  calls or anything. They just kind of gloss over it.
18           OPR mentions them in a footnote, but we
19  think they are important for your consideration,
20  because they do corroborate what Andy just testified
21  to and what he's been saying all along and what he

Page 180

1  testified to with OIG.
2           In addition,      (P)      we noted, testified
3  to OIG and also put in her signed sworn statement that
4  she had been asked by Mike Kortan, at the direction of
5  Jim Comey, to go on background on another occasion to
6  speak to a reporter at the New York Times. That's
7  pages 11 and 12 of her signed sworn statement.
8           And in her testimony as well.
9           So, not, you know, unusual or out of the
10  ordinary that Jim would think      (P)      might be on
11  background of something.
12           So one of the other key points -- and Andy
13  made this point himself, but I think it's really an
14  important one. Is this OIG and OPR theory doesn't
15  make any sense unless that Andy is going to lie to the
16  director, to INSD, and to OIG about who authorized
17      (P)      to go on the record, unless he's then going
18  to go on obstruct the investigation and somehow
19  conspire with (P) and Mike, who are plainly involved,
20  and say to them, you know, "Don't say anything if
21  anyone asks you about this." It just didn't happen.



Page 181

1  And it didn't happen because he wasn't worried about
2  this. He wasn't doing anything wrong.
3      I'll show you a minute some of the testimony
4  from (P) on that point.
5      So those are the pieces about the Jim Comey
6  aspect of his testimony.
7      With respect to the May 9th interview by
8  INSD that he later testified about, he gave you the
9  context today. I think the context is super important
10  here.
11      And probably critical to your decision.
12      He was in the interview with INSD thinking
13  it was about something completely different with
14  respect to the Circa News investigation that he
15  actually requested. And even though there was a
16  debate within the investigators, it looked like to us,
17  about whether to even bring up the October 30th
18  article, the one agent did bring it up. There was a
19  discussion for about five minutes regarding the Wall
20  Street Journal article during that May 9th meeting.
21  And, to our knowledge, the only notes from that May

Page 182

1  9th meeting are tab 6. And the only reference is what
2  I've highlighted "next day briefing DAD NAG
3  uncomfortable. No idea where it came from."
4      MR. GARY: Whose notes are these?
5      MR. BRUCE: These are Voviette -- Molnar's,
6  right.
7      And in the course of this, you can kind of
8  see they're jumping around to different parts, at
9  times talking about parts of the article, at times
10  talking about the whole article, because towards the
11  top they do reference the last page of the article,
12  one to three paragraphs. And it says, "He read the
13  whole article. It seems like Andy's saying he read
14  it, the whole thing, when it came out." I can't read
15  some of these notes. But he read the whole article
16  when it came out.
17      MR. SCHOOLS: Don't those two words
18  say "during interview"? Read the article during
19  interview.
20      MR. BRUCE: Could be. That looks right.
21  "During interview."

Page 183

1      So there is a discussion of the whole
2  article, then there is discussion at times of the
3  PADAG call. This single note "no idea where it came
4  from" I think is what (P) and Morgan are relying on
5  in terms of saying that Andy told them he didn't
6  authorize the PADAG call to be included in the
7  article.
8      I think it's completely ambiguous. It
9  leaves a lot of room for miscommunication here as to
10  whether this was pinned down or not and that there was
11  really sort of a meeting of the minds.
12      Are you talking about the whole article or
13  are you talking about this specific piece? It's just
14  kind of jumping around. And in leak investigations,
15  it's important to be precise. And this just doesn't
16  seem precise to us.
17      There is a particular reason with this
18  article, if you go to tab 7. As Andy just explained,
19  it had a ton of information in it. And what we did in
20  this sort of dissection of the article is break out of
21  all of the sort of individual leaks, or disclosures

Page 184

1  that were in the article itself. And it ranges from
2  everything to how many e-mails were found, who was
3  doing what with respect to a search warrant and the
4  like.
5      And to be sure, there are pieces of it that
6  relate to the PADAG call, but the imprecision, I
7  think, in the questioning or at least Andy's
8  understanding of what they were getting at, we think
9  is what led to the miscommunication that happened at
10  the May 9th call.
11      Because Andy is not saying and has never
12  said, you know, (P) and Voviette are liars, you
13  know, and they're out to get me. You just gave him
14  the opportunity to do that. That was not his position
15  at the OIG interview when he was first presented with
16  a lot of this and it's not his position now.
17      Based on everything we've looked at, we
18  think it was just a simple miscommunication. They
19  came out of it with one understanding, Andy intended
20  to communicate another.
21      Another piece of why we think that this

| | Page 185 | | Page 187 |
|---|---|---|---|
| 1 | theory, this OIG and OPR theory that he was covering | 1 | brought up by May 9th, after the INSD interview, he |
| 2 | this up doesn't make sense, is that if he intended to | 2 | would you have done -- if he really was of that |
| 3 | cover it up and try to put them off on the wrong | 3 | mindset, I need to hide that, the first person he |
| 4 | track, he should have just signed the draft sworn | 4 | would you have gone to is (P) |
| 5 | statement from May 12th. I mean, it says, you know, | 5 | So they drill her over and over again. "Did |
| 6 | "I don't know who the source is." If they are saying | 6 | he ask you after the OIG interview?" |
| 7 | that's what -- if the INSD agents came away with the | 7 | No. It's always the same. No. |
| 8 | impression that that's what he said orally, and the | 8 | So it just doesn't make sense. It doesn't |
| 9 | theory from OIG and OPR is he was intentionally | 9 | hold true that Andy was really trying to bury this and |
| 10 | misleading them, then if you're willing to lie to | 10 | he was willing to lie under oath about it, lie to the |
| 11 | them, you know, orally, why wouldn't you lie in | 11 | director, lie to INSD, and lie to OIG. |
| 12 | writing also if you're engaged in this massive | 12 | So, we'd ask you to consider, you know, not |
| 13 | coverup? But it doesn't happen. Because eventually, | 13 | only the evidence and the story that OIG has laid out, |
| 14 | when he gets back to his desk, you know, and | 14 | but also the lack of evidence here, what's lacking, |
| 15 | eventually reads the statement, he's like "This is not | 15 | what makes sense that, you know, would be there if |
| 16 | right." So he doesn't sign it. And eventually he | 16 | someone were trying to bury this thing. |
| 17 | calls them back in to correct it. | 17 | As to the July 28th interview, turn to that |
| 18 | As I said, if he were engaged in the | 18 | for a minute, by OIG, because that's the other under |
| 19 | coverup, I think he would have just signed it. | 19 | oath allegation. |
| 20 | Also, for the same reason I mentioned | 20 | Obviously, there are two pieces to that as |
| 21 | earlier, he doesn't collude -- if you go to tab 8, he | 21 | well. That Andy falsely stated that he was not aware |

| | Page 186 | | Page 188 |
|---|---|---|---|
| 1 | doesn't collude with (P) or Mike Kortan. This is | 1 | that (P) was authorized to speak to reporters |
| 2 | (P) testimony. They asked her about eight | 2 | and his comment that he was out of town, so he didn't |
| 3 | different ways whether Andy sort of colluded with her | 3 | know what she was doing. |
| 4 | or conspired with her to keep her quiet. They asked | 4 | I think you have the context a little bit |
| 5 | her about, you know, after the event happened, did he | 5 | more, which again I think is important. |
| 6 | tell you not the say anything to anybody in the | 6 | He went into this thinking I don't want to |
| 7 | office? Asked her about when they last had the | 7 | be interviewed about anything I'm involved in or I'm |
| 8 | conversation about the Wall Street Journal article. | 8 | under investigation for. |
| 9 | It says it was around the time of the actual | 9 | I think some of your questions, Scott, were |
| 10 | article. | 10 | about why he thought he might be under investigation |
| 11 | "Did it come up in 2017?" | 11 | for something regarding disclosures to the media. And |
| 12 | "No, not that I can recall." | 12 | he made reference -- I don't know how clearly it came |
| 13 | On the next page they go at her again and | 13 | out, but he made reference to the January 9th -- |
| 14 | again and again asking "Do you know if he was | 14 | January 12th, rather, disclosure by OIG, which I guess |
| 15 | interviewed by INSD?" | 15 | you have. |
| 16 | "I don't know. Certainly with respect to | 16 | MR. SCHOOLS: Yes, I do. |
| 17 | the first one, I presume, since he made the referral" | 17 | MR. BRUCE: Which, you know, references |
| 18 | -- meaning Circa News to you -- "but we've not talked | 18 | allegations that department and FBI employees |
| 19 | about it. "No conversations about INSD interviews." | 19 | improperly disclosed public information. |
| 20 | "Not to my recollection." | 20 | So whether he was specifically told that he |
| 21 | I mean, if Andy was worried about this being | 21 | was under investigation for that or not, obviously he |

Page 189

1 knew about, you know, that statement by OIG and had
2 been questioned by INSD about it.
3 So he indicated, you know, he wanted counsel
4 present for that. When they started getting into that
5 -- and OIG may have not -- there may not have been a
6 meeting of the minds there either. He was saying "I
7 want counsel for things I'm involved in and that I'm
8 under investigation for."
9 And this was a frustration of mine with
10 Michael, to be honest. I asked before we responded to
11 the OIG draft report, can I see the full transcript
12 from July 28th and he wouldn't make it available.
13 Again his process.
14 But that, you know, when we've seen more
15 about it, that helps shed light that maybe they didn't
16 understand what had gone on previously, because what
17 they were hearing from INSD was, oh, he is not
18 involved in this. You know, this October 30th article
19 because they came away with that understanding.
20 So I guess they thought it was fair game to
21 talk about that whereas in Andy's mind it was all part

Page 190

1 and parcel of the same thing.
2 So, he -- as the transcript speaks for
3 itself at that point. He's trying to object,
4 basically, to that line of questioning because, as he
5 put it, it's crossing strings or right in the middle
6 of what he's involved in, or however he phrases it.
7 And, you know, in a sort of defensive and dismissive
8 attempt to get off the subject, he says, "Not that I'm
9 aware of."
10 And, you know, given the contention you
11 heard about what he's processing about these 70,000
12 text messages, you know, and all the implications for
13 all the major investigations he's responsible for at
14 the time, it was -- he misspoke. He said he misspoke.
15 And he did the right thing. He thought
16 about it and he clarified it. He has to take a lot of
17 actions in between those two things in terms of
18 speaking to (P) reassigning people, addressing all
19 the issues raised by the texts themselves. But,
20 again, it sort of doesn't make sense if he was really
21 trying to intentionally lie under oath to go back and

Page 191

1 clarify it two business days later.
2 In our written submission, we did pull a
3 couple cases that, hopefully, will be helpful to you
4 just from the perjury context. That says, you know,
5 when people come back and correct the record, it's
6 essentially, you know, can be evidence that they never
7 intended to make a misstatement in the first place.
8 Even after coming back with these explosive
9 text messages, he has to talk to (P) about what's
10 going on. But, again, no attempt to tell her, you
11 know, don't say anything about, you know, our
12 engagement with (P) if asked by the OIG.
13 Which, again, we think is sort of consciousness of
14 innocence in a lot of ways.
15 So we're asking you, obviously, to reject
16 the proposal by OPR that he intentionally lied under
17 oath and terminate him, I guess, tomorrow.
18 You know, we think that's inappropriate,
19 would not be consistent with the facts, and just not
20 the right thing to do under these circumstances.
21 I do want to talk briefly about some of the

Page 192

1 other sort of allegations.
2 The ones that are the not-under-oath
3 essentially are just recast from the under oath ones.
4 But I think it's worth talking about the offense code
5 4.10, which are the media guidelines.
6 I think, you know, Michael and I would both
7 say that's a closer call here. Andy fees like he made
8 the right judgment. You heard him say that.
9 You know, he was, again, under enormous
10 pressure. I think he was trying to do the right thing
11 for the bureau. You asked him some hard questions
12 about that, which in the light of day are fair
13 questions.
14 But overall, I think his motives were pure.
15 I think he thought he was doing the right thing.
16 And, you know, ultimately, with respect to
17 that allegation, I think we feel, you know -- again,
18 looking at it with the benefit of hindsight and
19 retrospect -- reasonable minds could differ about
20 whether he made the right judgment call there. It was
21 a judgment call. But even if you were to disagree



Page 193

1 that it was the right call, which he feels strongly
2 about, I think there are a lot of mitigating factors
3 there as well.
4       First, he was authorized to speak to the
5 media. There is no question about that.
6       You know, which it unlike the usual
7 unauthorized disclosure case where the person
8 shouldn't even be talking to the media in the first
9 place. He had that authority. There is no question.
10       The act of allowing (P) to talk about the
11 PADAG call, you know, what OIG and OPR say is it
12 implicitly confirms the existence of the Clinton
13 Foundation investigation.
14       In this situation, as he said -- and I think
15 as we all know -- that investigation was out there. I
16 mean, it had been written about extensively. It had
17 been the subject of books, articles, and the like. So
18 even if that were to be your conclusion, he implicitly
19 authorized it, again, I think a mitigating factor, at
20 the very least, is it was already well known that the
21 bureau was investigating that matter.

Page 194

1       And, again, third, I think, just to
2 reiterate, I think a mitigating factor is here.
3 Andy's motivation and what he was trying to do. Which
4 was to protect the bureau. It wasn't something for
5 some other, you know, sinister reason. He thought the
6 narrative that the bureau had been politicized and
7 were making decisions for political reasons rather
8 than law enforcement reasons was incredibly damaging,
9 and that's why he did what he did.
10       So even if you were to disagree with us on
11 that point, we think there is a lot of mitigating
12 factors that would, you know, need to be considered in
13 assessing any penalty.
14       MR. SCHOOLS: Okay.
15       MR. BROMWICH: I think you've really covered
16 the waterfront completely. And I guess the only thing
17 I would add on the last point is, again, as you said,
18 this is very different from the kind of leaks that are
19 out there. He is one of two or three -- as it turns
20 out it's really two -- people who are authorized to
21 speak with media. They are required under the media

Page 195

1 guidelines to take into account the public interest.
2 Andy thought he was doing that. I guess he thought
3 that the attacks on the bureau were acting with
4 political motives or political purposes was maligning
5 the bureau institutionally. And I think, looking at
6 it from his perspective, I think that's right.
7       I think your questions were fair about
8 matters that are handled jointly by justice department
9 and the FBI. I think it's fairly clear that he didn't
10 really sort of think of it in that kind of wholistic
11 way. He was saying, "My agency's being attacked, and
12 I need to respond."
13       And if he had to do it over again, you know,
14 would he do it the same way, probably not. What he's
15 been through. But I just don't think it's the sort of
16 thing that even the maximum punishment for an
17 unauthorized disclosure to the media warrants. I
18 would think that something more like censure or
19 reprimand or something like that.
20       The other thing that, you know, I think it
21 is appropriate to take into account -- I know that in

Page 196

1 Candace Wills' letter she says lying under oath is a
2 termination offense. No ifs, ands, or buts about it.
3       I think both the evidence that we've
4 presented and the arguments that Eric has just made
5 really demonstrate that there is insufficient evidence
6 to show that he lied under oath.
7       Even if you were to conclude differently --
8 and I don't think there is any basis for doing that --
9 there are a number of OPR cases over the years where a
10 proposal by OPR to dismiss for lying under oath were
11 mitigated, and our written submission will include a
12 couple of citations to that.
13       I think this is an extraordinary case,
14 obviously, for lots of reasons. But I think, you
15 know, whatever discipline, if any, you think is
16 appropriate, I think you have to take into account
17 just the context in which Andy and others in the
18 bureau were operating, the unbelievable pressure that
19 they were operating under with respect to the Clinton
20 e-mail investigation, Clinton Foundation
21 investigation, the heightened tensions throughout a



Page 197

lengthy period between the department and the FBI. There is always some level of tension. But from his description and others, this was sort of a at a whole different level.

He did the best that he could to navigate the shoals of an extraordinarily different environment. A lot of sort of what's in here, then comes up in a period in which he's in a position where he never thought he would be the acting director of FBI. He had a million things going on.

He's called over to meet with the President. He says many things to him. So it's just a situation like none other than I've ever seen. And I think he deserves credit in terms of whatever discipline you may think is appropriate for his 21 years of extraordinary service to this country.

People at the bureau admire him and they respect him. And I think it's important, again, if you conclude contrary to the evidence we believe that he is guilty of an offense that would under the circumstances would warrant dismissal, that's just the

Page 198

wrong outcome. That's just not fair. It's not just and it would -- it would crush personally and professionally. But, more importantly, I think it would send a terrible signal that even if, according to your likes, he made a couple of mistakes, that that drowns a distinguished career where the only matter on his disciplinary record is he lost a building pass in 1998. It's a pretty clean record of 21 years.

So I don't know if, Scott, you have any questions sort of in response to our presentation, either the interview or the arguments that we've made.

MR. SCHOOLS: I don't think so. Appreciate it.

MR. BROMWICH: So where do we go from here? So we're going to send you a submission that will get here no later than noon tomorrow. And obviously you don't know where you'll come out. I hope you do know and it's in our favor, but I would suspect you're going to reserve on that. Where do we go?

MR. SCHOOLS: The process is that I do my thing and make an little -- effectively be a

Page 199

recommendation to the attorney general. And he either endorses or changes it. I don't -- I think when we talked earlier and I talked about the process, I think my understanding is because there is a proposal for removal, what I recommend is just that. And is not limited by my recommendation. My intention will be to support my recommendations.

MR. BROMWICH: Right.

MR. SCHOOLS: We'll have more than just a dotted line I used, but --

MR. BROMWICH: Right.

So but if it's not a termination, I think it is -- if it's a suspension for more than 30 days or a termination that goes to him. But if it's less, your decision is final? Is that right? No.

MR. SCHOOLS: Not really. If you look closely at the DOJ order, disciplining people in any of these positions are reserved to the AG and the DAG. So I think, technically, if it's under 30, the DAG has the authority to approve it.

MR. BROMWICH: Oh, okay. So there is a

Page 200

review by someone.

MR. SCHOOLS: That's right.

MR. BROMWICH: And if it's a proposal for 30 days and above suspension or termination, it is the AG. If it's less than 30 days, censure, reprimand, whatever it is, including nothing? I mean, if you recommended nothing, he's absolved of all this, that would still have to be approved by the deputy?

MR. SCHOOLS: By somebody.

MR. GARY: It would be the DAG.

MR. SCHOOLS: Or if the AG has all of the authority. They could say I just want to know what you recommend and make a decision, and I don't know the DAGs. I don't need the DAG to that, if that's what happens.

MR. BROMWICH: Right.

MR. SCHOOLS: I don't know how all of that's going to play. Obviously, I don't know what the answer is yet.

MR. BROMWICH: Right.

MR. BRUCE: Will we be notified of your



Page 201

1  recommendation, Scott?

2          MR. SCHOOLS: No. I think not.

3          MR. BROMWICH: So, again, as careful

4  lawyers, we want to sort of prepare for the worst even

5  though we're hoping and think we've fully supported

6  that the best should result. If, in fact, you propose

7  termination, we want to meet with the attorney general

8  personally.

9          Again, I hope this is a completely moot

10  discussion, but we want to make that request.

11          MR. SCHOOLS: Okay.

12          All right. I'll make sure they are aware of

13  that.

14          MR. BRUCE: Want a copy.

15          MR. BROMWICH: Yes. 4:50 p.m.

16          (The Oral Statement concluded at 5:34 p.m.)

17

18

19

20

21

Page 202

1              REPORTER'S CERTIFICATE

2              District of Columbia

3              County of Washington, to wit:

4                    I, (P)          , a Notary Public of

5  the District of Columbia, County of Washington, do

6  hereby certify that the within named witness

7  personally appeared before me at the time and place

8  herein set out, and after having been duly sworn by

9  me, according to law, was examined.

10                    I further certify that the examination

11  was recorded stenographically by me and this

12  transcript is a true record of the proceedings.

13                    I further certify that I am not of

14  counsel to any of the parties, nor in any way

15  interested in the outcome of this action.

16                    As witness my hand and notarial seal

17  this 15th day of March 2018.        (P)

18                    _____

19                              (P)

20                         Notary Public

21



EXHIBIT 4

**U.S. Department of Justice**

*Washington, D.C. 20530*

---

March 8, 2018

**By e-mail :** ████dd@fbi.gov
Mr. Andrew G. McCabe
████████████████

Subject:      Proposed Removal from the FBI

Dear Mr. McCabe:

On March 7, 2018, Ms. Candice Will, Assistant Director, Office of Professional Responsibility, Federal Bureau of Investigation (FBI) sent you a letter notifying you of your proposed removal from the FBI, including the basis for that proposal. This letter notifies you that your removal would be effective no earlier than March 16, 2018. A final decision on the proposal will be made in accordance with DOJ Order 1202 (November 26, 2013) (copy attached).

You have the right to review the material relied upon to support the proposal. You have the right to reply to this notice orally, in writing, or both, and to submit any affidavits or other documentary evidence you wish in support of your reply. You also have the right to have your attorneys assist you in preparing and presenting your reply. You and your attorneys will be provided access to the supporting materials, and I have been copied on e-mails confirming that your attorneys will begin their review at 11:00 a.m. on March 9, 2018. You and they should continue to work with Ms. Will to arrange additional access.

Your written reply must be received by me no later than close of business on March 15, 2018. Please submit your reply to me via e-mail at Scott.Schools@usdoj.gov, or by delivery to Room 4111, RFK Main Building, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530.

If you wish to make an oral reply, you may contact me at (202) 305-7848 to arrange a time. After review of the record, including your reply (if any), I will notify you in writing of the final decision. During the notice period, you will remain in your current paid leave status.

If you have any questions concerning the procedures governing this action, you may contact me by phone or e-mail.

Sincerely yours,

Scott N. Schools
Associate Deputy Attorney General

Attachment

**By e-mail Michael.Browmwich@thebrowmichgroup.com**
Michael R. Bromwich, Esq.
Senior Counsel
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, NW, Suite 411L
Washington, D.C. 20006

**By e-mail Eric.Bruce@kobrekim.com**
Eric B. Bruce, Esq.
Kobre & Kim LLP
1919 M Street, NW
Washington, D.C. 20036

 **U.S. Department of Justice**                    **1202**

**Approved On:** November 26, 2013

# DOJ ORDER

## EXECUTIVE RESOURCES MANAGEMENT

| | |
|---|---|
| **PURPOSE:** | This Order establishes Department of Justice (DOJ) policies that govern executive resources management.  Executive Resources include Senior Executive Service (SES), Senior Level (SL), and Scientific and Professional (ST) positions and appointments. SL and ST positions are collectively referred to as "Senior Professional" (SP) positions. |
| **SCOPE:** | The provisions of this Order apply to all SES and SP positions in the Department, except that only the following portions of the Order apply to positions in the Federal Bureau of Investigation (FBI) and Drug Enforcement Administration (DEA): Section I.A - Delegation; and Section I.D - Position Titles. |
| **ORIGINATOR:** | Justice Management Division (JMD), Human Resources (HR) Staff. |
| **CATEGORY:** | (I) Administrative, (II) Human Resources. |
| **AUTHORITY:** | 5 U.S.C. §§ 3104, 3131-3134, 3151-3152, 3301, 3324-3325, 3391-3396, 4301-4303, 4311-4314, 5108, 5376, 5381-5385; 5 U.S.C. Chapter 75. |
| **CANCELLATION:** | DOJ Order 1920.1; DOJ Order 1200.1, Part 8; Deputy Attorney General (DAG) Memoranda, Delegation of Authority for Executive Resources, December 29, 1999; DAG Memorandum, Updated Delegation of Authority for Senior Executive Service Positions, May 27, 2008. |
| **DISTRIBUTION:** | This Order is distributed electronically to those components referenced in the "SCOPE" section as well as posted to the DOJ Directives electronic repository (SharePoint). |
| **APPROVED BY:** | *Eric H. Holder, Jr.*<br>Attorney General |

# ACTION LOG

All DOJ directives are reviewed, at minimum, every five years and revisions are made as necessary.  The action log records dates of approval, recertification, and cancellation, as well as major and minor revisions to this directive.  A brief summary of all revisions will be noted.  In the event this directive is cancelled or superseded, or supersedes another directive, that will also be noted in the action log.

| Action | Authorized by | Date | Summary |
|---|---|---|---|
| Initial Approval | The Attorney General (AG) | November 26, 2013 | Establishes DOJ policies that govern executive resources management. |
| Minor Change | The Assistant Attorney General for Administration | June 19, 2014 | On the last page of the Appendix, the reference to "Assistant Chief Immigration Judge" under "Key SL Positions" was deleted.  These judges are on the Immigration Judge pay scale and are not SL positions. |

# TABLE OF CONTENTS

Glossary of Terms ........................................................................................................ 4

I. Policy .................................................................................................................... 7

   A.   Delegation. ..................................................................................................... 7

   B.   Allocations. ..................................................................................................... 7

   C.   Position Designation ...................................................................................... 8

   D.   Position Titles. ................................................................................................ 8

II. Roles and Responsibilities ................................................................................... 8

   A.   Deputy Attorney General (DAG). ................................................................ 8

   B.   Component Heads. ......................................................................................... 8

   C.   Senior Executive Resources Board (SERB). ............................................... 8

   D.   Executive Resources Boards (ERB). ........................................................... 9

   E.   Performance Review Boards (PRB). ......................................................... 10

Appendix  - U.S. Department of Justice Executive Resources Delegations of Authority ............ 12

# GLOSSARY OF TERMS

**DEFINITIONS**

| Term | Definition |
|---|---|
| Annual Summary Rating | The overall rating level that an appointing authority assigns at the end of the appraisal period after considering a PRB's recommendations. This is the official rating. |
| Appointing Authority | The AG or other Department official with authority to make an SES or SP appointment. For purposes of performance management, the appointing authority is the AG or other Department official with authority to issue an annual summary rating. |
| Career Reserved SES Position | A position that meets the criteria in 5 C.F.R. § 214.402. |
| Career SES Appointment | An appointment to an SES position based on OPM's approval of the appointee's executive qualifications. |
| Component | An Office, Board, Division, or Bureau of the Department of Justice as defined in 28 C.F.R. § 0.1. |
| General SES Position | A position that does not meet the criteria in 5 C.F.R. § 214.402. |
| Higher Level Reviewing Official | An official designated to provide a higher level review of an SES or SP appointee's initial appraisal, typically the second-level supervisor. |
| Initial Summary Rating | The overall rating level the supervisor derives from appraising the SES or SP appointee's performance during the appraisal period and forwards to the PRB. |
| Key SES, SL and ST Positions | High-ranking executive positions over which the AG and Deputy Attorney General (DAG) retain certain personnel authorities. These positions are listed in the Appendix of this Order. |
| Limited Emergency SES Appointment | A non-renewable appointment, not to exceed 18 months, to a SES position established to meet a bona fide, unanticipated, urgent need. |
| Limited Term SES Appointment | A non-renewable appointment not to exceed three years to a SES position where the duties will expire at the end of such term. |
| Non-Career SES Appointment | An SES appointment that is not a career, limited term, or limited emergency appointment. |
| Performance | The accomplishment of the work described in the SES or SP appointee's performance plan. |

| | |
|---|---|
| **Performance Appraisal** | The review and evaluation of an SES or SP appointee's performance against performance elements and requirements documented on a Department-approved SES or SP Performance Work Plan (PWP). |
| **Performance Management System** | The framework of policies and practices established under 5 U.S.C. § 4312 and 5 C.F.R. Part 430, Subpart C, for SES, or 5 U.S.C. § 4302 and 5 C.F.R. Part 430, Subpart B, for SPs, for planning, monitoring, developing, evaluating, and rewarding both individual and organizational performance and for using resulting performance information in making personnel decisions. |
| **Performance Review Board** | An agency board that is responsible for making recommendations to the appointing authority on SES and SL performance ratings and bonuses. Agencies may have more than one PRB. |

**ACRONYMS**

| Acronym | Meaning |
|---------|---------|
| AAG/A | Assistant Attorney General for Administration |
| AG | Attorney General |
| CHCO | Chief Human Capital Officer |
| DAG | Deputy Attorney General |
| DEA | Drug Enforcement Administration |
| DOJ | Department of Justice |
| ERB | Executive Resources Board |
| FBI | Federal Bureau of Investigation |
| JMD/HR | Justice Management Division Human Resources |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| PL | Public Law |
| PRB | Performance Review Board |
| SERB | Senior Executive Resources Board |
| SES | Senior Executive Service |
| SL | Senior Level (positions) |
| SP | Senior Professional (positions) |
| ST | Scientific and Professional (positions) |

## I. Policy

This Order establishes the Department of Justice (DOJ or Department) policies that govern executive resources management. These policies ensure that human resources decisions relating to executive resources are consistent with principles of fairness and comply with all applicable laws. DOJ will not discriminate based on race, color, national origin, religion, sex, gender identity, age, political affiliation, disability, marital status, sexual orientation, status as a parent, membership or non-membership in an employee organization, genetic information, or other non-merit factor. The Department is an Equal Opportunity/Reasonable Accommodation Employer.

This Order is based on the executive personnel provisions of the Civil Service Reform Act (Pub. L. No. 95-454) as codified in Titles 5 and 28 of the U.S. Code, and regulations and guidance issued by the Office of Personnel Management (OPM). Additional administrative policy guidance affecting the DOJ's executive resources shall be issued as necessary by the Assistant Attorney General for Administration (AAG/A).

**A. Delegation.** The Attorney General (AG) delegates to the heads of Department Components the authorities identified in the Appendix. The Appendix also identifies the authorities retained by the Deputy Attorney General (DAG) or, in some cases, the AG. The Appendix identifies certain SES, SL, and ST positions as key positions over which the AG retains certain, enumerated authorities. The DAG may modify the delegations made in this Order pursuant to the DAG's authority under 28 C.F.R. § 0.15(b)(1)(i).

**B. Allocations.** The DAG, with the support of the Senior Executive Resources Board (SERB), oversees the biennial allocation of executive resources (SES and SP) to Components.

1. During each biennial cycle, Components shall provide to Justice Management Division, Human Resources (JMD/HR) a comprehensive assessment of their executive resources needs. This assessment shall identify the Components' established SES and SP positions and any requests for new SES and SP positions, and it shall prioritize all established and requested positions in terms of their relative contribution to the Department's mission.

2. JMD/HR, under the guidance of the Chief Human Capital Officer (CHCO), shall compile the Components' assessments and present them to the AAG/A. The AAG/A shall review and make recommendations to the DAG regarding the Components' requests for SES and SP positions.

3. Following transmittal of the AAG/A's recommendations, the SERB shall review and make recommendations to the DAG regarding all requests for new allocations. The

DAG shall approve DOJ's final request for SES and SP positions and submit that request to the OPM and the Office of Management and Budget (OMB).

4. Upon receipt of OPM/OMB's decision, the DAG or the SERB will allocate to the respective Components the positions authorized by OPM/OMB.

5. Upon the DAG's approval of the allocation, JMD/HR shall report new position establishments to OPM.

6. The DAG may request from OPM an adjustment of DOJ's allocations outside the biennial cycle.

7. When a component establishes a new executive position, JMD/HR must classify the position prior to any personnel action (reassignment, transfer, initial career appointment).

8. Components that receive additional SES or SP positions through the biennial allocation must assign position titles as approved by the SERB.

**C. Position Designation.** SES positions are designated as either general or career reserved. A career reserved position may be filled only by a career appointee. A general position may be filled by a career, noncareer, limited term, or limited emergency appointment. Upon establishment of positions, Components shall submit recommendations to JMD/HR on whether the positions should be designated as general or career reserved. JMD/HR approval is required for position designations. JMD/HR shall submit any requests to change position designations to OPM for OPM's approval.

**D. Position Titles.** Components will utilize position titles that clearly communicate the nature and duties of the position. JMD/HR may review SES and SP position titles for consistency and compliance with Department protocols and regulations.

## II. Roles and Responsibilities

**A. Deputy Attorney General.** The DAG, by delegation at 28 C.F.R. § 0.15(b)(1)(i), is responsible for managing the Department's executive resources. The DAG chairs the SERB. The DAG makes final decisions regarding matters over which the DAG retains authority, as listed in the Appendix.

**B. Component Heads.** The heads of Department Components exercise the delegated authorities identified in the Appendix.

**C. Senior Executive Resources Board.**

1. **Membership.**  The SERB shall have the following members:

   a.  The DAG, who shall serve as the Chairperson (voting member);

   b.  The AAG/A, who shall serve as the Vice Chairperson (voting member);

   c.  The Associate Attorney General (voting member);

   d.  The Chief of Staff to the AG, or designee (voting member);

   e.  The DOJ CHCO, who shall serve as the Executive Secretary (non-voting member);

   f.  The Director, JMD/HR, who may serve as a non-voting Technical Advisor on an "as needed" basis; and

   g.  Up to three non-voting members designated by the DAG on an "as needed" basis.

2. **Functions.**  The SERB reviews and, with the approval of the DAG, makes determinations regarding: the allocation of SES and SP positions to Components; agency awards and performance-based pay adjustments for SES and SP appointees; and any other action for which the DAG requires or requests the recommendation of the SERB.

**D.  Executive Resources Boards (ERB).**

1. **Establishment.**  Components shall establish one or more ERBs.

2. **Membership.**  The members of an ERB shall be appointed by the Component Head or the Component Head's designee.  ERBs shall consist of SES or SP appointees employed by the Department.  A Component should consider diversity and qualifications when staffing an ERB.  More than one half of the members of each Board shall be career SES appointees.  Components shall not appoint officials to serve on an ERB who are in the supervisory chain of the position being filled.  Each ERB shall be led by a Chairperson.  ERB Chairpersons shall appoint a non-voting technical advisor.  The technical advisor should be a human resources expert who is available to the ERB as an advisor on executive resources.

3. **Functions.**  ERBs shall review the qualifications of candidates for executive positions, make written recommendations to the appropriate selecting official concerning eligible executive candidates, and identify the best-qualified candidates.

U.S. Department of Justice
Order 1202

**E. Performance Review Boards (PRB).**

1. **Establishment.** Each Component Head shall establish a PRB to review the performance of SES and SP appointees. Two or more Component Heads may jointly establish one PRB. A Component may establish a separate PRB to review SP performance, or it may use the same PRB to review both SES and SP performance.

2. **Membership.**

   a. Each PRB shall have at least three members, one of which shall serve as Chairperson. When appraising a career SES appointee's performance or recommending a career SES appointee for an agency award, a majority of the PRB must be career SES appointees. When appraising an SP appointee's performance or recommending an SP for an agency award, a majority of the PRB must be either career SES or SP appointees. Component Heads shall appoint PRB members in such a manner as to assure consistency, stability, and objectivity in reviewing performance appraisals. In lieu of appointing their own PRB members, Component Heads may request that JMD/HR appoint the members of the PRB.

   b. JMD/HR shall maintain a list of all employees eligible to serve on PRBs. This list shall consist of all career and noncareer SES appointees and SP appointees in the Department, except those in the FBI and DEA. The AAG/A shall submit the list to the Office of Legal Counsel, which shall ensure that it is published in the Federal Register. Other than for the FBI and DEA, no one may serve on a PRB unless his or her name is included on the most recent list of PRB eligible employees published in the Federal Register.

   c. To be appointed to a PRB, an SES or SP appointee:

      (1) Must have a current performance rating of "Achieved Results" or above;

      (2) Should have consistently applied the Department's appraisal systems effectively in his or her respective organization; and

      (3) Should possess a thorough knowledge and understanding of the performance appraisal system and other pertinent aspects of SES or SP performance management.

      PRB members must recuse themselves from matters that pose an actual or apparent conflict of interest. Accordingly, a member of a PRB may not participate in the consideration of the performance appraisal of:

(1) Any SES/SP employee whom the PRB member initially reviewed during the same rating cycle;

(2) Anyone in the supervisory chain of the PRB member; or

(3) The PRB member's own performance appraisal.

If a PRB member is recused from a particular action or review, the remaining PRB members shall conduct the action or review.

3. **Functions.**

   a. For each SES or SP appraisal assigned to a PRB, the PRB shall review and evaluate: (1) the initial appraisal and initial summary rating; (2) any accompanying recommendations for awards, performance-based pay adjustments, or corrective actions; (3) the employee's written response (if any); and (4) the written comments of the higher-level reviewing official (if any). To aid in its review, a PRB may seek or review additional information, including by conducting interviews. A PRB shall request assistance from their servicing Human Resources staff in conducting such interviews.

   b. The PRB shall submit its recommendations in writing under the signature of the PRB Chairperson, along with the proposed rating and accompanying documentation, to the appropriate appointing authority. Where the PRB does not concur with the initial appraisal, or where the employee or higher level reviewing official disagrees with the initial appraisal, the PRB shall provide a written justification to accompany its recommendations. The appointing authority shall issue the final appraisal and annual summary rating only after considering the PRB's recommendations.

U.S. Department of Justice
Order 1202

# APPENDIX

### U.S. Department of Justice Executive Resources Delegations of Authority

| Position Management Delegations | |
|---|---|
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>Establishment/abolishment of SES and SP positions within Component's allocation.</li><li>Abolishment of encumbered SES and SP positions [i.e., reduction-in-force (RIF)], after notification to the AAG/A.</li></ul> | <ul><li>Request allocation from Office of Personnel Management (OPM) for Senior Executive Service (SES) and Senior Professional (SP) positions.</li><li>Approval of Components' SES and SP allocations, including temporary ("float") allocations, within Department's overall allocation.</li></ul> |

| Staffing Delegations | |
|---|---|
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>Establishment of qualifications standards.</li><li>Establishment of ERBs.</li><li>Approval of SES and SP career appointments (except to key positions listed below).</li><li>Approval of SES and SP reassignments, reinstatements, transfers, and intradepartmental details, including designations of acting officials (except to key positions listed below).</li></ul> | <ul><li>AG approval required for appointments, reassignments, reinstatements, transfers, and details to key positions listed below, including designations of acting officials.</li><li>Limited term and limited emergency SES appointments, except FBI/DEA.</li><li>AG approval required for noncareer appointments.</li></ul> |

U.S. Department of Justice
Order 1202

| Compensation Delegations | |
| --- | --- |
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>Initial pay setting of career SES and SP not to exceed 10% over current salary (except for key positions listed below).</li><li>Pay setting of career SES not to exceed 10% over current salary upon reassignments or transfers to positions with greater complexity, scope, and responsibility (except for key positions listed below).</li><li>Recruitment and relocation bonuses (except to key positions listed below). Only career SES and SL are eligible for these bonuses.</li></ul> | <ul><li>Initial pay setting of career SES and SP in excess of 10% of current salary.</li><li>Pay setting of career SES in excess of 10% over current salary upon reassignments or transfers to positions with greater complexity, scope, and responsibility.</li><li>Approval of retention allowances.</li><li>Initial pay setting and pay adjustments for key positions listed below.</li><li>Initial pay setting and pay adjustments for limited term and limited emergency appointments.</li><li>AG approval required for initial pay setting and non-performance based pay adjustments for noncareer executives.</li></ul> |

| Performance Management Delegations | |
| --- | --- |
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>Issuance of annual summary rating on SES and SP performance appraisals.</li><li>Appointment of Performance Review Boards.</li><li>Performance-based reassignments (except to key positions listed below).</li></ul> | <ul><li>Approval of agency awards for SES and SP appointees.</li><li>The AG or the AG's designee makes recommendations to OPM for Presidential Rank Awards.</li><li>SES and SP performance-based pay adjustments.</li><li>Waiver to 12-month restriction on SES pay adjustments.</li></ul> |

| Adverse Action Delegations | |
| --- | --- |
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>Reprimand, suspension, or removal (except those retained by the AG/DAG).</li></ul> | <ul><li>Reprimand, suspension or removal of appointees from key positions listed below. The AG has sole authority to approve removal from key position or suspension without pay from key position for more than 30 days.</li><li>The AG has sole authority to approve reprimand, suspension, or removal of noncareer executives.</li><li>Suspension or removal of career SES attorneys.</li><li>Reprimand, suspension, or removal of limited emergency and limited term appointees covered by 5 C.F.R. Part 752, Subpart F.</li></ul> |

| Other Delegations | |
| --- | --- |
| **Authority Delegated to Component Heads** | **Authority Retained by the AG/DAG** |
| <ul><li>None.</li></ul> | <ul><li>Any other authority granted to the DAG by law or by delegation from the AG, and which the DAG cannot delegate or has not delegated.</li></ul> |

**Key SES positions (except DEA and FBI):**

- Assistant Attorney General for Administration
- All career Deputy Assistant Attorneys General
- All career SES officials who report directly to the DAG or the Associate Attorney General
- All career SES officials who are deputy Component Heads in Components with a single deputy position
- All career SES officials who are principal or ranking deputy Component Heads, including those designated as such by order or memorandum, in Components with two or more deputy positions
- All career SES officials who are deputy Component Heads in Components with two or more deputies but no principal or ranking deputy
- The Chairman and Vice Chairman (if career) of the Board of Immigration Appeals
- The Chief Immigration Judge and Deputy Chief Immigration Judge

U.S. Department of Justice
Order 1202

- The following additional career SES officials in the Office of Justice Programs:
  - All career Deputy Directors in the National Institute of Justice and the Bureau of Justice Statistics; and
  - The Directors of the following offices:
    - Office of Audit, Assessment, and Management; and
    - Community Capacity Development Office.

**Key DEA SES positions:**

- Deputy Administrator
- Chief of Operations
- Chief of Intelligence
- Assistant Administrator for Human Resources
- Assistant Administrator for Operational Support
- Chief Inspector
- Chief Counsel
- Chief Financial Officer

**Key FBI SES positions:**

- Deputy Director
- Associate Deputy Director
- All Executive Assistant Directors
- General Counsel
- SES officials who report directly to the Director of the FBI

**Key SL positions:**

- Vice Chairman and Members of the Board of Immigration Appeals

** Note: Nothing in this Order authorizes the appointment, reassignment, transfer, or reinstatement of a person to an inferior officer position, or the removal or suspension without pay for over 30 days of a person from an inferior officer position, without the express approval of the Attorney General.

** Note: Additional SES, SL, or ST positions in the Department may be identified as key positions for purposes of this Order.

** Note: The approval of the President is required for an appointment, reassignment, reinstatement, transfer, or detail to the Assistant Attorney General for Administration position, and for a removal of the Assistant Attorney General for Administration.

EXHIBIT 5

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 08-31-2018 BY            NSICG

b6 -1
b7C -1

# ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

1801 K STREET, N.W., SUITE 411 L
WASHINGTON, D.C. 20006
PHONE (202) 775-4500
FAX (202) 775-4510
www.robbinsrussell.com

Michael R. Bromwich

b6 -3
b7C -3

March 16, 2018

## CONFIDENTIAL FOIA TREATMENT REQUESTED

### BY ELECTRONIC MAIL

Scott N. Schools, Esq.
Associate Deputy Attorney General
U.S. Department of Justice
RFK Main Building, Room 4111
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Re:   **FBI Deputy Director Andrew G. McCabe**

Dear Mr. Schools:

We respectfully submit this response to your letter, dated March 8, 2018, concerning the March 7, 2018 proposal (the "Proposal") by the Federal Bureau of Investigation's Office of Professional Responsibility ("OPR") to remove FBI Deputy Director Andrew G. McCabe.

Mr. McCabe vigorously rejects the findings that form the basis for the Proposal. For the reasons set forth below, and in the oral presentation we provided to you on March 15, 2018, we respectfully submit that those findings are unsupported by the evidence and ask you to reject them in making your final determination in this matter.

Further, based on the weakness of the evidence supporting the alleged violations of FBI Offense Codes 2.6 and 2.5, the substantial doubt surrounding the conclusions reached by the Office of the Inspector General ("OIG"), and the very real possibility that misunderstandings, miscommunication, and honest failures of recollection occurred during a period of time when Mr. McCabe was, by OPR's admission, "facing unprecedented and unimaginable pressure and challenges," we respectfully request that you find that termination is entirely inappropriate under the circumstances, especially given Mr. McCabe's long and distinguished career in the FBI.

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 2

### A.     OPR's Finding of Lack of Candor – Under Oath

To establish a violation of FBI Offense Code 2.6, there must be sufficient evidence of an employee "*[k]nowingly* providing false information in a verbal or written statement made under oath" (emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 2.6 in his interviews with OIG on November 29, 2017 and July 28, 2017. Those findings are unwarranted for the reasons set forth below.

#### 1.  Interview with OIG on November 29, 2017

With respect to the November 29, 2017 OIG interview, there is no basis for a finding of intentional misconduct regarding (a) Mr. McCabe's statements to OIG about his interaction with former Director Comey regarding the disclosure that Mr. McCabe authorized in connection with the article that was initially published online in the *Wall Street Journal ("WSJ")* on October 30, 2016 and in the print edition on October 31; or (b) Mr. McCabe's statements regarding his recollection of what he said in his May 9 INSD interview about authorizing the disclosures to the *WSJ*.

##### i.  Mr. McCabe's Statements Regarding the October 31, 2016 Conversation with Director Comey

A lack of candor finding based on Mr. McCabe's recollection of the conversation with Director Comey is unwarranted for a number of reasons.

First, as a threshold matter, a lack of candor finding is inappropriate where, as here, there was an informal conversation between only two parties and the other party repeatedly admits that he does not recall the conversation. *See Weiler v. United States*, 323 U.S. 606, 607 (1945) ("'The general rule in prosecutions for perjury is that the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused . . .'" (quoting *Hammer v. United States*, 271 U.S. 620, 626[1118])).

b7A Per DOJ/OIG

a.

b6 -1, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1, Per DOJ/OIG

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 3

b7A Per DOJ/OIG

- "No, no. Nope. In fact, *likely told me* the opposite.  Definitely didn't tell me he
  authorized it and *I think gave me the impression* he didn't know what was going on."
  (Comey Tr. 305:4-6,              )

b7A Per DOJ/OIG

b6 Per DOJ/OIG
b7A Per DOJ/OIG
b7C Per DOJ/OIG

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 4

b7A Per DOJ/OIG

For this reason alone, the lack of candor finding is unwarranted.

Second, the evidence (and particularly the evidence that we received within the last two days), strongly corroborates Mr. McCabe's testimony that he made Director Comey aware of the disclosure. The evidence demonstrates the following:

- On October 21, 2016, Mr. McCabe informed Director Comey, as well as Director Comey's Chief of Staff, James Rybicki, and David Bowdich, that an article by Devlin Barrett about Mr. McCabe's involvement in "Midyear" (the Clinton email investigation) and Dr. McCabe's campaign was forthcoming in the *WSJ*. He further stated, "I will work with [FBI Assistant Director for Public Affairs Michael Kortan] to ***provide some basic facts to push back***. And, as always, will keep you advised" (emphasis added). Director Comey responded, "Outstanding."

- On October 23, 2016, Mr. McCabe updated Director Comey, Mr. Rybicki and Mr. Bowdich on the status of his interactions with Barrett, stating "Mike K and I spent a good part of the day ***trying to shape the WSJ story*** on my alleged conflict. . . . The reporter also called Jill for a comment, so we are working that as well" (emphasis added).

- On October 30, 2016, Mr. Kortan emailed Mr. Rybicki, forwarding a detailed summary by Barrett of the contents of the forthcoming article. The summary included all of the main points that would appear in the final article, including the McCabe/Matthew Axelrod interaction. The underlying email from Devlin Barrett reflects that he had previously discussed the McCabe/Axelrod call with Mr. Kortan. The subject line of the email is "story is filed to my NY editors," reflecting that they had previously discussed at least some part of the story. Further, in notable contrast to the rest of the email in which Mr. Barrett appears to provide new information about the story to Mr. Kortan, he does not provide any background about the McCabe/Axelrod call, and instead provides a brief update that the story will "have more color from the Aug 12 McCabe-Axelrod call," and notes that "at present I'm disinclined to name Axelrod." Mr. Kortan made no attempt to hide from Rybicki the fact that he had discussed the McCabe-Axelrod call with the media. To the contrary, he promptly provided this information to the Director's Chief of Staff before the article was posted.

b6 -2, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -2, Per DOJ/OIG

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 5

b6 -1,2, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1,2, Per DOJ/OIG

Taken together, this evidence corroborates Mr. McCabe's account that he kept Director Comey updated regarding his communications with the *WSJ*, that the Director knew that he and Mr. Kortan were providing information to the *WSJ* in order to shape those stories, and that Mr. McCabe had no reason to hide this fact from Director Comey based on their prior interactions.

Finally, Director Comey's inability to recall a very brief conversation with Mr. McCabe, possibly lasting no more than a minute or two, is understandable given the context and time period in which it occurred. This conversation took place in the chaotic period immediately following Director Comey's October 28, 2016 letter to Congress and the expedited investigation of the Weiner laptop, so it is likely that Director Comey simply did not recall Mr. McCabe's comments to him because he was focused on other pressing, and far more important, matters. As Mr. McCabe made clear during yesterday's presentation, there were many more pressing issues on Director Comey's mind that day. In short, Mr. Comey's testimony, contradicted by Mr. McCabe's, cannot be relied on to support a finding of lack of candor.

### ii. Mr. McCabe's Statements Regarding the May 9, 2017 INSD Interview

A lack of candor finding based on Mr. McCabe's recollection in his OIG interview of the INSD interview is also unwarranted.

First, OPR overlooked substantial evidence that Mr. McCabe's statements reflected an understandably imprecise, but genuinely held, recollection by Mr. McCabe of the underlying events. As OPR acknowledged, Mr. McCabe was questioned about a time period when he was "facing unprecedented and unimaginable pressure and challenges." Proposal at 15. Just hours after what the INSD investigators testified was a brief discussion with Mr. McCabe regarding the *WSJ* article, Mr. McCabe was informed that Director Comey had been fired and that he was the new Acting Director the FBI. In the days and weeks that followed, he had to abruptly assume responsibility for leadership of the entire Bureau in a tumultuous period of uncertainty and political turmoil.

Notably, OIG described the statements that Mr. McCabe made in the November 29, 2017 interview describing the INSD interaction as a brief discussion that took place at the end of a meeting on a different topic, made findings that the description was inaccurate, and concluded

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 6

that Mr. McCabe was intentionally deceitful about the meeting. In fact, the evidence

b6 -3
b7A Per DOJ/OIG
b7C -3

Second, OPR overlooked substantial evidence that Mr. McCabe's statements reflected a simple misunderstanding and/or miscommunication with the INSD agents.

b6 -1,2,3, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1,2,3, Per DOJ/OIG

Additionally, the *WSJ* article that INSD asked Mr. McCabe to review contained not one but 24 separate facts and quotes from anonymous FBI sources, including references to sources who incorrectly stated that Mr. McCabe gave a "stand down" instruction on the Clinton Foundation investigation. Even if the INSD agents walked away from that discussion with an understanding that Mr. McCabe was specifically and exclusively referring to the Axelrod call while they were discussing the source of the "leaks" in the article, there is no evidence that Mr. McCabe had the same understanding. The most reasonable inference is that, in a short conversation at the end of a meeting set to discuss a different topic, where Mr. McCabe was nevertheless asked to review an article with 24 leaks, there was a simple miscommunication.

The fact that there was a miscommunication is further supported by the fact that Mr. McCabe later told the INSD agents that the summary they prepared of the conversation was inaccurate. The draft SSS did not implicate him in the disclosure, so if he had wanted to

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 7

disclaim responsibility, he could have simply signed the SSS. The fact that he refused to sign an inaccurate summary of his May 9 INSD interview belies OPR's finding that he was engaged in a cover up.

Finally, there is absolutely no evidence of any collusion or a conspiracy to hide the fact that Mr. McCabe authorized the disclosure of the Axelrod call. The purpose of the disclosure was to correct the reporter's misimpression that McCabe had directed that the FBI stand down from the Clinton Foundation investigation.  Mr. McCabe had the authority to direct that the disclosure be made, he directed [            ] and [            ] to make it, and he never sought to keep    b6 -1,2
secret the fact that he had done so.  Indeed, if Mr. McCabe had any intention of covering up the    b7C -1,2
disclosure or obstructing the investigation, he would have needed to communicate with the people whom he had authorized to make the disclosure [            ] and [            ] to tell them not to say anything about it. [            ]
[                                        ] and indeed you have advised us that this is uncontested. Put    b7A Per DOJ/OIG
simply, it would have made no sense for Mr. McCabe to knowingly lie to the INSD agents
without also asking [            ] and [            ] to lie about these events—which he did not do.    b6 -1,2
And in the absence of any evidence that he discouraged others from sharing information about    b7C -1,2
the disclosure, Mr. McCabe had absolutely no motive to lie to the INSD about his authorization of the disclosure, and no motive to lie to OIG about it. He did not do so.

Accordingly, there is no basis for a finding of intentional misconduct based on the November 29, 2017 OIG interview.

### 2. Interview with OIG on July 28, 2017

The finding that Mr. McCabe deliberately tried to mislead OIG investigators in his July 28, 2017 interview is similarly unsupported by the facts.

First, the highly unusual circumstances surrounding the July 28 interview (which are not recounted anywhere in the OPR Proposal) undermine the conclusion that Mr. McCabe engaged in any type of intentional misconduct.  Even though Mr. McCabe was the Acting Director of the FBI at the time, [                                                                ]
[                                        ] Mr. McCabe expressed to    b7A Per DOJ/OIG
OIG that he wanted to be represented by counsel when questioned about matters in which he was involved [                                                                ]
[                                                                                        ]

b7A Per DOJ/OIG

[                        ] the OIG investigators shared with Mr. McCabe information that he found truly startling about the existence of a large volume of highly inflammatory and sensitive text messages between two of his colleagues, [            ] and [            ] He immediately began to process this information and start to think about what steps he needed to take immediately as Acting Director to protect ongoing, highly-sensitive FBI investigations.  As the interview progressed, the OIG attorneys began to question Mr. McCabe regarding matters involving his

b6 -1, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1, Per DOJ/OIG

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 8

own conduct, which was contrary to his understanding of what would occur during the interview. Mr. McCabe was confused as to why the OIG attorneys were asking him about matters involving his own conduct, contrary to his understanding of his prior agreement with them, and while trying to object to the line of questioning, made statements regarding [ ] authorization to speak to the *WSJ* reporter. Under these highly unusual circumstances, an inference that Mr. McCabe was attempting to be intentionally deceptive is unwarranted. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (holding that a perjury prosecution requires proof of specific intent, that is, that the defendant made the false statement with knowledge of its falsity, rather than as a result of confusion, mistake or faulty memory).

b6 -1
b7C -1

As Mr. McCabe explained during his testimony yesterday, the OIG attorneys repeatedly showed him text messages, which he had not sent or received, and asked him to explain what the participants intended or were referring to in those texts. As countless lawyers have counseled countless witnesses in these types of situations, Mr. McCabe (without his own counsel present to advise him) was trying not to speculate about what others intended or were doing. [ ]

b7A Per DOJ/OIG

[ ] stating that he was not in town during those days, and therefore couldn't say where [ ] was or what she was doing. Although Mr. McCabe was out of town during this time period and could not possibly have known everything that [ ] was doing during this weekend, Mr. McCabe became concerned he had left the misimpression with the OIG attorneys and promptly acted to clarify any misimpression.

b6 -1
b7C -1

Second, to the extent that he had misspoken during the July 28 interview, Mr. McCabe affirmatively took steps to clarify his responses promptly after the interview, which is completely inconsistent with any deliberate effort to mislead. As OIG correspondence confirms, as soon as Mr. McCabe had a chance to reflect on the interview [ ]

[ ] he voluntarily contacted OIG to clarify any potential miscommunication or misunderstanding about the *WSJ* article, confirmed that he was traveling at the time of the *WSJ* article, and informed OIG that they could speak to [ ] if they needed additional information. *See* August 1, 2017 Email from [ ]

b6 -1,2, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1,2, Per DOJ/OIG

As courts have stated in the context of perjury cases, evidence of voluntary steps to clarify the record negates an inference of intentional deceit. *See United States v. Norris*, 300 U.S. 564, 576 (1937) ("the correction of an innocent mistake, or the elaboration of an incomplete answer," may "demonstrate that there was no willful intent to swear falsely"); *Beckanstin v. United States*, 232 F.2d 1, 4 (5th Cir. 1956) (reversing perjury conviction and holding that "[w]illingness to correct the misstatement . . . is potent to negative [sic] a willful intent to swear

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 9

falsely"); *United States v. Lococo*, 450 F.2d 1196, 1198 n.2 (9th Cir. 1971) ("willingness to correct a misstatement is relevant to the issue of intent").

Third, as noted above, there is no other evidence of any collusion or conspiracy to hide the fact that Mr. McCabe authorized the disclosure. If Mr. McCabe truly had intended to deceive the OIG investigators, not only would he not have clarified his testimony a few days later, he would have needed to ask [          ] and [          ] not to be truthful with the OIG investigators when they later testified. The evidence is clear that he did not do so because he had no intent whatsoever to deceive anyone about this matter.

<span style="float:right">b6 -1,2<br>b7C -1,2</span>

Accordingly, there is no basis for a finding of intentional misconduct based on the July 28, 2017 OIG interview.

**B.    OPR's Finding of Lack of Candor – No Oath**

To establish a violation of FBI Offense Code 2.5, there must be sufficient evidence of an employee:

> ***Knowingly*** providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person.

(emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 2.5 during his October 31, 2016 conversation with Director Comey and the May 9, 2017 interview with INSD. Those findings are unwarranted for the reasons set forth at length above.

**C.    OPR's Finding of Unauthorized Disclosure**

To establish a violation of FBI Offense Code 4.10, there must be sufficient evidence of an employee *"[w]ithout authorization*, disclosing or attempting to disclose the FBI's, or another agency's, sensitive material"* (emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 4.10 based on an unspecified "general prohibition" on disclosing information about an ongoing criminal investigation and certain statements made by Director Comey. Proposal at 14. That finding is unsupported by the evidence for the reasons set forth below.

First, a violation of FBI Offense Code 4.10 is inappropriate as a legal matter because there is no evidence that Mr. McCabe made any disclosure "without authorization." As Deputy Director, Mr. McCabe was authorized to make and coordinate disclosures of information to the media. *See* Media Relations at FBIHQ and in Field Offices Policy Guide, § 3.1: Authorization of Federal Bureau of Investigation Personnel to Make and Coordinate Disclosures and Information Releases to the Media.

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 10

b7A Per DOJ/OIG

Director Comey even qualified that "unless [he] authorized it or Deputy Director McCabe authorized it, [he] considered it an unauthorized disclosure." Comey Tr. 302:13-15, The fact that Mr. McCabe's judgment on the *WSJ* disclosure may have differed from Director Comey's does not make Mr. McCabe's decision unauthorized.

Second, the Clinton Foundation investigation had been publicly reported for months before the disclosure in the October 30, 2016 *WSJ* article,[1] and the *WSJ* article itself contained numerous acknowledgements from other FBI sources that the FBI had opened a criminal investigation into the Clinton Foundation. In fact, the only reason Mr. McCabe felt the need to make a disclosure, in order to protect the reputation and integrity of the FBI, was to rebut the false narrative coming from anonymous FBI sources regarding the status of the investigation. Mr. McCabe's authorization to provide information that was designed to combat the destructive and false narrative of FBI political bias was motivated solely by a desire to protect the institution that he loves and to which he has dedicated his entire professional life. Faced with the decision whether to leave the false narrative uncorrected, or provide information that tended to counter the suggestion that the FBI was buckling to political pressure, Mr. McCabe made a judgment call, which he had the clear authority to make, that the disclosure of the limited amount of information to the *WSJ* was in the best interests of the FBI.

### D.   Prior OPR Precedent

As part of the due process accorded FBI personnel facing potential discipline, OPR shared with us limited information on cases it has previously handled involving similar allegations against FBI personnel. Despite the assertion in the March 7, 2018 letter that, "all FBI employees know that lacking candor under oath results in dismissal," the cases show that is not consistently the case. Illustrative examples include the following:

- In OPR Case No.

b6 -1
b7C -1

---

[1] *See, e.g.*, Catherine Herridge & Pamela K. Brown, FBI's Clinton probe expands to public corruption track, FOX NEWS (Jan. 11, 2016), http://www.foxnews.com/politics/2016/01/11/fbis-clinton-probe-expands-to-public-corruption-track.html; S.A. Miller, Obama admin blocked FBI probe of Clinton Foundation corruption: Report, THE WASHINGTON TIMES (Aug. 11, 2016), https://www.washingtontimes.com/news/2016/aug/11/obama-admin-blocked-fbi-probe-clinton-foundation/; Drew Griffin, Pamela Brown & Shimon Prokupecz, First on CNN: Inside the debate over probing the Clinton Foundation, CNN (Aug. 11, 2016, 4:23 PM), https://www.cnn.com/2016/08/11/politics/hillary-clinton-state-department-clinton-foundation/index.html; Richard Pollock, Exclusive: Joint FBI-US Attorney Probe of Clinton Foundation is Underway, THE DAILY CALLER (Aug. 11, 2016, 10:36 PM), http://dailycaller.com/2016/08/11/exclusive-joint-fbi-us-attorney-probe-of-clinton-foundation-is-underway/.

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 11

- In OPR Case No.                                                                    b6 -1
                                                                                      b7C -1

- In OPR Case No.                                                                    b6 -1
                                                                                      b7C -1

    These three cases are merely illustrative. We found a number of additional cases in which OPR found an employee to have lied under oath, OPR proposed dismissal, and a lesser sanction was imposed. These cases demonstrate that the FBI has on a number of occasions exercised its discretion to take mitigating factors into account and substitute a lesser sanction than dismissal.

    Thus, even if you were to find, contrary to the evidence, that Mr. McCabe knowingly lied under oath, the Department has the discretion to impose a lesser sanction. In light of OPR's acknowledgement that Mr. McCabe has "21 years of remarkable FBI service and [has shown] truly outstanding performance," and at the time of the events in question was "facing unprecedented and unimaginable pressures and challenges," (March 7, 2018 letter at 15), you should exercise that discretion in Mr. McCabe's favor and impose a sanction other than dismissal. That is the fair, just, and humane result.

### E.    Conclusion

    For the reasons stated above, we respectfully submit that any findings of intentional misconduct are inappropriate here.

Respectfully submitted,

Michael R. Bromwich

cc:    Eric B. Bruce, Kobre & Kim

# EXHIBIT 6



**U.S. Department of Justice**

Office of the Deputy Attorney General

```
ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 09-04-2018 BY          ꜀b6 -1
                            b7C -1
```

*Washington, DC 20530*

March 16, 2018

**By e-mail amg.dd@fbi.gov**
Andrew G. McCabe

b6 -1
b7C -1

Mr. McCabe,

Enclosed please find the Attorney General's written decision on the Federal Bureau of Investigation's proposal for your removal.

Sincerely yours,

Scott N. Schools
Associate Deputy Attorney General

Enclosure

cc:

**By e-mail**

b6 -3
b7C -3

Michael R. Bromwich, Esq.
Senior Counsel
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, NW, Suite 411L
Washington, D.C. 20006

**By e-mail**

b6 -3
b7C -3

Eric B. Bruce, Esq.
Kobre & Kim LLP
1919 M Street, NW
Washington, D.C. 20036



**U.S. Department of Justice**

Office of the Deputy Attorney General

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 09-04-2018 BY [      ]NSIC b6 -1
                                b7C -1

---

Associate Deputy Attorney General                    *Washington, D.C. 20530*

March 16, 2018

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH:          THE DEPUTY ATTORNEY GENERAL

FROM:             Scott Schools
                  Associate Deputy Attorney General

SUBJECT:          Proposed Removal of Andrew G. McCabe from the FBI

PURPOSE:          To provide a recommendation regarding the proposed removal of FBI
                  Deputy Director Andrew G. McCabe

TIMETABLE:        As soon as possible.

DISCUSSION:

On March 7, 2018, Candice M. Will, Assistant Director of the Office of Professional Responsibility of the Federal Bureau of Investigation (FBI), proposed that Andrew G. McCabe be dismissed from the FBI. Ms. Will's proposal resulted from her determination that Mr. McCabe (A) lacked candor under oath on two occasions in violation of FBI Offense Code 2.6; (B) lacked candor not under oath on two different occasions in violation of FBI Offense Code 2.5; and (C) made an unauthorized disclosure in violation of FBI Offense Code 4.10.

Mr. McCabe was notified of the proposal on or about March 7, 2018, and on March 8, 2018, Mr. McCabe and his counsel were advised of their right to provide to me an oral and/or written response to the proposal by March 15, 2018. On March 14, 2018, I extended the time for filing the written response to March 16, 2018 at noon. On March 15, 2018, Mr. McCabe and his counsel presented an oral response to the proposal, and I timely received the written response.

Mr. McCabe and his counsel were provided documents on which Ms. Will relied in making her proposal. Those documents included a report from the Office of Inspector General (OIG) pertaining to the conduct in question and documents underlying that report, including witness transcripts or relevant portions thereof, and other relevant documents. Ms. Will's charges were consistent with the conclusions of the Inspector General. Mr. McCabe's counsel made requests for additional documents during the course of their preparation of the responses. The Department accommodated each of those requests. On March 15, 2018, Mr. McCabe and his counsel presented their oral response to the proposal for approximately four hours. On March 16, 2018, Mr. McCabe through counsel submitted a written response to the proposal.

I have reviewed the entire record and carefully considered Mr. McCabe's oral and written responses. I incorporate Ms. Will's proposal by reference except to the extent specifically noted below. I recommend the following:

A.    Lack of Candor Under Oath

    1.    Interview with the OIG on July 28, 2017

    During an OIG interview on July 28, 2017, Mr. McCabe was questioned about an October 30, 2016 Wall Street Journal (WSJ) article that reported a conversation that Mr. McCabe had with a Senior Department Official (SDO), in which Mr. McCabe reportedly asked the SDO whether the SDO was directing the FBI to shut down a validly predicated investigation. The OIG showed Mr. McCabe the article and asked about text messages between Employee A and a third employee, the content of which indicated that Employee A was on the phone with the WSJ reporter on October 27 and 28, two days before the WSJ article. In response to being confronted with the article and text messages, Mr. McCabe stated, [                                    b7A Per DOJ/OIG



] I was not even in town during those days, so I can't tell you where [Employee A] was or what [Employee A] was doing." Mr. McCabe subsequently acknowledged that he authorized two of his subordinates (Employees A and B) to disclose the substance of the communication to the WSJ "on background."

    In a November 29, 2017 interview with the OIG, Mr. McCabe recounted in significant detail the events leading up to the WSJ article, including his specific authorization of Employees A and B to contact the WSJ, and disclose the details of the conversation with the SDO [                                    b7A Per DOJ/OIG

]

    In light of the level of involvement Mr. McCabe had with Employees A and B regarding the article, the extensive phone calls he had with Employee A during the relevant time period, and the details regarding these events that he provided during his subsequent OIG interview, I find that a preponderance of the evidence supports the conclusion that his statement in the July 28, 2017 OIG interview that he did not know what Employee A was doing on the days in question was knowingly false.

    Mr. McCabe advised that on July 28, 2017 [                                    b7A Per DOJ/OIG

] However, the transcript also reflects that the OIG advised Mr. McCabe that the interview was voluntary. Therefore, Mr. McCabe could decline to answer the questions or answer them honestly. His statement denying knowledge of Employee A's activities in connection with the discussion of the October 30, 2016 article was false.

    On August 1, 2017, Mr. McCabe advised the OIG that he had authorized Employees A and B to provide information that formed the basis of the October 30, 2016 article. The lack of significant notice that Mr. McCabe had in advance of the interview, his inability to contact his counsel prior to the interview, and his contacting the OIG four days after he provided false

2

information under oath to correct the record mitigate the seriousness of the offense.
Nonetheless, I recommend that you sustain the charge that Mr. McCabe lacked candor under
oath in the July 28, 2017 OIG interview.

2.    Interview with the OIG on November 29, 2017

The proposing official found that Mr. McCabe lacked candor in two respects in
connection with his OIG interview on November 29, 2017. First, Ms. Will found that Mr.
McCabe lacked candor when he told the OIG that he told then-FBI Director James B. Comey on
October 31, 2016, that he authorized the disclosure of that portion of the WSJ article that
revealed the details of the conversation between Mr. McCabe and the SDO. Mr. McCabe
indicated in his testimony before the OIG that he advised Mr. Comey on the morning of October
31, 2016 about the authorization. Mr. Comey denied that Mr. McCabe told him that he had
authorized the disclosure to the WSJ. Mr. McCabe points out that Mr. Comey's testimony is
uncertain and speculative in many respects. However, Mr. Comey testified:

[OIG]:        He did not tell you that he authorized it.

MR. COMEY:   No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell
             me he authorized it and I think gave me the impression he didn't know
             what was going on.

Mr. Comey's testimony is in some respects vague and speculative. However, his assertion that
Mr. McCabe did not affirmatively inform him that he (Mr. McCabe) authorized the disclosure in
the October 30, 2016 WSJ article is unequivocal. Mr. Comey's recollection is consistent with
other testimony and contemporaneous events. First, the other witnesses from the FBI's front
office (except Employee A) testified that they were unaware that Mr. McCabe had authorized the
disclosure, despite Mr. McCabe's claim that his authorization of the disclosure was well known.
Second, as a result of the October 23, 2016 WSJ article that first reported contributions to Mr.
McCabe's wife's political campaign, Director Comey had declined to receive input from Mr.
McCabe regarding a particular investigation (Investigation 1) that was related to a second
investigation (Investigation 2) that was the subject of the WSJ articles. It seems unlikely that in
light of Mr. Comey's assessment about potential recusal issues arising from Mr. McCabe's
wife's campaign, he would have been "okay with" Mr. McCabe's having made the decision to
authorize the disclosure in the October 30, 2016 WSJ article. Third, that same day, October 31,
2016, Mr. Comey had a meeting with the Attorney General that included a small group. Later
that day, a Department of Justice (DOJ) official e-mailed an FBI official to advise that DOJ had
received a media inquiry about that very small meeting and that the inquirer had significant
detail about the meeting. The DOJ employee denied having disclosed the details of the meeting,
implying that the FBI was the source. When advised of the e-mail, Mr. Comey replied, "What?
Do they think we're idiots?" This e-mail is inconsistent with Mr. Comey's being "okay with"
Mr. McCabe's authorization of the disclosure of a one-on-one conversation between Mr.
McCabe and the SDO. Fourth, the FBI's Inspection Division (INSD) opened an unauthorized
disclosure investigation regarding the October 30, 2016 article, which seems unlikely to have
happened if Mr. Comey and others were aware that Mr. McCabe had authorized the release of
the information. Fifth, after publication of the October 30, 2016 the article, the SDO spoke with
Mr. McCabe and expressed his view that the release of details regarding his one-on-one

3

conversation with Mr. McCabe was not conducive to a good working relationship. Although Mr. McCabe apologized, he did not (by his own admission) tell the SDO that he (Mr. McCabe) had authorized the disclosure. Sixth, even if Mr. McCabe was not expecting INSD to ask him about the October 30, 2016 article during INSD's May 9, 2017 interview, if it were well known that he had authorized the disclosure, it seems unlikely that he would have denied it to INSD. Seventh, the disclosure identified a previously undisclosed FBI investigation as "validly predicated," thereby confirming its existence at a time when the FBI had not previously confirmed the existence of the investigation, and the confirmation occurred just 9 days before a Presidential election that could have been impacted by the disclosure. Finally, after the publication of the article, Mr. McCabe contacted two supervisory FBI agents who were overseeing Investigation 2 to chastise them based on Mr. McCabe's assessment that their subordinates were improperly speaking to the media about the Investigation 2. During these calls, Mr. McCabe did not acknowledge authorizing the disclosure of his conversation with the SDO.

In sum, nothing about Mr. McCabe's immediate or subsequent actions pertaining to the WSJ article suggests that he would have revealed to Mr. Comey that he authorized the release of the information. For all of these reasons, the preponderance of the evidence supports that Mr. McCabe lacked candor when he testified that he told Mr. Comey on October 31, 2016 that he had authorized the release of the information in the October 30, 2016 WSJ article.

Ms. Will also concluded that Mr. McCabe lacked candor in his November 29, 2017 OIG interview when he denied that in his May 9, 2017 INSD interview he told INSD that he did not know who authorized the disclosure in the October 30, 2016 article. By this time, Mr. McCabe had again met with INSD, and in the second meeting he admitted that he authorized the disclosure. Mr. McCabe's description of the May 9, 2017 meeting contradicts the contemporaneous notes of the INSD agent and the recollections of both agents. Mr. McCabe described the May 9, 2017 encounter with INSD as his having been pulled aside by one of the agents outside of the presence of the others and asked about the article. In fact, one of the agents whom Mr. McCabe described as not present took the notes of the conversation, and his notes reflect not only that Mr. McCabe discussed the article and the conversation with the SDO, but also that he denied knowing its source. Mr. McCabe notes that just hours after INSD interviewed him, he learned that Mr. Comey had been removed as Director of the FBI. He has stated that the events that followed likely impaired his ability to recall the INSD interview in detail. In fact, in his discussion of the May 9, 2017 interview, Mr. McCabe frequently caveats his assertions by noting his lack of perfect recollection. However, because he had met with INSD a second time by that point, he must have known that the interviewing agents understood him to have denied that he authorized the disclosures in the October 30, 2016 article. His effort to minimize the significance of that portion of the meeting, which the agents described as lasting five to seven minutes, seems designed to persuade the OIG that the denial did not happen. Although a closer question, the preponderance of the evidence supports a finding that Mr. McCabe's testimony failing to acknowledge that he denied to INSD that he authorized the disclosure in the October 30, 2017 article was false, and that he lacked candor.

4

FBI 18-cv-01766-2521

B.    Lack of Candor—Not Under Oath

1.    Meeting with the Director on October 31, 2016

Ms. Will concluded that Mr. McCabe lacked candor when he told Mr. Comey on October 31, 2016, that he did not know how the information got into the October 30, 2016 WSJ article. As noted above, however, Mr. Comey's testimony regarding Mr. McCabe's affirmative denial of authorizing the disclosure in the article is equivocal and speculative. Although the preponderant evidence supports a finding that Mr. McCabe did not tell Mr. Comey that he authorized the disclosure, the testimony is insufficient to support a finding that Mr. McCabe denied being the source. Therefore, the first charge of lack of candor under oath is not supported by preponderant evidence.

2.    May 9, 2017 INSD interview

Ms. Will found that Mr. McCabe denied authorizing the disclosure of the information in the WSJ article when INSD interviewed him on May 9, 2017. Mr. McCabe in his oral response stated, "I guess I did tell them I don't know." The contemporaneous notes of the interviewing agent along with INSD's contemporaneous preparation of a draft signed sworn statement reflecting Mr. McCabe's denial are strong evidence of the denial.

b7A Per DOJ/OIG

At the August 18, 2017 interview, the interviewing agents told Mr. McCabe that they had spent considerable resources and time trying to find out the source of the information as a result of his earlier denial, and he did not suggest that their time had been wasted because he had previously told them he was the source. In other words, during the second interview, he did not claim to have earlier reported that he was the source.

Mr. McCabe points out that INSD's questioning of him about the WSJ article during the May 9, 2017 interview was unexpected and that may have been why he failed to acknowledge that he authorized the disclosure. However, the events surrounding the October 30, 2016 WSJ article were fresher in his mind at that point than they would have been in the November 29, 2017 OIG interview, yet he recounted the events during the November interview in considerable detail. The preponderance of the evidence supports a finding that Mr. McCabe lacked candor in his May 9, 2017 interview with INSD.

C.    Unauthorized Disclosure

Ms. Will next concluded that Mr. McCabe's authorization to disclose the conversation with the SDO that also confirmed the existence of a previously unconfirmed investigation violated FBI Offense Code 4.10. Mr. McCabe contends that the FBI's Media Policy authorized him to make disclosure determinations. However, that policy also restricted the circumstances under which the FBI would disclose information about ongoing investigations. Although Mr. McCabe contends that the October 23, 2016 article suggesting that the FBI was acting politically deserved a response, and that it was in the public interest to refute that allegation, he chose to

5

disclose a private conversation that involved a DOJ official not in the FBI, and in so doing confirmed the existence of an investigation. He acknowledged in his oral response that his "defense" of the FBI was at the expense of DOJ. The FBI is within the Department of Justice, and no rational analysis could conclude that it was in the public interest to defend the FBI at the expense of larger DOJ. At the very least, Mr. McCabe should have consulted with DOJ before unilaterally making the decision to disclose confidential information in the form of what appeared to be a leak. His failure to admit to the SDO that he (Mr. McCabe) had authorized the disclosure demonstrates his recognition that the disclosure was not in the overall best interest of the Department of Justice. Whether the disclosure was accurate or not, he should not have authorized the disclosure, and the preponderance of the evidence supports a finding that the disclosure was not authorized by FBI policy.

## Penalty Determination

I have attached and incorporate Ms. Will's proposal and the Office of Professional Responsibility report that summarizes her Douglas factor analysis. I have also considered the FBI's disciplinary history. As Ms. Will notes, the standard penalty for lack of candor under oath is dismissal. The substantiated findings of lack of candor under oath are compounded by the finding of lack of candor not under oath, and the unauthorized disclosure finding. Although Mr. McCabe has had a distinguished career in the FBI, as Ms. Will observed, he was the second highest-ranking official in the FBI, and he is expected to handle himself with utmost integrity. For these reasons and having considered the Douglas factors, I recommend that you concur in her proposal that Mr. McCabe be dismissed from the FBI.

RECOMMENDATION:    I recommend that you accept the proposal of Candice Will, Assistant Director, Office of Professional Responsibility, that Andrew G. McCabe be dismissed from the rolls of the FBI.

## Decision

For the reasons stated in the foregoing recommendation, I have decided that Andrew G. McCabe should be removed from the Federal Bureau of Investigation and from the civil service.

March 16, 2018
Date

Jefferson B. Sessions III
Attorney General

6

FBI 18-cv-01766-2523