# EXHIBIT 1



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D.C. 20535-0001

March 7, 2018

PERSONAL

Mr. Andrew G. McCabe
(P-1)

Dear Mr. McCabe:

I have completed my review of an administrative inquiry, investigated by the Department of Justice, Office of Inspector General (OIG), regarding allegations that you: (1) lacked candor in an interview with the OIG on July 28, 2017, and in a second interview with the OIG on November 29, 2017, in violation of FBI Offense Code 2.6 (Lack of Candor – Under Oath); (2) lacked candor when discussing a October 30, 2016 *Wall Street Journal* article with the FBI Director, and in an interview with FBI's Inspection Division on May 9, 2017,[1] in violation of Offense Code 2.5 (Lack of Candor – No Oath); and (3) disclosed, without authorization, an FBI investigation, in violation of Offense Code 4.10 (Unauthorized Disclosure – Sensitive Information).[2]  Based on a preponderance of the evidence, I conclude the allegations are substantiated.  Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, I propose dismissing you from the rolls of the FBI.[3]

## DISCUSSION

### October 23, 2016 *Wall Street Journal* Article

On October 23, 2016, the *Wall Street Journal* (WSJ) published an online article written by Reporter which stated that the Virginia Democratic Party and a political action committee (PAC) run by the Virginia Governor donated nearly $675,000 to your wife's unsuccessful 2015

---

[1] The OIG found that you lacked candor under oath when you spoke to Inspection on May 9, 2017.  However, it is unclear from the case file whether you were under oath at the time you spoke with investigators about the article in question.  Accordingly, I find the May 9 interview is more appropriately considered not under oath.

[2] This administrative inquiry was opened after January 1, 2017, and thus will be analyzed under the FBI's 2017 Offense Codes and Penalty Guidelines.

[3] Pursuant to the Deputy Attorney General's Memorandum dated May 27, 2008, to the Director of the FBI, the Justice Department has retained final decision-making authority over adverse actions impacting the Deputy Director of the FBI.

state senate campaign.[4]  The article described the Governor's close connection to Bill and Hillary Clinton, and noted that you were an FBI official "who later helped oversee Investigation #1."[5]

The WSJ article resulted in significant public discussion as to whether your subsequent oversight of Investigation #1 was appropriate given your wife's connection to the Governor and the Virginia Democratic Party.  Your Special Counsel told the OIG, "[s]o that article comes out on Sunday.  And it is like an enormous fire storm.  It is hugely, you know, it's not only all over the news, but there's just a lot of swirl and churn associated with that fact coming out."[6] According to the OIG's investigation, a Senator immediately called for your recusal.  On October 27, 2016, in a meeting on Investigation #1, the FBI General Counsel (GC) suggested that you, present by telephone, not be present for the discussion on Investigation #1.  The GC acknowledged that the question of whether you should recuse yourself had not yet been settled, but out of an abundance of caution, the GC felt you should not be in the meeting.  The Director agreed and you ended your call into the meeting.[7]

On October 24, 2016, Reporter emailed the Assistant Director, Office of Public Affairs, to ask additional questions for a follow-up story he was working on.[8]  In that email, Reporter asked about your involvement in Investigation #2, among other things.[9]  Specifically, Reporter's email said that he was told that:

in the summer, McCabe himself gave some instruction as to how to proceed with the [Investigation #2] probe, given that it was the height of election season and

---

[4] The print edition of the article was published on October 24, 2016.

[5] The article acknowledged that you played no role in your wife's 2015 state senate campaign and that you were promoted to FBI Deputy Director, with oversight of Investigation #1, months after your wife's defeat.  You did not have an oversight role in Investigation #1 when your wife was running for office.

The FBI Director told the OIG that he first learned of the issue regarding your wife and her connection to the Governor when you emailed the Director on October 21, 2016, two days before the article was released, stating, "[The Office of Public Affairs (OPA)] informed me that [Reporter] at WSJ is putting together an article claiming I had a conflict of interest on [Investigation #1] as a result of [your wife's] campaign connections to Governor [].  I'll work with [OPA] to provide some basic facts to pushback."  On October 23, 2016, you emailed the Director and wrote, "Not too much in the update.  The only additional notable news is that [OPA] and I spent a good part of the day trying to shape the Wall Street Journal's story on my alleged conflict...," which you noted was to be released online.

[6] Special Counsel OIG interview, 9/7/2017, pg. 253.

[7] In your 12/4/2017 interview with the OIG, you stated that you dropped out of the call because the GC brought up the need to discuss classified information and you were on an open line.  You denied that you were asked to leave the meeting due to the possibility of recusal or a conflict of interest.

[8] Assistant Director has since retired from the FBI.

[9] Investigation #2 was a separate and distinct investigation from Investigation #1.  Although Investigation #1 was publicly acknowledged by the FBI, Investigation #2 was not.  When the Director was asked during Congressional testimony whether the FBI was involved in Investigation #2, he declined to answer.

Mr. Andrew G. McCabe

the FBI did not want to make a lot of overt moves that could be seen as going after [] or drawing attention to the probe.

Reporter's email asked Assistant Director if this was accurate and if there was anything else Reporter should know.

You were notified that Reporter was working on a follow-up story that would cover your oversight of Investigation #2 in the face of Reporter's earlier article that the gave significant campaign contributions to your wife. Special Counsel stated that you both believed that narrative being developed by the WSJ was inaccurate and you authorized Special Counsel to speak to Reporter "to fix this story and give a complete picture."[10] Special Counsel stated, "Andy [McCabe] directs me to work with [Assistant Director] on a follow-up story with [Reporter]…So I am a source on background with [Reporter] at Andy [McCabe] and [Assistant Director's] direction in order to try to correct the inaccurate sort of representations in that article."[11] Special Counsel advised that this was the first time she had communicated with the media in her official capacity at the FBI.

Special Counsel and Assistant Director were scheduled to speak with Reporter for the first time on October 27, 2016, in "receive mode," to hear what Reporter's story intended to address. Special Counsel and Assistant Director would then discuss an appropriate response and speak to Reporter a second time. You were on personal travel from Thursday, October 27 – Sunday, October 30, 2016. Despite this, you maintained close contact with your Special Counsel regarding her and Assistant Director's progress with Reporter. According to text messages, on October 27, 2016, at 12:06 pm, you texted Special Counsel, "Are you with wsj now." Special Counsel texted back that she was "going there now" and would call you "immediately after re call with [Reporter]." A little over an hour later, Special Counsel texted you asking if you were free to talk. Telephone records show that you and Special Counsel spoke by telephone at 2:54 p.m. for approximately 51 minutes. According to Special Counsel, she briefed you on her conversation with Reporter and a purported "stand down" order that you had issued to agents working on Investigation #2. You and Special Counsel discussed the inaccurate and inflammatory nature of Reporter's information. According to Special Counsel, you cited your August 12, 2016 phone call with the DOJ Principal Associate Deputy Attorney General (PADAG) in which PADAG expressed anger at you that the FBI had not shut down Investigation #2 based on PADAG's misunderstanding of the situation. In that call, you pushed back against PADAG and told him that the FBI would continue to take appropriate and logical investigative steps in Investigation #2. You then asked if PADAG was telling you "to shut down a validly predicated investigation," which PADAG said he was not. According to Special Counsel, you wanted to provide an account of your conversation with PADAG to rebut the false "stand down" scenario that had been shared with the WSJ. Special Counsel's notes of her conversation with you on October 27 include a notation "Fri. Aug 12 with [PADAG]" to remind her to discuss the telephone call with Reporter.

---

[10] Special Counsel OIG interview, 9/7/2017, pg. 280.

[11] Special Counsel OIG interview, 9/7/2017, pg. 272.

Mr. Andrew G. McCabe

Text messages and phone records show that immediately before Special Counsel and Assistant Director spoke with Reporter for the second time on October 27, 2016, you called Special Counsel and you spoke for six minutes. Special Counsel and Assistant Director than spoke to Reporter from 4:45 p.m. to 5:21 p.m. According to Special Counsel's contemporaneous notes and testimony to the OIG, in this call to Reporter she responded to claims regarding FBI leadership's handling of Investigation #2 and provided the account of the August 12 phone call between you and PADAG. Later that evening, Special Counsel texted you, "We're done. He's going to look at this story again and we'll circle back with him in the morning."

On October 28, 2016, Special Counsel and Assistant Director spoke to Reporter a third time. He gave them a preview of his revised story, which now included a report on the PADAG phone call. After this call ended, Special Counsel texted you, "Just got off with [Reporter]. Give me a call here." You called Special Counsel and you spoke for 23 minutes.

**October 30, 2016 *Wall Street Journal* Article**

On October 30, 2016, Reporter's follow-up article was published online.[12] The article mentioned the Director's stunning disclosure two days earlier, on Friday, October 28, that the FBI was taking another look at Hillary Clinton's emails days before the presidential election and discussed tension inside the FBI and DOJ on how best to proceed. The article again mentioned the Governor's campaign contributions to your wife's failed state senate campaign in 2015 and discussed your efforts to refocus Investigation #2.[13] The article reported that agents had been told to "[s]tand down" on Investigation #2 and that "the order had come from the deputy director – Mr. McCabe," but also that "[o]thers familiar with the matter deny Mr. McCabe or any other senior FBI official gave such a stand-down instruction." The article described the August 12 conversation between you and PADAG (the latter identified only as a "senior Justice Department official"), stating:

> According to a person familiar with the probes, on Aug. 12, a senior Justice Department official called Mr. McCabe to voice his displeasure at finding that New York FBI agents were still openly pursuing the [Investigation #2] probe during the election season. Mr. McCabe said agents still had the authority to pursue the issue as long as they didn't use overt methods requiring Justice Department approvals.
>
> The Justice Department official was "very pissed off," according to one person close to McCabe, and pressed him to explain why the FBI was still chasing a matter the department considered dormant…

---

[12] The print edition of the article was published on October 31, 2016.

[13] This represented the first public acknowledgment that the FBI had opened a criminal investigation into Investigation #2. The Director had previously declined to answer questions about the existence of an investigation of Investigation #2.

4

Mr. Andrew G. McCabe

> "Are you telling me that I need to shut down a validly predicated investigation?"
> Mr. McCabe asked, according to people familiar with the conversation.  After a
> pause, the official replied "Of course not," these people said.

## Meeting with the Director on October 31, 2016

The following day, Monday morning, October 31, 2016, the Director held a staff meeting, attended by you and Special Counsel, among others.  During the meeting, according to Special Counsel's contemporaneous notes, the Director said, "Need to figure out how to get our folks to understand why leaks hurt our organization."  In his statement to the OIG, the Director advised that he remembered reading the October 30, 2016 WSJ article and thinking, "what the hell[,]" "I was very concerned about it for a number of reasons[,]" "this was going to poison our relationship with the Department of Justice."[14]  The Director went on to say that his second reaction was, "what are we doing talking about what we're doing in an investigation…"[15]  He considered it a disclosure of sensitive FBI information.  The Director stated, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[16]  When questioned further by the OIG whether you told him that you authorized the disclosure, the Director stated, "No, no.  Nope.  In fact, likely told me the opposite.  Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[17]  When asked again if you told him that you authorized Special Counsel to speak to the WSJ, the Director stated that you said, "something like can you believe this crap?  How does this stuff get out kind of thing?  But I took from whatever communication we had that he wasn't involved in it…"[18]  The Director stated that he did not suspect that you were the source of the disclosure based on what you told him the morning after the article came out.

The Director told the OIG it is "very unlikely" "in fact approaching zero" that he would have authorized disclosure of the PADAG telephone call if asked ahead of time.  The Director stated that part of the reason for declining to disclose that information is that it explicitly confirms the existence of a criminal investigation.[19]  The Director advised that when he disclosed the existence of Investigation #3 to Congress, he did so reading from a script that was carefully drafted and considered.  He stated that disclosing a criminal investigation anonymously sourced in a newspaper is not something the FBI would do.  Regarding the October 30, 2016 WSJ article, the Director stated, "I did not authorize this.  I would not have authorized this."[20]  The Director

---

[14] Director OIG interview, 11/16/2017, pgs. 301-302.

[15] Director OIG interview, 11/16/2017, pg. 302.

[16] Director OIG interview, 11/16/2017, pgs. 304-305.

[17] Director OIG interview, 11/16/2017, pg. 305.

[18] Director OIG interview, 11/16/2017, pgs. 314-315.

[19] Director OIG interview, 11/16/2017, pg. 310.

[20] Director OIG interview, 11/16/2017, pg. 311.

Mr. Andrew G. McCabe

further stated that as the Director of the FBI, significant disclosures about investigations would always go through him because he is responsible for how the FBI interacts with the world. The Director stated that if the Deputy Director wanted to disclose information regarding an ongoing investigation, he would expect the Deputy Director to check with him first.

**Inspection Division Interview on May 9, 2017**

The FBI Inspection Division was tasked with investigating various media leaks. One of the leaks pertained to an article published by Circa News reporting that you had made derogatory comments about the former National Security Advisor and the President during a private FBI executives meeting. On May 9, 2017, Section Chief (SC) and Supervisory Special Agent (SSA) #1 interviewed you in your office concerning the leaks.[21] SC and SSA #1 (and SSA #2) had previously interviewed you in April 2017, following which SSA #1 had prepared and emailed to you a signed, sworn statement for your review, editing (if necessary), and signature. This May meeting was to go over the previously emailed statement about the Circa article and to ask you about the October 30 WSJ article. SC advised that they met with you in the privacy of your office.

After going over changes to the previously emailed statement, SC showed you a copy of the October 30 WSJ article, and directed your attention to the first three paragraphs on the last page which discussed the PADAG conversation. SSA #1 stated, "we paused and let him read, read the article. I mean, he read the article, not just that piece. I think he refreshed his memory and flipped through the article."[22] You initialed the article to acknowledge that you read it.

According to SSA #1, you indicated the WSJ article was "somewhat familiar" because you recalled reading it when it came out in October 2016.[23] SSA #1 stated that you said you did not know who leaked the information, "[You] didn't authorize it. [You] didn't direct anybody to give it out."[24] SSA #1 recalls asking you who you thought could have disclosed the information about your private telephone conversation because it seemed likely that only a few people would have been present during the phone call. According to SSA #1, you said you could not recall how many people were present or how many people you told the story to because you had related the story many times. At this point in time, SSA #1 considered you the victim of the leak.[25]

---

[21] May 9, 2017, is the same day that the Director was fired and you became Acting Director of the FBI. This occurred after your meeting with Inspection.

[22] SSA #1 OIG interview, 10/5/2017, pg. 26.

[23] SSA #1 OIG interview, 10/5/2017, pg. 26.

[24] SSA #1 OIG interview, 10/5/2017, pg. 29.

[25] SSA #1 took contemporaneous notes throughout your interview.

Mr. Andrew G. McCabe

SC's account of the May 9 interview of you is consistent with SSA #1's. She stated that you read the article and although she could not remember what you said verbatim, "the overarching issue, or take-away from it was that [you] did not grant anyone permission to divulge the information to the media. That [you] personally hadn't shared the information. And [you] hadn't granted anyone else permission to. And that [you] did consider it a media leak[.]"[26]

On May 12, 2017, SSA #1 sent you an email attaching a revised version of your signed, sworn statement, "You will note that your requested changes have been made, and we added a short paragraph, in parenthesis beginning on page 10, relative to your recollection of circumstances pertaining to the [October 30] Wall Street Journal article we reviewed with you." The paragraph read:

> On 05/09/2017, SC [] and SSA [#1] provided me with a photocopy of a Wall Street Journal article, dated 10/30/2016, and requested I evaluate and assess the content of the first three paragraphs appearing on the last page for accuracy. My assessment of the referenced portion of the article is that it is basically an accurate depiction of an actual telephonic interaction I had with a Department of Justice (DOJ) Executive. Since this event, I have shared the circumstances of this interaction with numerous FBI Senior Executives, and other FBI personnel. I do not know the identity of the source of the information contained in the article. I gave no one authority to share any information relative to my interaction with the DOJ Executive with any member of the media. *I initialed the photocopy of the article, which is attached to my statement as Exhibit #5.*

(Emphasis in original.) SC stated that there was no doubt in her mind that you told her that you did not authorize the disclosure to the WSJ and that you did not know who had disclosed the information to the WSJ. SC stated that she stands by what is contained in your draft statement.[27] The statement is consistent with contemporaneous notes taken by SSA #1 during the interview.

When you failed to sign and return the statement to Inspection, it was emailed it to you again by Inspection on June 23, 2017.

### OIG Interview on July 28, 2017

On July 28, 2017, the OIG interviewed you under oath regarding a separate matter. The OIG told you that it would not be covering issues related to your recusal in a different investigation. The OIG showed you certain text messages exchanged between your Special Counsel and Counterintelligence Deputy Assistant Director (DAD).[28]

---

[26] SC OIG interview, 12/20/2017, pg. 14.

[27] SC OIG interview, 12/20/2017, pg. 40.

[28] Special Counsel has since been reassigned to the Office of General Counsel. DAD has since been reassigned to the Human Resources Division.

Mr. Andrew G. McCabe

The OIG referred you to the October 30, 2016 WSJ article written by Reporter and told you there was information in the Special Counsel/DAD texts also on October 30, 2016, indicating Special Counsel had spoken to the press. The OIG showed you a text in which DAD forwarded a *Washington Post* article that was critical of the FBI to Special Counsel, and DAD wrote, "This is all [PADAG]." Special Counsel responded, "Yeah, I saw it. Makes me feel WAY less bad about throwing him under the bus in the forthcoming [Investigation #2] article."

The OIG told you it believed Special Counsel's October 30 text related to the WSJ's article later that same day revealing Investigation #2 and the PADAG telephone conversation. You responded, "I don't know what she's referring to."[29] You then stated the OIG's questions exceeded the scope of the OIG's current investigation for which it was questioning you, and that you did not want to "get into discussing the article" with the OIG. The OIG asked, "Was she ever authorized to speak to reporters in this time period, was [Special Counsel]?" You responded, "Not that I'm aware of."[30] You went on to say, "I was not even in town during those days. So I can't tell you where she was or what she was doing."[31]

**Your Phone Call to OIG on August 1, 2017**

Four days later, on August 1, 2017, you called the Assistant Inspector General to provide additional information about matters discussed during your July 28 OIG interview. The Assistant Inspector General memorialized the phone conversation in an email, which reads in relevant part:

> First, he [McCabe] stated that he believes that [Special Counsel] may have been authorized by him to work with [Assistant Director] (Public Affairs) and to speak with the WSJ for the late October article. He said he had worked with [Special Counsel] on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies. At the time the second article was being prepared, McCabe was out of town visiting his son in CT. He believes he may have authorized [Special Counsel] to work with [Assistant Director] and speak to [] (the WSJ reporter) because she had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues.

**Inspection Division Interview of Special Counsel on August 7, 2017**

On August 7, 2017, Special Counsel was interviewed by SC and SSA #2. The investigating agents showed Special Counsel the October 30 WSJ article and she acknowledged that she was familiar with it. Special Counsel told SC and SSA #2 that you told her to work with Assistant Director to speak with Reporter "on background" and provide him with information to help shape his next article. She advised that she spoke to Reporter by telephone on October 27

---

[29] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[30] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[31] Andrew McCabe OIG interview, 7/28/2017, pg. 32.

and 28, 2016. Special Counsel signed a sworn statement to this effect on August 15, 2017. Special Counsel was also interviewed by the OIG on September 7 and October 26, 2017, in which she gave the same account.

**Inspection Division Interview on August 18, 2017**

After learning from Special Counsel that you authorized her to speak to Reporter, SSA #2 and SSA #1 re-interviewed you on August 18, 2017. SSA #1 showed you the earlier draft statement that Inspection prepared for you to sign (you never did) and the October 30 WSJ article again. SSA #1 stated that he asked you, "I want to ask you about this article because we're, we're having conflicting information. And so I need to know from you, did you authorize this article? Were you aware of it? Did you authorize it?"[32] SSA #1 advised that you read the article and said, "yep. Yep I did."[33] SSA #1 was taken aback and stated that he told you, "sir, you understand that we put a lot of work into this based on what you've told us. I mean, and I even said, long nights and weekends working on this, trying to find out who amongst your ranks of trusted people would, would do something like that." According to SSA #1, you "kind of just looked down, kind of nodded, and said, yeah, I'm sorry."[34] You apologized and told SSA #1 and SSA #2 that "there was a lot going on then."

SSA #1 reported the new information to his supervisors in the Inspection Division and recommended they turn the matter over to the OIG. The Assistant Director, Inspection Division, agreed and referred the matter to the OIG. The OIG formally accepted the referral on August 31, 2017.

**OIG Interview on November 29, 2017**

**Authorization**

On November 29, 2017, the OIG interviewed you under oath again, this time focusing on the WSJ disclosure. During the interview, you told the OIG that you authorized Assistant Director and Special Counsel to speak to Reporter to try to correct what you perceived as "incredibly damaging inaccuracies" in his story.[35] You described the first WSJ article as "creat[ing] a false narrative that I had been exercising my judgment in a political way. And this article continued in that direction, which I thought was incredibly damaging for us as an organization."[36] You stated that you thought having Assistant Director and Special Counsel

---

[32] SSA #1 OIG interview, 10/5/2017, pg. 45.

[33] SSA #1 OIG interview, 10/5/2017, pg. 46.

[34] SSA #1 OIG interview, 10/5/2017, pgs. 47-48.

[35] Andrew McCabe OIG interview, 11/29/2017, pg. 20.

[36] Andrew McCabe OIG interview, 11/29/2017, pg. 58.

speak to Reporter "was the right thing to do" and that you "felt very confident doing it."[37]  When asked what sparked your recollection of authorizing Assistant Director and Special Counsel, you denied speaking to Special Counsel or Assistant Director about the matter, and simply stated that you thought a lot about it.

### FBI Director

The OIG asked you if, prior to authorizing Special Counsel and Assistant Director to speak to Reporter, you discussed the matter with the Director.  You stated that you did not remember discussing it with the Director beforehand, but did recall discussing the article with the Director in person on Monday, October 31, the day after the article was published:

> [W]e talked about the article.  I asked him his thoughts about it.  He thought it was, you know, he had the same impression as I did that it was really kind of a one-sided narrative supported by a lot of spurious information.  But he thought that it was good that we at least had gotten the, the, you know, the information, that they at least presented information that indicated that, no, that's not who we are.  That we are, that we're independent and doing our job.  We discussed the fact that the Department was likely to be pretty angry, and specifically [PADAG] was, was unhappy about that the fact that this may, that this made its way into the paper.

The OIG asked you, "are you telling him at this time, hey boss, I authorized [Assistant Director] and [Special Counsel] to disclose the account of the August 12[th] call?"  You stated, "Yes.  He knew that."  The OIG repeated, "You told him that?"  You stated, "Yes."  The OIG asked you for the Director's reaction.  You stated, "He did not react negatively, just kind of accepted it."  The OIG continued to question you and asked, "Did he have any reaction to the fact that by disclosing the account of the August 12[th] call, even though it's not a direct quote attributed to you.  It essentially is in substance confirming the existence of [Investigation #2].  Did he have any reaction to that?"  You replied, "He did not."[38]

You further claimed that the fact that Assistant Director and Special Counsel spoke to Reporter was not a secret and that people generally knew you authorized the disclosure because it was your private conversation with PADAG that was disclosed.[39]

---

[37] Andrew McCabe OIG interview, 11/29/2017, pg. 62.

[38] Andrew McCabe OIG interview, 11/29/2017, pgs. 94-96.

[39] Andrew McCabe OIG interview, 11/29/2017, pg. 106.

Mr. Andrew G. McCabe

**Interviews with Inspection Division**

The OIG also questioned you about your interviews with Inspection. You incorrectly recalled being interviewed by SC, SSA #1, and SSA #2 on May 9, 2017.[40] You advised that as SSA #2 and SSA #1 were walking out of your office, SC "kind of grabbed [you] by the arm" to ask you something.[41] You advised that SC then showed you the October 30 WSJ article. You told her that you knew about the article. You stated that you do not recall reading the WSJ article when SC handed it to you.[42] You stated:

> I remember being like kind of confused about why she was even bringing it up because it had nothing to do with what I had asked them to, to investigate, so I was trying to kind of connect the two and understand what the relevance was. And she asked me a question or two about it. And that was it. It was a very quick exchange.[43]

You stated that you later received the draft statement from Inspection "that reflected [the interview] in a way that I thought was inaccurate."[44]

You were asked whether you believed you told SC, SSA #2, and SSA #1 that you gave authorization for the WSJ disclosure, and that their recollections to the contrary are wrong. You stated, "I'm telling you that I don't know exactly what we discussed in that May 9th meeting. But to be perfectly honest, May 9th, prior to Director []'s firing and learning of that from the AG later that evening, everything that happened prior to that moment is a little bit distant for me."[45]

You stated that you raised the issue of the inaccurate statement with SC in a later meeting and told her that you authorized Special Counsel and Assistant Director to speak to Reporter. You said that SC seemed surprised and you suggested that she coordinate with the OIG. You stated that you did not attempt to correct the statement when you received the drafts by email. You stated that you were the Acting Director at the time and were focused on that. You stated that once you got back to your Deputy Director role, you worked to resolve the outstanding issues with Inspection. You told the OIG that you did not remember when you actually looked at the draft statement but that it could have been months later.

---

[40] You repeatedly told the OIG that all three Inspection Division investigators, SC, SSA #1, and SSA #2, were present. In fact, only two investigators were present during the interviews on May 9 (SC and SSA #1) and August 18 (SSA #1 and SSA #2). However, all three were present when they first interviewed you in April 2017.

[41] Andrew McCabe OIG interview, 11/29/2017, pg. 142.

[42] Andrew McCabe OIG interview, 11/29/2017, pg. 145.

[43] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[44] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[45] Andrew McCabe OIG interview, 11/29/2017, pg. 157.

Mr. Andrew G. McCabe

**ANALYSIS**

**A. Lack of Candor – Under Oath**

According to FBI Offense Code 2.6, employees are prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

**1. Interview with OIG on July 28, 2017**

During your July 28, 2017 interview under oath with the OIG, after being shown Special Counsel's October 30 text concerning having thrown PADAG "under the bus" in a forthcoming article, you falsely stated that you were not aware that Special Counsel was authorized to speak to reporters at that time. You also falsely stated that because you were out of town, you did not know where Special Counsel was or what she was doing at that time. In fact, as you later admitted, you did authorize Special Counsel to speak to Reporter for the October 30 WSJ article, and you were aware of what she was doing because you stayed in constant contact with her through texts and phone calls. Although you did not know you were going to be questioned about the WSJ article before sitting down with the OIG on July 28, the interview was voluntary and you had the opportunity to end it at any time. Instead, you provided false information.

**2. Interview with OIG on November 29, 2017**

I further find that you lacked candor under oath during your November 29, 2017 OIG interview when you falsely told the OIG that: (a) you told the Director on October 31, 2016, that you had authorized the disclosure to the WSJ and that the Director agreed it was a "good" idea; and (b) you did not deny to the Inspection agents on May 9 that you had authorized the disclosure to the WSJ.

As discussed below, I credit the Director's recollection of his conversation with you regarding the WSJ article on October 31, the gist of which was that you had not authorized the leak the prior day and did not know who was behind it. Accordingly, I find your statement to the OIG that you told the Director you authorized the disclosure to the WSJ and that the Director agreed it was a "good" idea is false.

Also, as discussed below, the testimony of SC and SSA #1, SSA #1's contemporaneous notes of the interview, and the draft statement prepared shortly thereafter show that you denied authorizing the disclosure in your interview with Inspection on May 9. Your statement to the contrary is false.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 2.6 is substantiated.

Mr. Andrew G. McCabe

## B. Lack of Candor – No Oath

According to FBI Offense Code 2.5, employees are prohibited from "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

### 1. Meeting with the Director on October 31, 2016

You lacked candor in your conversation with the Director on October 31, 2016, when you discussed the October 30 WSJ article. The Director told the OIG, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[46] When questioned further as to whether you told the Director that you authorized the disclosure, the Director stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[47] Again, the Director later stated when asked if you told him about authorizing Special Counsel to speak to the WSJ, you said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it..."[48] The Director stated that he did not suspect that you were the source of the disclosure based on what you told him the morning after the article came out. Although it appears that the Director never directly asked you if you authorized, or made the disclosure, your overall statements to the Director were deceptive. You owed it to the Director, your immediate supervisor and the Director of the FBI, to be forthcoming and transparent in your discussions with the Director about any matter, much less one of such significance.

The Director was concerned about leaks in general and this disclosure in particular because he was concerned it would poison the FBI's relationship with DOJ. Therefore, I do not credit your account that you told the Director that you authorized the disclosure and that the Director "did not react negatively, just kind of accepted it." Additionally, your failure to be forthright with the Director is consistent with your behavior in denying authorizing the disclosure up until you were confronted with Special Counsel's texts by the OIG on July 28, 2017. I therefore credit the Director's account.

### 2. Interview with INSD on May 9, 2017

SC and SSA #1 both stated that you told them on May 9, 2017, that you did not know who authorized the disclosure of the PADAG call to the WSJ. SC stated that there was no doubt

---

[46] Director OIG interview, 11/16/2017, pgs. 304-305.

[47] Director OIG interview, 11/16/2017, pg. 305.

[48] Director OIG interview, 11/16/2017, pgs. 314-315.

Mr. Andrew G. McCabe

in her mind that you told her that you did not authorize the disclosure to the WSJ and that you did not know who disclosed the information to the WSJ. SSA #1 stated that you told him, "[you] didn't know who gave it out. [You] didn't authorize it. [You] didn't direct anybody to give it out." SSA #1 noted that you took time to read the WSJ article and initialed it, indicating that you reviewed it. You had an opportunity to refresh your recollection of the article at issue and still gave a false answer. SC and SSA #1's accounts are consistent with each other and are corroborated by SSA #1's contemporaneous notes of the interview and the draft statement that SSA #1 prepared for your signature shortly after the interview. I credit their account of their May 9 interview and find that you lacked candor in your May 9 interview with Inspection.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 2.5 is substantiated.

## C. Unauthorized Disclosure

According to FBI Offense Code 4.10, without authorization, employees are prohibited from "disclosing or attempting to disclose the FBI's, or another agency's, sensitive material."

There is a general prohibition on disclosing information about an ongoing criminal investigation. Investigation #2 was especially sensitive, having, as it did, a connection to a presidential campaign. The Director declined to confirm the existence of Investigation #2 in his testimony to Congress in July 2016. When questioned by the OIG, the Director stated that nobody in the FBI was authorized to publically confirm Investigation #2. The Director considered the information contained in the October 30 WSJ article to be a disclosure of sensitive FBI information. The Director advised that the default rule is that the FBI does not discuss open investigations but would consider whether the public interest requires it. Your decision to confirm the existence of Investigation #2 through an anonymously sourced quote, recounting the content of a phone call with a DOJ Executive, was not within the public interest exception.

Based on a preponderance of the evidence, I conclude the allegation that you violated Offense Code 4.10 is substantiated.

## PENALTY DETERMINATION

In proposing an appropriate penalty, I considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

The investigation establishes you violated FBI Offense Code 2.6 (Lack of Candor – Under Oath). The standard penalty is dismissal. This Offense Code does not include a mitigated or aggravated range.

The investigation establishes you violated FBI Offense Code 2.5 (Lack of Candor – No Oath). The standard penalty is a 14-day suspension. Mitigating factors warrant a letter of

Mr. Andrew G. McCabe

censure to a ten-day suspension, and aggravating factors warrant a 20-day suspension to dismissal.

The investigation establishes you violated FBI Offense Code 4.10 (Unauthorized Disclosure - Sensitive Information). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

I have considered all mitigating factors supported by the record, including, but not limited to, your 21 years of remarkable FBI service and your truly outstanding performance record. At the time of the misconduct, you were facing unprecedented and unimaginable pressure and challenges. Notwithstanding all relevant and significantly mitigating factors, however, I find that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand. Without it, we are nothing. As the Deputy Director, you held the second-highest position in the FBI and are expected to comport yourself with the utmost integrity. Despite this, you repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division. Your lack of candor is incompatible with the FBI's Core Values. Based on the circumstances of this case, I propose dismissing you for your 2.6, 2.5, and 4.10 offenses.

### CONCLUSION

In sum, I propose dismissing you from the rolls of the FBI. The Deputy Attorney General will make the final decision in this matter. [49]

Sincerely yours,

Candice M. Will
Assistant Director
Office of Professional Responsibility

---

[49] You are admonished not to discuss this matter with anyone other than OPR, the FBI's Employee Assistance Program, the FBI's Ombudsman, or an attorney who has signed the appropriate Nondisclosure Agreement. Neither you, your attorney, nor anyone acting on your behalf should contact any witness or potential witness about this inquiry without first obtaining approval from DOJ OIG or FBI OPR. In addition, you are admonished that any redacted materials or other FBI documents you review in connection with this inquiry are the property of the FBI, and you are prohibited from photocopying or removing such documents from FBI space. You may take notes concerning the content of such material, but those notes may be used only to facilitate your participation in this disciplinary inquiry and for no other purpose.

Mr. Andrew G. McCabe

Michael R. Bromwich
Senior Counsel
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, N.W. Suite 411L
Washington, D.C. 20006

Eric B. Bruce, Esq.
Kobre & Kim LLP
1919 M Street, N.W.
Washington, D.C. 20036

✓ 1- Deputy Attorney General, Department of Justice
1 - Office of the Inspector General, Department of Justice
1 - Director, FBI
1 - Deputy Director, FBI
1 - OIG, DOJ
1 - AD, OPR
263X-HQ-xxxxxx
1 - Tickler Copy, OPR
Based on OPR ROI, dated 03/06/2018
CMW (P) (9)

16

OFFICE OF PROFESSIONAL RESPONSIBILITY (OPR)
REPORT OF INVESTIGATION
File Number 263x-HQ-xxxxxx
Adjudication Unit II,   (P)
03/06/2018

RE:  ANDREW G. MCCABE
DEPUTY DIRECTOR
DIRECTOR'S OFFICE

## PREDICATION

This administrative inquiry, investigated by the Department of Justice, Office of Inspector General (OIG), was predicated on the allegations that Deputy Director Andrew G. McCabe: (1) lacked candor in an interview with the OIG on July 28, 2017, and in a second interview with the OIG on November 29, 2017, in violation of FBI Offense Code 2.6 (Lack of Candor – Under Oath); (2) lacked candor when discussing a October 30, 2016 *Wall Street Journal* article with FBI Director James Comey, and in an interview with FBI's Inspection Division on May 9, 2017,[1] in violation of Offense Code 2.5 (Lack of Candor – No Oath); and (3) disclosed, without authorization, the FBI's investigation into the Clinton Foundation, in violation of Offense Code 4.10 (Unauthorized Disclosure – Sensitive Information).[2]  Based on a preponderance of the evidence, OPR concludes the allegations are substantiated.  Based on the circumstances of this case, and considering the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors, OPR recommends to the Deputy Attorney General that McCabe be dismissed from the rolls of the FBI.[3]

## PERSONNEL HISTORY

McCabe, EOD: 07/07/1996, is an ES-0 Deputy Director.  McCabe was rated "Outstanding" in his 2014-2017 Performance Appraisal Reports.  BPMS shows he has received a Commendation (1999), a Quality-Step Increase (2003), a Special Act/Achievement Award (1999), two Cash Awards (2009 (2x)), and five SES Performance Awards (2010, 2011, 2012, 2014, and 2016).  He is not a preference-eligible veteran, and he has been the subject of one prior administrative inquiry.  In OPR Case #1999-0041, McCabe was issued an oral reprimand for losing a building pass.

---

[1] The OIG found that McCabe lacked candor under oath when he spoke to Inspection on May 9, 2017.  However, it is unclear from the case file whether McCabe was under oath at the time he spoke with investigators about the article in question.  Accordingly, OPR finds the May 9 interview is more appropriately considered not under oath.

[2] This administrative inquiry was opened after January 1, 2017, and thus will be analyzed under the FBI's 2017 Offense Codes and Penalty Guidelines.

[3] Pursuant to the Deputy Attorney General's Memorandum dated May 27, 2008, to the Director of the FBI, the Justice Department has retained final decision-making authority over adverse actions impacting the Deputy Director of the FBI.

## DISCUSSION

The reader is referred to OPR investigative file 263x-HQ-xxxxxxx for a complete account of all the facts and circumstances regarding this matter.

### October 23, 2016 *Wall Street Journal* Article

On October 23, 2016, the *Wall Street Journal* (WSJ) published an online article written by ▮▮(P)▮▮ which stated that the Virginia Democratic Party and a political action committee (PAC) run by Virginia Governor Terry McAuliffe donated nearly $675,000 to McCabe's wife's unsuccessful 2015 state senate campaign.[4]  The article described McAuliffe's close connection to Bill and Hillary Clinton, and noted that McCabe was an FBI official "who later helped oversee the investigation into Mrs. Clinton's email use."[5]

The WSJ article resulted in significant public discussion as to whether McCabe's subsequent oversight of the Clinton Email investigation was appropriate given his wife's connection to McAuliffe and the Virginia Democratic Party.  McCabe's Special Counsel, (P) ▮▮ told the OIG, "[s]o that article comes out on Sunday.  And it is like an enormous fire storm.  It is hugely, you know, it's not only all over the news, but there's just a lot of swirl and churn associated with that fact coming out."[6]  According to the OIG's investigation, Senator Charles Grassley immediately called for McCabe's recusal.  On October 27, 2016, in a meeting on the Clinton Email investigation, the FBI General Counsel (GC) suggested that McCabe, who was present by telephone, not be present for the discussion on the Clinton Email investigation.  The GC acknowledged that the question of whether McCabe should recuse himself had not yet been settled, but out of an abundance of caution, the GC felt McCabe should not be in the meeting.  Director Comey agreed and McCabe ended his call into the meeting.[7]

---

[4] The print edition of the article was published on October 24, 2016.

[5] The article acknowledged that McCabe played no role in his wife's 2015 state senate campaign and that he was promoted to FBI Deputy Director, with oversight of the Clinton Email investigation, months after his wife's defeat. McCabe did not have an oversight role in the Clinton Email investigation when his wife was running for office.

Then FBI Director James Comey told the OIG that he first learned of the issue regarding McCabe's wife and her connection to McAuliffe when McCabe emailed the Director on October 21, 2016, two days before the article was released, stating, "[The Office of Public Affairs (OPA)] informed me that (P) at WSJ is putting together an article claiming I had a conflict of interest on [the Clinton Email investigation] as a result of Jill's campaign connections to Governor McAuliffe.  I'll work with [OPA] to provide some basic facts to pushback."  On October 23, 2016, McCabe emailed Comey, "Not too much in the update. The only additional notable news is that [OPA] and I spent a good part of the day trying to shape the Wall Street Journal's story on my alleged conflict...," which McCabe noted was to be released online.

[6]  (P)  OIG interview, 9/7/17, pg. 253.

[7] In his 12/4/2017 interview with the OIG, McCabe stated that he dropped out of the call because the GC brought up the need to discuss classified information and McCabe was on an open line.  McCabe denied that he was asked to leave the meeting due to the possibility of recusal or a conflict of interest.

On October 24, 2016, (P) emailed Assistant Director Michael Kortan, Office of Public Affairs, to ask additional questions for a follow-up story he was working on.[8] In that email, (P) asked about McCabe's involvement in the Clinton Foundation investigation, among other things.[9] Specifically, (P) email said that he was told that:

> in the summer, McCabe himself gave some instruction as to how to proceed with the Clinton Foundation probe, given that it was the height of election season and the FBI did not want to make a lot of overt moves that could be seen as going after [Clinton] or drawing attention to the probe.

(P) email asked Kortan if this was accurate and if there was anything else (P) should know.

McCabe was notified that (P) was working on a follow-up story that would cover McCabe's oversight of the Clinton Foundation investigation in the face of (P) earlier article that McAuliffe gave significant campaign contributions to McCabe's wife. (P) stated that she and McCabe believed that narrative being developed by the WSJ was inaccurate and McCabe authorized (P) to speak to (P) "to fix this story and give a complete picture."[10] (P) stated, "Andy [McCabe] directs me to work with Mike [Kortan] on a follow-up story with (P) …So I am a source on background with (P) at Andy [McCabe] and Mike's [Kortan] direction in order to try to correct the inaccurate sort of representations in that article."[11] (P) advised that this was the first time she had communicated with the media in her official capacity at the FBI.

(P) and Kortan were scheduled to speak with (P) for the first time on October 27, 2016, in "receive mode," to hear what (P) story intended to address. (P) and Kortan would then discuss an appropriate response and speak to (P) a second time. McCabe was on personal travel from Thursday, October 27 – Sunday, October 30, 2016. Despite this, he maintained close contact with his Special Counsel regarding her and Kortan's progress with (P) According to text messages, on October 27, 2016, at 12:06 pm, McCabe texted (P) "Are you with wsj now." (P) texted back that she was "going there now" and would call him "immediately after re call with (P) A little over an hour later, (P) texted McCabe asking if he was free to talk. Telephone records show that McCabe and (P) spoke by telephone at 2:54 p.m. for approximately 51 minutes. According to (P) she briefed McCabe on her conversation with (P) and a purported "stand down" order that McCabe had issued to agents working on the Clinton Foundation investigation. (P) and McCabe discussed the inaccurate and inflammatory nature of (P) information. According to (P) McCabe cited his August 12,

---

[8] Kortan has since retired from the FBI.

[9] The Clinton Foundation investigation was a separate and distinct investigation from the Clinton Email investigation. Although the Clinton Email investigation was publicly acknowledged by the FBI, the Clinton Foundation investigation was not. When Director Comey was asked during Congressional testimony whether the FBI was investigating the Clinton Foundation, he declined to answer.

[10] (P) OIG interview, 9/7/17, pg. 280.

[11] (P) OIG interview, 9/7/17, pg. 272.

3

2016 phone call with DOJ Principal Associate Deputy Attorney General (PADAG) Matthew Axelrod in which Axelrod expressed anger at McCabe that the FBI had not shut down the Clinton Foundation investigation based on Axelrod's misunderstanding of the situation. In that call, McCabe pushed back against Axelrod and told him that the FBI would continue to take appropriate and logical investigative steps in the Clinton Foundation investigation. McCabe then asked if Axelrod was telling McCabe "to shut down a validly predicated investigation," which Axelrod said he was not. According to (P) McCabe wanted to provide an account of his conversation with Axelrod to rebut the false "stand down" scenario that had been shared with the WSJ. (P) notes of her conversation with McCabe on October 27 include a notation "Fri. Aug 12 with [PADAG]" to remind her to discuss the telephone call with (P)

Text messages and phone records show that immediately before (P) and Kortan spoke with (P) for the second time on October 27, 2016, McCabe called (P) and they spoke for six minutes. (P) and Kortan than spoke to (P) from 4:45 p.m. to 5:21 p.m. According to (P) contemporaneous notes and testimony to the OIG, in this call to (P) she responded to claims regarding FBI leadership's handling of the Clinton Foundation investigation and provided the account of the August 12 phone call between McCabe and Axelrod. Later that evening, (P) texted McCabe, "We're done. He's going to look at this story again and we'll circle back with him in the morning."

On October 28, 2016, (P) and Kortan spoke to (P) a third time. He gave them a preview of his revised story, which now included a report on the McCabe-Axelrod phone call. After this call ended, (P) texted McCabe, "Just got off with (P) Give me a call here." McCabe called (P) and they spoke for 23 minutes.

### October 30, 2016 *Wall Street Journal* Article

On October 30, 2016, (P) follow-up article was published online.[12] The article mentioned Comey's stunning disclosure two days earlier, on Friday, October 28, that the FBI was taking another look at Hillary Clinton's emails days before the presidential election and discussed tension inside the FBI and DOJ on how best to proceed. The article again mentioned McAuliffe's campaign contributions to McCabe's wife's failed state senate campaign in 2015 and discussed McCabe's efforts to refocus "the Clinton Foundation probe[.]"[13] The article reported that agents had been told to "[s]tand down" on the Clinton Foundation investigation and that "the order had come from the deputy director – Mr. McCabe," but also that "[o]thers familiar with the matter deny Mr. McCabe or any other senior FBI official gave such a stand-down instruction." The article described the August 12 conversation between McCabe and Axelrod (the latter identified only as a "senior Justice Department official"), stating:

> According to a person familiar with the probes, on Aug. 12, a senior Justice Department official called Mr. McCabe to voice his displeasure at finding that

---

[12] The print edition of the article was published on October 31, 2016.

[13] This represented the first public acknowledgment that the FBI had opened a criminal investigation into the Clinton Foundation. Director Comey had previously declined to answer questions about the existence of an investigation of the Clinton Foundation.

New York FBI agents were still openly pursuing the Clinton Foundation probe during the election season. Mr. McCabe said agents still had the authority to pursue the issue as long as they didn't use overt methods requiring Justice Department approvals.

The Justice Department official was "very pissed off," according to one person close to McCabe, and pressed him to explain why the FBI was still chasing a matter the department considered dormant...

"Are you telling me that I need to shut down a validly predicated investigation?" Mr. McCabe asked, according to people familiar with the conversation. After a pause, the official replied "Of course not," these people said.

**Meeting with Director Comey on October 31, 2016**

The following day, Monday morning, October 31, 2016, Comey held a staff meeting, attended by (P) and McCabe, among others. During the meeting, according to (P) contemporaneous notes, Comey said, "Need to figure out how to get our folks to understand why leaks hurt our organization." In his statement to the OIG, Comey advised that he remembered reading the October 30, 2016 WSJ article and thinking, "what the hell[,]" "I was very concerned about it for a number of reasons[,]" "this was going to poison our relationship with the Department of Justice."[14] Comey went on to say that his second reaction was, "what are we doing talking about what we're doing in an investigation..."[15] He considered it a disclosure of sensitive FBI information. Comey stated, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[16] When questioned further by the OIG whether McCabe told Comey that McCabe authorized the disclosure, Comey stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[17] When asked again if McCabe told Comey that McCabe authorized (P) to speak to the WSJ, Comey stated that McCabe said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it..."[18] Comey stated that he did not suspect that McCabe was the source of the disclosure based on what McCabe told him the morning after the article came out.

Comey told the OIG it is "very unlikely" "in fact approaching zero" that he would have authorized disclosure of the Axelrod telephone call if asked ahead of time. Comey stated that part of the reason for declining to disclose that information is that it explicitly confirms the

---

[14] James Comey OIG interview, 11/16/2017, pgs. 301-302.

[15] James Comey OIG interview, 11/16/2017, pg. 302.

[16] James Comey OIG interview, 11/16/2017, pgs. 304-305.

[17] James Comey OIG interview, 11/16/2017, pg. 305.

[18] James Comey OIG interview, 11/16/2017, pgs. 314-315.

existence of a criminal investigation.[19]  Comey advised that when he disclosed the existence of the Russia investigation to Congress, he did so reading from a script that was carefully drafted and considered.  He stated that disclosing a criminal investigation anonymously sourced in a newspaper is not something the FBI would do.  Regarding the October 30, 2016 WSJ article, Comey stated, "I did not authorize this.  I would not have authorized this."[20]  Comey further stated that as the Director of the FBI, significant disclosures about investigations would always go through him because he is responsible for how the FBI interacts with the world.  Comey stated that if the Deputy Director wanted to disclose information regarding an ongoing investigation, he would expect the Deputy Director to check with him first.

**Inspection Division Interview of McCabe on May 9, 2017**

The FBI Inspection Division was tasked with investigating various media leaks.  One of the leaks pertained to an article written by      (P)      and published by Circa News reporting that McCabe had made derogatory comments about former National Security Advisor Michael Flynn and President Trump during a private FBI executives meeting.  On May 9, 2017, Section Chief (SC) Voviette Morgan and Supervisory Special Agent (SSA)      (P)      interviewed McCabe in his office concerning the leaks.[21]  Morgan and   (P)   (and SSA      (P)      had previously interviewed McCabe in April 2017, following which   (P)   had prepared and emailed to McCabe a signed, sworn statement for McCabe's review, editing (if necessary), and signature.  This May meeting was to go over the previously emailed statement about the  (P)  article and to ask McCabe about the October 30 WSJ article.  Morgan advised that they met with McCabe in the privacy of his office.

After going over changes to the previously emailed statement, Morgan showed McCabe a copy of the October 30 WSJ article, and directed his attention to the first three paragraphs on the last page which discussed the McCabe-Axelrod conversation.   (P)   stated, "we paused and let him read, read the article.  I mean, he read the article, not just that piece.  I think he refreshed his memory and flipped through the article."[22]  McCabe initialed the article to acknowledge that he read it.

According to   (P)   McCabe indicated the WSJ article was "somewhat familiar" because he recalled reading it when it came out in October 2016.[23]   (P)   stated that McCabe said he did not know who leaked the information, "He didn't authorize it.  He didn't direct anybody to give it out."[24]   (P)   recalls asking McCabe who he thought could have disclosed

---

[19] James Comey OIG interview, 11/16/2017, pg. 310.

[20] James Comey OIG interview, 11/16/2017, pg. 311.

[21] May 9, 2017, is the same day that Director Comey was fired and McCabe became Acting Director of the FBI. This occurred after McCabe's meeting with Inspection.

[22]    (P)    OIG interview, 10/5/2017, pg. 26.

[23]    (P)    OIG interview, 10/5/2017, pg. 26.

[24]    (P)    OIG interview, 10/5/2017, pg. 29.

the information about his private telephone conversation because it seemed likely that only a few people would have been present during the phone call. According to   (P)   McCabe said he could not recall how many people were present or how many people he told the story to because he had related the story many times. At this point in time,   (P)   considered McCabe the victim of the leak.[25]

Morgan's account of the May 9 interview of McCabe is consistent with   (P)   She stated that McCabe read the article and although she could not remember what he said verbatim, "the overarching issue, or take-away from it was that he did not grant anyone permission to divulge the information to the media. That he personally hadn't shared the information. And he hadn't granted anyone else permission to. And that he did consider it a media leak[.]"[26]

On May 12, 2017,   (P)   sent McCabe an email attaching a revised version of his signed, sworn statement, "You will note that your requested changes have been made, and we added a short paragraph, in parenthesis beginning on Page 10, relative to your recollection of circumstances pertaining to the [October 30] Wall Street Journal article we reviewed with you." The paragraph read:

> On 05/09/2017, SC Morgan and SSA   (P)   provided me with a photocopy of a Wall Street Journal article, dated 10/30/2016, and requested I evaluate and assess the content of the first three paragraphs appearing on the last page for accuracy. My assessment of the referenced portion of the article is that it is basically an accurate depiction of an actual telephonic interaction I had with a Department of Justice (DOJ) Executive. Since this event, I have shared the circumstances of this interaction with numerous FBI Senior Executives, and other FBI personnel. I do not know the identity of the source of the information contained in the article. I gave no one authority to share any information relative to my interaction with the DOJ Executive with any member of the media. *I initialed the photocopy of the article, which is attached to my statement as Exhibit #5.*

(Emphasis in original.) Morgan stated that there was no doubt in her mind that McCabe told her that he did not authorize the disclosure to the WSJ and that he did not know who had disclosed the information to the WSJ. Morgan stated that she stands by what is contained in McCabe's draft statement.[27] The statement is consistent with contemporaneous notes taken by   (P)   during the interview.

When McCabe failed to sign and return the statement to Inspection, it was emailed to him again by Inspection on June 23, 2017.

---

[25]   (P)   took contemporaneous notes throughout the interview of McCabe.

[26] Voviette Morgan OIG interview, 12/20/2017, pg. 14.

[27] Voviette Morgan OIG interview, 12/20/2017, pg. 40.

## OIG Interview of McCabe on July 28, 2017

On July 28, 2017, the OIG interviewed McCabe under oath regarding a separate matter. The OIG told McCabe that it would not be covering issues related to McCabe's recusal in the McAuliffe investigation. The OIG showed McCabe certain text messages exchanged between McCabe's Special Counsel (P) and Counterintelligence Deputy Assistant Director (DAD) (P) [28]

The OIG referred McCabe to the October 30, 2016 WSJ article written by (P) and told McCabe there was information in the (P) texts also on October 30, 2016, indicating (P) had spoken to the press. The OIG showed McCabe a text in which (P) forwarded a *Washington Post* article that was critical of the FBI to (P) and (P) wrote, "This is all [Axelrod]." (P) responded, "Yeah, I saw it. Makes me feel WAY less bad about throwing him under the bus in the forthcoming CF article."

The OIG told McCabe it believed (P) October 30 text related to the WSJ's article later that same day revealing the Clinton Foundation investigation and the McCabe-Axelrod telephone conversation. McCabe responded, "I don't know what she's referring to."[29] McCabe then stated the OIG's questions exceeded the scope of the OIG's current investigation for which it was questioning him, and that he did not want to "get into discussing the article" with the OIG. The OIG asked, "Was she ever authorized to speak to reporters in this time period, was (P) McCabe responded, "Not that I'm aware of."[30] McCabe went on to say, "I was not even in town during those days. So I can't tell you where she was or what she was doing."[31]

## McCabe Phone Call to OIG on August 1, 2017

Four days later, on August 1, 2017, McCabe called Assistant Inspector General (P) to provide additional information about matters discussed during McCabe's July 28 OIG interview. (P) memorialized the phone conversation in an email, which reads in relevant part:

First, he [McCabe] stated that he believes that (P) may have been authorized by him to work with AD Michael Kortan (Public Affairs) and to speak with the WSJ for the late October article. He said he had worked with (P) on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies. At the time the second article was being prepared, McCabe was out of town visiting his son in CT. He believes he may have authorized (P) to work with Kortan and speak to (P) (the WSJ reporter) because she

---

[28] (P) has since been reassigned to the Office of General Counsel. (P) has since been reassigned to the Human Resources Division.

[29] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[30] Andrew McCabe OIG interview, 7/28/2017, pg. 31.

[31] Andrew McCabe OIG interview, 7/28/2017, pg. 32.

had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues.

**Inspection Division Interview of** (P) **on August 7, 2017**

On August 7, 2017, (P) was interviewed by SC Morgan and SSA (P) The investigating agents showed (P) the October 30 WSJ article and she acknowledged that she was familiar with it. (P) told Morgan and (P) that McCabe told her to work with Kortan to speak with (P) "on background" and provide him with information to help shape his next article. She advised that she spoke to (P) by telephone on October 27 and 28, 2016. (P) signed a sworn statement to this effect on August 15, 2017. (P) was also interviewed by the OIG on September 7 and October 26, 2017, in which she gave the same account.

**Inspection Division Interview of McCabe on August 18, 2017**

After learning from (P) that McCabe authorized (P) to speak to (P) (P) and (P) re-interviewed McCabe on August 18, 2017. (P) showed McCabe the earlier draft statement that Inspection prepared for McCabe to sign (he never did) and the October 30 WSJ article again. (P) stated that he asked McCabe, "I want to ask you about this article because we're, we're having conflicting information. And so I need to know from you, did you authorize this article? Were you aware of it? Did you authorize it?"[32] (P) advised that McCabe read the article and said, "yep. Yep I did."[33] (P) was taken aback and stated that he told McCabe, "sir, you understand that we put a lot of work into this based on what you've told us. I mean, and I even said, long nights and weekends working on this, trying to find out who amongst your ranks of trusted people would, would do something like that." According to (P) McCabe "kind of just looked down, kind of nodded, and said, yeah, I'm sorry."[34] McCabe apologized and told (P) and (P) that "there was a lot going on then."

(P) reported the new information to his supervisors in the Inspection Division and recommended they turn the matter over to the OIG. Nancy McNamara, Assistant Director, Inspection Division, agreed and referred the matter to the OIG. The OIG formally accepted the referral on August 31, 2017.

**OIG Interview of McCabe on November 29, 2017**

**Authorization**

On November 29, 2017, the OIG interviewed McCabe under oath again, this time focusing on the WSJ disclosure. During the interview, McCabe told the OIG that he authorized Kortan and (P) to speak to (P) to try to correct what McCabe perceived as "incredibly

---

[32]  (P)  OIG interview, 10/5/2017, pg. 45.

[33]  (P)  OIG interview, 10/5/2017, pg. 46.

[34]  (P)  OIG interview, 10/5/2017, pgs. 47-48.

damaging inaccuracies" in his story.[35]  McCabe described the first WSJ article as "creat[ing] a false narrative that I had been exercising my judgment in a political way.  And this article continued in that direction, which I thought was incredibly damaging for us as an organization."[36]  McCabe stated that he thought having Kortan and (P) speak to (P) "was the right thing to do" and that he "felt very confident doing it."[37]  When asked what sparked his recollection of authorizing Kortan and (P) McCabe denied speaking to (P) or Kortan about the matter, and simply stated that he thought a lot about it.

**Director Comey**

The OIG asked McCabe if, prior to authorizing (P) and Kortan to speak to (P) he discussed the matter with Comey.  McCabe stated that he did not remember discussing it with Comey beforehand, but did recall discussing the article with Comey in person on Monday, October 31, the day after the article was published:

> [W]e talked about the article.  I asked him his thoughts about it.  He thought it was, you know, he had the same impression as I did that it was really kind of a one-sided narrative supported by a lot of spurious information.  But he thought that it was good that we at least had gotten the, the, you know, the information, that they at least presented information that indicated that, no, that's not who we are.  That we are, that we're independent and doing our job.  We discussed the fact that the Department was likely to be pretty angry, and specifically Matt Axelrod was, was unhappy about that the fact that this may, that this made its way into the paper.

The OIG asked McCabe, "are you telling him at this time, hey boss, I authorized Kortan and (P) to disclose the account of the August 12[th] call?"  McCabe stated, "Yes.  He knew that."  The OIG repeated, "You told him that?"  McCabe stated, "Yes."  The OIG asked McCabe for Comey's reaction.  McCabe stated, "He did not react negatively, just kind of accepted it."  The OIG continued to question McCabe and asked, "Did he have any reaction to the fact that by disclosing the account of the August 12[th] call, even though it's not a direct quote attributed to you.  It essentially is in substance confirming the existence of the Clinton Foundation investigation.  Did he have any reaction to that?"  McCabe replied, "He did not."[38]

McCabe further claimed that the fact that Kortan and (P) spoke to (P) was not a secret and that people generally knew McCabe authorized the disclosure because it was his private conversation with Axelrod that was disclosed.[39]

---

[35] Andrew McCabe OIG interview, 11/29/2017, pg. 20.

[36] Andrew McCabe OIG interview, 11/29/2017, pg. 58.

[37] Andrew McCabe OIG interview, 11/29/2017, pg. 62.

[38] Andrew McCabe OIG interview, 11/29/2017, pgs. 94-96.

[39] Andrew McCabe OIG interview, 11/29/2017, pg. 106.

**Interviews with Inspection Division**

The OIG also questioned McCabe about his interviews with Inspection. McCabe incorrectly recalled being interviewed by Morgan, (P) and (P) on May 9, 2017.[40] He advised that as (P) and (P) were walking out of his office, Morgan "kind of grabbed [him] by the arm" to ask him something.[41] He advised that Morgan then showed him the October 30 WSJ article. He told her that he knew about the article. McCabe stated that he does not recall reading the WSJ article when Morgan handed it to him.[42] McCabe stated:

> I remember being like kind of confused about why she was even bringing it up because it had nothing to do with what I had asked them to, to investigate, so I was trying to kind of connect the two and understand what the relevance was. And she asked me a question or two about it. And that was it. It was a very quick exchange.[43]

McCabe stated that he later received the draft statement from Inspection "that reflected [the interview] in a way that I thought was inaccurate."[44]

McCabe was asked whether he believed he told Morgan, (P) and (P) that he gave authorization for the WSJ disclosure, and that their recollections to the contrary are wrong. McCabe stated, "I'm telling you that I don't know exactly what we discussed in that May 9th meeting. But to be perfectly honest, May 9th, prior to Director Comey's firing and learning of that from the AG later that evening, everything that happened prior to that moment is a little bit distant for me."[45]

McCabe stated that he raised the issue of the inaccurate statement with Morgan in a later meeting and told her that he authorized (P) and Kortan to speak to (P) McCabe said that Morgan seemed surprised and he suggested that she coordinate with the OIG. McCabe stated that he did not attempt to correct the statement when he received the drafts by email. He stated that he was the Acting Director at the time and was focused on that. He stated that once he got back to his Deputy Director role, he worked to resolve the outstanding issues with Inspection. McCabe told the OIG that he did not remember when he actually looked at the draft statement but that it could have been months later.

---

[40] McCabe repeatedly told the OIG that all three Inspection Division investigators, Morgan, (P) and (P) were present. In fact, only two investigators were present during the interviews on May 9 (Morgan and (P) and August 18 ( (P) and (P) However, all three were present when they first interviewed McCabe in April 2017.

[41] Andrew McCabe OIG interview, 11/29/2017, pg. 142.

[42] Andrew McCabe OIG interview, 11/29/2017, pg. 145.

[43] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[44] Andrew McCabe OIG interview, 11/29/2017, pg. 143.

[45] Andrew McCabe OIG interview, 11/29/2017, pg. 157.

## ANALYSIS

### A.  Lack of Candor – Under Oath

According to FBI Offense Code 2.6, employees are prohibited from "[k]nowingly providing false information in a verbal or written statement made under oath.  This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

#### 1.  Interview with OIG on July 28, 2017

During his July 28, 2017 interview under oath with the OIG, after being shown (P) October 30 text concerning having thrown Axelrod "under the bus" in a forthcoming article, McCabe falsely stated that he was not aware that (P) was authorized to speak to reporters at that time.  He also falsely stated that because he was out of town, he did not know where (P) was or what she was doing at that time.  In fact, as McCabe later admitted, he did authorize (P) to speak to (P) for the October 30 WSJ article, and he was aware of what she was doing because he stayed in constant contact with her through texts and phone calls.  Although McCabe did not know he was going to be questioned about the WSJ article before sitting down with the OIG on July 28, the interview was voluntary and he had the opportunity to end it at any time. Instead, McCabe provided false information.

#### 2.  Interview with OIG on November 29, 2017

OPR further finds that McCabe lacked candor under oath during his November 29, 2017 OIG interview when he falsely told the OIG that: (a) he told Comey on October 31, 2016, that he (McCabe) had authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea; and (b) he did not deny to the Inspection agents on May 9 that he had authorized the disclosure to the WSJ.

As discussed below, OPR credits Comey's recollection of his conversation with McCabe regarding the WSJ article on October 31, the gist of which was that McCabe had not authorized the leak the prior day and did not know who was behind it.  Accordingly, OPR finds McCabe's statement to the OIG that he (McCabe) told Comey he authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea is false.

Also, as discussed below, the testimony of Morgan and          (P) contemporaneous notes of the interview, and the draft statement prepared shortly thereafter show that McCabe denied authorizing the disclosure in his interview with Inspection on May 9.  His statement to the contrary is false.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 2.6 is substantiated.

12

## B. Lack of Candor – No Oath

According to FBI Offense Code 2.5, employees are prohibited from "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person. This misconduct includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

### 1. Meeting with Director Comey on October 31, 2016

McCabe lacked candor in his conversation with Director Comey on October 31, 2016, when they discussed the October 30 WSJ article. Comey told the OIG, "I don't have a clear recollection, but I must have had some conversation with Andy [McCabe] about it where I took from it that he didn't do [it] and didn't authorize it."[46] When questioned further as to whether McCabe told Comey that he (McCabe) authorized the disclosure, Comey stated, "No, no. Nope. In fact, likely told me the opposite. Definitely didn't tell me he authorized it and I think gave me the impression he didn't know what was going on."[47] Again, Comey later stated when asked if McCabe told him about authorizing (P) to speak to the WSJ, McCabe said, "something like can you believe this crap? How does this stuff get out kind of thing? But I took from whatever communication we had that he wasn't involved in it…"[48] Comey stated that he did not suspect that McCabe was the source of the disclosure based on what McCabe told him the morning after the article came out. Although it appears that Comey never directly asked McCabe if he authorized, or made the disclosure, McCabe's overall statements to Comey were deceptive. McCabe owed it to Comey, his immediate supervisor and the Director of the FBI, to be forthcoming and transparent in his discussions with Comey about any matter, much less one of such significance.

Comey was concerned about leaks in general and this disclosure in particular because he was concerned it would poison the FBI's relationship with DOJ. Therefore, OPR does not credit McCabe's account that he told Comey that he authorized the disclosure and that Comey "did not react negatively, just kind of accepted it." Additionally, McCabe's failure to be forthright with Comey is consistent with his behavior in denying authorizing the disclosure up until he was confronted with (P) texts by the OIG on July 28, 2017. OPR therefore credits Comey's account.

### 2. Interview with INSD on May 9, 2017

Morgan and (P) both stated that McCabe told them on May 9, 2017, that he did not know who authorized the disclosure of the McCabe-Axelrod call to the WSJ. Morgan stated that

---

[46] James Comey OIG interview, 11/16/2017, pgs. 304-305.

[47] James Comey OIG interview, 11/16/2017, pg. 305.

[48] James Comey OIG interview, 11/16/2017, pgs. 314-315.

13

there was no doubt in her mind that McCabe told her that he did not authorize the disclosure to the WSJ and that he did not know who disclosed the information to the WSJ.  (P)  stated that McCabe told him, "[h]e didn't know who gave it out. He didn't authorize it. He didn't direct anybody to give it out."  (P)  noted that McCabe took time to read the WSJ article and initialed it, indicating that he reviewed it. McCabe had an opportunity to refresh his recollection of the article at issue and still gave a false answer. Morgan and  (P)  accounts are consistent with each other and are corroborated by  (P)  contemporaneous notes of the interview and the draft statement that  (P)  prepared for McCabe's signature shortly after the interview. OPR credits their account of their May 9 interview and finds that McCabe lacked candor in his May 9 interview with Inspection.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 2.5 is substantiated.

## C. Unauthorized Disclosure

According to FBI Offense Code 4.10, without authorization, employees are prohibited from "disclosing or attempting to disclose the FBI's, or another agency's, sensitive material."

There is a general prohibition on disclosing information about an ongoing criminal investigation. The Clinton Foundation investigation was especially sensitive, having, as it did, a connection to a presidential campaign. Comey declined to confirm the existence of the Clinton Foundation investigation in his testimony to Congress in July 2016. When questioned by the OIG, Comey stated that nobody in the FBI was authorized to publically confirm the Clinton Foundation investigation. Comey considered the information contained in the October 30 WSJ article to be a disclosure of sensitive FBI information. Comey advised that the default rule is that the FBI does not discuss open investigations but would consider whether the public interest requires it. McCabe's decision to confirm the existence of the Clinton Foundation investigation through an anonymously sourced quote, recounting the content of a phone call with a DOJ Executive, was not within the public interest exception.

Based on a preponderance of the evidence, OPR concludes the allegation that McCabe violated Offense Code 4.10 is substantiated.

## *DOUGLAS* FACTORS

**1. The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.**

McCabe's offenses are extremely serious and directly related to his position and responsibilities as an FBI executive. All FBI employees are expected to tell the truth and demonstrate the utmost integrity at all times. His misconduct was intentional, and while it was a one-time disclosure, McCabe repeatedly failed to be fully forthright about whether he authorized the disclosure.

**2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.**

McCabe is the Deputy Director of the FBI. Several Assistant Directors and other component heads reported directly to him. His role was extremely prominent as he was second-in-command of the FBI, heading the daily operations of the Bureau. McCabe interacted with the highest levels of the government and a wide array of other government and private entities and individuals.

**3. The employee's past disciplinary record.**

McCabe has one prior administrative inquiry. In OPR Case #1999-0041, McCabe was issued an oral reprimand for losing a building pass.

**4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability.**

McCabe has 21 years of FBI service. He was rated "Outstanding" in his 2014-2017 Performance Appraisal Reports. BPMS shows he has received a Commendation (1999), a Quality-Step Increase (2003), a Special Act/Achievement Award (1999), two Cash Awards (2009 (2x)), and five SES Performance Awards (2010, 2011, 2012, 2014, and 2016).

**5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties.**

McCabe's offenses have severely impacted his ability to perform at a satisfactory level. OPR finds that McCabe cannot satisfactorily perform his assigned duties when he has irrevocably broken the trust the FBI placed in him.

**6. Consistency of the penalty with those imposed on other employees for the same or similar offense.**

As courts have often concluded, "[a]n agency need not exercise its discretion identically in every case. A penalty that is within the authority of the agency is not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases and mere unevenness in the application of the sanction does not render its application in a particular case unwarranted in law." *Villela v. Dep't of the Air Force*, 727 F.2d 1574, 1577 (Fed. Cir. 1984); see *Schoemer v. Dep't of the Army*, 81 MSPB 363, 367 (1999) (stating "the Board has consistently found that allegations of disparate penalties provide no basis for reversal or mitigation where the punishment is appropriate to the seriousness of an employee's offense"). OPR must ascertain the appropriate penalty for misconduct in every substantiated case. Precedent is a helpful resource. Thus, OPR reviewed the 444 cases under Offense Codes 2.6, 2.5, and 4.10 (as of March 6, 2018), which reflect penalties ranging from oral reprimand to summary dismissal. After reviewing the 444 precedent cases, OPR concludes the recommended

penalty is consistent with those imposed upon other employees for the same or similar offenses.[49]

**7. Consistency of the penalty with any applicable agency table of penalties.**

The recommended sanction is consistent with the FBI's Penalty Guidelines.

**8. The notoriety of the offense or its impact upon the reputation of the agency.**

When the notoriety of the offenses becomes known, it will, without question, significantly damage the reputation of the FBI.

**9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.**

McCabe is aware of the FBI's standards of conduct and the obligation to tell the truth at all times.

**10. Potential for employee's rehabilitation.**

OPR finds that McCabe's offenses demonstrates he has failed to act with integrity at all times and has broken the FBI's trust in him

**11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.**

From October 2016 through August 2017, McCabe, as both Deputy Director and then as Acting Director, was under intense, even unimaginable, scrutiny dealing with a variety of highly sensitive matters that generated a significant amount of controversy.

**12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.**

OPR does not believe that alternative sanctions are appropriate in this matter.

## PENALTY DETERMINATION

When determining an appropriate penalty, OPR considered the 12 *Douglas* Factors, including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors.

---

[49] The discussion above is designed to document that OPR has considered the applicable precedent. It does not, and is not intended to, convey the full extent of OPR's analysis of these precedents. OPR has carefully reviewed and weighed every precedent serialized into the investigative file. OPR's penalty determination is driven primarily by the facts of the case before it, including applicable mitigators and aggravators, with precedent review serving to promote general consistency and uniformity.

The investigation establishes McCabe violated FBI Offense Code 2.6 (Lack of Candor – Under Oath). The standard penalty is dismissal. This Offense Code does not include a mitigated or aggravated range.

The investigation establishes McCabe violated FBI Offense Code 2.5 (Lack of Candor – No Oath). The standard penalty is a 14-day suspension. Mitigating factors warrant a letter of censure to a ten-day suspension, and aggravating factors warrant a 20-day suspension to dismissal.

The investigation establishes McCabe violated FBI Offense Code 4.10 (Unauthorized Disclosure - Sensitive Information). The standard penalty is a seven-day suspension. Mitigating factors warrant a letter of censure to a five-day suspension, and aggravating factors warrant a ten-day suspension to dismissal.

OPR has considered all mitigating factors supported by the record, including, but not limited to, McCabe's 21 years of remarkable FBI service and his truly outstanding performance record. At the time of the misconduct, McCabe was facing unprecedented and unimaginable pressure and challenges. Notwithstanding all relevant and significantly mitigating factors, however, OPR finds that dismissal is appropriate because all FBI employees know that lacking candor under oath results in dismissal and that our integrity is our brand. Without it, we are nothing. As the Deputy Director, McCabe held the second-highest position in the FBI and is expected to comport himself with the utmost integrity. Despite this, McCabe repeatedly lacked candor with the Director of the FBI, the OIG, and the FBI's Inspection Division. McCabe's lack of candor is incompatible with the FBI's Core Values. Based on the circumstances in this case, OPR concludes that McCabe should be dismissed from the rolls of the FBI for his violations of FBI Offense Codes 2.6, 2.5, and 4.10.

## CONCLUSION

Based on a preponderance of the evidence, OPR concludes McCabe violated FBI Offense Codes 2.6, 2.5, and 4.10. Based on the circumstances of this case, OPR recommends to the Deputy Attorney General that McCabe be dismissed from the rolls of the FBI for his 2.6, 2.5, and 4.10 offenses.

1 – Deputy Attorney General, Department of Justice
1 – Director, FBI
1 – Deputy Director, FBI
1 – OIG, DOJ
1 – AD, OPR
1 – 263X-HQ-xxxxxxx
1 – Tickler Copy, OPR