EXHIBIT 3

**DELETION CODES**

G.     THE LAW ENFORCEMENT PRIVILEGE - THE DISCLOSURE OF THIS INFORMATION COULD CAUSE HARM TO, IMPEDE, IMPAIR, OR HINDER AN INVESTIGATION AND/OR AN INVESTIGATIVE INTEREST OF THE FBI.

P.     THE PRIVACY ACT OF 1974, 5 U.S.C. § 552a

P-1     INFORMATION, THE DISCLOSURE OF WHICH WOULD BE AN UNWARRANTED INVASION OF PERSONAL PRIVACY.

S.     PERSONAL IDENTIFYING INFORMATION RELATED TO LAW ENFORCEMENT PERSONNEL AND THEIR FAMILY MEMBERS, THE DISCLOSURE OF WHICH IS ROUTINELY GUARDED FOR SECURITY REASONS.

**Page 1**

```
1                    IN RE ANDREW G. MCCABE

2                        ORAL RESPONSE

3

4

5       Hearing in the Matter of Andrew G. McCabe

6                      Washington, DC,

7                  Thursday, March 15, 2018

8                         1:15 p.m.

9

10

11    Job No: J1841144

12    Pages:  1-202

13    Reported by:       (P)

14

15

16

17

18

19

20

21
```

**Page 2**

```
1     ORAL ARGUMENT IN THE MATTER OF Andrew G. McCabe

2     Held at the Law Offices of:

3

4          THE UNITED STATES DEPARTMENT OF JUSTICE

5          U.S. DEPARTMENT OF JUSTICE

6          950 Pennsylvania Avenue, NW,

7          Room 4133

8          Washington, DC 20530

9          (202) 514-3452

10

11

12          Pursuant to Notice, before      (P)       , a

13    Professional Reporter and Notary Public in and for the

14    District of Columbia.

15

16

17

18

19

20

21
```

**Page 3**

```
1     APPEARANCES:

2          ON BEHALF OF THE U.S. DEPARTMENT OF JUSTICE:

3          ARTHUR E. GARY, ESQUIRE and

4          SCOTT N. SCHOOLS, ESQUIRE

5          United States Department of Justice, Office

6          Justice Management Division

7          145 N Street, NE

8          Suite 8E.500

9          Washington, DC 20530

10         Telephone: (202) 514-3452

11         E-mail: arthur.gary@usdoj.gov

12

13         ON BEHALF OF THE ANDREW G. MCCABE:

14         MICHAEL R BROMWICH, ESQUIRE and

15         ERIC B. BRUCE, ESQUIRE

16         Robbins, Russell, Englert, Orseck,

17         Untereiner & SAUBER LLP

18         1919 M Street, NW

19         Washington, DC 20036

20         Telephone: (202) 775-4521

21         E-mail: mbromwich@robbinsrussell.com
```

**Page 4**

```
1                        CONTENTS

2     ORAL STATEMENT OF Andrew G. McCabe          Page

3          By Mr. Bromwich                          5

4          By Mr. Schools

5

6

7

8

9     Exhibits                                    Page

10    (No exhibits marked)

11

12

13

14

15

16

17

18

19

20

21
```



ESQUIRE
DEPOSITION SOLUTIONS

Page 13

1    So when I graduated, they were under the
2  hiring freeze. So I went into private practice for
3  three years first in Camden, New Jersey, and then in
4  Newark, New Jersey. I was trying to cover both of the
5  worst cities in New Jersey in the span of two jobs.
6    And then, of course, in 1996 I got my letter
7  to go to Quantico. Summer of '96.
8    So after Quantico, first office of
9  assignment was New York City where I did organized
10  crime work. I was on the Russian organized crime
11  squad as street agent for seven years, and then I
12  became the supervisor of that squad. I was promoted
13  as a stationary supervisor for the next three years. I
14  was in -- so I spent the first half of my career
15  essentially doing criminal work in New York.
16    In 2006, I had been on the desk for
17  three years. The five-and-out policy has been kind of
18  -- was being fairly strictly enforced. I was still
19  only about halfway through my career, so I knew that
20  at some point I would have to come down to
21  headquarters. So I convinced my wonderful wife, who

Page 14

1  is a physician -- she was in a private practice, a
2  pediatrician in Westchester County -- to kind of walk
3  away from her practice, and we took a transfer down to
4  headquarters to do counterterrorism work.
5    I had not ever worked CT except for, of
6  course, 911 when everybody in New York worked CT. But
7  I felt like, if I was coming to headquarters, I had
8  done -- I had had such a great criminal experience in
9  the field that it was time to learn something
10  different.
11    So I came down as a unit chief. I was
12  assigned out at (S) as -- in the counterterrorism
13  division doing ITOS-1, International Terrorism
14  Operations Section 1. I worked for Mike Hunbach
15  there. And after a few months he asked me to put in
16  for the assistant section chief job, which I did. And
17  then I stayed there at ITOS-1 for about two years as
18  the assistant section chief.
19    In 2008 -- forwards the end of 2008, I went
20  over to the Washington field office as an ASAC also CT
21  there. And then a year later Director Mueller asked

Page 15

1  me to come back to headquarters to serve as the first
2  director of the High-Value Detainee Interrogation
3  Group.
4    So it was the very beginning of the Obama
5  administration, and they had with an executive order
6  made some changes in the way that we were going to
7  approach issues around interrogating terrorists and
8  suspected terrorists, mostly internationally but also
9  here in the United States.
10    So he called for the creation of this group
11  and asked Director Mueller to stand it up and kind of
12  build it and run it and, you know, pay for it, take
13  care of care and feeding and that sort of thing. And
14  so Director Mueller asked me to do that.
15    So I did that for two years. Built the HIG
16  into what it is now. And then at the end of that
17  time, I actually tried to go back to the Washington
18  field officer as an SAC. And Jim McJunkin, who was
19  also a former boss of mine, was the ADIC at the time.
20  He was the assistant director in charge, ADIC, at the
21  Washington field office. I felt pretty confident of

Page 16

1  my chances of getting back to work for Jim.
2    And, actually, the day before the career
3  board, Mark Giuliano, who is the assistant director of
4  the counterterrorism division, he asked me to put that
5  aside and come back to the CT Division as a deputy
6  assistant director.
7    So I did that.
8    I served in that position for a year, when
9  the assistant director at the time, a man named Ralph
10  Bolter, B-O-L-T-E-R, retired and Director Mueller
11  asked me to serve as assistant director for CT. I did
12  that for a year.
13    And then Stephanie Douglas, D-O-U-G-L-A-S,
14  who was the executive assistant director for national
15  security, she retired and director -- then new
16  Director Comey asked me to serve as the EAD for
17  national security.
18    So that was in 2013. I did that for a year.
19    And then in the fall of 2014, then Deputy
20  Director Mark Giuliano, G-I-U-L-I-A-N-O, asked me
21  to -- if I would be interested in going back to the

Page 17

1  Washington field office. There had been a lot of
2  tours at headquarters, and I was very much looking
3  forward to getting back to the field. And he asked if
4  I would be interested in serving as the assistant
5  director in charge of the Washington field office,
6  which I did in -- towards the end of 2014.
7      MR. SCHOOLS: I can't ever keep this
8  straight. The ADIC is the WFO boss there?
9      THE WITNESS: Yes.
10     So New York, WFO, and Los Angeles all have
11 ADICs. And as ADIC at WFO you have five SACs that
12 report to you. One SAC for each division.
13 Essentially you've got a CT, CD, criminal, admin, and
14 intelligence.
15     So I went over very happy to go back to WFO
16 after a long time away, and that's where I was
17 essentially when things started in the beginning of
18 2015.
19     MR. BROMWICH: Why don't you walk us through
20 just your other promotions, and then we'll go back to
21 the events of your wife's campaign.

Page 18

1      THE WITNESS: Okay. So I stayed at WFO
2  until September of 2015. And at that time Mark, who
3  was still Deputy Director, Kevin Perkins, who was the
4  ADD was leaving to go back to the SAC at Baltimore,
5  and so Mark asked me to come back and serve in the ADD
6  role with the intention of having me kind of work
7  closely with him knowing that he was going to retire.
8      (Off-the-record discussion.)
9      THE WITNESS: In any case, Mark asked me to
10 come back to be the ADD, and he and Director Comey had
11 discussed that Mark was likely going to retire in the
12 beginning of 2016, and that I would then be well
13 positioned to follow Mark as deputy director. And
14 that's, in fact, what happened.
15     In February of 2016, Mark retired and
16 Director Comey asked me to serve as deputy director.
17     MR. SCHOOLS: The ADD is the number three?
18     THE WITNESS: Yes.
19 BY MR. BROMWICH:
20     Q. So you mentioned a moment ago your wife's
21 run for office in Virginia. And, obviously, articles

Page 19

1  about that serve as kind of the core of the events
2  that flow from that and were the subject of the
3  investigation.
4      So could you tell Mr. Schools and Mr. Gary
5  sort of how that came about?
6      A. Sure.
7      So just to go back a little bit. So -- and
8  these are facts that we did not know at the time, but
9  we have come to know them now.
10     Q. The background for her running for office?
11     A. That's right. And I say "we", I mean my
12 wife Jill and I. We've now kind of pieced this
13 together.
14     But in any case, in February of 2014, Jill
15 is a pediatrician. When we came to -- we moved here
16 back in 2006, we live out in Louden County, and she
17 decided -- because I promised her we would only be
18 here for 18 months. I did not live up to that
19 promise.
20     She took a job in the ER of our local
21 hospital, because thinking we might not be here for

Page 20

1  very long. So she still works there. She run the
2  pediatric ER in Louden Innova Hospital, and she has a
3  number of other responsibilities, but that's her main
4  job.
5      So, in any case, she was at the hospital on
6  this day in 2014 when, you know, unknown to her and
7  not having anything to do with her, then Governor
8  McAuliffe, who had made expanding Medicaid in the
9  state of Virginia one of his kind of principle issues.
10 So he was doing a tour of, like, local hospitals to
11 draw attention to that issue. He came to her hospital
12 and did some -- you know, looked around and saw the
13 ER, what have you.
14     At some point during that visit a reporter
15 for the Washington Post just happened to see my wife
16 there working. He asked her, "What are your thoughts
17 on expanding -- do you think it's important to expand
18 Medicaid coverage?"
19     Jill is not a political person. Was not
20 involved or interested or any even following politics
21 in any meaningful way, but she is a healthcare

Case 1:19-cv-02399-RDM   Document 23-4   Filed 11/01/19   Page 6 of 51

ANDREW G. MCCABE
IN RE ANDREW G. MCCABE ORAL RESPONSE

March 15, 2018
21--24

Page 21
1  provider. And, so, medical, you know, insurance
2  coverage for children, specifically in families is
3  very important to her. An issue she feels deeply
4  about.
5      So she answered the question, and the next
6  day in the article about McAuliffe's visit to the
7  hospital it included a quote from her as a physician
8  who worked at the hospital.
9      Q.  On the Medicaid issue?
10     A.  Right. She said something about how
11  important it was that children have access to medical
12  attention and having Medicaid helped that. And I
13  don't know if you follow Virginia politics, but it's
14  been a combative issue in Virginia that they did not
15  expand Medicaid in the way that other states did, I
16  guess, under Obamacare. So that's where that comes
17  from.
18     So she thought it was funny that she had
19  been quoted in the paper. We had no idea at the time
20  what it would lead to.
21     So a year later, in the beginning of 2015,

Page 22
1  thinking about the 2015 elections, state elections,
2  the -- the Governor and his team decided to try to
3  turn the balance in the state senate. They would
4  target five state senate races around Virginia, and
5  one of them was going to be our district, which is
6  District 13.
7      They also decided that their best candidate
8  in District 13 would be someone who was supportive of
9  Medicaid expansion. And, so, should -- that person
10  should be a doctor and would preferably be a female.
11     They had no idea who would fill that, you
12  know, that set of requirements.
13     Ralph Northam was given the kind of tasking
14  to find someone to fit that billing. He passed it on
15  to his chief of staff, whose name I cannot remember.
16     He had no idea who he was looking for. He
17  spoke to some people in the medical society of
18  Virginia, which my wife was not even a member of.
19  They didn't know my wife, but one of them did remember
20  this article that had appeared a year before and said
21  there was a doctor who was quoted in this article in

Page 23
1  Louden County, in that area. So they went back,
2  looked up the article and realized it was her, and
3  Northam's -- he was lieutenant governor at the time.
4  His chief of staff called Jill at the end of
5  February 2015 out of the blue.
6      We were stunned and didn't really take it
7  seriously at first but thereafter she had a number of
8  contact from other people, local, you know, state
9  level politicians who tried to convince her to run.
10     So that's how they found her.
11     As I said, she was not -- she was almost
12  exclusively motivated by the healthcare issue. That
13  was what she believed in. She voted for Democrats in
14  the past, for Republicans in the past. She does not
15  consider herself to be a partisan or even, like, a
16  politically, you know, focused person in any way.
17     So she decided to do it. Well -- we started
18  the process of trying to decide should she do it,
19  could she do it, how would it affect her career, our
20  family, her schedules, all that kind of stuff.
21     In about the second week of March, we -- she

Page 24
1  and I both -- she had been asked by a Virginia state
2  politician -- I think maybe Don McEachin or somebody
3  else, if she would come down to Richmond to meet other
4  state senators and delegates on a Saturday morning.
5      And so we were working through this thing
6  together trying to figure out if she should do it and
7  if she could do it. So we both went down to meet at
8  this -- they were having some prearranged conference
9  where a bunch of them would be, and so we went down
10  there to meet some people. When we got there, they
11  told us that Governor McAuliffe would like to talk to
12  her. So they took us over to the governor's residence
13  in Richmond where we met with McAuliffe.
14     Q.  Had you ever met him before?
15     A.  No, I had never.
16     Q.  Had she ever met with before?
17     A.  No, she hadn't.
18     Q.  All right.
19     A.  We met with him for 45 minutes to an hour,
20  and then we went back to the conference where he gave
21  a speech. And then we got in our car and left.

 ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

Page 25
1  A few days later -- well, after that, I
2  really dug into the issue on the work side with the
3  Bureau to try to figure out if there were reasons that
4  we shouldn't get involved in this, to include finding
5  out how the director felt about it.
6      Do you want me to through that?
7      Q. Yes.
8      A. Yes.
9      So, that Monday I talked to Mark Giuliano,
10 who was the deputy director. He was supportive of the
11 idea and recommended that I kind of pulse the director
12 on it and see what this thoughts were.
13     I talked to my lawyer at the Washington
14 field office who was a -- still is -- a woman named
15     (P)      . I spoke to Jim Baker and Pat Kelly.
16 And I talked to Chuck Rosenberg and laid the whole
17 thing out for him. Chuck Rosenberg was the director
18 -- Director Comey's chief of staff at the time, and he
19 said that he would have a conversation with the
20 director about it and let me know.
21     He got back to me a few hours later and said

Page 26
1  the director has no problem with it, it's fine, thinks
2  it's great, you know, good for her sort of thing.
3      So the next thing I met with Pat Kelly, Jim
4  Baker,     (P)     , and I -- we all met in Pat
5  Kelly's office to talk about the conflict issues,
6  Hatch Act, all the things that I should be thinking
7  about to insure that her political activity had no
8  impact on what I was doing at the FBI.
9      So Pat gave me some guidance on both the
10 Hatch Act, which was -- it was kind of two buckets.
11 There was Hatch Act on the one side, which is, like,
12 things I should be careful about during the campaign,
13 and on the other side was conflict of interest issues.
14 And most of those wouldn't really come into effect
15 until after she was elected if, in fact, she was
16 elected. That's how Pat explained it to me. But we
17 kind of walked through what some of those things were.
18     So, as a result of those meetings, I made a
19 couple of decisions. One, I decided and communicated
20 to Jill and anybody else that I would have no role in
21 the campaign, even though the Hatch Act permits the

Page 27
1  spouse of a candidate to do some things. It's very
2  specific, right? It's like you can put a sticker on
3  your car, but you can't drive the car into the
4  government parking lot.
5      You can go to an event, but you can't stand
6  in the receiving line. Things like that.
7      Rather than try to navigate those
8  intricacies I just said I won't do anything. I won't
9  attend an event, I won't, you know, knock on doors,
10 encourage people to vote. Certainly not raise money,
11 anything like that.
12     So that was the first thing.
13     Secondly on more of the kind of conflict of
14 interest side, I was concerned about kind of the
15 appearance of cases that -- one case in particular at
16 the Washington field office     (G)
17          I was concerned about that case. And any
18 other kind of Virginia state political corruption
19 cases that might create an appearance of a problem
20 there.
21     So I did two things. One, I had been

Page 28
1  speaking to Adam Lee, who at that time and still to
2  this day is the Special Agent in Charge or SAC of the
3  Richmond field office.
4      So I called Adam and I talked to him about
5          (G)
6
7      So rather than just kind of recusing myself
8  from it, I had the case moved to a different field
9  office.
10     Which he was perfectly happy to do.
11     And then I set up a system with my lawyer at
12 WFO,   (P)  , whereby she and the SAC for criminal
13 division at WFO would basically review all the
14 Virginia cases, determine what I should or should not
15 be recused from, and that they would kind of triage
16 all incoming political corruption cases to determine
17 whether or not I should be included or recused from
18 those cases, and then to kind of communicate that down
19 to the criminal folks who were working them.
20     And so that's how we did it. Essentially I
21 was out of anything involving Virginia state politics.



Page 29

1 Those things were all handled by the SAC for the
2 criminal division and the appropriate, you know,
3 people at headquarters.
4     So that's kind of the -- that's how it
5 started.
6     And she ran and then lost in the first week
7 of November of 2015. She lost her election. I had
8 gone back to headquarters a few weeks prior to that as
9 the ADD where, as you know, Scott, I was doing the
10 role previously held by Dave Bowders, the kind of
11 beans and bullets, you know, admin facilities, all
12 that stuff.
13     Q. And all the way up through the election, the
14 safeguards and prophylactics and things that you
15 wouldn't get involved in, that remained the same?
16 That didn't change?
17     A. That's right.
18     Q. From the time you made those decisions and
19 announced those decision up through the election?
20     A. That's right. That's right.
21         I later learned — and this is much later —

Page 30

1 that after I left WFO they moved the case back. But I
2 didn't even know it happened.
3     Q. You said before in walking us through the
4 chronology of your promotions in the FBI, that you
5 were promoted to deputy director in February of 2016?
6     A. That's right.
7     Q. And that was three months after the election
8 was over.
9         At that time, did you assume supervisory
10 responsibilities or some supervisory responsibilities
11 over the Clinton e-mail investigation?
12     A. I did. I did.
13     Q. Why don't you describe what those were?
14     A. So as the deputy director, you are
15 responsible for all investigative and intelligence
16 collection activity in the FBI.
17         Obviously, I don't know, a hundred thousand
18 open cases at any given time. You're down in the
19 weeds on all of them or even the majority of them, but
20 there are a few that are of such importance they come
21 to your attention on a regular basis. Terrorist

Page 31

1 attacks, mass shootings, you know, you name it. And
2 at that time what we refer to as the mid-year review
3 — and that was the code name for the investigation.
4 We called it mid year, but it was the investigation of
5 Hillary Clinton's use of a private e-mail server and
6 specifically whether or not she had -- she had stored
7 or had classified material on that private server.
8         And so, that case was worked differently
9 than many other cases. We thought about it as what
10 historically is referred to as a Headquarter's
11 Special. So it wasn't assigned to a field office.
12 The investigative work was done by a small team at
13 headquarters.
14         A lot of different reasons for that, a lot
15 of precedent for doing that. In very sensitive,
16 high-profile cases we've done that for many, many
17 years.
18         MR. SCHOOLS: That happened before you
19 became deputy director.
20         THE WITNESS: That's right. I didn't have
21 anything to do with those decisions.

Page 32

1         By the time I got there in February, there
2 was already a small team in place that had been
3 working the mid-year case since, I want to say, July
4 of 2015. I think they opened it in July of 2015.
5 BY MR. BROMWICH:
6     Q. The ADD wouldn't have had any role in that?
7     A. Not really. Not really. I mean, in the
8 meetings that I -- Dave Bowditch, B-O-W-D-I-T-C-H, was
9 present at many of the meetings. He was present,
10 especially more towards the end for some of the, like,
11 leadership meetings on mid-year. But, you know,
12 technically, the counterintelligence division was
13 working it and they reported up to the EAD for
14 national security, which for most of that time was
15 Michael Steinbach, S-T-E-I-N-B-A-C-H. And Mike
16 reported to me, directly to me as deputy director.
17         So we met on the mid-year case. We had like
18 an official update with the director at least once a
19 week.
20         I met with members of the team and members
21 of my staff who were involved in it all the time. I



Page 33

1  mean, as issues would come up, they would come into my
2  office and we would talk about things.
3       You know I wasn't calling the shots on who
4  gets interviewed when and what questions get asked,
5  but I was more in kind of a top level supervisory and
6  oversight role. So when they were having particular
7  problems and issues, they would come to me and discuss
8  them, things like that.
9       Q. Can you back up to one part of your wife's
10  campaign pain?
11      She apparently got a sizable contribution
12  from a political action committee that — either
13  controlled or had some involvement. I don't know if
14  it was one contribution from two PACs or one
15  contribution from one PAC or what it was.
16      A. Yes.
17      Q. What did you know about that and when did
18  you know it?      .
19      A. I did not know about that when it happened.
20      I learned of those two contributions in
21  October of 2016 when the first Wall Street Journal

Page 34

1  article came out.
2       I did — obviously I knew that McAuliffe had
3  encouraged her to run. I knew that McAuliffe had
4  appeared at two or three events during the course of
5  her campaign, so I knew he was supporting her. I
6  mean, that was clear. But I had no knowledge of the
7  finances or how much money he had contributed or
8  anything like that. I was intentionally staying out
9  of all that.
10      Q. I know the campaign was over, because the
11  election was in November of 2015, but did you guys do
12  any additional sort of ethical — ethics analysis
13  regarding any conflicts that may have lingered from
14  your wife's campaign when you became deputy director?
15      A. Not just kind of as a prophylactic matter
16  when I became deputy director. We had — I'm sure
17  we'll get into this -- a lot of conversations around
18  those issues in October of 2016 in the wake of these
19  articles that ultimately led to my decision to recuse,
20  which was a little bit fraught with kind of — a lot
21  of conversations between me and Jim Baker and the

Page 35

1  director.
2       During that period, Jim Baker talked to --
3  he told me he talked to Pat Kelly about it.
4       Q. Pat Kelly's position was what?
5       A. He was the assistant director of office of
6  ethics.
7       He was the chief ethics, you know, officer
8  of the bureau.
9       I didn't talk to Pat Kelly at that time, but
10  Baker did.
11      I later went back to Kelly. As other issues
12  came up with other press reports and things like that,
13  I later went back and talked to Kelly about the whole
14  thing, soup to nuts, and he actually provided me with
15  his official ethics opinion, documented opinion.
16      I think that came — I think that happened
17  when we were -- we had moved on. Mid year was over
18  and we were working the Russia case. And some article
19  claimed that I should recuse from the Russia case
20  because of my wife's campaign.
21      So at that time I had Pat Kelly do, like, a

Page 36

1  full write up, and he concluded that I should not
2  recuse from the Russia case. And he also concluded
3  that there was actually no reason for me to have
4  recused from the mid-year case.
5       Q. When was that analysis done just in point of
6  time?
7       A. That's in April of 2017.
8       Q. Okay.
9       A. Don't quote me on that date, but that's my
10  best recollection.
11      MR. SCHOOLS: I'm sure we'll get into those
12  sort of October events more granularly at some point,
13  but if I recall correctly from what I've read before
14  the October 23rd, 2016, article your wife had gotten a
15  call from a        (P)
16      MR. BROMWICH: Yeah, we'll get into all of
17  that. We're about to get there.
18      MR. SCHOOLS: I'll shut up and let you.
19      MR. BROMWICH: No, no, not at all.
20  BY MR. BROWICH:
21      Q. Just a couple of other points.

Page 37
1  So you mentioned your involvement in the
2  mid-year investigation, the Clinton e-mail
3  investigation, and you said that started when you
4  became deputy director in February of 2016?
5    A. That's right.
6    Q. From the time that you became deputy
7  director in February until the time of Director
8  Comey's announcement on July 5th, was there any other
9  investigation that you spent more time dealing with
10 than that one?
11   A. No.
12   Q. So you were very involved in that?
13   A. I was very involved in it. It was obviously
14 a very important investigation. It took a lot of our
15 time. There were other things that happened in there,
16 like the Pulse Nightclub shooting, which I spent
17 probably four days nonstop trying to sort through.
18 Other things like that would periodically come on and
19 off the radar, but over -- in an overarching way, that
20 is the one that really dogged us.
21   Q. And you were involved in discussions with

Page 38
1  Director Comey that led up to his announcement?
2    A. Yes. Yes, I was.
3    Q. So let's turn, as Scott suggested, to the
4  Wall Street Journal's stories in October of 2016.
5        How did the fact that  (P)  then
6  of the Wall Street Journal, was in the process of
7  gathering information and reporting a story that dealt
8  with your wife's campaign?
9    A. Yes.
10       So my independent recollection, my best
11 recollection of learning about it, was when  (P)
12 called my wife. We were in the car together, and that
13 was on Sunday.
14   Q. Had she ever spoken to him before?
15   A. No. No.
16   Q. Had you ever ever spoken to him before?
17   A. No. Neither of us. We had never spoken to
18 him.
19       I have now seen an e-mail from the previous
20 Friday, so that would be the --
21   Q. 21st?

Page 39
1    A. -- 21st. And it's an e-mail, I think,
2  between myself and the director in which I refer to
3  that -- the Wall Street Journal is asking questions
4  and seems to want to do an article about my wife's
5  campaign. Something like that.
6        So likely Mike Kortan told me about that
7  exchange on or about that Friday. But, nevertheless,
8  my independent recollection was I'm in the car with
9  Jill, my daughter is in the back seat. We're on our
10 way to an event, and her cell phone rings. And  (P)
11        -- it's  (P)  calling. She didn't
12 take the call. I think he left a message, a
13 voicemail. And we were just both kind of taken aback
14 that he would even call.
15       So as a result of that call, I immediately
16 called Mike Kortan, and I told him to reach out to
17    (P)  and to find out what, you know, where
18 were they going with this thing and to start kind of
19 getting a sense from  (P)  as to what they're writing
20 and making sure we could correct things that were
21 wrong, that sort of thing.

Page 40
1    Q. Before we get further into that, what was
2  your understanding at that time as to what your
3  authority was as deputy director to direct people in
4  the FBI or to yourself --
5    A. Right.
6    Q. -- share information about an investigation?
7    A. Miller understanding at that time -- and
8  still is today -- because this has not changed under
9  the new policy, is that at deputy director, I was one
10 of maybe three people in the FBI that had the
11 independent authority to interact with the media,
12 share information with the media, or authorize others
13 to share information with the media. That was my
14 understanding.
15   Q. Including up to and confirming the existence
16 of an investigation?
17   A. Yes. Whatever -- I had had kind of blanket
18 authority to make those decisions about what we -- how
19 we would interact and what we would share.
20   Q. Did you also have that authority as ADD?
21   A. As ADD?



Page 41
1   Q. Yes.
2   A. Well, I never --
3   Q. If you did you never exercised it?
4   A. I didn't know that I did. I never exercised
5   it. But I now know because we have done a pretty
6   thorough review of what the policy used to be and
7   we've recently done an update to the policy. The new
8   policy is not different from the old one in that
9   respect. It is the director, the deputy director, and
10  the ADD who have that authority.
11      Q. So when you say "independent authority",
12  does that mean, for example, that the ADD does not
13  need to check with you before interacting with the
14  media? And similarly, you wouldn't have to go to the
15  director to directly or direct others to interact with
16  the media?
17      A. That is the case. And it is -- however,
18  there is a presumption that the ADD essentially has
19  that authority, so that he can perform that role if
20  he's covering for the deputy or the director.
21      That's why it's written into the policy that

Page 42
1   way.
2   Q. So, in practice, it's really the two of you,
3   the director and the deputy director?
4   A. Yes. And really, day-to-day practice, it's
5   the deputy. I handled those questions all the time. I
6   mean, Mike Kortan was a direct report to me. So Mike
7   and I would talk every day, morning, and then again in
8   the afternoon at least, and if necessary more in the
9   middle. And he would let me know, like, "Here's who
10  called today. Here is what they're asking about.
11  Here's the stories that are in progress. How do you
12  want me to handle X, Y, and Z?"
13      And it is a constant flow of requests and
14  inquiries, the vast majority of which we say "No
15  comment." We don't provide any information or engage.
16      But many we do engage in some way.
17      Sometimes it is merely saying, you know,
18  "Hey, you're off base. You have your facts wrong."
19      Other times it's sharing information on
20  background.
21      Other times it's finding the right person to

Page 43
1   be interviewed and then actually providing that person
2   for an interview, either on background or on the
3   record.
4       Sometimes it's a full blown on the record. I
5   mean, there is a very wide array of possible ways you
6   could handle those inquiries and they come in
7   constantly.
8       Q. So it sounds like a not insignificant amount
9   of your time was spent dealing with press inquiries?
10      A. That's --
11      Q. Kortan was a direct report to you, so you
12  were dealing with a steady stream of these issues?
13      A. That's right.
14      Q. So let's get back to the narrative of
15  October of 2016.
16      MR. SCHOOLS: A couple questions on the
17  authority.
18      You, I think, in response to one of
19  Mr. Bromwich's questions indicated that your authority
20  to interact with the press would have included the
21  authority to confirm the existence of an

Page 44
1   investigation. I think that's what you said.
2       THE WITNESS: That was my understanding at
3   the time. That I had that kind of independent
4   authority.
5       MR. SCHOOLS: Did you -- maybe you didn't
6   think about it at the time. If you didn't, that's
7   fine. But you can envision situations where there is
8   an investigation that the FBI is involved in, like the
9   Pulse Nightclub shooting, where you guys are going to
10  be on scene and confirming that you're on scene and
11  you're doing things to ensure the public that you're
12  doing what the public expects you to do.
13      A. Right.
14      Q. A different situation would be where you're
15  in ongoing investigation of sorts and the department
16  of justice is involved, their lawyers are
17  participating. Do you draw any distinction between
18  those two type of scenarios and the scope of your
19  authority to confirm an investigation?
20      A. I don't know if I drew that kind of
21  distinction in terms of the scope of my authority.



Page 45

1   I'm very familiar with our practice. Under
2   most circumstances we don't confirm the existence of
3   investigations.
4         Some where it's undeniable, like the ones
5   you've cited, you know, there is really no — our mere
6   presence or showing up at a press conference or
7   something like that is a confirmation.
8   BY MR. BROMWICH:
9         Q.   To reassure the public?
10        A.   To reassure the public.
11        So, you know — but there are many
12  investigation where, you know, we wouldn't do that.
13        So I'm aware of that distinction, and I was
14  always careful about it.
15        I've also had the experience of working on
16  cases where we maybe would have preferred that they
17  not be exposed to the public, but by virtue of the
18  fact that they've been reported on and referred by —
19  talked about by other people, whether on the hill or
20  other people around town, like the denying the
21  existence of something becomes a bit of a fiction at

Page 46

1   some point because things become -- even though they
2   are not officially acknowledged by the department or
3   the bureau, the fact that we're doing X has been so
4   widely discussed by maybe people involved in it or
5   witnesses or what have you, it becomes -- it becomes
6   hard to maintain that position.
7         Q.   I don't necessarily don't know of all the
8   instances in which that may have occurred, but of the
9   two I know most recently I think there were
10  discussions with the department of justice prior to
11  the bureau's confirming the existence of the
12  investigation even though there had been a lot of
13  public chatter about it.
14        So I think you guys did that on Clinton, and
15  I know you did it on Russia.
16        A.   You're absolutely right about those two.
17        And I think in any case where we would make
18  a public kind of on-the-record confirmation, I can't
19  fathom doing that without coordinating it. All this
20  stuff, ideal circumstances would be closely
21  coordinated, so I don't deny that at all.

Page 47

1         Q.   Can you recall any other instances in which
2   you personally were involved in confirming the
3   existence of an investigation that had not been
4   publicly confirmed by the FBI?
5         A.   Sure.
6         And specifically in that kind of providing
7   background information, correcting, shaping a story,
8   the one that comes to mind most clearly to me is the
9   story that was kind of a long-term thing in the
10  making. And I can't remember. I think it was a
11  Washington Post story abou                    (P-1)
12                    (G)                          The
13  Post became aware of it. I don't know how. And did
14  this kind of big expose-type story on it.
15        We had a number of people. Kortan worked on
16  that, kept me apprised of it. We made a lot of
17  decisions about providing people to be interviewed off
18  the record to try to shape that story. And all of
19  that was implicitly acknowledging the existence of a
20  case.
21        All done with -- you know, with knowledge of

Page 48

1   and frequent reporting, knowledge — and the director
2   was aware of that. Others were aware of it. It was
3   discussed at meetings. So, I mean, that's one example
4   where -- that I can think of off the top of my head.
5         There are certainly others more recently. I
6   have had to interact with -- I had to interact with
7   the editor of the New York Times over the holidays at
8   the Director Ray's request to try to get them to not
9   publish a story that would identify -- specifically
10  identify basically the source of some information we
11  had received. And in an effort to try to protect that
12  source, I had to have this conversation with the
13  editor. And that conversation certainly
14  acknowledgedly implicitly the existence of the
15  investigation and the identity of the source.
16        So those kinds of exchanges happen. That's
17  part of -- you know, it's part of being responsible
18  for having to kind of try to manage the reputation and
19  the, you know, the public image of the organization.
20        Q.   Is there anything else on that?
21        So let's turn back to this initial contact,

ESQUIRE
DEPOSITION SOLUTIONS

Page 49

1   (P)      of the Wall Street Journal leaves a
2   voicemail on Jill's phone you think, and then you
3   begin to engage with, I think you said, Michael
4   Kortan. So pick up the narrative there.
5       What do you recall happening next?
6       A. So we were out the whole day, so it was kind
7   of one of those Sundays where you are on the e-mail
8   all day.
9       Series of interactions between myself, Mike
10  Kortan, Mike Kortan to       (P)      back and forth
11  with questions. It's hard for Kortan, because he
12  didn't know the details of my wife's campaign, so I
13  did send him one long e-mail that laid out some of
14  that.
15      That e-mail has been produced in multiple
16  FOIA requests, so it's one that gets referred to
17  often.
18      So, yeah, we went back and forth all day. I
19  at some point talked to or at least put the director
20  on notice that we were doing this, working to kind of
21  try to mitigate the damage of the story.

Page 50

1       And ultimately, he ran the story that night.
2   I think it posted online that Sunday night, and it was
3   in the paper on Monday morning. So that's the one
4   that I kind of think of as the first Wall Street
5   Journal story.
6       Q. And do you remember in general terms what
7   topics were addressed in the story?
8       A. It talked about what you just referred to,
9   Scott. The fact that -- so, as Governor McAuliffe was
10  the head of the Virginia State Democratic Party and
11  the State Democratic Party had contributed some
12  amount -- maybe $200,000 -- don't hold me to the
13  numbers -- to my wife's campaign, I think in the form
14  of like mailing support or something like that. And
15  the -- and then McAuliffe also had a PAC that he
16  controlled, and that PAC contributed, I want to say
17  generally, maybe another $400,000 to her campaign in
18  the last, maybe, week or two of her campaign to help
19  with whatever they were doing in that end of the
20  campaign and stuff.
21      So he reported that.

Page 51

1       And then kind of made this allegations that
2   my -- because my wife was supported by the governor,
3   the governor is a friend of Hillary Clinton, and I was
4   supervising the Clinton investigation, therefore, you
5   know, my involvement in the case was politically
6   biased and affecting my decisions. Not in those
7   words, but that was the basic theme of the story.
8       MR. SCHOOLS: Just to follow my earlier
9   question, the fact of those contributions, was that
10  not known by you until you saw the article or was that
11  part of the conversations that you may have had with
12  Kortan or he was giving feedback from   (P)   about
13  what the article was going to say? When did you know
14  about that?
15      THE WITNESS: I did not know about those
16  contributions until   (P)   told Kortan that he was
17  putting that in his article.
18  BY MR. BROMWICH:
19      Q. So you knew it before the article
20  appeared --
21      A. Before the article appeared.

Page 52

1       Q. -- but certainly before it from   (P)
2   through Kortan?
3       A. Hours before, right. So I did not know
4   about that until that exchange.
5       Q. So walk us through sort of the immediate
6   aftermath.
7       So the article gets posted online that
8   Sunday afternoon or evening. It's in the printed
9   version of the paper on Monday, the 24th. And then at
10  some point you learn that   (P)   is continuing to
11  work the story or angles of the story.
12      Tell us about that.
13      A. Well, it's important to, I mean, put it in a
14  little bit of context.
15      This was, like, in the middle of a storm of
16  articles that were coming out that were really rough
17  on the department and the bureau. And most of which
18  were based to some great degree on information that
19  was coming out of the FBI or the department in an
20  unauthorized fashion.
21      So not in the way that I have been talking



Page 53

1 about, but rather just people who were speaking
2 unauthorized off the record out of turn.
3      There was -- I think in the days around
4 that, there was an article about a reorganization in
5 the Eric Garner case in New York, which angered the AG
6 greatly at the time.
7      There was another article that came out,
8 like, I think within 24 hours of the Wall Street
9 Journal article about my wife's claim.
10      There was another article that came out that
11 cited to a private, like, one-on-one meeting that the
12 AG had had with Director Comey, like, that Monday
13 morning, the 31st. Which was inexplicable.
14     Q. The 31st or the 24th?
15     A. I'm sorry. That was the 31st. That was a
16 few days --
17     Q. Right.
18     A. -- in any case.
19     Q. General point.
20     A. A lot of articles coming out at that time.
21     So, in that week at some point (P) makes

Page 54

1 it known to Kortan that he's going to write a
2 follow-up article which will repeat most of the
3 allegations from the first article but will also
4 include these new allegations that he's getting from
5 people inside the FBI that I had made a decision to
6 try to kill the Clinton Foundation case, you know, in
7 an effort to, I don't know, whatever, help Hillary
8 Clinton or something like that.
9     Q. And just to back up a step, what was your --
10 what had been your involvement in the Clinton
11 Foundation case, which I gather was something that was
12 worked by multiple field offices at one point?
13     A. It was.
14     So I had really no involvement in it
15 whatsoever when I was at the Washington field office.
16     I knew that Washington field had an
17 investigation of

18
19
20     That was really all I knew about that. That
21 was the case that I moved out of WFO when I was there.

Page 55

1 So when I later found out that WFO had a stake in the
2 Clinton Foundation matter, I didn't -- I was surprised
3 by that.
4     But nevertheless, my involvement in the
5 Clinton Foundation case up until that point had really
6 only been in talking to people here at DOJ, and most
7 of that was conversations with Matt Axelrod,
8 A-X-E-L-R-O-D.
9     There had been some back and forth between
10 the criminal division of the bureau and the public
11 integrity section here about whether that case would
12 kind of continue moving forward. They had had a
13 meeting here in which PIN, public integrity section --
14 is that right?
15     MR. SCHOOLS: That's an acronym PIN.
16     THE WITNESS: They later came back to the
17 bureau and said, "We don't think there is enough to
18 keep moving. We're not going to support it with
19 process," and things like that.
20     So there was this back and forth.
21     There was also frustration on the part of

Page 56

1 the field level, primarily in New York, where New York
2 wanted to keep investigating. And they were getting
3 positive signals like that from their -- from the U.S.
4 attorney in the Eastern District at the time.
5     But DOJ main was kind of relying on the PIN
6 position to say this shouldn't be moving forward. So
7 there was this, like, tension between our field and
8 the U.S. attorney's office and DOJ main.
9     So Matt and I would have conversations about
10 that periodically back and forth.
11     So that was kind of really my role in it.
12     I did have one meeting in which I brought
13 the heads of those offices together and instructed
14 them -- like, this is after the PIN decision. So,
15 like, pursuing it, like, coming back to DOJ and
16 arguing again for, like, search warrants and stuff
17 like that did not seem to be a good idea, particularly
18 as we were getting close to the election.
19     That was the word that I was getting from
20 Matt and others here.
21     But, on the field side, they had information

Page 57
1 to work with. They had bank records that they had
2 seized in Los Angeles. They had a couple of
3 cooperators that they had recruited.
4        There was some historical Title 3 intercepts
5 of people that they thought were relevant.
6        So, basically, we kind of sorted it out as
7 to who would do what. And New York was basically
8 told, they have the cooperator and the T3. So the
9 agreement on this meeting was that New York would
10 continue moving forward with what they had, like,
11 tried to develop more information that we could then
12 after the election sit down with PIN again and say,
13 "Okay, here's what we've developed." And that Little
14 Rock would support that effort. And that the
15 Washington field would continue doing their thing with
16        but have to coordinate with New York just to
17 try to organize the cats, as it were, having four
18 field offices shooting at the same target.
19        So there was that. And then really my last
20 interaction was this phone call that's now -- now
21 infamous phone call between Mr. Axelrod and I where we

Page 58
1 really kind of -- Matt, I guess, had discovered that I
2 had given this direction to the field to continue
3 working with what they had. He was very frustrated by
4 that. He felt that that was contrary to the
5 conversations that he and I had had previously.
6        He called me in the middle of August. I was
7 actually at home at the time, because I was traveling
8 overseas for some other meeting. And he caught me,
9 like, right before I went to the airport. And we had
10 this very heated conversation in which I felt that
11 Matt was really pushing me inappropriately to try to
12 shut down these cases. And I basically kind of called
13 him out on it and said, "Look, is this what you're
14 telling me? Are you telling me to close down cases
15 that we have that are viable cases that are going
16 forward?" And at that point he said, "No, no, no."
17 So that was that.
18    Q.  So fast forward now to the week of October
19 24th. You find out, just to bring us back where we
20 were, that (P) is planning to write a follow-up
21 story.

Page 59
1    A.  Right.
2    Q.  And that part of it is going to be about the
3 Clinton Foundation investigation.
4    A.  Right.
5    Q.  So take it from there.
6    A.  So the story is, really, I think, very
7 damaging. It's going to basically say that, you know,
8 DOJ is trying to politically, you know, kill these
9 cases for politics and that the FBI is vulnerable to
10 that kind of pressure. You know, we're not doing --
11 our own people are mad, because we're kind of caving
12 to this pressure and we're not being the independent
13 kind of investigators that we should be.
14        And it's very -- I feel like it's going to
15 be very damaging to the bureau. Externally,
16 certainly. But even internally. Like, the fact that
17 people have this so wildly wrong is concerning to me
18 at that time.
19    Q.  And part of it — correct me if I'm wrong —
20 is that he says that he's going to write that there
21 was some sort of directive from you to stand down?

Page 60
1    A.  Right. That I have issued the kill order or
2 something, the stand down order on these cases.
3        So at this point, I leave town on
4 October 27th, that is Thursday of that week. And Mike
5 Kortan is sent to have this kind of exchange with
6        (P)    that day or the next day.
7        Because I am gone, I tell    (P)    who is
8 at that time counselor -- like, counsel to the deputy
9 director. I tell her to work with Kortan on this.
10 Sit with him when he talks to, you know,  (P)  to
11 try to kind of figure this thing out.
12        We have -- so, I leave town. I have to go
13 up to Connecticut to my son's school. And (P) and
14 Mike kind of keep in touch with me on the phone as
15 they have the series of conversations with (P).
16        It's in those conversations where we're
17 trying to think, like, how can we show that this is
18 not, in fact, what happened? We didn't cave to
19 political pressure. We're doing our job in the way
20 that we should. We've pushed back appropriately. And
21 to me, this conversation between Axelrod is an example

(P-1), (G)



Page 61

1  of that.

2       So we talk about that, and I tell them to

3  share that with      (P)

4       Q.  And so this is their series of text

5  messages, phone calls, and so forth in which you're

6  dealing with  (P)  and Kortan on this issue?

7       A.  That's right.  Probably (P)  calls me, but I

8  think the two of them are together.  They may have

9  even been on speakerphone.  But it's a back and forth

10 that takes place from, like, the 27th to the 28th.

11      Q.  So you realize that the call was, obviously,

12 a sensitive one.  What was your purpose in authorizing

13 them to share it?

14      A.  Yeah, I just felt like -- you know, I felt

15 like the story was really going to be damaging to the

16 bureau.  And I knew that there would be consequences

17 to revealing the phone call.  It was a conversation

18 that I had -- I had already told people about

19 internally but obviously never shared publicly.

20      I had talked about it with the then EAD over

21 the criminal division and other people, likely the

Page 62

1  director and others.  Not in the context of the

2  article, but just after I had that exchange with Matt,

3  I was taken aback by it and told people about it.

4       So the idea to share it publicly, I mean it

5  was -- you know, I felt like it was necessary to try

6  to stop this, I guess, greater harm to the reputation

7  of the organization.

8       The Clinton Foundation case was something

9  that not only had been widely reported on, books had

10 been written about it, numerous articles written about

11 it.  Many people from within the organization were

12 already confirming it.  I know it's different.

13 They're not the deputy director, but there was a lot

14 of information in the article sourced to people in the

15 bureau or DOJ.

16      So it was being talked about in that article

17 one way or the other.

18      So that's kind of how I thought about it at

19 the time.

20      Q.  So at some point, you get from Kortan either

21 an e-mail or a draft of the story, which includes the

Page 63

1  account of the phone call; is that right?

2       A.  I'm not sure I ever got that.

3       Q.  Okay.

4       A.  I'm not sure I ever got that.

5       Q.  So did you know that  (P)  was going to

6  include that anecdote in this story before the story

7  came out?

8       A.  I just knew the result of their

9  conversations with him.

10      Q.  Um-um.

11      A.  And I can't remember whether (P)  or Mike

12 told me that he told that them he would put it in, but

13 I think that was my assumption.

14      Q.  So that story appears online on Sunday, the

15 30th?

16      A.  That's right.

17      Q.  And then it appears in the print version on

18 October 31st.

19           MR. SCHOOLS:  Can I back up?

20           MR. BROMWICH:  Yes.

21           MR. SCHOOLS:  Ask you about the decision to

Page 64

1  authorize the disclosure of that.

2       You had to know that that was going to send

3  Matt Axelrod off the edge; right?

4           THE WITNESS:  Yes, I knew he would not be

5  happy about it.

6           MR. SCHOOLS:  And, so, when the context we

7  were talking about earlier with respect to your

8  authorization to release information --

9           THE WITNESS:  Yes.

10          MR. SCHOOLS:  -- sort of what I was talking

11 about earlier was the distinction between sort of

12 uniquely FBI information --

13          THE WITNESS:  Right.

14          MR. SCHOOLS:  -- and the bigger DOJ

15 information.  This is sort of a bigger DOJ

16 conversation because, at least, it's evil going to in

17 part disclose what someone over here said and not just

18 what was going on from the bureau.  Do you see any

19 distinction in that type of information with respect

20 to what you were authorized?

21          THE WITNESS:  I thought it was.



Page 65

1    I don't think I thought of it that way at
2    the time. Honestly, I didn't think of it even really
3    as, like, talking about a case because, in my mind, we
4    weren't discussing, like, the case, the evidence, the
5    strategy, the plan, whatever.
6         This was really more about, like, an
7    argument I had with another individual.
8         MR. SCHOOLS: So I know    (P)
9    assessments are not necessarily your assessments or
10   not even your assessment. She has a text message in
11   which she says about that article "I feel a lot less
12   bad about throwing Matt under the bus."
13        So her assessment of what she achieved by
14   talking to    (P)    was to throw Matt under the
15   bus.
16        Was that your assessment? Did you feel that
17   way?
18        THE WITNESS: No. That was the one thing
19   that -- one of the things that crossed my mind that
20   was, you know, regretful or unfortunate. Like, Matt
21   and I talked probably multiple times a day every

Page 66

1    single day. And we didn't -- all those conversations
2    weren't always, like, happy times. I mean, we knocked
3    heads over quite a few things, but we had a lot of
4    really important work to do. So that bothered me.
5    Like, I didn't want to -- I didn't want to destroy my
6    relationship with Matt, but I didn't think it would do
7    that.
8         And he was frustrated the next day. There
9    is no question about that.
10        I called him. I saw him in the morning
11   meeting and then I called him later that day, I think,
12   and just we kind of talked through it.
13        You know, then we, you know, were able to
14   get past it.
15        MR. SCHOOLS: The way that always happens
16   when we hear or you across the street speak to
17   reporters and authorize them to attribute this story
18   to something other than a named individual over
19   here --
20        THE WITNESS: Right.
21        MR. SCHOOLS: -- is that it sometimes looks

Page 67

1    like a leak. So (P) and Mike are authorized to talk
2    to (P) Barrett on background. I can't remember how
3    that specific piece of it was sourced, but I think it
4    might have been a source close to McCabe or an FBI
5    official or something like that, which to the casual
6    reader probably looks like a leak. Even though this
7    isn't a leak, it's an authorized disclosure because
8    you've authorized it.
9         THE WITNESS: Right.
10        MR. SCHOOLS: So how in the universe of the
11   things that are going on at that time where you've got
12   lots of leaks about the Clinton Foundation that you're
13   contemporaneously frustrated with, because you're
14   talking to Sweeney about it. Walk me through the
15   process of how an on background disclosure of a
16   specific communication like that doesn't further the
17   problem you're trying to solve?
18        THE WITNESS: Yes.
19        I can certainly see how it would seem that
20   way. And now, being, you know, through this process
21   more familiar with kind of how Bill and Paul saw it at

Page 68

1    the time, I can understand their perspective on that.
2         But I can only tell you that I saw it
3    different. Like, my authorization of including that
4    fact in the article was something that I felt like I
5    had to do to combat the other 20 things that someone
6    from the FBI had in an unauthorized way already put
7    into the article.
8         I felt like I was in this situation because
9    I was trying to kind of mitigate the damage that we
10   were sustaining from unauthorized leaks.
11        So that's one thing.
12        I also felt like, you know, whether I, as
13   the deputy director, decide to share something on
14   background, that was the authority that I had to make
15   that decision.
16        There isn't anyone in the New York field
17   office to include Sweeney or the Washington field
18   office who was in a position to do that.
19        And so, at that time I felt like, you
20   know -- so when I look back on those conversations I
21   had with Paul and with Bill, which were very much at

Page 69

1  the blessing and at the direction of the director,
2  because we were talking about this stuff a lot. Yeah,
3  we were trying to kind of close off those – that
4  activity. We were trying to shut that out. We
5  actually took all kind of steps to try to figure out
6  who's talking to these reporters.
7         The way that -- to answer your question, the
8  way that the conversation was related in this article
9  could look like another leak. I mean, I guess that's
10  true. I didn't think of it that way at the time. I
11  thought of it differently because I had the authority
12  to make those decision and really nobody else that I
13  was aware of did.
14         MR. SCHOOLS: Did you ever contemplate
15  making sort of attributable representations to (P)
16  (P) to address the concerns that were raised by
17  the unauthorized leaks?
18         THE WITNESS: I don't remember -- I don't
19  remember considering doing that.
20         It's hard for me to say why we didn't.
21  BY MR. BROMWICH:

Page 70

1    Q. Well, is it fair to say that you more often
2  provide information on background than on an
3  attributed basis?
4    A. Yes. This is -- right. This is, like,
5  normal course of business. This one -- and, in
6  fact -- this one is particularly that way because this
7  whole exchange for me began a week earlier. It
8  started on that Sunday, the 23rd.
9         So this was just like a process that had
10  been going on for a week.
11         And this is where we ended up with it. And
12  I guess in some ways that's an escalation but, yes,
13  this is -- this is how we had interacted with the
14  media on countless articles in the past.
15         So that's how I thought about doing it this
16  way, I guess.
17    Q. You had a conversation with Matt after the
18  fact in which he expressed his frustration about, you
19  know, it's hard for us to work together if our private
20  conversations are going to end up in the newspaper.
21  His characterization of that call is that you

Page 71

1  apologized.
2    Q. I don't think you told him -- I don't think
3  you've said you told him and he didn't say you told
4  him that you had authorized it.
5    A. I didn't. I don't remember telling him
6  that.
7    Q. Why not?
8    A. I didn't think about telling him that. I
9  kind of felt like -- I don't know. I guess I didn't
10  think it was necessary.
11    Q. Is it fair to say based on your conversation
12  with him that -- did you feel like he was assessing
13  that the information had leaked as opposed to it being
14  an authorized disclosure?
15    A. Boy, I don't know. I mean, I don't remember
16  thinking about it that way at the time, so it would be
17  wrong for me to go back.
18    Q. Okay.
19    A. I mean, it was really about -- it was one in
20  a series of conversations that he and I had had about
21  information that had shown up in the paper, in which

Page 72

1  we would be frustrated because we thought things came
2  from here.
3         They would be frustrated because they
4  thought things were coming from us. I mean, you know
5  how that takes place all the time.
6         And Matt -- I just remembered Matt saying,
7  you know, like, basically this isn't going to work if
8  our conversations are showing up. And I was, "Okay,
9  agreed." You're right sort of thing.
10    Q. And did you -- or did he communicate to you
11  or did you ever have any concern about the impact of
12  the disclosure being sort of to defend the FBI, but to
13  portray DOJ in a negative light?
14    A. Did I think about that?
15    Q. Were you protecting the FBI at the expense
16  of the department is my question?
17    A. I might have been, but I was -- I felt like,
18  under the circumstances, it was appropriate. I felt
19  like the exchange that we had had was an actual,
20  truthful representation of, like, how these
21  conversations were taking place.



Page 73

1   And Matt was pressuring me to stop these
2   cases, and I had made the decision not to.
3        And, like, even in our conversation, he
4   didn't dispute that. So did it make the department --
5   did it shine a negative light on the department? I
6   guess it did for that issue.
7        But I didn't think that that was like -- it
8   wasn't unfair.
9        MR. SCHOOLS: It was accurate?
10       THE WITNESS: It was accurate.
11  BY MR. BROMWICH:
12  Q. So the article gets published the 30th,
13  31st.
14       Just to put this in a slightly broader
15  context, a few days earlier, on October 28th, Director
16  Comey had issued his letter announcing the reopening
17  of the Clinton e-mail investigation as a result of
18  additional work that had been done by the FBI in
19  connection with the Weiner laptop?
20  A. Yes.
21  Q. Were you sort of involved in aspects of

Page 74

1   that? And was that sort of occupying significant part
2   of your time and energy in the weeks between the two
3   Wall Street Journal articles?
4        MR. SCHOOLS: Can we do this? I feel like
5   we are moving to another topic, and I need to take a
6   five-minute break.
7        MR. BROMWICH: Fine.
8        MR. SCHOOLS: Be right back.
9        (Whereupon, a recess ensued.)
10  BY MR. BROMWICH:
11  Q. So, again, we talked about the two Wall
12  Street Journal stories, and I started to ask you about
13  your involvement in the decision leading up to
14  Director Comey's letter on October 28th reopening the
15  Clinton e-mail investigation.
16  A. Right. So, to try to tighten this up a
17  little bit -- so in that same week that it came to my
18  attention that we had basically not -- we needed to
19  make decisions about what we were going to do with the
20  material on the Anthony Weiner laptop.
21       And so I called for, you know, the usual

Page 75

1   updates, get people to let me know what's going on
2   since I had last heard about the issue, which was
3   maybe three weeks earlier.
4        So based on those conversations, I told the
5   director -- I thought I had told him that Wednesday
6   night before I left the office for the week, but I
7   have recently seen an e-mail that I sent to him at
8   about 5:00 o'clock on Thursday morning. Basically I
9   told him that, you know, an issue had come up that the
10  team needed to make some decisions on and he really
11  needed to weigh in on those decisions.
12       So that was what provoked the meeting with
13  the director and the rest of the team at 11:00 o'clock
14  that Thursday morning. And I called into it from --
15  from travel. I was on the road.
16       I called in, but was very quickly dropped
17  off the call. But that was the meeting that started
18  their thinking about and deciding how to handle the
19  congressional notification and the laptop and all that
20  stuff.
21       So I wasn't actually a part of those

Page 76

1   decisions, but that's kind of what happened.
2        So that Monday, when we got back into the
3   office, that 31st, I mean, that was really the thing
4   that everyone was focused on.
5   Q. So I'm going to talk about the meeting on
6   the 31st because, as you know, Director Comey's
7   recollection of discussions he had with you on that
8   date are a focal point for some of the charges in the
9   proposal.
10  A. Right.
11  Q. Before we talk about that, I want to show
12  you --
13       MR. BROMWICH: Scott, I don't know how you
14  want to handle documents as exhibits. We are not
15  going to use very many, but do you want me to just
16  refer to them and read them or do you want to have
17  them marked?
18       MR. SCHOOLS: I don't think you need to mark
19  them. If you can just refer to them and describe them
20  sufficiently so that we can identify them later.
21       MR. BRUCE: I have extra copies, so this is

Page 77
1 what we'll be talking about.
2 BY MR. BROMWICH:
3 Q. So this is tab number two. This is a very
4 short string of e-mails.
5 The first one, the one on the bottom is from
6 you to Director Comey with copies to James Rybicki and
7 David Bowditch. The time is 9:59 p.m., again, on the
8 21st, which would have been before the first story.
9 And I want to direct your attention to the
10 second paragraph. And I'll just read it to you. "In
11 the more bad news category Mike K" -- is that a
12 reference to Mike Kortan?
13 A. It is.
14 Q. -- "informed me that (P) at the
15 Wall Street Journal is putting together an article
16 claiming that I had a conflict of interest on MIR" --
17 is that an abbreviation for mid-year?
18 A. Yes.
19 Q. -- "as a result of Jill's campaign
20 connections to Governor McAuliffe. I will work with
21 Mike to provide some basic facts to push back. And as

Page 78
1 always, will keep you advised."
2 And the response that you get within
3 15 minutes or so from the Director is "Outstanding.
4 Don't sweat it."
5 And then next one, at tab four, is an e-mail
6 from you to Director Comey on October 23rd,
7 9:00 o'clock in the evening. And it says "Not too
8 much in the update. The only additional notable news
9 is that Mike K and I spent a good part of the day
10 trying to shape the Wall Street Journal story on my
11 alleged conflict. Looks like they may try to release
12 it online tonight. The reporter also called Jill for
13 comments, so we're working that as well."
14 So this was -- tell me if I'm characterizing
15 this incorrectly -- an attempt by you to keep Director
16 Comey in the loop on the work that you were doing to
17 shape and correct the stories that (P) was
18 working on at the time?
19 A. That's right.
20 Q. And this is in advance of the first story?
21 A. That's correct.

Page 79
1 Q. So let's move to the 31st.
2 A. Um-um.
3 Q. And I'm going to first frame for you what
4 Director Comey has said about his interaction, his
5 statements and interactions, with you on the issue of
6 this second story.
7 He is cited at having said that what was in
8 the paper that day, including the account of the
9 discussion between you and Axelrod was going
10 to "poison our relationship with DOJ. That he said he
11 must have had some conversation with you about it,
12 that he likely told me the opposite of the fact that
13 you had authorized the sharing of information." He
14 said further that "he" -- you -- "gave me the
15 impression that he didn't know what was going on."
16 What's your recollection of what your
17 exchange was, your discussion was, with Director Comey
18 on October 31st either in a larger group or just the
19 two of you?
20 A. Yes.
21 Yes. It's not that. It is not -- I don't

Page 80
1 believe that accurately represents what or really
2 represents at all our exchange.
3 I completely understand why Director Comey
4 may not have a clear recollection, because I think it
5 was far from the most important thing on his mind on
6 that day.
7 My recollection is clearer than his. I
8 remember that we had the normal kind of -- I think it
9 was probably 7:45 deputy director briefing followed by
10 the 8:15 director's briefing. So that would be mine
11 at 7:45 with my kind of larger team, and then a
12 smaller bunch of us going and meeting with the
13 director. I think we did them at 8:15. We've changed
14 the times a bunch, so I might be off on the times.
15 And then we would meet until about 9:45. We
16 kind of go around the room. People would update what
17 they had. And then, typically, the group would leave
18 and then some collection of usually myself, the chief
19 of staff, who with is James Rybicki, R-Y-B-I-C-K-I,
20 and the ADD, who was David Bowditch would stick
21 around.



Page 81

1      I don't remember if the two of them were
2  present for this exchange, but I do remember that day
3  after the director's briefing the director and I
4  staying to talk before we went downstairs to meet with
5  DOJ. Because back in those days, the morning briefs
6  with DOJ were in our building in SIOC.
7      I remember us talking very briefly about the  ·
8  article, because it wasn't the main point of what I
9  had stayed to talk to him about.
10     And so over a minute or two we discussed the
11 article. I remember talking to him about the fact,
12 which he already knew, that I had had Mike and (P)
13 working with (P) on the article. And that would
14 have included discussing the fact that we had provided
15 information about the conversation with Axelrod.
16     I remember the director being still
17 frustrated by the article. But, you know, I think
18 somehow thinking that it was -- well, at least it
19 included information that, you know, tried to balance
20 it sort of. We didn't have a long conversation about
21 it.

Page 82

1      Like I said, I had really stuck around
2  because I wanted to talk to him about -- we were
3  having a bunch of side conversations about my recusal
4  from the mid year case and whether I would do that and
5  how that would affect the case.
6      So that was really what I wanted to talk to
7  him about.
8      We didn't end up having an in-depth
9  conversation about that then, but we did talk about it
10 somewhat.
11     So that was really the point of our
12 interaction.
13     But there was this brief comments by the
14 both of us on the article.
15  Q.  And what do you remember, as best you can
16 recall, what you said and what he said?
17  A.  I can't tell you exactly the words that I
18 used or his exact response, but I do remember talking
19 to him about the fact that, you know, essentially we
20 tried to improve the article as much as we could.  I
21 had Mike and (P) kind of interacting with (P) all

Page 83

1  weekend and we provided the information that we
2  provided, but it still included, you know, 25 other
3  facts that were leaked from who knows where. And over
4  all the article was damaging.  Had some balance that
5  it would not have had but for the fact that we tried
6  to shape it.  But overall it was just another article
7  that was causing us problems.
8      MR. SCHOOLS:  Can you -- Director Comey's
9  testimony is, I think, on its face sort of this is
10 what I think happened.
11     THE WITNESS:  Right.
12     MR. SCHOOLS:  Or kind of alters back and
13 forth between what did happen and what he thinks
14 happened, but he did give what he thought his reaction
15 would be.
16     MR. BROMWICH:  Would be.
17     MR. SCHOOLS:  To the article and what he
18 would have said or what he thought about the fact of
19 the disclosure about the Axelrod conversation.
20     THE WITNESS:  Right.
21     MR. SCHOOLS:  That's sort of on its face is

Page 84

1  what we might expect him to think, but I realize that
2  at it's at a time in the relationship between your FBI
3  and the department was perhaps suboptimal.
4      THE WITNESS:  Totally fair.
5      MR. SCHOOLS:  Can you help put that whole
6  time frame in context with respect to the relationship
7  between the Bureau and the DOJ that in a context it
8  might suggest that what Director Comey later said
9  about what he thought his reaction would be, was not
10 what his reaction actually was.  That's a very long
11 question.
12     MR. BROMWICH:  I think we understand your
13 point.
14     THE WITNESS:  So, just kind of off the top
15 and referring to the way he characterized what his
16 reaction would have been, that was not his reaction on
17 that morning.
18     So that's the first thing.
19     So to go a little bit broader to answer your
20 question, yes, the relationship between us was under
21 enormous stress for many reasons.



Page 85
1  Even prior to his announcement on July 5th
2  of the end of the Clinton case, things had gotten very
3  strained between us in terms of the DOJ's oversight,
4  but not really, of the Clinton investigation and how
5  that was handled, exacerbated more by, you know, the
6  infamous tarmac incident.
7      It was just -- yeah, those morning meetings
8  were rough. We would frequently talk about, like, how
9  awkward things were between us and even between others
10  on the same side of the table.
11      So there was a lot of tension in those rooms
12  at the time.
13      We would, you know, so it was -- things were
14  under great strain.
15      To be perfectly clear, though, this article
16  did not stand out in that crowd of issues that were
17  putting strain on our relationship.
18      As I've said, it was one of a number of
19  articles that even came out within that one-week
20  period.
21      So, like, the idea that, like, we would

Page 86
1  reconvene on that Monday morning and this would be the
2  biggest topic of concern was just not accurate.
3      I think he was very focused on -- I didn't
4  know the details of this then. I've now learned a
5  little bit of it from just kind of reporting stuff,
6  but I guess there were a lot of heated phone calls
7  between the DAG and the director and other folks here,
8  Axelrod included, and other people at FBI over the
9  course of that weekend regarding the notification to
10  Congress.
11      So things were -- you know, were really
12  inflamed as a result of the congressional notification
13  that had taken place.
14      So the idea that, like, this article was
15  going to poison the relationship would have been,
16  like, you know, poisoning the ocean. It was just a
17  much bigger, broader kind of, you know, bucket of
18  tension that we were dealing with.
19      MR. SCHOOLS: My understanding just from
20  having heard about it after the fact, because I wasn't
21  here yet, that Matt Axelrod was engaging with Jim

Page 87
1  Rybicki about the October 28th letter. And I assume
2  that ordinarily -- or I don't assume -- would
3  ordinarily those engagement have been with you, but
4  they were with Jim because you were out of town or
5  recused or whatever the status was at that time? Do
6  you know any of that?
7      A. I do know that Axelrod and Rybicki had a lot
8  of heated back and forth over that weekend. Why it
9  was the two of them and not me is an interesting
10  question.
11      Like, normally, Axelrod would have just
12  called me wherever I was. We had a lot of
13  conversations when I was on vacation or at home or
14  whatever. So I don't know the answer. I don't know
15  if, like, Rybicki or someone else had told the -- had
16  told DOJ that, okay, Andy is not part of this
17  conversation. Or Andy's recused or thinking of
18  recusing whatever. I don't know the answer to that.
19      In my mind, I was not recused yet. So I got
20  kind of unceremoniously dropped from that phone call.
21  And then after I had a conversation with the director,

Page 88
1  in which he said to me, "I don't need you for this
2  decision. I've already decided what I'm going to do,
3  and I don't need you to weigh into this. So it is
4  just easier to do it myself. So don't worry about it
5  and we'll talk about it when you get back" sort of
6  thing. And I had a couple back and forth during the
7  weekend with (P) and with Jim, and I made it clear to
8  them -- I knew that people were thinking that I might
9  should recuse and I made it clear to them that I
10  didn't want to make any decisions about that until I
11  got back and had an opportunity to sit and talk with
12  Jim and talk to Jim Baker.
13      So, in my mind, I hadn't recused yet. But,
14  of course, we had all those conversations on the 31st
15  and the 1st, and then I issued the recusal memo on the
16  2nd.
17      MR. SCHOOLS: Which does bring up a
18  question. I realize the recusal timeline is pretty
19  tricky, but there is that e-mail from Sweeney. I
20  think it's dated the 30th or 31st. It reflects a
21  conversation he had with you on October the 26th in



Page 89

1 which you told him you were going to recuse or going
2 to or had recused?
3      THE WITNESS: Yeah, I don't remember that
4 the same way as he does.
5      We had a conversation, and I think I said to
6 him I was thinking about it or we were talking about
7 it or something. It had come up in the wake of Wall
8 Street Journal 1.
9      But, in fact, he didn't really -- my
10 recollection we didn't have the kind of nuts and
11 bolts, should I or shouldn't I conversation until I
12 got back from that trip to Connecticut.
13      But I did not communicate that to anyone
14 else.
15      Bill and I were on this somewhat strange
16 call with the AG that week. I think it was that week.
17 Where she convened a bunch of us to basically express
18 her frustration with leaks. And it didn't have
19 anything to do with the Wall Street Journal articles.
20 It was, I think, really more of a reaction to the Eric
21 Garner article. That's the best of my recollection.

Page 90

1 And it may have been in the wake of that call that
2 Bill and I talked about it. But I don't -- I hadn't,
3 in my mind, made a decision about that until the
4 following week when Jim finally sat down with me --
5 Jim Comey -- and said, "I agree with your analysis.
6 There is no conflict here. But I think just because
7 as a result of the article, for appearance sake, you
8 should probably recuse."
9      I didn't agree with him then. I don't
10 really agree with him to this day, but he asked me to
11 do it, so I did it.
12      MR. SCHOOLS: What did you know about the
13 conversations that Axelrod was having with anybody at
14 the bureau in advance of the October 28th letter going
15 out?
16      THE WITNESS: Really nothing. I mean, I had
17 a couple of conversations that -- I had a few phone
18 calls with Jim Baker, but we did not discuss, like,
19 the substance of the meetings. And we certainly
20 didn't discuss, like, the substance of phone calls
21 with DOJ.

Page 91

1      Because Baker was the guy that actually kind
2 of pushed me off the phone call. So he was, like,
3 being very careful.
4      So, yeah, those are things that I only know,
5 like, kind can of learned later.
6 BY MR. BROMWICH:
7      Q. Just one other question focusing on the
8 October 31st meeting and Director Comey's memory of
9 it. He said at one point in his testimony that
10 "Significant disclosure would always go through me
11 because I'm responsible for how the FBI interacts with
12 the world."
13      What's your reaction to that?
14      A. I think that's an overstatement. I think I
15 know what he's referring to.
16      I think we had conversations -- well, I say
17 "we." I didn't, because I wasn't there then. But
18 they had these sorts of conversations, as I now know,
19 around the idea of do we disclose to the public the
20 existence of the mid year case.
21      We did have those same sorts of

Page 92

1 conversations in anticipation of his congressional
2 testimony about what he would say and what he would
3 acknowledge and what he wouldn't acknowledge about the
4 Russia investigation.
5      And I think that's probably what he -- my
6 guess. I can't read his mind, but that's probably
7 what he's thinking of with that response.
8      My experience was in matters like this where
9 we were sharing information, not necessarily the
10 existence of an investigation but information with the
11 media on this kind of day-to-day basis that I've
12 described, he was not involved in those decisions.
13      Those are things that Mike Kortan and I
14 would transact upon. We would -- Mike would
15 frequently report the results of those interactions
16 with Jim, but he didn't play an active role in, like,
17 determining what facts would be shared or anything
18 like that.
19      MR. BROMWICH: Scott, I'm going to move on
20 to something else unless you have any --
21      MR. SCHOOLS: All right.



Page 93
1  BY MR. BROMWICH:
2      Q.  So let's move several months forward in time
3  to April of 2017.
4      A.  Um-um.
5      Q.  And at some point you meet with
6  investigators from the inspections division?
7      A.  Yes.
8      Q.  And they focus with you on a leaks related
9  matter, which has been characterized as a leaks
10  investigation and focusing on an article that appeared
11  in Circa.
12      A.  Yes.
13      Q.  Do you recall that?
14      A.  Yes. It was actually based on questions
15  that we had gotten. Once again, the reporter called
16  with questions, because they were anticipating writing
17  a story. It was in this case  (P)      , who was
18  with Circa News. I had never even heard of it before
19  then, or her. And she asked Mike Kortan three or four
20  questions that she claimed to have from several
21  sources. And they referred to a meeting that I had

Page 94
1  had with my leadership team and she alleged or
2  somebody alleged that I had made, like, defamatory
3  statements about Mike Flynn.
4          The facts -- not the statements themselves,
5  but the facts around the allegations actually very
6  closely mirrored an actual conversation that we had
7  had in one of my meetings, and so that caused me great
8  concern.
9          And, so, based on that concern, I called the
10  inspection division and essentially referred the
11  matter for investigation because I thought some --
12  it's possible even, unlikely, but possible that
13  someone from one of my very small kind of leadership
14  meetings had shared information or maybe talked to
15  someone who had or what have you.
16          So that was how that started.
17      Q.  And the article focused on supposedly
18  defamatory statements you had made both about or
19  others in the meeting had made about Mike Flynn and
20  about the President; is that right?
21      A.  That's right.

Page 95
1          It started out -- it talked about we had
2  received a request from the White House to connect
3  with them with, I think, major city chiefs or the
4  major county sheriffs who were having some sort of a
5  meeting here in D.C., and they wanted the President to
6  appear at the meeting. Like, the White House wanted
7  the President to appear to give a speech there. So
8  they asked us to, like, negotiate that for them.
9          And that was an actual conversation that we
10  had. And in the real conversation, I had said, "Okay.
11  Go ahead and do that. Connect them, but then step out
12  of it." Like, we shouldn't be negotiating the terms
13  of the President's appearance somewhere. That's
14  something for the White House to do. But if they need
15  a point of contact with either of those associations,
16  certainly we could help them and connect them with the
17  right people.
18          That was a real conversation. In the
19  question she said that we were talking about this
20  White House request to connect them with the
21  associations. And I said, No, you know, and, like --

Page 96
1  you know, use profanity in describing both Mike Flynn
2  and the President and that, you know, we're out to get
3  them. And it said, like, we went around and
4  celebrated when Mike Flynn got fired and everybody was
5  slapping high fives at my meeting. Just ridiculous.
6  Nonsense, that obviously never happened. But it was
7  because it so closely mirrored an actual conversation
8  we had that caused me concern.
9      Q.  So you had the interview with them?
10      A.  Yes.
11      Q.  And then at some point you get a draft
12  signed sworn statement?
13      A.  Yes.
14      Q.  And this is focusing solely on the Circa
15  issue; is that right?
16      A.  Yes.
17      Q.  And then at some point they re-interview
18  you. And that's on May 9th.
19          Do you recall the events with respect to the
20  draft signed sworn statement or any contacts between
21  inspections investigators and your office and how that



Page 97

1  follow-up meeting comes to be?
2     A.  How the follow-up meeting comes to be?
3     Q.  The May 9th meeting, yeah.
4     A.  I think it was because I had looked at --
5  there may have actually been two meetings before
6  May 9th. I don't remember that very clearly. It was
7  definitely one where I laid out for them my basic
8  concerns.
9        Then they interviewed me and prepared the
10 draft signed sworn statement. And, again, I don't
11 know if that took place over the course of one or two
12 meetings.
13       Nevertheless, I get the draft. I take a
14 look at it. I think I made some corrections on it.
15 And it's to discuss those corrections that we meet on
16 May 9th.
17       And I can't remember whether I asked them to
18 come back and meet on May 9th or they called the
19 office and said, "Hey, does he want to meet?" I can't
20 remember. But it was, I think, essentially to discuss
21 this signed sworn statement.

Page 98

1     Q.  What is your recollection however the
2  meeting get set up, whether it was initiated by you or
3  initiated by them, what do you recall about the
4  meeting you had with them and the discussion you had
5  with the inspections investigators?
6     A.  I don't have a great recollection of the
7  meeting. It happened during a particularly busy time
8  on a day that then was, like, completely eclipsed by
9  the firing of Director Comey, which I learned about,
10 maybe, an hour or two after that. So I don't have a
11 clear recollection.
12       I know -- I think it was some combination of
13 the same people that I had met with before. Likely
14 all three. Voviette Morgan, V-O-V-I-E-T-T-E, and the
15 last name Morgan.    (P)    M-O-L-N-A-R. And
16          (P)          I think it was the three
17 of them.
18       We talked about the statement. We talked
19 about kind of -- you know, kind of a case update,
20 another investigative update. Not all the details of
21 what they were doing, but the basics of, like, what

Page 99

1  are you finding?
2     Q.  In that particular case in the Circa matter
3  or more broadly --
4     A.  This is all about the Circa matter.
5        And then, best of my recollection, it was
6  only at the end of the meeting where they brought up
7  the Wall Street Journal article.
8     Q.  What do you recall about that? Do you
9  remember -- what kind of details do you recall about
10 that discussion?
11    A.  I don't remember much about it.
12       I do remember at one point having a kind of
13 private pull-aside conversation with Voviette Morgan.
14 And I remember that because she kind of -- they were
15 leaving my office and the other two had kind of walked
16 out into the hallway and Voviette kind of pulled me
17 aside, put her hand on my arm and we had this very,
18 like, close conversation, which is a little bit
19 awkward. And so I remember that happened.
20       And, originally, I thought that that
21 happened in the May 9th meeting. In retrospect, I

Page 100

1  cannot be perfectly clear whether that was the May 9th
2  meeting or one of the prior meetings.
3        So I just don't know. But I do know that at
4  some point they kind of out of the blue brought the
5  Wall Street Journal article out, which I was surprised
6  to see. And they asked me, you know, a couple of
7  questions about it. I remember it.
8     Q.  What do you remember telling them about the
9  article?
10    A.  To the best of my recollection, is they
11 asked me if I knew, like, who was the source for the
12 article. And I guess I told them I don't know.
13    Q.  Why did you tell them you didn't know?
14    A.  You know, I don't -- I don't have -- I'm not
15 sure whether I was maybe -- I was thinking that I
16 were talking about the source for, like, all of the
17 information in the article, which I don't know.
18    Q.  Um-um.
19    A.  Whether they had actually kind of drawn a
20 bead upon the conversation with Axelrod. I just don't
21 remember.

Page 101

1 I mean, I now know that they walked away
2 from that exchange with a different understanding than
3 I had. I know that both because of the signed sworn
4 statement -- the edited signed sworn statement that I
5 got from them after that meeting. And of course from
6 what was included in the report.
7 I just can't sit here and explain to you
8 with perfect clarity exactly what we discussed and
9 what pieces of the article we focussed on. I just
10 don't remember. It's something that, you know, it
11 happened in the middle of the course of events that I
12 think really kind of occupied most of my thoughts and
13 my recollection from that time.
14 But in any case, I did get the signed sworn
15 statement sometime after. And when I read that, I
16 realized that they had the wrong impression about my
17 authorization to Korton and (P).
18 So that's why I didn't sign it. And,
19 ultimately, you know, several weeks later asked them
20 to come back to discuss it again because it was not
21 right.

Page 102

1 Q. Let me ask you a couple of direct questions
2 about that.
3 A. Yes.
4 Q. Did you at that time have a motive or a
5 reason for wanting to conceal the fact that you had
6 authorized Kortan and (P) to share the Axelrod
7 conversation with (P)
8 A. No. Absolutely not. Absolutely not.
9 In my mind, there wasn't and there still
10 isn't anything secret about my authorization to (P)
11 and Kortan.
12 Q. Did you ever tell (P) not to share the
13 fact that you had authorized her to share information
14 with (P)
15 A. No.
16 Q. Did you ever have any similar conversation
17 with Mike Kortan?
18 A. Absolutely not. Absolutely not.
19 And I don't know to this day who else they
20 might have shared the fact that they talked to (P)
21 with.

Page 103

1 You know, I don't know the mechanics of how
2 and where they talked to him or who set up that call.
3 I'm sure there are -- there may be people that they
4 talked to about it. I don't know. It would not have
5 concerned me. I did not see it as something that
6 needed to be hidden. And certainly not something to,
7 you know, conceal from the inspection division.
8 Although, to be quite honest, I don't -- I didn't
9 really understand their interest in it.
10 Q. Sort of off topic?
11 A. I remember thinking when they brought it
12 out, I was, like, what's this all about sort of thing.
13 It was off what I asked them to look at.
14 Q. Did -- at any time did either (P) or Kortan
15 initiate a conversation with you in which you got the
16 impression that they thought you wanted this
17 disclosure of the Axelrod conversation to be kept a
18 secret?
19 A. No. Absolutely not.
20 MR. BROMWICH: Scott, I don't know if you
21 have any questions on that. If not, I'll move on.

Page 104

1 MR. SCHOOLS: I don't think so. I may go
2 back to this. Not right now.
3 BY MR. BROMWICH:
4 Q. So you've averted to the fact that May 9th
5 was a pretty significant day, and I think you
6 mentioned that a couple of hours -- within a couple of
7 hours after you had this meeting with the inspections
8 investigators, your world kind of turned upside down.
9 Describe in -- try briefly how you learned
10 about Director Comey having been fired by the
11 President and events that immediately followed that.
12 A. Okay.
13 So, that day, I don't know what time I met
14 with the inspectors. It must have been maybe 2:00 or
15 3:00 or something like that. It was in the afternoon.
16 My closeout meeting was at 5:00. So it
17 would have been my EADs and a couple of ADs meet in my
18 conference room at 5:00.
19 We were just getting started and one of the
20 gals came in with -- the secretaries came in and said,
21 "The attorney general would like to speak to you."



Page 105

1    So I excused myself from the meeting,
2  immediately went out, and said, "What line is he on?"
3  And they said, "No. He wants to see you in person.
4  He's not on the phone."
5    Which I thought that can't be good.
6    So I grabbed my coat and told my security
7  person, and we walked over here.
8    Had to wait. He was busy. Had to wait
9  maybe 10, 15 minutes before I went into his office.
10 And it was myself and Attorney General Sessions and
11 the DAG Rod Rosenstein. So it was the DAG and the AG
12 and I think Jim Crowell was there as well.
13   Q.  Who is he?
14   A.  Was he the acting packing pay DAG at the
15 time?
16   MR. SCHOOLS: Um-um.  C-R-O-W-E-L-L.
17   THE WITNESS: That's right. And I walked in
18 and they said, "I don't know if you've heard, but we
19 had to fire the director." I said, "No, I had not
20 heard that."
21   I was surprised.

Page 106

1    And that's what kind of set in motion really
2  a very tough couple of weeks.
3  BY MR. BROMWICH:
4    Q.  How long did you meet with the attorney
5  general and the others?
6    A.  Not long. 10 minutes, something like that.
7  And he told me that he needed me to serve as acting
8  director, and that it might not be for long because
9  they were thinking about putting in an interim
10 director in between that day and whenever a permanent
11 director would be selected.
12   I think I asked him a question about sending
13 a message to my work force, and the DAG told me not to
14 do that. Not do anything until we heard -- until we
15 heard more.
16   And that was it. Pretty much. I left.
17 Went back across the street. In fact, the DAG told me
18 to don't say anything to anyone until you hear more
19 from us basically.
20   And I said okay. So we went back across the
21 street kind of, like, "Oh, my God, what do I do now?"

Page 107

1  But by the time I got there, it was on the news. So
2  it was widely known. That leadership team was still
3  there. We immediately jumped into trying to figure
4  out how to run the bureau without the director from
5  that point forward.
6    We pulled every SAC back into their field
7  office. We had visits with them that night. We step
8  up a communications plan. They needed very specific
9  guidance on how to handle their personnel, media
10 questions, and all kinds of stuff like that.
11   Yeah, it was just a crazy time.
12   I also got asked to go down to the White
13 House that night to talk to the President. I had
14 never met him before.
15   Q.  Is that after the meeting you just
16 described?
17   A.  Yes.
18   Q.  So about what time?
19   A.  I think I met with the President at 7:00.
20 And we actually had the SAC -- I met with my
21 leadership team, then met with the President, then

Page 108

1  came back for the teleconference with the SACs.
2    And it ended up leaving late that night with
3  the detail, first time with a 24-hour security detail.
4  I think there were television cameras in my front yard
5  when I got home.
6    Q.  How long was your meeting with the
7  President?
8    A.  It was probably a half hour.
9    Q.  In general terms, what did you talk about?
10   A.  It was a strange conversation. We talked
11 about all kinds of things.
12   He asked me if I was part of the resistance,
13 whether or not I supported the director. Is it true
14 that people didn't like the director and that people
15 were frustrated with him.
16   These are all questions that he asked me and
17 of course I answered him in different ways.
18   He talked to me about what he characterized
19 as that mistake that I had made, which I asked him to
20 clarify. And he made clear that he was talking about
21 my wife and her run for office.



Page 109

1    All kinds of things like that.

2    Q.   Was there an issue that arose about whether

3    Director Comey was going to be able to take a

4    government plane?

5    A.   That was the following morning.

6    Q.   All right.

7    A.   The President called me in my office, and he

8    was very frustrated about the fact that the director

9    had taken the FBI plane to return to Virginia. And I

10   explained to him that it was, you know, the

11   appropriate thing to do and that I fully approved it.

12   And he had -- although he was not the director, he

13   still had a security detail because the assessment was

14   there were threats to him, and we would reevaluate

15   that assessment. But for the time being, you know, he

16   needed transportation back to Virginia and that was

17   the right way to do it. And he disagreed with that.

18        Then he asked me to come back that afternoon

19   for a conversation about whether or not he should

20   appear at the Hoover Building that week, the President

21   should. Which I did. I went back that week and --

Page 110

1    Q.   That day you mean?

2    A.   That day. And I think that was the last

3    time I saw him that week.

4    Q.   He did not go the Hoover Building?

5    A.   He decided to do it on -- I think they were

6    going to do it on Thursday or Friday. I can't

7    remember which day, and then ultimately they canceled.

8    Q.   So you've described what happened on May 9th

9    after meeting with the inspections investigators?

10   A.   Yes.

11   Q.   And, again, your responsibilities had

12   changed and increased dramatically --

13   A.   Right.

14   Q.   -- that afternoon and early evening of the

15   9th.

16        Part of the narrative that's related to the

17   proposal is that a redrafted, signed sworn statement

18   gets sent to you on the 12th.

19   A.   Yes.

20   Q.   So three days later and two and a half to

21   three days after you becoming acting director. Do you

Page 111

1    remember receiving it?

2    A.   I remember getting it. I don't think --

3    when I initially got it, I'm not even sure I even

4    opened the attachment.

5        At some point weeks -- I think weeks later I

6    did look at the attachment, but I kind of pushed it

7    aside and said, "I don't need to worry with this right

8    now. I have so many other things to do."

9        I was very, very concerned about our Russia

10   investigation and what would happen to it.

11   Q.   What do you mean?

12   A.   Well, I was concerned about whether or not

13   our investigation was on a sound enough footing that

14   it would continue. Whether or not I was serving as

15   acting director. I didn't know if an interim director

16   would come in or what would happen to me if one did.

17   I expected that that might happen at any moment. I

18   didn't know the answer to that, and I wanted to make

19   sure that our case was on solid ground.

20        So I had a series of conversations with the

21   DAG over the course of several days in which I

Page 112

1    advocated strongly for the appointment of a special

2    counsel. So that was another thing. That was the

3    thing that was really taking up the most of my

4    attention at that time.

5        So, in that context, you know, reviewing for

6    the second time the inspection division's signed sworn

7    statement that the Mike Flynn leak was not -- was not

8    high on my list of priorities. So I kind of put it

9    aside until I had more bandwidth to focus on it.

10   Q.   Let's move forward to late July of 2017.

11        You're still the acting director. I believe

12   you remained the acting director until either

13   August 1st or August 2nd when Director Wray was

14   confirmed; is that right?

15   A.   That sounds about right.

16   Q.   So you were contacted by the inspector

17   general's office; is that right?

18   A.   That is correct.

19   Q.   Describe what you recall about the initial

20   contact and then the events that followed that.

21   A.   It was a Friday, and I received a phone call



Page 113

1 or a message from the IG's office from (P),
2 and I don't remember if I took the call directly from
3 him or if he had called and I had to call back. But
4 in any case, we get on the phone and he explained to
5 me that they needed me to come over and sit down and
6 talk to them that day.
7     And I asked him what it was about. He said
8 he couldn't tell me, but that it was very important
9 and that I absolutely had to do it that day. And it
10 was something of utmost importance that they had to
11 kind of share with me and talk about.
12     Q. Um-um.
13     A. And so, I said, Okay. I'm not sure I can do
14 that, and I wanted to contact my counsel, my attorney.
15     Q. You were represented by counsel at the time?
16     A. I had an attorney at that time, yeah.
17 Because I knew I was under investigation by the IG as
18 per their announcement in January of '17.
19     So I contacted my -- it took me some time to
20 get in touch with my lawyer because he was actually
21 out of the country at the time. And so, he was unable

Page 114

1 to appear with me. I had not been interviewed by the
2 IG about the investigation that I was a part of up
3 until that point, and I figured that I would have more
4 time to kind of prepare for that. You know, I would
5 get more notice of it.
6     I certainly didn't expect our initial
7 engagement to be, like, hey, you have got to get over
8 here immediately.
9     So, I called Dan back. That's my
10 recollection. I called him back and said that I would
11 come over, but I was concerned about doing so because
12 my attorney was not available.
13     He said that that was fine. I explained to
14 him I did not want to talk about anything that had to
15 do with matters, you know, connected to their
16 investigation of me. He said that was fine. Come
17 over. He had to talk to me about some other things.
18     So I did that.
19     Q. You went across the street. And what
20 happens there?
21     A. Come across the street, just me and my

Page 115

1 security guy. He waited outside. I came into a
2 conference room. It was not this one, but one like
3 it. And it was (P) and two other attorneys
4 from from the IG's office who I did not know. I don't
5 remember their names.
6     And I made it, you know -- they thanked me
7 for coming over, and I made it very clear, like, you
8 know, fine. You know, happy to oblige, but I am
9 concerned about being here because I know that you're
10 investigating me and I'm not prepared to be
11 interviewed, and I don't have my lawyer. He's not
12 available to be here and so I don't want to talk about
13 anything that is connected to, you know, matters
14 that's your investigating -- could be investigating me
15 about.
16     They said that's no problem, you know, it's
17 a voluntary interview and that they wouldn't ask me
18 those questions. That it was something else that they
19 wanted to talk to me about.
20     Q. So what happens next?
21     A. So I agreed to talk to them, and they put it

Page 116

1 on the record or they started recording. And they
2 proceeded to explain to me that they had a massive
3 quantity of text messages between (P) and (P)
4 (P) which they thought were very -- they thought they
5 were really concerned about these messages, and that
6 they might be, you know, indicative of some sort of
7 political bias. And so, anyway, we started talking
8 about the texts.
9     Q. Did they show you some of those texts that
10 (P) texts that had had caused them concern and
11 then started causing you concern?
12     A. They showed me a lot of them. I'm sure it
13 was a small percentage of the total, since the total
14 was in the tens of thousands.
15     Q. That's what they said, it was in the tens of
16 thousands?
17     A. I think the number they told me was 70,000
18 or more.
19     Q. Okay.
20     A. But they had pulled out a whole stack of
21 ones that they were particularly concerned about. So

Page 117
1 we started to go through those. And they were asking
2 me questions like -- like did we ever talk about
3 Watergate or something like that. Like, I guess
4 questions that were keying off of substance of
5 different texts. They would ask me a question like
6 that, and then they would show me a text in which --
7 and I'm just using this as an example -- in which
8 (P) made some Watergate reference. Like,
9 what did that mean?
10 Anyway, we went over a lot of those that way
11 for a while. They were very concerning to me.
12 They asked me how they felt -- not how they
13 felt. But they asked me what did I think of the
14 texts, how did I feel about them, and things like
15 that.
16 So I told them that they concerned me
17 greatly.
18 Q. Based on what they had just shown you?
19 A. Just upon what they said and what they ·
20 seemed to suggest. Like, but I also said, look, if
21 you're asking me am I concerned that (P)

Page 118
1 were their decision and their participation in the mid
2 year case influenced by their personal politics, my
3 answer was, no, I never saw that. I never saw any
4 language like they had used in the texts. I never at
5 no time in working very closely with them did I ever
6 develop the sense that they were, you know, steering
7 things based on their politics.
8 But nevertheless, the texts themselves are
9 really inflammatory and, you know, concerned me.
10 That's what I told them.
11 Q. Then at some point they show you the text
12 message that has language that's from (P) to
13 (P) that uses the phrase "throwing the PADAG under
14 the bus."
15 A. Yes.
16 Q. What do you recall about that?
17 A. I remember that they showed me a text. I
18 think there was one at the same time -- maybe it's
19 that's one or another one in that same time period in
20 which -- I thought there was a mention specifically of
21 (P) or WSJ.

Page 119
1 Q. I don't have it in front of me. Let me
2 just quote to you just so we're focused.
3 This is from FBI OPR's summary of what
4 happened during that interview.
5 A. Okay.
6 Q. "The OIG told you he believed special
7 counsel's October 30th text related to the Wall Street
8 Journal's article later that same day revealing
9 investigation number two," which is the Clinton
10 e-mail, the Clinton Foundation investigation. "And
11 the PADAG telephone conversation. You responded, 'I
12 don't know what she's referring to.' You then stated
13 the OIG's questions exceed the scope of the OIG's
14 current investigation for which it was questioning you
15 and that you did not want to 'get into discussing the
16 article with the OIG.' The OIG then asked, "Was she
17 ever authorized to speak to reporters in this time
18 period? Was she?" You responded, "Not that I'm aware
19 of." You went on to say, "I was not even in town
20 during those days, so I can't tell you where she was
21 or what she was doing."

Page 120
1 A. Yes.
2 Q. So walk us through what you were thinking --
3 A. Right.
4 Q. -- and why you said what you said.
5 A. So they had asked me a lot of questions
6 about -- almost every text ended with the question
7 "What are they talking about here? What did she mean
8 by this?" And I was being very careful to make it
9 clear that I didn't know. I was not a party to those
10 conversations. And I didn't feel comfortable going
11 back after the fact and saying what was in her head or
12 (P) head.
13 So when they brought up the throwing him
14 under the bus comment, like that was my initial
15 reaction was, like, I can't sit here today in July,
16 whatever it was, and tell you what these two people
17 meant when they had a private conversation back in
18 October.
19 Then I think that my recollection is that
20 (P) or someone -- I think it was (P) -- brought out
21 the actual Wall Street Journal article from the 30th



Page 121

1 and asked something to the effect of, "Is this what
2 they're talking about?" And he kind of, like, you
3 know, drew my attention to that article specifically.
4    And that's where I said, Hey, now we're kind
5 of getting -- you're asking me questions about, you
6 know, whatever I said about --
7    Q. Crossing the strings?
8    A. Yeah. I didn't think we were going into
9 that area. It started to feel like I was being
10 examined about, you know, something other than being
11 notified about their texts, if that make sense.
12    Q. Um-um.
13    A. And, yes. So I was really trying to just,
14 like, stop the questioning in the way that I had told
15 them I didn't want to be questioned.
16    So I tried to kind of parry the question off
17 in and awkward and ineffective way. I probably should
18 have just said, "Hey, I'm not going to answer that."
19    But that's what I was thinking. I was kind
20 of processing a million things at once, and that's the
21 answer I gave him.

Page 122

1    Q. So you complete that interview with the OIG
2 on July 28th?
3    A. Yes.
4    Q. And you go back across the street. And what
5 do you do?
6    A. Well, I mean, I was really not focused on
7 the Wall Street Journal article. Certainly not
8 initially. I was greatly concerned about what was I
9 going to do with    (P)    . I felt like at
10 least  (P)  continued involvement on the team -- he
11 was assigned as the kind of FBI lead on the special
12 counsel team, and I thought that the texts could, you
13 know, by shining a negative light on (P) could
14 undermine the work of the team, the special counsel
15 team essentially. And I felt like I could not take
16 the chance of negatively impacting what the special
17 counsel's team was trying to do.
18    So I convened my kind of group of leaders,
19 Dave Bowditch, who had also, I learned, had spoken to
20 the OIG earlier in the day. So he was aware of the
21 texts.

Page 123

1    Q. You didn't know that when you went over?
2    A. No, I don't think I did.
3    But, in any case, he was aware of it.
4    Also Carl Ghattas, G-H-A-T-T-A-S. I think
5 Bill Priestap, P-R-I-E-S-T-A-P.
6    Because the special counsel kind of
7 supervision of that team was being done by Ghattas and
8 Priestap.
9    And Jim Baker I talked to as well. I think
10 it was just the four of them and myself in the
11 director's office. And we kind of talked about, like,
12 what do we do? What's the right thing here? We
13 didn't want the, like, penalize (P) We didn't want
14 to rush to judgment. We didn't want to take, you
15 know, unfair kind of, you know, negative action
16 against (P) but at the same time we felt like he's
17 in a very sensitive spot.
18    So we figured out that we had an equivalent
19 position that we could put him in. He was a deputy
20 assistant director. There was an open deputy
21 assistant director position or there was one

Page 124

1 somewhere. It was not where we would want to put him.
2 He felt like it would be better to put him in a
3 nonoperational role at least until the investigation
4 of this was concluded.
5    So we made some other moves essentially and
6 we created and empty spot for him in the human
7 resources division.
8    Q. How about for    (P)
9    A.    (P)    had already left the special
10 counsel's team a couple of weeks earlier, and had
11 returned to the headquarters where she was still
12 assigned to the deputy director's office.
13    At that time I was not working with the
14 deputy director's office. I had moved into the
15 director's office and was working with the director's
16 office staff. I had handed over the deputy director's
17 role kind of to Dave Bowditch. And so (P) was back
18 at headquarters, but I was not interacting with her on
19 a regular basis.
20    Q. Did you talk to her at all in the immediate
21 aftermath of your July 28th OIG interview about what

Page 125
1  you had seen?
2      A.  I did.  I talked to her that night very
3  briefly, because we were going to reassign her as
4  well, essentially out of the deputy director's office
5  back to the general counsel's office.
6          And, so, I simply told her that I had had a
7  conversation with the IG, and they had shared with me
8  information that was very damaging, and that as a
9  result of that I had to -- I was moving her
10  essentially out of the deputy director's staff and
11  back to Office of General Counsel.
12     Q.  Did you specifically mention that they had
13  shown you text messages between her and  (P)
14     A.  I don't believe I talked to her about any of
15  the details of it.
16     Q.  Did you mention to her that they had shown
17  you this reference to PADAG and throwing PADAG under
18  the bus?
19     A.  No.  Absolutely not.  Absolutely not.
20     Q.  The record is that you contacted the OIG a
21  couple of business days later.

Page 126
1      A.  Yes.
2      Q.  On August 1st.
3          First, tell us what caused you to make that
4  recontact?
5      A.  I was a little bit unsettled by -- I was
6  thinking back about it, thinking about the whole
7  exchange and trying to process, you know, not only,
8  like, what's happening with the special counsel's
9  team, how do we make sure that's not undermined, but
10  these two people whose lives are really going to be --
11  two people who I know well and think highly of who
12  apparently had exercised incredibly poor judgement and
13  had, as a result really -- you know, trying to assess
14  the damage of what would come of this to the bureau,
15  to the investigation, but also to them on a personal
16  level.  I felt terrible about it.  You know, they were
17  both really shaken up by the text message, the
18  existence of the messages and everything that would
19  come of that.
20          And so just in rethinking about all the
21  stuff that night, maybe the next day, I felt like my

Page 127
1  exchange with (P) over the article -- I was concerned
2  that I had left him with the wrong impression.  And
3  specifically that, like, they would now think that
4  (P) had not been authorized and would, like, kind of
5  add that to their investigative focus on her.  And I
6  wanted to make perfectly clear with them, you know, my
7  recollection of how that had happened, the fact that
8  she and Mike had been authorized about that exchange.
9      Q.  Had you before they interviewed on the 28th
10  and then you went through this process of thinking
11  about it and you were in contact with them on the 1st,
12  had you had occasion to think much about the October
13  31st Wall Street Journal article and focus in
14  particular on the PADAG quote?  I mean, you were doing
15  a lot of other things.
16     A.  No.  No, it was not a matter that -- you
17  know, I was surprised when the inspection division
18  folks brought it up in May.  Hadn't thought about it
19  probably then since, like, the previous October.  Yes,
20  I was just not -- it wasn't really relevant to  ·
21  anything that I was doing at the time.

Page 128
1 ·    Q.  So what do you recall about the August 1st
2  call that you make to the IG's office?
3          MR. SCHOOLS:  Can I follow up on July before
4  we get to that?
5          MR. BROMWICH:  Yes.
6          MR. SCHOOLS:  I will have to grab the
7  transcript if we need to to be precise, but you
8  mentioned earlier that you understood you were under
9  investigation by the IG at that time?
10         THE WITNESS:  Yes.
11         MR. SCHOOLS:  What did you understand you
12  were under investigation for?
13         THE WITNESS:  I wasn't laser clear on that.
14  I knew that recusal was an issue.  I knew that
15  unauthorized -- well, I mean, my interaction with the
16  media.  I don't remember how that's phrased in the
17  January announcement was on that list of things.
18         And then, of course, the very general kind
19  of, you know, the catch-all category of, like, I think
20  it's FBI decisionmaking around the Hillary Clinton
21  investigation, which certainly could include me on a



Page 129

1 number of areas of investigation.

2 MR. SCHOOLS: I actually do want to go grab

3 that transcript so, I will be right back.

4 (Whereupon, a recess ensued.)

5 MR. SCHOOLS: Back on the record.

6 So, when your interview with them -- show

7 you the article from the Wall Street Journal dated

8 October 30th, ask you some questions about text

9 messages around that same time frame, their questions

10 start of concludes with a description of the text that

11 says, and (P) responds, "Yeah, I saw it. Make me

12 feel way less bad about throwing hill under the bus in

13 forth coming CF article." He says, "Which we're not

14 sure what that relates to. Perhaps Clinton

15 Foundation. Do you happen to know?" And you said, "I

16 don't know what she's referring to." And

17 says, "Or perhaps a code name." And you

18 said, "Not one that I recall. But this thing is like

19 right in the middle of the allegations about me, so I

20 don't really want to get into discussing this article

21 with you."

Page 130

1 And that's what I wanted to ask you about.

2 THE WITNESS: Okay.

3 MR. SCHOOLS: When you said, "this thing is,

4 like, right in the middle of the allegations about

5 me," what were you thinking at that point with respect

6 to the article and sort of where you were and what was

7 going on in that interview?

8 THE WITNESS: I think I was thinking a lot

9 of things, Scott. I think, like, I was trying to be

10 careful about not presuming what they were talking

11 about or what they weren't talking about. I never

12 heard "CF" used as a code name. It's not an official

13 code name that I'm familiar with.

14 Could it be Clinton Foundation? Sure. It

15 could.

16 And that, to me, puts me in that kind of

17 catch-all bucket of all things Clinton saying that I

18 know the IG is looking at.

19 And, so, that's part of it.

20 And that was my way of telling them, like,

21 hey, I'm not really comfortable kind of talking about

Page 131

1 this.

2 MR. SCHOOLS: Did it clue in to you at that

3 point that they were looking at this article as a

4 potential leak? You had mentioned earlier that one of

5 the things you understood was they were looking at was

6 leaks.

7 Did this start to feel like a leak

8 investigation in the middle of this kind of --

9 THE WITNESS: I didn't know.

10 MR. SCHOOLS: -- meeting?

11 THE WITNESS: I didn't know at that moment.

12 I think that's kind of how I started thinking about it

13 after the fact, which is why it was important to me

14 that they knew that that was not the case, at least

15 not with respect to (P)

16 Like, I think of that article as having a

17 ton of other leaks in it, but not any that I'm aware

18 that (P) was involved in.

19 MR. SCHOOLS: And then you've said this

20 already, but I want to just kind of run through it

21 again. You made the comment that you were out of town

Page 132

1 and you didn't know what (P) was up to during

2 that time.

3 THE WITNESS: Yes. I think if you read the

4 exchange leading up to that --

5 MR. SCHOOLS: So there is a question that

6 starts -- so, here, I mean, I can show you there is

7 not much content from what you already read. This is

8 October 27th "still on with (P) And this is

9 around the time of the, you know, the Comey, Comey

10 letter to Congress is the following day about the

11 Weiner matter. You say, "Yeah." says, "And

12 things like that." "So there is another one in the

13 same period, the next day, that you know is still on

14 with (P) , but not any other context with it just

15 those." You say, "I -- not that I'm aware of. Okay?"

16 And then you say, "And, again, I'm not even -- I don't

17 feel comfortable getting into this with you guys

18 but" -- says, "Um-hum." And you said, "I

19 was not even in town during those days, so I can't

20 tell you where she was or what she was doing."

21 THE WITNESS: Yeah, so in my mind, they're



Page 133

1  asking me, like, this day, what did she mean with this
2  text? What did the following day? There's all these
3  things going on in the background.
4        I was -- again, my focus is, like, I don't
5  want to -- I don't want to assume that I know what
6  she's taking about, what CF means. I'm not a party to
7  those conversations, so I don't -- that's not -- I
8  didn't think that was an appropriate thing for me to
9  do.
10       So that comment is, like, basically me
11  saying I'm not -- again, I'm not thinking about the
12  authorization. I'm saying, like,     (P)     are
13  texting during that time. I'm not there. I'm not in
14  those conversations. I can't sit here and tell you
15  where she was and what she was doing every minute of
16  the day.
17       That's how much I'm thinking about that. It
18  was, like, an offhand comment to explain to them,
19  like, you can't hold me responsible for the things
20  that's   (P)   and   (P)   are saying in text
21  messages. I can't be a -- I can't actually tell you

Page 134

1  what was in their minds.
2        MR. SCHOOLS: So it's based on fairly clear
3  recollection you have about the events of that
4  weekend, at least as it pertains to the Wall Street
5  Journal article --
6        THE WITNESS: Yes.
7        MR. SCHOOLS: -- that statement is sort of
8  demonstratively false.
9        THE WITNESS: I don't know where she was or
10  what she was doing.
11       MR. SCHOOLS: I mean, I appreciate the
12  context of it. I wanted to make sure that you have
13  had every opportunity to say, "Look, this is the
14  atmosphere. They were questioning me about things
15  that" --
16       THE WITNESS: Yes.
17       MR. SCHOOLS: -- "I wasn't anticipating they
18  were questioning me about."
19       THE WITNESS: That's basically, Scott, what
20  I told the IG in the interview. Clearly, I misspoke.
21  And I was confused, anxious about being there without

Page 135

1  an attorney. Questions are kind of going all over the
2  place. I felt like they were asking me to basically
3  explain what these other two people meant in their
4  texts, and I was trying to kind of, like, defend
5  against the questions. I wasn't at all, at all,
6  thinking about, like, oh, gosh, I shouldn't tell them
7  that I authorized this disclosure.
8        And, in fact, that's why I called them
9  Monday or Tuesday the next week and said, "Look, just
10  to be clear, I don't know" -- and this is my
11  recollection of that conversation. "I don't know,
12  And still cannot tell you what the two of them were
13  talking about. I can't be responsible for their
14  private conversations. But I can tell you that I did
15  authorize her and Mike Kortan to talk to the Wall
16  Street Journal about that article." And I think I
17  also clarified something else with him about -- I
18  think he had asked me something about had I seen her
19  socially or something like that. And I remembered
20  something else that another occasion or something that
21  I hadn't told him about in the prior interview, so I

Page 136

1  corrected that as well.
2        MR. SCHOOLS: So listen to this question.
3  You mentioned that your counsel was out of town. I
4  don't know if maybe that wasn't the time, but were you
5  able to talk with your lawyer? I don't want to know
6  what was said, but between the July 28th interview and
7  the August 1st call to OIG?
8        THE WITNESS: No, no.
9        MR. SCHOOLS: Okay.
10  BY MR. BROMWICH:
11       Q.  So moving then to the --
12       A.  I should have waited for you to object. It
13  wasn't planned.
14       Q.  All right.
15       So, again, going back to the August 1 call,
16  you thought about it?
17       A.  Yes.
18       Q.  It's sort of careening around in your head.
19  I think this is a paraphrase of you, but you want to
20  correct any misimpression.
21       A.  Correct. I think they told me to do that.



Page 137

1  Q.  Sorry?

2  A.  I think they told me to do that at the

3  interview.  Like, they normally do.  Like, if you

4  think of something differently after the fact, just

5  call us up and let us know.  That's how I thought

6  about it.

7  Q.  You called that part in.  What do you recall

8  saying?  He wrote a memo to the file, which you may

9  have seen by now, but what do you recall telling him?

10  A.  I recall telling him that there were two

11  things that I had realized after the fact that I

12  wanted to make sure that they had correct.  And I

13  think one of them was this -- had to do -- not

14  particularly relevant, but it had to do with some

15  other question that he had asked me about times I had

16  seen her or something like that.  And then I brought

17  up the article,and said, you know, "Just to be clear,

18  I don't want to have given you the wrong -- a

19  misimpression or the wrong impression."  An, again, I

20  tried to be very clear about, like, I'm not changing

21  my answer in terms of being able to shed light on what

Page 138

1  she and (P) were talking about.  I felt very strongly

2  that that's not my role to be, like, interpreting

3  their comments.

4       .      But, you know, in context, just so you know,

5  that I had authorized she and Mike Kortan to talk to

6  the Wall Street Journal.

7  Q.  Now, he -- there is a memo that he writes,

8  an e-mail that he writes summarizing the conversation.

9  And the language that he uses to describe what you

10  said is a little odd, at least that was my reaction.

11  He says you told him that (P) may have been

12  authorized by you to work with Kortan.  And the second

13  time that you may have authorized her to work with

14  Kortan and speak to the Wall Street Journal reporter,

15  because she previously worked with you on issues

16  raised by your wife's campaign.

17       Were you that equivocal about it, that you

18  may have authorized it?  Or do you recall it

19  differently?

20  A.  No, I recall it very differently.  I mean,

21  like, I would not have called him back to be equivocal

Page 139

1  about -- if I didn't want to clearly indicate to him

2  what my recollection was, i wouldn't have called him.

3       So I don't remember it that way at all.

4       MR. BROMWICH:  I'm going to move on to

5  something else unless you have any additional

6  questions about either the July 28th or the follow-up

7  call.

8       MR. SCHOOLS:  I don't.

9       MR. BROMWICH:  Okay.

10  BY MR. BROMWICH:

11  Q.  Let's move on to a couple of weeks after

12  that.  Just into the second half of August.

13       And I want to ask you about another meeting

14  you had with people from the inspections division.

15  A.  Okay.

16  Q.  How do you recall that that meeting came

17  about?

18  A.  That meeting came about because -- okay.  So

19  we had done this very outward and intentional kind of

20  shift of responsibilities, right, when the director

21  got fired.  So not in that very first week, but maybe

Page 140

1  in the second week.  I announced it to the field and

2  everything that I would be moving into his office,

3  taking on his role, you know, because it was important

4  to me that the bureau knew it had a director during

5  that time, or an acting director.

6       And, so, part of that was taking on his

7  calendar and his responsibilities and doing the

8  speeches he had committed to and all that stuff.

9       So, like, I had basically taken all my

10  deputy director stuff and put it aside for that

11  period, and that was my thinking around the signed

12  sworn statement.

13       So now it's August.  I'm back.  I had

14  physically moved back into my old office, and I sit

15  down and I going through those things that I've kind

16  of neglected over the last three months.  One of them

17  is the signed sworn statement.

18       I take a look at that.  I had already read

19  it.  At some point I had read the attachment and

20  realized it was inaccurate, but I knew that I needed

21  to reengage with the inspection team to get it

Page 141

1 corrected.

2 And so I told my secretary to reach out to

3 inspection and get them on the calendar to come in and

4 talk about the statement again.

5 Q. So what do you recall happening next?

6 A. I remember that we reconvened in my office.

7 I remember that (P) was there. I don't remember

8 whether Voviette and/or (P) were there. I just

9 don't have -- like I said, over the course of those

10 meetings I conflate them a bit in my mind.

11 We met, and I said, I need to talk to you

12 about the signed sworn statement and also some other

13 stuff. And we just immediately got into talking about

14 the statement. And I told them that the piece that --

15 it was essentially very similar to the first edition

16 of the signed sworn statement, except it included a

17 paragraph or two on the very end about the Wall Street

18 Journal article, which was inaccurate and I explained

19 that to them. Yeah.

20 Q. What do you recall about their reaction?

21 A. (P) was kind of surprised.

Page 142

1 Q. (P)

2 A. (P) yes. And he was, like, "Oh, well."

3 And he made a point of saying a couple of times,

4 "Well, like, you have the authority to do that, so

5 that's fine."

6 And I said, "Yeah, I know that." And he's

7 like that's perfectly -- you know, he said that a

8 couple of times, which I thought was odd.

9 And he might have said something else, like,

10 well, you know, kind of we wasted time on that. We

11 wasted some time on that. If we had known that, then

12 we wouldn't have. I was, like, Well, that's why when

13 I saw it, I told you that that's not accurate.

14 Q. Um-um. He even said something like you hung

15 your head and you said "I'm sorry."

16 Do you remember anything like that?

17 A. No, no. I remember sitting in my conference

18 table and (P) was sitting to my right. I can't

19 remember if both of the other -- of the two ladies

20 were sitting on me left or just one of them or

21 whatever. But, yeah. No, it was a very kind of -- it

Page 143

1 was, like, right off the top of the bat at the

2 meeting. And, like I said, (P) was surprised, but he

3 kind of went into this soliloquy about, like, what my

4 authority was to authorize disclosures to the media,

5 which I thought was strange. And that was it.

6 I certainly did not have any intention of

7 apologizing to them for anything. There was not -- no

8 need for that.

9 Like I said, I saw it as simply correcting a

10 misimpression that they had. Which, again, like,

11 that's their process. I'd been through this before

12 and done other signed sworn statements. They send you

13 a draft, you may changes, you get together and you

14 talk about it. They send you another one, you correct

15 it, you get together, and eventually you get to the

16 final product. And that's how I saw this signed sworn

17 statement as a part of that process. I was simply

18 correcting something they had put in there in error.

19 And it wasn't finalized yet. I had never signed it,

20 but it was -- you know, we were getting to that, I

21 guess.

Page 144

1 Q. You --

2 A. I also told them that they were -- that I

3 had learned that the IG was now investigating the

4 Flynn comment allegation, and that that was surprising

5 to me.

6 Q. This is the Circa thing we talked about

7 before?

8 A. Yes. And did they know that? And I said,

9 "Look, you guys should kind of, you know, get with the

10 IG and figure out, like, who's doing what. Because it

11 didn't make sense to continue doing it if the IG was

12 already going to do it."

13 And they were very incensed by that. They

14 were not aware of that. And they seemed to be, you

15 know, mad about the fact that there was kind of two

16 horses going down the same road.

17 Q. Now, at some point. I believe it was

18 October, you were given a notification by the IG's

19 office that you were the subject of an investigation

20 into areas --

21 A. Yes.

1  Q.  -- that you had not been a subject in
2  before.
3      What do you recall about that?
4  A.  Dave Bowditch gave that to me.  Sometime in
5  October.  And, honestly, like, my initial impression
6  was I didn't -- I wasn't sure that it was anything
7  different.  Like, I almost thought, like, Well, maybe
8  this is just them coming back and giving me, like, the
9  official notice after the fact of what had been
10 started in January or something.  I didn't really
11 understand, like, how this was different than what
12 they had said publicly in January.
13     And, again, I wasn't clear on exactly, like,
14 what I was the subject of at that point.
15     So then I e-mailed    (P)    and asked in
16 some form, like, is this, you know -- I can't remember
17 what I said in the e-mail.  I'm sure somebody has it.
18 But I asked for a clarification as to what I was the
19 subject of.
20     Q.  And did he clarify?  How did he respond to
21 your e-mail?

1  A.  He did.  He said that I was the subject of
2  everything that they had announced in January and also
3  this now.  And I remember thinking that was odd,
4  because there were all kinds of restrictions in the
5  FBI on the OPR side about how you have to notice
6  someone at the beginning of an investigation and all
7  that stuff.  And he was basically saying that the
8  public announcement in January was my official notice
9  of that stuff.  And I just thought that that was
10 strange that that could serve as a notice.
11     But in any case, he sent me an e-mail and he
12 tried to clarify that.
13     Q.  Am I right that you fully cooperated with
14 the IG's office in terms of making yourself available
15 for multiple interviews --
16     A.  Absolutely.
17     Q.  -- in November and early December?
18     A.  We did them over the course of, I think,
19 two days in November and then another day in December.
20 Probably for a total of, I don't know, 24, 25,
21 26 hours, something like that.

1  Q.  And did you tell them the truth to the best
2  of your ability and recollection throughout those
3  interviews?
4  A.  I did.  I did, yes.
5  Q:  So just a final couple of questions.
6      I've asked these before.
7      Did you have any motive to conceal the fact
8  that you had authorized sharing information with the
9  Wall Street Journal about your discussions with Matt
10 Axelrod?
11     A.  Absolutely not, no.  It is my understanding
12 that I had the authority to do that, and I was -- it
13 was not something that was secret or concealed.
14     Q.  Did you ever speak to   (P)   and
15 discourage her from disclosing the fact that she had
16 been authorized to speak with the Wall Street Journal?
17     A.  No.
18     Q.  Did you ever have any similar conversations
19 with Michael Kortan?
20     A.  I did not.
21         MR. BROMWICH:  I don't have anything else

1  here.
2      Do you have anything?
3      MR. BRUCE:  No.
4  BY MR. SCHOOLS:
5      Q.  I want to go back to the week of the 24th
6  and just talk a little bit about the recusal
7  timelines.
8      A.  Okay.
9      Q.  I'm trying to figure out what discussions
10 were happening and when.
11     So, the October 23rd article comes out, I
12 guess, Sunday afternoon?
13     A.  Yes.
14     Q.  It disclosed the McAuliffe contributions
15 about which you were aware -- only became aware just
16 prior to the publication of the article?
17     A.  That's right.
18     Q.  And then it's in the newspaper on the 24th.
19     Did that article prompt discussions about
20 recusal from Clinton e-mail or Clinton Foundation?
21 And if so, at what point did they start?



Page 149

1  A. I don't remember having any, like, really
2  serious conversations with the director or with Jim
3  Baker about recusal simply in the wake of that first
4  Wall Street Journal article.
5      I know Sweeney has this recollection of me
6  making that comment to him in a phone call. He's not
7  someone I would have, like, gone to for advice on that
8  or even included in the discussion.
9      Is it possible that (P) and I talked
10 about it after that? It's certainly possible. But my
11 recollection is (P) felt generally about the recusal
12 the same way that I did, which is that there really
13 was no conflict. There was nothing explicitly calling
14 for it. And that if I did recuse at that point, we
15 ran the risk of creating all kind of havoc and
16 criticism of our work on the case up until that point,
17 which of course we were getting criticized for for
18 many other reasons. But I felt like it would create
19 this misimpression that it would undermine, like, all
20 the decisions I had made leading up to that point.
21 Right?

Page 150

1      So if I should have recused then for
2  something that happened back in 2015, then I shouldn't
3  have been involved in -- it would kind of create this,
4  like, cloud hanging over my involvement in the case
5  which I didn't think was fair.
6      So in a normal situation where you might be
7  inclined to just err on the side of caution and say,
8  Well, the recusal is not really called for, but it is
9  possible that, for appearance sake, err on the side of
10 caution and recuse. I felt like if we did that here,
11 because of the unique circumstances of this case and
12 the timing of the recusal, that we would hurt the
13 public perception of our work more than we would help
14 it, if that makes sense.
15     And I know that (P) felt that way about it.
16 I don't know if she and I discussed it in that much
17 detail during that week, but we definitely did in the
18 wake of those -- of that weekend.
19     Q. In Director Comey's testimony, I think in
20 reference to that article, he makes a comment that
21 suggested to me when I read it, that he was unaware of

Page 151

1  all those facts. But he was aware of the campaign and
2  that Jill had run for office and lost. And McAuliffe
3  piece would have been new to everybody at that point.
4      A. Well, here's what I think he's referring --
5  again, I shouldn't be thinking what other people are
6  thinking.
7      He absolutely knew about about the campaign.
8      His recollection about that now, I don't
9  know. But he absolutely knew about it. I talked to
10 him about it. Well, through Chuck Rosenberg got his
11 approval before she ran. He and I would discuss it in
12 a kind of offhand way periodically.
13     But on another occasion, he and my wife
14 talked about it for an extended period of time, half
15 hour, maybe even an hour.
16     We were together on a trip in -- I think it
17 was either June or July of 2016. We went to the Five
18 Eyes Intel Conference, which that year was in Jackson
19 Hole. And I remember there was one event that I got
20 kind of pre-dinner kind of cocktail party where Jim
21 and Jill sat on a couch and he asked her, like, a ton

Page 152

1  of questions about it. Like, what was it like raising
2  money? What was it like asking -- having to call
3  people up? What was it like knocking on -- just the
4  whole kind of, like, really granular questions about
5  the campaign.
6      Did he know the exact amount that McAuliffe
7  had contributed to her campaign? I don't know. Maybe
8  that took him by surprise that week, as it did me.
9      But did he know that she ran? Absolutely.
10     Did he know that McAuliffe supported her?
11 It's unfathomable to me that she would not have
12 included that detail. That's why she ran. Right?
13 They recruited her to run. It was, like, part of the
14 story, and they spent a lot of time, at least on that
15 occasion, talking about that story.
16     Q. The conversation, the phone call on the
17 27th -- let me back up.
18     A. Um-um.
19     Q. So you had been made aware of the e-mails on
20 the Weiner laptop. I think you said earlier maybe
21 three weeks before --



Page 153

1    A. That's right.
2    Q. -- you had actually brought it to the
3    attention of the director?
4        A. Well, no. I mean, yes, I learned of it
5    maybe first week in October, in a phone call from Phil
6    Sweeney, who I think had just learned about it
7    himself. I think he was on his way to New York to
8    start as ADIC in New York. And he called me and told
9    me about this thing, the laptop. I had never heard of
10   it before.
11       As a result of that conversation, I, I think
12   immediately, called Bill Priestap, P-R-I-E-S-T-A-P,
13   and told him you need to get the midyear team or
14   somebody from it up to New York, have them sit with
15   the investigators and figure this thing out. I don't
16   know what they have, whether it's relevant to us.
17   Maybe it's materials we have already seen. We have no
18   idea, but you need to get somebody on this.
19       Then I didn't really hear anything else
20   about it for two weeks, three weeks, whatever that is.
21       During that time, I traveled to Hawaii for

Page 154

1    an Intel conference with Asian partners. We then went
2    to San Diego for the SAC conference. There was a lot
3    going on.
4        I come back. It's that first -- that last
5    week in October. So, like, what is that? The 24th?
6    Of that week.
7        And as near as I can recall -- okay, so
8    before I get to that, when the laptop thing initially
9    came up, I definitely mentioned it to Jim. It may not
10   have been in a e-mail. It may have been in a
11   face-to-face, like, close out type situation, but I
12   mentioned to Jim, like, Hey, this thing in New York
13   has come up. Anthony Weiner, it looks like, you know,
14   he has got e-mails on his laptop that might have been
15   midyear. We don't know what it is.
16       Not in an alarmist way at all. It's
17   basically like, "Hey, we have this thing. We're
18   looking into it. I'll get back to you."
19       So now fast forward. It's the last week in
20   October. I think it was the end of a -- I can't say
21   this for sure, but I'm pretty -- I don't know if it

Page 155

1    was the end of a morning meeting with DOJ or it was
2    just some other exchange I was having with, I think,
3    Toscos said to me, like, what's going on? Did you
4    hear about that Anthony Weiner laptop?
5        And when he first mentioned it to me, I
6    didn't even kind of remember. He said, "Yeah,
7    Weiner's got this laptop." So he jarred my memory and
8    I said, "Yeah, let me find out. I haven't heard about
9    that. Let me get back to you."
10       I then, you know, came back and talked to
11   Priestap or whoever it would have been and said, "Hey,
12   I need to know where we are with this thing? What's
13   going on? We're running out of time here," or
14   whatever.
15       I think I had a conversation with Mary
16   McCord about it as well, maybe a phone call.
17       Q. A phone call the week of the 24th?
18       A. That's all the week of the 24th. And it is
19   that afternoon, Wednesday, the 26th, I think when I
20   finally kind of get the information from the
21   counterintelligence division. And it is based on that

Page 156

1    that I say we need to get this in front of Comey,
2    like, tomorrow.
3        I knew that I wouldn't be here. I wanted to
4    be obviously in on the conversation, but I would have
5    to dial in from traveling.
6        So I thought that I talked to him again
7    about it that night, but I've recently seen an e-mail
8    that I sent to him, that looks like I actually sent
9    him an e-mail very early the next mourning and said,
10   basically, you have to get this on your calendar
11   today.
12       Q. Did he have any recollection, if you
13   remember, when you said you need to get this on your
14   calendar today, what it was about? You said you ahd
15   mentioned the e-mails on the Weiner laptop to him
16   maybe three weeks before?
17       A. Yes.
18       Q. What I'm trying to get at is in the first
19   three or four days of the week of the 24th, the
20   Clinton e-mail investigation, but for that, was
21   closed?

Page 157

1   A. That's right.

2   Q. So I was just trying to figure out would

3 there be any reason to have conversations about

4 recusal on Clinton's e-mails until this issue came up

5 on the morning of the 27th like you're saying?

6   A. Not really. What we were doing then was,

7 like, responding to FOIA requests.

8   Q. How about Clinton Foundation matters?

9   A. Not at all.

10   Q. Okay.

11   A. Not at all.

12   Q. Was there anything that was particularly --

13 there was leaks going on. I guess that article on the

14 24th would have generated discussions about the

15 Clinton Foundation case?

16   A. Yes.

17   Q. Did that start — did that article result in

18 conversations about recusal from that matter?

19   A. No. Not that I can recall.

20   Q. So then on the 27th, when that phone call

21 occurs, your recollection about why you got off the

Page 158

1 call and sort of everybody else's recollection was a

2 little different. You weren't in the room, and maybe

3 that's the reason for that. But they all recall it

4 was Andy might be recused, we need to get him off the

5 call.

6   Do you recall there being some

7 classification questions?

8   A. I don't remember Baker saying — I remember

9 Baker brought it up. Like, hold on, before we go any

10 further, should we really have Andy on this call? ·

11 Something like that. And my recollection is he said

12 it might include classified. I can't sit here and

13 tell you that he didn't say recusal. I don't remember

14 him saying recusal. He might have, but I don't have a

15 perfect recollection of everything he said.

16   I think it was likely. And from having read

17 some of these materials, it seems like there was

18 probably some conversation about it maybe after I got

19 off the call, but obviously I wasn't there for that.

20   Q. So the reason I'm asking is some people

21 might speculate that, look, you have these

Page 159

1 conversations on the 27th about the impact of the

2 article that came out on the 24th and the information

3 in it, and that it may be pragmatic at least for you

4 to recuse from Clinton e-mails and Clinton Foundation

5 and that, given those discussions, that you would have

6 had no business communicating or authorizing

7 communications with the Wall Street Journal about that

8 matter. `

9   A. I see.

10   Q. Because of the recusal type question. And

11 to think that because of that sequence of events, that

12 might provide a motive for you to not want to disclose

13 that you were involved in that, because the director

14 may have thought, hey, he was supposed to be recused

15 from that and we had the conversation. What is he

16 doing authorizing communication with the Wall Street

17 Journal about it.

18   So I've not heard anybody say that, those

19 kind of facts sort of are all in the mix together

20 there and I just wanted to give you a chance to talk

21 about it.

Page 160

1   A. Sure. Yeah, I mean, I never considered that

2 before. And I've been asked about it.

3   I guess the best thing I can tell you is I

4 did not -- I had not engaged in any, as I said,

5 serious conversations about recusal like leading up to

6 that. It was only really the issue came up that

7 weekend, I guess without me present. And then it

8 really hit the ground running when I got in on the

9 31st.

10   And pointedly, I would say, like, I did talk

11 to Jim Comey after their meeting. And I talked to jim

12 Comey several times that weekend.

13   We exchanged a couple of e-mails. We had at

14 least one phone call on Sunday night. And in none of

15 those calls did Jim Comey say anything to me, like,

16 you need to recuse.

17   Q. I think it's reported -- maybe even by you

18 -- that in the conversation you had on the 27th, he

19 made a comment, like, "I know what I'm going to do" or

20 "I don't need your input on this question."

21   A. That's exactly what he said. Like, he said,



Page 161

1 I've already decided what I'm going to do, so I don't
2 need you to -- I don't need you to weigh in on this
3 decision.
4        He did not say you can't or you shouldn't or
5 I'm considering you to be recused or anything like
6 that.
7        And even -- I'll be honest with you, it was
8 a little bit strange. I really wanted to talk to him
9 about recusal on Monday morning, and that's why I
10 stuck around for kind of the after with him, after the
11 morning meeting. And he really kind of dodged the
12 issue, to be perfectly honest.
13        And i brought it up and he was, like, "Well,
14 you guys should talk about that. Kind of talk to
15 Baker and see what you think." That's sort of thing.
16 It was very kind of, like, noncommittal and, like,
17 didn't want to -- you know, clearly didn't want to get
18 into a long conversation about it. And we didn't have
19 a lot of time, because we had to get downstairs to the
20 meeting, but I remember thinking that at the time.
21        And then I had this series of conversations

Page 162

1 with Jim Baker. And it was clear to me that, like,
2 Jim Baker and Jim Comey were talking about it, and
3 then, like, Jim Baker would come talk to me. And so
4 it was only over the course of those conversations
5 that I realized that, like, I don't know. Maybe I
6 started thinking maybe Jim Comey wasn't comfortable
7 talking to me about it or something.
8        And, in fact, even at one point Jim and I
9 were -- Jim Baker and I were arguing kind of the legal
10 question over the course of these conversations on
11 that Monday and early on Tuesday. I wanted to resolve
12 it with the director on Monday. I did not get a
13 chance to talk to him to resolve it that day, and so
14 it all rolls into Tuesday. And at some point Baker
15 said to me, like, kind of like, he wants you to
16 recuse. Like, he's not going to tell you that, but
17 that's what he wants.
18        And, so, then I said, "Well, I need to hear
19 it from him." And I got time on his calendar. He and
20 I had a one-on-one in his office. He was sitting on
21 the couch, I was sitting in the chair. And I laid out

Page 163

1 for him why I thought it was a bad idea. And he said
2 basically, you know, you make a good point, and you're
3 right. I think your legal analysis is right, but in
4 light of all the tension generated by these articles,
5 I think just in light of that it's better that, you
6 know, you recuse.
7        So it was -- I guess that's a really long
8 way of saying over the course of all those
9 interactions, it wasn't until he and I met, sat down
10 in his office on Tuesday, that he actually said to me
11 "you should be recused" or "you should recuse
12 yourself."
13        So, yeah, I was not -- I would never have
14 been up until that point concerned about, like, not
15 letting him know that I had authorized the disclosure
16 of the article, because, oh, I should have been
17 recused and that's not something I should have done.
18        Q.  I don't have a list of the witnesses with
19 me, but are there any witnesses who are -- that you
20 know of that have been interviewed in connection with
21 this matter that you have a poor relationship with

Page 164

1 that you think would have any reason to sort of
2 testify negatively against you?
3        A.  Well, no.
4        Q.  Okay.
5        A.  I mean, not that I can think of.
6        Q.  Okay.
7        A.  You never really know I guess.
8           MR. BROMWICH:  Until they testify against
9 you.
10          THE WITNESS:  I think other than Jim Comey,
11 all of them reported to me at some point. Maybe at
12 multiple points over the last 12 years. So, like,
13 could there be something there? I guess. But not
14 that I'm aware of.
15          MR. SCHOOLS:  That's all I have.
16          MR. BROMWICH:  Can he now go down to your
17 office and we'll continue and we'll come get you when
18 we're done.
19          (Witness excused from the room.)
20          MR. BROMWICH:  Okay. Do you want us to talk
21 about -- want to do that at the end or now?



Page 165

1    MR. SCHOOLS: About the process?

2    MR. BROMWICH: Yeah. Well, both. Why we

3 needed more time and about the process. Want to do

4 that now?

5    MR. SCHOOLS: Yes.

6    MR. BROMWICH: So just to give you the

7 entire chronology, on February 21st, the OIG's draft

8 report was made available for review.

9    On February 23rd, Eric and your colleague --

10    MR. BRUCE: No, just me.

11    MR. BROMWICH: -- made an oral presentation

12 to the OIG.

13    MR. BRUCE: Oh, I did have a colleague with

14 me on that day.

15    MR. BROMWICH: So we were given -- Eric was

16 given -- I wasn't even in the case until the 22nd.

17 But very harried time table to review the report,

18 respond to the report in person and provide a written

19 submission.

20    All together from the time that it was first

21 made available, February 21st, to the time the written

Page 166

1 submission was due was February 26th, I actually asked

2 for an extension of that, because I had just gotten

3 into the case.

4    Horowitz said he couldn't do that or he

5 wouldn't do that, they were on a very tight time

6 table.

7    Then we understand that the revised OIG

8 report -- and at that time we had no idea whether any

9 revisions had been made or what revisions had been

10 made -- were transmitted to FBI OPR on February 28th.

11    On March 6th, Candace Will transmitted

12 nondisclosure agreements to Eric and me and Andy. She

13 was actually going to have it hand delivered to Andy's

14 house. Andy was not here. And let me talk about that

15 briefly.

16    Andy had scheduled a year ago, rather had

17 planned a year ago, to take a family vacation around

18 now.

19    And in early January, they had actually

20 scheduled and ticketed it. So well before any of this

21 time table was known.

Page 167

1    And so, I think I've told you, Scott, that

2 he was away and had been away for a number of days

3 before we had knowledge of when the IG report was

4 going to be transmitted to OPR and what the subsequent

5 steps were going to be.

6    MR. SCHOOLS: When did he leave? Do you

7 know?

8    MR. BROMWICH: I don't recall. I think it

9 was -- I don't know. We should check with him.

10    MR. SCHOOLS: Okay.

11    MR. BROMWICH: But my recollection is it was

12 the weekend of the 27th or so. I'm not a hundred

13 percent sure about that.

14    Then the administrative file was made

15 available to Eric and me last Friday. As you know,

16 it's a large file. I don't know if that binder

17 contains the entire file. I don't think so. Because

18 there are four volumes.

19    MR. SCHOOLS: A fourth of it.

20    MR. BROMWICH: Yeah. Four volumes and

21 Candace, again, has been extremely cooperative and

Page 168

1 helpful through all this, made it available to us

2 starting last Friday.

3    So we spent some time Friday, Monday, and at

4 the end of the day I told Candace that I didn't see

5 how we were going to be able to get through all of

6 this stuff given the volume.

7    Then I think at that point she made some

8 contact with you. She made some contact with the IG's

9 office, and we were given the entire file on Monday

10 afternoon.

11    You know, in going through that file we had

12 to make a number of requests for additional

13 information. Some of which actually we found to be

14 quite relevant and helpful. Important stuff comes to

15 mind, somebody e-mails involving Kortan and Rybicki

16 have been quite helpful. And then, you know, really

17 this week we had to through a combination of trying to

18 complete our review of the administrative file,

19 working with Andy, who returned Tuesday night, and

20 getting ready for this session.

21    So I have never seen as quick a turnaround

ESQUIRE
DEPOSITION SOLUTIONS

Page 169

1 time as the IG had here. It's been 19 years since I
2 have been in that job, but I don't ever recall putting
3 that kind of pressure on anyone to respond to a very
4 significant report that could affect somebody's future
5 in that kind of a time frame. And similarly, I've had
6 many less experience with FBI OPRs process, so I don't
7 now that compares. But its been a very rushed process
8 from our point of view.
9       And so, it was not just for the sake of it
10 that we asked for additional time. I think we could
11 have made very good use of the additional time. And I
12 think it's really hampered our ability to do as good a
13 job as we would have liked to have done. And for him
14 to, frankly, have been prepared. Ideally, he would
15 have been able to review the entire file and spot
16 checked various factual matters that we could have
17 then gone back and tried to corroborate or whatever,
18 and he hasn't been able to do that.
19       MR. SCHOOLS: Are there any people that you
20 wanted to speak with or interview or contact that you
21 were unable to reach?

Page 170

1       MR. BROMWICH: To be honest with you, we
2 haven't had the time to do that. In other
3 circumstances we wanted to reach out to a whole list
4 of people, including virtually all of the witnesses
5 whose transcripts have been given to us. I mean,
6 that's just part of decent lawyering in representing
7 our client.
8       I don't know. There may well be people
9 beyond that list that we would have wanted to talk to.
10 Certainly, we would have wanted to talk to virtually
11 all of them.
12       Eric, I don't know if you have anything to
13 add?
14       MR. BRUCE: Well, I think that summarizes
15 it.
16       And we asked for information from OIG before
17 we had to give the oral presentation and the written
18 presentation, and the response was "We have our
19 process and you're not entitled to anything."
20       And if that's the process, that's the
21 process. But that, coupled with the timing, made it

Page 171

1 extremely difficult to respond in a meaningful way.
2       And it was essentially Michael, who I have
3 known and liked for 18 years, saying, you know, kind
4 of put in your response and then we'll address it.
5 You know, but without giving us a chance to really be
6 able to dig in and do it in a meaningful way.
7       MR. BROMWICH: So Eric is going to handle
8 his piece of it.
9       MR. SCHOOLS: All right.
10      MR. BRUCE: You know, I can sort of go
11 through it any way you want, Scott. There are
12 particular pieces that are more important to you than
13 others. We wanted to be helpful and field any
14 questions to the best of our ability, or I can just go
15 through it.
16      I mean, I think that the most important
17 charges are the under oath charges, obviously, so if
18 you don't have any preference, I'll probably start
19 with those.
20      MR. SCHOOLS: I agree with that as a
21 priority.

Page 172

1       MR. BRUCE: Yeah. Okay. So, look, part of
2 it is -- and, again, we thank you for your time. We
3 wanted you to hear it from Andy. We find him
4 incredibly credible, and we hope you will too.
5       He's been put in difficult situation after
6 difficult situation by anyone's standards. And as he
7 acknowledged, his memory is not perfect, but he's done
8 the best he can. And in our view, he's not a liar and
9 not a perjurer. And we think there's a lot of gaps
10 and inconsistencies in both the OIG conclusions and
11 the OPR conclusions.
12      The OPR conclusions, really, just being
13 paper conclusions. In other words, they didn't have a
14 chance to judge his credibility. But we think it's
15 important that both of you did.
16      So, going through the under oath
17 conclusions, the -- they relate to the November 29th
18 interview, obviously. And two aspects to it, which
19 are then sort of Incorporated into the not-under-oath
20 allegations.
21      So for the November 29th interview, OPR



Page 173
1  focuses on whether Andy told Jim Comey on or about
2  October 31st that he had authorized the disclosure of
3  the PADAG call.  And, secondly, whether he had denied
4  to the INST investigators on May 9th that he had
5  authorized that.
6       So with respect to the Comey issue first --
7  it sounds like you've gone through the transcript in
8  detail, which we think is -- again, we're grateful,
9  but we think it's helpful also.  And what we have done
10  in the binder I gave you, if you could turn to tab 1?
11       Because what we've done, Scott and Art, is
12  gone through it closely as well.  And we think the OIG
13  report is unfair in the sense that it concludes -- and
14  it reads like Jim has some specific recollection of
15  this conversation when his testimony is equivocal all
16  over the place with respect to whether he remembers
17  anything.
18       He definitely testifies about an impression
19  he's left with in his mind.  But if you look at the
20  actual testimony, just even like the first one is
21  maybe one of the best examples.  He's testifying about

Page 174
1  his recollection of conversations with Andy and he
2  says, "I'm really worried    (P)    went off the
3  reservation or something here.  I'm making this up
4  because I don't have a clear recollection, but I must
5  have had some conversation with Andy about it where I
6  took from him that he didn't do and -- he didn't do
7  and didn't authorize it."  And we have page numbers
8  and cites for you.
9       Then he goes on to say, "This is what I
10  think what happened, this is what I think it is.  I
11  think I asked if something could be done.  He likely
12  told me the opposite.  He definitely didn't tell me he
13  authorized, and I think gave me the impression he
14  didn't know what was going on."
15       So just a ton of equivocation from Jim in a
16  way that we submit to you in this kind of he said, he
17  said battle of credibility, the OIG and you should not
18  find that Andy's lying under oath about his
19  recollection.  It's just not strong enough.  I mean,
20  in this context.
21       And I think the OIG report, it's great that,

Page 175
1  as I said, you read the testimony.  The OIG report, I
2  think, cherry picks it in a way that makes it sound a
3  lot stronger than it is.
4       Look, as to Jim, I think it's understandable
5  that he may not have a great recollection of this,
6  given all of the events we have just talked about, his
7  decision to write the letter to Congress, the
8  expedited of the Weiner laptop, that -- as Andy just
9  testified, this is maybe a minute or two between the
10  two men as to Andy conveying to him what had happened
11  and Jim trying to process a million things at once.
12       As Michael just referenced and as we've
13  seen, we think even the limited amount of
14  investigation we have been able to do has helped
15  corroborate Andy's version.
16       So -- and I won't go through all of these,
17  but they are there for you to review.
18       But we looked at the second -- if you go to
19  tab 2, we looked at this e-mail with Andy.  Pretty
20  clear Andy's keeping the director updated on what he's
21  doing with    (P)    working on background.

Page 176
1  Says, "I will work with Mike to provide some basic
2  facts to push back.  As always keep you advised."
3       You know, recollections are a funny thing,
4  because if you go to tab 3 for a minute, in -- this is
5  Jim Comey's OIG interview.  Okay.  They showed him the
6  e-mail we just looked at.  And              says,
7  "Behind tab 25, there is an October 21st e-mail from
8  Andy McCabe to you, Jim Rybicki, Dave Bowditch that
9  says, "In the more bad new category, Mike K. informed
10  me that    (P)    of the Wall Street Journal is
11  putting together an articles claiming I had a conflict
12  of interest on midyear as a result of Jill's campaign.
13  Connections to Governor McAuliffe.  I'll work with
14  Mike to provide some basic facts to push back."
15       And then she asked, "And,        if you want
16  to jump in with any questions, please feel free."  And
17  then they ask him, "What was your reaction to this
18  e-mail?"  And Jim says, "What is this?'
19              Yeah."  And Jim, "Yeah, that was my
20  reaction.  It was -- I'm quite certain, one never
21  knows, but I think this was the first time I learned

Page 177

1 about any issue related to. And I had no idea that
2 Andy had gone to ethics counsel, Pat Kelly, and all
3 that had gone on before. I think this is -- first,
4 I'm highly confident this is the first time that I
5 learn about this." "Okay. And what is your
6 reaction?" I mean, I think you said earlier that you
7 were concerned. What's your reaction to this e-mail?"
8 Answer by Jim Comey. "What's going on?
9 What are they going to say?" Meaning to the Wall
10 Street Journal reporters. "What is this about?
11 What's the story with McAuliffe? I mean, I have a
12 million questions."
13 Okay? That's Jim's recollection of what he
14 thought at the time. But if you go back to the actual
15 e-mail, if you go back to tab 2, all he says to Andy
16 is "Outstanding. Don't sweat it."
17 So he may have a stronger recollection than
18 he had a reaction at the time. Again, putting in
19 context, this is an extremely difficult time for
20 everyone.
21 The other articles we think are helpful

Page 178

1 also. If you go to tab 4, we looked at that together.
2 Again, on the 23rd, Andy is again keeping
3 him updated. Rybicki, Bowditch, others. "The only
4 additional notable news is that Mike K. and I spent a
5 good part of the day trying to shape the Wall Street
6 Journal story on my alleged conflict. That can only
7 be background information. Looks like they may try to
8 release it online tonight. The reporter also called
9 Jill for a comment, so we're working on that as well."
10 No reaction that we know of from Jim Comey
11 saying, you know, you shouldn't be doing any of this.
12 We talked about -- if you go to tab 5, we
13 talked about the e-mail. Now moving to the second
14 Wall Street Journal article, we talked about the
15 e-mail that    (P)    sends to Mike Kortan with
16 the reference to the PADAG call. The story will go
17 into a long discussion of the internal conversations
18 that have been going on, around, have more color from
19 the August 12th McCabe-Axelrod call. "Though at
20 present I'm disinclined to name Axelrod." And that
21 gets forwarded to Rybicki obviously.

Page 179

1 We believe these e-mails are, you know, very
2 good corroboration that Jim is in the loop on these
3 things and that there is certainly no reason to hide
4 any of this from Jim Comey.
5 We're also putting together, what is being
6 worked on now, a timeline of some additional calls,
7 Scott, between Andy and Jim around this time period
8 that shows that they were in touch. Including about
9 an hour after the -- after the article posted to the
10 Internet.                                          
11 So, you know, we'll put that in a letter as
12 well.
13 But, again, you know, kind of shows, we
14 think, Andy keeping Jim updated all throughout. And,
15 again, no reason to hide anything.
16 OIG doesn't mention these e-mails or the
17 calls or anything. They just kind of gloss over it.
18 OPR mentions them in a footnote, but we
19 think they are important for your consideration,
20 because they do corroborate what Andy just testified
21 to and what he's been saying all along and what he

Page 180

1 testified to with OIG.
2 In addition,    (P)    we noted, testified
3 to OIG and also put in her signed sworn statement that
4 she had been asked by Mike Kortan, at the direction of
5 Jim Comey, to go on background on another occasion to
6 speak to a reporter at the New York Times. That's
7 pages 11 and 12 of her signed sworn statement.
8 And in her testimony as well.
9 So, not, you know, unusual or out of the
10 ordinary that Jim would think    (P)    might be on
11 background of something.
12 So one of the other key points -- and Andy
13 made this point himself, but I think it's really an
14 important one. Is this OIG and OPR theory doesn't
15 make any sense unless that Andy is going to lie to the
16 director, to INSD, and to OIG about who authorized
17    (P)    to go on the record, unless he's then going
18 to go on obstruct the investigation and somehow
19 conspire with (P) and Mike, who are plainly involved,
20 and say to them, you know, "Don't say anything if
21 anyone asks you about this." It just didn't happen.



Page 181

1  And it didn't happen because he wasn't worried about
2  this. He wasn't doing anything wrong.
3      I'll show you a minute some of the testimony
4  from    (P)    on that point.
5      So those are the pieces about the Jim Comey
6  aspect of his testimony.
7      With respect to the May 9th interview by
8  INSD that he later testified about, he gave you the
9  context today. I think the context is super important
10 here.
11     And probably critical to your decision.
12     He was in the interview with INSD thinking
13 it was about something completely different with
14 respect to the Circa News Investigation that he
15 actually requested. And even though there was a
16 debate within the investigators, it looked like to us,
17 about whether to even bring up the October 30th
18 article, the one agent did bring it up. There was a
19 discussion for about five minutes regarding the Wall
20 Street Journal article during that May 9th meeting.
21 And, to our knowledge, the only notes from that May

Page 182

1  9th meeting are tab 6. And the only reference is what
2  I've highlighted "next day briefing DAD NAG
3  uncomfortable. No idea where it came from."
4      MR. GARY: Whose notes are these?
5      MR. BRUCE: These are Voviette -- Molnar's,
6  right.
7      And in the course of this, you can kind of
8  see they're jumping around to different parts, at
9  times talking about parts of the article, at times
10 talking about the whole article, because towards the
11 top they do reference the last page of the article,
12 one to three paragraphs. And it says, "He read the
13 whole article. It seems like Andy's saying he read
14 it, the whole thing, when it came out." I can't read
15 some of these notes. But he read the whole article
16 when it came out.
17     MR. SCHOOLS: Don't those two words
18 say "during interview"? Read the article during
19 interview.
20     MR. BRUCE: Could be. That looks right.
21 "During interview."

Page 183

1      So there is a discussion of the whole
2  article, then there is discussion at times of the
3  PADAG call. This single note "no idea where it came
4  from" I think is what   (P)   and Morgan are relying on
5  in terms of saying that Andy told them he didn't
6  authorize the PADAG call to be included in the
7  article.
8      I think it's completely ambiguous. It
9  leaves a lot of room for miscommunication here as to
10 whether this was pinned down or not and that there was
11 really sort of a meeting of the minds.
12     Are you talking about the whole article or
13 are you talking about this specific piece? It's just
14 kind of jumping around. And in leak investigations,
15 it's important to be precise. And this just doesn't
16 seem precise to us.
17     There is a particular reason with this
18 article, if you go to tab 7. As Andy just explained,
19 it had a ton of information in it. And what we did in
20 this sort of dissection of the article is break out of
21 all of the sort of individual leaks, or disclosures

Page 184

1  that were in the article itself. And it ranges from
2  everything to how many e-mails were found, who was
3  doing what with respect to a search warrant and the
4  like.
5      And to be sure, there are pieces of it that
6  relate to the PADAG call, but the imprecision, I
7  think, in the questioning or at least Andy's
8  understanding of what they were getting at, we think
9  is what led to the miscommunication that happened at
10 the May 9th call.
11     Because Andy is not saying and has never
12 said, you know,   (P)   and Voviette are liars, you
13 know, and they're out to get me. You just gave him
14 the opportunity to do that. That was not his position
15 at the OIG interview when he was first presented with
16 a lot of this and it's not his position now.
17     Based on everything we've looked at, we
18 think it was just a simple miscommunication. They
19 came out of it with one understanding, Andy intended
20 to communicate another.
21     Another piece of why we think that this

Page 185

1 theory, this OIG and OPR theory that he was covering
2 this up doesn't make sense, is that if he intended to
3 cover it up and try to put them off on the wrong
4 track, he should have just signed the draft sworn
5 statement from May 12th. I mean, it says, you know,
6 "I don't know who the source is." If they are saying
7 that's what -- if the INSD agents came away with the
8 impression that that's what he said orally, and the
9 theory from OIG and OPR is he was intentionally
10 misleading them, then if you're willing to lie to
11 them, you know, orally, why wouldn't you lie in
12 writing also if you're engaged in this massive
13 coverup? But it doesn't happen. Because eventually,
14 when he gets back to his desk, you know, and
15 eventually reads the statement, he's like "This is not
16 right." So he doesn't sign it. And eventually he
17 calls them back in to correct it.
18          As I said, if he were engaged in the
19 coverup, I think he would have just signed it.
20          Also, for the same reason I mentioned
21 earlier, he doesn't collude -- if you go to tab 8, he

Page 186

1 doesn't collude with (P) or Mike Kortan. This is
2 (P) testimony. They asked her about eight
3 different ways whether Andy sort of colluded with her
4 or conspired with her to keep her quiet. They asked
5 her about, you know, after the event happened, did he
6 tell you not the say anything to anybody in the
7 office? Asked her about when they last had the
8 conversation about the Wall Street Journal article.
9          It says it was around the time of the actual
10 article.
11          "Did it come up in 2017?"
12          "No, not that I can recall."
13          On the next page they go at her again and
14 again and again asking "Do you know if he was
15 interviewed by INSD?"
16          "I don't know. Certainly with respect to
17 the first one, I presume, since he made the referral"
18 -- meaning Circa News to you -- "but we've not talked
19 about it. "No conversations about INSD interviews."
20          "Not to my recollection."
21          I mean, if Andy was worried about this being

Page 187

1 brought up by May 9th, after the INSD interview, he
2 would you have done -- if he really was of that
3 mindset, I need to hide that, the first person he
4 would you have gone to is    (P)
5          So they drill her over and over again. "Did
6 he ask you after the OIG interview?"
7          No. It's always the same. No.
8          So it just doesn't make sense. It doesn't
9 hold true that Andy was really trying to bury this and
10 he was willing to lie under oath about it, lie to the
11 director, lie to INSD, and lie to OIG.
12          So, we'd ask you to consider, you know, not
13 only the evidence and the story that OIG has laid out,
14 but also the lack of evidence here, what's lacking,
15 what makes sense that, you know, would be there if
16 someone were trying to bury this thing.
17          As to the July 28th interview, turn to that
18 for a minute, by OIG, because that's the other under
19 oath allegation.
20          Obviously, there are two pieces to that as
21 well. That Andy falsely stated that he was not aware

Page 188

1 that   (P)   was authorized to speak to reporters
2 and his comment that he was out of town, so he didn't
3 know what she was doing.
4          I think you have the context a little bit
5 more, which again I think is important.
6          He went into this thinking I don't want to
7 be interviewed about anything I'm involved in or I'm
8 under investigation for.
9          I think some of your questions, Scott, were
10 about why he thought he might be under investigation
11 for something regarding disclosures to the media. And
12 he made reference -- I don't know how clearly it came
13 out, but he made reference to the January 9th --
14 January 12th, rather, disclosure by OIG, which I guess
15 you have.
16          MR. SCHOOLS: Yes, I do.
17          MR. BRUCE: Which, you know, references
18 allegations that department and FBI employees
19 improperly disclosed public information.
20          So whether he was specifically told that he
21 was under investigation for that or not, obviously he

Page 189

1  knew about, you know, that statement by OIG and had
2  been questioned by INSD about it.
3       So he indicated, you know, he wanted counsel
4  present for that. When they started getting into that
5  -- and OIG may have not -- there may not have been a
6  meeting of the minds there either. He was saying "I
7  want counsel for things I'm involved in and that I'm
8  under investigation for."
9       And this was a frustration of mine with
10 Michael, to be honest. I asked before we responded to
11 the OIG draft report, can I see the full transcript
12 from July 28th and he wouldn't make it available.
13 Again his process.
14      But that, you know, when we've seen more
15 about it, that helps shed light that maybe they didn't
16 understand what had gone on previously, because what
17 they were hearing from INSD was, oh, he is not
18 involved in this. You know, this October 30th article
19 because they came away with that understanding.
20      So I guess they thought it was fair game to
21 talk about that whereas in Andy's mind it was all part

Page 190

1  and parcel of the same thing.
2       So, he -- as the transcript speaks for
3  itself at that point. He's trying to object,
4  basically, to that line of questioning because, as he
5  put it, it's crossing strings or right in the middle
6  of what he's involved in, or however he phrases it.
7  And, you know, in a sort of defensive and dismissive
8  attempt to get off the subject, he says, "Not that I'm
9  aware of."
10      And, you know, given the contention you
11 heard about what he's processing about these 70,000
12 text messages, you know, and all the implications for
13 all the major investigations he's responsible for at
14 the time, it was -- he misspoke. He said he misspoke.
15      And he did the right thing. He thought
16 about it and he clarified it. He has to take a lot of
17 actions in between those two things in terms of
18 speaking to (P) reassigning people, addressing all
19 the issues raised by the texts themselves. But,
20 again, it sort of doesn't make sense if he was really
21 trying to intentionally lie under oath to go back and

Page 191

1  clarify it two business days later.
2       In our written submission, we did pull a
3  couple cases that, hopefully, will be helpful to you
4  just from the perjury context. That says, you know,
5  when people come back and correct the record, it's
6  essentially, you know, can be evidence that they never
7  intended to make a misstatement in the first place.
8       Even after coming back with these explosive
9  text messages, he has to talk to (P) about what's
10 going on. But, again, no attempt to tell her, you
11 know, don't say anything about, you know, our
12 engagement with      (P)      if asked by the OIG.
13 Which, again, we think is sort of consciousness of
14 innocence in a lot of ways.
15      So we're asking you, obviously, to reject
16 the proposal by OPR that he intentionally lied under
17 oath and terminate him, I guess, tomorrow.
18      You know, we think that's inappropriate,
19 would not be consistent with the facts, and just not
20 the right thing to do under these circumstances.
21      I do want to talk briefly about some of the

Page 192

1  other sort of allegations.
2       The ones that are the not-under-oath
3  essentially are just recast from the under oath ones.
4  But I think it's worth talking about the offense code
5  4.10, which are the media guidelines.
6       I think, you know, Michael and I would both
7  say that's a closer call here. Andy fees like he made
8  the right judgment. You heard him say that.
9       You know, he was, again, under enormous
10 pressure. I think he was trying to do the right thing
11 for the bureau. You asked him some hard questions
12 about that, which in the light of day are fair
13 questions.
14      But overall, I think his motives were pure.
15 I think he thought he was doing the right thing.
16      And, you know, ultimately, with respect to
17 that allegation, I think we feel, you know -- again,
18 looking at it with the benefit of hindsight and
19 retrospect -- reasonable minds could differ about
20 whether he made the right judgment call there. It was
21 a judgment call. But even if you were to disagree



Page 193
1  that it was the right call, which he feels strongly
2  about, I think there are a lot of mitigating factors
3  there as well.
4        First, he was authorized to speak to the
5  media. There is no question about that.
6        You know, which it unlike the usual
7  unauthorized disclosure case where the person
8  shouldn't even be talking to the media in the first
9  place. He had that authority. There is no question.
10       The act of allowing (P) to talk about the
11 PADAG call, you know, what OIG and OPR say is it
12 implicitly confirms the existence of the Clinton
13 Foundation investigation.
14       In this situation, as he said -- and I think
15 as we all know -- that investigation was out there. I
16 mean, it had been written about extensively. It had
17 been the subject of books, articles, and the like. So
18 even if that were to be your conclusion, he implicitly
19 authorized it, again, I think a mitigating factor, at
20 the very least, is it was already well known that the
21 bureau was investigating that matter.

Page 194
1        And, again, third, I think, just to
2  reiterate, I think a mitigating factor is here.
3  Andy's motivation and what he was trying to do. Which
4  was to protect the bureau. It wasn't something for
5  some other, you know, sinister reason. He thought the
6  narrative that the bureau had been politicized and
7  were making decisions for political reasons rather
8  than law enforcement reasons was incredibly damaging,
9  and that's why he did what he did.
10       So even if you were to disagree with us on
11 that point, we think there is a lot of mitigating
12 factors that would, you know, need to be considered in
13 assessing any penalty.
14       MR. SCHOOLS: Okay.
15       MR. BROMWICH: I think you've really covered
16 the waterfront completely. And I guess the only thing
17 I would add on the last point is, again, as you said,
18 this is very different from the kind of leaks that are
19 out there. He is one of two or three -- as it turns
20 out it's really two -- people who are authorized to
21 speak with media. They are required under the media

Page 195
1  guidelines to take into account the public interest.
2  Andy thought he was doing that. I guess he thought
3  that the attacks on the bureau were acting with
4  political motives or political purposes was maligning
5  the bureau institutionally. And I think, looking at
6  it from his perspective, I think that's right.
7        I think your questions were fair about
8  matters that are handled jointly by justice department
9  and the FBI. I think it's fairly clear that he didn't
10 really sort of think of it in that kind of wholistic
11 way. He was saying, "My agency's being attacked, and
12 I need to respond."
13       And if he had to do it over again, you know,
14 would he do it the same way, probably not. What he's
15 been through. But I just don't think it's the sort of
16 thing that even the maximum punishment for an
17 unauthorized disclosure to the media warrants. I
18 would think that something more like censure or
19 reprimand or something like that.
20       The other thing that, you know, I think it
21 is appropriate to take into account -- I know that in

Page 196
1  Candace Wills' letter she says lying under oath is a
2  termination offense. No ifs, ands, or buts about it.
3        I think both the evidence that we've
4  presented and the arguments that Eric has just made
5  really demonstrate that there is insufficient evidence
6  to show that he lied under oath.
7        Even if you were to conclude differently --
8  and I don't think there is any basis for doing that --
9  there are a number of OPR cases over the years where a
10 proposal by OPR to dismiss for lying under oath were
11 mitigated, and our written submission will include a
12 couple of citations to that.
13       I think this is an extraordinary case,
14 obviously, for lots of reasons. But I think, you
15 know, whatever discipline, if any, you think is
16 appropriate, I think you have to take into account
17 just the context in which Andy and others in the
18 bureau were operating, the unbelievable pressure that
19 they were operating under with respect to the Clinton
20 e-mail investigation, Clinton Foundation
21 investigation, the heightened tensions throughout a



Page 197
1  lengthy period between the department and the FBI.
2  There is always some level of tension. But from his
3  description and others, this was sort of a at a whole
4  different level.
5      He did the best that he could to navigate
6  the shoals of an extraordinarily different
7  environment. A lot of sort of what's in here, then
8  comes up in a period in which he's in a position where
9  he never thought he would be the acting director of
10 FBI. He had a million things going on.
11     He's called over to meet with the President.
12 He says many things to him. So it's just a situation
13 like none other than I've ever seen. And I think he
14 deserves credit in terms of whatever discipline you
15 may think is appropriate for his 21 years of
16 extraordinary service to this country.
17     People at the bureau admire him and they
18 respect him. And I think it's important, again, if
19 you conclude contrary to the evidence we believe that
20 he is guilty of an offense that would under the
21 circumstances would warrant dismissal, that's just the

Page 198
1  wrong outcome. That's just not fair. It's not just
2  and it would -- it would crush personally and
3  professionally. But, more importantly, I think it
4  would send a terrible signal that even if, according
5  to your likes, he made a couple of mistakes, that that
6  drowns a distinguished career where the only matter on
7  his disciplinary record is he lost a building pass in
8  1998. It's a pretty clean record of 21 years.
9      So I don't know if, Scott, you have any
10 questions sort of in response to our presentation,
11 either the interview or the arguments that we've made.
12     MR. SCHOOLS: I don't think so. Appreciate
13 it.
14     MR. BROMWICH: So where do we go from here?
15 So we're going to send you a submission that will get
16 here no later than noon tomorrow. And obviously you
17 don't know where you'll come out. I hope you do know
18 and it's in our favor, but I would suspect you're
19 going to reserve on that. Where do we go?
20     MR. SCHOOLS: The process is that I do my
21 thing and make an little -- effectively be a

Page 199
1  recommendation to the attorney general. And he either
2  endorses or changes it. I don't -- I think when we
3  talked earlier and I talked about the process, I think
4  my understanding is because there is a proposal for
5  removal, what I recommend is just that. And is not
6  limited by my recommendation. My intention will be to
7  support my recommendations.
8      MR. BROMWICH: Right.
9      MR. SCHOOLS: We'll have more than just a
10 dotted line I used, but --
11     MR. BROMWICH: Right.
12     So but if it's not a termination, I think it
13 is -- if it's a suspension for more than 30 days or a
14 termination that goes to him. But if it's less, your
15 decision is final? Is that right? No.
16     MR. SCHOOLS: Not really. If you look
17 closely at the DOJ order, disciplining people in any
18 of these positions are reserved to the AG and the DAG.
19 So I think, technically, if it's under 30, the DAG has
20 the authority to approve it.
21     MR. BROMWICH: Oh, okay. So there is a

Page 200
1  review by someone.
2      MR. SCHOOLS: That's right.
3      MR. BROMWICH: And if it's a proposal for
4  30 days and above suspension or termination, it is the
5  AG. If it's less than 30 days, censure, reprimand,
6  whatever it is, including nothing? I mean, if you
7  recommended nothing, he's absolved of all this, that
8  would still have to be approved by the deputy?
9      MR. SCHOOLS: By somebody.
10     MR. GARY: It would be the DAG.
11     MR. SCHOOLS: Or if the AG has all of the
12 authority. They could say I just want to know what
13 you recommend and make a decision, and I don't know
14 the DAGs. I don't need the DAG to that, if that's
15 what happens.
16     MR. BROMWICH: Right.
17     MR. SCHOOLS: I don't know how all of that's
18 going to play. Obviously, I don't know what the
19 answer is yet.
20     MR. BROMWICH: Right.
21     MR. BRUCE: Will we be notified of your



Page 201

1   recommendation, Scott?

2         MR. SCHOOLS: No. I think not.

3         MR. BROMWICH: So, again, as careful

4   lawyers, we want to sort of prepare for the worst even

5   though we're hoping and think we've fully supported

6   that the best should result. If, in fact, you propose

7   termination, we want to meet with the attorney general

8   personally.

9         Again, I hope this is a completely moot

10  discussion, but we want to make that request.

11        MR. SCHOOLS: Okay.

12        All right. I'll make sure they are aware of

13  that.

14        MR. BRUCE: Want a copy.

15        MR. BROMWICH: Yes. 4:50 p.m.

16        (The Oral Statement concluded at 5:34 p.m.)

17

18

19

20

21

Page 202

1         REPORTER'S CERTIFICATE

2         District of Columbia

3         County of Washington, to wit:

4               I,   (P)      , a Notary Public of

5   the District of Columbia, County of Washington, do

6   hereby certify that the within named witness

7   personally appeared before me at the time and place

8   herein set out, and after having been duly sworn by

9   me, according to law, was examined.

10              I further certify that the examination

11  was recorded stenographically by me and this

12  transcript is a true record of the proceedings.

13              I further certify that I am not of

14  counsel to any of the parties, nor in any way

15  interested in the outcome of this action.

16              As witness my hand and notarial seal

17  this 15th day of March 2018.      (P)

18              _____

19                    (P)

20                    Notary Public

21

