# EXHIBIT 5

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 08-31-2018 BY [ ] NSICG

**ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**

1801 K STREET, N.W., SUITE 411 L
WASHINGTON, D.C. 20006
PHONE (202) 775-4500
FAX (202) 775-4510
www.robbinsrussell.com

b6 -1
b7C -1

Michael R. Bromwich

b6 -3
b7C -3

March 16, 2018

**CONFIDENTIAL FOIA TREATMENT REQUESTED**

**BY ELECTRONIC MAIL**

Scott N. Schools, Esq.
Associate Deputy Attorney General
U.S. Department of Justice
RFK Main Building, Room 4111
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

    Re:    **FBI Deputy Director Andrew G. McCabe**

Dear Mr. Schools:

    We respectfully submit this response to your letter, dated March 8, 2018, concerning the March 7, 2018 proposal (the "Proposal") by the Federal Bureau of Investigation's Office of Professional Responsibility ("OPR") to remove FBI Deputy Director Andrew G. McCabe.

    Mr. McCabe vigorously rejects the findings that form the basis for the Proposal. For the reasons set forth below, and in the oral presentation we provided to you on March 15, 2018, we respectfully submit that those findings are unsupported by the evidence and ask you to reject them in making your final determination in this matter.

    Further, based on the weakness of the evidence supporting the alleged violations of FBI Offense Codes 2.6 and 2.5, the substantial doubt surrounding the conclusions reached by the Office of the Inspector General ("OIG"), and the very real possibility that misunderstandings, miscommunication, and honest failures of recollection occurred during a period of time when Mr. McCabe was, by OPR's admission, "facing unprecedented and unimaginable pressure and challenges," we respectfully request that you find that termination is entirely inappropriate under the circumstances, especially given Mr. McCabe's long and distinguished career in the FBI.

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 2

### A. OPR's Finding of Lack of Candor – Under Oath

To establish a violation of FBI Offense Code 2.6, there must be sufficient evidence of an employee "*[k]nowingly* providing false information in a verbal or written statement made under oath" (emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 2.6 in his interviews with OIG on November 29, 2017 and July 28, 2017. Those findings are unwarranted for the reasons set forth below.

#### 1. Interview with OIG on November 29, 2017

With respect to the November 29, 2017 OIG interview, there is no basis for a finding of intentional misconduct regarding (a) Mr. McCabe's statements to OIG about his interaction with former Director Comey regarding the disclosure that Mr. McCabe authorized in connection with the article that was initially published online in the *Wall Street Journal ("WSJ")* on October 30, 2016 and in the print edition on October 31; or (b) Mr. McCabe's statements regarding his recollection of what he said in his May 9 INSD interview about authorizing the disclosures to the *WSJ*.

##### i. Mr. McCabe's Statements Regarding the October 31, 2016 Conversation with Director Comey

A lack of candor finding based on Mr. McCabe's recollection of the conversation with Director Comey is unwarranted for a number of reasons.

First, as a threshold matter, a lack of candor finding is inappropriate where, as here, there was an informal conversation between only two parties and the other party repeatedly admits that he does not recall the conversation. *See Weiler v. United States*, 323 U.S. 606, 607 (1945) ("'The general rule in prosecutions for perjury is that the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused . . .'" (quoting *Hammer v. United States*, 271 U.S. 620, 626[118])).

[redacted — b7A Per DOJ/OIG]

a. [redacted — b6 -1, Per DOJ/OIG; b7A Per DOJ/OIG; b7C -1, Per DOJ/OIG]

FBI 18-cv-01766-2499

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 3

b7A Per DOJ/OIG

[redacted]

- "No, no. Nope. In fact, *likely told me* the opposite. Definitely didn't tell me he authorized it and *I think gave me the impression* he didn't know what was going on."
  (Comey Tr. 305:4-6, [redacted]

b7A Per DOJ/OIG

[redacted]

b6 Per DOJ/OIG
b7A Per DOJ/OIG
b7C Per DOJ/OIG

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 4

b7A Per DOJ/OIG

[redacted] For this reason alone, the lack of candor finding is unwarranted.

Second, the evidence (and particularly the evidence that we received within the last two days), strongly corroborates Mr. McCabe's testimony that he made Director Comey aware of the disclosure. The evidence demonstrates the following:

- On October 21, 2016, Mr. McCabe informed Director Comey, as well as Director Comey's Chief of Staff, James Rybicki, and David Bowdich, that an article by Devlin Barrett about Mr. McCabe's involvement in "Midyear" (the Clinton email investigation) and Dr. McCabe's campaign was forthcoming in the *WSJ*. He further stated, "I will work with [FBI Assistant Director for Public Affairs Michael Kortan] to *provide some basic facts to push back*. And, as always, will keep you advised" (emphasis added). Director Comey responded, "Outstanding."

- On October 23, 2016, Mr. McCabe updated Director Comey, Mr. Rybicki and Mr. Bowdich on the status of his interactions with Barrett, stating "Mike K and I spent a good part of the day *trying to shape the WSJ story* on my alleged conflict. . . . The reporter also called Jill for a comment, so we are working that as well" (emphasis added).

- On October 30, 2016, Mr. Kortan emailed Mr. Rybicki, forwarding a detailed summary by Barrett of the contents of the forthcoming article. The summary included all of the main points that would appear in the final article, including the McCabe/Matthew Axelrod interaction. The underlying email from Devlin Barrett reflects that he had previously discussed the McCabe/Axelrod call with Mr. Kortan. The subject line of the email is "story is filed to my NY editors," reflecting that they had previously discussed at least some part of the story. Further, in notable contrast to the rest of the email in which Mr. Barrett appears to provide new information about the story to Mr. Kortan, he does not provide any background about the McCabe/Axelrod call, and instead provides a brief update that the story will "have more color from the Aug 12 McCabe-Axelrod call," and notes that "at present I'm disinclined to name Axelrod." Mr. Kortan made no attempt to hide from Rybicki the fact that he had discussed the McCabe-Axelrod call with the media. To the contrary, he promptly provided this information to the Director's Chief of Staff before the article was posted.

[redacted]

b6 -2, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -2, Per DOJ/OIG

FBI 18-cv-01766-2501

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.  
March 16, 2018  
Page 5

b6 -1,2, Per DOJ/OIG  
b7A Per DOJ/OIG  
b7C -1,2, Per DOJ/OIG

[redacted]

Taken together, this evidence corroborates Mr. McCabe's account that he kept Director Comey updated regarding his communications with the *WSJ*, that the Director knew that he and Mr. Kortan were providing information to the *WSJ* in order to shape those stories, and that Mr. McCabe had no reason to hide this fact from Director Comey based on their prior interactions.

Finally, Director Comey's inability to recall a very brief conversation with Mr. McCabe, possibly lasting no more than a minute or two, is understandable given the context and time period in which it occurred. This conversation took place in the chaotic period immediately following Director Comey's October 28, 2016 letter to Congress and the expedited investigation of the Weiner laptop, so it is likely that Director Comey simply did not recall Mr. McCabe's comments to him because he was focused on other pressing, and far more important, matters. As Mr. McCabe made clear during yesterday's presentation, there were many more pressing issues on Director Comey's mind that day. In short, Mr. Comey's testimony, contradicted by Mr. McCabe's, cannot be relied on to support a finding of lack of candor.

### ii. Mr. McCabe's Statements Regarding the May 9, 2017 INSD Interview

A lack of candor finding based on Mr. McCabe's recollection in his OIG interview of the INSD interview is also unwarranted.

First, OPR overlooked substantial evidence that Mr. McCabe's statements reflected an understandably imprecise, but genuinely held, recollection by Mr. McCabe of the underlying events. As OPR acknowledged, Mr. McCabe was questioned about a time period when he was "facing unprecedented and unimaginable pressure and challenges." Proposal at 15. Just hours after what the INSD investigators testified was a brief discussion with Mr. McCabe regarding the *WSJ* article, Mr. McCabe was informed that Director Comey had been fired and that he was the new Acting Director the FBI. In the days and weeks that followed, he had to abruptly assume responsibility for leadership of the entire Bureau in a tumultuous period of uncertainty and political turmoil.

Notably, OIG described the statements that Mr. McCabe made in the November 29, 2017 interview describing the INSD interaction as a brief discussion that took place at the end of a meeting on a different topic, made findings that the description was inaccurate, and concluded

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 6

that Mr. McCabe was intentionally deceitful about the meeting. In fact, the evidence

[redacted] b6 -3
b7A Per DOJ/OIG
b7C -3

Second, OPR overlooked substantial evidence that Mr. McCabe's statements reflected a simple misunderstanding and/or miscommunication with the INSD agents.

[redacted] b6 -1,2,3, Per DOJ/OIG
b7A Per DOJ/OIG
b7C -1,2,3, Per DOJ/OIG

Additionally, the *WSJ* article that INSD asked Mr. McCabe to review contained not one but 24 separate facts and quotes from anonymous FBI sources, including references to sources who incorrectly stated that Mr. McCabe gave a "stand down" instruction on the Clinton Foundation investigation. Even if the INSD agents walked away from that discussion with an understanding that Mr. McCabe was specifically and exclusively referring to the Axelrod call while they were discussing the source of the "leaks" in the article, there is no evidence that Mr. McCabe had the same understanding. The most reasonable inference is that, in a short conversation at the end of a meeting set to discuss a different topic, where Mr. McCabe was nevertheless asked to review an article with 24 leaks, there was a simple miscommunication.

The fact that there was a miscommunication is further supported by the fact that Mr. McCabe later told the INSD agents that the summary they prepared of the conversation was inaccurate. The draft SSS did not implicate him in the disclosure, so if he had wanted to

disclaim responsibility, he could have simply signed the SSS. The fact that he refused to sign an inaccurate summary of his May 9 INSD interview belies OPR's finding that he was engaged in a cover up.

Finally, there is absolutely no evidence of any collusion or a conspiracy to hide the fact that Mr. McCabe authorized the disclosure of the Axelrod call. The purpose of the disclosure was to correct the reporter's misimpression that McCabe had directed that the FBI stand down from the Clinton Foundation investigation. Mr. McCabe had the authority to direct that the disclosure be made, he directed [____] and [____] to make it, and he never sought to keep secret the fact that he had done so. Indeed, if Mr. McCabe had any intention of covering up the disclosure or obstructing the investigation, he would have needed to communicate with the people whom he had authorized to make the disclosure [____] and [____] to tell them not to say anything about it. [____] and indeed you have advised us that this is uncontested. Put simply, it would have made no sense for Mr. McCabe to knowingly lie to the INSD agents without also asking [____] and [____] to lie about these events—which he did not do. And in the absence of any evidence that he discouraged others from sharing information about the disclosure, Mr. McCabe had absolutely no motive to lie to the INSD about his authorization of the disclosure, and no motive to lie to OIG about it. He did not do so.

Accordingly, there is no basis for a finding of intentional misconduct based on the November 29, 2017 OIG interview.

### 2. Interview with OIG on July 28, 2017

The finding that Mr. McCabe deliberately tried to mislead OIG investigators in his July 28, 2017 interview is similarly unsupported by the facts.

First, the highly unusual circumstances surrounding the July 28 interview (which are not recounted anywhere in the OPR Proposal) undermine the conclusion that Mr. McCabe engaged in any type of intentional misconduct. Even though Mr. McCabe was the Acting Director of the FBI at the time, [____] Mr. McCabe expressed to OIG that he wanted to be represented by counsel when questioned about matters in which he was involved [____]

[____] the OIG investigators shared with Mr. McCabe information that he found truly startling about the existence of a large volume of highly inflammatory and sensitive text messages between two of his colleagues, [____] and [____] He immediately began to process this information and start to think about what steps he needed to take immediately as Acting Director to protect ongoing, highly-sensitive FBI investigations. As the interview progressed, the OIG attorneys began to question Mr. McCabe regarding matters involving his

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 8

own conduct, which was contrary to his understanding of what would occur during the interview. Mr. McCabe was confused as to why the OIG attorneys were asking him about matters involving his own conduct, contrary to his understanding of his prior agreement with them, and while trying to object to the line of questioning, made statements regarding [        ] authorization to speak to the *WSJ* reporter. Under these highly unusual circumstances, an inference that Mr. McCabe was attempting to be intentionally deceptive is unwarranted. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (holding that a perjury prosecution requires proof of specific intent, that is, that the defendant made the false statement with knowledge of its falsity, rather than as a result of confusion, mistake or faulty memory). <span>b6 -1<br>b7C -1</span>

As Mr. McCabe explained during his testimony yesterday, the OIG attorneys repeatedly showed him text messages, which he had not sent or received, and asked him to explain what the participants intended or were referring to in those texts. As countless lawyers have counseled countless witnesses in these types of situations, Mr. McCabe (without his own counsel present to advise him) was trying not to speculate about what others intended or were doing. [        ] <span>b7A Per DOJ/OIG</span>
[                                                                ] stating that he was not in town during those days, and therefore couldn't say where [        ] was or what she was doing. Although Mr. McCabe was out of town during this time period and could not possibly have known everything that [        ] was doing during this weekend, Mr. McCabe became concerned he had left the misimpression with the OIG attorneys and promptly acted to clarify any misimpression. <span>b6 -1<br>b7C -1</span>

Second, to the extent that he had misspoken during the July 28 interview, Mr. McCabe affirmatively took steps to clarify his responses promptly after the interview, which is completely inconsistent with any deliberate effort to mislead. As OIG correspondence confirms, as soon as Mr. McCabe had a chance to reflect on the interview, [                                              ]
[                        ] he voluntarily contacted OIG to clarify any potential miscommunication or misunderstanding about the *WSJ* article, confirmed that he was traveling at the time of the *WSJ* article, and informed OIG that they could speak to [        ] if they needed additional information. *See* August 1, 2017 Email from [                                              ]

<span>b6 -1,2, Per DOJ/OIG<br>b7A Per DOJ/OIG<br>b7C -1,2, Per DOJ/OIG</span>

As courts have stated in the context of perjury cases, evidence of voluntary steps to clarify the record negates an inference of intentional deceit. *See United States v. Norris*, 300 U.S. 564, 576 (1937) ("the correction of an innocent mistake, or the elaboration of an incomplete answer," may "demonstrate that there was no willful intent to swear falsely"); *Beckanstin v. United States*, 232 F.2d 1, 4 (5th Cir. 1956) (reversing perjury conviction and holding that "[w]illingness to correct the misstatement ... is potent to negative [sic] a willful intent to swear

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 9

falsely"); *United States v. Lococo*, 450 F.2d 1196, 1198 n.2 (9th Cir. 1971) ("willingness to correct a misstatement is relevant to the issue of intent").

Third, as noted above, there is no other evidence of any collusion or conspiracy to hide the fact that Mr. McCabe authorized the disclosure. If Mr. McCabe truly had intended to deceive the OIG investigators, not only would he not have clarified his testimony a few days later, he would have needed to ask [   ] and [   ] not to be truthful with the OIG investigators when they later testified. The evidence is clear that he did not do so because he had no intent whatsoever to deceive anyone about this matter.  b6 -1,2  b7C -1,2

Accordingly, there is no basis for a finding of intentional misconduct based on the July 28, 2017 OIG interview.

### B. OPR's Finding of Lack of Candor – No Oath

To establish a violation of FBI Offense Code 2.5, there must be sufficient evidence of an employee:

> ***Knowingly*** providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person.

(emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 2.5 during his October 31, 2016 conversation with Director Comey and the May 9, 2017 interview with INSD. Those findings are unwarranted for the reasons set forth at length above.

### C. OPR's Finding of Unauthorized Disclosure

To establish a violation of FBI Offense Code 4.10, there must be sufficient evidence of an employee "*[w]ithout authorization*, disclosing or attempting to disclose the FBI's, or another agency's, sensitive material" (emphasis added). In the Proposal, OPR found that Mr. McCabe violated FBI Offense Code 4.10 based on an unspecified "general prohibition" on disclosing information about an ongoing criminal investigation and certain statements made by Director Comey. Proposal at 14. That finding is unsupported by the evidence for the reasons set forth below.

First, a violation of FBI Offense Code 4.10 is inappropriate as a legal matter because there is no evidence that Mr. McCabe made any disclosure "without authorization." As Deputy Director, Mr. McCabe was authorized to make and coordinate disclosures of information to the media. *See Media Relations at FBIHQ and in Field Offices Policy Guide*, § 3.1: Authorization of Federal Bureau of Investigation Personnel to Make and Coordinate Disclosures and Information Releases to the Media.

[redacted] Director Comey even qualified that "unless [he] authorized it or Deputy Director McCabe authorized it, [he] considered it an unauthorized disclosure." Comey Tr. 302:13-15, [redacted] The fact that Mr. McCabe's judgment on the *WSJ* disclosure may have differed from Director Comey's does not make Mr. McCabe's decision unauthorized.

Second, the Clinton Foundation investigation had been publicly reported for months before the disclosure in the October 30, 2016 *WSJ* article,[1] and the *WSJ* article itself contained numerous acknowledgements from other FBI sources that the FBI had opened a criminal investigation into the Clinton Foundation. In fact, the only reason Mr. McCabe felt the need to make a disclosure, in order to protect the reputation and integrity of the FBI, was to rebut the false narrative coming from anonymous FBI sources regarding the status of the investigation. Mr. McCabe's authorization to provide information that was designed to combat the destructive and false narrative of FBI political bias was motivated solely by a desire to protect the institution that he loves and to which he has dedicated his entire professional life. Faced with the decision whether to leave the false narrative uncorrected, or provide information that tended to counter the suggestion that the FBI was buckling to political pressure, Mr. McCabe made a judgment call, which he had the clear authority to make, that the disclosure of the limited amount of information to the *WSJ* was in the best interests of the FBI.

D.  **Prior OPR Precedent**

As part of the due process accorded FBI personnel facing potential discipline, OPR shared with us limited information on cases it has previously handled involving similar allegations against FBI personnel. Despite the assertion in the March 7, 2018 letter that, "all FBI employees know that lacking candor under oath results in dismissal," the cases show that is not consistently the case. Illustrative examples include the following:

- In OPR Case No. [redacted]

---

[1] *See, e.g.*, Catherine Herridge & Pamela K. Brown, *FBI's Clinton probe expands to public corruption track*, FOX NEWS (Jan. 11, 2016), http://www.foxnews.com/politics/2016/01/11/fbis-clinton-probe-expands-to-public-corruption-track.html; S.A. Miller, *Obama admin blocked FBI probe of Clinton Foundation corruption: Report*, THE WASHINGTON TIMES (Aug. 11, 2016), https://www.washingtontimes.com/news/2016/aug/11/obama-admin-blocked-fbi-probe-clinton-foundation/; Drew Griffin, Pamela Brown & Shimon Prokupecz, *First on CNN: Inside the debate over probing the Clinton Foundation*, CNN (Aug. 11, 2016, 4:23 PM), https://www.cnn.com/2016/08/11/politics/hillary-clinton-state-department-clinton-foundation/index.html; Richard Pollock, *Exclusive: Joint FBI-US Attorney Probe of Clinton Foundation is Underway*, THE DAILY CALLER (Aug. 11, 2016, 10:36 PM), http://dailycaller.com/2016/08/11/exclusive-joint-fbi-us-attorney-probe-of-clinton-foundation-is-underway/.

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Scott N. Schools, Esq.
March 16, 2018
Page 11

- In OPR Case No. [redacted]   b6 -1 b7C -1

- In OPR Case No. [redacted]   b6 -1 b7C -1

These three cases are merely illustrative. We found a number of additional cases in which OPR found an employee to have lied under oath, OPR proposed dismissal, and a lesser sanction was imposed. These cases demonstrate that the FBI has on a number of occasions exercised its discretion to take mitigating factors into account and substitute a lesser sanction than dismissal.

Thus, even if you were to find, contrary to the evidence, that Mr. McCabe knowingly lied under oath, the Department has the discretion to impose a lesser sanction. In light of OPR's acknowledgement that Mr. McCabe has "21 years of remarkable FBI service and [has shown] truly outstanding performance," and at the time of the events in question was "facing unprecedented and unimaginable pressures and challenges," (March 7, 2018 letter at 15), you should exercise that discretion in Mr. McCabe's favor and impose a sanction other than dismissal. That is the fair, just, and humane result.

E. **Conclusion**

For the reasons stated above, we respectfully submit that any findings of intentional misconduct are inappropriate here.

Respectfully submitted,

Michael R. Bromwich / CKE

Michael R. Bromwich

cc: Eric B. Bruce, Kobre & Kim