**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW G. MCCABE, <br><br> *Plaintiff,* <br><br> v. <br><br> WILLIAM P. BARR, <br> in his official capacity as <br> ATTORNEY GENERAL OF THE <br> UNITED STATES, *et al.,* <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. 19-2399 (RDM) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

ARNOLD & PORTER KAYE SCHOLER LLP
Howard N. Cayne (D.C. Bar. No. 331306)
Murad Hussain (D.C. Bar. No. 999278)
Brittany McClure (D.C. Bar. No. 1001889)
Owen Dunn (D.C. Bar. No. 1044290)
Ryan D. White (D.C. Bar. No. 1655918)
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999

*Attorneys for Plaintiff Andrew G. McCabe*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 5

    A.  Plaintiff's Early Career And His Wife's Political Campaign .............................5

    B.  Trump Begins Attacking Plaintiff And His Wife ...............................................7

    C.  Trump Repeatedly Questions Plaintiff's Political Loyalty After Taking Office ................8

    D.  Trump Calls For Plaintiff's Termination ...........................................................10

    E.  Plaintiff Is Demoted And Defendants Accelerate Their Termination Decision ................12

ARGUMENT ................................................................................................................. 14

I.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS. ............................. 14

II.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS PREMATURE AND
     SHOULD BE DEFERRED UNTIL AFTER DISCOVERY. .................................................. 17

    A.  The Motion Should Be Treated Solely As One For Summary Judgment. ........................17

    B.  Summary Judgment Is Premature. ....................................................................18

III. GENUINE DISPUTES OF MATERIAL FACT WARRANT OUTRIGHT DENIAL OF
     SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT CLAIMS. .............. 20

    A.  First Amendment Framework ...........................................................................20

    B.  Defendants' Own Evidence Confirms That They Demoted Plaintiff. ..............................21

    C.  Defendants Engaged In Political Patronage When They Terminated Plaintiff. ...............22

    D.  Defendants Engaged In Political Patronage When "Racing The Clock." ........................26

IV. COUNTS 1 AND 2 STATE VALID CLAIMS DUE PROCESS CLAIMS, AND GENUINE
     ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT. ......................... 27

    A.  Defendants Violated The Due Process Clause By Depriving Plaintiff Of His Legitimate
        Property Entitlement In His Law Enforcement Pension. ..................................................29

       1.   Plaintiff is entitled to his immediate law enforcement officer annuity ...................... 29

2.  Defendants arbitrarily deprived Plaintiff of his immediate annuity entitlement, in violation of substantive due process. ......................................................................... 35

3.  Defendants also deprived Plaintiff of his immediate annuity entitlement in violation of procedural due process. ......................................................................................... 36

B.  Defendants Violated The Due Process Clause By Depriving Plaintiff Of His Legitimate Property Entitlement In Continued Employment. ............................................................36

1.  Plaintiff had a property interest in his continued employment. .................................. 37

2.  Plaintiff was arbitrarily deprived of his property interest in 30 days' continued employment, in violation of substantive due process. ................................................. 42

3.  Plaintiff was deprived of his continued employment without adequate notice or opportunity to be heard, violating procedural due process. ........................................ 43

CONCLUSION............................................................................................................................ 45

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>**CASES**</u>

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).........................................................................................17

*Banneker Ventures, LLC v. Graham*,
 798 F.3d 1119 (D.C. Cir. 2015) ..................................................................17, 18

*Bd. Of Regents of State Colls. v. Roth*,
 408 U.S. 564 (1972).................................................................................16, 29

*Berkeley v. Home Ins. Co.*,
 68 F.3d 1409 (D.C. Cir. 1995) ....................................................................18

*Brady v. Office of Sergeant at Arms*,
 520 F.3d 490 (D.C. Cir. 2008) ..................................................16, 22, 24, 27

*Branti v. Finkel*,
 445 U.S. 507 (1980).................................................................................21, 27

*Brown v. Dep't of Justice*,
 715 F.2d 662 (D.C. Cir. 1983) ....................................................................40, 43

*Brown v. District of Columbia*,
 No. 17-CV-348, 2019 WL 3423208 (D.D.C. July 8, 2019) ....................................34

*Celotex Corp. v. Catrett*,
 477 U.S. 317, 326 (1986)...........................................................................2

*Cage v. Harper*,
 No. 17-CV-7621, 2018 WL 4144624 (N.D. Ill. Aug. 30, 2018) ...........................38

*Cine SK8, Inc. v. Town of Henrietta*,
 507 F.3d 778 (2d Cir. 2007)..........................................................................28, 36

*Cleveland Bd. of Educ. v. Loudermill*,
 470 U.S. 532 (1985)....................................................................................38, 43

*Cnty. of Sacramento v. Lewis*,
 523 U.S. 833 (1998).....................................................................................8

*Coats v. DeVos*,
 232 F. Supp. 3d 81 (D.D.C. 2017) ...................................................................24

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury,*
No. 1:19-CV-01974 (TNM), 2019 WL 4094563 (D.D.C. Aug. 29, 2019).............................18

*Conn v. Am. Nat'l Red Cross,*
149 F. Supp. 3d 136 (D.D.C. 2016) ........................................................................................20

*Convertino v. U.S. Department of Justice,*
684 F.3d 93 (D.C. Cir. 2012) .................................................................................................18

*Crosby-Bey v. Dist. Of Columbia,*
786 F.2d 1182 (D.C. Cir. 1986) .............................................................................................42

*Cruz v. McAleenan,*
931 F.3d 1186 (D.C. Cir. 2019) ..........................................................................3, 19, 25, 26

*Czekalski v. Peters,*
475 F.3d 360 (D.C. Cir. 2007) ...............................................................................................22

*Dawson v. Department of Agriculture,*
121 M.S.P.R. 495 (2014) ..................................................................................................43, 44

*Dodson v. U.S. Capitol Police,*
No. 18-CV-2680, 2019 WL 4860720 (D.D.C. Sept. 30, 2019) ........................................28, 36

*Duffy v. Selsky,*
No. 95-CV-474, 1996 WL 407225 (S.D.N.Y. July 18, 1996) ................................................42

*Dunnington v. Dep't of Justice,*
956 F.2d 1151 (Fed. Cir. 1992)..............................................................................................40

*Duran v. MSPB,*
707 F.2d 1174 (10th Cir. 1983) .............................................................................................40

*Elrod v. Burns,*
427 U.S. 347 (1976).................................................................................................................21

*Farris v. Clinton,*
602 F. Supp. 2d 74 (D.D.C. 2009) ....................................................................................16, 27

*FDIC v. Henderson,*
940 F.2d 465 (9th Cir. 1991) .................................................................................................38

*Fields v. Vilsack,*
207 F. Supp. 3d 80 (D.D.C. 2016) .........................................................................................19

*Filebark v. U.S. Dep't of Transp.,*
555 F.3d 1009 (D.C. Cir. 2009) .............................................................................................15

*Froehlich v. Dep't of Treasury*,
    21 M.S.P.R. 265 (1984) ..................................................................................................40

*Garrow v. Gramm*,
    856 F.2d 203 (D.C. Cir. 1988) .......................................................................................37

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004) .......................................................................................15

*Gray v. Office of Pers. Mgmt.*,
    771 F.2d 1504 (D.C. Cir. 1985) ...............................................................................15, 16

*Green v. City of Hamilton, Hous. Auth.*,
    937 F.2d 1561 (11th Cir. 1991) ...............................................................................29, 32

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) .......................................................................................28

*Hamilton v. Geithner*,
    666 F.3d 1344 (D.C. Cir. 2012) ...............................................................................20, 23

*Hannon v. Dep't of Air Force*,
    19 M.S.P.R. 510 (1984) ..................................................................................................30

*Harrison v. Bowen*,
    815 F.2d 1505 (D.C. Cir. 1987) ...............................................................................16, 38

*Hedgeye Risk Mgmt., LLC v. Heldman*,
    271 F. Supp. 3d 181 (D.D.C. 2017) ................................................................2, 18, 19, 20

*Heffernan v. City of Paterson, N.J.*,
    136 S. Ct. 1412 (2016) ....................................................................................................21

*Henderson v. Dep't of Vet. Affairs*,
    878 F.3d 1044, 1048 (Fed. Cir. 2017) ...........................................................................44

*Hewitt v. Helms*,
    459 U.S. 460 (1983) ........................................................................................................43

*Holly v. City of Naperville*,
    603 F. Supp. 220 (N.D. Ill. 1985) ................................................................................33

*Hubbard v. U.S. Envt'l Prot. Agency, Adm'r*,
    809 F.2d 1 (D.C. Cir. 1986) ...........................................................................................14

*In re Grand Jury Investigation*,
    315 F. Supp. 3d 602 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019) ..............33, 34

*Johnson v. George*,
    No. 05-CV-157, 2007 WL 1697276 (D. Del. June 12, 2007)..................................44

*Kelly v. Indep. Sch. Dist. No. 12*,
    80 F. App'x 36 (10th Cir. 2003) ............................................................38

*Kukla v. Vill. of Antioch*,
    647 F. Supp. 799 (N.D. Ill. 1986) ........................................................29

*La. Ass'n of Indep. Producers v. FERC*,
    958 F.2d 1101 (D.C. Cir. 1992) ...........................................................44

*Lamb v. Holder*,
    82 F. Supp. 3d 416 (D.D.C. 2015) ...................................................16, 37

*LeFande v. District of Columbia*,
    841 F.3d 485 (D.C. Cir. 2016) ............................................................18

*Lingle v. Chevron USA Inc.*,
    544 U.S. 528 (2005)...........................................................................36

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)...........................................................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................17

*McBryde v. Comm. to Rev. Cir. Council Conduct*,
    83 F. Supp. 2d 135 (D.D.C. 1999) ..................................................44, 45

*Morrissey v. Brewer*,
    408 U.S. 471 (1972)...........................................................................44

*Mozier v. Bd. of Ed. of Cherry Hill Twp., Camden Cty.*,
    450 F. Supp. 742 (D.N.J. 1977) ..........................................................38

*O'Connor v. Pierson*,
    426 F.3d 187 (2d Cir. 2005)................................................................36

*O'Hare Truck Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996)......................................................................21, 26

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000)...........................................................................20

*Ringo v. Dep't of Def.*,
    122 M.S.P.R. 91 (2015) ................................................................30, 31

*Rutan v. Republican Party of Ill.*,
   497 U.S. 62 (1990) ............................................................................................21

*Sagar v. Lew*,
   309 F.R.D. 18 (D.D.C. 2015) .........................................................................18

*Segar v. Mukasey*,
   508 F.3d 16 (D.C. Cir. 2007) .........................................................................39

*Sims v. Apfel*,
   530 U.S. 103 (2000) ........................................................................................34

*Sipe v. Fritz*,
   43 B.R. 984 (D. Ariz. 1984) ...........................................................................32

*Spagnola v. Mathis*,
   859 F.2d 223 (D.C. Cir. 1988) (*en banc*) ................................................15, 16

*Toyens v. Dep't of Justice*,
   58 M.S.P.R. 634 (1993) ..................................................................................32

*U.S. v. Bowens*,
   291 F. App'x 644 (5th Cir. 2008) ...................................................................35

*U.S. v. Caceres*,
   440 U.S. 741 (1979) ........................................................................................42

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959) ........................................................................................15

*Ward v. U.S. Postal Serv.*,
   634 F.3d 1274 (Fed. Cir. 2011) ......................................................................43

## STATUTES

5 U.S.C. § 702 ......................................................................................................14

5 U.S.C. § 3151 ...................................................................................37, 39, 42, 45

5 U.S.C. § 6302(b) ..........................................................................................30, 31

5 U.S.C. § 7511 ....................................................................................................37

5 U.S.C. § 7513(b) .............................................................................37, 40, 43, 44

5 U.S.C. § 7543 .............................................................................................. *passim*

5 U.S.C. § 8412(d)(2) ...........................................................................................29

28 U.S.C. § 508(a) .........................................................................4, 33, 34, 39

28 U.S.C. § 1361 ..................................................................................................14


## REGULATIONS & RULES

5 C.F.R. § 890.1102 ......................................................................................24, 42

28 C.F.R. § 0.157 .................................................................................................37

Fed. R. Civ. P. 12(d) ............................................................................................17

Fed. R. Civ. P. 56 ....................................................................................16, 17, 18


## OTHER AUTHORITIES

Attorney General Order No. 1600-92, 57 Fed. Reg. 31,314 (July 15, 1992) ................................37

*Federal Employees Health Benefits Program—Temporary Continuation of Coverage*, 54 Fed. Reg. 52,333 (Dec. 21, 1989) ................................................24, 42

Inspector General Act of 1978, Pub. L. No. 95-452, § 3(a) & (b), 92 Stat. 1101..........................25

S. Rep. 969, 95th Cong., 2nd Sess. (1978) ..............................................................43, 44

## INTRODUCTION

On March 16, 2018, Defendants purported to fire Plaintiff Andrew G. McCabe, a career civil servant and  former Deputy Director of the Federal Bureau of Investigation ("FBI"), on the eve of his retirement and weekend of his 50th birthday, after 21 years of service to the FBI and the nation.  Defendants' transparent attempt to deprive Plaintiff of his immediate entitlement to his law enforcement officer annuity came less than 90 days after President Donald J. Trump announced to the world, via his Twitter.com account, that he was threatening Plaintiff's job:

> *How can FBI Deputy Director Andrew McCabe, the man in charge, along with leakin' James Comey, of the Phony Hillary Clinton investigation (including her 33,000 illegally deleted emails) be given $700,000 for wife's campaign by Clinton Puppets during investigation?*
>
> *FBI Deputy Director Andrew McCabe is racing the clock to retire with **full benefits**. 90 days to go?!!!*

Pl.'s Ex. ("PX-"[1]) 3 (summary chart of selected Trump statements), ll. 10-11 (emphasis added).

Trump's tweets contained numerous false insinuations about Plaintiff's wife's 2015 Virginia state senate campaign, with the overall false message being that Plaintiff was politically aligned with Hillary Clinton, Trump's 2016 U.S. presidential election opponent.  This was just the latest in Trump's yearlong public political vendetta against Plaintiff.  But the import of Trump's new "racing the clock" message was crystal clear: Defendants must take all action necessary to disqualify Plaintiff from collecting the "full benefits" to which he would be entitled upon retirement.  Bowing to Trump's whims, Defendants demoted Plaintiff from the position of Deputy Director on January 29, 2018.  Then, they seized on a deeply flawed February 28, 2018 report by the Department of Justice ("DOJ") Office of Inspector General ("OIG"), which asserted that

---

[1] Plaintiff's exhibits attached to the Declaration of Murad Hussain ("Hussain Decl.") are cited as "PX-1" through "PX-17B," and those attached to the Declaration of Andrew McCabe ("McCabe") are cited as "PX-18" through "PX-24."  Defendants' exhibits are cited as "DX."

Plaintiff "lacked candor" when he spoke with investigators in 2017 about disclosures that he authorized to the *Wall Street Journal* in October 2016 during the heat of the presidential campaign.

"Racing the clock" and shredding due process, Defendants used the OIG Report to rush out their directive to terminate Plaintiff, giving him only one week's notice for his disciplinary hearing, violating established statutory and regulatory protections for senior FBI personnel, and even admitting to Plaintiff's counsel: "We're making it up as we go along."  The evening of March 16, 2018, then-Attorney General Jeff Sessions wrote that Plaintiff "should be" fired from the FBI.

On August 8, 2019, Plaintiff filed this lawsuit alleging that his demotion, purported termination, and accelerated disciplinary hearings violated his rights under the First Amendment and the Fifth Amendment's Due Process Clause.  In response, Defendants once again seek to race the clock to judgment, only now in this Court.  After trying to fire Plaintiff on an impermissibly compressed timeline, Defendants have doubled down, seeking summary judgment on Plaintiff's claims here, before the commencement of discovery, and before they even answer the Complaint.

But Plaintiff will not be "'railroaded' by a premature motion for summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).  This constitutional case requires deciding numerous disputed factual questions about Defendants' motives, whether their stated rationale was genuinely held or a pretext for unlawful impulses, and whether they arbitrarily violated statutory restrictions on their discretion in personnel matters.  Under Federal Rule of Civil Procedure 56(d), the Court should defer Defendants' motion until Plaintiff has an opportunity to take discovery.  As required, undersigned counsel has submitted a detailed declaration explaining what Plaintiff intends to seek from Defendants, and how those materials support Plaintiff's claims. *E.g.*, *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 187 (D.D.C. 2017) (Moss, J.).

Defendants' motion should also be denied on the merits, because the limited evidence

already available to Plaintiff evinces factual disputes warranting trial.  Defendants' personnel decisions affecting Plaintiff, a civil servant, violated the First Amendment's prohibition on "political patronage," meaning that they improperly punished Plaintiff for his perceived affiliation with the opposing political party.  For example, Trump, Sessions, and Rosenstein repeatedly confronted or criticized Plaintiff about his political affiliations, particularly his support for his wife's 2015 Virginia state senate campaign as a Democratic Party candidate.

Defendants do not even try to defend Plaintiff's January 29, 2018 demotion; they simply insist that he was Deputy Director until he left the FBI.  But the OIG Report says otherwise.

Defendants defend their termination decision by relying on the OIG Report and investigation.  But this simply invites scrutiny of whether the OIG Report was a pretext for unlawful political motives, because the D.C. Circuit "has never held that the existence of an independent investigation is dispositive on the question of pretext."  *Cruz v. McAleenan*, 931 F.3d 1186, 1193 (D.C. Cir. 2019) (vacating summary judgment for agency and reversing denial of plaintiff's Rule 56(d) discovery request).  Even the OIG Report, for all its exculpatory omissions, never suggested firing Plaintiff—that was entirely Defendants' decision.

Ample direct and circumstantial evidence links Plaintiff's firing to his perceived politics, from the many statements and criticisms by Trump, Sessions, and Rosenstein; to the mere 84 days that passed between Trump's "racing the clock" tweet and Plaintiff's purported termination; to the April 2018 determination by the FBI Office of General Counsel that Plaintiff was *not* terminated for "gross misconduct," starkly contradicting Defendants' stated rationale.  The full record permits a reasonable factfinder to conclude that Defendants' reliance on the OIG Report was mere pretext.

Defendants also deprived Plaintiff of due process in at least two ways that flow directly from Defendants' disregard for statutory and regulatory procedures.  First, the evidence will show

that Defendants did not actually succeed in firing Plaintiff, and yet they have falsely recorded his separation date as March 16, 2018.  This improper record prevents Plaintiff from immediately collecting his law enforcement pension, in which he has a statutory property entitlement.  Such arbitrary recording of erroneous information affecting Plaintiff's retirement benefits, earned over the course of his 21-year career in federal law enforcement, is a violation of both substantive and procedural due process.  Defendants argue that Plaintiff has no due process interest in his pension because he was fired.  But that presumes, without evidence, that AG Sessions' termination decision was *effective* in removing Plaintiff from the FBI payroll before Plaintiff became entitled to his full law enforcement officer retirement benefits.  It was not.[2]

Even if Defendants had taken the steps necessary to fire Plaintiff, which they did not, the purported firing occurred too late on Friday, March 16, 2018, after the close of business on that final business day before Plaintiff's 50th birthday.  At that time, federal law and FBI practice deemed him employed for the entire pay period ending midnight Saturday, March 17.  And in addition to being too late, AG Sessions' purported termination decision was legally deficient, because he lacked authority to fire Plaintiff under DOJ policy (as Plaintiff was no longer Deputy Director) and under 28 U.S.C. § 508(a) (due to Sessions' "disability," given his recusal from all 2016 campaign-related investigations, from which Plaintiff's disciplinary hearings arose).

And even if the termination were effective, Defendants still violated due process by depriving Plaintiff of his property right to 30 days' continued employment, from the time he received written notice of the proposed termination—*i.e.*, no earlier than March 8 or 9,

---

[2] Defendants mistakenly believe that simply because the due process analysis will examine their procedural compliance, this means Plaintiff has brought independent claims for statutory and regulatory compliance over which this Court lacks jurisdiction.  Hardly.  Plaintiff's claims are constitutional.  Defendants' procedural non-compliance simply informs the constitutional analysis.

2018.  Defendants' Motion never mentions the statutory protection for Plaintiff and other members of the FBI Senior Executive Service ("SES"): 5 U.S.C. § 7543(b), applied to the FBI SES by 5 U.S.C. § 3151(a)(5)(D), and implemented by FBI SES Policy (DX-2).  These statutes necessarily restrict Defendants' termination authority.  Thirty days' notice from March 8 would have barred Defendants from firing Plaintiff until April—letting Plaintiff retire as planned the weekend of March 17, 2018.  Instead, Defendants decided to fire him on only one week's notice.

Citing the FBI SES policy that mirrors § 7543(b)(1), Defendants now claim that the so-called "crime exception" let them shorten the notice period, because they had "reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed."  They argue, without analysis or authority, that the OIG Report triggered this provision by finding that Plaintiff supposedly "lacked candor" under oath.  But Defendants produce no evidence that they ever invoked the crime exception or gave Plaintiff notice that they did so.  And the relevant case law makes clear that OIG's finding of purely *administrative* offenses does not trigger the exception.  By unlawfully shortening the statutory notice period without statutory authority, Defendants' firing was *ultra vires* action and a substantive due process violation.

Finally, even if Defendants one week's notice was permissible under the statute, it was still inadequate notice under the Constitution.  At a minimum, the record raises a factual question of whether, as Plaintiff's counsel repeatedly told Defendants at the time, Plaintiff had insufficient time to review the voluminous evidence and prepare a meaningful defense.  For all of these reasons, Defendants' motion should be denied.

## FACTUAL BACKGROUND

### A.    Plaintiff's Early Career And His Wife's Political Campaign

Plaintiff resides in the Commonwealth of Virginia.  Decl. of Andrew G. McCabe ("McCabe Decl.") ¶ 1.  His wife, Dr. Jill McCabe, is a pediatric emergency physician.  *Id.*

In 1996, Plaintiff started his FBI career in the New York Field Office.  McCabe Decl. ¶ 3; Defs.' Stmt. of Material Facts ("DSMF") ¶ 1.  Plaintiff was promoted through the ranks and eventually joined the FBI Senior Executive Service ("SES") in 2009.  DSMF ¶ 2; McCabe Decl. ¶ 4.  In 2014, Plaintiff became the assistant director in charge of the FBI's Washington Field Office. McCabe Decl. ¶ 5.  On July 30, 2015, then-FBI Director James B. Comey appointed Plaintiff to serve as FBI Associate Deputy Director, responsible for overseeing the FBI's budget, human resources, information systems, and administrative functions.  *See id.* ¶ 12; DSMF ¶ 2.

Earlier, in March 2015, Plaintiff's wife announced that she would be a Democratic candidate for the Virginia state senate.  McCabe Decl. ¶ 6.  Before Dr. McCabe made her announcement, Plaintiff notified appropriate FBI officials, including the Deputy Director, General Counsel, and chief ethics officer, and sought their guidance to ensure that Plaintiff took any and all steps necessary to ensure his compliance with government ethics obligations and avoid any conflicts of interest.  *Id.*  None of the FBI officials whom McCabe notified expressed any concerns, and the FBI provided Plaintiff with specific guidelines he needed to, and did, follow with respect to Dr. McCabe's campaign.  *Id.* ¶¶ 7-8.  Later that summer, Plaintiff, Dr. McCabe, and their children attended a swim meet, where Plaintiff posed for a family photograph in which each family member wore a campaign T-shirt reading: "DR. JILL MCCABE FOR STATE SENATE."  *Id.* ¶ 9.  This photograph did not identify Plaintiff as an FBI employee, and his appearing in that photograph was consistent with the ethics guidance he received.  *Id.* ¶ 10.

Over the course of 2015, a political action committee ("PAC") of then-Virginia Governor, Terry McAuliffe, made campaign contributions to Dr. McCabe's 2015 Virginia state senate campaign and also contributed similar amounts to other Democratic state senate candidates in Virginia.  Pl.'s Counterstatement of Material Facts ("CMF") ¶ 7.  Plaintiff had no knowledge of

these contributions to Dr. McCabe's campaign until late October 2016.  McCabe Decl. ¶ 11.

Ultimately, Dr. McCabe lost her Virginia state senate election in November 2015.  *See id.* ¶ 1.

Also in 2015, former U.S. Secretary of State Hillary Clinton declared her candidacy for the

Democratic Party's nomination for the U.S. presidency.  CMF ¶ 8.  That summer, the FBI opened

an investigation into whether Clinton had improperly stored or transmitted classified information

on a private email server while conducting official business during her tenure as Secretary of State

("Clinton email investigation").  *Id.* ¶ 9.  Plaintiff had no role in the FBI's Clinton email

investigation until February 1, 2016, when he was promoted  to the role of Deputy Director of the

FBI.  McCabe Decl. ¶¶ 13-14; DSMF ¶ 3.

### B.    Trump Begins Attacking Plaintiff And His Wife

On July 5, 2016, FBI Director Comey publicly announced the end of the Clinton email

investigation and the conclusion reached that the facts did not support criminal charges against

Clinton.  CMF ¶ 10.  Later that month, Clinton and Donald J. Trump accepted the presidential

nominations of the Democratic Party and Republican Party, respectively.  *Id.* ¶ 11.

In October 2016, Plaintiff learned that a *Wall Street Journal* ("WSJ") reporter was

developing an article suggesting that Dr. McCabe's 2015 state senate campaign, and the

contributions it received from Governor McAuliffe's PAC, created a conflict of interest for

Plaintiff's later 2016 involvement in the Clinton email investigation.  PX-13.  On October 21,

Plaintiff informed Comey, Comey's chief of staff James Rybicki, and Associate Deputy Director

David Bowdich about the upcoming WSJ article, and how Plaintiff and Michael Kortan, the

Assistant Director for the Office of Public Affairs, were working to educate the reporter.  *Id.*

On October 23, 2016, the WSJ published the article online, stating that McAuliffe was "an

influential Democrat with long-standing ties to Bill and Hillary Clinton."  CMF ¶ 13.  Around that

time, Plaintiff told Comey how he and Kortan had tried "to shape the WSJ story on [Plaintiff's]

alleged conflict." PX-14.  The next day, October 24, the WSJ reporter contacted Kortan about a follow-up story concerning Plaintiff's oversight of the FBI's investigation into the Clinton Foundation, a non-profit organization established by former president Bill Clinton.  CMF ¶ 14.

Also on October 24, 2016, Trump cited the WSJ article at a campaign rally, falsely suggesting that Plaintiff oversaw the Clinton email investigation during Dr. McCabe's campaign, and that Plaintiff' supposedly dropped the investigation because of the McAuliffe PAC's contributions.  PX-3 (Summary Chart of Selected Public Statements by Donald J. Trump), line 1. The next day, October 25, Trump repeated these false and groundless suggestions about Plaintiff, Clinton, and Dr. McCabe's campaign during a television interview.  *Id.*, line 2.

Following the October 24 WSJ story, Plaintiff continued working with Kortan and also with Plaintiff's Special Counsel, Lisa Page, to engage with the reporter about his follow-up story. McCabe Decl. ¶ 30; DX-3 at 60:4-11.  Plaintiff was aware of the public criticisms of the FBI's independence and sought to defend the Bureau's reputation for impartiality by rebutting concerns over the independence of its Clinton-related investigations.  DX-3 ("Oral Resp. Tr.") at 59:6-18; 61:14-62:19, 72:10-73:10, 195:2-12.  As Deputy Director, Plaintiff was authorized to disclose the existence of ongoing FBI investigations.  *Id.* ¶ 69:11-13.  He authorized Page and Kortan to share with the WSJ reporter the fact that in August 2016, Plaintiff had a phone call with a DOJ official in which Plaintiff resisted what he perceived as a suggestion to end the Clinton Foundation investigation prematurely.  *Id.* ¶ 57:19-61:10.  On October 30, Kortan emailed Comey's chief of staff Rybicki, forwarding the WSJ reporter's detailed summary of the forthcoming article's contents, including references to Plaintiff's August 2016 call with the DOJ official.  *See* DX-5 (Dkt. 23-6) at 4 (discussing email).  The WSJ article was ultimately published on October 31.  *Id.*

**C.     Trump Repeatedly Questions Plaintiff's Political Loyalty After Taking Office**

Even after his January 2017 inauguration as president, Trump continued to portray Plaintiff

as a political adversary aligned with Clinton and the Democratic Party, and repeatedly challenged Plaintiff's political loyalty, directly and through subordinates.  After a February 10, 2017 meeting with Vice President Michael R. Pence, then-White House Chief of Staff Reince Priebus, then-White House Counsel Donald F. McGahn, and others, Plaintiff was informed that White House officials questioned his commitment to the Trump administration.  McCabe Decl. ¶ 17.  On February 15, Preibus asked Plaintiff to have the FBI publicly refute a recent news story that was unfavorable to Trump; when Plaintiff refused on FBI policy grounds, Priebus criticized Plaintiff and the FBI for not being "good partners" to Trump.  *Id.* ¶ 18.  On March 6, Plaintiff learned that White House officials were looking for ways to fire FBI Director Comey, and that these officials felt Comey should have removed Plaintiff from his position.  *Id.* ¶ 19.[3]

On May 9, 2017, Plaintiff learned that Trump had fired Comey and that, as a result, Plaintiff was now Acting Director of the FBI.  McCabe Decl. ¶ 22.  In the days that followed Plaintiff's elevation, Plaintiff met with Trump and his inner circle multiple times, and Trump repeatedly probed Plaintiff's political loyalty and said that Plaintiff made a "mistake" in letting Dr. McCabe run for the Virginia state senate.  *Id.* ¶¶ 22-27.  At one point, on May 10, Trump asked Plaintiff whether he had voted for Trump in the 2016 election—an improper question that discomfited Plaintiff.  *Id.* ¶ 24.  Plaintiff did not directly respond to that question and simply stated that he "always played it right down the middle."  *Id.*  Trump was visibly displeased by that response.  *Id.*  In a May 17 meeting in the Oval Office, Plaintiff explained to Trump that he considered himself a lifelong Republican and had always voted for the Republican candidate for president, except in the

---

[3] In March 2017, Attorney General ("AG") Jeff Sessions announced that he "decided to recuse [him]self from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  CMF ¶ 16.  He further stated that the (then-acting) Deputy Attorney General ("DAG") "shall act as and perform the functions of the Attorney General with respect to any matters from which I have recused myself to the extent they exist."  *Id.*

2016 general election when he did not cast a vote for president.  *Id.* ¶ 27.

In a May 13, 2017 meeting with AG Sessions and Deputy Attorney General ("DAG") Rod Rosenstein, Plaintiff was confronted about his 2015 family photograph and wearing his wife's campaign T-shirt.   McCabe Decl. ¶ 25.   During this same meeting, Plaintiff told Sessions and Rosenstein that he had long planned to retire from public service immediately after  becoming eligible for retirement in March 2018.   *Id.*   When later meeting with Rosenstein on May 16 and 21, Rosenstein repeatedly criticized Plaintiff for his 2015 family T-shirt photograph, stating it created a "political problem" and "credibility issue."  *Id.* ¶¶ 26, 28.

### D.     Trump Calls For Plaintiff's Termination

In July 2017, a White House official told a member of Plaintiff's staff that unnamed individuals in the White House had decided to remove Plaintiff from the FBI immediately upon the confirmation of a new FBI Director.  Shortly thereafter, the President himself began to publicly broadcast his intent to fire Plaintiff.

On the morning of July 25, 2017, Trump posted ("tweeted") to his publicly available Twitter.com account: "Attorney General Jeff Sessions has taken a VERY weak position on Hillary Clinton crimes (where are E-mails & DNC server) & Intel leakers!"  PX-3, line 4.  Nine minutes later, Trump tweeted again: "Problem is that the acting head of the FBI & the person in charge of the Hillary investigation, Andrew McCabe, got $700,000 from H for wife!"  *Id.*, line 5.  The next morning, July 26, Trump tweeted twice in three minutes:  "Why didn't A.G. Sessions replace Acting FBI Director Andrew McCabe, a Comey friend who was in charge of Clinton investigation but got...." "...big dollars ($700,000) for his wife's political run from Hillary Clinton and her representatives.  Drain the Swamp!"  *Id.*, ll. 6-7.

Two days later, on Friday, July 28, 2017, DOJ's Office of Inspector General ("OIG") asked to meet with Plaintiff urgently.  McCabe Decl. ¶ 30.  Earlier that year, in January 2017, OIG had

opened an investigation of various actions by the DOJ and FBI in advance of the 2016 election ("2016 election investigation"), including allegedly improper disclosures of non-public information by DOJ and FBI employees. *Id.* ¶ 16; CMF ¶ 15. On July 28, Plaintiff attended a meeting with OIG personnel who questioned him about the meaning of multiple text messages between Page and another FBI employee, and then, based on the text messages, asked whether Plaintiff had authorized Page to speak to a *WSJ* reporter about the Clinton email investigation in late October 2016. *Id.* ¶ 30. At no time did Plaintiff respond to these questions, or any other questions from anyone in DOJ or FBI, with any intentionally false or misleading statements. *Id.*

Two business days later, on August 1, 2017, Plaintiff contacted one of the OIG officials from the July 28 meeting to follow up on that discussion, and stated that he recalled authorizing Lisa Page to speak to the WSJ reporter. *Id.* ¶ 31. Plaintiff also recommended that OIG speak to Michael Kortan, who might have information about this issue. *Id.* That same day, Defendant Wray was sworn in as FBI Director and Plaintiff returned to his position of Deputy Director. McCabe Decl. ¶ 2. Sometime later that month, Trump pushed to end Plaintiff's career by urging Sessions to pressure Wray to fire Plaintiff, although Sessions was unsuccessful. *Id.* ¶ 32; PX-5.

In a series of December 2017 tweets, Trump explicitly linked his own erroneous portrayal of Plaintiff's political affiliation as a Democrat with thinly veiled public calls for Plaintiff's swift termination. *See* PX-3, ll. 9-13. On December 2, Trump renewed his pressure on Wray by tweeting: "Wray needs to clean house. Now we know the politicization even worse than McCabe's ties to McAuliffe/Clinton." PX-3, line 8. On December 23, the media reported that Plaintiff was planning to retire in March 2018, when he turned 50 years old. McCabe Decl. ¶ 36. That afternoon, Trump tweeted: "How can FBI Deputy Director Andrew McCabe, the man in charge . . . of the Phony Hillary Clinton investigation . . . be given $700,000 for wife's campaign by Clinton

Puppets during investigation?"  PX-3, line 10.  Three minutes later, Trump tweeted again: "FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits. 90 days to go?!!!" *Id.*, line 11.  Around that same time, in late December 2017, Inspector General ("IG") Michael Horowitz notified Defendant Wray that OIG would expedite and complete the part of its 2016 election investigation that examined Plaintiff's actions in connection with the two WSJ articles from late October 2016, and that OIG would issue a separate report about Plaintiff before issuing OIG's broader report on its 2016 election investigation.  McCabe Decl. ¶ 35.

### E.    Plaintiff Is Demoted And Defendants Accelerate Their Termination Decision

On January 29, 2018, Defendant Wray demoted Plaintiff from the role of Deputy Director. McCabe Decl. ¶ 38.  Wray refused to provide an explanation for the demotion, instead saying that he had promised Sessions he would not discuss specifics with Plaintiff.  *Id.* ¶ 37.  Plaintiff elected to take terminal leave until March, when he would become eligible for retirement.  *Id.* ¶¶ 38, 40. As of January 29, Plaintiff no longer served in a duty status and except for his FBI email account, Plaintiff had no access to FBI offices, networks, or workstations.  *Id.* ¶ 40.

Around February 20, 2018, Plaintiff was permitted to review OIG's draft spin-off report about him, titled "A Report of Investigation of Certain Allegations Relating to Former Deputy Director Andrew McCabe", but he could only review that report in OIG's Washington, D.C. office. McCabe Decl. ¶ 42.  Although Plaintiff had the assistance of counsel, including former DOJ Inspector General Michael R. Bromwich, Plaintiff had less than a week to present arguments and comments to OIG about the draft report.  *See* Decl. of Michael Bromwich ("Bromwich Decl.") ¶¶ 6, 9.  The morning of February 28, Trump pressured IG Horowitz by publicly chastising him as "an Obama guy" who was "already late with reports on Comey *etc.*"  PX-3, line 13. (emphasis added).  Later that same day, OIG submitted its final report ("OIG Report") to Candice Will, Assistant Director of the FBI's Office of Professional Responsibility ("OPR"), for review and

proposal of potential discipline.  PX-6.  The final OIG Report criticized Plaintiff for authorizing disclosures to the WSJ and declared that Plaintiff supposedly "lacked candor" when discussing the October 2016 WSJ articles with Comey and later, with OIG and other DOJ investigators.  CMF ¶ 5.  The OIG Report did not reference any evidence from Kortan.  *Id.* ¶ 6.

On March 7, 2018, OPR finalized its proposal that Plaintiff be terminated for "lack of candor," and stated that DAG Rosenstein "will make the final decision in this matter."  DX-1 at 15.  On March 8, OPR attempted to serve Plaintiff with the proposal, but his counsel notified OPR that Plaintiff was away on a pre-planned family vacation.  Bromwich Decl. ¶ 12.  By letter to Plaintiff dated March 8, Associate DAG Scott Schools stated that he would review OPR's notice of proposed removal and would notify Plaintiff of his decision.  Dkt. 23-5 (DX-4) at 2.  The letter stated Schools would make his decision as early as Friday, March 16—the final workday of Plaintiff's final biweekly pay period before his retirement.  McCabe Decl. ¶ 47.  Plaintiff could submit written briefing by "close of business" on March 15 and arrange for a hearing with Schools, which was also scheduled for March 15.  Bromwich Decl. ¶ 14.

On Friday, March 9, 2018, Plaintiff's counsel was first given access to a 1,000-page partial record.  Bromwich Decl. ¶¶ 16-17.  That morning, he spoke with Schools, who said regarding the process being followed: "We're making it up as we go along."  *Id.* ¶ 15.  On Tuesday, March 13, Plaintiff returned early from his family vacation.  *See* McCabe Decl. ¶ 45.  As Plaintiff and his counsel reviewed the record, they found it was incomplete and made repeated requests for additional documents, which were provided in piecemeal fashion as late as the morning of Thursday, March 15.  Bromwich Decl. ¶¶ 20-25.  On the morning of March 14, citing an inability "to properly prepare for both the oral presentation and written presentation," Plaintiff's counsel asked Schools to postpone the hearing.  *Id.* ¶¶ 22-23.  That same morning, Schools responded, "I

cannot do that, " but did extend the written submission deadline to noon on Friday, March 16.  *Id.* ¶ 23.  Also on March 14, Plaintiff's counsel first received Kortan's exculpatory October 30, 2016 email with the WSJ reporter and the transcript of Kortan's statement to investigators.  *Id.* ¶ 24.[4]

On March 15, 2016, Plaintiff and his counsel made their oral response to Schools, and then submitted Plaintiff's written response on March 16.  Bromwich Decl. ¶¶ 26-28.  On March 16 around 10:00 p.m., Sessions—not Rosenstein—issued a statement to the media announcing Plaintiff's purported termination, supposedly for lack of candor.  *Id.* ¶ 29; McCabe Decl. ¶ 48.  However, Plaintiff had not yet seen any final decision.  McCabe Decl. ¶ 49.  The next day, Trump tweeted: "McCabe was caught, called out and fired.  How many hundreds of thousands of dollars was given to wife's campaign by Crooked H friend, Terry M, who was also under investigation?"  PX-3, line 16.  Weeks later, by memorandum dated April 11, 2018, the FBI Office of General Counsel told Plaintiff that his separation was not due to "gross misconduct."  PX-23.

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS.

Plaintiff seeks only equitable relief under the Constitution or, in the alternative, under the *mandamus* statute, 28 U.S.C. § 1361.  Counts One through Four allege violations of the First Amendment and the Due Process Clause of the Fifth Amendment and seek only brief reinstatement and related remedies.  "Because 5 U.S.C. § 702 (1982) waives sovereign immunity from suits not seeking money damages, federal courts have jurisdiction to grant equitable relief to remedy agency violations of constitutional rights."  *Hubbard v. U.S. Envt'l Prot. Agency, Adm'r*, 809 F.2d 1, 11

---

[4] Also during the week of March 12, 2018, Plaintiff communicated with FBI human resources officials, including Human Resource Specialist Patreece Carter, who worked with Plaintiff to provide various retirement paperwork and benefits estimates.  McCabe Decl. ¶ 46.  On March 14, Carter told him that under the agency's age-calculation rules, his first full day of retirement could be March 17, so he approved her making that change to his paperwork.  *Id.* ¶ 47.

(D.C. Cir. 1986) (reversing dismissal of First Amendment-based claim for equitable reinstatement), *aff'd in relevant part & vacated on other grounds*, *Spagnola v. Mathis*, 859 F.2d 223, 229-30 (D.C. Cir. 1988) (*en banc*).[5]

Defendants misread Plaintiff's complaint as bringing statutory and regulatory claims for which Defendants seek dismissal in a section of their brief entitled, "The CSRA Precludes [Plaintiff]'s Statutory and Regulatory Claims."  Defs.' Mem. in Supp. of Summ. J. ("SJ Mem.") (Dkt. 23) at 10.  Instead of addressing Plaintiff's constitutional and *mandamus* claims, Defendants build and vanquish a strawman.  They speculate that Plaintiff is suing under the Administrative Procedure Act ("APA") or the lines of cases based on *Vitarelli v. Seaton*, 359 U.S. 535 (1959),[6] and argue that the CSRA deprives this Court of jurisdiction over such claims.  SJ Mem. 10-14. But Plaintiff's claims do not arise under the APA or agency regulations, because he is pleading the deprivation of constitutional rights.  Defendants' cited authorities are therefore inapposite, because those decisions merely held that the CSRA precluded challenges to agency employment decisions when the claims are based *solely* on statutory or regulatory violations, *independently* of any constitutional claim.[7]   Here, of course, Defendants concede that "[t]he CSRA does not

---

[5] Count 5 seeks a writ of *mandamus* to compel ministerial acts, and "for mandamus to lie [plaintiffs] must not have an adequate alternative remedy."  *Gray v. Office of Pers. Mgmt.*, 771 F.2d 1504, 1514 (D.C. Cir. 1985).  Plaintiff thus properly invokes *mandamus* solely as an alternative remedy if constitutional relief were deemed unavailable.

[6] *Vitarelli* concerns "a judicial evolved rule of administrative law" that permits employees with "no protected employment rights" to challenge personnel decisions solely on the ground that an agency violated its own regulations.  359 U.S. at 547 (Frankfurter, J., concurring).

[7] *E.g.*, *Graham v. Ashcroft*, 358 F.3d 931, 932 (D.C. Cir. 2004) (noting prior affirmance of district court's dismissal of due process claim, and then *separately* holding that CSRA rejected *Vitarelli* claim that challenged letter of censure); *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1015 (D.C. Cir. 2009) (rejecting claim based solely on APA).

- 15 -

preclude" Plaintiff's constitutional claims.  SJ Mem. 4; *see also id.* at 13 n.5 (quoting *Spagnola*).[8]

Defendants seem to believe that statutory or regulatory violations are only relevant here if they provide a vehicle for seeking relief.  Not so.  For example, as the D.C. Circuit has explained, "the limited procedural protection offered by a statute does not preclude the creation of a property interest."  *Harrison v. Bowen*, 815 F.2d 1505, 1519 n.33 (D.C. Cir. 1987).  Thus, CSRA provisions can create protected property interests for  constitutional due process analysis, *even if* those same CSRA provisions do not give plaintiffs a vehicle for direct review of agency actions.  *See id.* (if CSRA section created "an entitlement to continued employment" but "preclude[d] direct review before the MSPB," employee could still "seek judicial review to ensure that he or she is provided procedural due process when removed under that section").  And "[l]ike statutes, regulations may create protected property interests."  *Lamb v. Holder*, 82 F. Supp. 3d 416, 425 (D.D.C. 2015).

Plaintiff's claims rest, in part, on the answers to factual questions about Defendants' statutory and regulatory compliance, such as whether Plaintiff had a "legitimate claim of entitlement" to a property interest recognized under the Due Process Clause.  *See Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 577-78 (1972) (finding no constitutional property interest where no statute, rule, or policy conferred any "legitimate claim" to continued employment); *see generally infra* pp. 29-34, 37-42.  Similarly, "[a] defendant's failure to follow established criteria or procedures can cast doubt on its asserted legitimate, nondiscriminatory reason for [an adverse action]."  *Farris v. Clinton*, 602 F. Supp. 2d 74, 87 (D.D.C. 2009) (discussing failure to hire); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008).  Nothing bars this Court from entertaining these fact questions when exercising its jurisdiction over Plaintiff's claims.

---

[8] Given Defendants' argument that Plaintiff has no remedy under the CSRA, the CSRA is no bar to Plaintiff's *mandamus* claim.  *Cf. Gray*, 771 F.2d at 1514.

II.   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS PREMATURE AND SHOULD BE DEFERRED UNTIL AFTER DISCOVERY.**

A month after Trump's "racing the clock" tweet (PX-3, line 11), Defendants demoted Plaintiff.  A month after that, they finalized the OIG Report.  A week after that, they decided to terminate Plaintiff altogether, and a week after that, they sped his disciplinary hearing to completion on the literal eve of his retirement—telling Plaintiff's counsel that "[w]e're making it up as we go along."  Bromwich Decl. ¶ 15.  Each of these adverse actions was unlawful, and each should be the subject of discovery in this Court.

Summary judgment is only proper if Defendants can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When evaluating the record, the Court must draw reasonable inferences and construe evidence in Plaintiff's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Under Rule 56(d) (previously 56(f)), summary judgment must "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)—as is the case here.  Accordingly, this Court should defer Defendants' motion under after discovery.

A.   **The Motion Should Be Treated Solely As One For Summary Judgment.**

Defendants do not challenge Plaintiff's First Amendment claims on pleading grounds, arguing only that "Plaintiff's First Amendment claim . . . cannot survive summary judgment."  SJ Mem. 28.  They do challenge Plaintiff's due process claims on pleading grounds, but rely on documents beyond the pleadings, so their arguments must also be treated as ones for summary judgment.  SJ Mem. 19 n.8; *see* Fed. R. Civ. P. 12(d); *cf. Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1132-34 & n.6 (D.C. Cir. 2015) (declining to consider "opinions and conclusions" of defendant-commissioned report attached to motion to dismiss, because plaintiff did not "purport

to endorse its overall analysis" or "adopt the factual contents of the report wholesale").[9]

**B.      Summary Judgment Is Premature.**

"Because pre-discovery summary judgment is disfavored, the D.C. Circuit has directed trial courts to grant Rule 56(d) requests almost as a matter of course." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, No. 1:19-CV-01974 (TNM), 2019 WL 4094563, at \*3 (D.D.C. Aug. 29, 2019) (denying plaintiff's summary judgment as premature and noting defendant-intervenor Trump's "inten[t] to seek discovery" (quotation marks omitted)); *accord Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995). This Court should defer ruling on summary judgment, because it is "unfair to require Plaintiff to oppose Defendant's summary judgment motion without any opportunity for discovery." *Sagar v. Lew*, 309 F.R.D. 18, 20 (D.D.C. 2015) (Moss, J.); *Fields v. Vilsack*, 207 F. Supp. 3d 80, 86 (D.D.C. 2016) (Moss, J.) *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 187 (D.D.C. 2017) (Moss, J.).

Defendants' defense based on the OIG Report is premature. The Report is not even properly in the record, and there has been no discovery on its origins, contents, or conclusions. Defendants have not filed an Answer to the Complaint, and Plaintiff has had no opportunity to seek discovery even though his claims "implicate questions of fact," such as whether his perceived political affiliation or activity was "a substantial or motivating factor in prompting the retaliation" against him. *See LeFande v. District of Columbia*, 841 F.3d 485, 493-94 (D.C. Cir. 2016).

As required under Rule 56(d) and *Convertino v. U.S. Department of Justice*, 684 F.3d 93,

---

[9] Defendants' due process arguments rely on the OIG Report, which is not quoted in the Complaint (except its title) or attached to Defendants' Motion. *See* SJ Mem. 23. They also rely on the FBI SES Policy (DX-2), Plaintiff's March 15, 2018 hearing transcript (DX-3), his March 16 brief (DX-5), and Defendants' March 7 removal proposal and March 16 final decision letter (DX-1 and DX-6). SJ Mem. 19 n.8. The Complaint never cites the FBI SES Policy or the March 15 transcript, simply noting the *fact* of the March 15 hearing. Compl. ¶ 123. As for the other documents, even if Plaintiff "referred to some of the [documents'] recitations," that does not automatically permit "treat[ing] the entire document as incorporated into the complaint." *Banneker*, 798 F.3d at 1133.

100 (D.C. Cir. 2012), Plaintiff's request to defer Defendants' motion is supported by the attached declaration of undersigned counsel Murad Hussain, which (1) "outline[s] the particular facts [Plaintiff] intends to discover and describe why those facts are necessary to the litigation"; (2) "explain[s] why [Plaintiff] could not produce the facts in opposition to the motion for summary judgment"; and (3) "demonstrate that the information is in fact discoverable." *Hedgeye*, 271 F. Supp. 3d at 187 (quotation marks, citations, and brackets omitted). For example, a month before Defendants filed their motion, Plaintiff served them with a letter emphasizing the need to preserve the documents of key custodians, including Trump, Sessions, Rosenstein, Horowitz, Defendant Wray, Bowdich, Schools, and Will. *See* PX-1. Plaintiff intends to seek documents from those and other individuals with knowledge of the circumstances of Plaintiff's investigation, demotion, and accelerated termination. The information and documents to be sought are all in the possession of Defendants, their current and former personnel, or other Executive Branch personnel, as detailed at length in the Hussain Declaration, along with numerous exhibits cited therein to provide predication for the discovery plan. *See generally* Hussain Decl. ¶¶ 9-13.

Taken together, the evidence sought will show that Defendants' reliance on the OIG Report is merely pretextual, *see Cruz v. McAleenan*, 931 F.3d 1186, 1193 (D.C. Cir. 2019) (vacating summary judgment for agency defendant, reversing denial of plaintiff's Rule 56(d) discovery request, and noting that "[t]his Court has never held that the existence of an independent investigation is dispositive on the question of pretext"); that Defendants disregarded agency policies creating legitimate property entitlements to retirement and disciplinary procedures, and that they did so selectively to Plaintiff's detriment; and that Plaintiff's demotion, purported termination, and accelerated disciplinary proceedings were unlawfully influenced by, *inter alia*: (1) Trump's 17-month public and private campaign against Plaintiff; (2) Sessions' and

Rosenstein's criticism of Plaintiff's support for his wife's 2015 state senate campaign; and (3) Sessions' sudden involvement in Plaintiff's disciplinary proceedings, despite his recusal from all 2016 campaign-related matters, his earlier unsuccessful efforts to cause Defendant Wray to fire Plaintiff, and Will's view that Rosenstein would be the final decisionmaker.   Accordingly, the Court should deny Defendants' motion as premature.  *E.g.*, *Hedgeye*, 271 F. Supp. 3d at 187.

## III.   GENUINE DISPUTES OF MATERIAL FACT WARRANT OUTRIGHT DENIAL OF SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT CLAIMS.

Defendants seek summary judgment on Plaintiff's First Amendment allegations, arguing that they "would have taken the same action even in the absence of any protected activity."  SJ Mem. 27.  Where, as here, the parties dispute the true motivation for personnel decisions, "the sole remaining issue [is] 'discrimination *vel non*.'"  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000).  The plaintiff "must be afforded the opportunity to prove . . . that [any] legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (quotation marks omitted).  "[I]n appropriate cases a factfinder's disbelief of the reasons put forward by the defendant may support an inference of intentional discrimination," so plaintiffs need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment."  *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).  Summary judgment is only proper if the Court can "conclude that no reasonable jury could reach a verdict in [the plaintiff's] favor."  *Id.*[10]  Here, ample evidence permits a jury to find that Defendants' reliance on the OIG Report was a pretext for terminating Plaintiff on political grounds.

### A.   First Amendment Framework

For purposes of this motion, Plaintiff accepts *arguendo* Defendants' suggestions that his

---

[10] The "reasonable-jury standard would still apply in the event of a bench trial because the law of summary judgment does not vary with this circumstance."  *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 143 (D.D.C. 2016) (quotation marks omitted).

claims should be analyzed under the *Elrod v. Burns*, 427 U.S. 347 (1976), "political patronage" line of cases. *See* SJ Mem 26 & n.10. Political patronage occurs when a career civil servant suffers an adverse personnel action because he is "not affiliated with or sponsored by" the dominant political party or its leaders. *Branti v. Finkel*, 445 U.S. 507, 517 (1980) (quotation marks omitted). "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("[G]overnment officials may not discharge public employees for refusing to support a political party or its candidates."). This Court may redress unconstitutional political patronage, including through reinstatement, where an adverse action was motivated by a perception—even an incorrect one—about the employee's political beliefs, expression, or affiliation. *See Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1416, 1418 (2016).

**B.     Defendants' Own Evidence Confirms That They Demoted Plaintiff.**

Defendants do not defend Plaintiff's demotion as lawful; they simply deny that it happened. SJ Mem. 27 n.11. But Plaintiff *was* demoted, and Plaintiff will prove that the demotion violated the First Amendment. But for now, the linchpin of Defendants' arguments—the OIG Report itself—confirms that Defendant Wray demoted Plaintiff on January 29, 2018, because it states that Plaintiff held the position of Deputy Director "until January 29, 2018." CMF ¶ 1. Indeed, Defendants concede that ***the February 2018*** OIG Report's title says Plaintiff was "Former FBI Deputy Director." SJ Mem. 1-2. OPR's head also considered David Bowdich to be Deputy Director ahead of Plaintiff's March 2018 separation. PX-2A (handwritten note to "Director Wray and Deputy Director Bowdich"); *see also* PX-2A (email subject: "DD Bowdich"). This evidence creates a genuine factual dispute about whether Plaintiff was demoted. Because Defendants offer

no other arguments on Plaintiff's demotion claim, summary judgment should be denied.[11]

### C. Defendants Engaged In Political Patronage When They Terminated Plaintiff.

The Complaint sets forth how political animus infected Defendants' decisions to demote and terminate Plaintiff.  Defendants do not challenge the allegations except to dispute their motivations, insisting they relied on the OIG Report's conclusions and "decided to remove Plaintiff due to his lack of candor, irrespective of Plaintiff's perceived political affiliation."  SJ Mem. 4.  Whether this stated reason is a pretext is a question for the factfinder.  Employees can show pretext by showing that, *inter alia*, "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," or otherwise similarly situated employees were treated more favorably, or by identifying "changes and inconsistencies in the stated reasons for the adverse action" or "discriminatory statements by the decisionmaker." *Brady*, 520 F.3d at 495 & n.3.  Here, Plaintiff will develop a record on pretext during discovery. *See* Hussain Decl. ¶¶ 10-11.  But even at this early stage, a factfinder could easily discredit Defendants' stated rationale and find that their true motivation for terminating Plaintiff was political in nature.

First, after taking office, Trump continued attacking Plaintiff for his perceived political affiliation.  Throughout May 2017, in the presence of subordinates (including AG Sessions and DAG Rosenstein), Trump repeatedly cited Dr. McCabe's state senate campaign, criticized Plaintiff as politically disloyal, and asked Plaintiff point-blank for whom he voted in the 2016 election. *See* McCabe Decl. ¶¶ 22-27.  Around this time, Sessions and Rosenstein—the ultimate decision-

---

[11] Defendants also never address Plaintiff's allegations, now supported by his declaration, showing that he had none of the Deputy Director's responsibilities in March 2018. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (plaintiff raised genuine issue about whether reassignment "left her with 'significantly different'—and diminished—supervisory and programmatic responsibilities"); *see* McCabe Decl. ¶¶ 37-40 (citing January 28-29, 2018 discussions with Defendant Wray, Plaintiff's resulting demotion and non-duty terminal leave status, and his surrender of access to FBI facilities and networks except for his official email account).

makers in Plaintiff's termination proceedings—also repeatedly confronted Plaintiff with the 2015 photograph of his family wearing of Dr. McCabe's campaign T-shirts, with Rosenstein explicitly calling it a "political problem" and "credibility issue."  McCabe Decl. ¶¶ 25-26, 28.

By July 2017, Trump began openly advocating for Plaintiff's termination, to subordinates in private, to the press, and to the entire world on Twitter, including tweeting to ask why Sessions did not replace Plaintiff due to Plaintiff's supposed partisan affiliation.  *Id.* ¶ 29; PX-3, ll. 4-7. After Defendant Wray's August 2017 confirmation as FBI Director, Trump attempted to have Sessions terminate Plaintiff by unsuccessfully pressuring Wray to do the deed.  McCabe Decl. ¶ 32; PX-5.  When that failed, on December 23, Trump tweeted a criticism of Plaintiff's supposed affiliation with Clinton and then, three minutes later: "FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits. 90 days to go?!!!"  PX-3, line 11.  A reasonable factfinder could easily read that statement as an instruction that Defendants should terminate Plaintiff before he could collect his retirement benefits.  Less than 90 days later, Defendants tried to do just that, and Trump tweeted in celebration of Sessions' March 16, 2018 termination announcement, again linking it to Plaintiff's supposed partisan affiliation.  PX-3, ll. 15-16.  These instances of expressly stated (rather inferred) animus permit a factfinder to reasonably—and easily—conclude that the temporal proximity of these events causally connects Plaintiff's termination to political animus.  *Cf. Hamilton*, 666 F.3d at 1357 (jury could reasonably infer causation where employer's adverse actions took place within three-month period following employee's protected activity, even absent direct evidence of discriminatory animus).

Sessions' final say over Plaintiff's fate (DX-6 at 8) draws an unbroken line from Trump's political animus to those proceedings—passing through Sessions' own confrontation of Plaintiff about his political support for his wife's campaign, to Trump's public tweets that Sessions should

have fired Plaintiff for his partisan affiliation, to Sessions failed attempt to push Defendant Wray fire Plaintiff, to Wray's demotion of Plaintiff based on Wray's discussion with Sessions, and ultimately to Sessions' March 16, 2018 termination announcement.  The fact that OPR assumed Rosenstein, not Sessions, would have the final say on Plaintiff's termination (*e.g.*, PX-2A) makes it even more suspicious that Sessions parachuted into the process at the last minute, despite his recusal from all 2016 campaign-related matters. *See infra* pp. 33-34 (analyzing Sessions' recusal); *see also Brady*, 520 F.3d at 495 n.3 (defendants' "failures to follow established procedures" can show pretext).  At a minimum, Trump's ongoing pressure on Sessions to remove Plaintiff invites a "cat's-paw" analysis, where "a reasonable jury could find that [Sessions'] decision was swayed by [Trump's] subjective judgments."  *See Coats v. DeVos*, 232 F. Supp. 3d 81, 90 (D.D.C. 2017) (Moss, J.) (denying summary judgment for agency) (quotation marks omitted).

Extensive circumstantial evidence also belies Defendants' reliance on the OIG Report's "lack of candor" charges.  In April 2018, the FBI Office of General Counsel concluded that Plaintiff's separation was ***not*** due to "gross misconduct."  PX-23.  "Gross misconduct means a flagrant and extreme transgression of law or established rule of action for which an employee is separated," 5 C.F.R. § 890.1102, including "an offense punishable as a felony" and some lesser offenses, *Federal Employees Health Benefits Program—Temporary Continuation of Coverage*, 54 Fed. Reg. 52,333 (Dec. 21, 1989).  Defendant FBI thus concluded that Plaintiff did ***not*** commit a "flagrant or extreme transgression" of established rules—starkly contradicting OPR's conclusion that his supposed actions were "incompatible with the FBI's Core Values."  Dkt. 23-2 (DX-1) at 34.  Indeed, in Defendants' rush to fire Plaintiff, they apparently bypassed the FBI General Counsel altogether in order to consult the Office of Legal Counsel ("OLC") on March 8, 2018 about "FBI SES policies."  PX-10 (email chain originally between Steven Engel and Robert Hur).

Defendants insist that OIG is an "independent investigative agency" whose findings are beyond dispute, SJ Mem. 30, and that Defendants' self-serving written statements that they relied on the OIG Report forecloses any possibility that such reliance was a pretext for impermissible motivation.  These arguments ignore the law and the facts.

*First*, Defendants offer the unsupported conclusion that "the government would have reached the same decision regardless of what any official believed about Plaintiff's political affiliation" simply because of the OIG Report's findings.  SJ Mem. 27-28.  This is simply wrong. As a legal matter, the OIG Report's existence does not categorically foreclose any effort to show that Defendants acted for impermissible reasons.  *See* SJ Mem. 30.  The D.C. Circuit "has *never* held that the existence of an independent investigation is dispositive on the question of pretext." *Cruz*, 931 F.3d at 1193 (emphasis added).  Thus, *Cruz* reversed summary judgment for the Department of Homeland Security on an employee's retaliation claim where, as here, the agency filed a pre-discovery summary judgment motion.  *Id.* at 1191.  The district court impermissibly relied on a disciplinary investigation's supposed independence, and the D.C. Circuit found that "the evidence sought by [the plaintiff] could create a genuine dispute of material fact as to whether [the agency's] proffered reasons for taking adverse action were pretextual."  *Id.* at 1192-93.

*Second*, OIG and IG Horowitz were not insulated from Trump's (and Sessions') corrupting influence.  The DOJ Inspector General "shall report to and be under the general supervision of" the Attorney General and "may be removed from office by the President."  Inspector General Act of 1978, Pub. L. No. 95-452, § 3(a) & (b), 92 Stat. 1101.  Here, the President was the source of political pressure to fire Plaintiff.  In an unprecedented move, around late December 2017, IG Horowitz decided to spin off his investigation of Plaintiff from the broader 2016 election investigation and accelerated the completion of the OIG Report about Plaintiff, ***before*** he

completed the broader 2016 election report.   McCabe Decl. ¶¶ 16, 35; Bromwich Decl. ¶ 8.

Horowitz then notified Defendant Wray of this decision around December 20.  McCabe Decl. ¶ 35.

Trump then openly criticized Horowitz via tweet for being late with his reports (PX-3, line 13),

and that same day, OIG submitted Plaintiff's report to OPR.  *See* PX-6.[12]

*Third*, even if the OIG Report were accurate (which it is not), it does not conclusively

establish Defendants' motives for demoting and terminating Plaintiff.   The OIG Report never

recommended or required Plaintiff's termination; it was issued for such action as ***the FBI*** "deems

appropriate."   CMF ¶ 3.   Thus, it was entirely Defendants' choice how to respond, and their

discretionary actions are not immune from review.   The central question—and the only disputed

question on this claim—is this:   What was Defendants' motivation when they fired Plaintiff?

*O'Hare Truck Serv.*, 518 U.S. at 714 (ultimate question is whether motivation was political).   The

OIG Report is but a small piece of that much larger puzzle.

### D.      Defendants Engaged In Political Patronage When "Racing The Clock."

Defendants' acceleration of Plaintiff's termination proceedings constitutes a free-standing

adverse action, causing independent harm—an unfairly rushed process (*see infra* pp. 36-45) that

led to the loss of Plaintiff's immediate pension eligibility.   Defendants do not defend the

suspiciously the rushed timeline of their investigations and proceedings; they argue only that if the

---

[12] The OIG Report's neutrality is also not a forgone conclusion. *Cf. Cruz*, 931 F.3d at 1192 n.1 (record supported inference that "investigation was merely a *post hoc* effort to shore up" decision to discipline plaintiff).   For example, the Report concluded that Plaintiff concealed his WSJ disclosures from Comey.   But it ignored key exculpatory evidence, such as Kortan's October 30, 2016 email to Comey's chief of staff revealing the disclosures.  DX-5 at 4; *see also* McCabe Decl. ¶ 44; Hussain Decl. ¶ 6(g) (seeking discovery "relating to decisions to omit exculpatory evidence from Michael Kortan from the OIG Report and disciplinary decisions").   The Report's conclusion is also contradicted by Trump's repeated statements that Plaintiff and Comey were so close professionally that Comey would have known whatever Plaintiff was doing.   PX-3, line 17 (tweeting about OIG Report: "McCabe was totally controlled by Comey - McCabe is Comey!!"); *id.*, ll. 16, 19, 21-22.   On summary judgment, there is no basis to discredit Trump's statements.

termination decision were not unlawful, then accelerating the proceedings could not be unlawful either.  SJ Mem. 29 n.11.  But even if the OIG Report somehow compelled their termination decision (which it did not), it did not compel their *discretionary* decision about how and when to conduct disciplinary hearings.  The evidence shows Defendants had the choice of letting Plaintiff retire while continuing their review.  *See* PX-11 (Comey's email asking Will for thoughts about "not closing matters when an employee resigns or retires[,] to avoid an employee who has engaged in misconduct returning to government service without record of a completed investigation"); PX-12 at 2 (Will: "Bottom line is we will do whatever you think is best."); CMF ¶ 4 (citing two OIG "lack of candor" investigations where employees retired before any adverse action was taken).

Defendants' "failures to follow established procedures" governing their efforts to remove Plaintiff is also evidence of pretext.  *See Brady*, 520 F.3d at 495 n.3; *Farris*, 602 F. Supp. 2d at 87. OPR's head concluded on March 5, 2018 that if the proceedings were conducted "[p]ursuant to standard procedures," they were "unlikely" to "reach final resolution" before Plaintiff retired. PX-2A (emphasis added).  Four days later, Schools told Plaintiff's counsel that instead of using standard procedures, "We're making it up as we go along."  Bromwich Decl. ¶ 15.  The proceedings unfolded haphazardly, also violating due process.  *See infra* pp. 43-45.

In short, a reasonable factfinder could conclude that Defendants' reliance on the OIG Report is a pretext and that they punished Plaintiff because he was "not affiliated with or sponsored by" Trump.  *Branti v. Finkel*, 445 U.S. 507, 517 (1980).  For all of these reasons, summary judgment should be denied and the First Amendment claims should proceed to trial after discovery.

## IV.   COUNTS 1 AND 2 STATE VALID CLAIMS DUE PROCESS CLAIMS, AND GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT.

Defendants violated Plaintiff's rights to procedural and substantive due process.  "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or

employing it as an instrument of oppression." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quotation marks and brackets omitted). Its "touchstone" is the "protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 845-46 (quotation marks and citations omitted).

Thus, where the government acts without authority when depriving a plaintiff of property or liberty, its actions are "sufficiently arbitrary to amount to a substantive due process violation," *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007) (Calabresi, J.) (vacating summary judgment for defendants).[13] By contrast, "[t]o prevail on his procedural due process claim, the plaintiff must first show a deprivation of 'life, liberty, or property' and must then show that the procedures used by the Government in effecting the deprivation [did not] comport with due process of law." *Dodson v. U.S. Capitol Police*, No. 18-CV-2680, 2019 WL 4860720, at *5 (D.D.C. Sept. 30, 2019) (Moss, J.) (denying motion to dismiss) (quotation marks omitted).

Count 1 of the Complaint alleges that Defendants caused the deprivation of Plaintiff's legitimate statutory entitlement to his retirement pension, by falsely and arbitrarily recording that he was terminated on March 16, 2018, even though the purported termination had no legal effect. Count 2 alleges that even if the termination had been legally effective, Defendants unlawfully accelerated it by arbitrarily depriving Plaintiff of his entitlements to 30 days' continued employment after receiving notice of his proposed removal, and to adequate notice of the charges against him.[14] Defendants move to dismiss these claims, but by introducing documents outside

---

[13] *See also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987) (Bork, J.) (discussing possibility of claims for "*ultra vires* governmental action")

[14] Count 2 also alleges that Defendants have harmed Plaintiff's liberty interest in his reputation. Defendants suggest that Plaintiff "has not been sidelined by his removal," citing his efforts to chart

the record and upon which the Complaint does not rely (*see supra* pp. 17-18), Defendants converted their motion into one for summary judgment.  Regardless, the Complaint pleads valid claims, and the record also creates genuine disputes of material fact precluding summary judgment.

### A.     Defendants Violated The Due Process Clause By Depriving Plaintiff Of His Legitimate Property Entitlement In His Law Enforcement Pension.

#### 1.     Plaintiff is entitled to his immediate law enforcement officer annuity.

Plaintiff is presently entitled to receive his immediate law enforcement officer annuity, because he separated from his employment on his planned retirement date of March 17, 2018, when he was deemed to reach 50 years of age with over 20 years in service. 5 U.S.C. § 8412(d)(2); *see* PX-20 (stating March 17 would be relevant date).  Defendants insist that Plaintiff "did not satisfy the requirements for entitlement to this law-enforcement officer annuity because *he was not employed* as a law enforcement officer" on March 17.  SJ Mem. 16 (emphasis added).  That is a fact question.  Defendants' statement presumes, without analysis, that Sessions' purported March 16 termination decision stopped Plaintiff from being deemed employed on March 17.  The Court must therefore consider the effect of Sessions' actions and the authorities and practices governing Defendants' personnel processes.[15]   As pled in the Complaint and set forth below, Sessions' actions lacked legal effect and thus did not disrupt Plaintiff's employment and "legitimate claim of entitlement" to his immediate retirement benefit.  *See Roth*, 408 U.S. at 577.

---

a new professional course now that Defendants have stigmatized him.   SJ Mem. 17. Notwithstanding Plaintiff's best efforts, Trump and others still cite Defendants' actions as justification for attacking Plaintiff's honesty. *E.g.*, PX-3, line 23.

[15] *Kukla v. Vill. of Antioch*, 647 F. Supp. 799, 814 (N.D. Ill. 1986) ("The existence of a property interest based on the parties' conduct is a fact question rarely resolved at the pleading stage."); *e.g.*, *Green v. City of Hamilton, Hous. Auth.*, 937 F.2d 1561, 1566 (11th Cir. 1991) (vacating summary judgment for defendant on plaintiff's due process claim, because he raised factual dispute about his employment contract and thus about "the existence of a property interest").

### a. By law and agency practice, Plaintiff was deemed employed through March 17, 2018.

Plaintiff was on "terminal leave" when he separated from the FBI, meaning that he remained on the FBI's payroll while using previously accrued annual leave time, but had no affirmative work responsibilities. CMF ¶ 2; McCabe Decl. ¶ 40. As alleged, and as a reasonable factfinder could conclude, Plaintiff completed his FBI tour of duty at 5 p.m. on Friday, March 16, 2018, so he was deemed employed for the full pay period ending on his retirement date of Saturday, March 17—and so Defendants' termination announcement at 10 p.m. Friday came too late.[16]

FBI employees are paid on a biweekly basis, and each pay period's administrative workweek runs from Monday through Friday, with a standard 5 p.m. close of business. McCabe Decl. ¶ 47; PX-17B (FBI Manual of Administrative Operations and Procedures ("MAOP"), Pt. 2, § 1-2.4.1). When federal agencies calculate how career employees accrue annual and sick leave, the employees are "***deemed employed for a full biweekly pay period*** if [they] [are] employed during the days within that period, exclusive of holidays ***and nonworkdays*** . . . , which fall within [their] basic administrative workweek." 5 U.S.C. § 6302(b) (emphasis added). However, "annual and sick leave accrues ***only after the completion of the pay period.***" *Ringo v. Dep't of Def.*, 122 M.S.P.R. 91, 95 (2015) (endorsing Office of Personnel Management's view) (emphasis added). In Plaintiff's case, being employed at 5 p.m. on a pay period's final Friday would mean he was "deemed employed" for, and thus "completed," the full pay period through the next day, Saturday.

---

[16] *Cf. Hannon v. Dep't of Air Force*, 19 M.S.P.R. 510, 511-12 (1984) (finding that where employee's probationary period would have ended on Memorial Day, "the last day he actually had to demonstrate fitness for further employment" was the preceding Friday, because weekends were not part of his "ordinary work week," so he was no longer probationary when agency tried to fire later that Friday night without adequate procedures), *holding modified on unrelated grounds by Stephen v. Dep't of Air Force*, 47 M.S.P.R. 672 (1991). Decisions by the Merit Systems Protection Board ("MSPB") are obviously not binding on this Court, but warrant consideration given the MSPB's familiarity with federal personnel authorities.

The record evidence shows that Plaintiff's final pay period ended on Saturday, March 17, 2018, and that he completed his virtually non-existent employment obligations for that period on Friday, March 16, 2018, before Sessions' termination announcement. *See also* Compl. ¶ 151.  On Tuesday, March 13, FBI Human Resources officer Patreece Carter completed Plaintiff's estimated retirement package with an effective date of Monday, March 19.  PX-19.  She calculated that on March 19, Plaintiff would have 193.30 hours of unused accrued annual leave.  *Id.*  On March 14, she informed Plaintiff that his first full day of retirement could actually be Saturday, March 17:

> This way, you will retire with a full paycheck and not have to wait another two weeks for your payroll card to close out.  Additionally, ***you will be able to gain sick and annual leave for pay period 5.***  If you are okay with changing your retirement date to 3/17/2018, your retirement annuity will not change and the effective date of your annuity will remain at 4/1/2018.  I will send down your retirement package to OPM via NFC on Friday afternoon and have my office and payroll process your retirement action dated for 3/17/2018 instead of 3/19/2018.

PX-20 (emphasis added).  In other words, if Plaintiff completed the workday on Friday, March 16, he would satisfy his obligations for the pay period, and be "deemed employed for [the] full biweekly pay period."  5 U.S.C. § 6302(b). Plaintiff approved Carter changing his retirement application to reflect this.  McCabe Decl. ¶ 47.

After Plaintiff's separation from the FBI, he received a FERS Benefit Estimate Report based on a retirement age of 60.  McCabe Decl. ¶ 51.  Despite that change, the lump-sum annual leave payout remained $187,000 and Plaintiff's unused annual leave total remained 193.3 hours.  *Id.*; PX-22; *compare* PX-19.  This confirms that Plaintiff was "deemed employed" for the entirety of the pay period ending Saturday, March 17, 2018, *see* 5 U.S.C. § 6302(b), and that he had "gain[ed] sick and annual leave for pay period 5" as Carter had predicted, PX-19.  Because "annual and sick leave accrues only after the ***completion*** of the pay period," *Ringo*, 122 M.S.P.R. at 95 (emphasis added), a reasonable fact-finder could conclude that as a matter of law and agency

practice, Plaintiff completed the pay period ending Saturday, March 17, 2018 by completing all March 16 workday obligations before Defendants' attempted 10 p.m. termination, and therefore has a legitimate property entitlement to his immediate retirement annuity.

<strong>b.    Sessions lacked authority to fire Plaintiff.</strong>

But even if Sessions' termination announcement was not too late, Sessions had no power to remove Plaintiff.  First, Sessions invoked DOJ Order 1202 as his sole authority for removing Plaintiff, but Order 1202 did not give Sessions the power to remove Plaintiff.  Order 1202 provides that only the FBI Director—then as now, Defendant Wray—can terminate most career FBI senior executives.  Dkt. 23-5  (DX-4) at 17.  However, the Attorney General may remove those serving in certain enumerated "key positions," including the position of FBI Deputy Director.  *Id.*  But Plaintiff was only Deputy Director "until January 29, 2018."  CMF ¶ 1 (quoting OIG Report); PX-2A; PX-2B; *supra* pp. 21-22.  After that point, Plaintiff was a regular career SES employee, so Wray alone had the authority to terminate his employment.  But Wray did not fire Plaintiff—just as he had previously refused to do several months earlier under pressure from Sessions.

Because Order 1202 did not empower Sessions to terminate Plaintiff, the termination had no legal effect and cannot preempt Plaintiff's entitlement to his immediate annuity.  *See Toyens v. Dep't of Justice*, 58 M.S.P.R. 634, 637 (1993) (explaining that the deciding official must have "the proper authority [to] effect[] the personnel action" and sustaining termination by DOJ official who "had such authority"); *Sipe v. Fritz*, 43 B.R. 984, 996 (D. Ariz. 1984) (in APA action, invalidating termination of deputy bankruptcy clerk Administrative Office of the U.S. Courts, because Office had no authority to terminate her).  At the very least, a genuine factual question about Plaintiff's position on March 16, 2018—and Sessions' authority—precludes summary judgment.[17]

---

[17] *E.g.*, *Green*, 937 F.2d at 1566 (vacating summary judgment on due process claim, due to fact

- 32 -

Second, even if Plaintiff had been the Deputy Director on March 16, 2018 (which he was not), Sessions was statutorily disabled from firing Plaintiff.  A year earlier, when Sessions announced his recusal from all "investigations of any matters related in any way to the campaigns for President of the United States,"  CMF ¶ 16, this triggered 28 U.S.C. § 508(a), which provides that upon the Attorney General's "disability," "the Deputy Attorney General may exercise all the duties of that office."  This Court has already held that Sessions' "recusal from any campaign-related matters" was a "disability" under § 508(a), and DAG Rosenstein "became Acting Attorney General, *by operation of law,* as to those matters for which the Attorney General was recused."  *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 621 (D.D.C. 2018) (Howell, C.J.) (emphasis added), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019).

Defendants' disciplinary proceedings arose from investigations related "to the campaigns for President of the United States."  Most directly, they rested on Candice Will's "Report of Investigation" (*see* Dkt. 23-2 at 18), which examined Plaintiff's authorization of disclosures to the press, during the final weeks of the 2016 presidential campaign, about the FBI's investigations of 2016 presidential candidate Clinton and the Clinton Foundation, and in response to media coverage and then-2016 presidential candidate Trump portraying Plaintiff and the FBI as favoring Clinton's campaign.  *See id.* at 18-22; PX-3, ll. 1-2; CMF ¶ 5 (citing OIG Rpt. 1-2); Oral Resp. Tr. 59:6-18; 61:14-62:19, 72:10-73:10, 195:2-12.  Will's report in turn drew on the OIG Report, whose underlying investigation spun off from OIG's 2016 election investigation.  McCabe Decl. ¶ 35.

Because Plaintiff's proceedings fell within the express scope of Sessions' recusal, Sessions

---

dispute about supervisor's authority "to make employment decisions regarding employees in unidentified 'key' positions"); *Holly v. City of Naperville*, 603 F. Supp. 220, 225 (N.D. Ill. 1985) (denying defendant's summary judgment motion on due process claim, due to fact dispute over "whether plaintiff was in fact a department head to be excluded from [a policy]'s protections").

was statutorily disabled from participating in Plaintiff's termination.   Alternately at a bare

minimum, because OPR believed that DAG Rosenstein "will make the ***final decision*** in this

matter," Dkt. 23-2 at 16 (emphasis added); *accord* PX-2A, there is a genuine fact dispute about

whether Sessions in fact was recused, precluding summary judgment.

**c.**   **Plaintiff did not make or waive any allegations of "bias."**

Defendants never address Plaintiff's express allegations (*see* Compl. ¶ 155) about § 508(a)

and Sessions' statutory disability.   Instead, Defendants try to rewrite the Complaint as alleging

Sessions' "bias."  SJ Mem. 19–23.   But Plaintiff does not allege bias; he attacks Sessions' lack of

authority to act under § 508(a).   In other words, the issue is not that Sessions *should have* recused

himself, but that he *was already* recused, because his ongoing "single-issue recusal [was] a

'disability' that ***created*** a vacancy that the Deputy Attorney General was eligible to fill."   *Grand*

*Jury Investigation*, 916 F.3d at 1055-56 (emphasis added).

Defendants also argue that Plaintiff supposedly waived any allegations of Sessions' bias

by not raising them during before Schools. SJ Mem. 17–19.   As an initial matter, the doctrine of

issue waiver (or "issue exhaustion") does not apply here, because the doctrine presumes that a

court is reviewing an "appeal" of an administrative decision, as was the situation in all of

Defendants' cited cases.  *See* SJ Mem. at. 18-19.   But this is not an administrative appeal.

Moreover, the waiver doctrine is inapplicable because Defendants' regulations do not "require

issue exhaustion" and their removal proceedings were "not adversarial."   *Sims v. Apfel*, 530 U.S.

103, 108, 110 (2000)) (Thomas, J., majority op.) (finding waiver doctrine inapplicable).[18]

---

[18] The proceedings were "inquisitorial" instead, because Sessions "ha[d] no representative before
the [agency decision-maker] to oppose" Plaintiff's claim. *Sims*, 530 at 111 (Thomas, J., plurality
op.); *cf. Brown v. District of Columbia*, No. 17-CV-348 (RDM/GMH), 2019 WL 3423208, at *10
n.8 (D.D.C. July 8, 2019) (analyzing *Sims* and applying waiver doctrine to adversarial hearing).

In any event, it was premature to attack Sessions' partiality (and lack of authority). Plaintiff never appeared before him, and it was unclear whether Sessions would even review Schools' final recommendation. An attack on Sessions would have been akin to prematurely attacking an appellate judge as biased before a trial court even issues its verdict.[19] At the end of Plaintiff's March 15, 2018 hearing, his counsel asked Schools about next steps; Schools responded ambiguously but suggested that depending on his recommendation, the decision might pass either to AG Sessions (in the case of termination or a suspension of 30 days or more), DAG Rosenstein (in the case of suspension shorter than 30 days), or "someone." Oral Resp. Tr. 198:14-200:19. At this point, Plaintiff's counsel requested the opportunity to "meet with the attorney general personally" if Schools proposed termination. *Id.* at 201:3-10. Schools said he would "make sure they are aware of that" request. *Id.* at 201:11-13. If Plaintiff had been given a hearing before Sessions, it may have been appropriate to challenge his bias at that time. Ultimately, however, the agency never gave Plaintiff that hearing, and a few hours after Schools received Plaintiff's March 16 brief, Sessions rubber-stamped the packaged rationale for terminating Plaintiff.[20]

### 2. Defendants arbitrarily deprived Plaintiff of his immediate annuity entitlement, in violation of substantive due process.

A reasonable factfinder could also conclude that Defendants have arbitrarily deprived Plaintiff of his pension in violation of substantive due process, by improperly recording his FBI separation date as March 16, 2018 and causing that erroneous date to be transmitted to the Office for Personnel Management ("OPM"). McCabe Decl. ¶ 50; PX-21. "[I]f [the government] did not

---

[19] *See also U.S. v. Bowens*, 291 F. App'x 644, 645 (5th Cir. 2008) (motion to recuse judge from considering habeas petition was premature, because petition was not yet before him to decide).

[20] Even then, Sessions signed the portion of Schools' March 16, 2018 letter that stated only that Plaintiff "should be" removed, without stating that the removal would be effective immediately or on any other date. DX-6 at 8. This is yet another reason that Plaintiff was not terminated on March 16 and retired as an agent in good standing. Compl. ¶ 151.

have authority for the actions it took regarding [the plaintiff's property interest]—as it appears it did not—the [government's] actions were *ultra vires* and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *See Cine SK8*, 507 F.3d at 789; *accord Lingle v. Chevron USA Inc.*, 544 U.S. 528, 543 (2005) (discussing possibility that government action impairing property right could be "so arbitrary as to violate due process"). The factfinder could also conclude, from the evidence explicitly linking Plaintiff's retirement benefits to Trump's vendetta against him (*see supra* pp. 22-24), that Defendants' actions were "intended to injure or to spite" Plaintiff. *See O'Connor v. Pierson*, 426 F.3d 187, 203–04 (2d Cir. 2005) (vacating summary judgment for defendants on tenured teacher's substantive due process claim).

### 3. Defendants also deprived Plaintiff of his immediate annuity entitlement in violation of procedural due process.

A reasonable factfinder could also conclude that, because Plaintiff was never terminated, Defendants violated procedural due process by recording him as having been terminated. "In evaluating whether governmental procedures meet the constitutional minimum set by the due process clause, the Court must consider (1) the private interest; (2) 'the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) the governmental interest." *Dodson*, 2019 WL 4860720, at *5 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Here, the Plaintiff's private interest in collecting his pension is high, while the governmental interest in transmitting an erroneous separation date to OPM is non-existent. Whatever the procedure used, it was deficient by definition, because it has yielded "an erroneous deprivation of [the private] interest." *Id.* For all of these reasons, the Court should deny summary judgment on Count 1.

### B. Defendants Violated The Due Process Clause By Depriving Plaintiff Of His Legitimate Property Entitlement In Continued Employment.

Even if Defendants' accelerated termination of Plaintiff had legal effect, it deprived

Plaintiff of both substantive and procedural due process.  As relevant here, Plaintiff enjoyed two independent but related property interests conferred by statute and FBI policy: the right to be terminated only for cause, and the right to 30 days' advance notice ahead of his proposed removal. These two protections thus imposed substantive restrictions on *why* and *when* Defendants could terminate Plaintiff, and also gave Plaintiff a property interest in continued employment.  *Garrow v. Gramm*, 856 F.2d 203, 207 (D.C. Cir. 1988) (property interests are "created by understandings, statutes, or rules that secure certain benefits and that support claims of entitlement to those benefits"); *Lamb*, 82 F. Supp. 3d at 425 (regulations can "create protected property interests").

 After receiving Candice Will's proposed notice of termination on March 8, 2018, Plaintiff was supposedly terminated eight calendar days later.  But had Plaintiff not been arbitrarily denied his full 30 days' notice, he would have enjoyed his first full day of retirement on March 17, 2018.

### 1.   Plaintiff had a property interest in his continued employment.

Defendants wrongly argue that "Plaintiff did not enjoy for-cause removal protections," noting that he was not covered by the for-cause removal provisions of 5 U.S.C. §§ 7511 or 7513. SJ Mem. 15-16.  Those statues are irrelevant.  Defendants overlook that Congress extended a *different* statute's for-cause protections to FBI SES employees in 1988: 5 U.S.C. § 7543, as applied to the FBI SES by 5 U.S.C. § 3151(a)(5)(D).  In fact, Defendant Barr personally issued the 1992 order that formally established the FBI SES "pursuant to 5 U.S.C. [§] 3151."  *See* AG Order No. 1600-92, 57 Fed. Reg. 31,314 (July 15, 1992) (codified at 28 C.F.R. § 0.157).  Section 7543(b)'s procedural protections are listed almost verbatim on page 16 of the FBI SES Policy that Defendants introduced into the record as DX-2.  All of Defendants' cited cases are irrelevant, because none of them involved FBI *SES* employees and their unique protections.  *See* SJ Mem. 15 (citing cases).

These statutory protections, and the FBI policies implementing them, prevented Defendants from removing Plaintiff without cause.  This alone gave him a constitutionally

protected property interest in his continued employment, subject to constitutionally adequate preterminiation procedures. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985) (state employee who, per state statute, could not be terminated except for cause had protected property interest in continued employment). But beyond for-cause protections, these same statutes and regulations also entitled Plaintiff to a *second*, independent property interest: 30 days' advanced written notice before being terminated, which created a "limited property interest" in his continued employment for those 30 days.[21] Although Plaintiff has no *statutory* remedy to vindicate these statutory rights, these statutory rights create property interests that can be vindicated with *constitutional* remedies. *Harrison*, 815 F.2d at 1519 n.33.

### a.      5 U.S.C. § 7543's protections apply to FBI SES employees.

Section 7543 sets forth the general procedural protections given to members of the Senior Executive Service. Subsection (a) provides that agencies may only remove an SES employee "for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." Subsection (b) states that when an agency proposes to remove an SES employee, the employee is "entitled to," *inter alia*, (1) "at least 30 days' advance written notice, unless there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed, stating specific reasons

---

[21] *E.g.*, *Cage v. Harper*, No. 17-CV-7621, 2018 WL 4144624, at *4 (N.D. Ill. Aug. 30, 2018) (denying motion to dismiss due process claim, because although public employee "could be terminated at-will, such a termination was subject to a twelve-month period of continued employment following notice of termination"); *Kelly v. Indep. Sch. Dist. No. 12*, 80 F. App'x 36, 41 (10th Cir. 2003) (where employee could be terminated without cause only upon 30 days' prior notice, he "had a legitimate claim of entitlement to thirty days of continued employment if terminated without cause"); *FDIC v. Henderson,* 940 F.2d 465, 476 (9th Cir. 1991) (similar as to bank employee who could be terminated without cause only with 90 days' prior notice); *cf. Mozier v. Bd. of Ed. of Cherry Hill Twp., Camden Cty.*, 450 F. Supp. 742, 748 (D.N.J. 1977) ("no property interest was implicated in the process of [the plaintiff's termination" because he received "all that his contract of employment gave him a right to expect, *i.e.*, 60 days notice of his discharge").

for the proposed action," and (2) "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer[.]" 5 U.S.C. § 7543(b).  Although § 7543 does not apply to the FBI SES by its own terms, Congress mandated that the regulations governing the FBI SES "shall . . . provide for . . . removal or suspension consistent with subsections (a), (b), and (c) of section 7543" (with exceptions not relevant here).  5 U.S.C. § 3151(a)(5)(D); *see also Segar v. Mukasey*, 508 F.3d 16, 27 (D.C. Cir. 2007) (rejecting DEA's argument for disregarding another statutory cross-reference by § 3151(a)).

Pursuant to § 3151, the FBI promulgated its SES Policy to implement § 7543(a) and (b), largely by copying the statutory text.  *See* DX-2 at 5 ¶ II.C (citing § 3151's mandate); *id.* at 16-17 ¶ V.C.2.a.   However, the policy also summarizes the FBI's gloss on the interplay between subsections (a) and (b): "[I]f there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment can be imposed, the [30 days'] advance notice may be curtailed to as little as seven days."  *Id.* at 16 ¶ V.C.2.a.1.

> **b.** **Defendants could only shorten Plaintiff's 30-day notice if they invoked the "crime exception."**

Defendants concede that "if a proposed removal is based on misconduct, then the [FBI SES] employee is presumptively afforded 30 days to respond to the proposal."  SJ Mem. 15-16 (citing FBI SES Policy).  This is dictated by § 7543(b)(1), which "entitles" an SES employee to "at least 30 days' advanced written notice" before the "proposed action" takes effect.   Defendants correctly note that "there is an exception to this rule" (SJ Mem. 16), because termination can occur on a shorter timeframe only if "there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed."  5 U.S.C § 7543(b)(1).  But even when this accelerating provision, known as the "crime exception," is invoked, the advanced written notice must still "stat[e] specific reasons for the proposed action[.]"  *Id.*

No known case law interprets § 7543(b).  However, that provision's text is virtually identical to 5 U.S.C. § 7513(b)'s protections for non-SES employees, so decisions interpreting § 7513(b)'s identical crime exception are instructive.  These decisions confirm that agencies must have reasonable cause *in hand* when they invoke the crime exception.  *Brown v. Dep't of Justice*, 715 F.2d 662, 664, 666 (D.C. Cir. 1983) ("[A]n agency can justify its suspension of an employee by proving that *it had* reasonable cause to believe the employee had committed a work-related crime." (emphasis added)); *Dunnington v. Dep't of Justice*, 956 F.2d 1151, 1156 (Fed. Cir. 1992) ("A summary suspension (one taken on less than 30 days' notice) is an administrative decision . . . available *only when* there has been *an allegation* of a serious crime" (emphases added)).

In other words, an agency's invocation of and basis for the crime exception must be apparent when it proposes the adverse action; *post hoc* rationalizations will not suffice.  Thus, the crime exception will be justified where the agency relied upon the commencement of formal criminal proceedings, *e.g.*, *Brown*, 715 F.2d at 667 (DOJ employee's indictment on work-related charges supported invoking crime exception to suspend him on only 10 days' notice); *Dunnington*, 956 F.2d at 1157 (same based on warrants, criminal complaints, and witness statements), or workplace assaults, *see also Duran v. MSPB*, 707 F.2d 1174 (10th Cir. 1983) (crime exception appropriate where employee's use of pipe wrench to beat co-worker into hospitalization "constitutes aggravated assault").  But "the mere fact of an arrest by the police is not, in and of itself, sufficient to provide reasonable cause," *id.*, nor is the mere issuance of an arrest warrant, *see Froehlich v. Dep't of Treasury*, 21 M.S.P.R. 265, 268-69 (1984).  The FBI's own internal policies track these principles and gives OPR the responsibility for assessing "reasonable cause":

> *Should the Office of Professional Responsibility (OPR) find that reasonable cause exists to believe an employee has committed a crime for which a sentence of imprisonment may be imposed,* a letter signed by the Assistant Director, OPR, *will* be prepared

> advising the employee that he/she *will* be placed on indefinite suspension (without pay or duties) and the reason for such action. . . . In these types of criminal conduct cases, employees *will not be* given the option of using leave.

PX-17A (MAOP, Pt. 1, § 13-11.1(1)) (emphases added).

### c.   Defendants did not invoke the "crime exception."

Defendants insist without elaboration that they could accelerate Plaintiff's termination under the crime exception, because the OIG Report concluded that Plaintiff "lacked candor under oath."   SJ Mem. 3.   But "lacking candor" is an administrative charge, not a crime, and thus is insufficient as a matter of law and FBI policy to trigger the crime exception.  The OIG investigation was not a criminal proceeding, the OIG Report did not analyze any criminal laws or make any findings of criminal conduct, and there was no arrest, warrant, complaint, or indictment.

Defendants have not produced no evidence showing that when notifying Plaintiff of his proposed termination, they either *invoked* the crime exception or *believed* they had reasonable cause to do so.  Tellingly, there is no evidence that OPR made any "find[ing] that reasonable cause exists" consistent with the MAOP.  PX-17A.  (MAOP, Pt. 1, § 13-11.1(1)).  Will's removal proposal did not invoke the crime exception, said anything nothing about criminal activity, and merely analyzed the FBI's administrative "offense codes" rather than analyzing any criminal statutes.  DX-1 at 2.  Thus, as Defendants concede, Wills merely concluded that Plaintiff "had engaged in misconduct"—not that he had committed any crime.  SJ Mem. 6.  The same is true of Schools' March 16, 2018 Memorandum for the Attorney General.  DX-6.

Instead, the record creates a genuine dispute of material fact by showing that Defendants were *not* applying the crime exception and did *not* believe they had reasonable cause of any crime having been committed.  Will's March 5, 2018 email to Deputy Director Bowdich and her March 7 note to Bowdich and Director Wray stated that OPR was employing "standard procedures," and

Bowdich's March 5 email response reinforced that they should "follow the regular process."  PX-2A; PX-2B; Compl. ¶ 113.  Nor did Will do what the MAOP stated that OPR "will" do: place Plaintiff on "indefinite suspension (without pay or duties)" and revoke his "option of using [his accrued annual] leave," as he was using while on terminal leave.  PX-17A.  And finally, the FBI Office of General Counsel later said Plaintiff's separation was ***not*** due to "gross misconduct," PX-23, meaning that the FBI concluded that Plaintiff did ***not*** commit a "felony" or any other "flagrant" transgression of law.  5 C.F.R. § 890.1102; 54 Fed. Reg. at 52,333.  On this record, a reasonable factfinder could conclude that Defendants did not actually or properly invoke the crime exception and therefore could not expedite Plaintiff's removal.

### 2. Plaintiff was arbitrarily deprived of his property interest in 30 days' continued employment, in violation of substantive due process.

Congress mandated that the FBI SES regulations "provide for" removal "consistent with" 5 U.S.C. § 7543(b).  *See* 5 U.S.C. § 3151(a)(5)(D).  The FBI SES Policy implements § 7543(b).  Congress gave Plaintiff 30 days' protection before he could be removed, and did not authorize Defendants to shorten that period without invoking the crime exception.  They did not invoke it, so by supposedly terminating Plaintiff on fewer than 30 days' advanced written notice, Defendants exceeded the statutory restrictions on their removal discretion, deprived Plaintiff of his property interest in 30 days' continued employment, and thereby violated his substantive due process right to be free from arbitrary, *ultra vires* action.  *See supra* pp. 35-36 (citing authorities); *cf. U.S. v. Caceres*, 440 U.S. 741, 749 (1979) ("A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law.).[22]

---

[22] Citing only two prison cases, Defendants argue that violating statutory or regulatory procedures does not, in itself, violate due process.  SJ Mem. at 15 n.6 (citing *Crosby-Bey v. Dist. Of Columbia*, 786 F.2d 1182, 1183 (D.C. Cir. 1986) (rejecting due process claim based on prisoner's segregation from general population), and *Duffy v. Selsky*, No. 95-CV-474, 1996 WL 407225, at *5 (S.D.N.Y.

### 3. Plaintiff was deprived of his continued employment without adequate notice or opportunity to be heard, violating procedural due process.

Defendants gave Plaintiff inadequate notice to meaningfully prepare for his disciplinary hearing and written submission. The substance of the notice and the amount of time provided—*i.e.*, both the quality and quantity of notice—were constitutionally deficient.

First, if Defendants had truly invoked the crime exception in order to accelerate the proceedings, then Candice Will's March 7, 2018 letter failed to alert Plaintiff to the charges against him—*i.e.*, that Defendants believed that he committed a crime. Where, as here, "a public employee has a property interest in continued employment, the Due Process Clause of the Fifth Amendment requires that the employee be afforded notice '***both of the charges*** and of the employer's evidence' and an 'opportunity to respond' before being removed from employment." *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1279 (Fed. Cir. 2011) (*quoting Stone v. FDIC*, 179 F.3d 1368, 1374-76 (Fed. Cir. 1999)) (emphasis added); *accord Loudermill*, 470 U.S. at 546. Plaintiff was entitled to written notice "stating specific reasons for the proposed action," 5 U.S.C. § 7543(b), and the legislative history of the identically worded § 7513(b) explains that this required telling Plaintiff "the reasons for the proposed action *in sufficient detail to allow [him] to make an informed reply*." S. Rep. 969, 95th Cong., 2nd Sess., at 2772 (1978) (emphasis added).

The crime exception is thus "a special notice provision." *Brown*, 715 F.32 at 666. The MSPB's decision *Dawson v. Department of Agriculture*, 121 M.S.P.R. 495 (2014), is instructive on the quality of notice required by the Constitution when invoking § 7513(b)'s crime exception. The MSPB found that when an employee was indefinitely suspended on less than 30 days' advance

_____

July 18, 1996) (similar for solitary confinement)). But the procedures challenged in those cases were not mandated by federal law. In any event, "one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison." *Hewitt v. Helms*, 459 U.S. 460, 472 (1983).

notice, he had constitutionally adequate notice of reasonable cause because "the agency's proposal letter specifically referenced a criminal investigation, the potential for a penalty of imprisonment, and the appellant's confession to the misconduct at issue." *Id.* at 500; *accord Henderson v. Dep't of Vet. Affairs*, 878 F.3d 1044, 1048 (Fed. Cir. 2017) (disciplinary notice was constitutionally adequate because it explained that employee's indictment gave reasonable cause under §7513(b)).

Here, by contrast, Candice Will's March 7, 2018 letter proposed dismissal solely for violations of internal FBI policy codified as "offense codes," making no mention of any crime, criminal statute, or criminal investigation.   Plaintiff had a right know if he was being accused of more than just violating FBI policy, in order to make an "informed reply." S. Rep 969, 95th Cong., 2nd Sess., at 2772 (1978).  A criminal accusation would color the agency's review and disciplinary process, in turn informing the arguments and testimony that Plaintiff and his counsel chose to emphasize in his oral and written replies. *Cf. Dawson*, 121 M.S.P.R. at 500 (noting ALJ's similar conclusion, albeit reversing him as to sufficiency of notice).

Second, the notice period itself was inadequate.  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).   This necessarily fact-intensive analysis precludes summary judgment. Defendants cite several cases to suggest that Plaintiff had enough time with the OIG Report and with OPR's charges that his disciplinary proceedings were a model of efficiency.  SJ Mem. 24. But unlike the plaintiffs in Defendants cited cases,[23] Plaintiff and his counsel had vastly less time

---

[23] *See McBryde v. Comm. to Rev. Cir. Council Conduct*, 83 F. Supp. 2d 135 (D.D.C. 1999) (plaintiff had report for 2 weeks before non-removal hearing), *vac'd in relevant part on jurisdictional grounds*, 264 F.3d 52, 58, 62-63 (D.C. Cir. 2001); *La. Ass'n of Indep. Producers v. FERC*, 958 F.2d 1101, 1108-09 (D.C. Cir. 1992) (years of proceedings before hearing); *Johnson v. George*, No. 05-CV-157, 2007 WL 1697276, at *8 (D. Del. June 12, 2007), *aff'd*, 299 F. App'x 139 (3d Cir. 2008) (employee received report of charges over two months before hearing).

with the OIG Report, OPR proposal removal, and evidentiary record.

When Plaintiff and his counsel reviewed the draft OIG Report, they were not allowed to keep a copy or even examine the underlying record. Bromwich Decl. ¶ 7; McCabe Decl. ¶ 43. When OPR first issued its notice on March 8, Plaintiff was away from the D.C. area, so OPR did not formally serve him that day. Bromwich Decl. ¶ 12; McCabe Decl. ¶ 45. By Plaintiff's March 15 hearing, his counsel had fewer than 5 days of access to the 1,000-page record and were unable review a significant portion of it, all while Defendants kept producing documents in a piecemeal fashion as late as the morning of the hearing. Bromwich Decl. ¶¶ 18, 24-25. The day before, counsel pleaded unsuccessfully to extend Plaintiff's deadlines: "We simply don't have enough time." *Id.* ¶¶ 22-23. That Plaintiff and his counsel did their best rather than surrender in the face of unfairness is not a sign of due process, but of their zeal in fighting "the rush to judgment—and the rush to finality—that has characterized this process." *Id.* ¶ 28 (quoting letter to Schools).

Defendants' reliance on *McBryde* reinforces Plaintiff's arbitrary treatment. The *McBryde* plaintiff offered "unsupported assumptions about the appropriate amount of time a decisionmaker should devote to arriving at its decision." 83 F. Supp. 2d at 168. But here, Congress mandated that FBI SES employees facing removal receive 30 days' advance written notice absent invocation of the crime exception, and even then, they should have the greater of seven days or a "reasonable" time. 5 U.S.C. § 7543(b)(2); *id.* § 3151(a)(5)(D). On this record, a reasonable factfinder could conclude that Plaintiff had an objectively ***un***reasonable period to review and respond to the record before Defendants tried to end his decades of service to the FBI and this nation.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and for Summary Judgment (Dkt. 23) should be denied.

December 23, 2019                          Respectfully submitted,

                                            /s/ Murad Hussain
                                           Howard N. Cayne (D.C. Bar. No. 331306)
                                           Murad Hussain (D.C. Bar. No. 999278)
                                           Brittany McClure (D.C. Bar No. 1001889)
                                           Owen Dunn (D.C. Bar. No. 1044290)
                                           Ryan D. White (D.C. Bar No. 1655918)
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           601 Massachusetts Avenue, NW
                                           Washington, DC  20001-3743
                                           Telephone: (202) 942-5000
                                           Fax: (202) 942-5999

                                           *Attorneys for Plaintiff Andrew G. McCabe*