**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANDREW G. MCCABE, <br><br> *Plaintiff*, <br><br> v. <br><br> WILLIAM P. BARR, <br> in his official capacity as <br> ATTORNEY GENERAL OF THE <br> UNITED STATES, *et al.*, <br><br> *Defendants*. | Civil Action No. 19-2399 (RDM) |

**DECLARATION OF ANDREW G. MCCABE IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

I, Andrew G. McCabe, make this Declaration in support of my Opposition to Defendants' Motion to Dismiss and Motion for Summary Judgment ("Motion"). I make the following declaration based on personal knowledge and to the best of my recollection:

1. I am the Plaintiff in the above-captioned matter. I currently reside in the Commonwealth of Virginia with my wife, Dr. Jill McCabe. Jill is a pediatric emergency physician and a former Democratic candidate for the Virginia state senate during the November 2015 Virginia state elections.

2. I am a former employee of the FBI. On February 1, 2016, I became Deputy Director of the FBI, overseeing all FBI domestic and international investigative and intelligence activities. I became Acting Director of the FBI on May 9, 2017, when then-FBI Director James B. Comey was fired by President Donald J. Trump. I served as Acting Director until August 1, 2017, when the U.S. Senate confirmed Defendant Christopher Wray as the new Director. At that time, I

resumed my duties as Deputy Director and held that position until January 29, 2018. During my entire time at the FBI, I was a career civil servant.

3. I joined the FBI in 1996 in the New York field office as a special agent.

4. In 2003, I was promoted to the position of supervisory special agent.

5. In 2014, I began serving as the assistant director in charge of the FBI's Washington Field Office.

6. In March 2015, Jill announced her candidacy as a Democratic candidate for the Virginia state senate. Before she announced, I sought the guidance of numerous FBI officials, including FBI Deputy Director, FBI General Counsel, Comey's Chief of Staff, and FBI chief ethics officer, to ensure I complied with government ethics obligations and avoided conflicts of interests.

7. None of those officials expressed any concerns about Jill's campaign.

8. The FBI provided me with specific ethics guidance that I needed to follow during Jill's campaign. I followed those guidelines.

9. During the summer of 2015, Jill and I attended our children's swim meet, where I posed for a family photograph in which we all wore campaign T-shirts that read "DR. JILL MCCABE FOR STATE SENATE."

10. Nothing in the photograph identified me as an employee of the FBI. The photograph did not violate the ethics guidance that the FBI had provided me.

11. Out of an abundance of caution for both the campaign and the integrity of the FBI, I limited my involvement with Jill's campaign. Until late October 2016, I was unaware of any contributions made to Jill's campaign by the political action committee of then-Virginia Governor Terry McAuliffe.

12. On July 30, 2015, Comey announced my appointment to serve as FBI Associate Deputy Director, where I was responsible for overseeing the FBI's budget, human resources, information systems, and administrative functions. In that capacity I became familiar with FBI human resources and personnel procedures.

13. Throughout 2015, I had no involvement with any investigation of former U.S. Secretary of State Hillary Clinton's use of a private email server ("Clinton email investigation").

14. I only became involved in the Clinton email investigation after my promotion to FBI Deputy Director effective February 1, 2016.

15. Around July 31, 2016, the FBI began a counter-intelligence investigation into whether Trump campaign associates were linked to the Russian government's efforts to interfere in the 2016 U.S. presidential election ("Russia investigation"). In May 2017, the Russia investigation was assigned to a Special Counsel, former FBI Director Robert S. Mueller III. Over time, the Russia investigation identified links between individuals in Trump's presidential campaign and the Russian government and other Russian individuals and entities.

16. My role in the Clinton email investigation and other matters related to the 2016 U.S. presidential campaign was originally reviewed as part of the U.S. Department of Justice ("DOJ") Office of Inspector General ("OIG") investigation and eventual report on various actions by the DOJ and FBI in advance of the 2016 election ("2016 election investigation"). OIG opened the 2016 election investigation in January 2017, and announced that it would examine "[a]llegations that Department [of Justice] and FBI employees improperly disclosed non-public information."

17. On February 10, 2017, around 4:30 p.m., I briefed the staff of Vice President Michael R. Pence on counterintelligence matters. After that meeting, then-White House Counsel Donald F. McGahn asked me to meet him in the West Wing. I went to McGahn's office but was then redirected to the Pence's office, where I met with Pence, McGahn, Priebus, and two others. Afterward, around 9 p.m. that night, I was informed that White House officials were questioning my commitment to the Trump administration.

18. On or about February 15, 2017, Trump, through Priebus, asked me to have the FBI publicly refute a recent news story that was unfavorable to Trump. When I refused on FBI policy grounds, Priebus said that the FBI and I were not "good partners" to Trump.

19. On March 6, 2017, I was informed that White House officials were looking for ways to fire Comey, and that these officials did not understand why Comey had not yet removed me from my position.

20. According to what I later learned from then-Deputy Attorney General Rod Rosenstein, Trump had drafted a letter explaining his reasons for firing Comey. The reasons referenced Jill's campaign and my oversight of the Clinton email investigation. Trump showed that letter to Rosenstein on May 8, 2017 in a meeting at the White House. Rosenstein then provided me a copy of Trump's draft letter.

21. In April 2017, I met with the FBI's Inspection Division regarding an existing investigation that I had initiated regarding an unauthorized disclosure to the media.

22. On May 9, 2017, I met with the FBI's Inspection Division for the purpose of reviewing a draft signed, sworn statement from the earlier April 2017 interview. This May 9 meeting was not scheduled as an interview, and I did not consider it to be such. Soon after, at approximately 5:30 p.m., I learned that Comey had been fired and that I was now Acting Director

of the FBI.  At approximately 6 p.m., I was asked to meet Trump at the White House.  I arrived at this meeting at approximately 6:30 p.m.  I had never met Trump before this.  Present at the meeting were Trump, Pence, Priebus, McGahn, and myself.  During the meeting, Trump asked if I disagreed with Comey's decisions to close the Clinton email investigation without prosecution, and if I was part of supposed internal FBI "resistance" to Comey's leadership.  Based on Trump's tone of voice and body language, I understood these questions to be Trump's attempts to assess my loyalty to Trump.  I explained that I worked very closely with Comey and was a part of Comey's July 2016 investigative decisions.  Trump also stated that I would be considered for the permanent position of FBI Director, but that I made a "mistake" in letting my wife run for the Virginia state senate in 2015.

23.    On May 10, 2017, at approximately 10 a.m., I was in my office and received a telephone call from Trump.  Other people were present in the room with me during this call.  Trump discussed with me the possibility of Trump visiting FBI headquarters.  Trump also stated that most FBI personnel likely voted for him in the 2016 U.S. presidential election.  Trump also commented on Jill's 2015 Virginia state senate campaign, saying that it must have been "tough" to "be a loser."  Trump also asked me to come to the White House at 2 p.m. that day.  After completing the call with Trump, I relayed the contents of the call to the people in the room with me.

24.    On May 10, 2017, at approximately 2 p.m., I met with Trump in the Oval Office.  Priebus and McGahn were present.  I understand that McGahn's chief of staff, Annie Donaldson, was also present.  Donaldson took notes of this meeting.  During the meeting, Trump stated that FBI personnel loved Trump and supported him, and that at least 80 percent of FBI personnel voted for him. Trump then asked me how I voted in the 2016 U.S. presidential election.  The question made me profoundly uncomfortable, because no superior had ever asked me about my voting

5

history in my entire career as a public servant, and I knew it to be improper. I did not directly respond to the question and simply stated that I "always played it right down the middle." Trump was visibly displeased by my statement.

25.    On May 13, 2017, I met with Sessions and Rosenstein and was interviewed for the position of FBI Director. During the meeting, one of Sessions' aides brought in a smartphone showing the 2015 swim-meet photograph of Jill, our children, and me wearing Jill's campaign T-shirts, and I was questioned about it. Right-wing media had found the photograph on the Internet and circulated it, falsely stating that I was wearing it while canvassing for Jill's campaign. I explained that the photograph was being mischaracterized. At the end of the meeting, I also revealed to Sessions and Rosenstein that I would become eligible for retirement in March 2018 and intended to retire from public service at that time and begin work in the private sector. I advised Sessions and Rosenstein that, consistent with past practice, the interests of the FBI would best be served by appointing a Director from outside the agency.

26.    On May 16, 2017, I met with Rosenstein and others. Rosenstein stated that I had a "political problem," and referenced Jill's 2015 Virginia state senate campaign. Rosenstein also told me that in Trump's unsent draft letter firing Comey, Comey's decision to let me remain as FBI Deputy Director was cited as a reason for Comey's firing. Rosenstein also criticized me for the family photograph of Jill, our children, and me wearing Jill's campaign T-shirts, which was now available on the Internet. I explained that I wore this T-shirt at my children's swim meet and did not violate the ethics guidance I received from the FBI.

27. Also on May 17, 2017, I met with Trump, Sessions, Priebus, and McGahn in the Oval Office, to interview for the position of FBI Director. Trump returned to the topic of the 2016 U.S. presidential election. During that discussion, I told Trump that I considered myself a lifelong Republican and had always voted for the Republican candidate for president, except in the 2016 general election, when I did not cast a vote for president.

28. On May 21, 2017, I met with Rosenstein, Special Counsel Mueller, and others. Rosenstein had called the meeting for supposed "coordination and logistics issues." However, once I arrived at the meeting, no such issues were discussed. Instead, the subject of the meeting focused on Jill's 2015 Virginia state senate campaign. Rosenstein stated that he believed that I had no conflicts with the Russia investigation, but that I should nonetheless consider recusing myself from that investigation because of Jill's 2015 campaign. Rosenstein cited my prior statements that I played no role in Jill's campaign, and then incorrectly suggested that those prior statements were contradicted by the photograph posted on the Internet showing Jill, our children, and me wearing campaign T-shirts. Rosenstein stated that this was a potential "credibility issue" that could cause other unspecified people to complain about my involvement in the Russia investigation. I explained that my prior statements remained accurate, and that there was no contradiction: this photograph did not show me playing a role in or attending events for Jill's campaign, and simply showed that I attended a swim meet with my children. I understood Rosenstein's concern about unspecified third parties' complaints to include the only officials who outranked Rosenstein in the DOJ chain of command: Trump and Sessions. I also explained that I had a memorandum from the FBI's chief ethics officer, which concluded that there was no basis to find that I had any conflict (or the appearance of one) warranting my recusal. I then suggested that Rosenstein should consider recusing himself from the Russia investigation, given Rosenstein's

7

own potential conflict as a likely witness in that investigation. Rosenstein did not state that he had his own ethics opinion supporting his continued work on the Russia investigation.

29. Around July 19, 2017, a White House official told a member of my staff that I should not attend a July 21, 2017 White House briefing. The White House official also said that "they" (*i.e.*, unnamed individuals in the White House) had decided to get rid of me as soon as a new FBI Director was in place.

30. On Friday, July 28, 2017, I was contacted by a DOJ Assistant Inspector General ("Assistant IG") who summoned me to talk to him urgently and immediately. Later that same day, I met with the Assistant IG and other OIG personnel, as requested. The OIG personnel displayed and questioned me about the meaning of multiple text messages between FBI employees Peter Strzok and Lisa Page, and then, based on the text messages, asked whether I had authorized Page to speak to a *Wall Street Journal* reporter about the Clinton email investigation in late October 2016. At no time did I respond to these questions, or any other questions from anyone in the DOJ or FBI, with any intentionally false or misleading statements.

31. On Tuesday, August 1, 2017, I contacted the Assistant IG and stated that I recalled authorizing Lisa Page to speak to the *Wall Street Journal*. I also recommended that the OIG speak to Michael Kortan, the FBI Assistant Director for Public Affairs, who might have information about this issue.

32. Also on August 1, Wray was confirmed as the new Director of the FBI. Later that month, I learned that Sessions unsuccessfully pressured Wray to fire me.

33. On November 28-29, 2017, I met for an interview with OIG personnel. At no time did I make any intentionally false or misleading statements.

34. On December 4, 2017, I met for an interview with OIG personnel. At no time did I make any intentionally false or misleading statements.

35. I learned that, in late December 2017, Inspector General Horowitz decided to expedite and complete part of the 2016 election investigation, specifically, their assessment of my actions in connection with two *Wall Street Journal* articles published during late October 2016, and to issue a separate report on my actions, before OIG issued its broader report on its 2016 election investigation. I learned from then-Associate Deputy Director David Bowdich that around December 20, 2017, Horowitz notified Defendant Wray of his decision.

36. On December 23, 2017, the media reported that I was planning retire in March 2018, when I turned 50 years old.

37. On January 28, 2018, Defendant Wray informed me that I could not remain in the role of Deputy Director, because of the OIG investigation. When I asked Wray to explain his specific concerns, he refused, saying that he had promised Sessions that he would not discuss specifics with me. Wray offered me two options for demotion: (1) Wray could reassign me to a new position, which in effect would be an involuntary demotion; or (2) I could step down from my post as Deputy Director, transition to a lesser role, and falsely announce to the FBI that I had done so voluntarily.

38. On January 29, 2018, I told Defendant Wray that I would not lie to the FBI workforce about the circumstances of my departure. I informed Wray that I would be taking terminal leave until I became eligible to retire. That same day, David Bowdich replaced me as FBI Deputy Director.

39. On January 29, 2018, I sent an email to all FBI personnel, announcing "with great sadness" the commencement of my terminal leave and forthcoming retirement:

> It has been my privilege and honor to work with you all for the last 21 years. I am continually amazed by your dedication, your professionalism and your compassion. You have the greatest mission on earth – protecting the American people and upholding the constitution. And you accomplish it in a million different ways around the world every day. Please always remember that the key to those successes is an unflagging focus on integrity. You are the greatest workforce on earth because you speak up, you tell the truth and you do the right thing.
>
> Thank you for your service, your support and your friendship.

40. As of January 29, 2018, I was on pre-approved terminal leave and no longer served in a duty status. Within the next 24 hours, Bowdich called me to explain that my FBI facilities access pass was deactivated, and I would not have access to any FBI offices without prior approval. I maintained email access, but did not have access to FBI databases, workstations, networks, documents, and information. However, I was still considered an FBI employee for the purpose of collecting pay, establishing eligibility for my retirement annuity, and continuance of health benefits for myself and my family.

41. On February 15, 2018, I submitted my retirement application with an effective date of March 19, 2018, the day after my 50th birthday.

42. On February 18, 2018, Marc Borodin of OIG emailed my counsel, Eric Bruce, to say that the draft OIG report ("OIG Report") on "former Deputy Director McCabe" will be available for review on Tuesday, February 20. A true and correct redacted copy of that email is attached hereto as **Exhibit PX-18**.

43. On or about February 20, 2018, I was asked to sign a Non-Disclosure Agreement ("NDA") so that I could review the draft OIG Report. The NDA states that the draft report was titled "A Report of Investigation of Certain Allegations Relating to Former Deputy Director

Andrew McCabe." After signing the NDA, I reviewed a copy of the draft OIG Report, but not any of the underlying investigatory materials. I was only able to review the report at OIG's DC office during the workweek and during regular business hours. I was not allowed to take a copy of the draft report out of OIG's DC office.

44. The investigative conclusions in both the draft report and final report are deeply flawed, in part because the Report relies on material mischaracterizations and omissions, including the Report's failure to reference any testimony by exculpatory witnesses such as Michael Kortan.

45. On March 7, 2018, when OPR issued its notice to propose my removal, I was out of town on a long-planned and previously-ticketed family vacation. I returned to the Washington, D.C. area on Tuesday, March 13.

46. On March 13, 2018, FBI Human Resources Specialist Patreece Carter emailed me stating that she had completed my retirement package. My date of retirement was to be March 19. Carter provided a final retirement estimate based on that date, which included a calculation of "gross lump-sum annual leave payment" based on "final basic of $187,000 and 193.30 hours of unused annual leave." A true and correct redacted copy of that email is attached hereto as **Exhibit PX-19**.

47. On March 14, 2018, Patreece Carter emailed me stating that my first full day of retirement could actually be Saturday, March 17. A true and correct redacted copy of that email is attached hereto as **Exhibit PX-20**. (As her email explained, I would accrue sick and annual leave for "pay period 5." She was referring to the fact that FBI employees are paid biweekly (as I was), with a regular workweek of Monday-Friday, and the regular workday ending at 5 p.m.) I approved her making that change, which she did by editing the retirement effective date to March 17, 2018.

48. On March 16, 2018, around 10:30 p.m., I learned from media reports that Sessions had announced my termination "effective immediately." The effective date of Sessions' announcement surprised me, because Defendants had not communicated this information to me before reporting it to the media.

49. When I learned of my "termination" from the media, I had not yet seen any notice from DOJ or the FBI about it. I then saw that I had an email from Associate Deputy Attorney General Scott Schools providing notice of his recommendation that I be terminated, which Attorney General Jeff Sessions had signed, but Sessions' "decision" stated only that I "should be" terminated, not that I was being terminated "effective immediately." Even after reviewing Schools' email, I continued to wait for a notice of termination consistent with FBI policy and practice, based on my prior experience with human resources matters. Normally, for the termination of FBI employees, a packet of information is prepared with detailed instructions about how a termination must be implemented. Termination decisions are not effective until (1) a supervisor notifies the employee of the termination and its specific effective date, and (2) the supervisor hands the employee a physical document explaining this information. I was aware of these FBI policies and procedures because I had implemented them in my various FBI supervisory roles. To this day, I have not received notice of my termination consistent with these policies and procedures.

50. By letter dated March 30, 2018, I was notified that the Office of Personnel Management was informed that I separated from the FBI on March 16, 2018. A true and correct redacted copy of that letter is attached hereto as **Exhibit PX-21**.

51. After I was separated from the FBI, I received an additional FERS Benefit Estimate Report based on a retirement age of 60. That report listed an official "Date of Separation" of Friday, March 16, 2018, which resulted in a calculation of "gross lump-sum annual leave payment" based on "final basic of $187,000 and 193.30 hours of unused annual leave." A true and correct redacted copy of that estimate is attached hereto as **Exhibit PX-22**.

52. On April 11, 2018, Wendy Guthrie of the FBI's Human Resources Division emailed Jill a memorandum from Guthrie to me about post-separation benefits. This memorandum stated: "The Office of General Counsel (OGC) has declared you eligible for Temporary Continuation of Coverage (TCC) of your health benefits since your separation is not due to gross misconduct." A true and correct redacted copy of that memorandum is attached hereto as **Exhibit PX-23**.

53. Also on April 11, 2018, Jill responded to the Guthrie email with her understanding of an April 10 call during which Guthrie had described the "normal 'process'" would have been an "official exit for Andrew with his supervisor and HR," and that "this process was not followed in [Andy's] case." On April 13, 2018, Jill sent a follow up email to FBI HR. Dave Schlendorf, Assistant Director of Human Resources for the FBI, replied, "Obviously Mr. McCabe's departure from the FBI was an unusual situation in that he was first on terminal leave, and then terminated by the Attorney General. Therefore, this process was not typical, but we believe we have covered everything that would have otherwise been covered in the normal departure process. […]" A true and correct redacted copy of these emails is attached hereto as **Exhibit PX-24**.

54. Since separating from the FBI, I have not received any payments of my retirement pension or other related retirement benefits.

I declare under penalty of perjury that the foregoing *Declaration Of Andrew G. McCabe In Support Of His Opposition To Defendants' Motion To Dismiss And For Summary Judgment* is true and correct.

Executed on December 20, 2019

Andrew G. McCabe