## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW G. MCCABE,<br><br>   *Plaintiff*,<br><br> v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*,<br><br>   *Defendants*. | Civil Action No. 19-2399 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Andrew McCabe brings this action against the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI"), alleging that he was unlawfully demoted from his position as Deputy Director of the FBI in January 2018 and then fired from his career civil service position in March 2018—on the night of his planned retirement—based on his perceived political affiliation, decision not to vote for then-candidate Trump in the 2016 presidential election, and unwillingness to pledge his personal loyalty to President Trump. Dkt. 1. The Complaint asserts five claims based on alleged violations of the First Amendment and the due process clause of the Fifth Amendment. *Id.* at 37–47. Defendants move to dismiss, in part, for lack of subject matter jurisdiction and, in part, for failure to state a claim upon which relief can be granted and move, in the alternative, for summary judgment, in part. Dkt. 23. In Defendants' view, the Court lacks jurisdiction over Plaintiffs' statutory and regulatory claims, while his constitutional claims fail on both the law and the facts. Most significantly, Defendants contend that Plaintiff was not fired because of his perceived political affiliation, vote in the 2016 presidential election, or refusal to pledge personal loyalty to the President but because he lacked

candor (including under oath) in an investigation conducted by the FBI's Inspection Division and the DOJ's Office of Inspector General.  Dkt. 23 at 13–18.

As explained below, portions of Defendants' motion are premised on a misunderstanding of the claims that Plaintiff asserts (and does not assert), while the remainder of the motion turns on disputed questions of fact that the Court cannot resolve at this stage of the proceeding.  In short, it is too early in the case to determine which, if either, of the parties' competing versions of the relevant facts is correct.  The Court will, accordingly, **DENY** Defendants' motion and will set a schedule for discovery and further proceedings.

## I.  BACKGROUND

To the extent Defendants move to dismiss for failure to state a claim, the Court must accept the allegations contained in the Complaint as true and, to the extent they move for summary judgment, the Court must view the evidence in the light most favorable to Plaintiff. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018); *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006).

**A.    Factual Background**

Plaintiff Andrew McCabe was employed by the FBI from July 1996 until March 2018. Dkt. 1 at 8 (Compl. ¶ 22).  Over the course of his lengthy career, McCabe "was never a political appointee" and was promoted to the FBI Senior Executive Service in 2009.  *Id.* (Compl. ¶¶ 27–28).  He served as Deputy Director from February 1, 2016, *id.* at 9 (Compl. ¶ 29), until January 2018 according to McCabe, *id.* at 4 (Compl. ¶ 7), and until March 2018 according to Defendants, Dkt. 23 at 48 (Defs' SUMF ¶ 51).

In 2015, prior to his promotion to Deputy Director, McCabe's wife, Dr. Jill McCabe, ran for Virginia state senate as a Democrat, ultimately losing to the Republican incumbent in

Virginia's November 2015 election.  Dkt. 1 at 12 (Compl. ¶ 47).  McCabe attests that prior to his

wife announcing her candidacy, he consulted with various "FBI officials, including [the] FBI

Deputy Director, FBI General Counsel, [the FBI Director's] Chief of Staff, and [the] FBI chief

ethics officer, to ensure [that he] complied with government ethics obligations and avoided

conflicts of interest."  Dkt. 27-21 at 2 (McCabe Decl. ¶ 6).  "None of those officials," according

to McCabe, "expressed any concerns about [Dr. McCabe's] campaign," and the FBI provided

him "with specific ethics guidance," which he "followed."  *Id.* (McCabe Decl. ¶¶ 7–8).

In the summer of 2015, amidst Dr. McCabe's campaign, Plaintiff and Dr. McCabe

attended their "children's swim meet, where [Plaintiff] posed for a family photograph in which

[they] all wore campaign T-shirts that read 'DR. JILL MCCABE FOR STATE SENATE.'"  *Id.*

(McCabe Decl. ¶ 9).  The photograph was later posted on a social media account for Dr.

McCabe's campaign.  Dkt. 1 at 13 (Compl. ¶ 50).  The photo did not mention McCabe's

employment with the FBI and "did not violate the ethics guidance that the FBI had provided" to

Plaintiff.  Dkt. 27-21 at 2 (McCabe Decl. ¶ 10).  The same year, and of particular importance to

this case, Dr. McCabe's campaign received a $467,500 contribution from a political action

committee, "Common Good VA," which was affiliated with then-Governor Terence R.

McAuliffe, a Democrat.  Dkt. 1 at 13 (Compl. ¶ 51).  Plaintiff attests that he had no knowledge

of the donation until late October 2016.  Dkt. 27-21 at 2 (McCabe Decl. ¶ 11); Dkt. 1 at 13

(Compl. ¶ 52).

The U.S. presidential primaries meanwhile commenced, with former Secretary of State

Hillary Clinton announcing her candidacy in April 2015 and now-President Trump announcing

his candidacy in June 2015.  Dkt. 1 at 10 (Compl. ¶¶ 39–40).  In July 2015, the FBI opened an

investigation into Secretary Clinton's use of a private email server while she was serving as

Secretary of State.  *Id.* (Compl. ¶ 40).  According to Plaintiff, he played no role in this investigation prior to his promotion to Deputy Director in February 2016.  Dkt. 27-21 at 3 (McCabe Decl. ¶¶ 13–14).  On July 5, 2016, FBI Director James Comey announced the conclusion of the Clinton email investigation and his recommendation that the facts did not support bringing criminal charges against Secretary Clinton.  Dkt. 1 at 12 (Compl. ¶ 45).  Several weeks later, on July 31, 2016, the FBI allegedly began a counter-intelligence investigation into whether individuals associated with the Trump campaign were linked to the Russian-government-backed efforts to interfere with the 2016 presidential election.  Dkt. 27-21 at 3 (McCabe Decl. ¶ 15).

On October 23, 2016, the *Wall Street Journal* ("*WSJ*") published an online article, which was published in the paper's print edition the following day, reporting that Dr. McCabe had received a campaign contribution from a political action committee affiliated with Governor McAuliffe; describing the Governor's close relationship with Bill and Hillary Clinton; and asserting that Plaintiff subsequently "helped oversee" the investigation into Secretary Clinton's use of a private email server.  Devlin Barrett, *Clinton Ally Aided Campaign of FBI Official's Wife*, Wall St. J., https://www.wsj.com/articles/clinton-ally-aids-campaign-of-fbi-officials-wife-1477266114 (last updated Oct. 24, 2016); *see also* Dkt. 27-30 at 22 (Pl's Resp. to Defs' SUMF ¶ 13); Dkt. 31 at 46–47 (Defs' Resp. to Pl's CSUMF ¶ 13).  The next day, then-candidate Trump asserted at a campaign rally:

> [O]ne of the closest people to Hillary Clinton [. . .] gave more than $675,000 to the campaign of the spouse, the wife of the top FBI official, who helped oversee the investigation into Mrs. Clinton's illegal email server.  So the man that was investigating her from the FBI, his wife runs for office and they give her more than $675,000 to run. [. . .]  And it's unbelievable how Hillary Clinton got away with the email lie, the email scam, the email corruption, but now at least we have a pretty good idea.

4

Dkt. 1 at 14 (Compl. ¶ 54).  A day later, on October 25, 2016, President Trump returned to the

subject, stating during an interview with Fox News:

> Terry McAuliffe, they gave to the FBI person at the high level, who was doing
> the investigation, who was in charge of the investigation.  They gave his wife
> $675,000.  Now you think of that.  Now, that's Clinton giving the money
> because that's how close they are.  So Clinton gave the FBI agent, who was—
> top person, who's the top person in charge of her email case, which is a disgrace
> that she got off of that. [. . .] She gave money at a huge clip, $675,000, to the
> wife of the FBI agent who was in charge of her investigation.

*Id.* (Compl. ¶ 55).  After the election, President Trump continued to make similar statements

about Plaintiff and his wife.  *See e.g.*, *id.* at 24–27 (Compl. ¶¶ 95, 101–02, 104).

On October 30, 2016, the *WSJ* ran a follow-up story regarding Plaintiff's oversight of a

second, politically sensitive investigation.  Dkt. 23 at 41–42 (Defs' SUMF ¶ 4); Dkt. 23-2 at 21

(Ex. 1).  But before the story ran, Plaintiff authorized his Special Counsel, Lisa Page, to speak

with the reporter in an effort to preemptively correct the story.  Dkt. 27 at 17; Dkt. 27-1 at 10

(Hussain Decl. ¶ 11); Dkt. 27-21 at 8 (McCabe Decl. ¶¶ 30–31).  According to a report prepared

by the DOJ's Office of the Inspector General ("OIG") after the fact, Plaintiff sought to correct

the reporter's belief that Plaintiff had stopped the second investigation.  Dkt. 23-2 at 20–21 (Ex.

1).  For support, Plaintiff disclosed to Page a conversation he had with the DOJ Principal

Associate Deputy Attorney General ("PADAG"), in which the PADAG "expressed anger at

[Plaintiff]" for not "shut[ting] down the Clinton Foundation investigation."  *Id.* at 21.  Plaintiff

further informed Page that he "pushed back against" the PADAG, telling "him that the FBI

would continue to take appropriate and logical investigative steps in the Clinton Foundation

investigation."  *Id.*  Page then recounted this conversation to the reporter on background, and the

reporter included it in his story without disclosing his source.  *Id.* at 21–22.

On October 31, 2016, Plaintiff met with Director Comey, who raised the October 30, 2016 *WSJ* article. *Id.* at 22–23. The parties disagree about the contents of the conversation that ensued. According to Defendants, Director Comey expressed his displeasure about leaks to the press and about how the October 31, 2016 article would "poison" the FBI's relationship with the DOJ. *Id.* at 22. They further contend that, although Director Comey's recollection was not clear, he believes that Plaintiff "gave [him] the impression [that] he didn't know what was going on" by saying "something like[,] can you believe this crap?" *Id.* Plaintiff, in contrast, maintains "that he kept Director Comey updated regarding his communications with the *WSJ*, that the Director knew that he and [others] were providing information to the *WSJ* in order to shape those stories, and that [Plaintiff] had no reason to hide this fact from Director Comey based on their prior interactions." Dkt. 23-6 at 6 (Ex. 5).

According to Plaintiff, the subject of his wife's campaign and the contribution came up again during a January 27, 2017 dinner attended by President Trump and then-Director Comey. Dkt. 1 at 17 (Compl. ¶ 68). At the dinner, the President allegedly told Director Comey that "he needs and expects loyalty" from public servants and asked whether McCabe had a problem with him, explaining that he "was pretty rough on [Plaintiff] and [Dr. McCabe] during the campaign." *Id.* The President returned to the subject on February 8, 2017 and again asked Director "Comey whether Plaintiff had a problem with [him], because [he] had criticized Plaintiff during the 2016 presidential campaign." *Id.* (Compl. ¶ 69). Plaintiff further alleges that, in his presence, Attorney General Sessions "expressed support for discriminatory considerations in FBI personnel decisions," *id.* at 18 (Compl. ¶ 70), and that "White House officials . . . question[ed] Plaintiff's commitment to the Trump administration," *id.* (Compl. ¶ 71); *see also id.* (Compl. ¶ 72).

On May 9, 2017, President Trump fired Director Comey, leaving Plaintiff to become the Acting Director of the FBI.  *Id.* at 9 (Compl. ¶ 31).  According to Plaintiff, President Trump had drafted a letter explaining his reasons for firing Director Comey, and one such reason involved Dr. McCabe's campaign and Plaintiff's oversight of the Clinton email investigation.  Dkt. 27-21 at 4 (McCabe Decl. ¶ 20).  On May 10, 2017, Plaintiff received a telephone call from the President, during which the President allegedly "stated that most FBI personnel likely voted for him in the 2016 U.S. presidential election."  *Id.* at 5 (McCabe Decl. ¶ 23).  According to Plaintiff, the President also "commented on" Dr. McCabe's "2015 Virginia state senate campaign, saying that it must have been 'tough' to 'be a loser.'"  *Id.*

Later that same day, Plaintiff met with President Trump in the Oval Office.  Plaintiff attests that:

> During the meeting, [President] Trump stated that FBI personnel loved Trump and supported him, and that at least 80 percent of FBI personnel voted for him. [President] Trump then asked [Plaintiff] how [he] voted in the 2016 U.S. presidential election.  The question made [Plaintiff] profoundly uncomfortable, because no superior had ever asked [him] about [his] voting history in [his] entire career as a public servant, and [he] knew it to be improper.  [Plaintiff] did not directly respond to the question and simply stated that [he] 'always played it right down the middle.'  [President] Trump was visibly displeased by [Plaintiff's] statement.

*Id.* at 5–6 (McCabe Decl. ¶ 24).

On May 13, 2017, Plaintiff met with Attorney General Sessions and Deputy Attorney General Rosenstein, and, during the meeting, an aide "brought in a smartphone showing the 2015 swim-meet photograph of [Dr. McCabe], [their] children, and [Plaintiff] wearing [Dr. McCabe's] campaign T-shirts."  *Id.* at 6 (McCabe Decl. ¶ 25).  According to Plaintiff, he "explained that the photograph was being mischaracterized," and, at the end of the meeting, Plaintiff revealed to the Attorney General and Deputy Attorney General that he planned to retire when he became eligible

in March 2018.  *Id.*  Three days later, Plaintiff met with Deputy Attorney General Rosenstein,

who told him that he had "a 'political problem,' and referenced [Dr. McCabe's] 2015 Virginia

state senate campaign."  *Id.* at 6 (McCabe Decl. ¶ 26).  Deputy Attorney General Rosenstein also

"criticized" Plaintiff for the family photograph, which showed Plaintiff wearing a campaign T-

shirt.  *Id.*

Plaintiff met with President Trump on May 17, 2017, ostensibly "to interview for the

position of FBI Director."  *Id.* at 7 (McCabe Decl. ¶ 27).  At that meeting, the President allegedly

"returned to the topic of the 2016 U.S. presidential election."  *Id.*  Plaintiff told the President that

he "considered himself a lifelong Republican and had always voted for the Republican candidate

for president, except in the 2016 general election, when [he] did not cast a vote for president."

*Id.*

Around the same time, the FBI's Inspection Division ("INSD") "began investigating

whether information published in [the] October 30, 2016 *WSJ* article 'was [derived] from an

unauthorized leak and, if so, who was [responsible for] the leak.'"  Dkt. 23 at 41 (Defs' SUMF

¶ 4).  As part of that investigation, INSD spoke to Plaintiff but did not conduct an interview

under oath.  Dkt. 23-2 at 14–15 (Ex. 1); Dkt. 23 at 42 (Defs' SUMF ¶ 5).  According to the INSD

agents, Plaintiff was given a copy of the article to review, and, after doing so, he told the agents

that he "did not know who leaked the information."  Dkt. 23-2 at 7 (Ex. 1).  Plaintiff has a

different view of the "brief discussion that took place at the end of a meeting on a different

topic" and attributes the agents' conclusions to an honest misunderstanding, which explains why

he refused to sign the summary of the conversation that the agents prepared.  Dkt. 23-6 at 6–8

(Ex. 5).

On July 28, 2017, while still serving as the Acting Director, Plaintiff was contacted by an assistant inspector general from the DOJ's OIG, who indicated that he needed to speak with Plaintiff "urgently and immediately."  Dkt. 27-21 at 8 (McCabe Decl. ¶ 30).  Later that same day, Plaintiff met with the assistant inspector general and other OIG staff.  Dkt. 1 (Compl. ¶ 97).  He alleges that he understood that he was a subject of the broader OIG investigation and that he informed the assistant inspector general that he did not wish to be interviewed for such an investigation without his lawyer present.  *Id.*  Plaintiff further alleges that, in response to his concerns, he was assured the meeting "would not be . . . an interview, but rather an opportunity to bring something urgent to Plaintiff's attention."  *Id.*

During the course of the meeting, Plaintiff was shown "multiple text messages between FBI employees Peter Strzok and Lisa Page."  Dkt. 27-21 at 8 (McCabe Decl. ¶ 30).  Among those materials were text messages reflecting that Page had spoken to the *WSJ* "about the Clinton email investigation in late October 2016."  *Id.*  Plaintiff was then asked, while under oath, whether Page was "ever authorized to speak to reporters in this time period."  Dkt. 23-2 at 9 (Ex. 1).  According to Defendants, Plaintiff responded, "Not that I'm aware of."  *Id.*  Plaintiff further stated that he "was not even in town during those days" and thus couldn't "tell [OIG] where [Page] was or what she was doing."  *Id.*  Plaintiff counters that, "[a]t no time did [he] respond to th[o]se questions, or any other questions from anyone in the DOJ or FBI, with any intentionally false or misleading statements."  Dkt. 27-21 at 8 (McCabe Decl. ¶ 30).  In any event, two business days later, Plaintiff contacted the same assistant inspector general and explained that he recalled authorizing Page to speak to the *WSJ* and recommended that the assistant inspector general speak to the FBI Assistant Director for Public Affairs about the matter.  Dkt. 1 at 25 (Compl. ¶ 98).

The following day, Defendant Christopher Wray was sworn in as the new FBI Director, and Plaintiff resumed his responsibilities as Deputy Director.  *Id.* at 26 (Compl. ¶ 99).  Plaintiff alleges that, "on or about this date, [Attorney General] Sessions, acting at [President] Trump's urging, asked Defendant Wray to fire Plaintiff" and that "Wray refused on the basis that he would not allow personnel decisions at the FBI to be politicized" and threatened to resign if such requests were made in the future.  *Id.*  Several months later, on December 2, 2017, President Trump retweeted another Twitter user's statement that "Wray needs to clean house.  Now we know the politicization [is] even worse than McCabe's ties to McAuliffe/Clinton."  *Id.* (Compl. ¶ 101).  The next day, President Trump tweeted about "Clinton money going to [the] wife of an[] FBI agent in charge."  *Id.* (Compl. ¶ 102).

The OIG interviewed Plaintiff under oath again on November 29, 2017.  Dkt. 23 at 42 (Defs' SUMF ¶ 11).  During that interview, Plaintiff told the OIG that he had authorized Page and the FBI's Assistant Director for Public Relations to speak with the *WSJ* reporter "to try to correct what [Plaintiff] perceived as 'incredibly damaging inaccuracies' in [the reporter's] story."  Dkt. 23-2 at 10 (Ex. 1).  Defendants do not doubt the veracity of those statements, but they question two additional statements Plaintiff made during this interview—first, that he told Director Comey on October 31, 2016 that he had authorized the disclosure of the August 12 call with the PADAG to the *WSJ* reporter and, second, that he did not deny to the INSD agents on May 9, 2017 that he had authorized the disclosure.  *Id.* at 11–12, 14–15.  Plaintiff, in turn, once again disputes that he made "any intentionally false or misleading statements."  Dkt. 27-21 at 9 (McCabe Decl. ¶ 34).

B.       **Administrative Background**

On December 23, 2017, the press reported Plaintiff's plans to retire in March 2018.  Dkt.
1 at 27 (Compl. ¶ 104).  At 3:27 p.m. that same day, President Trump tweeted: "How can FBI
Deputy Director Andrew McCabe, the man in charge, along with leakin' James Comey, of the
Phony Hillary Clinton investigation (including her 33,000 illegally deleted emails) be given
$700,000 for wife's campaign by Clinton Puppets during investigation?"  Dkt. 27-1 at 4 (Hussain
Decl. ¶ 10); *see also* Dkt. 1 at 27 (Compl. ¶ 104).  "Three minutes later," the President "tweeted:
'FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits.  90 days to
go?!!!'"  Dkt. 1 at 27 (Compl. ¶ 104).  Plaintiff alleges that "in late December 2017" some
combination of White House personnel and Department of Justice officials "decided to
accelerate the completion of part of the investigation into events surrounding the 2016 election"
that pertained to Plaintiff's actions and specifically decided to issue a "separate report about
Plaintiff's actions." *Id.* at 26 (Compl. ¶ 103).  Plaintiff further alleges that this decision was
made "because of pressure from [President] Trump." *Id.*

A month later, according to Plaintiff, Director Wray informed him that he could no
longer serve as Deputy Director because of the results of the OIG investigation. *Id.* at 27
(Compl. ¶ 105).  Director Wray allegedly declined to discuss the specifics of this decision with
Plaintiff, citing a promise he made to Attorney General Sessions.  Dkt. 27-21 at 9 (McCabe Decl.
¶ 37).  Plaintiff attests that Director Wray told him that he could either transition to a lesser role
of his own choosing, if he announced to FBI personnel that he had stepped down voluntarily, or
Director Wray would reassign him to a lesser role of Director Wray's choosing. *Id.*  Plaintiff
alleges that he declined to step down voluntarily; that he intended to take "terminal leave until
[he] became eligible to retire;" and that Wray promoted David Bowdich to Deputy Director. *Id.*

11

at 9 (McCabe Decl. ¶ 38).  Thus, Plaintiff alleges, as of January 29, 2018, he "no longer served in a duty status, and he relinquished all access to FBI offices, networks, and workstations" but "remained an FBI employee for the purpose of establishing eligibility for his retirement annuity and continuance of health benefits for himself and his family."  Dkt. 1 at 28 (Compl. ¶ 108).

On or about February 15, 2018, Plaintiff informed the FBI that his first full day of retirement would be March 17, 2018 and that, as a result, Friday, March 16, 2018 would be his last day of work.  *Id.* at 9–10 (Compl. ¶ 36).  Nearly two weeks later, on February 28, 2018, the OIG delivered its report—entitled "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe" ("February 2018 OIG Report")—to the FBI's Office of Professional Responsibility, led by career civil servant Candice M. Will, for review and potential discipline.  *Id.* at 28–29 (Compl. ¶¶ 110–11).  "The OIG report concluded that Plaintiff had lacked candor on four occasions, in violation of FBI rules: once when speaking with then-FBI Director James Comey on October 31, 2016; once while being questioned, under oath, by Inspection Division Agents on May 9, 2017; and twice while being questioned, under oath, by OIG on July 28, 2017 and November 29, 2017."  Dkt. 23 at 42 (Defs' SUMF ¶ 11).  The Report further "concluded that Plaintiff authorized the disclosure of information to the *Wall Street Journal* in violation of the FBI's and the Department of Justice's media policy."  *Id.* (Defs' SUMF ¶ 12).  Plaintiff alleges that the "investigative conclusions [in the report] are incorrect;" that the report "relies on material mischaracterizations and omissions;" and that it "fail[s] to reference any testimony by exculpatory witnesses," such as the FBI's Assistant Director for Public Affairs, Michael Kortan.  Dkt. 1 at 28–29 (Compl. ¶ 111).

On March 7, 2018, Will recommended Plaintiff's termination.  *Id.* at 29 (Compl. ¶ 115).  This recommendation, according to Plaintiff, was "based solely on her review of the February

2018 OIG report;" Will conducted "no independent investigation." *Id.*  Will was unpersuaded

that Plaintiff was under oath when he spoke to the INSD agents but otherwise agreed with the

OIG's conclusion that Plaintiff lacked candor while under oath during both of his OIG

interviews.  Dkt. 23 at 43 (Defs' SUMF ¶ 18).  Will observed that the "standard penalty" for lack

of candor while under oath is dismissal.  Dkt. 23-2 at 15 (Ex. 1).  Will wrote:

> I have considered all mitigating factors supported by the record, including, but
> not limited to, your 21 years of remarkable FBI service and your truly
> outstanding performance record.  At the time of the misconduct, you were facing
> unprecedented and unimaginable pressure and challenges.  Notwithstanding all
> relevant and significantly mitigating factors, however, I find that dismissal is
> appropriate because all FBI employees know that lacking candor under oath
> results in dismissal and that our integrity is our brand.  Without it, we are
> nothing.  As the Deputy Director, you held the second-highest position in the
> FBI and are expected to comport yourself with the utmost integrity.  Despite
> this, you repeatedly lacked candor with the Director of the FBI, the OIG, and the
> FBI's Inspection Division.  Your lack of candor is incompatible with the FBI's
> Core Values.  Based on the circumstances of this case, I propose dismissing you
> for your . . . offenses.

*Id.* at 16.  Attached to Will's recommendation was a note from Will reading: "It seems unlikely

that [the proposed termination] will reach final resolution before Mr. McCabe's March 18[,

2018] retirement date, but that is up to the [Deputy Attorney General]."  Dkt. 1 at 29–30 (Compl.

¶ 116).

The next day, another career official, Associate Deputy Attorney General Scott N.

Schools, sent a letter to Plaintiff indicating that he had received Will's notice of proposed

removal and that a final decision would be made in accordance with DOJ Order 1202—the DOJ

policy governing removal of FBI senior executives.  *Id.* at 30 (Compl. ¶ 117).  That letter

informed Plaintiff that his response was due to Schools by "close of business" on March 15,

2018, and that he would receive access to the relevant files beginning on Friday, March 9, 2018.

*Id.* (Compl. ¶ 118).  Plaintiff and his counsel were also scheduled to meet with Schools to make

an oral presentation on March 15, 2018.  *Id.* at 32 (Compl. ¶ 123).  On the morning of March 9, 2018, Schools allegedly told Plaintiff's counsel on a telephone call: "We're making it up as we go along."  *Id.* at 31 (Compl. ¶ 119).

On Wednesday March 14, 2018, Schools permitted Plaintiff to review the transcripts from Kortan's interview with the OIG.  *Id.* (Compl. ¶ 120).  The same day, Plaintiff's counsel requested that the hearing and written submission deadlines be postponed.  *Id.* (Compl. ¶ 121).  The record consisted of over 1,000 pages of written materials and was made available only four business days before Plaintiff's response was due and the hearing was to be held.  *Id.*  Plaintiff's counsel explained that he was "simply unable to properly prepare for both the oral presentation and written presentation that are necessary to adequately represent Mr. McCabe."  *Id.*  The request to postpone the hearing was denied, but Schools extended the deadline for providing a written submission by half a day to 12:00 p.m. on Friday, March 16, 2018.  *Id.* at 32 (Compl. ¶ 122).

McCabe and his counsel met with Schools for an oral hearing on Thursday, March 15, 2018, and McCabe provided his written submission to Schools on Friday, March 16, 2018 at 12:00 p.m.  *Id.* (Compl. ¶¶ 123–24).  McCabe alleges that at 5:00 p.m. on Friday, March 16, 2018, he "fulfilled his final week of service with the FBI and retired from the agency."  *Id.* (Compl. ¶ 125).  He further contends that, at that time, "[t]he FBI charged [his] accrued leave account for a full week of leave time, confirming that the FBI deemed [him] to have been employed for the entire week preceding his retirement."  *Id.*

That night, at around 10:00 p.m., Attorney General Sessions issued a statement to the media announcing that McCabe had been fired "pursuant to [DOJ] Order 1202."  *Id.* (Compl. ¶ 126).  This statement was not sent to Plaintiff, although he received an email around the same

time attaching a letter dated March 16, 2018 from Schools to Attorney General Sessions recommending that Plaintiff be terminated.  *Id.*  Schools prepared a decision memorandum for Attorney General Sessions, which recounted the relevant background and included Schools' own recommendations.  Dkt. 23-7 (Ex. 6).  In particular, Schools disagreed with Will's finding that McCabe lacked candor during his October 31, 2016 meeting with then-Director Comey, but otherwise agreed with her findings, and, most importantly, agreed that termination was the appropriate penalty.  *Id.*  Although the memorandum is not timestamped, Attorney General Sessions signed it sometime on March 16, 2018.  *Id.* at 8.  Just above Attorney General Session's signature, the memorandum states: "Decision:  For the reasons stated in the foregoing recommendation, I have decided that Andrew G. McCabe should be removed from the Federal Bureau of Investigation and from the civil service."  *Id.*  But, as McCabe observes, the memorandum does not specify when that decision was to become effective.  Dkt. 1 at 32–33 (Compl. ¶ 126).  At around 10:30 p.m., McCabe saw media reports that Attorney General Sessions had announced his termination "effective immediately."  *Id.* at 33 (Compl. ¶ 127). Plaintiff alleges that this termination process deviated from the procedures typically used to effect terminations from the FBI.  *Id.* (Compl. ¶ 129).

Since these events, Defendants have identified March 16, 2018 as the effective date of Plaintiff's termination, which is "one day earlier than the date set forth on [his] notice of retirement and application for retirement benefits."  *Id.* (Compl. ¶ 130).  Plaintiff alleges that "[t]his discrepancy has materially altered and diminished the benefits to which [he] is entitled by, among other things, eliminating the benefits Plaintiff would have otherwise received beginning at age 50."  *Id.*  On or about March 21, 2018, Director Wray was asked by the press about Plaintiff's termination.  *Id.* at 33 (Compl. ¶ 131).  He responded: "I want to be careful about what

15

I can say about the process." *Id.* at 34 (Compl. ¶ 131) (quotation marks omitted).  On April 11,

2018, the FBI's Office of General Counsel informed McCabe that his termination "was not due

to gross misconduct." *Id.* (Compl. ¶ 132) (quotation marks omitted).

After Plaintiff's termination, President Trump continued to comment on Plaintiff's tenure

at the FBI and Dr. McCabe's receipt of the campaign contribution from the political action

committee affiliated with Governor McAuliffe.  On March 17, 2018 at 12:08 a.m., for example,

he tweeted:

> Andrew McCabe FIRED, a great day for the hard working men and women of
> the FBI - A great day for Democracy.  Sanctimonious James Comey was his
> boss and made McCabe look like a choirboy.  He knew all about the lies and
> corruption going on at the highest levels of the FBI!

*Id.* (Compl. ¶ 134).  Thirteen hours later, President Trump tweeted:

> The Fake News is beside themselves that McCabe was caught, called out and
> fired.  How many hundreds of thousands of dollars was given to wife's campaign
> by Crooked H friend, Terry M, who was also under investigation? How many
> lies?  How many leaks?  Comey knew it all, and much more!

*Id.* at 35 (Compl. ¶ 135).  On April 15, 2018, President Trump sent a tweet criticizing a book

written by former Director Comey on the ground that it did not discuss "McCabe's $700,000."

*Id.* (Compl. ¶ 136) (quotation marks omitted).  A month later, on May 18, 2018, he tweeted:

"Why isn't disgraced FBI official Andrew McCabe being investigated for the $700,000 Crooked

Hillary Democrats in Virginia, led by Clinton best friend Terry M (under FBI investigation that

they killed) gave to McCabe's wife in her run for office?  Then dropped case on Clinton!" *Id.*

(Compl. ¶ 137) (quotation marks omitted).  The following month, on June 28, 2018, President

Trump tweeted that Plaintiff and former Director Comey "took their orders from you know

who," which McCabe alleges was a reference to the President's partisan opponents. *Id.* (Compl.

¶ 138) (quotation marks omitted).

On February 19, 2019, President Trump tweeted: "I never said anything bad about Andrew McCabe's wife other than she (they) should not have taken large amounts of campaign money from a Crooked Hillary source when Clinton was under investigation by the FBI.  I never called his wife a loser to him (another McCabe made up lie)!"  *Id.* at 36 (Compl. ¶ 143) (quotation marks omitted).  During a March 27, 2019 television interview President Trump stated that Plaintiff "was running the FBI and running all sorts of cases, and his wife got hundreds of thousands of dollars from essentially Clinton's, from Clinton's closest friend.  And then he rules so favorably.  I mean, he tries to say that he wasn't involved. . . .  I don't believe that.  But, you know, she got all those good rulings."  *Id.* (Compl. ¶ 144) (quotation marks omitted).  President Trump continued to speak negatively about Plaintiff in public during the following months.  *Id.* (Compl. ¶¶ 144–146).  Finally, in an arguable reference to Plaintiff and others, the President stated at a White House press conference on December 24, 2019: "[W]e found out they're a bunch of dirty cops. . . .  I hope that someday I'm going to consider it my greatest—or one of my greatest achievements—getting rid of them.  Because we have no place in our country for people like that."  Dkt. 28-2 at 2.

## C.    Procedural Background

Plaintiff brought this action on August 8, 2019.  Dkt. 1.  He alleges that his termination was a "legal nullity" or was otherwise "*ultra vires*" in violation of the Fifth Amendment's due process clause, *id.* at 37 (Count I); that Defendants' "sham and accelerated" proceedings that resulted in his terminations also violated the due process clause, *id.* at 39 (Count II); that his termination was impermissibly motivated by Defendants' perception of his partisan affiliation, in violation of the First Amendment, *id.* at 42 (Count III); and that he was demoted and terminated in retaliation for his political expression and intimate association, also in violation of the First

Amendment, *id.* at 45 (Count IV).  Finally, if no other form of relief is available, Plaintiff seeks a writ of mandamus "compelling Defendants to recognize Plaintiff as retired from the role of Deputy Director in good standing with the FBI or, alternatively, to rescind the unlawful demotion and termination orders."  *Id.* at 46 (Count V).

Defendants "move to dismiss, in part, Plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and seek summary judgment as to the remainder of the complaint, under Federal Rule of Civil Procedure 56."  Dkt. 23 at 1.  Plaintiff opposes that motion.  Dkt. 27.  For the following reasons, the Court will deny Defendants' motion.

## II.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) may raise a "facial" or a "factual" challenge to the Court's jurisdiction.  A facial challenge asks whether the plaintiff has alleged facts sufficient to establish the Court's jurisdiction, while a factual challenge asks whether "the complaint [as] supplemented by undisputed facts evidenced in the record, or the complaint [as] supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts" are sufficient to establish the Court's jurisdiction.  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  The plaintiff bears the burden of demonstrating that the Court has subject-matter jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A motion to dismiss for failure to state a claim under Rule 12(b)(6), in contrast, tests the legal sufficiency of the allegations contained in the complaint.  A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Although "detailed factual allegations" are not necessary to withstand a

Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or

"a formulaic recitation of the elements of a cause of action." *Id.* Instead, the complaint's

"[f]actual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.*

(citations omitted).

Finally, a party is entitled to summary judgment under Rule 56 if that party can show that

"there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986). A fact is "material" if it is capable of affecting the outcome of the litigation. *Holcomb v.*

*Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "'genuine' if 'the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477

U.S. at 248). "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

### III.  ANALYSIS

Defendants raise a host of arguments, one that goes to the Court's jurisdiction, others that

go to the sufficiency of the Complaint, and still others that go to the ultimate merits of the

dispute. As explained below, Defendants' jurisdictional challenge is premised on a

misunderstanding of the claims that Plaintiff seeks to pursue; their challenge to the sufficiency of

the Complaint fails as a matter of law; and their challenge to Plaintiff's claims on the merits is

premature. The Court will accordingly deny Defendants' motion.

### A.    Jurisdiction Under the Civil Service Reform Act

Defendants first argue that Plaintiff's "statutory and regulatory claims" must be

dismissed for lack of jurisdiction pursuant to Rule 12(b)(1) because the Civil Service Reform Act

("CSRA"), 5 U.S.C. § 1101 *et seq.*, "precludes judicial review of such claims," Dkt. 23 at 19, 23. The CSRA, among other things, sets forth procedures for terminating certain federal employees, identifies certain bases upon which those employees may challenge their terminations, and channels those challenges through an administrative process culminating in judicial review in the Court of Appeals for the Federal Circuit. *See Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004). Both the Supreme Court and the D.C. Circuit have held that the CSRA provides the exclusive means of judicial review for certain claims brought by civil servants relating to the termination of their employment. *See United States v. Fausto*, 484 U.S. 439, 443, 448–49 (1988); *Graham*, 358 F.3d at 933–35. "Although FBI employees are generally excluded from CSRA provisions," *Graham*, 358 F.3d at 933, exclusion of a class of employees from the judicial review provisions of the CSRA means that those employees have lesser, not greater, rights to judicial review, *see Fausto*, 484 U.S. 449; *see also Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009). Thus, in Defendants' view, the CSRA strips the Court of jurisdiction to consider Plaintiff's "statutory and regulatory claims." Dkt. 23 at 19, 21.

Plaintiff's answer to this argument is brief yet conclusive: he asserts only constitutional claims, and thus the CSRA's channeling rules for statutory and regulatory employment-related claims have nothing to do with this case.[1] Dkt. 27 at 23–25. To be sure, the Complaint references various statutory and regulatory provisions. *See, e.g.*, Dkt. 1 at 37–40 (Compl. ¶¶ 150, 153–54, 158, 160–63). But it does so, Plaintiff explains, only to lay the predicate for his

---

[1] The one possible exception to this blanket assertion is Count V of the Complaint, which seeks a writ of mandamus compelling certain ministerial acts. Dkt. 1 at 47 (Compl. ¶ 193). As Plaintiff explains, however, he asserts that claim "solely as an alternative remedy if constitutional relief [is] deemed unavailable." Dkt. 27 at 24 n.5. Because Plaintiff merely seeks to preserve his ability to argue that mandamus is available in a case in which the CSRA provides no remedy, *see id.* at 25 n.8, and in which no constitutional remedy is available, the question of the Court's jurisdiction to consider such a hypothetical claim is not ripe for consideration.

constitutional challenges—establishing, for example, that he has a property right sufficient to sustain his due process challenge. Dkt. 27 at 25; *see also id.* at 13 n.2 ("Plaintiff's claims are constitutional."). For their part, Defendants agree that "[t]he CSRA does not preclude judicial review of . . . constitutional claims," including Plaintiff's First and Fifth Amendment claims, Dkt. 23 at 22 n.5; *see also id.* at 21 (CSRA, with certain exceptions, provides the exclusive remedy "for non-constitutional employment-related claims"). And, perhaps acknowledging that their first defense takes aim at an empty target, Defendants make no reference to this defense in their reply brief. Dkt. 31.

Given Plaintiff's clarification that he intends to pursue only constitutional claims and Defendants' concession that the CSRA poses no hurdle to constitutional claims, there is nothing left for the Court to decide with respect to this issue—at least at this juncture. If at a later point in the litigation it appears that Plaintiff's constitutional claims are indistinguishable from the statutory or regulatory claims that Defendants initially discerned—if Plaintiff argues, for example, that the failure to comply with a statutory requirement constituted, without more, a due process violation—the Court can return to the CSRA at that time. For now, however, the Court is persuaded that it has jurisdiction over Plaintiff's claims.

**B.      First Amendment Claims**

Defendants also maintain that "Plaintiff's First Amendment claim[s]," which they treat collectively, "cannot survive summary judgment." Dkt. 23 at 37. They argue that "[t]he documents charting the course of the Attorney General's removal decision establish that the but-for cause behind Plaintiff's removal was his lack of candor" and not Plaintiff's perceived political affiliation. *Id.* at 36. In his Complaint, Plaintiff recounts a series of statements by President Trump that suggested or directly called for Plaintiff's termination and that invoked the

President's perception that Plaintiff supported his political rivals.  *See e.g.*, Dkt. 1 at 24–27, 34–

35 (Compl. ¶¶ 95, 101–02, 104, 133–37).  In light of these statements, Plaintiff alleges that

Defendants' proffered basis for Plaintiff's termination was pretextual and that his termination

was, in fact, motivated by Defendants' perception of Plaintiff's political affiliation and his

refusal to pledge his personal loyalty to President Trump—or pressure from President Trump

based on his perception of Plaintiff's political allegiances.  *See* Dkt. 1.

Defendants wisely do not argue that Plaintiff's First Amendment claims fail at the

pleading stage, but they instead move for summary judgment on the ground that no reasonable

jury could find that they were motivated by Plaintiff's perceived political affiliation or pressure

from the President.[2]  Defendants do so before answering the Complaint and before Plaintiff has

had any opportunity for discovery.  That approach is contrary to settled law, which provides that

a plaintiff "must be afforded the opportunity to prove . . . that [any] legitimate reasons offered by

the defendant were not its true reasons but were a pretext for discrimination."  *Reeves v.*

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quotation marks and citation

omitted); *see also Anderson*, 477 U.S. at 250 n.5 ("Rule 56[(d)] provi[des] that summary

judgment [must] be refused where the nonmoving party has not had the opportunity to discover

information that is essential to his opposition."); *Convertino v. U.S. Dep't of Justice*, 684 F.3d

93, 99 (D.C. Cir. 2012) ("[S]ummary judgment is premature unless all parties have had a full

---

[2]  Defendants argue in their reply brief that "Plaintiff's First Amendment claims are . . . subject to dismissal under Rule 12(b)(6) or summary judgment under Rule 56 without further discovery."  Dkt. 31 at 14.  But, as Plaintiff's sur-reply correctly notes, Defendants' operative motion, Dkt. 23, "never asserted any defense to [Plaintiff's] First Amendment claims under Rule 12(b)(6)," Dkt. 32-1 at 3 (Ex. A) (cleaned up).  The Court will therefore evaluate whether Plaintiff's First Amendment claims should survive summary judgment.  *See, e.g.*, *2910 Georgia Ave. LLC v. District of Columbia*, 983 F. Supp. 2d 127, 137–38 (D.D.C. 2013) (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008)).  But, even if the Court were to apply Rule 12(b)(6), the result would be the same.

opportunity to conduct discovery." (quotation marks and citation omitted)).  Plaintiff has had no

such opportunity.  In accord with Rule 56(d), he offers a declaration from his counsel identifying

the discovery that he will seek that would bear on whether the asserted basis for his termination

(before he could leave the FBI voluntarily with his retirement benefits intact) was pretextual,

including, but not limited to:

a.    Information and documents relating to Defendants' decisions to demote
      and terminate Plaintiff; their motivation for doing so; the timing, process,
      and pace of Plaintiff's disciplinary proceedings; and why Defendants
      decided to complete those proceedings before Plaintiff could retire.

b.    Information and documents relating to Department of Justice ("DOJ")
      and FBI officials' awareness and perception of, and their responses to,
      (i) a belief by Trump (or their own belief) that Plaintiff was not
      politically loyal to Trump (or to them), or (ii) a desire by Trump (or their
      own desire) to remove Plaintiff from the position of Deputy Director or
      Acting FBI Director, or to terminate Plaintiff's employment.

c.    Information and documents relating to DOJ or FBI officials' belief or
      conclusion in 2017 that a photograph of Plaintiff with his family,
      wearing T-shirts supporting his wife's 2015 Virginia state senate
      campaign, was a "political" problem for Plaintiff.

d.    Information and documents relating to DOJ and FBI officials' awareness
      and perception of, and responses to, Trump's tweets, including but not
      limited to his tweets on December 23, 2017, at 3:27 p.m. and 3:30 p.m.:

      •  "How can FBI Deputy Director Andrew McCabe, the man in
         charge, along with leakin' James Comey of the Phony Hillary
         Clinton investigation (including her 33,000 illegally deleted
         emails) be given $700,000 for wife's campaign by Clinton
         Puppets during investigation?" . . .

      •  "FBI Deputy Director Andrew McCabe is racing the clock to
         retire with full benefits. 90 days to go?!!!"

      . . . .

e.    Information and documents relating to whether [President] Trump or
      [Attorney General] Sessions asked [Director] Wray to fire Plaintiff at
      any time(s). . . .

. . . .

h.      Information and documents relating to . . . why [Deputy Attorney General Rosenstein] did not exercise final decision-making authority despite Candice Will's understanding that he would . . . .

i.      Information and documents relating to penalties imposed on government employees after OIG issued findings substantiating charges of "lack of candor" against those other employees, including whether or not any such employees were permitted to retire before a penalty was imposed . . . .

j.      Information and documents showing that OIG investigations and Defendants' disciplinary proceedings for "lack of candor" need not be accelerated to completion before the subjects of those proceedings are able to retire . . . .

Dkt. 27-1 at 3–7 (Husain Decl. ¶ 10).  Plaintiff's counsel also seeks the opportunity to obtain

discovery "relating to Plaintiff's January 2018 demotion, including the appointment and service

of David Bowdich as FBI Deputy Director or 'Acting' Deputy Director beginning on January 29,

2018," and other evidence relating to whether Plaintiff was demoted in January 2018, as he

contends, or whether he remained Deputy Director until his termination, as Defendants contend.

*Id.* at 8–9 (Husain Decl. ¶ 11).

Under Rule 56(d), this declaration suffices to preclude the entry of summary judgment.  It

"outline[s] the particular facts [the party] intends to discover" with respect to Plaintiff's First

Amendment claims, and those facts, including Defendants' subjective motivations and

knowledge, are clearly "necessary to the litigation." *Convertino*, 684 F.3d at 99.  Moreover,

because these facts relate to the subjective motivations of Defendants and include

communications to which Plaintiff was not privy, Plaintiff could not have offered them himself

in response to Defendants' pre-discovery motion for summary judgment.  *See id.* at 99–100.

Finally, the information that Plaintiffs seeks "is in fact discoverable" through typical civil

discovery.  *Id.* at 100.

24

Defendants respond that "[a] Rule 56(d) request is properly denied where the requesting party has offered only a conclusory assertion without any supporting facts to justify the proposition that the discovery sought will produce the evidence required," Dkt. 31 at 13 (quotation marks omitted), and, here, Plaintiff offers no reason to believe that Attorney General Sessions—as opposed to President Trump—was motivated by Plaintiff's "perceived political affiliation," *id.* at 14, and no reason to doubt that the Attorney General acted solely because of Plaintiff's lack of candor, *id.* at 20. Without providing some opportunity for discovery, however, the Court cannot foreclose the possibility that Attorney General Sessions felt overwhelming pressure from President Trump to take punitive action against Plaintiff (based on the President's belief regarding Plaintiff's political affiliation and personal loyalty) and that, to avoid angering or disappointing the President, he fired Plaintiff late on a Friday night before Plaintiff could voluntarily retire and receive all of his accrued benefits.

Finally, without citing any authority, Defendants contend that the "cat's paw" theory of liability—which posits liability for a decisionmaker influenced by another official who was motivated by an improper motive, *see, e.g.*, *Noisette v. Lew*, 211 F. Supp. 3d 73, 94 (D.D.C. 2016)—ought not be extended "to a Cabinet Secretary acting under an oath to uphold the Constitution," Dkt. 31 at 20 n.5. But that argument ignores the fact that *all* federal officials take an oath to uphold the Constitution and that *no one* is entitled to an irrebuttable presumption of virtue under the law. Defendants might ultimately show that the Attorney General was not swayed by the President's tweets and comments, but Plaintiff is entitled to test his claim of improper influence through discovery and the usual rules of civil litigation.

For all of these reasons, the Court concludes that Defendants' motion for summary judgment with respect to Plaintiff's First Amendment claims is premature and will, accordingly, deny the motion without prejudice.[3]

## C.    Due Process Claims

Plaintiff asserts two claims under the Fifth Amendment's due process clause:  Count One claims that his termination was a legal nullity or, in the alternative, was *ultra vires* such that the deprivation of his employment-related rights, including his retirement benefits, violated the due process clause.  Dkt. 1 at 36 (Count I).  The termination was a nullity, according to Plaintiff, because: (1) he completed his work obligations at 5:00 p.m. on Friday, March 16, 2018, and was

---

[3]  Defendants argue for the first time in their reply brief that Plaintiff lacks Article III standing to pursue his First Amendment claim based on his alleged demotion from his position as Deputy Director.  Dkt. 31 at 15.  According to Defendants, "Plaintiff's personnel documents [do not] reflect" that he was "demot[ed] . . . [but instead] reflect that he was the FBI's Deputy Director at the time he was removed."  *Id.*  As a result, Defendants say, Plaintiff cannot obtain the equitable relief he seeks—an order requiring Defendants to "expunge Plaintiff's personnel file of all records related to Defendants' unconstitutional demotion."  Dkt. 1 at 47 (Compl. ¶ 194).  There is simply "no record [of demotion] to expunge."  Dkt. 31 at 15.

Plaintiff disagrees.  In his view, there is indeed a record that can be expunged from his personnel file: the OIG Report that evidences his demotion.  Dkt. 27 at 30 ("[T]he February 2018 OIG Report's title says Plaintiff was [the] Former FBI Deputy Director" (quotation marks omitted)); *id.* (OIG report "states that Plaintiff held the position of Deputy Director 'until January 29, 2018'" (quoting Dkt. 27-30 at 19 (Pl's Resp. Defs' SUMF ¶ 1))).  On the present record, the Court cannot determine whether the OIG Report is part of Plaintiff's personnel file or whether it can be redacted in a manner that would redress Plaintiff's alleged injury.  As a result, and mindful of the pre-discovery posture of Defendants' motion, the Court is persuaded that Plaintiff has done enough to allege Article III standing at this early juncture of the case.  That conclusion may change, of course, if, after discovery, Plaintiff cannot adduce evidence that his "personnel file" contains the OIG Report or other records "related to Defendants' unconstitutional demotion and termination decisions."  Dkt. 1 at 47 (Compl. ¶ 194).  Significantly, "standing is not dispensed in gross," *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted)—a plaintiff must establish at it at each "successive stage[] of the litigation," *Lujan*, 504 U.S. at 561, "for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and "for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).

thus "deemed to have been employed for the full pay period," which did not end until Saturday; (2) under DOJ Order 1202, only Director Wray was authorized to fire him; (3) Attorney General Sessions was recused from the investigation of any matter related in any way to the 2016 presidential campaigns, and he thus lacked to power to terminate or discipline Plaintiff; (4) the memorandum that Attorney General Sessions signed late in the evening on March 16, 2018 did not specify an effective date for Plaintiff's purported termination; and (5) the email that Plaintiff received late that evening stated only that the Attorney General believed that Plaintiff "'should be' removed" but did not specify the reasons for his termination or set an effective date.  *Id.* at 37–39 (Compl. ¶¶ 148–56).

Count Two of the Complaint alleges that Plaintiff was terminated pursuant to "sham and accelerated proceedings" that failed to comply with required procedures and policies in violation of his Fifth Amendment right to procedural due process.  *Id.* at 39 (Count II).  He alleges, in particular, that Defendants (1) ignored the established processes in order to accelerate his termination; (2) deprived him of a meaningful opportunity to respond to the charges against him; (3) failed to provide him with the thirty days' notice before termination to which he was entitled; (4) did not provide him with seven days to evaluate the evidentiary record upon which his removal was premised; (5) conducted a sham proceeding designed to implement President Trump's desire to fire him before his benefits fully vested; (6) "violated the FBI's longstanding administrative policies and practices," which "explicitly contemplate that an employee subject to a personnel inquiry might instead submit his or her resignation rather than see the inquiry continue," and (7) deprived Plaintiff of his "protected liberty interest in his reputation, in violation of the Fifth Amendment."  *Id.* at 39–42 (Compl. ¶¶ 157–69).  Above all else, the proceeding was unfair and inconsistent with due process, in Plaintiff's view, because "[i]n truth

and in fact, the sole decision-maker concerning Plaintiff's termination was [President] Trump, whose decision was made and finalized before Defendants ever commenced their pretextual termination process." *Id.* at 41 (Compl. ¶¶ 164).

Faced with this long list of allegations, Defendants offer their own, equally lengthy list of responses.  They move to dismiss or for summary judgment on the grounds that: (1) Plaintiff lacked any protected property interest in his continued employment or retirement benefits and any tarnish to his reputational interest was premised on a "solid foundation;" (2) Plaintiff waived any argument that Attorney General Sessions was personally biased; (3) the Attorney General was not recused from the proceeding and was an appropriate decisionmaker; (4) Plaintiff has not, in any event, stated a plausible claim of bias; (5) Plaintiff had adequate time to respond to the notice of proposed removal; and (6) Plaintiff failed to plead a substantive due process claim and, even if he did, the Complaint fails to allege facts sufficient to state a substantive due process claim.[4]

---

[4] "Plaintiff contends that Defendants' motion [as to Plaintiff's due process claims] should be treated as seeking solely summary judgment as to his due process claims—not dismissal under Rule 12(b)(6)—because it relies on documents outside the pleadings." Dkt. 31 at 12.  But "[i]n weighing a motion to dismiss, a court may consider . . . any documents either attached to or incorporated in the complaint." *Mills v. Hayden*, 284 F. Supp. 3d 14, 17 (D.D.C. 2018) (quotation marks omitted).  Those are precisely the documents on which Defendants rely here. Dkt. 31 at 12–13.  Defendants are therefore entitled to have their motion treated as one seeking both dismissal and summary judgment.

With that said, "[w]hen considering [a complaint's] incorporation [of documents], it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133–34 (D.C. Cir. 2015) (quotation marks omitted).  Here, it strains belief that Plaintiff, who alleges the DOJ investigation was pretext for a politically-motivated and ultra vires removal, would attach or incorporate documents purporting to legitimatize his removal with the intention that they be taken to be true for purposes of the pleading stage.  Thus, the Court will not take as true every statement contained in the documents on which Defendants' rely that the Complaint incorporates.  Dkt. 31 at 12–13 (listing documents).

For present purposes, the Court need not resolve each and every dispute between the parties but, instead, must determine whether one or both of Plaintiff's due process claims—his claim that his termination was, in fact, a nullity, and his claim that, even if he was removed, the process was both a "sham" and illegally rushed—should be dismissed.  If either claim can be sustained on any of the theories Plaintiff proffers, the Court can—and should—leave for another day the question whether each of Plaintiff's asserted grievances would suffice.  *See Cavalier v. Catholic Univ.*, 306 F. Supp. 3d 9, 27 (D.D.C. 2018) (denying a motion to dismiss because at least one set of facts in Plaintiff's Complaint gave rise to a plausible claim to relief).

1.   *Protected Property Right or Liberty Interest*

In addressing whether Plaintiff has asserted an interest sufficient to trigger protection under the due process clause, the parties treat Counts One and Two together, recognizing that Plaintiff must establish that he was deprived "life, liberty, or property" to prevail on either Count.  *See, e.g.*, *Dodson v. U.S. Capitol Police*, 2019 WL 4860720, at *5 (D.D.C. Sept. 30, 2019) ("To prevail on [a] procedural due process claim, the plaintiff must first show a deprivation of 'life, liberty, or property' and must then show that 'the procedures used by the Government in effecting the deprivation [did not] comport with due process of law.'" (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014))); *George Washington Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) ("The [plaintiff's] primary challenges sound in substantive due process.  Although that doctrine normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest."); *see also Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007).

Defendants maintain that Plaintiff lacked a protected property interest in his continued employment with the FBI and in his retirement benefits, Dkt. 23 at 24–26, which include "his law enforcement pension and health insurance," Dkt. 1 at 5 (Compl. ¶ 9).  With respect to his continued employment, Defendants observe that a government employee lacks a constitutionally protected interest in his job if he serves "at his employer's 'will'" and can be removed without "'cause.'"  *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008).  Plaintiff does not take issue with that premise.  But the parties disagree about whether Plaintiff was an at-will employee.  In Defendants' view, "Plaintiff did not enjoy for-cause removal protection" because the CSRA, with certain exceptions not applicable here, excludes FBI employees from its for-cause removal protections.  Dkt. 23 at 24 (citing 5 U.S.C. § 7511(b)(8) ("This subchapter does not apply to an employee . . . whose position is within . . . the Federal Bureau of Investigation . . . .").  As Defendants observe, courts have rejected due process challenges brought by former FBI employees for this just this reason.  *See Lamb v. Holder*, 82 F. Supp. 3d 416, 424–35 (D.D.C. 2015); *Mack v. United States*, 814 F.2d 120, 123 (2d Cir. 1987).

Plaintiff responds that Defendants' argument overlooks two other statutes, which extend for-cause removal protection to members of the FBI's Senior Executive Service ("FBI SES").  Dkt. 27 at 46.  The first of those statutes, 5 U.S.C. § 3151(a)(5)(D), provides that "[t]he Attorney General may by regulation establish a personnel system for senior personnel within the Federal Bureau of Investigation" and specifies that "[t]he regulations establishing the [FBI SES] shall . . . provide for . . . removal or suspension consistent with subsections (a), (b), and (c) of section 7543 (except that any hearing or appeal to which a member of the [FBI SES] is entitled shall be held or decided pursuant to procedures established by regulations of the Attorney General)."  The second statute, 5 U.S.C. § 7543(a), provides that, "[u]nder regulations prescribed by the

Office of Personnel Management, an agency may take an action covered by this subchapter against an employee only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."  Section 7543 also provides certain procedural protections which, in turn, appear "almost verbatim on page 16 of the FBI SES Policy."  Dkt. 27 at 46.  According to Plaintiff, these statutes authorize the Attorney General to create the FBI SES and, should he do so, require him to promulgate regulations extending to the FBI SES the for-cause removal restrictions contained in § 7543.  That limitation on the Attorney General's removal authority, Plaintiff argues, is sufficient to create a property interest in continued employment.

At least on the present record, the Court agrees that the combination of 5 U.S.C. §§ 3151(a)(5)(D) and 7543 require good cause to remove a member of the FBI SES and that this protection is sufficient to create a property interest.  Defendants offer only one response to Plaintiff's argument, and that response is unconvincing.  Although conceding that 5 U.S.C. § 7543 creates a property interest for covered employees, Defendants argue that § 7543 differs from the FBI SES Policy adopted by the Attorney General in one dispositive respect: "Section 7543 states that '[a]n agency may take an action covered by this subchapter against an employee *only* for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function,'" while "the FBI's SES Policy omits the word 'only,'" and, instead, provides that an "[a]ction may be taken against a member of the SES for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."  Dkt. 31 at 26–27.

That argument fails for several reasons.  First, and most importantly, it ignores the text of the governing statutes.  Section 3151(a)(5)(D) is, in fact, mandatory—although the Attorney

General was not required to establish an FBI SES, if he elected to do so, he was required (the statute says "shall") to provide for removal "consistent with subsections (a), (b), and (c) of section 7543." 5 U.S.C. § 3151(a)(5)(D).  Nor can there be any mistake that Congress intended to include for-cause removal protection.  In cross-referencing § 7543, Congress made specific reference to § 7543(a), and that paragraph does only one thing—it provides for-cause removal protection, using the word "only," which, under Defendants' own view of the law, unambiguously precludes at-will removal.

Second, Defendants misread the governing provision of the FBI SES Policy.  To be sure, the Policy omits the word "only."  But it does not, as Defendants suggest, replace that term with the word "may."  To the contrary, the Policy tracks § 7543 in essential respects.  Both the Policy and the statute provide that agency "may" take an action against a covered employee for one of the enumerated forms of misconduct or neglect.  That is, both use the word "may" to convey that the agency is not required to take an adverse action.  Both then list the circumstances under which the agency "may" take such an action.  To be sure, the statute includes the word "only" before the list of covered misconduct and the Policy does not.  But, when read in light of § 3151(a)(5)(D)'s command that the governing regulations comport with § 7543(a), one cannot plausibly read the Policy to provide that a member of the FBI SES "may" be removed for one of the listed forms of misconduct or neglect and, by the way, for any other rationale that might occur to the deciding official (or for no reason at all).  After all, *expressio unius est exclusio alterius*.

Third, this reading of the Policy is consistent with Supreme Court precedent.  Just last term in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), the Court considered the constitutionality of a statutory provision similar to the SES policy here:

"The President," the CFPB's governing statute provided, "*may* remove the [CFPB's] Director for inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c)(3) (emphasis added).  There, like here, the word "only" was missing.  *Id.*  But despite the use of "may" and the absence of "only," the Supreme Court held that § 5491(c)(3) nevertheless delineated the exclusive categories of conduct for which the CFPB director could be removed.  *See Seila Law*, 140 S. Ct. at 2193 ("The [CFPB] Director serves for a term of five years, during which the President may remove the Director from office *only* for 'inefficiency, neglect of duty, or malfeasance in office.'" (emphasis added) (quoting 12 U.S.C. § 5491(c)(3))).

The *Seila* decision was hardly breaking new ground:  The Supreme Court made the same point eighty-five years earlier in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).  At issue in *Humphrey's Executor* was whether "the provisions of section 1 of the Federal Trade Commission Act, stating that 'any commissioner *may* be removed by the President for inefficiency, neglect of duty, or malfeasance in office', restrict[ed] or limit[ed] the power of the President to remove a commissioner except upon one or more of the causes named."  *Humphrey's Ex'r*, 295 U.S. at 619 (1935) (quoting 15 U.S.C. § 41) (emphasis added).  "Yes," the Court unanimously concluded, "the intent of the act [wa]s to limit the executive power of removal to the causes enumerated," missing "only" notwithstanding.  *Id.* at 626, 632.  "The words of the act [were] definite and unambiguous."  *Id.* at 623.  So they are here.[5]

---

[5]  The Supreme Court has embraced a similar reading of removability clauses elsewhere.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010) (interpreting statute providing that "[a] member of the Board *may* be removed. . . for good cause shown," 15 U.S.C. § 7211(e)(6) (emphasis added), to mean that Board members can be removed "*only* for good cause" (emphasis added) (quotation marks omitted)); *see also Seila*, 140 S. Ct. at 2201 n.4 (declining dissent's invitation to "ignore the reasoning of *Humphrey's Executor*").

Defendants also argue that Plaintiff cannot show that he has a protected property interest in his retirement benefits, Dkt. 23 at 25–26, but that argument fails for the same reason that the preceding argument fails.  According to Defendants, Plaintiff "did not satisfy the requirements for entitlement to [his] law-enforcement officer annuity because he was not employed as a law enforcement officer 'after becoming 50 years of age and completing 20 years of service,'" and as a result, "he has no protected property interest in the annuity." *Id.* at 25.  That argument, however, turns on the premise that Plaintiff was lawfully removed hours before his retirement benefits vested.  But if Plaintiff can show that he had a property interest in his continued employment and that he was unlawfully terminated, his termination might be treated as a nullity and, if so, his retirement benefits might have vested.  It is too early in the litigation to decide whether Plaintiff can clear these hurdles, but it is also too early to pretermit his efforts to do so.

Defendants' contention that Plaintiff cannot show that he had a protected property interest in his retirement benefits fails—at least at this stage of the proceeding—for a second reason as well:  Defendants' argument is premised on at least one disputed fact.  Plaintiff contends that his purported termination from the FBI late on the evening of March 16, 2018 came too late to deprive him of his retirement benefits.  Dkt. 27 at 39.  He alleges that at 5:00 p.m. on March 16, 2018, he "fulfilled his final week of service with the FBI and retired from the agency.  The FBI charged Plaintiff's accrued leave account for a full week of leave time, confirming that [it] deemed Plaintiff to have been employed for the entire week preceding his retirement."  Dkt. 1 at 32 (Compl. ¶ 125); *see also id.* at 10 (Compl. ¶ 36) (alleging that because Plaintiff's date of eligibility for retirement benefits "would fall during a weekend, Plaintiff's last day of service was scheduled for Friday, March 16, 2018").  In his opposition brief, Plaintiff also cites to his own declaration and agency manuals to show that the administrative workweek at the

FBI runs from Monday morning to close of business (at 5:00 p.m.) on Friday.  Dkt. 27 at 39–41.
This is significant, he explains, because federal agencies "'deem[]'" individuals "'employed for a
full biweekly pay period if [they] [are] employed during the days within that period, exclusive of
holidays and nonworkdays . . . which fall within [their] basic administrative workweek.'"  *Id.* at
39 (emphases omitted) (quoting 5 U.S.C. § 6302(b)).  And, if Plaintiff reached retirement before
Attorney General Sessions purported to terminate him, his property interest in his retirement
benefits indisputably vested.

Defendants counter by arguing that "[a]n FBI Agent's day does not stop at 5 p.m., even
on a Friday," and, in support of that contention, they point to "[t]he FBI's Special Agent Hiring
Policy Guide," which explains that "'[a]pplicants must be advised that [Special Agents] are
expected to be available for duty at all times, based upon the needs of the FBI,'" and to the FBI
website, which asserts "that 'FBI Special Agents must . . . [w]ork a minimum of 50 hours a
week, which may include irregular hours, and be on call 24/7, including holidays and
weekends.'"  Dkt. 31 at 30–31 (quoting Federal Bureau of Investigation, *Special Agent Selection
Process: All you Need to Know to Apply*, https://www.fbijobs.gov/sites/default/files/how-to-
apply.pdf (last visited Sept. 23, 2020, 7:12 PM)).  The fact that the FBI gave Plaintiff credit for
accrued leave pursuant to § 6302(b) carries no weight, according to Defendants, because that
statute "is focused solely on leave accrual, and . . . does not establish a general rule for work
hours at the FBI."  *Id.* at 31.

Putting aside Plaintiff's reliance on § 6302, the parties have briefed the question of when
Plaintiff completed his "tour of duty" for purposes of the vesting of his retirement benefits as a
question of fact.  *Id.* at 30.  Both point to FBI policies, statements, and manuals, and both draw
competing conclusions from those materials.  To take one example, in response to Defendants'

contention that all FBI agents—including those in senior management positions—are on call "24/7" and that the workweek does not end at 5:00 p.m. on Friday evening, Plaintiff contends that he was on "pre-approved terminal leave," was "no longer serv[ing] in a duty status," and thus was not "on duty" at the time of his removal.  Dkt. 32-1 at 6 (Ex. A) (emphases omitted). Framed in this manner, the Court can only conclude that Defendants' motion turns on a disputed issue of fact and is, accordingly, premature.

Defendants also challenge Plaintiff's alternative theory that Defendants interfered with his protected liberty interest in his reputation.  Dkt. 1 at 39, 41–42 (Compl. ¶¶ 156, 166, 169). "In this circuit, a plaintiff may avail himself of two different legal theories to establish a reputation-based due-process violation." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016).  "The first, commonly called a 'reputation plus' claim, requires 'the conjunction of official defamation and [an] adverse employment action.'"  *Id.* (quoting *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998).  A plaintiff pursing such a claim must demonstrate that: (1) "the government's defamation resulted in a harm to some interest beyond reputation," like the "[l]oss of present or future government employment;" and (2) "the government has actually stigmatized his or her reputation by, for example, charging the employee with dishonesty, and that the stigma has hampered future employment prospects."  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985).

The "second option is to pursue what is known as a 'stigma plus' theory," *Jefferson*, 170 F. Supp. 3d at 205, which "differs from [a reputation-plus claim] in that it does not depend on official *speech*, but on a continuing stigma or disability arising from official *action*."  *O'Donnell*, 148 F.3d at 1140 (emphases added).  "In other words, where a 'reputation plus' theory requires some form of defamatory or stigmatizing speech by the government, the [stigma-plus theory]

36

depends only on governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'" *Jefferson*, 170 F. Supp. 3d at 205 (quoting *O'Donnell*, 148 F.3d at 1140).

Plaintiff does not specify which type of claim he is bringing and devotes strikingly little of his briefing to establishing that he has a sufficient property or liberty interest in his reputation. *See, e.g.*, Dkt. 27 at 37–38 n.14.  Defendants' responses to Plaintiff's allegations are similarly anemic.  Both of Defendants' principal arguments—that the "statements about Plaintiff's misconduct rest[ed] on a solid foundation" and that "[Plaintiff] has not been sidelined by his removal," Dkt. 23 at 26—involve questions of disputed fact that cannot be resolved at this juncture.  For present purposes, the Court expresses no view on whether Plaintiff retains a cognizable property interest in his reputation and merely holds that Defendants have not carried their burden of showing that the claim fails at this early stage of the proceeding.

Finally, Defendants correctly observe that Plaintiff's substantive due process claim requires more than a property interest; it requires a "*significant* property interest[]."  Dkt. 31 at 12 (emphasis added); *see also Fuentes v. Shevin*, 407 U.S. 67, 86 (1972); *Tri Cty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997).  Defendants contend that Plaintiff's interests here are not significant because substantive due process simply "does not protect property interests in public employment."  Dkt. 31 at 25 (collecting cases).  But Defendants misread the caselaw on which they rely.  The D.C. Circuit's decision in *American Federation of Government Employees, AFL-CIO v. United States*, 330 F.3d 513 (D.C. Cir. 2003), does not question that government employment can, at least at times, constitute a property interest protected by substantive due process.  To be sure, the decision held that such a property interest is not "fundamental" and thus does not trigger strict scrutiny; the court, accordingly, applied

rational basis scrutiny in considering the plaintiff's substantive due process claim. *Id.* at 523. Nothing in the parties' briefing, however, turns on the level of constitutional scrutiny applicable in this case. For now, the question is merely whether Plaintiff's property interest in his continued employment with the FBI and in his retirement benefits qualifies as "significant."

Turning to that question, the Court is unpersuaded—at least at this early stage of the proceedings and on the existing record—that Plaintiff's substantive due process claim fails to clear this hurdle. First, although the caselaw on whether a particular property interest is significant for purposes of substantive due process is undeveloped, the procedural due process caselaw makes clear that "the significance of the private interest in retaining employment cannot be gainsaid." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985); *see also Thompson v. District of Columbia*, 428 F.3d 283, 287 (D.C. Cir. 2005) (a career employee at the District of Columbia Lottery Control Board retained "significant interest in continued employment"); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir. 2003) ("A public employee has a [protected] property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge."); *James v. City of Houston, Texas*, 2002 WL 31114951, at *7 (5th Cir. Sept. 12, 2002) (assistant director at Department of Health and Human Services in Houston "had a significant interest in continued employment"); *Edelman v. W. Airlines, Inc.*, 892 F.2d 839, 848 (9th Cir. 1989); *Baxter v. Anello*, 2007 WL 925766, at *4 (W.D.N.Y. Mar. 26, 2007) ("[I]t is clear that a public employee's interest in continued employment . . . constitutes a significant property interest for purposes of the Fourteenth Amendment."). The parties do not address whether, and to what extent, a significant

property interest in the procedural due process context qualifies as a significant property interest in the substantive due process context.[6]

Much is the same for Plaintiff's property interest in his retirement benefits. It is true that the Supreme Court has recognized that the due process clause's "protection of property . . . has been read broadly to extend protection to statutory entitlements," *Shevin*, 407 U.S. at 86, and that here, Plaintiff's right to receive an annuity upon completion of a certain tenure at the FBI is expressly guaranteed by statute, 5 U.S.C. § 8412(d)(2). It is also true that Plaintiff alleges that he was deprived of substantial property itself—his "*full* retirement benefits . . . and health insurance." Dkt. 1 at 5 (Compl. ¶ 9) (emphasis added). But Plaintiff does not explain what he means by this—did he lose all of his retirement benefits, most of them, or a small portion of them? Did he lose a portion or all of his health insurance? The answer to these questions is important because a small loss might fail to qualify as a significant property interest. *Cf. Fox v. District of Columbia*, 851 F. Supp. 2d 20, 34 n.18 (D.D.C. 2012) (suggesting, in the procedural due process context, that a loss of $35 is not a significant property interest). The Court recognizes, of course, that many individuals commonly depend on retirement benefits and health insurance to obtain the necessities of life after their working years. But neither party has established that Plaintiff is (or is not) one of these individuals. As a result, it is again too early to

---

[6] Defendants, for example, while arguing that Plaintiff's property interest is not significant, cite decisions that instead address whether interests in government employment are "fundamental." Dkt. 31 at 25 (citing *Am. Fed'n*, 330 F.3d at 523; *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 341 (D.D.C. 2018); *Am. Fed'n of Gov't Employees, Local 2741 v. District of Columbia*, 689 F. Supp. 2d 30, 36 (D.D.C. 2009); *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 71 (D.D.C. 2007); *Winder v. Erste*, 511 F. Supp. 2d 160, 182 (D.D.C. 2007), *aff'd in part, rev'd in part and remanded*, 566 F.3d 209 (D.C. Cir. 2009)). Plaintiff, for his part, fails to distinguish between protected property interests in the procedural due process context and the limited subset of significant property interests that substantive due process protects. Dkt. 27 at 46–47, 51–52.

conclude that Plaintiff's property interest in his retirement benefits is insignificant.  The Court

therefore cannot reject Plaintiff's substantive due process claim based solely on the significance

of the property interest that it seeks to protect.

        2.       *Procedural Due Process Claims*

        Defendants maintain that Plaintiff's procedural due process claims fail because:

(1) Plaintiff waived the argument that Attorney General Sessions was personally biased;

(2) Attorney General Sessions was not recused and was the appropriate decisionmaker;

(3) Plaintiff has not plausibly alleged that Attorney General Sessions was biased; and

(4) Plaintiff had ample time to respond to the charges against him.  Dkt. 23 at 23–35.

        Plaintiff responds that his claim does not turn on an allegation that the Attorney General

was actually biased, Dkt. 27 at 43; rather, he alleges that the Attorney General was already

recused and thus without power to act, and that the DOJ proceedings were a "sham" because:

(1) "the sole decision-maker concerning Plaintiff's termination was [President] Trump, whose

decision was made and finalized before Defendants ever commenced their pretextual termination

process;" and (2) Defendants unreasonably accelerated the termination policy in order to satisfy

the President's professed "desire[]" to remove Plaintiff before he could retire.  Dkt. 1 at 41

(Compl. ¶ 164).

        For present purposes, the Court need not reach the question whether Attorney General

Sessions lacked authority to act because Plaintiff's alternative theory suffices to state a claim.

Under that theory, the President's attacks on Plaintiff—including his assertion that Plaintiff was

"racing the clock to retire with full benefits[] 90 days to go?!!!", *id.* at 27 (Compl. ¶ 104)—

infected the process and left senior DOJ management with only one palatable option: to remove

Plaintiff before the ninety days expired.  In other words, Plaintiff does not contend that Attorney

General Sessions was personally biased against him but, rather, alleges that the President wanted Plaintiff gone before his retirement benefits vested, and the Attorney General followed what he would have understood to be an unmistakable direction from his boss.  The question before the Court is not whether Plaintiff's factual allegations are correct but only whether he has alleged a plausible claim that raises a disputed issue of material fact.  *Anderson*, 477 U.S. at 247; Fed. R. Civ. P. 56(a).  Plaintiff easily clears that modest hurdle.

Plaintiff states a procedural due process claim for a second reason as well:  He plausibly alleges that he was not provided sufficient time to review the relevant materials and to present his defense.  Dkt. 1 at 31–32, 40 (Compl. ¶¶ 120–25, 161–62).  "The essential requirements of due process," the Supreme Court has explained, "are notice and an opportunity to respond." *Loudermill*, 470 U.S. at 546.  These requirements are "flexible"—"procedural protections" wax and wane "as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Thus, a plaintiff may receive sufficient due process even if, for example, he "desire[s] a greater opportunity to present [his] case than the limited nature of the [agency] hearing provided." *Louisiana Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.*, 958 F.2d 1101, 1115 (D.C. Cir. 1992).  In *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of Judicial Conference of the United States*, 83 F. Supp. 2d 135, 168 (D.D.C. 1999), *aff'd in part, vacated in part*, 264 F.3d 52 (D.C. Cir. 2001), for example, this Court held that a plaintiff received sufficient process despite "enjoy[ing] less than two weeks to prepare his response" to a "159-page final [r]eport" accusing him of judicial misconduct.

Plaintiff and Defendants each contend that they have the better of the due process argument, and accordingly, both point to a number of decisions that, they say, compel a finding that the process here was enough (in Defendants' view) or not enough (in Plaintiff's).  *Compare*

Dkt. 23 at 33–34 *with* Dkt. 27 at 53 n.23.  But this "battle of the string citations can have no

winner." *Smith v. Wade*, 461 U.S. 30, 93 (1983) (O, Connor, J., dissenting).  That is because the

question here—whether the process afforded was the process due—turns on the facts.  Due

process requires not just notice, but *meaningful* notice.  *Bellagio, LLC v. N.L.R.B.*, 854 F.3d 703,

712 (D.C. Cir. 2017).  And the gravamen of the parties' dispute is just that: was Plaintiff, in

practice, given sufficient time to respond to charges against him?

Plaintiff says he was not.  In his view, he "and his counsel were given hardly any time to

review key pieces of essential evidence," including "exculpatory evidence" that Plaintiff alleges

was withheld from him "until the eve of his termination hearing."  Dkt. 1 at 31 (Compl. ¶ 120).

Plaintiff alleges that "[t]he record consisted of over 1,000 pages of materials, and [that he] and

his counsel [were] given only four business days to review the materials, prepare for a hearing

. . . and draft a written response."  *Id.* (Compl. ¶ 121).  Finally, Plaintiff claims that "Defendants

kept producing documents in a piecemeal fashion as late as the morning of the hearing."  Dkt. 27

at 54.

In response, Defendants argue that "Plaintiff learned of the conclusions underlying the

notice of proposed removal weeks before the notice was delivered to him," Dkt. 23 at 32; "the

notice of proposed removal spanned only 15 substantive pages," *id.* at 33; and that the "seven

days" Defendants gave Plaintiff "to respond to the notice of proposed removal" were

constitutionally sufficient, *id.* at 34; *but see id.* at 33 (Defendants acknowledging that

"[r]esponding to a 15-page document in a week might be a burdensome task for a team of

experienced attorneys").  Defendants, however, neither address their purported delay in turning

over evidence nor refute Plaintiff's allegation that he was denied timely access to crucial portions

of the administrative record.  *Id.* at 32–35; Dkt. 31 at 37.

At this point, then, the Court is faced with a factually laden claim that can neither be dismissed nor summarily adjudged.

3.      *Substantive Due Process*

Plaintiff also alleges that Defendants violated his substantive due process rights by arbitrarily and without authority depriving him of his full retirement benefits.  Dkt. 27 at 37, 44–45.  As the Supreme Court has observed, the guarantee of substantive due process "[i]s intended to prevent government officials from abusing [their] power[] or employing it as an instrument of oppression."  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotation marks omitted); *see also Robinson v. District of Columbia.*, 736 F. Supp. 2d 254, 261 (D.D.C. 2010).  As a result, "the doctrine of substantive due process constrains only egregious government misconduct," *George Washington*, 318 F.3d at 209, for example, "an act of 'grave unfairness'" or "'a deliberate flouting of the law that trammels significant personal or property rights,'" *American Federation of Government Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007) (quoting *Tri County*, 104 F.3d at 459).  By contrast, "[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of offic[i]al duties, do not warrant redress."  *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

Defendants argue that Plaintiff's substantive due process claim fails for two reasons.  First, they contend that Plaintiff's Complaint refers only to due process generally, not to substantive due process specifically.  Dk. 31 at 23.  This argument fails for two reasons.  First, although the Complaint does not use the phrase "substantive due process," neither does it use the phrase "procedural due process."  On Defendants' logic, then, the Complaint fails to allege a procedural *or* a substantive due process claim.  To be sure, procedural due process claims are more common than substantive due process claims.  But that is no reason to construe the

43

Complaint, which fails expressly to invoke either doctrine, to state only a procedural due process claim. Dkt. 1 at 6, 37, 39 (Compl. ¶¶ 11, 149).  Second, the Complaint succeeds in alleging a substantive due process claim despite failing to use that label.  The Complaint alleges that Plaintiff's termination was "ultra vires," *id.* at 37, 39 (Compl. ¶¶ 149, 156), recurrently alleges that Attorney General Sessions was without authority to fire Plaintiff, *id.* at 38–39 (Compl. ¶¶ 153–55), and notes that Attorney General Sessions suffered from "conflicts of interest and recusals" that should have prevented or disabled him from terminating Plaintiff, *id.* at 38 (Compl. ¶ 155).  This is sufficient to allege that Defendants "deliberate[ly] flout[ed] . . . the law [in a manner] that trammel[ed] significant personal or property rights.'"  *Nicholson*, 475 F.3d at 353 (quotation marks omitted).

For much the same reason, Defendants' second argument against Plaintiff's substantive due process claim fares no better.  Defendants contend (for the first time in their reply brief) that even if Plaintiff had pled a substantive due process claim, that claim would fail because Defendants did not engage in any "conscience-shocking" conduct.  But conscience-shocking conduct is, as explained, not the only way of establishing a substantive due process claim.  *See Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018); *see also Nicholson*, 475 F.3d at 353.  Plaintiff's allegations that, as of 5:00 p.m. on March 16, 2018, he had completed his tour of duty, earned his retirement benefits as a consequence of twenty years of service, and retired from the FBI, only to be denied those benefits against the backdrop of pointed, public denunciation by the President of the United States suggests a plausible claim that

Defendants "deliberately flouted" the law in order to deprive Plaintiff of his retirement benefits. *See Nicholson*, 330 F.3d 513, 523.[7]

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss or, in the alternative, for summary judgment, Dkt. 23, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 24, 2020

---

[7]  As with Plaintiff's procedural due process claim, the Court concludes that, at this juncture, it "need not reach the question whether Attorney General Sessions lacked authority to act because Plaintiff's alternative theory"—namely, that the deprivation of his retirement benefits was the product of wholly arbitrary government action—"suffices to state a claim." *See supra* at 40.